Moreover, as is his right, Defendant Guidry will request that this Honorable Court sequester witnesses during trial. Specifically, Article 615 of the Louisiana Code of Evidence provides in pertinent part:

> On its own motion the court may, and on the request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings...

As a witness, Slater will be subject to the sequestration order requested by the Defendants. It will be very difficult for Slater to represent the Plaintiff in this case and at the same time comply with a sequestration order.

Further, Slater cannot argue that he is exempt from sequestration merely because he is counsel to one or all of the parties to this litigation. Slater cannot accept representation knowing that he is a witness in this case and subject to sequestration and at the same time argue he should be exempt from sequestration. See Exnicios v. Saunders, 448 So. 2d 751 (La. Ct. App. 4th Cir.. 1984) and Lyons v. Lyons, 571 So. 2d 221 (La. Ct. App. 3d Cir. 1990).

As the foregoing discussions and citations indicate, once it is established that Slater is likely to be a necessary witness In this case, he shall not act as an advocate at trial for any of the parties.

Without question, undersigned counsel for the Plaintiff, will be calling Slater to testify at the trial in this matter. Slater's importance and necessity as a witness in this matter is clear: he was a key player in Copeland's attempts to obtain a riverboat gaming license and key player in attempting to derail Guidry's efforts to obtain a riverboat gaming license. He was in communication with important state officials during Guidry's efforts to schedule a licensing hearing.

Slater did not merely draft documents. As previously discussed, this motion is filed prior to the answer. Slater's testimony will not relate to an uncontested issue. Specifically, the issue of whether Copeland would have received a license will be highly contested. The nature and value of legal services rendered by Slater relative to his services rendered to the Plaintiff in this proceeding are not at issue. Defendant, Robert Guidry, points out the distinction between services rendered to a party for the prosecution or defense of a suit, and legal services rendered prior to the suit that are unrelated to the defense or prosecution of a suit. The former, not the

15



latter is what is referred to in the Rules of Professional Conduct. However, the Rules of
Professional Conduct contemplate an exception to the general rule only for testimony regarding
the nature and value of legal services rendered to a party in a suit for the prosecution or defense
of that suit, such as the Plaintiff's legal expenses in prosecuting this suit, and not legal services
rendered prior to the suit that are unrelated to the defense or prosecution of said suit. At the
present time, Plaintiff does not intend to elicit testimony from Slater regarding the nature and
value of his services in the prosecution of the instant suit.

Finally, the Plaintiff cannot argue that disqualification of Slater would work a substantial
hardship upon him. With regard to this third exception "the critical question is whether the
distinctive value of a particular lawyer or his firm as trial counsel is so great that withdrawal
would work a substantial ... hardship upon the client." Gutierrez v. Travelers Insurance
Company, 358 So. 2d 349 (La. Ct App. 4th Cir. 1978). Here, the Plaintiffs cannot show that
disqualification of Slater would work a substantial hardship upon it. There are thousands of
lawyers in this area of the state from which to choose. Likewise, because this motion is filed at
the earliest possible stage, the Plaintiff cannot argue that it would be prejudiced in some manner
by having to change counsel. The Plaintiff cannot argue that it would be a hardship to retain
other counsel because new counsel could not possibly be adequately prepared.

Slater's testimony will not relate to an uncontested issue. Slater's testimony will not
relate to the nature and value of legal services rendered in this case. Disqualifying Slater will not
work a substantial hardship upon the Plaintiff. Accordingly, none of the exceptions to the
general rule are applicable here.

## CONCLUSION

Under the clear mandate of the Rules of Professional Conduct, a lawyer cannot act as
both an advocate and a necessary witness at trial unless an applicable exception can be found. In
the instant case Slater is a necessary witness. Slater was a key player in the events raised by
plaintiff in its petition. As a key player, Slater is a very necessary witness in this action.
Accordingly, the general rule that a lawyer may not act as both an advocate and a necessary
witness applies. Furthermore, Slater's status is not saved by any of the exceptions provided in
the Rules Of Professional Conduct, as none of those exceptions are applicable here. Therefore,
for the foregoing reasons and because the Rules of Professional Conduct have the force and

effect of substantive law, Benjamin R. Slater, III must be disqualified as counsel for the Plaintiff in this matter.

RESPECTFULLY SUBMITTED:

LANNY R. ZATZKIS, T.A. (Bar #13781)
KAREN D. McCARTHY (Bar #14193)
YVETTE A. D'AUNOY (Bar #22761)
ANDREW N LEE (Bar #24154)
ZATZKIS & ASSOCIATES
700 Camp Street
New Orleans, Louisiana 70130
Telephone: (504) 523-2266
Attorneys for Robert Guidry

WINSTON DECUIR (Bar # 04795)
LINDA LAW CLARK (Bar #22305)
1951 Government Street
Baton Rouge, Louisiana 70806
Telephone: (225) 346-8716
Attorneys for Robert Guidry

RALPH CAPITELLI (Bar # 3858)
CAPITELLI & WICKER
1100 Poydras Street
Energy Center Suite 2950
New Orleans, Louisiana 70163
Telephone: (504) 582-2425
Attorney for Robert Guidry

ARTHUR A. LEMANN, III (Bar #8296)
ARTHUR A. LEMANN, III & ASSOCIATES
936 Lafayette Street, Suite 100
New Orleans, Louisiana 70113
Telephone (504) 588-2104
Attorney for Robert Guidry

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing document has been served upon all parties, through counsel of record, via facsimile, hand delivery or U.S. Mails postage prepaid and properly addressed, this ___ day of _September_ 2000.

17

11/23/93

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 400750     DIVISION " "     DOCKET NO.

364.00

AMERICAN INTERNATIONAL GAMING
ASSOCIATION, INC.

# A

VERSUS

THE LOUISIANA RIVERBOAT GAMING COMMISSION
and the
RIVERBOAT GAMING ENFORCEMENT DIVISION
OF THE GAMING ENFORCEMENT SECTION
OF THE OFFICE OF STATE POLICE, PUBLIC SAFETY SERVICES,
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

FILED: _____     _____
                                      DEPUTY CLERK

### PETITION FOR APPEAL OF ACTION TAKEN BY
### THE LOUISIANA RIVERBOAT GAMING COMMISSION
### AND FOR A DECLARATORY JUDGMENT

**NOW INTO COURT,** through undersigned counsel, comes
petitioner American International Gaming Association, Inc.
(hereinafter "AIGA") who respectfully represents:

1.

This suit involves an appeal of action taken by the
Louisiana Riverboat Gaming Commission (hereinafter variously
"Gaming Commission" or "Commission") pursuant to LSA-R.S.
4:548, § 911 of the Gaming Commission Rules, and the Louisiana
Administrative Procedure Act, LSA-R.S. 49:950 et seq.; and a
declaratory judgment action under article 1871, et seq. of the
Louisiana Code of Civil Procedure.

2.

Petitioner AIGA is a Louisiana corporation whose
principal office is located in Jefferson Parish, Louisiana.
AIGA is an applicant seeking authorization to conduct gaming
activities on a riverboat in accordance with the Louisiana
Riverboat Economic Development and Gaming Control Act
(hereinafter "the Act"), LSA-R.S. 4:501, et seq.



**EXHIBIT**

*a*

Made Respondent is the Louisiana Riverboat Gaming Commission, a division of the Louisiana Department of Public Safety and Corrections that was created by the Act at LSA-R.S. 4:510.

4.

Made Respondent is the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, Department of Public Safety and Corrections (hereinafter "Division"), which was created by the Act at LSA-R.S. 4:515. The Division is an indispensable party to all appeals under the Act pursuant to LSA-R.S. 4:556.

5.

Venue for this action is appropriate in East Baton Rouge Parish pursuant to LSA-R.S. 4:506, LSA-R.S. 49:963-64, and Gaming Commission Rule § 911.

6.

Under the Act, the Gaming Commission has the authority to issue rules "providing for and determining the following:"

    (a) The authorized routes of a riverboat upon designated rivers or waterways, the duration of riverboat excursions, and the stops which a riverboat may make.

    (b) The minimum levels of insurance to be maintained by the licensees.

    (c) In consultation with the U.S. Army Corps of Engineers and the U.S. Coast Guard, binding emergency orders regarding the navigability of rivers in the event of extreme weather conditions, acts of God, or other extreme circumstances.

    (d) Specification for the design, appearance, accommodations, and constructions of riverboats, except for designated gaming area surveillance facilities and systems.

    (e) The procedures for negotiable instrument transactions involving patrons, including limits on the circumstances and amounts of the transaction, and the establishment of forms and procedures for negotiable instrument transactions, redemptions, and consolidations.

    (f) Mandatory periodic inspections to assure that a riverboat, licensed under the provisions of this Chapter, is of new construction.

*102*

(g) that preferential treatment is given to Louisiana firms to the extent allowed by law in the procurement of all resources and goods used in the operation of a riverboat come from Louisiana and that a preferential treatment to the extent allowable by law in the awarding of contracts for services and entertainment is given to Louisiana firms and residents.

LSA-R.S. 4:511. The Act also gives the Commission the power to hear and determine certain appeals relating to permits; make an annual report to the Joint Legislative Committee on the Budget; and reject unacceptable rules proposed by the Division. _Id._

7.

The Division, on the other hand, has the authority to "Issue, deny, condition, or restrict licenses and permits" to conduct riverboat gaming activities. LSA-R.S. 4:518(2). The Division may issue no more than fifteen licenses to conduct riverboat gaming activity. LSA-R.S. 4:525.

8.

Pursuant to its rulemaking authorization contained in both the Gaming Control Act and the Administrative Procedure Act, the Gaming Commission promulgated rules and regulations that were published in Volume 19 of the Louisiana Register. These rules were readopted as emergency rules on June 18, 1993, and became finally effective on July 20, 1993. Upon information and belief, a draft version of these rules guided the Commission's actions prior to June 18, 1993.

9.

Gaming Commission Rule § 303 is entitled "Application for Certificate of Preliminary Approval," and provides that "each person seeking approval of riverboat plans" must "submit for advance approval of the Commission an application for a Certificate of Preliminary Approval" (hereinafter a "Certificate").

10.

Each application for a Certificate submitted to the Gaming Commission must contain (1) an Application Form; (2) a

- 3 -

*103*

Detailed . .cement of Proposed Riverb   Operations; (3) a

Feasibility Study; (4) an Economic Development and Utilization

Plan; (5) a Statement of Local Support or Opposition; (6) an

Application and Evaluation Fee; and (7) certain other Requests

and Information.

11.

The official Application Form that the Commission

requires to be submitted as part of an application to obtain a

Certificate mandates identification of "the designated

waterway or waterways upon which the vessel will operate, and

the general area or areas where it is intended the riverboat

will operate and berth." Commission Rule § 303 A. 1.

12.

An Application's "Detailed Statement of Proposed

Riverboat Operations" must contain:

b.   a statement of the total estimated cost of
construction of the riverboat and shore and dock
facilities proposed in the application, as well as
the projected construction schedule for completion
of the riverboat and shore and dock facilities.

c.   a description of planned excursions including
all proposed designated waterways and routes,
frequency and approximate schedule of excursions,
projected passenger load, admission charges, and a
proposed general location of the berth or berths.

d.   a description of proposed support facilities
and services to be provided for each route and each
proposed berth including parking, transportation to
and from the vessel, security employee areas, food
service, and facilities necessary for the safety of
the operation.

Commission Rule § 303 A. 2.

13.

An Application's "Feasibility Study" is required to

discuss "the overall market for riverboat gaming operations

and the effect of the proposed riverboat on the market.   In

addition, the feasibility study shall address possible

competition from other riverboat gaming and other forms of

gaming . . . ." Commission Rule § 303 A. 3.

- 4 -

*104*

14.

An Application's "Statement of Local Support or
Opposition" must contain:

> Any statements of support from the community or
> communities in which applicant intends to operate,
> including any letters of recommendation and, if
> available, letters of no opposition or support from
> businesses which, according to applicant's
> feasibility study, might be affected by applicant's
> operation of the riverboat. The applicant shall
> also list any organized opposition to its proposed
> actions.

15.

Gaming Commission Rule § 325 is entitled "Commission
Decision," and states that:

> The Commission will consider and conduct a hearing on the
> application for preliminary approval after the
> application is deemed complete. Applications first filed
> will be first considered, but not necessarily acted upon
> by the commission in the order of filing.

16.

Gaming Commission Rule § 315, entitled "Criteria for
Commission Action," sets forth the standards that the
Commission must use in deciding whether to approve an
application for a Certificate. Section 315 states that the
Commission "shall evaluate each application based on the
information provided therein. The commission shall approve
those applications for certificate [sic] of preliminary
approval it deems to be in the best interest of the state and
locale of the proposed operation . . . ."

17.

The Commission's evaluation under § 315 is "subject to"
certain conditions. Among these conditions is that:

> no proposed route, excursion schedule, or berth may be
> approved if the approval would:
>
> a. Create a foreseeable danger to the riverboat
> passengers and crew or an unreasonable risk of harm
> to the riverboat, docks, or real property, or
>
> b. Be inconsistent with laws, regulations,
> ordinances, or orders issued by the United States
> Coast Guard.

- 5 -

*105*

**18.**

Upon information and belief, the Commission received forty-three applications for Certificates; six of these applications asked for preliminary approval to operate a gaming riverboat in Kenner, Louisiana.

**19.**

On December 11, 1992, AIGA submitted its application to the Commission for a Certificate of Preliminary Approval for a proposed riverboat route and other operations at the Kenner Laketown Harbor Park on the shores of Lake Pontchartrain.

**20.**

Treasure Chest Casino, Inc. submitted an application to the Commission on March 8, 1993 that also proposed to locate its gaming riverboat at Kenner's Laketown Harbor Park. Virtually every section of the Treasure Chest application contained information that was distinctive to both Lake Pontchartrain and the Laketown Harbor Park site.

**21.**

In accordance with its rules, on March 26, 1993 the Gaming Commission held a public hearing on the Treasure Chest application to operate a gaming riverboat on the shores of Lake Pontchartrain at Kenner's Laketown Harbor Park.

**22.**

On April 29, 1993, subsequent to its public presentation before the Gaming commission, Treasure Chest filed a modification to its application for a Certificate; this modification proposed locating its gaming riverboat at Rivertown, U.S.A. on the banks of the Mississippi River in Kenner. No hearing was ever held on the feasibility or suitability of this site as a location to base a gaming riverboat.

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 9 of 344

23.

On June 4, 1993, the Gaming Commission held a public hearing at which AIGA made a presentation on its application for a Certificate of Preliminary Approval.

24.

At the Gaming Commission's June 4, 1993 hearing, Chairman Pickering requested that the Commission adopt a resolution concerning the proper interpretation of Emergency Rule 3337, whose text was later effectuated, without change, as Commission Rule § 321 C. This Rule stated that:

> An application or certificate may be modified by leave of the commission upon the filing of a petition for modification by the application. Any modification to an application may have the effect of establishing the date of such modification as the filing date of the application with respect to any time requirements for action on the application which have been set by the commission . . . .

25.

At the June 4, 1993 hearing, Chairman Pickering stated his belief that certain application modifications were not really modifications at all; these modifications changed the original applications so substantially that they were, in effect, new applications. He then went on to provide a specific example:

> What is happening to us--they are changing those substantially, at least in my opinion, they are changing or asking for them to be changed substantially, which really means that as you saw it and as it was presented, it isn't the same thing anymore: different town, different--for instance, we had one--not just this afternoon--to go from Lake Pontchartrain to the River. Now, I'd suggest to you those are two different animals. They are less than four miles apart but they are two different animals altogether. And that's the type of situation we are finding ourselves in, when they are really, it's really almost like a brand new application except, you know, and the question is, what do we do with it?[1]

---

[1] Petitioner avers that it is unaware whether the record of the June 4, 1993 hearing has been transcribed. The excerpts quoted in the text come from the tape recordings of the June 4, 1993 hearing.

*107*

Accordingly, at the June 4, 1993 meeting, the Gaming Commission adopted a Resolution stating that:

> For purposes of consideration of future applications, that a change of waterway, change in a berth, change of an operator, change in ownership, or a combination of those, is more than a modification and requires a new application.

27.

The Gaming Commission held another meeting on June 18, 1993. By that date, it had approved eight applications for Certificates. None of these eight approved applications involved proposals to locate a gaming riverboat in Kenner.

28.

The June 18, 1993 meeting was, according to Chairman Pickering, to "choose seven out of the remaining thirty-five [applications]. Twenty-eight will go by the wayside." See Transcript of Gaming Commission meeting of June 18, 1993, at 4-5 (hereinafter "Transcript") (a copy of which is attached hereto as Exhibit "A"). Although neither the Act nor the Gaming Commission's rules provide any numerical limitation on the number of Certificates that could be issued by the Commission, Pickering noted the Commission's belief that it could only approve fifteen applications by stating that "obviously, once we have chosen seven of those [remaining thirty-five] boats, there will be no need to go any further as there is nothing this commission can do at that point." Further, after seven boats were ultimately approved on June 18th, Chairman Pickering stated "That gives us seven boats. I assume there is no reason to consider any other boats." Transcript at 86.

29.

At the June 18, 1993 meeting, Chairman Pickering also noted that there was no necessity for "any public comment today. We have heard all of the public comment, and so I will not anticipate that there would be any." Transcript at 7.

*108*

Prior to voting on any of the applications on June 18th, the Commission rescinded the resolution that it had adopted on June 4th regarding modifications to applications for Certificates of Preliminary Approval. The Commission then adopted a motion "that would allow subsequent changes to applications or status of those applications leaving basically . . . discretion as to whether new or not at the discretion of the Chairman with the consent of the Commission." Transcript at 28-29.

31.

The Commission then voted on eight applications for Certificates at the June 18th meeting, and approved seven applications; the Treasure Chest application for a Certificate of Preliminary Approval of its Rivertown location was one of those applications that was approved. See Transcript at 75-77.

32.

On information and belief, after the Commission approved Treasure Chest's application to conduct riverboat gaming on the Mississippi River in Kenner, several state and federal agencies such as the United States Coast Guard, United States Army Corps of Engineers, and the Louisiana State Police expressed concern about Treasure Chest's Rivertown location.

33.

On October 14, 1993, the United States Coast Guard notified the United States Army Corps of Engineers that it opposed Treasure Chest's application for a permit to begin constructing docking facilities at Rivertown due to safety considerations. On November 2, 1993, the Corps of Engineers determined that the Rivertown location could not be used to base the Treasure Chest gaming riverboat and denied its request for a permit to constrict docking facilities at the Rivertown location out of safety considerations.

On November 8, 1993, although its application for a Certificate had already been granted based on its submission of the Rivertown site as its gaming riverboat's docking location and base, Treasure Chest sought permission to modify its Certificate to move the site of its proposed riverboat route and operations back to Lake Pontchartrain as called for in the original Treasure Chest application.

35.

The scope of a party's ability to modify its Certificate is governed by Gaming Commission Rule § 307:

> It shall be a requirement that, within 30 days of the granting of a certificate of preliminary approval or final promulgation of application rules by the division which ever is later, the applicant or the proposed gaming operator for the riverboat must apply to the division for a license to conduct gaming operations and further must actually commence construction of the riverboat as authorized by the preliminary certificate within 60 days of being granted a license by the division. Should the applicant fail to apply to the division or fail to commence construction within either period specified above, the certificate shall become null and void. _A construction plan, condition, berth, route or excursion may, upon approval of the commission, be changed at any time prior to or after the granting of a certificate by filing a petition for modification of certificate with the commission requesting the modification(s) described therein._

(Emphasis added).

36.

The acceptable modifications described in Gaming Commission Rule § 307 are defined terms in Gaming Commission Rule § 101. A "condition" is defined as:

> a condition or term upon which a certificate is issued. A condition may be voluntary or proposed by the applicant, or may be ordered by the commission even if not agreed to or proposed by the applicant in his application or certificate.

A "berth" is "the approximate location or locations where the riverboat is or will be authorized to dock as provided in the act and commission rules." A "route" is defined as "the authorized route or path of a riverboat moving upon the designated rivers and waterways as permitted or authorized by

- 10 -

*110*

the commi ...on." An "excursion" is t ...e "that period of time
when a riverboat is away from its approved berth or is
embarking or disembarking passengers at its approved berth."

37.

Conspicuously absent in the list of acceptable
modifications contained in Gaming Commission Rule § 307 is the
ability to change a riverboat's "designated waterway," which
is defined under Gaming Commission Rule § 101 to be "those
waterways listed in the act" upon which gaming riverboats may
travel. The Act itself also defines this term to mean "those
rivers or bodies of water listed in R.S. 4:503 upon which
gaming activities may be conducted." LSA-R.S. 4:504(5).

38.

In addition, nowhere does Gaming Commission Rule § 307
give Certificate holders the ability to change the entirety of
the scope and base of operations of the riverboat and its
supporting constructions.

39.

Treasure Chest's request for modification came for
hearing before the Gaming Commission on November 13, 1993.
AIGA attended the November 13, 1993 meeting and objected to
Treasure Chest's request for a modification, arguing _inter_
_alia_ that Rule 307 did not allow a modification to change the
designated waterway upon which a gaming riverboat is to travel
and did not allow a modification to change the entirety of a
gaming riverboat's specified operations. The Gaming
Commission, however, granted Treasure Chest's request over
AIGA's objections.

40.

AIGA has been adversely affected by this action allowing
modification of Treasure Chest's Certificate and is therefore
an aggrieved party. Although AIGA's application for a
Certificate is still pending with the Commission, the comments
made at its June 18, 1993 hearing indicate that the Commission

- 11 -

will not ⌐ rove any further applicat⌐ ⌐s over and above fifteen. Further, Treasure Chest's modification places the location of its riverboat at the same spot that AIGA proposed to base its riverboat; the Treasure Chest and AIGA requests to the Division for a permit may not both, therefore, be granted. AIGA avers that it would suffer irreparable injury unless this Court pass upon the applicability of the Gaming Commission Rules §§ 307, 315, and 325.

41.

AIGA submits that the Commission's grant of a Certificate of Preliminary Approval to Treasure Chest is void and/or unlawful, for there was no public hearing on Treasure Chest's application to conduct riverboat gaming operations on the Mississippi River at Rivertown as required by Commission Rule § 325.

42.

AIGA submits that the Commission's grant of a Certificate of Preliminary Approval to Treasure Chest is void and/or unlawful, for it granted a Certificate for a location that was unsafe and created a "foreseeable danger to the riverboat passengers and crew or an unreasonable risk of harm to the riverboat, docks, or real property" and/or was inconsistent with the orders of the United States Coast Guard, all as prohibited by Commission Rule § 315.

43.

AIGA submits that the decision of the Gaming Commission to allow Treasure Chest to modify its application for a second time rendered on November 13, 1993 is void and/or unlawful, for Gaming Commission Rule § 307 does not give the Commission the authority to allow a modification of an application that changes the designated waterway upon which a gaming riverboat travels. Further, Gaming Commission Rule § 307 does not give the Commission the authority to allow a modification of an application that changes the entirety of a gaming riverboat's

- 12 -

112

specified operations. As Chairman Pickering has pointed out, such a modification is really an entirely new application.

WHEREFORE, petitioner American International Gaming Association, Inc. prays:

1. That a citation and certified copy of this petition be issued and served on the Louisiana Riverboat Gaming Commission and the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, Department of Public Safety and Corrections;

2. That, after due proceedings are had, this Court reverse the decision of the Commission to grant a Certificate of Preliminary Approval to Treasure Chest;

3. That, in the alternative, after due proceedings are had, this Court reverse the decision of the Commission to grant the request by Treasure Chest to modify its Certificate to change the designated waterway on which its Certificate was based from the Mississippi River to Lake Pontchartrain and change the entirety of its proposed specified operations;

4. That, in the alternative, after due proceedings are had, this Court render a judgment declaring that Section 307 of the Gaming Commission Rules applies to the request of Treasure Chest to both change the designated waterway upon which its gaming riverboat will travel from Lake Pontchartrain to the Mississippi River and change the entirety of its proposed specified operations, and does not permit such a modification.

5. That, in the alternative, after due proceedings are had, this Court render a judgment declaring that Section 315 of the Gaming Commission Rules applies

- 13 -

*113*

the decision of the Gamin. Commission to grant
Treasure Chest a Certificate to conduct riverboat
gaming operations at Rivertown U.S.A. and voids
Treasure Chest's Certificate because using the
Rivertown site would either create a foreseeable
danger to the riverboat's passengers and crew;
create an unreasonable risk of harm to the
riverboat, docks, or real property; and/or would be
inconsistent with the laws, regulations, ordinances,
or orders issued by the United States Coast Guard;

6. That, in the alternative, after due proceedings are
had, this Court render a judgment declaring that
Gaming Commission Rule § 325 applied to the request
by Treasure Chest to conduct gaming operations from
Rivertown, U.S.A., and voids Treasure Chest's
Certificate because there was never a hearing on
Treasure Chest's application to conduct riverboat
gaming from this site; and

7. For all other general and equitable relief to which
it may be entitled.

MONROE & LEMANN

Benj. R. Slater, Jr. - 12126
Benj. R. Slater, III - 12127
Mark E. Van Horn - 14476
Donald J. Miester, Jr. - 20294


By                 r  Slat  115
201 St. Charles Avenue, Suite 3300
New Orleans, Louisiana 70170-3300
(504) 586-1900
ATTORNEYS FOR PLAINTIFF AMERICAN
INTERNATIONAL GAMING ASSOCIATION,
INC.

- 14 -

*114*

**PLEASE SERVE:**

The Louisiana Riverboat Gaming Commission
Through its Chairman, Kenneth Pickering
305 Florida St.
Baton Rouge, LA 70801

The Riverboat Gaming Enforcement Division
of the Gaming Enforcement Section
of the Office of State Police, Public Safety Services,
Department of Public Safety and Corrections
8225 Florida St.
Baton Rouge, LA 70804

# SLATER LAW FIRM

(A PROFESSIONAL CORPORATION)
SUITE 1400
POYDRAS CENTER
650 POYDRAS STREET
NEW ORLEANS, LOUISIANA 70130-6101
TELEPHONE (504) 523-7355
FACSIMILE (504) 528-1050

BENJAMIN R. SLATER, III
PARTNER

April 29, 1994

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**ARTICLE NO. Z 771 875 399**

Mr. Howard P. Elliott, Jr.
265 South Foster Drive
Baton Rouge, Louisiana  70806

Dear Mr. Elliott:

As we have previously discussed, this firm represents American International Gaming Association, Inc. in certain matters arising in connection with its pending application for a gaming license.  Our client has requested that it be informed concerning the following:

1.  On what date was AIGA's application determined to be reasonably complete?

2.  What is the current status of the division's investigation in connection with AIGA's application?  If completed, on what date did this occur?  If not completed, by what date does the division expect that it will have completed its investigation.

3.  Please identify the officer currently responsible for the division's investigation of the AIGA application.

AIGA desires to have its application considered at a public hearing held on or prior to the date that Treasure Chest Casino will be scheduled for hearing on its application.  AIGA has been informed that its application is "as complete as" that filed by Treasure Chest and that the investigation into AIGA's application was virtually completed some time ago.  The recent precedent established with regard to the Baton Rouge applicants dictates that the public hearing on AIGA's application should be conducted at the same time as that of Treasure Chest.

EXHIBIT
**B**    *116*

# SLATER LAW FIRM

Mr. Howard P. Elliott, Jr.
Page 2
April 29, 1994


AIGA wishes to be notified at the time that public hearing is scheduled on the application of Treasure Chest Casino and will appreciate the division's prompt reply to the questions raised above.

Very truly yours,

Benj. R. Slater, III

/kcp

*117*

### SLATER LAW FIRM
*(A Professional Corporation)*
Attorneys and Counsellors at Law
2400 Poydras Center
650 Poydras Street
New Orleans, Louisiana 70130-6101

Telephone (504) 523-7333
Facsimile (504) 528-1080

May 9, 1994
18,457-5200

**VIA FACSIMILE**
**504-925-3974**

Stephen A. Quidd, Esq.
Senior Attorney
Louisiana State Police
Riverboat Gaming Division
P. O. Box 66614
Baton Rouge, Louisiana  70896

Dear Mr. Quidd:

In line with our discussion earlier today, attached hereto is a copy of the letter Ben Slater sent to Howard Elliott on April 29, 1994. It is imperative that we receive answers to the questions posed in this letter as soon as possible.

In addition, as I mentioned to you this afternoon, I understand Treasure Chest's application for a license has been set for hearing on Tuesday, May 17, 1994. I also understand that the Division has not yet set AIGA's application for hearing. Consequently, we expect that the Division either (1) hold a contemporaneous hearing on AIGA's application to allow the Division to choose between Treasure Chest and AIGA; or (2) defer the hearing on Treasure Chest's application until AIGA's application can be heard at the same time. Rest assured that we plan to take every appropriate step, including possibly seeking court intervention, to prevent the Division from hearing Treasure Chest's application without hearing AIGA's application.

Very truly yours,

*Donald J Miester*

Donald J. Miester, Jr.

/mcs
cc:    Bryan M. White

**EXHIBIT**
**C**

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 21 of 344



# STATE OF LOUISIANA

### DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

#### PUBLIC SAFETY SERVICES

EDWIN W. EDWARDS
GOVERNOR

COL. PAUL W. FONTENOT
DEPUTY SECRETARY

May 10, 1994

Mr. Donald J. Miester, Jr.
Slater Law Firm
2406 Poydras Center
650 Poydras Street
New Orleans, Louisiana 70130-6101

Re:  License Hearings on Treasure Chest and AIGA

Dear Mr. Miester:

I have received your correspondence dated May 9, 1994, and thank you for the same.

It is my understanding based that the background investigation on Treasure Chest has been completed. Once the background investigation on an applicant is completed, the Riverboat Economic Development and Gaming Control Act requires that the Division conduct the public hearing on the application and that the Division make a decision to grant or deny the license within ten days of the hearing. R.S. 4:533 (A) and (B). Therefore, the law would prohibit the Division from postponing the hearing on Treasure Chest.

It is my understanding that the background investigation on AIGA is not even close to completion, and therefore under the statute previously cited, it would not be appropriate to schedule the public hearing on AIGA.

The Division will vigorously oppose any attempt to delay any proceeding which is scheduled for a hearing.

I also believe that Treasure Chest would be an indispensable party to any action which your client might provoke to prevent the public hearing on Treasure Chest.

Sincerely,

Stephen A. Quidd
Senior Attorney

119

c. Lt. Marcal Poullard
   Robert J. Guidry

EXHIBIT
D

BENJAMIN R. SLATER, JR.
BENJAMIN R. SLATER, III
MARK E. VAN HORN
KEVIN M. WHEELER *
A. ELISE BROWN
ASHLEY L. BELLEAU **
DONALD J. MIESTER, JR.
CORY R. CAHN
SARAH NEY

# SLATER LAW FIRM

(A PROFESSIONAL CORPORATION)

SUITE 2600

POYDRAS CENTER

650 POYDRAS STREET

NEW ORLEANS, LOUISIANA 70130-6101

TELEPHONE (504) 523-7333

FACSIMILE (504) 528-1080

COUNSEL
W. MALCOLM STEVENSON ***
HAROLD B. CARTER, JR.
ROBERT B. ACOMB, III

ALSO ADMITTED IN
*** MISSISSIPPI
* TEXAS AND THE DISTRICT OF
COLUMBIA
** TEXAS AND WISCONSIN

November 13, 1998
18457-5201

Treasure Chest Casino, L.L.C.
c/o Mr. Paul S. West
One American Place, 9th Floor
Baton Rouge, LA 70825

Re: *Alvin C. Copeland v. Boyd Gaming Corporation, et als*

Dear Mr. West:

This Firm represents Mr. Al C. Copeland in connection with claims arising from the award of the license to conduct riverboat gaming operations in Kenner, Louisiana to Treasure Chest Casino, L.L.C. Mr. Copeland intends to institute suit against Treasure Chest Casino, L.L.C.; its former members, and Boyd Gaming Corporation. The suit, a copy of which is enclosed, will seek damages arising from those responsible for fraudulently obtaining the license, co-conspirators in those acts and those who have been unjustly enriched as a result. The suit will also seek recovery of treble damages pursuant to the provisions of 18 U.S.C. § 1462(b), (c), and (d).

As you are well aware, Mr. Copeland was the first applicant to seek to locate a riverboat in Kenner and the only applicant who maintained at all times his intention to operate that vessel on Lake Pontchartrain. Mr. Copeland, a life-long resident of Jefferson Parish and one of the area's largest employers and most successful business leaders, was the most qualified applicant for the Kenner license. But for the corrupt and illegal actions of certain defendants and their co-conspirators, as outlined in the Government's criminal indictment No. 98-165, Mr. Copeland would have been awarded the license.

Each of the defendants named in this suit benefitted directly from the corrupt and criminal acts outlined in the suit and in the Government's indictment. As a result, Mr. Copeland makes legal demand for return of all costs incurred in his effort to obtain the license, all profits and gains derived by you as result of the procurement and exploitation of the illegally obtained license and immediate transfer of the license currently held by Boyd Gaming through Treasure Chest Casino, L.L.C. to Mr. Copeland.



EXHIBIT

m   120



Mr. Copeland has instructed us to proceed immediately with the filing and prosecution of this action. Should you fail to acknowledge responsibility and willingness to make full reparation by the close of business November 17, 1998, we will commence litigation.

Very truly yours,

Benj. R. Slater, III

BRSIII/amm
Enclosure

121

Case 3:10-cv-00060-BAJ-CN Document 8 12/07/10 Page 24 of 344

# NINETEENTH JUDICIAL DISTRICT COURT

## PARISH OF EAST BATON ROUGE

### STATE OF LOUISIANA

ALVIN C. COPELAND

COST OK Amt. $15

NUMBER 464,607

VERSUS

34017
OCT 0 6 2000

DIVISION D

TREASURE CHEST CASINO, L.L.C.
AND ROBERT GUIDRY

BY _____
DY. CLERK OF COURT

POSTED

### TREASURE CHEST CASINO, L.L.C.'S
### MOTION FOR EXTENSION OF TIME WITHIN IN PLEAD

**NOW INTO COURT,** through undersigned counsel, comes Treasure Chest Casino, L.L.C., defendant in the above captioned matter, who moves this Court for an extension of time to file responsive pleadings and respectfully represents:

1.

Paul S. West, counsel for Treasure Chest Casino, L.L.C., will be out of the country until October 21, 2000, and, is unable to prepare and file responsive pleadings until such time as he returns.

2.

All counsel have been contacted regarding an extension, and all counsel have agreed to grant an extension of time to Treasure Chest Casino, L.L.C. until November 1, 2000, to file responsive pleadings.

**WHEREFORE,** Treasure Chest Casino, L.L.C. respectfully requests that this Court sign an order granting it an extension of time until November 1, 2000, to file responsive pleadings.

Respectfully Submitted:

_____ Par Paul S. West

Paul S. West, Louisiana Bar Roll Number 13375
MCGLINCHEY STAFFORD
A Professional Limited Liability Company
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825
Telephone 225-383-9000
Facsimile 225-383-9000



*122*

## CERTIFICATE

I certify that a copy of the above and foregoing Motion for Extension of Time Within Which to Plead has been mailed today via United States Mail, postage prepaid and properly addressed, to all other counsel of record in this matter.

Baton Rouge, Louisiana, on this ___4th___ day of ___Oct_____, 2000.

_____
Paul S. West

2

*123*

# NINETEENTH JUDICIAL DISTRICT COURT

# PARISH OF EAST BATON ROUGE

# STATE OF LOUISIANA

ALVIN C. COPELAND                          NUMBER 464,607

VERSUS                                     DIVISION D

TREASURE CHEST CASINO, L.L.C.
AND ROBERT GUIDRY

## ORDER

Considering the Treasure Chest Casino, L.L.C.'s Motion for Extension of Time Within Which to Plead:

IT IS ORDERED that Treasure Chest Casino, L.L.C. be granted an extension of ~~time~~ *15 days* *or until Nov. 1, 2000.* ~~until November 1, 2000~~, within which to file responsive pleadings.

SIGNED at Baton Rouge, Louisiana, this *10th* day of _____ *Oct* _____,

2000.

_Janice Clark_

JUDGE
NINETEENTH JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

**PLEASE NOTIFY:**

Paul S. West, Esquire
McGLINCHEY STAFFORD
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825

Stephen A. Quidd, Esquire
Post Office Box 67148
Baton Rouge, Louisiana 70896

Lanny R. Zatzkis, Esquire
ZATZKIS & ASSOCIATES
700 Camp Street
New Orleans, Louisiana 70130

Winston G. Decuir, Esquire
DECUIR & CLARK
1961 Government Street
Baton Rouge, Louisiana 70806

Michael A. Patterson, Esquire
THE LONG LAW FIRM
4041 Essen Lane, Suite 500
Baton Rouge, Louisiana 70809

Benjamin R. Slater, Jr., Esquire
SLATER LAW FIRM
650 Poydras Street, Suite 2600
New Orleans, Louisiana 70130

E. Barton Conradi, Esquire
LAW OFFICES OF E. BARTON CONRADI
343 Third Street, Suite 506
Baton Rouge, Louisiana 70801

*124*

## 19TH JUDICIAL DISTRICT COURT
## FOR THE PARISH OF EAST BATON ROUGE

### STATE OF LOUISIANA

NO. 464607         DIV. "D"         DOCKET

### ALVIN C. COPELAND

### VERSUS

### TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY

FILED:_____      _____
                                        DEPUTY CLERK

### EXCEPTION OF PRESCRIPTION
### OF PLAINTIFF'S CIVIL RICO CLAIM

NOW INTO COURT, through undersigned counsel, comes defendant and exceptor herein, Robert Guidry, who hereby excepts to the plaintiff, Alvin Copeland's claim under the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C.A. sec. 1964 ("civil RICO"). The plaintiff's civil RICO claim is clearly prescribed on its face for the foregoing reasons and as more fully set forth in the attached memorandum.

Plaintiff's civil RICO claim is prescribed by the four year statute of limitations period that applies to civil RICO claims, which runs from the date the plaintiff knew or should have known of the injury caused by the defendant's acts in violation of RICO. Rotella v. Wood, 120 S.Ct. 1075 (2/23/2000) Plaintiff's claim is for damages allegedly suffered as a result of American International Gaming Association, Inc., a now-dissolved corporation previously owned by plaintiff, not being awarded a riverboat gaming license to operate in Laketown Harbor in the City of Kenner, and the Treasure Chest, LLC, defendant herein, being awarded a riverboat gaming license to operate at that location on May 17, 1994. Plaintiff filed his petition on September 15, 1999, more than four years from the date he discovered his injury of not being awarded a riverboat gaming license. Therefore, plaintiff's civil RICO claim is clearly prescribed.

WHEREFORE, defendant, Robert Guidry prays that a rule nisi issue herein

1



Case 3:10-cv-00603-BAJ-DLD    Document 5    10/07/10    Page 28 of 344

ordering plaintiff, Alvin C. Copeland, to appear and show cause, if any he can, why

defendant Robert Guidry's Exception of Prescription should not be maintained, and

further prays that after all legal delays and due proceedings had, there be Judgment in

favor of defendant, Robert Guidry, maintaining the aforementioned exception.

RESPECTFULLY SUBMITTED:

LANNY R. ZATZKIS, T.A. (Bar #13781)
KAREN D. McCARTHY (Bar #14193)
YVETTE A. D'AUNOY (Bar #22761)
ANDREW N LEE (Bar #24154)
ZATZKIS & ASSOCIATES
700 Camp Street
New Orleans, Louisiana 70130
Telephone: (504) 523-2266
Attorneys for Robert Guidry

WINSTON DECUIR (Bar #04795)
LINDA LAW CLARK (Bar #22305)
1951 Government Street
Baton Rouge, Louisiana 70806
Telephone (225) 346-8716
Attorneys for Robert Guidry

RALPH CAPITELLI (Bar # 3858)
CAPITELLI & WICKER
1100 Poydras Street
Energy Center Suite 2950
New Orleans, Louisiana 70163
Telephone: (504) 582-2425
Attorney for Robert Guidry

ARTHUR A. LEMANN, III (Bar #8296)
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, Louisiana 70113
Telephone (504) 522-8104
Attorney for Robert Guidry

2

126

## 19TH JUDICIAL DISTRICT COURT
## FOR THE PARISH OF EAST BATON ROUGE

### STATE OF LOUISIANA

NO. 464-607          DIV. "D"                    DOCKET

### ALVIN C. COPELAND

### VERSUS

### TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY

FILED:_____          _____
                                         **DEPUTY CLERK**

### ORDER

    IT IS ORDERED that plaintiff, Alvin C. Copeland, appear and show cause, if any he can, on the _13_ day of ____Nov.____, 2000, at _9:30_ o'clock _A_m why Defendant Robert Guidry's Exception of Prescription Plaintiff's Civil RICO claim should not be maintained.

    BATON ROUGE, LOUISIANA this _10th_ day of ___Oct___,

2000.

_____
                                         **JUDGE**

Please serve:

**Alvin C. Copeland**
through his attorney of record:
BENJAMIN R. SLATER, III
650 Poydras Street
Suite 2600
New Orleans, Louisiana

127 [3]

## 19TH JUDICIAL DISTRICT COURT
## FOR THE PARISH OF EAST BATON ROUGE

### STATE OF LOUISIANA

NO. 464-607                    DIV. "D"                    DOCKET

### ALVIN C. COPELAND

### VERSUS

### TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY

FILED:_____          _____
                                                DEPUTY CLERK


### EXCEPTION OF NO RIGHT OF ACTION OR IN
### THE ALTERNATIVE, EXCEPTION OF VAGUENESS

**NOW INTO COURT,** through undersigned counsel, comes defendant,

Robert Guidry, who hereby excepts to the Petition of plaintiff, Alvin C. Copeland, for

the foregoing reasons and as more fully set forth in the attached memorandum:

Mr. Guidry hereby excepts to the plaintiff's petition insofar as said petition

does not show that plaintiff has a right of action against Mr. Guidry, as he has not

pled that he has any real and actual interest, as required by Louisiana Code of Civil

Procedure article 681. In the alternative, exceptor herein pleads that the petition is

vague, as it does not state whether the action is brought for damages suffered by

Plaintiff, Alvin Copeland, individually, or for damages suffered by American

International Gaming Association, Inc., a corporation which was dissolved prior to

institution of this action.

WHEREFORE, defendant, Robert Guidry prays that a rule nisi issue herein

ordering plaintiff, Alvin C. Copeland, to appear and show cause, if any he can, why

defendant Robert Guidry's Exception of No Right of Action or in the alternative,

Exception of Vagueness should not be maintained, and further prays that after all



*128*

legal delays and due proceedings had, there be Judgment in favor of defendant,

Robert Guidry, maintaining the aforementioned exceptions.

RESPECTFULLY SUBMITTED:

_____
LANNY R. ZATZKIS, T.A. (Bar #13781)
KAREN D. McCARTHY (Bar #14193)
YVETTE A. D'AUNOY (Bar #22761)
ANDREW N LEE (Bar #24154)
ZATZKIS & ASSOCIATES
700 Camp Street
New Orleans, Louisiana 70130
Telephone: (504) 523-2266
Attorneys for Robert Guidry

_____
WINSTON DECUIR (Bar #04795)
LINDA LAW CLARK (Bar #22305)
1951 Government Street
Baton Rouge, Louisiana 70806
Telephone (225) 346-8716
Attorneys for Robert Guidry

_____
RALPH CAPITELLI (Bar # 3858)
CAPITELLI & WICKER
1100 Poydras Street
Energy Center Suite 2950
New Orleans, Louisiana 70163
Telephone: (504) 582-2425
Attorney for Robert Guidry

_____
ARTHUR A. LEMANN, III (Bar #8296)
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, Louisiana 70113
Telephone (504) 522-8104
Attorney for Robert Guidry

*129*

## 19TH JUDICIAL DISTRICT COURT
## FOR THE PARISH OF EAST BATON ROUGE

### STATE OF LOUISIANA

NO. 464-607          DIV. "D"          DOCKET

### ALVIN C. COPELAND

### VERSUS

### TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY

FILED:_____          _____
                                                  DEPUTY CLERK

### ORDER

IT IS ORDERED that plaintiff, Alvin C. Copeland, appear and show cause, if any he can, on the _13_ day of _Nov_____, 2000, at _9:30_ o'clock _A_.m why Defendant Robert Guidry's Exception of No Right of Action, and in the alternative, Exception of Vagueness should not be maintained.

BATON ROUGE, LOUISIANA this _10th_ day of _Oct_____, 2000.

_____
JUDGE

Please serve:
**Alvin C. Copeland**
through his attorney of record:
BENJAMIN R. SLATER, III
650 Poydras Street
Suite 2600
New Orleans, Louisiana

*130*

19TH JUDICIAL DISTRICT COURT
FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607          DIV. "D"          DOCKET

**COST OK Amt.** 4 6 4 ⁰⁰
4846
OCT 0 6 2000
BY ____ B.R.
DY. CLERK OF COURT

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY

FILED: _____          _____

DEPUTY CLERK

## EXCEPTION OF NO CAUSE OF ACTION

NOW INTO COURT, through undersigned counsel, comes defendant, Robert Guidry, who hereby excepts to the Petition of plaintiff, Alvin C. Copeland, for the foregoing reasons and as more fully set forth in the attached memorandum:

Mr. Guidry hereby excepts to the plaintiff's petition insofar as the plaintiff fails to state a cause of action against Guidry.

WHEREFORE, defendant, Robert Guidry prays that a rule nisi issue herein ordering plaintiff, Alvin C. Copeland, to appear and show cause, if any he can, why defendant Robert Guidry's Exception of No Cause of Action should not be maintained, and further prays that after all legal delays and due proceedings had, there be Judgment in favor of defendant, Robert Guidry, maintaining the aforementioned exception.

RESPECTFULLY SUBMITTED:

_____
LANNY R. ZATZKIS, T.A. (Bar #13781)
KAREN D. McCARTHY (Bar #14193)
YVETTE A. D'AUNOY (Bar #22761)
ANDREW N LEE (Bar #24154)
ZATZKIS & ASSOCIATES
700 Camp Street
New Orleans, Louisiana 70130
Telephone: (504) 523-2266
Attorneys for Robert Guidry

1

*131*

WINSTON DECUIR (Bar #04795)
LINDA LAW CLARK (Bar #22305)
1951 Government Street
Baton Rouge, Louisiana 70806
Telephone (225) 346-8716
Attorneys for Robert Guidry

RALPH CAPITELLI (Bar # 3858)
CAPITELLI & WICKER
1100 Poydras Street
Energy Center Suite 2950
New Orleans, Louisiana 70163
Telephone: (504) 582-2425
Attorney for Robert Guidry

ARTHUR A. LEMANN, III (Bar #8296)
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, Louisiana 70113
Telephone (504) 522-8104
Attorney for Robert Guidry

2

132

**19TH JUDICIAL DISTRICT COURT**
**FOR THE PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

NO. 464-607                  DIV. "D"                  DOCKET

**ALVIN C. COPELAND**

**VERSUS**

**TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY**

FILED:_____

_____
**DEPUTY CLERK**

## ORDER

IT IS ORDERED that plaintiff, Alvin C. Copeland, appear and show cause, if any he can, on the 13 day of Nov. _____, 2000, at 9:30 o'clock A .m why Defendant Robert Guidry's Exception of No Cause of Action should not be maintained.

BATON ROUGE, LOUISIANA this 10th day of Oct _____,

2000.

_____
JUDGE

Please serve:

**Alvin C. Copeland**
through his attorney of record:
BENJAMIN R. SLATER, III
650 Poydras Street
Suite 2600
New Orleans, Louisiana

3

*133*

## 19TH JUDICIAL DISTRICT COURT
## FOR THE PARISH OF EAST BATON ROUGE

### STATE OF LOUISIANA

NO. 464-607          DIV. "D"          DOCKET

### ALVIN C. COPELAND

**"FILE COPY INTO RECORD"**

### VERSUS

### TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY

FILED: _____          _____

                                     DEPUTY CLERK

### MEMORANDUM IN SUPPORT OF EXCEPTION OF
### PRESCRIPTION OF PLAINTIFF'S RICO CLAIM

**Defendant declares evidence will be taken at the hearing on this Exception.**

In this action, the Plaintiff, Alvin Copeland ("Copeland") has grounded his first of four causes of action under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C.A. sec. 1964, which provides for civil remedies for those injured in their business or property proximately caused by criminal RICO violations. The defendant herein, Robert Guidry, denies that the Plaintiff has a right of action or cause of action under civil RICO and maintains plaintiff has no colorable claim. Even if the plaintiff has raised a colorable claim in his petition, his civil RICO claim *has clearly prescribed on its face*. Copeland's claim is that the defendant herein, Robert Guidry, was part of an "overarching corrupt conspiracy" along with Andrew Martin, former Governor Edwin Edwards and Stephen Edwards whose wrongful actions resulted in the Treasure Chest being awarded a riverboat gaming license on May 17, 1994, and the denial of a license for plaintiff's now dissolved corporation, AIGA. Copeland's allegation is that if it had not been for the wrongful acts of the corrupt conspiracy, the State of Louisiana would not have awarded a riverboat gaming license to the Treasure Chest (Paragraph 29 of Copeland's petition), and would have awarded a riverboat gaming license to AIGA. (Paragraph 28 of

1

*134* **"FILE COPY INTO RECORD"**

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 37 of 344

Copeland's petition).  AIGA, a now-dissolved corporation formerly owned by

Copeland, was effectively denied a riverboat gaming license on May 17, 1994.

Plaintiff filed suit on September 15, 1999.  As the statute of limitations period in a

civil RICO claim is four years, running from the date the plaintiff discovers or should

have discovered his injury, plaintiff's action has prescribed.      Rotella v. Wood, 120

S.Ct. 1075 (2/23/2000).


## FACTUAL BACKGROUND

Under the statute of limitations in civil RICO actions, the plaintiff has four

years from the date he discovers his injury to bring his claim, as discussed

hereinbelow.  Rotella v. Wood, 120 S.Ct. 1075 (2/23/2000). The argument that the

limitations period should run from the time the plaintiff learns that the defendant

engaged in a pattern of racketeering activity has been carefully considered and

thoroughly rejected by the United States Supreme Court, as discussed hereinbelow.

Id.  **Therefore, the relevant dates in terms of determining when a RICO cause**

**of action accrues is the date when the plaintiff discovers or should have**

**discovered his injury proximately caused by an act committed by the**

**defendant.**

In this case, the last possible accrual date would be when AIGA learned that

they would not be granted a riverboat gaming license.  Therefore Copeland

discovered his RICO injury on May 17, 1994, requiring him to file his civil RICO

action by May 17, 1998.  Copeland filed his action on September 15, 1999, more

than five years after he was constructively denied a riverboat gaming license, and well

outside the four year limitations period.  Therefore, Copeland's claim is prescribed.

The following dates are derived from Copeland's petition.  As can be seen from

the allegations set forth in Copeland's own petition, his petition is clearly prescribed

on its face.

*135*

2

**1992**

December 11---AIGA (Copeland) submits application to Commission

**1993**

February 9--- Guidry formed Treasure Chest Casino,
Incorporated

February 14---AIGA submits $50,000 application fee to Division

February 22---Supplement to application by AIGA

March 8--- Treasure Chest, Inc. applies to Commission

March 26--- Commission holds public hearing in Baton
Rouge, Louisiana on Treasure Chest, Inc.'s
proposed riverboat gaming casino

June 4--- Commission holds a hearing on AIGA's proposal
(par. 14).

June 18--- Commission approves Treasure Chest's application,
seven Certificates of Preliminary Approval granted,
bringing total number of Certificates of Preliminary
Approval to 15; AIGA is not granted a Certificate of
Preliminary Approval (par. 15).

Nov 13--- Treasure Chest seeks modification of its application
(relocating docking berth from river to lake); the
modification to Laketown site is approved by the
Commission (par. 18).

**1994**

March 15--- Commission issues a certificate to Treasure Chest, L.L.C.
(par. 18).

April---- Guidry has conversations with Andrew Martin to
help him with the licensing procedure following a
favorable decision regarding gaming suitability with
Guidry's video poker business (the Tanner hearing);
Martin makes extortion demands for an interest in
the Treasure Chest's profits to be split among
Martin, Edwin Edwards, and Stephen Edwards.

April or May- Guidry has conversation with Edwin Edwards
where Edwards assured Guidry he would get a
licensing hearing (par. 23).

May 17--- the State Police holds licensing hearing for the Treasure
Chest, Guidry fails to disclose his association with Edwin
Edwards (pars. 25 and 26). **The Treasure Chest is
granted a license (par. 28).**

**1995**



136

| | |
|---|---|
| December[1]--- | Guidry contacts Andrew Martin for help in obtaining Fire Marshall approval, Martin makes extortion demands for an additional 2% interest in the Treasure Chest (par. 30.) |

**1996--**

| | |
|---|---|
| February--- | Guidry starts making payments to Andrew Martin, as part of agreement to pay Martin, Edwin Edwards and Stephen Edwards. (par. 31) |
| November 6-- | Guidry arranges for meeting with Edwin Edwards and Stephen Edwards, pays them directly. |
| Nov 13--- | Martin arranges a meeting with Edwin Edwards and Guidry. |

**1997**

| | |
|---|---|
| April 8--- | Guidry meets with Edwin Edwards, Stephen Edwards, and Andrew Martin at the Highland Road Cafe and makes a cash payoff to Edwin Edwards, and Stephen Edwards. |

## LAW AND ARGUMENT

### The Statute of Limitations for civil RICO claims

Civil RICO actions are subject to a four-year limitations period. <u>Agency Holding Corp. v. Malley-Duff & Associates</u>, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767 (1987). The limitations period begins to run from the date the plaintiff discovers or should have discovered his injury. <u>Rotella v. Wood</u>, 120 S.Ct. 1075 (2/23/2000).

In <u>Malley-Duff</u>, the Supreme Court applied the four year limitations period from the Clayton Act to civil RICO actions, as the civil RICO statute does not provide a limitations period. Prior to the Supreme Courts decision in <u>Malley-Duff</u>, the various district courts employed different limitations periods with different accrual rules adopted from various state statutes. <u>Malley-Duff</u>, 483 U.S. at 149, 107 S.Ct at 2763. Although <u>Malley-Duff</u> established uniformity in the courts with a four

---

[1]Guidry's meeting with Andrew Martin concerning Fire Marshall approval actually occurred in December, 1994. Copeland's allegation in paragraph 30 of his petition is based upon the indictment in the criminal matter, United States v. Edwin Edwards, which erroneously used December, 1995.

*137*

year limitations period, it did not did not set forth a rule for when that four year limitations period begins to run. Following <u>Malley-Duff</u>, the various federal circuits used three different accrual rules: the injury discovery rule, the injury and pattern discovery rule, and the last predicate act rule. <u>Rotella</u>, 120 S.Ct. at 1077-1078.

As explained hereinbelow, the Supreme Court carefully considered and rejected two of these accrual rules used in other federal circuit courts: the injury and pattern discovery accrual rule, and the last predicate act rule. Those accrual rules hinged the accrual date to the date of the plaintiff's discovery of the defendant's **pattern of racketeering activity**, not the date of plaintiff's discovery of **his own injury** caused by the predicate acts of the defendant.

First, the Supreme Court eliminated the "last predicate act rule" in <u>Klehr v. A.O. Smith</u>, 521 U.S. 179, 117 S.Ct. 1984 (1997). The last predicate act rule allowed the plaintiff to bootstrap all predicate acts in a pattern of racketeering activity to the most recent predicate act, similar to a continuing tort. In striking down the last predicate act rule, the Supreme Court explained:

> For purposes of assessing the rule's lawfulness, we assume, as do the Klehrs, that this rule means that as long as Harverstore committed one predicate act within the limitations period (i.e. the four years preceding suit), the Klehrs can recover, not just for any added harm caused them by that late-committed act, but for all the harm caused them by all the acts that make up the total "pattern."

> We conclude that the Third Circuit's rule is not a proper interpretation of the law. <u>Klehr</u>, *supra*, 521 U.S. at 186, 117 S.Ct. at 1989.

However, the U.S. Supreme Court's decision in <u>Klehr</u> did not set forth a unified approach for determining the accrual date for civil RICO actions. After <u>Klehr</u>, a circuit split remained with some circuits using an injury and pattern discovery accrual rule while others used an injury discovery rule (including the United States Fifth Circuit Court of Appeals).[2]

---

[2] Justice Scalia, in a concurring opinion in <u>Klehr</u>, criticized the majority for not resolving the split in the circuits, and suggested the court use a fourth method, the "injury occurrence" rule, the most restrictive method which starts the running of prescription from when the defendant

*138*

Recently, the U.S. Supreme Court resolved the remaining circuit split in

Rotella v. Wood, 120 S.Ct. 1075 (2/23/2000), by eliminating the "injury and pattern

discovery accrual rule" for civil RICO actions. The Supreme Court used the Clayton

Act as a model for civil RICO, under which a cause of action accrues and the statute

begins to run when a defendant commits an act that injures a plaintiff's business.

The Supreme Court explained the distinction between the two methods: **"But in**

**applying the discovery accrual rule, we have been at pains to explain that**

**discovery of the injury, not discovery of the other elements of a claim, is what**

**starts the clock."** Id. 120 S.Ct. at 1080.

In Rotella, the plaintiff brought a civil RICO action in 1997 against a group of

doctors and related business entities for conspiring to admit, treat and retain him in a

psychiatric facility from 1984 to 1986. Rotella, 120 S.Ct. at 1079. The plaintiff,

Rotella, alleged the doctors held him for their financial interests rather than for

treatment of his psychiatric condition. Id. In 1994, some of the defendants named

by Rotella pled guilty to criminal fraud through improper relationships and illegal

agreements between the company and its doctors. Rotella, the plaintiff, filed his civil

RICO claim within four years of his discovery of the defendant's guilty plea, the time

when he learned of the defendants' pattern of racketeering activity. Rotella had

discovered his injury of being held in the hospital far longer than four years prior, but

had discovered the alleged pattern of racketeering activity of the defendants well

within four years of filing.

The district court dismissed his civil RICO claim as time-barred, ruling that

the plaintiff had four years from the time that he discovered his injury, which was in

1986, to bring his claim. Rotella v. Wood, 1997 WL 667941 (N.D. Tex.). The

district court ruled the question of when the plaintiff knew there was a pattern of

racketeering was irrelevant to a determination of whether plaintiff's claims are barred

---

commits an act that injures a plaintiff's business, regardless of the plaintiff's knowledge of his
injury. Klehr, 521 U.S. at 198, 117 S.Ct. at 1995.

*139*

by limitations. <u>Id.</u>  Whether the court used the injury discovery rule or the pattern
and injury discovery rule was determinative of whether Rotella's civil RICO action
was time-barred under the four-year limitations period set forth in <u>Malley-Duff</u>.  The
United States Fifth Circuit Court of Appeals upheld the district court's ruling, and
pronounced for the first time in a published decision that the Fifth Circuit joined the
First, Second, Fourth, Seventh and Ninth Circuits in its choice of the injury discovery
accrual rule, noting the split in the federal circuits on the question of accrual
following <u>Klehr</u>.  <u>Rotella v. Wood</u>, 147 F.3d 438, 439 (5th Cir. 1998).

    In this case, the defendant and exceptor herein, Robert Guidry, entered a
guilty plea in November of 1998 in connection with the criminal proceeding, and
plaintiff herein, Copeland, filed suit within four years of that date.  (It is important
to note that Guidry did not plead guilty to a criminal RICO violation.)  However,
Guidry's plea, like the defendant's in <u>Rotella</u>, does not start the clock.  **The accrual
of Copeland's civil RICO claim began when Copeland discovered or should
have discovered his injury, that is, the denial of a license in 1994.**  Whether
Copeland knew of the alleged RICO pattern of racketeering activity is irrelevant for
the determination of the accrual date.  As discussed at length in <u>Rotella</u>, Copeland
had the duty of a "private attorney general" to make his claim, and cannot rely on his
alleged late discovery of the alleged racketeering activity to suspend the running of
the limitations period beyond .  Like Rotella, the injury discovery rule of accrual will
bar the plaintiff's civil RICO action, as he filed his civil RICO claim more than four
years from the time of the discovery of his injury.  Copeland can neither base his
claim on the date he discovered the alleged wrongful acts of the defendants, nor can
he bootstrap all of the alleged wrongful acts in the alleged pattern of racketeering
activity on more recent acts to bring his claim within the four year period.

    Using the rules established in <u>Malley-Duff</u>, <u>Klehr</u>, and <u>Rotella</u>, and calculating
backwards from the date this lawsuit was filed, September 15, 1999, Copeland may


Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 43 of 344

only base his claims on injuries he discovered arising after September 15, 1995. By that time, however, the Treasure Chest was licensed and had been open for business for one full year at the Laketown location. Copeland's claimed injury, that he would have received a license and the Treasure Chest would not have received a license, occurred long before then.

**All allegations in Copeland's petition of events occurring after September 15, 1995 are irrelevant and cannot function as an accrual date for Copeland's civil RICO claim.**

Plaintiff makes several allegations of wrongdoing concerning Guidry and the "overarching corrupt conspiracy" which occur long after Copeland discovered his claimed injury of not receiving a riverboat gaming license. However, it is the date of the discovery of the injury, not the date of the predicate acts, which determines when the limitations period begins to run. Copeland's injury occurred and was discovered when he learned in May of 1994 he would not get a riverboat license and he has not claimed any additional injury occurring thereafter in his petition. In addition, Copeland cannot save his stale civil RICO claim by bootstrapping more recent alleged predicate acts in a pattern of racketeering activity which did not cause his injury to older predicate acts which he has alleged did cause his injury.

Copeland has alleged that Guidry met with Andrew Martin to help the Treasure Chest get State Fire Marshall approval for the Treasure Chest's entertainment barge in December of 1995, at which time Martin demanded Guidry pay an additional 2% of the Treasure Chest's profits and give him a high ranking position with the Treasure Chest (Paragraph 30 of Copeland's petition). At the time, the Treasure Chest featured an entertainment barge with concessions and live music that connected the riverboat to the docking berth for the benefit of customers waiting to board the riverboat. Guidry required additional time for the construction of a permanent structure to replace the entertainment barge. Guidry requested that Martin help him persuade the State Fire Marshall to delay the period of time for the



8

Treasure Chest to have the permanent structure put in place. Copeland's injury does not even have a remote connection to Guidry's difficulties with the State Fire Marshall, or Guidry's conversations with Andrew Martin concerning the State Fire Marshall approval.

Therefore, Copeland has not and cannot plead that he was injured by Andrew Martin and Robert Guidry's alleged predicate acts in dealing with the Fire Marshall. Whether or not the Treasure Chest had Fire Marshall approval had no bearing on the fact that Copeland did not have a license to operate a riverboat gaming vessel. **The plaintiff's lack of any injury caused by the predicate acts alleged with respect to the Fire Marshall granting temporary approval to the Treasure Chest is fatal.**

**The relevant date for starting the clock is when the plaintiff is injured by an act of the defendant.** While successive acts may give rise to a new and separate injury, the plaintiff has four years from the date of his discovery of the injury to file his lawsuit because "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." Klehr, 521 U.S. at 179, 189, 117 S.Ct. at 1990-1191. In other words, Copeland has only alleged a single injury here, that is, the denial of a license. Copeland has not and cannot plead injury as a result of Guidry's later contacts with Andrew Martin to ultimately gain Fire Marshall Approval. By this time, Copeland's injury had already occurred. In sum, the dates of these later acts related to the Fire Marshall are irrelevant to the determination of when Copeland discovered his injury, the denial of the riverboat gaming license.

With respect to any acts that occurred after September 15, 1995, Copeland may not argue that he suffered a "continuing injury" or a "continuing tort" in order to toll prescription, as that argument was directly rejected by the U.S. Supreme Court in Klehr. In Klehr, the plaintiffs were a group of dairy farmers who purchased an allegedly defective feed storage silo in 1974, but did not discover that the silo was



9

contaminated with mold until 1991. The Klehrs filed their civil RICO claim in 1993.

This type of argument, **which leads to indefinite tolling of limitations periods**, was considered and rejected by the Supreme Court in <u>Klehr</u>:

> But, as in the antitrust cases, the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period. [Citations omitted.] Thus the Klehrs may point to new predicate acts that took place after August 1989, such as sales to other farmers or the printing of new Harverstore advertisements. **But that fact does not help them, for, as the Court of Appeals pointed out, they have not shown how any new act could have caused them harm over and above the harm that the earlier acts caused. Nor can the presence of the new act help them recover for the injuries caused by pre-1989 acts, for it is in this respect that we find the Third Circuit's rule incorrect.** <u>Klehr</u>, 521 U.S. at 190, 117 S.Ct. at 1991.

Therefore, Copeland's allegations of predicate acts occurring after September 15, 1995 can not be used by him to save this lawsuit.

Finally, allegations concerning State Fire Marshall Approval are alleged in Copeland's petition to have occurred in December 1995:

> On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, in or about December, 1995, Guidry contacted Andrew Martin regarding his problem with obtaining State Fire Marshal approval for his entertainment barge at the Treasure Chest site. (par. 30).

**However, the events actually occurred in December of 1994 through the first few months of 1995, and all of the events occurred before September 15, 1995.** The 1995 date was an error in the indictment and bill of information drafted by the U.S. Attorney's office which Copeland refers to in his petition. Guidry corrected this mistake in his testimony in the <u>Edwards</u> criminal trial:

Q. Thank you. Now, Mr. Guidry, you've seen the indictment in this case, have you not?

A. Yes Sir.

Q. And the Bill of Information that you pled guilty to in connection with this case?

A. Yes, Sir.

...

10

143

Q. Did these events, Mr. Guidry, occur in December '94 or December '95?

A. December of '94.

pps. 27-28, Guidry testimony, February 1, 2000. See **Exhibit "A"**, attached hereto, excerpts of Guidry's testimony from the criminal trial

The U.S. attorney presented evidence showing that the events surrounding the State Fire Marshall scheme were completed by March 1995. Therefore, any injury caused by an act of the alleged conspirators occurred well before September 15, 1995. The defendants herein reserve their right to present evidence in the hearing on prescription, including but not limited to the fact that the State Fire Marshall approval scheme occurred in December, 1994.

Copeland has also alleged that Guidry made illegal payments from Guidry to Martin and Edwards starting in February 1996 and ending in April of 1997. However, these after-the-fact payments are not causally connected to Copeland's injury. Copeland's theory is that Guidry, and not Copeland, received the license because of Guidry's promise in 1994 to forego making illegal payments until 1996 and 1997. Mr. Copeland's injury would have occurred regardless of whether Mr. Guidry made good on this promise by actually paying Martin and Edwards in 1996 and 1997. Once again, there was no direct damage suffered by Copeland in 1996 and 1997, as the issue of whether he had been denied a license had long been decided. Copeland has not and cannot plead in his petition any separate injury apart from his alleged injury suffered in 1994 following denial of a license.

**The policy objectives of civil RICO are subverted by tolling of the four-year limitations period.**

In Rotella, the Supreme Court pointed out that:

"a pattern discovery rule would allow proof of a defendant's acts even more remote from time of trial and, hence, litigation even more at odds with the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." Id., 120 S.Ct. at 1081.

The Supreme Court next reasoned that the federal courts generally apply an

11

injury discovery rule to statutes of limitation, as in the case of professional

malpractice, and there was no good reason for accepting a lesser degree of

responsibility on the part of a RICO plaintiff to discover his claim.   120 S.Ct. at

1081.

Finally, the Supreme Court reasoned that a less demanding accrual rule would

undermine the basic congressional objective of deterring racketeering activity.  The

Supreme Court placed a burden on a plaintiff to discover his claim and cast him in

the role of a "private attorney general", citing the statutes underlying purpose of

encouraging timely investigation of wrongdoing.  In reference to the Clayton Act and

civil RICO, the Supreme Court supported its holding, reasoning  as follows:

> Both statutes share a common congressional objective of encouraging
> civil litigation to supplement Government efforts to deter and penalize
> the respectively prohibited practices. **The object of civil RICO is thus
> not merely to compensate victims but to turn them into
> prosecutors, "private attorneys general," dedicated to eliminating
> racketeering activity.** [Citations omitted.] (Civil RICO specifically has
> a "further purpose of encouraging potential private plaintiffs diligently
> to investigate"). The provision for treble damages is accordingly
> justified by the expected benefit of suppressing racketeering activity, an
> object pursued the sooner the better.  It would, accordingly, be strange
> to provide an unusually long basic limitations period that could only
> have the effect of postponing whatever public benefit civil RICO might
> realize.  Rotella, *supra,* 120 Sct. at 1082. [Emphasis added].

Copeland's claim is based on injuries suffered and discovered more than four

years prior to the date of filing.  Copeland can claim with no greater justification than

the plaintiffs in Klehr and Rotella that he should be allowed to escape the four year

limitations period running from the date of the discovery of his injury for civil RICO

cases.

**Copeland's allegation that Guidry concealed his activity does not save his**

**claim.**

In its attempt to save its clearly prescribed civil RICO claim, the Plaintiff

herein has made the general allegation that the defendants fraudulently concealed

their activity, but does not allege any specific facts which constitute concealment of

the plaintiff's injury. The plaintiff has also made a general allegation that it could not have discovered its claim with due diligence, even though he does not allege he did in fact, conduct due diligence, or allege any facts showing that he conducted due diligence. **A plaintiff must conduct due diligence in order to raise a fraudulent concealment claim.** <u>Klehr</u>.

The plaintiff has generally alleged predicate acts of fraud, including wire fraud and mail fraud. However, accrual of a claim is not suspended because the claim alleges predicate acts that sound in fraud.

In <u>Rotella</u>, the plaintiff argued that the court should use the injury and pattern discovery rule, especially in civil RICO cases that involve fraud where the plaintiff would not know of the alleged predicate acts. <u>Rotella</u>, 120 S.Ct. at 1082. With careful consideration, the Supreme Court rejected Rotella's argument that a fraud claim should be treated differently from other causes of action because it is concealed from the plaintiff:

> "Nor does Rotella's argument gain strength from the fact that some patterns of racketeering will include fraud, which is generally associated with a different accrual rule; **we have already found the connection between civil RICO and fraud to be an insufficient ground for recognizing a limitations period beyond four years**, and the lenient rule Rotella seeks would amount to backsliding from <u>Malley-Duff</u>". <u>Rotella</u>, 120 S.Ct. at 1082.

Therefore, plaintiff's allegations that the defendant committed predicate acts of fraud does not serve to extend the accrual of the plaintiff's claims. The Court in <u>Rotella</u> also noted that "a pattern of predicate acts may well be complex, concealed or fraudulent." <u>Id.</u>.

In order to apply the doctrine of equitable tolling, the plaintiff cannot rely on the mere fact that the predicate acts were fraudulent, but rather the plaintiff must plead and prove that the defendant performed a separate act of concealment to prevent or delay the plaintiff from discovering the plaintiff's injury **and** the plaintiff must plead and prove that he conducted due diligence but was unable to discover his

13

146

claim. <u>Klehr</u>, 117 S.Ct. at 1993.

Copeland pleads that Edwin Edwards went to great length to hide his participation in the RICO enterprise by having others perform overt acts in furtherance of the racketeering activity (Paragraph 76 of Copeland's petition), but does not plead that those acts were separate acts of concealment to prevent the plaintiff from bringing suit. Additionally, when pleading fraud, a plaintiff must plead the acts of fraud with particularity. Federal Rule of Civil Procedure 9(b). The plaintiff herein has not made any allegations of fraudulent concealment with the required particularity separate from the underlying acts of fraud. Therefore, by failing to plead acts of fraudulent concealment, and further failing to plead any such facts with the necessary particularity, the plaintiff has failed to satisfy the first prong of his fraudulent concealment claim. Therefore, plaintiff cannot use his naked allegation of concealment to toll the four-year limitation period.

In a civil RICO case cited with favor in <u>Klehr</u>, the Ninth Circuit stated the rule as follows:

> The doctrine of fraudulent concealment is invoked only if the plaintiff both **pleads and proves that the defendant actively misled her**, and that she had neither actual nor constructive knowledge of the facts constituting his cause of action despite her due diligence. <u>Grimmett v. Brown</u>, 75 F.3d 506, 514 (9th Cir. 1996). Emphasis added.

In the <u>Grimmett</u> decision, the court noted that the plaintiff failed to show "active concealment", and that the defendant's failure to 'own up' to her illegal conduct does not constitute active concealment. **"The limitations period does not toll simply because a party is ignorant of her cause of action."** <u>Id</u>.

The analysis used in the Fifth Circuit case State of <u>Texas v. Allan Construction Company</u>, Inc. 851 F.2d 1526, 5th Cir, 1988, which is a Clayton Act case, also requires active concealment. The court held that the statute of limitations in a Clayton Act case is only tolled if the defendant has engaged in "affirmative acts" of concealment, and that concealment only by silence is not enough. The defendant

14

must be guilty of some trick or contrivance tending to exclude suspicion and prevent inquiry. Id.

Plaintiff has also failed the second prong of pleading fraudulent concealment by failing to plead that he actually conducted a due diligence investigation to discover his claim, and was unable to discover the claim because of an alleged act of fraudulent concealment. Klehr, in addition to striking the last predicate act accrual rule, further holds that **a plaintiff who is not reasonably diligent may not assert fraudulent concealment.** Klehr, 521 U.S. at 194, 117 S.Ct. at 1993. In reference to antitrust and civil RICO claims, the Supreme Court in Klehr explained:

> Rather, in both of those contexts private civil actions seek not only to compensate victims but also to encourage those victims themselves diligently to investigate and thereby to uncover unlawful activity. See Malley-Duff, 483 U.S. at 151, 107 S.Ct., at 2764-2765. That being so, we cannot say that the "fraudulent concealment" doctrine is concerned only with the behavior of defendants. For that reason, and in light of the consensus of authority, we conclude that "fraudulent concealment" in the context of civil RICO embodies a "due diligence" requirement. Klehr, 521 U.S. at 195-196, 117 S.Ct. at 1993.

Copeland has not pled any facts to establish fraudulent concealment, nor has he pled any specific facts to indicate that he did in fact, conduct a due diligence investigation. Therefore, his reliance on equitable tolling, which the U.S. Supreme Court described in Rotella as the exception, not the rule, to toll the four year limitations period which has clearly run, cannot be invoked to save his claim.

## CONCLUSION

Copeland's civil RICO claim has clearly prescribed on its face, as he discovered his injury more than four years prior to the date he brought his claim. Copeland cannot base his claim on predicate acts in an alleged pattern of racketeering activity if those acts do not cause the injury he claims. Therefore, the specific acts and injury which caused Copeland's injury of not receiving a riverboat gaming license all occurred before May 17, 1994. Further, Copeland cannot support his claim of fraudulent concealment with facts, and has not alleged in his petition any facts to

15

show that he was diligent in his investigation of his civil RICO claim. Therefore,

Copeland's civil RICO claim has clearly prescribed.

RESPECTFULLY SUBMITTED:

LANNY R. ZATZKIS, T.A. (Bar #13781)
KAREN D. McCARTHY (Bar #14193)
YVETTE A. D'AUNOY (Bar #22761)
ANDREW N LEE (Bar #24154)
ZATZKIS & ASSOCIATES
700 Camp Street
New Orleans, Louisiana 70130
Telephone: (504) 523-2266


WINSTON DECUIR (Bar #04795)
LINDA LAW CLARK (Bar #22305)
1951 Government Street
Baton Rouge, Louisiana 70806
Telephone (225) 346-8716
Attorneys for Robert Guidry

RALPH CAPITELLI (Bar # 3858)
CAPITELLI & WICKER
1100 Poydras Street
Energy Center Suite 2950
New Orleans, Louisiana 70163
Telephone: (504) 582-2425
Attorney for Robert Guidry


ARTHUR A. LEMANN, III (Bar #8296)
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, Louisiana 70113
Telephone (504) 522-8104
Attorney for Robert Guidry

16

*149*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing document has

been served upon all parties, through counsel of record, via facsimile, hand delivery or

U.S. Mails postage prepaid and properly addressed, this 5th day of October,

2000.

*150*

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 53 of 344

I N D E X

WITNESSES FOR THE GOVERNMENT:

        ROBERT GUIDRY
            DIRECT EXAMINATION BY MR. HARPER                    P 10

152

```
             A P P E A R A N C E S
```

FOR THE GOVERNMENT:            Mr. James B. Letten
                               Mr. Peter G. Strasser
                               Mr. Michael W. Magner
                               Mr. Fred Harper
                               Mr. Todd Greenberg


FOR THE DEFENDANTS:            Mr. Daniel I. Small
                               Mr. James M. Cole
                               Ms. Rebecca L. Hudsmith
                               Mr. Servando C. Garcia, III
                               Mr. Ryan Roemershauser
                               Mr. Patrick Fanning
                               Mr. Ernest Johnson
                               Ms. Mary Olive Pierson
                               Mr. Hillar C. Moore, III
                               Mr. Craig Smith

*153*

1    Guidry.  Do you recall seeing this letter at the time it was

2    sent?

3         A.   Either I saw it or I was told about it.

4         Q.   Okay.

5         A.   But I'm sure I was told about it.

6         Q.   All right.  Go back to the top please.

7              The letter's dated what date, sir?  What's the

8    date on the letter?

9         A.   January 5th, '99 -- January 5th, 1995.

10        Q.   Thank you.  Now, Mr. Guidry, you've seen the

11   indictment in this case, have you not?

12        A.   Yes, sir.

13        Q.   And the Bill of Information that you pled guilty

14   to in connection with this case?

15        A.   Yes, sir.

16        Q.   And in that indictment and in that Bill of

17   Information, it refers to in or about December of 1995.  Can

18   you -- and we're talking here December of 1994 and January,

19   '95.  Can you explain that?

20        A.   Could you ask me that question again please?

21        Q.   The indictment refers to December of 1995 rather

22   than December, 1994.  Can you explain that?

23             MR. COLE:  Your Honor, I have a question as to why

24   the witness is being asked to explain the government's

25   indictment.

*154*

1          THE COURT:  As worded, the objection is sustained.

2    It's an appropriate area of inquiry, but, as worded, the

3    objection is sustained.

4    BY MR. HARPER:

5          Q.    Did these events, Mr. Guidry, occur in December

6    '94 or December '95?

7          A.    December of '94.

8          Q.    Now, Mr. Guidry, this letter of January the 5th,

9    1995, this letter was mailed to the state fire marshal, to

10   your knowledge?

11         A.    Sure was.  Yes, sir.

12         MR. HARPER:  All right, scroll to the bottom of

13   the letter to the highlighted portion please.

14   BY MR. HARPER:

15         Q.    At the bottom of the letter, Mr. Guidry, in

16   highlight it says:  In accordance with your recent telephone

17   conversation with Mr. Greed Brierre of the Mathes Group, we

18   are aware that the owner will not be permitted to continue

19   to operate the membering structure designed by me as a

20   temporary building after March 2nd, 1995.  We therefore

21   respectfully request that you now review this temporary

22   terminal as a permanent building.

23         What was the plan that was put into effect, Mr.

24   Guidry, in accordance with this letter?

25         A.    Well, we knew that it was going to take a bit

*155*

1    UNITED STATES DISTRICT COURT

2    MIDDLE DISTRICT OF LOUISIANA

3    BATON ROUGE   DIVISION

4

5    UNITED STATES OF AMERICA    *   Docket No.  98-165-B-M2
                                  *
6                                 *
     VERSUS                       *   February 1, 2000
7                                 *
                                  *
8                                 *
     EDWIN EDWARDS, ET AL         *   Baton Rouge, Louisiana
9    ****************************************************************

10

11

12          REPORTER'S OFFICIAL TRANSCRIPT OF
                 PROCEEDINGS AT TRIAL
13

14
          BEFORE THE HONORABLE FRANK J. POLOZOLA,
15       UNITED STATES DISTRICT JUDGE, AND A JURY

16

17

18

19

20

21

22   COURT REPORTER:          Connie S. Ezell, RPR, RMR, CRR
23                            P.O. Box 3034
                              Lafayette, Louisiana 70501
24

25       Proceedings recorded by mechanical stenography,
     transcript produced by computer.



157

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 58 of 344

# 19TH JUDICIAL DISTRICT COURT

# PARISH OF EAST BATON ROUGE

# STATE OF LOUISIANA

| | | |
|---|---|---|
| ALVIN C. COPELAND | * | DOCKET NO. 464,607 |
| VERSUS | * | DIVISION " " D |
| TREASURE CHEST CASINO, L.L.C., and ROBERT J. GUIDRY | * | JURY TRIAL REQUESTED |
| | * | |

FILED: _____        _____
                                                DEPUTY CLERK

COST OK Amt. 15.00

OCT - 6 2000

BY _____
DY. CLERK OF COURT

## MOTION TO CONTINUE HEARING ON
## MOTION TO DISQUALIFY COUNSEL

On Motion of plaintiff Alvin C. Copeland, and on suggesting to the Court that

defendant Robert Guidry has recently filed a "Motion to Disqualify" Copeland's counsel and

has set the Motion for Hearing on October 16; and on further suggesting that plaintiff requires

some additional time to review the pleadings and prepare a response and on further suggesting

that counsel for the defendants have indicated they are not opposed to a postponement of the

hearing on the motions, now moves the Court for an order continuing the hearing on Defendant's

Motion to Disqualify from October 16 to November 13, 2000.



Respectfully submitted,

**SLATER LAW FIRM**

Benj. R. Slater, Jr., Bar No. 12126
Benj. R. Slater, III, Bar No. 12127, T.A.
A. Elise Brown, Bar No. 19500
S. Joseph Welborn, Bar No. 25928

_____
650 Poydras Street
Suite 2600
New Orleans, LA 70130
Telephone: (504) 523-7333
Facsimile: (504) 528-1080
**ATTORNEYS FOR PLAINTIFF ALVIN C. COPELAND**

*156*

## 19TH JUDICIAL DISTRICT COURT

## PARISH OF EAST BATON ROUGE

## STATE OF LOUISIANA

| | | |
|---|---|---|
| **ALVIN C. COPELAND** | * | **DOCKET NO.** 464,607 |
| **VERSUS** | * | **DIVISION " "** D |
| **TREASURE CHEST CASINO, L.L.C., and ROBERT J. GUIDRY** | * | **JURY TRIAL REQUESTED** |
| | * | |

**FILED:** _____    _____
                                                **DEPUTY CLERK**

## ORDER

Considering the foregoing Motion to Continue Hearing on Motion to Disqualify Counsel,

**IT IS HEREBY ORDERED** that the Motion to Disqualify previously set for hearing on

October 16, 2000, be and is hereby reset for hearing on November 13, 2000.

**THUS DONE AND SIGNED**, this _10_ day of _Oct_, 2000.

_Jannie Clark_
J U D G E



*157*

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                    DIVISION "D"

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

FILED: _____          DEPUTY CLERK: _____

**COST OK Amt._____**

OCT 3 0 2000

BY_____
DY. CLERK OF COURT

## TREASURE CHEST CASINO'S
## PEREMPTORY EXCEPTION OF NO CAUSE OF ACTION

NOW INTO COURT, through undersigned counsel, comes Treasure Chest Casino,

L.L.C. ("Treasure Chest"), which files this exception to the petition of Alvin C. Copeland on

the grounds that it fails to state a cause of action.  Treasure Chest has filed a memorandum

in support of this exception.

WHEREFORE, Treasure Chest Casino, LLC prays that the exception be deemed well

founded and that the claim of Alvin C. Copeland against Treasure Chest Casino be dismissed

with prejudice.

Respectfully Submitted:

Paul S. West, Louisiana Bar Roll Number 13375
Charles R. Penot, Jr., Bar Roll Number 01530
Lisa D. Munyon, Bar Roll Number 24575
MCGLINCHEY STAFFORD
A Professional Limited Liability Company
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825
Telephone 225-383-9000
Facsimile  225-383-9000

ATTORNEYS FOR TREASURE CHEST
CASINO, L.L.C.

REC'D C.P.

NOV 0 6 2000

158

## CERTIFICATE

I certify that a copy of the above and foregoing pleading has been mailed today via United States Mail, postage prepaid and properly addressed, to:

Lanny R. Zatzkis, Esquire
ZATZKIS & ASSOCIATES
700 Camp Street
New Orleans, Louisiana 70130

Winston G. Decuir, Esquire
DECUIR & CLARK
1961 Government Street
Baton Rouge, Louisiana 70806

Benjamin R. Slater, Jr., Esquire
SLATER LAW FIRM
650 Poydras Street, Suite 2600
New Orleans, Louisiana 70130

Baton Rouge, Louisiana, on this _27_ day of _October_, 2000.

_____
Paul S. West



**159**

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                    DIVISION "D"

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

FILED: _____    DEPUTY CLERK: _____

## ORDER

Considering the Treasure Chest Casino, L.L.C.'s Peremptory Exception of No Cause of Action:

IT IS ORDERED that a hearing be set on Treasure Chest Casino, L.L.C.'s Peremptory Exception of No Cause of Action for the __13__ day of __Nov.__, 200_0_.

SIGNED at Baton Rouge, Louisiana, this _1st_ day of __Nov__, 2000.

_____
JUDGE
NINETEENTH JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

PLEASE NOTIFY:

Paul S. West, Esquire
McGLINCHEY STAFFORD
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825

Lanny R. Zatzkis, Esquire
ZATZKIS & ASSOCIATES
700 Camp Street
New Orleans, Louisiana 70130

Winston G. Decuir, Esquire
DeCUIR & CLARK
1961 Government Street
Baton Rouge, Louisiana 70806

Benjamin R. Slater, Jr., Esquire
SLATER LAW FIRM
650 Poydras Street, Suite 2600
New Orleans, Louisiana 70130

*160*

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                          DIVISION "D"

ALVIN C. COPELAND

-versus-                          **COST OK Amt** $68.50

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY    NOV 1 0 2000

                                                      BY _____
Filed:_____      _____    DY. CLERK OF COURT

                                          Deputy Clerk

**POSTED**

MEMORANDUM IN OPPOSITION TO TREASURE CHEST CASINO'S
PEREMPTORY EXCEPTION OF NO CAUSE OF ACTION NOV 1 3 2000

MAY IT PLEASE THE COURT:

Plaintiff, Alvin C. Copeland ("Copeland"), submits this Memorandum in Opposition to the Treasure Chest Casino's Peremptory Exception of No Cause of Action. By means of this Exception, Treasure Chest Casino, L.L.C. ("Treasure Chest") urges that Copeland's Petition fails to state a cause of action for all four counts alleged. Treasure Chest's arguments with respect to three of these counts, Unfair Trade Practices, Fraud and Unjust Enrichment, as well as its arguments with respect to RICO standing (Injury and Proximate Cause) are substantively identical to the arguments raised by its co-defendant, Robert Guidry.

In the interests of brevity and judicial economy, and due to the inordinately short time period between undersigned counsel's receipt of Treasure Chest's Exception and thirty-two (32) page Memorandum in Support, and the hearing on this Exception, Copeland respectfully directs the Court to his Memorandum in Opposition to Exception of No Cause of Action filed by Defendant Robert Guidry which he urges, with one significant late breaking development,[1] addresses Treasure Chest's arguments with respect to Counts II (Unfair Trade Practices), III (Fraud) and IV (Unjust Enrichment), as well as the standing issues with respect to Count I (Racketeering Influenced and Corrupt Organizations Act). Accordingly, subject to this exception, this Memorandum will chiefly address Treasure Chest's assertion that Copeland has failed to state a cause of action under 18 U.S.C. §1964(c).

_____

[1] The U.S. Supreme Court issued an opinion in *Cleveland v. United States*, No. 99-804, 2000 W.L. 1663649 on November 7, 2000. (A copy of this opinion is attached hereto as Exhibit "A"). While the *Cleveland* case does not directly address the issues presented in this matter, the Court's reasoning therein is pertinent with respect to the matter of *Guilbeaux v. Grand Casinos, Inc.*, No. 95-1167 (W.D.La. 7/2/96), aff'd, 114 F.3d 1181 (5th Cir.1997) which both Guidry and Treasure Chest erroneously contend is dispositive of the issues in this case.

*161*                    COPY FILED 11-9-00

## I.    INTRODUCTION

Copeland has brought this civil RICO claim in State Court under settled jurisprudence indicating that State Courts have concurrent jurisdiction to hear civil RICO claims.  While Copeland recognizes, that of necessity, this Court must rely to some extent upon federal jurisprudence in its interpretation of federal law, he nevertheless urges this Court to consider federal precedents with the caution, as there are distinctions between the pleadings requirements in federal courts, and that Treasure Chest has presented its challenge in the form of an Exception of No Cause of Action.

It should at all times be remembered that merely because an exception of no cause of action in Louisiana and a Motion to Dismiss brought pursuant to Fed.R.Civ.Proc. 12(b)(6) share similar standards,[2] this does not mean that they are identical.  There are significant distinctions between the considerations underlying a Federal Court Motion to Dismiss and an Exception of No Cause of Action, including, but not limited to the "conversion" of a Motion to Dismiss into a summary judgment under Federal Rule of Civil Procedure 12, and general distinctions between Federal and State Pleadings requirements.  Copeland submits that his Petition states a cause of action under Louisiana procedural law, and that this Exception should be overruled.

## II.    Copeland has Stated a Cause of Action under 18 U.S.C. §1964.

### A.    *Required Elements of a Civil RICO Claim.*

18 U.S.C. § 1964(c), which recognizes a private right action for damages arising out of RICO violations, provides, in pertinent part:

> (c)    Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee....

The applicable provisions of 18 U.S.C. § 1962 were succinctly restated by the federal Fifth Circuit in *Crowe v. Henry*, 43 F.3d 198, 203 (5th Cir. 1995).  In pertinent part:

> (a)    a person who has received income from a pattern of racketeering activity cannot invest that income in an enterprise;
>
> (b)    a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering activity; and

---

[2] For a recitation of the applicable standard of review, please see Section III, A, of Copeland's Memorandum in Opposition to Guidry's Exception, pp. 7-9.



(c)    a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and

(d)    a person cannot conspire to violate subsections (a), (b), or (c).

*Crowe*, 43 F.3d at 203.

In the instant case, Copeland has alleged that Defendants violated sections (b), (c) and (d). In addition to the foregoing, there are certain common elements to a civil cause of action for any of these RICO violations. These common elements include: (1) a "person" who engages in (2) a "pattern of racketeering activity," (3) connected to the acquisition, establishment, conduct, or control of an "enterprise." *Crowe*, 43 F.3d at 204, *citing Delta Truck & Tractor, Inc. v. J.I. Case Col.*, 855 F.2d 241, 242 (5th Cir. 1988), *cert. denied*, 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d. 836 (1989).

Treasure Chest has not challenged that it is properly alleged to be a RICO "person," but does question whether Copeland has sufficiently plead the last two elements, the existence of a "pattern of racketeering activity," and its connection to the conduct or control of the affairs of a RICO "enterprise." This challenge is unavailing, and this Exception must be denied.

### B.    *Copeland has Sufficiently Plead a "Pattern of Racketeering Activity".*

One of the terms of art in RICO litigation is the concept of a "pattern of Racketeering Activity, " which is defined as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. §1961(5). Acts of "racketeering activity" include generally recognized criminal activities, such as gambling, arson, robbery, bribery, extortion, wire fraud and mail fraud. Treasure Chest has not, and cannot in good faith contend that the allegations of the Petition do not meet the statutory definition.[3] In pertinent part, Copeland has alleged:

69.

> On information and belief, the RICO persons conducted and participated in the conduct of the affairs of the RICO enterprise through a pattern of racketeering activity in East Baton Rouge and other parishes, comprised of repeated acts of bribery (in violation of 18 U.S.C. 1952 and LSA-R.S. 14:118), extortion (in violation of 18 U.S.C. §1951, LSA R.S. 14:66 and LSA-R.S.

---

[3] If Treasure Chest's challenge is to the fact that Copeland's factual allegations are occasionally made "upon information or belief." or rest upon the fact that they are couched in terms of the language of the Edwards indictment, the Guidry plea, and various newspaper articles, Plaintiff's statement that the alleged "flaws in Copeland's petition are not susceptible to being cured by amendment," is patently false, as Copeland can clarify his allegations by means of the actual evidence presented at the criminal trial of the matter including Robert Guidry's sworn testimony, which resulted in multiple convictions. (Memorandum in Support of Treasure Chest Casino. L.L.C.'s Peremptory Exception of No Cause of Action, p. 2-3).



*163*

14:120), wire fraud (in violation of 18 U.S.C. §1343), and mail fraud (in violation of 18 U.S.C. §1341) (collectively, "predicate acts") extending over a period of years, in violation of 18 U.S.C. §1962(c).

What Treasure Chest does challenge is whether Copeland's pleadings satisfy the judicial gloss imposed on the statute by various Federal Courts which have interpreted it. The United States Supreme Court has defined this requirement to consist of two elements, "relatedness," and "continuity." *H.J. Inc. v. Northwestern Bell Telephone, Co.* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Relatedness, which is established if the acts alleged have the "same or similar purposes, results, participants, victims, or methods of commission,"[4] is not contested herein.

Whether Copeland has sufficiently alleged "continuity" is challenged by Treasure Chest, albeit largely by virtue of discussions of decisions involving lower courts dealing with factually distinct pleadings. However, the United States Fifth Circuit Court of Appeals in *Word of Faith World Outreach Center Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir.1996), *cert. Denied*, 520 U.S. 1117, 117 S.Ct. 1248, 137 L.Fed. 2d 329 (1997), succinctly distilled the essence of the Supreme Court's discussion of the issue:

> To establish continuity, plaintiffs must prove "continuity of racketeering activity, **or** its threat." .... This may be shown by **either** a closed period of repeated conduct, or an open- ended period of conduct that "by its nature projects into the future with a threat of repetition." ... *A closed period of conduct may be demonstrated "by proving a series of related predicates extending over a substantial period of time."* ... An open period of conduct involves the establishment of "a threat of continued racketeering activity." ... This may be shown where there exists a "specific threat of repetition extending indefinitely into the future," **or** *"where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business."* ... The Court stated that in enacting RICO, Congress was concerned with "long-term criminal conduct."

*Word of Faith World Outreach Center Church, Inc.*, 90 F.3d at 122, *citing H.J. Inc., supra.* (Internal citations omitted, emphasis added).

Under the U.S. Supreme Court's reasoning, the actual threat or continued threat of repetition is only required if the pattern of conduct is an "open" one, and even then, a Plaintiff need not show actual threat of future conduct if he can establish "that the predicates are a regular way of conducting defendant's ongoing legitimate business." *H.J. Inc.,* 492 U.S. at 242-243, 109 S.Ct. at 2903. Arguably, at the time that Copeland filed his Petition in September of 1999, this pattern may have been classified as an "open one," as, with the exception of Robert Guidry, the other RICO persons, including Edwin W. Edwards, Stephen Edwards, Andrew Martin, Treasure Chest, "and other unnamed persons and entities" had not plead guilty or otherwise been

---

[4] *H.J Inc* 492 U.S. at 240, 109 S.Ct. at 2901.

**164**

called to account for their actions. However, following the conclusion of the criminal trial, it is clear that the pattern is a closed one.

The facts supporting the requisite "series of related predicates extending over a substantial period of time" have in fact already been plead, although both Defendants Guidry and Treasure Chest have objected to the inclusion of some of these facts relating to the Shetler scheme, as well as those acts which are alleged to be outside of the statute of limitations. Nevertheless, the pattern alleged commenced with respect to Guidry's payment of "$25,000.00 for legal services relating to the preparation of the Treasure Chest license application" on February 9, 1993 (Petition, ¶ 12), and continued up until the furtive exchange of $65,000.00 in cash on or about April, 1997. (Petition, ¶ 37).

Clearly, Copeland has sufficiently alleged a pattern of racketeering activity, as that term is defined in the statute and as interpreted by the Supreme Court. To the extent that Treasure Chest's exception is based on this alleged fault, it must be overruled.

### C.    Copeland has Sufficiently Plead Treasure Chest's connection to the conduct or control of the affairs of a RICO "Enterprise".

Treasure Chest has also averred that Copeland has failed to plead both the existence of a RICO "enterprise" and Treasure Chest's connection to the conduct or control of its affairs. With respect to the first, the alleged existence of a RICO enterprise, Treasure Chest's claim is erroneous.[5]

18 U.S.C. 1961(4) defines an "enterprise" to "include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." In one of the very few Louisiana Appellate Court Opinions addressing civil RICO claims, the Fourth Circuit elaborated on what this has been held to mean:

> In order to show an "association-in-fact," a plaintiff must show "evidence of an ongoing organization, formal or informal, and ... evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981); *Manax v. McNamara*, 842 F.2d 808, 811 (5th Cir.1988). The case law interpreting that provision generally requires a showing that an association-in-fact have some purpose beyond the conduct complained about in the case. *See, e.g. Manax*, 842 F.2d 808, in which the court held that two individuals joined together to commit one discrete criminal act do not constitute an association-in-fact. *Id.* at 811, *citing Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 427 (5th Cir.1987).

*Burnham Broadcasting Co. v. Williams*, 93-0409 (La.App. 4 Cir. 12/16/93), 629 So.2d 1335, 1339, *writ denied*, 94-0150 (La. 2/25/94); 632 So.2d 770, *cert. denied*, 513 U.S. 814, 115 S.Ct. 69, 130 L.Ed.2d 25 (1994). Strictly speaking the "showing" required by the Court in *Burnham*

---

[5] This is no doubt why Guidry has not joined in this particular objection to Copeland's pleadings.

*165*

*Broadcasting Co.,* which dealt with an evidentiary hearing on an application for a preliminary injunction far exceeds what must merely be pled so as to overcome an Exception of No Cause of Action. Nevertheless, the essential elements of what must ultimately be proved based on the pleadings are stated in these few sentences.

Clearly, Copeland has sufficiently alleged the existence of an enterprise. He has, in fact, alleged an enterprise beginning prior to Edwin Edwards' fourth and final term as governor, (Petition, ¶ 73), and continuing past the end of that term, (Petition, ¶ 74), involving multiple predicate acts, each of which were committed for at least two separate purposes, i.e., proprietary gain and the corruption of the licensing process. Strict proof of each of these factors which may demonstrate the existence of an enterprise is not required even in the criminal context. For example, in *U.S. v. Owens,* 167 F.3d 739, 752 (1st Cir.1999), *cert.* Denied, 120 S.Ct. 224, 145 L.Ed. 2d 188 (1999), the Court held that: "[t]he evidence sufficiently established more than a mere series of criminal acts; and where, as here, 'a group of persons associated together for a common purpose of engaging in a [criminal] course of conduct,' an enterprise separate from the pattern of racketeering activity is sufficiently established." *Id, citing United States v. Doherty,* 867 F.2d 47, 68 (1st Cir.1989), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed. 2d 590 (1989). Certainly, Copeland has sufficiently **alleged** the existence of a RICO enterprise.

In perhaps its most interesting argument, Treasure Chest denies its connection with the RICO enterprise, urging that the allegations of the Petition do not specifically state that it personally committed any predicate acts, and accordingly, that Copeland's allegations that it violated 18 U.S.C. §1962(b), (c) and (d) must fall. Incredibly, Treasure Chest asserts that it is the "victim or object of the alleged scheme." Presumably this victimization consists of being forced to pay illicit bribes in order to illegally obtain a gaming license before being able to reap the benefits consisting of millions of dollars of revenue, rather than risking the uncertainties of honestly competing for a gaming license.

Treasure Chest's argument that it must have "personally" committed predicate acts after it was wholly acquired by Boyd Gaming by paying off Guidry for his efforts in October, 1997[b] is erroneous. In addition to the fact that many of the predicate acts were committed by Guidry on Treasure Chest's behalf, a defendant's civil RICO liability under §1962(d) does not require that the defendant have personally committed any predicate RICO act. The Supreme Court has

---

[b] Please see Petition, ¶ 39, wherein it is specifically alleged that "Treasure Chest's 'intangible license rights,' which had been obtained solely as a result of the overarching corrupt conspiracy, were valued at $85 million of the total purchase price [of approximately $113 million]."

*166*

definitively stated that a RICO defendant need not have personally committed any predicate act to be convicted of conspiracy. *Salinas v. United States*, 522 U.S. 52, 64, 118 S.Ct. 469, 477 (1997). Justice Kennedy explained the operations of § 1962(d):

> There is no requirement of some overt act or specific act in the statute before us, unlike the general conspiracy provision applicable to federal crimes, which requires that at least one of the conspirators have committed an "act to effect the object of the conspiracy." § 371. The RICO conspiracy provision, then, is even more comprehensive than the general conspiracy offense in § 371.

* * *

> The RICO conspiracy statute, § 1962(d), broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the Government to prove each conspirator agreed that he would be the one to commit two predicate acts.

*Salinas v. United States*, 522 U.S. at 64, 118 S.Ct. at 477. Under *Salinas*, it is therefore immaterial that, as a juridical entity, Treasure Chest was incapable of committing overt acts other than through its principals. Treasure Chest is alleged to have conspired with other RICO persons as required under 18 U.S.C. § 1962(d). That is all the law requires.

Moreover, Treasure Chest is chargeable with the actions of Robert Guidry as they were undertaken in the course and scope of his position with Treasure Chest and were done with actual and/or apparent authority under the doctrines of respondeat superior and/or Louisiana Civil Code Article 2320. (Petition, ¶91). "Respondeat Superior and agency liability further both the compensatory and deterrent goals of the RICO statute." *Brady v. Dairy Fresh Products, Co.*, 974 F.2d 1149, 1155 (9th Cir. 1992). Accordingly, an organization which is not alleged to be the RICO "enterprise" which derives benefit from its representative's wrongful acts may be held liable for these acts under 18 U.S.C. § 1962 (a), (b), and (c). *Crowe v.* Smith, 848 F.Supp. 1258, 1262-1264 (W.D. La. 1994). The fact that Treasure Chest's new owners paid Guidry handsomely for his "services" when they bought him out does not alter Treasure Chest's liability for these actions. Copeland has sufficiently plead Treasure Chest's connection with a RICO enterprise for the purposes of 18 U.S.C. § 1962(b), (c), and (d) and for this reason Treasure Chest's Exception should be denied.

### D. Copeland has adequately plead that he is a person "injured in his business or property" under 18 U.S.C. 1964(c).

The sufficiency of Copeland's pleading with respect to the RICO injury and proximate cause issues (collectively "standing") is fully treated in his Memorandum in Opposition to Exception of No Cause of Action filed by Defendant Robert Guidry. Additionally the fallacy of Defendants' reliance on Judge Doherty's unpublished opinion in *Guilbeaux v. Grand Casinos,*

*167*

*Inc.*, No. 95-1167 (W.D.La. 7/2/96), *aff'd*, 114 F.3d 1181 (5th Cir.1997) is exemplified by Justice Ginsburg's November 7, 2000 opinion in *Cleveland v. United States*, No. 99-804. In *Cleveland*, the Court addressed the precise issue presented in *Guilbeaux*, which is emphatically not an issue presented in *this* case which deals with whether Copeland's "property or business" has been injured by Defendants' RICO violations. The issue presented in both *Cleveland* and *Guilbeaux* is whether unissued Louisiana gaming licenses qualify as "property" under the federal mail fraud statute, 18 U.S.C. §1341, which proscribes the use of the mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." The *Cleveland* Court answered this question negatively, concluding:

> that permits or licenses of this order do not qualify as "property within §1341's compass. It does not suffice, we clarify, that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, **the thing obtained must be property in the hands of the victim.** State and municipal licenses in general, and Louisiana's video poker licenses in particular, we hold, do not rank as property, for the purposes of §1341, in the hands of the official licensor.

*Cleveland*, Ex. "A," p. 1 (emphasis added). This issue, the construction of the federal mail fraud statute as judicially limited by the Court's earlier opinion in *McNally v. United States*, 483 U.S. 350 (1987), was the sole context in which Judge Doherty addressed the definition of "money or property" with respect to Louisiana Riverboat Gaming Licenses.[7] The *Guilbeaux* Court only conclusorily dealt with the issue presented by Defendants herein[8], whether such the loss of such a license may be classified as "injury in business or property" under 18 U.S.C. 1964(c), and made this determination based on the jurisprudence under 18 U.S.C. §1341[9] and facts dramatically different from the instant case. Those distinctions include the fact that Guilbeaux made no showing of suitability by virtue of having obtained a video poker license in Louisiana or gaming license in Colorado (Petition, ¶29), that the issuance of a license for a Lafayette casino would have required special approval by the voters of Vermillion Parish, (*Guilbeaux* at p. 13), while both Lake Pontchartrain, where Copeland sought to locate a casino and the Mississippi River were approved waterways.

---

[7] At page 9 of her opinion, Judge Doherty defined her inquiry: "This Court must therefore examine whether plaintiff has alleged a scheme to defraud him of *money or property* as required by the jurisprudential interpretation of the mail and wire fraud statutes." (Emphasis in original).

[8] *Guilbeaux* did not even address whether sums expended in the pursuit of the license could be classified as "injury in business or property".

[9] While Copeland has alleged predicate acts of mail fraud which were the sole predicate acts alleged in *Guilbeaux*, he has also alleged "repeated acts of bribery (in violation of 18 U.S.C. 1952 and LSA-R.S. 14:118), [and] extortion (in violation of 18 U.S.C. §1951, LSA R.S. 14:66 and LSA-R.S. 14:120)." (Petition, ¶69).



*Cleveland* is also pertinent in several other respects. First, the fact that the Louisiana legislature expressly determines a gaming license "to be a pure and absolute irrevocable privilege and not a right, property or otherwise under the constitutions of the United States or of the state of Louisiana" has no bearing on the issue at hand, since '[the question whether a state-law right constitutes 'property' or 'rights to property' is a matter of federal law." *Cleveland*, Ex. "A," n. 4, p. 13 (citations omitted). Whether Copeland has sustained a RICO injury is a question of the interpretation of 18 U.S.C. §1964(c), not of state law.

Additionally, while it did not expressly decide the question of whether "video poker licensees may have property interests in their licenses," the *Cleveland* Court went out of its way to note that "[I]n some contexts, we have held that individuals have constitutionally protected property interests in state-issued licenses essential to pursuing an occupation or livelihood." *Cleveland*, Ex. "A," n. 4, p. 13, *citing Bell v. Burson*, 402 U.S. 535, 539 91 S.Ct. 1586, 29 L.Ed. 2d 90 (1971). **The Court implicitly recognized that there might be a federally constitutionally protected property right in gaming licenses**.

If such a right is protected under the U.S. Constitution, surely it is also protected under the Louisiana Constitution, which has been held to provide substantially greater rights, La.R.S. 51:1409 (Count II- Unfair Trade Practices), and La.C.C.art. 2315 (Count III - Fraud). Copeland has alleged that he has been "injured in his business or property" as required to state a cause of action under 18 U.S.C. §1964(c), as well as for the remaining Counts.

## IV. CONCLUSION

Notwithstanding any difficult issues of proof as to a determinable quantum of damages, it is apparent that Plaintiff has plead facts sufficient to state a cause of action under Louisiana law, and accordingly, that this Exception must be overruled.

In the unlikely event that this Court does determine that Plaintiff's Petition fails to set forth a cause of action in any particulars, pursuant to Louisiana Code of Civil Procedure article 934, Copeland respectfully submits that the Court should allow an amendment to cure any defects in the pleadings, based upon the facts obtained through the full trial of the merits in the Edwards matter.



9

Opinion of the Court

NOTICE:  This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 99–804

## CARL W. CLEVELAND, PETITIONER
## *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[November 7, 2000]

JUSTICE GINSBURG delivered the opinion of the Court.

This case presents the question whether the federal mail fraud statute, 18 U. S. C. §1341, reaches false statements made in an application for a state license. Section 1341 proscribes use of the mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  Petitioner Carl W. Cleveland and others were prosecuted under this federal measure for making false statements in applying to the Louisiana State Police for permission to operate video poker machines.  We conclude that permits or licenses of this order do not qualify as "property" within §1341's compass.  It does not suffice, we clarify, that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim.  State and municipal licenses in general, and Louisiana's video poker licenses in particular, we hold, do not rank as "property," for purposes of §1341, in the hands of the official licensor.

*171*

EXHIBIT
A

I

Louisiana law allows certain businesses to operate video poker machines. La. Rev. Stat. Ann. §§27:301 to 27:324 (West Supp. 2000). The State itself, however, does not run such machinery. The law requires prospective owners of video poker machines to apply for a license from the State. §27:306. The licenses are not transferable, §27:311(G), and must be renewed annually, La. Admin. Code, tit. 42, §2405(B)(3) (2000). To qualify for a license, an applicant must meet suitability requirements designed to ensure that licensees have good character and fiscal integrity. La. Rev. Stat. Ann. §27:310 (West Supp. 2000).

In 1992, Fred Goodson and his family formed a limited partnership, Truck Stop Gaming, Ltd. (TSG), in order to participate in the video poker business at their truck stop in Slidell, Louisiana. Cleveland, a New Orleans lawyer, assisted Goodson in preparing TSG's application for a video poker license. The application required TSG to identify its partners and to submit personal financial statements for all partners. It also required TSG to affirm that the listed partners were the sole beneficial owners of the business and that no partner held an interest in the partnership merely as an agent or nominee, or intended to transfer the interest in the future.

TSG's application identified Goodson's adult children, Alex and Maria, as the sole beneficial owners of the partnership. It also showed that Goodson and Cleveland's law firm had loaned Alex and Maria all initial capital for the partnership and that Goodson was TSG's general manager. In May 1992, the State approved the application and issued a license. TSG successfully renewed the license in 1993, 1994, and 1995 pursuant to La. Admin. Code, tit. 42, §2405(B)(3) (2000). Each renewal application identified no ownership interests other than those of Alex and Maria.

*172*

0111009041 12

Opinion of the Court

In 1996, the FBI discovered evidence that Cleveland and Goodson had participated in a scheme to bribe state legislators to vote in a manner favorable to the video poker industry. The Government charged Cleveland and Goodson with multiple counts of money laundering under 18 U. S. C. §1957, as well as racketeering and conspiracy under §1962. Among the predicate acts supporting these charges were four counts of mail fraud under §1341.[1] The indictment alleged that Cleveland and Goodson had violated §1341 by fraudulently concealing that they were the true owners of TSG in the initial license application and three renewal applications mailed to the State. They concealed their ownership interests, according to the Government, because they had tax and financial problems that could have undermined their suitability to receive a video poker license. See La. Rev. Stat. Ann. §27:310(B)(1) (suitability requirements).

Before trial, Cleveland moved to dismiss the mail fraud counts on the ground that the alleged fraud did not deprive the State of "property" under §1341. The District Court denied the motion, concluding that "licenses consti-

---

[1] Title 18 U. S. C. §1341 provides in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, [uses the mails or causes them to be used], shall be fined under this title or imprisoned not more than five years, or both." The Racketeer Influenced and Corrupt Organizations Act (RICO) prohibits participation and conspiracy to participate in a pattern of "racketeering activity," 18 U. S. C. §§1962(c), (d), and defines "racketeering activity" to include "any act which is indictable under . . . section 1341," §1961(1). The money laundering statute prohibits various activities designed to conceal or promote "specified unlawful activity," §1956, and defines "specified unlawful activity" to include (with an exception not relevant here) "any act or activity constituting an offense listed in section 1961(1) of this title," §1956(c)(7)(A).

*173*

0111009041 13

Opinion of the Court

tute property even before they are issued." 951
F. Supp. 1249, 1261 (ED La. 1997). A jury found Cleve-
land guilty on two counts of mail fraud (based on the 1994
and 1995 license renewals) and on money laundering,
racketeering, and conspiracy counts predicated on the
mail fraud. The District Court sentenced Cleveland to 121
months in prison.

On appeal, Cleveland again argued that Louisiana had
no property interest in video poker licenses, relying on
several Court of Appeals decisions holding that the gov-
ernment does not relinquish "property" for purposes of
§1341 when it issues a permit or license. See *United
States* v. *Shotts*, 145 F. 3d 1289, 1296 (CA11 1998) (license
to operate a bail bonds business); *United States* v.
*Schwartz*, 924 F. 2d 410, 418 (CA2 1991) (arms export
license); *United States* v. *Granberry*, 908 F. 2d 278, 280
(CA8 1990) (school bus operator's permit); *Toulabi* v.
*United States*, 875 F. 2d 122, 125 (CA7 1989) (chauffeur's
license); *United States* v. *Dadanian*, 856 F. 2d 1391, 1392
(CA9 1988) (gambling license); *United States* v. *Murphy*,
836 F. 2d 248, 254 (CA6 1988) (license to conduct charita-
ble bingo games).

The Court of Appeals for the Fifth Circuit nevertheless
affirmed Cleveland's conviction and sentence, *United
States* v. *Bankston*, 182 F. 3d 296, 309 (1999), considering
itself bound by its holding in *United States* v. *Salvatore*,
110 F. 3d 1131, 1138 (1997), that Louisiana video poker
licenses constitute "property" in the hands of the State.
Two other Circuits have concluded that the issuing
authority has a property interest in unissued licenses
under §1341. *United States* v. *Bucuvalas*, 970 F. 2d 937,
945 (CA1 1992) (entertainment and liquor license); *United
States* v. *Martinez*, 905 F. 2d 709, 715 (CA3 1990) (medical
license).

*174*

Opinion of the Court

We granted certiorari to resolve the conflict among the Courts of Appeals, 529 U. S. 1017 (2000), and now reverse the Fifth Circuit's judgment.

## II

In *McNally* v. *United States*, 483 U. S. 350, 360 (1987), this Court held that the federal mail fraud statute is "limited in scope to the protection of property rights." *McNally* reversed the mail fraud convictions of two individuals charged with participating in "a self-dealing patronage scheme" that defrauded Kentucky citizens of "the right to have the Commonwealth's affairs conducted honestly." *Id.*, at 352. At the time *McNally* was decided, federal prosecutors had been using §1341 to attack various forms of corruption that deprived victims of "intangible rights" unrelated to money or property.[2] Reviewing the history of §1341, we concluded that "the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." *Id.*, at 356.

As first enacted in 1872, §1341 proscribed use of the mails to further " 'any scheme or artifice to defraud.' " *Ibid.* In 1896, this Court held in *Durland* v. *United States*, 161 U. S. 306, 313, that the statute covered fraud not only by "representations as to the past or present," but also by "suggestions and promises as to the future." In 1909, Congress amended §1341 to add after "any scheme or artifice to defraud" the phrase "or for obtaining money or

---

[2] *E.g., United States* v. *Clapps*, 732 F. 2d 1148, 1153 (CA3 1984) (electoral body's right to fair elections); *United States* v. *Bronston*, 658 F. 2d 920, 927 (CA2 1981) (client's right to attorney's loyalty); *United States* v. *Bohonus*, 628 F. 2d 1167, 1172 (CA9 1980) (right to honest services of an agent or employee); *United States* v. *Isaacs*, 493 F. 2d 1124, 1150 (CA7 1974) (right to honest services of public official).

*175*

0111009041 15

property by means of false or fraudulent pretenses, representations, or promises." *McNally*, 483 U. S., at 357. We explained in *McNally* that the 1909 amendment "codified the holding of *Durland*," *id.*, at 357, and "simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property," *id.*, at 359. Rejecting the argument that "the money-or-property requirement of the latter phrase does not limit schemes to defraud to those aimed at causing deprivation of money or property," *id.*, at 358, we concluded that the 1909 amendment signaled no intent by Congress to "depar[t] from [the] common understanding" that "the words 'to defraud' commonly refer 'to wronging one in his property rights,'" *id.*, at 358–359 (quoting *Hammerschmidt* v. *United States*, 265 U. S. 182, 188 (1924)).

Soon after *McNally*, in *Carpenter* v. *United States*, 484 U. S. 19, 25 (1987), we again stated that §1341 protects property rights only. *Carpenter* upheld convictions under §1341 and the federal wire fraud statute, 18 U. S. C. §1343, of defendants who had defrauded the Wall Street Journal of confidential business information. Citing decisions of this Court as well as a corporate law treatise, we observed that "[c]onfidential business information has long been recognized as property." 484 U. S., at 26.

The following year, Congress amended the law specifically to cover one of the "intangible rights" that lower courts had protected under §1341 prior to *McNally*: "the intangible right of honest services." Anti-Drug Abuse Act of 1988, §7603(a), 18 U. S. C. §1346. Significantly, Congress covered only the intangible right of honest services even though federal courts, relying on *McNally*, had dismissed, for want of monetary loss to any victim, prosecu-

*176*

0111009041 16

tions under §1341 for diverse forms of public corruption, including licensing fraud.[3]

## III

In this case, there is no assertion that Louisiana's video poker licensing scheme implicates the intangible right of honest services. The question presented is whether, for purposes of the federal mail fraud statute, a government regulator parts with "property" when it issues a license. For the reasons we now set out, we hold that §1341 does not reach fraud in obtaining a state or municipal license of the kind here involved, for such a license is not "property" in the government regulator's hands. Again, as we said in *McNally*, "[i]f Congress desires to go further, it must speak more clearly than it has." 483 U. S., at 360.

To begin with, we think it beyond genuine dispute that whatever interests Louisiana might be said to have in its video poker licenses, the State's core concern is *regulatory*. Louisiana recognizes the importance of "public confidence and trust that gaming activities . . . are conducted honestly and are free from criminal and corruptive elements." La. Rev. Stat. Ann. §27:306(A)(1) (West Supp. 2000). The video poker licensing statute accordingly asserts the

---

[3] For example, in *United States* v. *Murphy*, 836 F. 2d 248, 254 (CA6 1988), the court overturned the mail fraud conviction of a state official charged with using false information to help a charitable organization obtain a state bingo license. Acknowledging "the *McNally* limitations" on §1341, the court said that the issue "distills to a consideration of whether Tennessee's 'right to control or object' with respect to the issuance of a bingo permit to a charitable organization constitutes 'property.' " *Id.*, at 253. It then held that "the certificate of registration or the bingo license may well be 'property' once issued, insofar as the charitable organization is concerned, but certainly an unissued certificate of registration is not property of the State of Tennessee and once issued, it is not the property of the State of Tennessee." *Id.*, at 253–254.

*197*

0111009041 17

State's "legitimate interest in providing strict regulation of all persons, practices, associations, and activities related to the operation of . . . establishments licensed to offer video draw poker devices." *Ibid.* The statute assigns the Office of State Police, a part of the Department of Public Safety and Corrections, the responsibility to promulgate rules and regulations concerning the licensing process. §27:308(A). It also authorizes the State Police to deny, condition, suspend, or revoke licenses, to levy fines of up to $1,000 per violation of any rule, and to inspect all premises where video poker devices are offered for play. §§27:308(B), (E)(1). In addition, the statute defines criminal penalties for unauthorized use of video poker devices, §27:309, and prescribes detailed suitability requirements for licensees, §27:310.

In short, the statute establishes a typical regulatory program. It licenses, subject to certain conditions, engagement in pursuits that private actors may not undertake without official authorization. In this regard, it resembles other licensing schemes long characterized by this Court as exercises of state police powers. *E.g., Ziffrin, Inc.* v. *Reeves,* 308 U. S. 132, 138 (1939) (license to transport alcoholic beverages); *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539, 558 (1917) (license to sell corporate stock); *Fanning* v. *Gregoire,* 16 How. 524, 534 (1854) (ferry license); *License Cases,* 5 How. 504, 589 (1847) (license to sell liquor) (opinion of McLean, J.), overruled on other grounds, *Leisy* v. *Hardin,* 135 U. S. 100 (1890).

Acknowledging Louisiana's regulatory interests, the Government offers two reasons why the State also has a property interest in its video poker licenses. First, the State receives a substantial sum of money in exchange for each license and continues to receive payments from the licensee as long as the license remains in effect. Second, the State has significant control over the issuance, renewal, suspension, and revocation of licenses.

*178*

011100904118

Opinion of the Court

Without doubt, Louisiana has a substantial economic stake in the video poker industry. The State collects an upfront "processing fee" for each new license application, La. Rev. Stat. Ann. §27:311(H)(2) (West Supp. 2000) ($10,000 for truck stops), a separate "processing fee" for each renewal application, §27:311(H)(4) ($1,000 for truck stops), an "annual fee" from each device owner, §27:311(A)(4) ($2,000), an additional "device operation" fee, §27:311(A)(5)(c) ($1,000 for truck stops), and, most importantly, a fixed percentage of net revenue from each video poker device, §27:311(D)(1)(b) (32.5% for truck stops). It is hardly evident, however, why these tolls should make video poker licenses "property" in the hands of the State. The State receives the lion's share of its expected revenue not while the licenses remain in its own hands, but only *after* they have been issued to licensees. Licenses pre-issuance do not generate an ongoing stream of revenue. At most, they entitle the State to collect a processing fee from applicants for new licenses. Were an entitlement of this order sufficient to establish a state property right, one could scarcely avoid the conclusion that States have property rights in any license or permit requiring an upfront fee, including drivers' licenses, medical licenses, and fishing and hunting licenses. Such licenses, as the Government itself concedes, are "purely regulatory." Tr. of Oral Arg. 24–25.

Tellingly, as to the character of Louisiana's stake in its video poker licenses, the Government nowhere alleges that Cleveland defrauded the State of any money to which the State was entitled by law. Indeed, there is no dispute that TSG paid the State of Louisiana its proper share of revenue, which totaled more than $1.2 million, between 1993 and 1995. If Cleveland defrauded the State of "property," the nature of that property cannot be economic.

Addressing this concern, the Government argues that Cleveland frustrated the State's right to control the issu-

179

0111009041 19

ance, renewal, and revocation of video poker licenses under La. Rev. Stat. Ann. §§27:306, 27:308 (West Supp. 2000). The Fifth Circuit has characterized the protected interest as "Louisiana's right to choose the persons to whom it issues video poker licenses." *Salvatore*, 110 F. 3d, at 1140. But far from composing an interest that "has long been recognized as property," *Carpenter*, 484 U. S., at 26, these intangible rights of allocation, exclusion, and control amount to no more and no less than Louisiana's sovereign power to regulate. Notably, the Government overlooks the fact that these rights include the distinctively sovereign authority to impose criminal penalties for violations of the licensing scheme, La. Rev. Stat. Ann. §27:309 (West Supp. 2000), including making false statements in a license application, §27:309(A). Even when tied to an expected stream of revenue, the State's right of control does not create a property interest any more than a law licensing liquor sales in a State that levies a sales tax on liquor. Such regulations are paradigmatic exercises of the States' traditional police powers.

The Government compares the State's interest in video poker licenses to a patent holder's interest in a patent that she has not yet licensed. Although it is true that both involve the right to exclude, we think the congruence ends there. A patent not only confers the right to exclude others from using an invention, it also protects the holder's right to use, make, or sell the invention herself. 35 U. S. C. §§154, 271(d)(1). Louisiana does not conduct gaming operations itself, it does not hold video poker licenses to reserve that prerogative, and it does not "sell" video poker licenses in the ordinary commercial sense. Furthermore, while a patent holder may sell her patent, see §261 ("patents shall have the attributes of personal property"), the State may not sell its licensing authority. Instead of a patent holder's interest in an unlicensed patent, the better analogy is to the Federal Government's

*180*

0111009041 20

interest in an unissued patent.  That interest, like the State's interest in licensing video poker operations, surely implicates the Government's role as sovereign, not as property holder.  See U. S. Const., Art. I, §8, cl. 8.

The Government also compares the State's licensing power to a franchisor's right to select its franchisees.  On this view, Louisiana's video poker licensing scheme represents the State's venture into the video poker business.  Although the State could have chosen to run the business itself, the Government says, it decided to franchise private entities to carry out the operations instead.  However, a franchisor's right to select its franchisees typically derives from its ownership of a trademark, brand name, business strategy, or other product that it may trade or sell in the open market.  Louisiana's authority to select video poker licensees rests on no similar asset.  It rests instead upon the State's sovereign right to exclude applicants deemed unsuitable to run video poker operations.  A right to exclude in that governing capacity is not one appropriately labeled "property."  See Tr. of Oral Arg. 25.  Moreover, unlike an entrepreneur or business partner who shares both losses and gains arising from a business venture, Louisiana cannot be said to have put its labor or capital at risk through its fee-laden licensing scheme.  In short, the State did not decide to venture into the video poker business; it decided typically to permit, regulate, and tax private operators of the games.

We reject the Government's theories of property rights not simply because they stray from traditional concepts of property.  We resist the Government's reading of §1341 as well because it invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress.  Equating issuance of licenses or permits with deprivation of property would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities.  We

*181*

note in this regard that Louisiana's video poker statute typically and unambiguously imposes criminal penalties for making false statements on license applications. La. Rev. Stat. Ann. §27:309(A) (West Supp. 2000). As we reiterated last Term, " 'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes." *Jones* v. *United States*, 529 U. S. 848, 858 (2000) (quoting *United States* v. *Bass*, 404 U. S. 336, 349 (1971)).

Moreover, to the extent that the word "property" is ambiguous as placed in §1341, we have instructed that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis* v. *United States*, 401 U. S. 808, 812 (1971). This interpretive guide is especially appropriate in construing §1341 because, as this case demonstrates, mail fraud is a predicate offense under RICO, 18 U. S. C. §1961(1) (1994 ed., Supp. IV), and the money laundering statute, §1956(c)(7)(A). In deciding what is "property" under §1341, we think "it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States* v. *Universal C. I. T. Credit Corp.*, 344 U. S. 218, 222 (1952).

Finally, in an argument not raised below but urged as an alternate ground for affirmance, the Government contends that §1341, as amended in 1909, defines two independent offenses: (1) "any scheme or artifice to defraud" and (2) "any scheme or artifice . . . for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Because a video poker license is property in the hands of the licensee, the Government says, Cleveland "obtain[ed] . . . property" and thereby committed the second offense even if the license is not property in the hands of the State.

*152*

0111009041 22

Opinion of the Court

Although we do not here question that video poker licensees may have property interests in their licenses,[4] we nevertheless disagree with the Government's reading of §1341.  In *McNally*, we recognized that "[b]ecause the two phrases identifying the proscribed schemes appear in the disjunctive, it is arguable that they are to be construed independently."  483 U. S., at 358.  But we rejected that construction of the statute, instead concluding that the second phrase simply modifies the first by "ma[king] it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property."  *Id.*, at 359.  Indeed, directly contradicting the Government's view, we said that "the mail fraud statute . . . had its origin in the desire to protect individual property rights, and any benefit which the Government derives from the statute must be limited to *the Government's interests as property holder*."  *Id.*, at 359, n. 8 (emphasis added).  We reaffirm our reading of §1341 in *McNally*.  See *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 205 (1991) ("*stare decisis* is most compelling" where "a pure question of statutory construction" is involved).  Were the Government correct that the second phrase of §1341 defines a separate offense, the statute would appear to arm federal prosecutors with power to police false statements in an enormous range of

---

[4] Notwithstanding the State's declaration that "[a]ny license issued or renewed . . . is not property or a protected interest under the constitutions of either the United States or the state of Louisiana," La. Rev. Stat. Ann. §27:301(D) (West Supp. 2000), "[t]he question whether a state-law right constitutes 'property' or 'rights to property' is a matter of federal law," *Drye* v. *United States*, 528 U. S. 49, 58 (1999) (citing *United States* v. *National Bank of Commerce*, 472 U. S. 713, 727 (1985)).  In some contexts, we have held that individuals have constitutionally protected property interests in state-issued licenses essential to pursuing an occupation or livelihood.  See, *e.g.*, *Bell* v. *Burson*, 402 U. S. 535, 539 (1971) (driver's license).

*183*

submissions to state and local authorities. For reasons already stated, see *supra*, at 11–12, we decline to attribute to §1341 a purpose so encompassing where Congress has not made such a design clear.

## IV

We conclude that §1341 requires the object of the fraud to be "property" in the victim's hands and that a Louisiana video poker license in the State's hands is not "property" under §1341. Absent clear statement by Congress, we will not read the mail fraud statute to place under federal superintendence a vast array of conduct traditionally policed by the States. Our holding means that Cleveland's §1341 conviction must be vacated. Accordingly, the judgment of the United States Court of Appeals for the Fifth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

184

Respectfully submitted,

**CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP**

By: _____
    **ROBERT A. KUTCHER** (LSBA #7895)
    **NICOLE S. TYGIER** (LSBA #19814)
    **VICKI A. TURKO** (LSBA #24677)
    Two Lakeway Center, Suite 900
    3850 North Causeway Boulevard
    Metairie, Louisiana 70002
    Telephone: (504) 830-3838
    Facsimile: (504) 836-9573

    **BENJAMIN R. SLATER, JR.** (LSBA #12126)
    **BENJAMIN R. SLATER, III, T.A.** (LSBA #12127)
    **A. ELISE BROWN** (LSBA #19500)
    **DONALD J. MEISLER, JR.** (LSBA #20294)
    **S. JOSEPH WELBORN** (LSBA #25928)
    **SLATER LAW FIRM**
    650 Poydras Street, Suite 2600
    New Orleans, Louisiana 70130
    Telephone: (504) 523-7333
    Facsimile: (504) 528-1080

*Attorneys for Plaintiff Alvin C. Copeland*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

(   )    Hand Delivery      ( ✓ )    Prepaid U.S. Mail
( ✓ )    Facsimile          (   )    Overnight Delivery

Metairie, Louisiana, this 9th day of November, 2000.

_____



*170*

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 87 of 344

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                    DIVISION "D"

ALVIN C. COPELAND

-versus-

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

Filed:_____          _____
                                                         **Deputy Clerk**

**MEMORANDUM IN OPPOSITION TO EXCEPTION OF
PRESCRIPTION OF PLAINTIFF'S CIVIL RICO CLAIM**

**MAY IT PLEASE THE COURT:**

Plaintiff, Alvin C. Copeland ("Copeland"), the successor to American International Gaming Association, Inc. ("AIGA"), submits this Memorandum in Opposition to the Exception of Prescription of Plaintiff's Civil RICO Claim filed herein by Defendant, Robert Guidry.

## I.    INTRODUCTION

Copeland filed this suit as a result of substantial losses incurred by him in his pursuit of a license to operate a proposed riverboat gaming operation at the Kenner Laketown Harbor Park on the shores of Lake Pontchartrain in Jefferson Parish. As the result of "an overarching corrupt conspiracy," i.e. a scheme to corrupt the entire process for issuing riverboat gaming licenses in which both Treasure Chest Casino, LLC and Robert Guidry joined, participated and engaged in overt acts in furtherance of, the license was not awarded to Copeland, but to Treasure Chest Casino, LLC. Copeland has filed this suit, seeking to hold Defendants accountable for both the expenses he incurred in attempting to fairly participate in the process subverted by Defendants' conduct, as well lost profits, attorneys fees and costs, and the value of the corruptly obtained Treasure Chest's gaming license and of its ill begotten success.

The method for Copeland's pursuit of these goals is his Petition for Damages, which alleges the Defendants' civil responsibility for their actions under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 *et seq.*, the Louisiana Unfair Trade Practices Act, La.R.S. 51:1401 *et seq.*, Louisiana Civil Code Article 2315 (Tortious Fraud), and 2298 (Unjust Enrichment). Copeland also alleges that Defendants are solidarily liable under 18 U.S.C.

*185*

§1962 and Louisiana Civil Code Article 2324, and that Treasure Chest is liable for the actions of Robert Guidry under the doctrines of apparent authority, respondeat superior and La.C.C.art. 2320. Despite the fact that Plaintiff neither knew nor could have known of the overarching corrupt conspiracy until it became public knowledge on or about November 6, 1998, Guidry now claims that Plaintiff's claim sunder the RICO act are prescribed.

## II.    LAW AND ARGUMENT

Although Plaintiff does not dispute that the holding of the United States Supreme Court in *Rotella v. Wood*, 120 S.Ct. 1075 (2000) provides for a four year statute of limitation applying to Civil RICO claims which runs from the date the Plaintiff knew or should have known of the injury caused by Defendant's acts in violation of RICO, he nevertheless submits that the claims brought herein are not prescribed by virtue of the Doctrine of Fraudulent Concealment and Equitable Tolling as set forth in *Klehr v. AO Smith Corp.*, 117 S.Ct. 1984 (1997). The key issue, therefore, is when the Plaintiff should have known of the injury caused by the Defendants. Contrary to Guidry's contention, that period was not triggered by the loss of the license awarded to Treasure Chest. At that time, due to the active concealment of the Defendants, which facts are a matter of public record, Plaintiff was not and could not have been aware that he suffered a RICO injury. Instead, Plaintiff's injury only accrued when the scheme to defraud became public knowledge. That occurred in November of 1998, less than four years prior to the institution of this action by Plaintiff, and as such, Plaintiff's claim has not prescribed. Clearly, the rulings on RICO limitations periods were not intended to reward fraudulent acts on behalf of those who have positively and actively violated the law and then purposefully concealed those acts from their victims.

As correctly noted by Guidry, since the filing of this lawsuit, the United States Supreme Court has twice addressed a split between the circuits regarding the choice of appropriate applications of statutes of limitations for Civil RICO claims. However, as Guidry also admits, the Supreme Court's indication that the pattern discovery rule does not apply in no way was meant to obviate the settled "understanding that the federal statutes of limitations are generally subject to principles of **equitable tolling**...and where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer to a plaintiff's difficulty...." *Rotella*, 120 S.Ct. at 1084, *citing Klehr*, 117 S.Ct. 1984 (emphasis added)

*186*

Under this doctrine, to avail itself of fraudulent concealment, a Plaintiff has the burden of proving that the Defendants concealed the conduct complained of, that the Plaintiff failed, despite the exercise due diligence on their part to discover the facts that form the basis of his claim. *Morton Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823 (11 Cir. 1999), *amended in part*, 211 F.3d 1224 (11 Cir. 2000), *cert. den.*, 120 S.Ct. 3724 (2000); *Blue Cross & Blue Shield of New Jersey, Inc. v. Phillip Morris, Inc.*, 113 F.Supp. 2d 345 (E.D.N.Y. 2000); *Tanaka v. First Hawaiian Bank*, 104 F.Supp. 2d 1243, 1252-1253 (D.Hawaii 2000).

In the instant case, Copeland has alleged facts sufficient to invoke the Doctrine of Fraudulent Concealment. In general terms, Plaintiff, in his Petition, Paragraph 77, specifically noted:

> 77.
>
> The RICO persons fraudulently concealed their illegal activities, and plaintiff neither knew nor, in the exercise of due diligence, could reasonably have known of the offenses committed by the members of the RICO enterprise.

In addition to this general allegation and the allegations that Guidry and others concealed their involvement in the overarching corrupt conspiracy noted by Guidry in his Memorandum in Support, Plaintiff has also noted specific affirmative acts of fraudulent concealment. In particular, Paragraph 25 of the Petition specifically alleges:

> 25.
>
> The State Police held a hearing into Treasure Chest's application in Baton Rouge, La. On May 17, 1994. At this hearing, the following exchange took place between Captain Mark Oxley of the Division and Robert Vosbein, counsel for Treasure Chest, who was under oath:
>
> Capt. Oxley: And are you testifying that there are no elected public officials doing business with Treasure Chest?
>
> Mr. Vosbein: That's correct.
>
> This statement was made by Mr. Vosbein as agent for Treasure Chest and/or Guidry; on information and belief, it was based on information supplied to him by Treasure Chest and/or Guidry. Treasure Chest's representations, through its agent Mr. Vosbein, violated LSA-R.S. 27:70 C. in failing to disclose Treasure Chest's relationship with Edwin Edwards, which was prohibited by LSA-R.S. 27:96 A.



3

Plaintiff also specifically pled that Guidry further committed another affirmative act of concealment by executing an Affidavit of Full Disclosure on February 2, 1993, falsely representing the involvement of Edwards in the overarching corrupt conspiracy:

> 27.
>
> > In conjunction with his submittal of the Treasure Chest application for a license, Guidry executed an "Affidavit of Full Disclosure" on February 26, 1993, wherein Guidry averred, in pertinent part:
> >
> > > ... except as reported in the Application, I have no agreements or understandings with any person or entity and no present intent to pay any sums of money or given anything of value as, including but without limitation, a finder's fee or commission to any person or entity related to the acquisition of any interest in the Application ...
> >
> > Pursuant to LSA-R.S. 27:70 C., Guidry had a continuing duty to render a full and accurate disclosure of his association with Edwin Edwards as set forth herein. Upon information and belief, Guidry has never disclosed this association, and has therefore violated his duty under LSA-R.S. 27:70 C.

In the instant case, Plaintiff has clearly and unequivocally alleged that Defendants actively concealed their fraudulent conduct so as to prevent Plaintiff from realizing that the injury he suffered on or about May 17, 1994, was the result of an overarching corrupt conspiracy prohibited by and punishable under the RICO statute.

While Guidry notes that Plaintiff has not belabored in his pleadings the facts supporting his "due diligence" with respect to his discovery of the Defendants' conduct, a review of the Petition establishes that Plaintiff diligently attempted to keep himself abreast of developments with respect to the processes involving the issuance of licenses and certificates of preliminary approval. In fact, it is specifically noted that Plaintiff objected to Treasure Chest's request for permission to modify its previously filed application to move the site of its proposed route and operations to Lake Pontchartrain (Petition, para. 18). Moreover, a review of the Petition clearly reveals that Plaintiff in fact diligently monitored local newspapers, including the Times-Picayune.

The degree of due diligence required to plead fraudulent concealment with respect to a RICO claim is a question of fact and is dependent upon the question of "when, under the totality of the circumstances, [a reasonable person] of ordinary intelligence would have discovered the existence of the fraud." *Blue Cross & Blue Shield of New Jersey, Inc.*, 113 F.Supp. 2d at 382.

The federal government, with all of its resources, did not immediately discover this fraud. Yet, Guidry complaints that the Plaintiff should have done so earlier. That argument comes with ill grace from a convicted felon who purposely hid his criminal activity.

In the instant case, Copeland respectfully submits that he has sufficiently alleged that he acted reasonably in filing this lawsuit at the earliest possible time after learning of credible evidence to support a claim of conspiracy. This evidence was in the form of the series of newspaper articles referred to throughout the Petition, and the issuance of Guidry's guilty plea and the Edwards indictment.

Guidry has indicated that he desires to present evidence at the trial of this Exception. Plaintiff stands ready to, and will introduce at this hearing, evidence and testimony that he acted diligently in keeping abreast of the licensing process. However, due to the nature of Defendants' affirmative acts of concealment, such reasonable efforts were non-availing, and Plaintiff did not learn of the Defendants' conduct until it became public knowledge.

### III.  CONCLUSION

Considering the foregoing, and based on the evidence to be presented at the hearing of this Exception, Plaintiff respectfully submits that this Court should overrule the Exception of Prescription in RICO filed herein by Guidry.

Respectfully submitted,

*CHOPIN, WAGAR, COLE, RICHARD,*
*REBOUL & KUTCHER, LLP*

By: _____
**ROBERT A. KUTCHER** (LSBA #7895)
**NICOLE S. TYGIER** (LSBA #19814)
**VICKI A. TURKO** (LSBA #24677)
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9573

*189*

**BENJAMIN R. SLATER, JR.** (LSBA #12126)
**BENJAMIN R. SLATER, III, T.A.** (LSBA #12127)
**A. ELISE BROWN** (LSBA #19500)
**DONALD J. MEISLER, JR.** (LSBA #20294)
**S. JOSEPH WELBORN** (LSBA #25928)
**SLATER LAW FIRM**
650 Poydras Street, Suite 2600
New Orleans, Louisiana 70130
Telephone: (504) 523-7333
Facsimile: (504) 528-1080

*Attorneys for Plaintiff Alvin C. Copeland*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

(   )   Hand Delivery      (   )   Prepaid U.S. Mail
(   )   Facsimile      ( X )   Overnight Delivery

New Orleans, Louisiana, this _____ day of _____ 2000.

*190*

01116142710 00

**19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

NO. 464607          **DIV. "D"**

**ALVIN C. COPELAND**

**VERSUS**

**TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY**

FILED:_____      _____

                                    **DEPUTY CLERK**

COST OK Amt._____

DOCKET

NOV 1 5 2000

BY_____ DY. CLERK OF COURT

POSTED

NOV 1 7 2000

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF EXCEPTION OF NO CAUSE OF ACTION**

**MAY IT PLEASE THE COURT:**

Oral argument was heard on November 13, 2000, on the Exception of No Cause of Action filed by Robert Guidry and a similar Exception of No Cause of Action filed by Treasure Chest, LLC. In order to clarify an issue addressed by the Court, defendant, Robert Guidry, submits the following supplemental memorandum in support of his Exception of No Cause of Action.

In State of Louisiana through the Louisiana Riverboat Gaming Commission v. Louisiana State Police Riverboat Gaming Enforcement Division, 694 So.2d 316 (La.App. 1 Cir. 1996), a decision issued on September 24, 1996, long after the license had been granted to Treasure Chest, the First Circuit Court of Appeal held that the Riverboat Gaming Commission ("Commission") exceeded its authority in promulgating certain rules providing for the granting of certificates of preliminary approval and charging fees, and held that the Commission was barred from any *further* application of these rules concerning the issuance of certificates or the charging of fees. The Court ruled as follows:

> We also affirm its [the trial court's] finding that the Commission exceeded its authority in promulgating certain of its rules and in assessing fees, and its holding that Sections 301-331 inclusive, 503-509 inclusive, 701-705 inclusive, and 717 of the Commission's rules are null, void, and without effect and *that any further application* of them is prohibited.

The Court's ruling clearly establishes that the nullity of certain rules promulgated by the Commission *had no effect* on the licenses previously issued by the Riverboat Gaming Enforcement Division ("Division"). Therefore, the 15 riverboat gaming licenses which had been

1

*191*

issued by the Division by that time were still effective, including the license issued to the Treasure Chest.

Guidry reasserts that Copeland cannot sustain a claim that he, Copeland (or AIGA), had any entitlement to a riverboat gaming license issued by the Division as a result of any actions taken by the Commission prior to the Court's decision. Further, the fact that AIGA did not receive a certificate of preliminary approval prior to any alleged wrongdoing on the part of Guidry-- and was effectively out of the running before any alleged fraudulent scheme, is significant. How could AIGA have been damaged if AIGA did not receive preliminary approval in a then-valid process before any alleged wrongdoing occurred. This fundamental basis for Guidry's Exception of No Cause of Action is not addressed by the plaintiff, as plaintiff knows he cannot change the facts.

Additionally, Copeland has previously sought the nullification of the license issued to the Treasure Chest. In November of 1993, AIGA filed suit against the Commission and the Division as Defendants in the 19th Judicial District Court for the Parish of East Baton Rouge, appealing a decision of the Commission in awarding a modification to the certificate of preliminary approval granted to the Treasure Chest allowing Treasure Chest to operate in Laketown Harbor Park on the shores of Lake Pontchartrain. (American International Gaming Association, Inc. v. The Louisiana Riverboat Gaming Commission et al., proceedings no. 400-750, 19th Judicial District Court) Over several years of litigation, Mr. Copeland amended his petition three times seeking relief from the Commission and the Division, as well as the newly created Gaming Control Board. With his Third Supplemental and Amending Petition filed in September of 1998, Copeland added an additional demand, requesting the Court to nullify the *license* issued to the Treasure Chest by the Division, and to award the license to Mr. Copeland. (See page 1 of the attached Third Supplemental and Amending Petition). Copeland argued without success that the Division improperly granted the license to the Treasure Chest and allowed the Commission to "usurp" this process. In July of this year, the trial Court in that case granted partial summary judgment in favor of the State, as well as a Motion to Dismiss Appeal, Exceptions of Prescription and Failure to Exhaust Administrative Remedies on behalf of Treasure Chest, as intervenor, denying Copeland all of his requested relief, including denial of the request for the Treasure Chest license, except for the return of fees paid to the state. (A copy of the Judgment is attached hereto.)



As this Court pointed out during oral argument, Mr. Copeland has not named the Commission or Division as defendants in this action, and has not even alleged any wrongdoing on their part in his petition. As the Defendants have previously argued, Copeland cannot sustain a cause of action **under any set of facts** based on his failure to obtain a riverboat gaming license when the sole authority charged with the power of issuing, denying, and revoking licenses in a highly regulated industry exercised its lawful power in refusing to issue a riverboat gaming license to AIGA and/or Copeland, particularly when Copeland has not alleged any facts implicating the Division or its members in any wrongdoing.

Plaintiff argued that they should be permitted discovery before naming Commission or Division members as part of the RICO enterprise. This Court is well aware that the civil RICO statute is limited in its application and requires pre-filing investigation by a plaintiff of criminal wrongdoing on the part of any defendant. Defendant maintains that accepting all of the allegations in plaintiff's petition as true, the plaintiff has not stated a cause of action under any theory and this fatal defect cannot be cured by amendment or post-filing discovery.

RESPECTFULLY SUBMITTED:

DECUIR AND CLARK, L.L.P.

_____
WINSTON DECUIR (Bar # 04795)
LINDA LAW CLARK (Bar #22305)
1951 Government Street
Baton Rouge, Louisiana 70806
Telephone: (225) 346-8716
Telecopier: (225) 336-1950
Attorneys for Robert Guidry

and

LANNY R. ZATZKIS, T.A. (#13781)
KAREN D. McCARTHY (#14193)
YVETTE A. D'AUNOY (#22761)
ANDREW N. LEE (#24154)
ZATZKIS & ASSOCIATES
700 Camp Street
New Orleans, Louisiana 70130
Telephone: (504) 523-2266
Attorneys for Robert Guidry

3

*193*

01 16 1427 03

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing document has been served

upon all parties, through counsel of record, via facsimile, hand delivery or U.S. Mails postage

prepaid and properly addressed, this 15th day of _November_ 2000.

_____

WINSTON G. DECUIR, SR.

CERTIFIED TRUE COPY

074293

DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH, LA
FILED

2000

4

*194*

**ALVIN COPELAND**

**VERSUS**

**LOUISIANA GAMING CONTROL**

**BOARD, ET AL.**

**NUMBER 400,750 DIVISION "A"**

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

COST BK ___ Amt. STATE

MAY 23 2000

BY _____

DY. CLERK OF COURT

<u>JUDGMENT</u>

This matter came on for hearing on the 17th day of April, 2000, pursuant to a Motion for Partial

Summary Judgment filed by defendants, State of Louisiana through the Louisiana Gaming Control

Board, the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office

of State Police, Public Safety Services, and the Department of Public Safety and Corrections; Motion

for Summary Judgment and Motion for Leave to File Fourth Supplemental and Amending Petition on

behalf of plaintiff, Alvin Copeland; and Exceptions of Prescription, Failure to Exhaust Administrative

Remedies and Motion to Dismiss Appeal on behalf of intervenor, Treasure Chest Casino, L.L.C.:

Present were:

**Donald Miester** for plaintiff, Alvin Copeland;

**Michael A. Patterson** for defendants, State of Louisiana through the Louisiana Gaming

Control Board, the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of

the Office of State Police, Public Safety Services, and the Department of Public Safety and

Corrections; and

**Donald Cravins** for intervenor, Treasure Chest Casino, L.L.C..

The court, after considering the evidence and law and hearing the argument of counsel, for oral

reasons assigned this date,

**IT IS ORDERED, ADJUDGED AND DECREED** that the Exceptions of Prescription,

Failure to Exhaust Administrative Remedies on behalf of intervenor, Treasure Chest Casino, L.L.C.

are **GRANTED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Motion to Dismiss

Appeal on behalf of intervenor, Treasure Chest Casino, L.L.C. is **GRANTED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Motion for Partial

Summary Judgment filed on behalf of defendants, State of Louisiana through the Louisiana Gaming

Control Board, the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of

the Office of State Police, Public Safety Services, and the Department of Public Safety and Corrections



is **GRANTED** except as to the reimbursement of the $50,000 fee paid by American International Gaming Association to the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Motion for Summary Judgment filed on behalf of plaintiff, Alvin Copeland is **GRANTED IN PART**. The Clerk of Court is hereby directed to release the funds currently held in the registry of the Court that have been deposited by the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police being in the amount of TWENTY THOUSAND, EIGHT HUNDRED SEVENTY THREE AND NO/100 DOLLARS, ($20,873.00), to plaintiff Copeland, reserving unto Copeland his right to seek the remainder of the $50,000 paid by AIGA to the Division. In all other aspects, Copeland's Motion for Summary Judgment is **DENIED**.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Motion to File Fourth Supplemental and Amending Petition filed on behalf of plaintiff, Alvin Copeland is DENIED. The court hereby expressly determines that there is no just reason for delay and therefore designates this judgment as a final judgment under La.C.C.P. art. 1915.

JUDGMENT RENDERED AND SIGNED in Baton Rouge, Louisiana, this 31ST day of May, 2000.

_____
JUDGE, 19th JUDICIAL DISTRICT COURT

Submitted by:

**RICHARD P. IEYOUB**
Attorney General

_____

**MICHAEL A. PATTERSON**
Special Assistant Attorney General
Bar Roll No. 10373
**DANIEL D. HOLLIDAY, III**
Special Assistant Attorney General
Bar Roll No. 23135
**LONG LAW FIRM, L.L.P.**
4041 Essen Lane, Suite 500
Baton Rouge, LA 70809
(225) 922-5110
**ATTORNEYS FOR THE STATE OF LOUISIANA, ET AL.**

I HEREBY CERTIFY THAT ON THIS DAY A COPY OF THE WRITTEN REASONS FOR JUDGMENT / JUDGMENT / ORDER / WAS MAILED BY ME, WITH SUFFICIENT POSTAGE AFFIXED TO:
Benjamin Slater, III; Michael Patterson; Paul S. West
DONE AND SIGNED ON May 31, 2000

_____
DEPUTY CLERK OF COURT

*196*

0   1   2   3   2   2   3       0

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 400-750              DIVISION "A"


ALVIN C. COPELAND

VERSUS

THE LOUISIANA GAMING CONTROL BOARD

and the

RIVERBOAT GAMING ENFORCEMENT DIVISION
OF THE GAMING ENFORCEMENT SECTION
OF THE OFFICE OF STATE POLICE, PUBLIC SAFETY SERVICES,
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS


FILED:_____
                                        DEPUTY CLERK _____

### THIRD SUPPLEMENTAL AND AMENDED PETITION

**NOW INTO COURT**, through undersigned counsel, comes plaintiff Alvin C.

Copeland, who hereby supplements and amends the "Petition for Appeal of Action Taken by

the Louisiana Riverboat Gaming Commission and for a Declaratory Judgment" filed on

November 22, 1993; the "Amended Petition of American International Gaming Association,

Inc." filed on June 29, 1998; and the "Second Amended Petition of American International

Gaming Association, Inc." filed on September 1, 1998 as follows:

1.

This suit involves (1) an appeal of action taken by the Riverboat Gaming Enforcement

Division of the Gaming Enforcement Section of the Office of State Police, Public Safety

Services, Department of Public Safety and Corrections (the "Division") pursuant to LSA-R.S.

4:548, LSA-R.S. 27:89, and the Louisiana Administrative Procedure Act, LSA-R.S. 49:950 *et

seq.*; (2) a request for a declaratory judgment that the license to conduct gaming activities on a

riverboat that was originally granted to Treasure Chest Casino, Inc. ("Treasure Chest") by the

Division (the "license") is null, void, and without continuing effect; (3) a request for monetary

damages from the Division for its violation of plaintiff's rights under the Louisiana and federal

Constitutions; and (4) a request for the return of all monies paid by plaintiff to the Louisiana

Riverboat Gaming Commission (the "Commission") and the Division. This suit commenced

on November 22, 1993, and the instant Third Supplemental and Amended Petition relates back

to and in part arises from the facts set forth in plaintiff's original Petition, as subsequently

amended.

*197*

5045939921           => DECUIR & CLARK      . TEL=2253361950        11/15'00 13:34

0 1 2 5 2 2 2 3   1

2.

Plaintiff Alvin C. Copeland ("Copeland") is a competent major residing in Jefferson Parish, Louisiana. Copeland is the former sole shareholder of the stock of American International Gaming Association ("AIGA"). AIGA was a Louisiana corporation whose principal office was located in Jefferson Parish, Louisiana; AIGA was also an applicant seeking authorization to conduct gaming activities on a riverboat in accordance with the provisions of the Louisiana Riverboat Economic Development and Gaming Control Act (hereinafter "the Original Act"), LSA-R.S. 4:501, *et seq.* AIGA was dissolved effective December 5, 1996; all references to "plaintiff" in this Amended Petition shall refer to Copeland and/or AIGA.

3.

Made defendant herein is the Louisiana Gaming Control Board ("the Board"). The Board was created under the terms of the Louisiana Gaming Control Law, LSA-R.S. 27:1 *et seq.*, and has the capacity to sue and be sued. The Board is the successor-in-interest to the Commission.

4.

Made defendant is the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, Department of Public Safety and Corrections, which was created by the Original Act at LSA-R.S. 4:515. The Division has the capacity to sue and be sued.

5.

Venue for this action is appropriate in East Baton Rouge Parish pursuant to LSA-R.S. 4:506, LSA-R.S. 27:18, LSA-R.S. 27:46, LSA-R.S. 49:963-64, La. Code Civ. Proc. Art. 74, and former Commission Rule § 911.

6.

As an applicant seeking authorization to conduct gaming activities on a riverboat, and as a citizen of the state of Louisiana, plaintiff has a pecuniary interest in the licensing process and its integrity. Further, as detailed below, plaintiff has a specific pecuniary interest in the license awarded to Treasure Chest, for AIGA had sought a license to conduct gaming operations at the same location as Treasure Chest and should have received the license ultimately awarded to Treasure Chest.

7.

Under the Original Act, the Commission had the authority to issue rules "providing for and determining the following:"

w:\djm\18457\5201\petition.app

- 2 -

*198*

(a)     The authorized routes of a riverboat upon designated rivers or waterways, the duration of riverboat excursions, and the stops which a riverboat may make.

(b)     The minimum levels of insurance to be maintained by the licensees.

(c)     In consultation with the U.S. Army Corps of Engineers and the U.S. Coast Guard, binding emergency orders regarding the navigability of rivers in the event of extreme weather conditions, act of God, or other extreme circumstances.

(d)     Specification for the design, appearance, accommodations, and constructions of riverboats, except for designated gaming area surveillance facilities and systems.

(e)     The procedures for negotiable instrument transactions involving patrons, including limits on the circumstances and amounts of the transaction, and the establishment of forms and procedures for negotiable instrument transactions, redemptions, and consolidations.

(f)     Mandatory periodic inspections to assure that a riverboat, licensed under the provisions of this Chapter is of new construction.

(g)     That preferential treatment is given to Louisiana firms to the extent allowed by law in the procurement of all resources and goods used in the operation of a riverboat come from Louisiana and that a preferential treatment to the extent allowable by law in the awarding of contracts for services and entertainment is given to Louisiana firms and residents.

LSA-R.S. 4:511. The Original Act also gave the Commission the power to hear and determine certain appeals relating to permits; make an annual report to the Joint Legislative Committee on the Budget; and reject unacceptable rules proposed by the Division.

8.

The Division, on the other hand, had the authority to "Issue, deny, condition or restrict licenses and permits" to conduct riverboat gaming activities. LSA-R.S. 4:518(2). The Division had the statutory authority to issue no more than 15 licenses. LSA-R.S. 4:525. No more than six of these licenses could be issued for riverboats in any one given parish.

9.

Purportedly acting under its rulemaking authorization contained in the Original Act and the Administrative Procedure Act, the Commission promulgated rules and regulations that were published in Volume 19 of the Louisiana Register. These rules were readopted as emergency rules on June 18, 1993, and became finally effective on July 20, 1993. Upon information and belief, a draft version of these rules guided the Commission's actions prior to June 18, 1993.

10.

Commission Rule § 303 is entitled "Application for Certificate of Preliminary Approval," and provides that "each person seeking approval of riverboat plans" must "submit for advance approval of the Commission an application for a Certificate of Preliminary Approval" (a "Certificate").

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 102 of 344
5045939921          => DECUIR & CLARK     ,TEL=2253361950      11/15'00 13:35

7  0  1  2  3  2  2  2    3  3

11.

Commission Rule § 315, entitled "Criteria for Commission Action," sets forth the standards that the Commission must use in deciding whether to approve an application for a Certificate. Section 315 states that the Commission "shall evaluate each application based on the information provided therein. The commission shall approve those application for certificate [sic] of preliminary approval it deems to be in the best interest of the state and locale of the proposed operation. . . . "

12.

On December 11, 1992, AIGA submitted its application to the Commission for a Certificate of Preliminary Approval for a proposed riverboat route and other operations at the Kenner Laketown Harbor Park on the shores of Lake Pontchartrain. AIGA submitted a second application form on February 22, 1993 containing supplemental information.

13.

Commission Rule 303 required applicants to remit to the Commission an application fee of "$25,000 for the application and $5,000 to defray the expenses of the commission in analyzing and evaluating an application for certificate." AIGA paid the necessary $30,000 to the Commission along with its application.

14.

On February 14, 1993, AIGA applied for a gaming license from the Division and submitted to the Division the filing fee of $50,000 required to fund its background investigation into license applicants.

15.

Treasure Chest submitted an application for a Certificate to the Commission on March 8, 1993. Like that submitted by AIGA, Treasure Chest's application proposed to locate its gaming riverboat at Kenner's Laketown Harbor Park.

16.

On March 26, 1993 the Commission held a public hearing on the Treasure Chest application to operate a gaming riverboat. On April 29, 1993, subsequent to its public presentation before the Commission, Treasure Chest filed a modification to its application for a Certificate; this modification proposed locating its gaming riverboat at Rivertown, U.S.A. on the banks of the Mississippi River in Kenner. No hearing was ever held on the feasibility or suitability of this site as a location to base a gaming riverboat.

17.

On June 4, 1993, the Commission held a public hearing at which AIGA made a presentation on its application for a Certificate.

w:\djm\18457\3201\petition.app

- 4 -



18.

Upon information and belief, the Commission received a total of 43 applications for Certificates; six of these applications asked for preliminary approval to operate a gaming riverboat in Kenner, Louisiana.

19.

The Commission held a meeting on June 18, 1993. By that date, it had approved eight applications for Certificates; none of these eight approved applications involved proposals to locate a gaming riverboat in Kenner. This meeting was, according to Chairman Pickering's transcribed comments, to "choose seven out of the remaining thirty-five [applications]. Twenty-eight will go by the wayside." Although neither the Act nor the Commission's rules provided any numerical limitation on the number of Certificates that could be issued by the Commission, Pickering noted the Commission's belief that it could only approve fifteen applications by stating that "obviously, once we have chosen seven of those [remaining thirty-five] boats, there will be no need to go any further as there is nothing this commission can do at that point." Further, after seven boats were ultimately approved on June 18th, Chairman Pickering stated "That gives us seven boats. I assume there is no reason to consider any other boats."

20.

The Commission then voted on eight applications for Certificates at the June 18th meeting, and approved seven applications; the Treasure Chest application for a Certificate of Preliminary Approval of its Rivertown location was one of those applications that was approved. The Commission did not grant AIGA a Certificate.

21.

The Commission issued no rules delineating how it would decide which of the 43 applicants would receive Certificates. Upon information and belief, none of the 43 applicants was ever told why their applications were either approved or rejected. Further, upon information and belief, the Commission did not conduct an independent, comparative analysis of the applicants.

22.

On November 8, 1992, although its application for a Certificate had already been granted based on its submission of the Rivertown site as its gaming riverboat's docking location and base, Treasure Chest sought permission to modify its Certificate to move the site of its proposed riverboat route and operations back to Lake Pontchartrain as called for in the original Treasure Chest application. Treasure Chest's request for modification came for

hearing before the Commission on November 13, 1993. Although AIGA objected to Treasure Chest's request for a modification, the Commission granted Treasure Chest's request

23.

The Division issued licenses to exactly the same 15 entities that had previously been given a Certificate by the Commission; Treasure Chest itself, for example, subsequently received a license from the Division on May 17, 1994. Upon information and belief, the Division never reviewed or considered a license application unless and until the applicant received a Certificate from the Commission.

24.

In merely issuing licenses to the 15 entities that had previously been given Certificates, the Division improperly abrogated the duty to independently issue licenses that had been delegated to it by the Louisiana legislature. The Division did not rely on any objective criteria; did not conduct any comparative analysis of competing applicants; and did not prepare any documents evidencing or relating to its rationale in awarding licenses.

25.

The Original Act was silent concerning what guidelines or criteria would be used by the Division in selecting who would receive a license in the event more than 15 applicants existed.

26.

In addition, upon information and belief, the Division did not promulgate any rules delineating how it would go about deciding which of the 43 applicants would receive the 15 licenses authorized by the legislature, and did not embrace any objective criteria. Rather, it simply allowed the Commission to make the decision for it. Although the Division has issued rules discussing the criteria to be used in determining an applicant's suitability, none of these rules discuss how the Division would rank multiple applicants for the finite number of licenses.

27.

On August 21, 1996, the Louisiana First Circuit Court of Appeal rendered a decision holding that the Commission "exceeded its authority in promulgating certain of its rules." Consequently, the First Circuit held that Commission Rules 301-331, 503 through 509, 701 through 705, and 717 were "null, void, and without effect," and prohibited "any further application of them." *State of Louisiana v. Louisiana State Police Riverboat Gaming Enforcement Division,* 694 So. 2d 316, 322-23 (La. App. 1st Cir. 1996). Among the rules that the First Circuit declared to be null and void were the entire set of rules providing for the issuance of Certificates of Preliminary Approval, as well as those setting forth the fees for applying for a Certificate.

w:\djm\184575201\petition.app

- 6 -



28.

To date, plaintiff has received neither a Certificate or a License. AIGA was a suitable applicant for a license, and plaintiff avers that, had the Division conducted an independent evaluation of the competing applicants, AIGA should have received a license to conduct gaming activity on a riverboat.

### COUNT ONE--APPEAL OF ACTIONS TAKEN BY THE DIVISION

29.

Copeland appeals the following actions taken by the Division pursuant to LSA-R.S. 4:548, LSA-R.S. 27:89, and the Louisiana Administrative Procedure Act, LSA-R.S. 49:950 *et seq.*: (1) its issuance of a license to Treasure Chest, and (2) its constructive denial of a license to plaintiff.

30.

Upon information and belief, the Division abrogated the authority granted to it by the legislature to issue licenses by allowing the Commission to usurp this process. Instead of independently determining which applicants deserved a license, the Division simply awarded licenses to those applicants that had previously received Certificates from the Commission. Because the Division did not properly exercise the authority granted to it by the legislature, the license issued to Treasure Chest is null and void.

31.

Plaintiff submits that the Division should be required to hold a hearing into his suitability to conduct gaming operating on a riverboat, and should therefore award him the license previously granted to Treasure Chest.

### COUNT TWO--DECLARATORY JUDGMENT

32.

Copeland respectfully submits that he is entitled to a declaratory judgment that the license to conduct gaming activities on a riverboat that was originally granted to Treasure Chest is null, void, and without continuing effect. Upon information and belief, the Division abrogated the authority granted to it by the legislature to issue licenses by allowing the Commission to usurp this process. Instead of independently determining which applicants deserved a license, the Division merely awarded licenses to those applicants that had previously received Certificates from the Commission. Because the Division did not exercise the authority granted to it by the legislature and never conducted an independent analysis of the competing applicants, the license issued to Treasure Chest is null and void.

w:\dj\m\18457\5201\petition.app

- 7 -

λο3

profits; loss of reputation and goodwill; all expenses he has incurred; and attorney fees pursuant to 42 U.S.C. 1988.

## COUNT FOUR--RETURN OF FEES PAID TO THE COMMISSION

### 39.

As the First Circuit Court of Appeal has found, the Commission had no authority to issue Certificates, and similarly had no authority to charge applicants fees in connection with the issuance of those Certificates. Plaintiff is therefore entitled to a refund of all fees paid by AIGA to the Commission.

## COUNT FIVE--RETURN OF FEES PAID TO THE DIVISION

### 40.

Plaintiff is entitled to a refund of all fees paid by AIGA to the Division. As detailed above, the Division's issuance of licenses was a foregone conclusion; it merely awarded licenses to those entities that had obtained Certificates from the Commission. As a result, there was no justification for it to expend any monies in performing a background check on AIGA.

## JURY DEMAND

### 41.

Plaintiff respectfully prays for a trial by jury.

**WHEREFORE,** premises considered, plaintiff Alvin C. Copeland prays that this amended petition be deemed good and sufficient, and that after due proceedings are had, there be judgment rendered herein in his favor and against the Louisiana Gaming Control Board and the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, Department of Public Safety and Corrections, which (1) declares that the license to conduct gaming activities on a riverboat that was originally granted to Treasure Chest Casino, Inc. is null, void, and without continuing effect; (2) awards plaintiff a fair hearing into whether he should be awarded a license to conduct gaming operations; (3) awards Copeland monetary damages in an amount reasonable in the premises from the Division for its violation of plaintiff's rights under the Louisiana and federal Constitutions, as well as its violation of 42 U.S.C. 1983; (4) awards plaintiff all monies paid by AIGA to the Commission and the Division; (5) awards Copeland all costs of these proceedings, as well as his attorney fees under 42 U.S.C. 1988; and (6) for all other legal and

w:\djm\18457\5201\petition.app

- 9 -

33.

Further, as detailed below, the application process violated plaintiff's constitutional rights to due process and equal protection. Consequently, plaintiff is entitled to a declaratory judgement that the entire application process was flawed, and the license awarded to Treasure Chest, is null and void.

## COUNT THREE--VIOLATIONS OF CONSTITUTIONAL RIGHTS

34.

Plaintiff respectfully submits that the above enumerated actions taken by the Division violated his due process rights under the Fourteenth Amendment to the United States Constitution, as well as his rights secured by Art. I, Sec. 2 of the Louisiana Constitution. Procedural due process required that the Division's selection of who would be awarded a license be made in accordance with ascertainable standards, and not be left to the arbitrary and unfettered discretion of the Division.

35.

Plaintiff respectfully submits that the above enumerated actions taken by the Division violated his equal protection rights under the Fourteenth Amendment to the United States Constitution, as well as his rights secured by Art. I, Sec. 3 of the Louisiana Constitution. Equal protection required that the Division's selection of who would be awarded a license be made in accordance with ascertainable standards, and the Division had to adopt rules containing guidelines providing for the issuance of licenses to the applicants it considered the most worthy. In failing to delineate how it would analyze competing applications, the Division therefore deprived plaintiff of his rights to equal protection under the law.

36.

The actions of the Division were taken under color of state law, and deprived Copeland of rights, privileges, and immunities secured by the Constitution and laws of the United States. As a result, the Division's actions also constitute a violation of 42 U.S.C. 1983.

37.

The actions of the Division in awarding a license to Treasure Chest, which license it has held continuously since May 17, 1994, have resulted in continuous damages to plaintiff and constitute a continuing tort.

38.

The Division's violations of plaintiff's constitutional rights and/or Section 1983 entitle Copeland to monetary damages from the Division that are reasonable in the premises, but Copeland itemizes these damages as including, but not being limited to, lost past and future

w:\djm\18457\5301\petition.app

- 8 -

204

ꞁ 1 2 ⁞ 2 2 3 ꞁ

equitable relief to which he may be entitled.

Respectfully Submitted,

SLATER LAW FIRM

Benj. R. Slater, III - 12127
Mark E. Van Horn - 14476
Donald J. Miester, Jr. - 20294

_[signature]_

650 Poydras Street
Suite 2600
New Orleans, LA 70130
(504)523-7333
**ATTORNEYS FOR PLAINTIFF ALVIN C.
COPELAND**

**PLEASE SERVE:**

(1)  The Louisiana Gaming Control Board (f/k/a The Louisiana Riverboat Gaming
Commission), through its attorneys of record:

  L. Rand Dennis
  Thomas A. Warner
  339 Florida Street, Suite 500
  Baton Rouge, LA 70801

- and -

(2)  The Riverboat Gaming Enforcement Division of the Gaming Enforcement Section
of the Office of State Police, Public Safety Services, Department of Public Safety and
Corrections, through its attorneys of record:

  L. Rand Dennis
  Thomas A. Warner
  339 Florida Street, Suite 500
  Baton Rouge, LA 70801

**19TH JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

STATE OF LOUISIANA 464607 COST OK Amt. 14,460

| | | |
|---|---|---|
| ALVIN C. COPELAND | * | DOCKET NO. DEC 1 2 2000 |
| VERSUS | * | DIVISION " " BY |
| TREASURE CHEST CASINO, L.L.C., and ROBERT J. GUIDRY | * | JURY TRIAL REQUESTED |
| | * | |

FILED: _____          464607-D
                                                    **DEPUTY CLERK**

### _EX PARTE_ MOTION AND ORDER
### TO WITHDRAW AS COUNSEL OF RECORD

On motion of Slater Law Firm, appearing through undersigned counsel, and on

suggesting to the Court that Slater Law Firm, through Benjamin R. Slater, Jr., Benjamin R.

Slater, III, A. Elise Brown and S. Joseph Welborn, have represented plaintiff Alvin C. Copeland

in this matter; that plaintiff is now represented by Robert A. Kutcher, Nicole S. Tygier and Vicki

A. Turko and the firm of Chopin, Wager, Cole, Richard, Reboul & Kutcher, LLP. who have

appeared and enrolled as counsel for plaintiff; and on further suggesting that Slater Law Firm on

behalf of its above referenced attorneys wish to withdraw as counsel, that plaintiff Alvin C.

Copeland has no objection to same, and that no prejudice shall be incurred nor shall the progress

of the matter be retarded inasmuch as plaintiff is represented by counsel, now moves the Court

for an order _ex parte_ permitting Benjamin R. Slater, Jr., Benjamin R. Slater, III, A. Elise Brown,

S. Joseph Welborn and Slater Law Firm to withdraw as counsel of record for plaintiff Alvin C.

Copeland in this matter.

Respectfully submitted,

**SLATER LAW FIRM**

Benj. R. Slater, Jr., Bar No. 12126
Benj. R. Slater, III, Bar No. 12127, T.A.
A. Elise Brown, Bar No. 19500
S. Joseph Welborn, Bar No. 25928

650 Poydras Street
Suite 2600
New Orleans, LA 70130
Telephone: (504) 523-7333          DEC 1 2 2000
Facsimile: (504) 528-      REC'D C.P.

DEC 1 4 2000

# 19TH JUDICIAL DISTRICT COURT

# PARISH OF EAST BATON ROUGE

# STATE OF LOUISIANA

| | | |
|---|---|---|
| **ALVIN C. COPELAND** | * | **DOCKET NO.** |
| **VERSUS** | * | **DIVISION " "** |
| **TREASURE CHEST CASINO,** | * | **JURY TRIAL REQUESTED** |
| **L.L.C., and ROBERT J. GUIDRY** | * | |

**FILED:** _____    _____
**DEPUTY CLERK**

## ORDER

Considering the foregoing, **IT IS HEREBY ORDERED** that the *Ex Parte* Motion to

Withdraw as Counsel of Record filed by Benjamin R. Slater, Jr., Benjamin R. Slater, III, A.

Elise Brown, S. Joseph Welborn, and Slater Law Firm, be and it is hereby **GRANTED,** and

Benjamin R. Slater, Jr., Benjamin R. Slater, III, A. Elise Brown, S. Joseph Welborn, and

Slater Law Firm are hereby permitted and ordered to be withdrawn as counsel of record for

plaintiff Alvin C. Copeland in this matter.

Baton Rouge, Louisiana, this ___13___ day of ___Dec___, 2000.

_____
JUDGE

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing *Ex Parte* Motion and Order to Withdraw as Counsel of Record has been served on all counsel of record, by depositing same in the United States mail, properly addressed, first class postage prepaid, or by hand delivery this 8th day of December, 2000.

# 19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

## STATE OF LOUISIANA

NO. 464607      DIV. "D"      DOCKET

ALVIN C. COPELAND

**COST OK Amt.** ___

MAR 0 6 2001

VERSUS      BY___

DY. CLERK OF COURT

### TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY

FILED:_____      DEPUTY CLERK:_____

## *JUDGMENT*

This matter came before this Honorable Court on November 13, 2000, for hearing on Exceptions of No Cause of Action, Prescription, and No Right of Action, and Alternatively, Vagueness filed by the defendant, Robert Guidry. Also before the Court was an Exception of No Cause of Action filed by the defendant, Treasure Chest Casino, L.L.C..

Present in Court were:      Robert A. Kutcher and Benjamin R. Slater, III, for the plaintiff, Alvin C. Copeland, and Paul S. West, for the defendant, Treasure Chest Casino, L.L.C., Lanny R. Zatzkis, Winston G. DeCuir, Sr. and Andrew N. Lee for the Defendant, Robert Guidry;

After examining the pleadings, memorandums and the arguments of counsel, the matter was taken under advisement by the Court. For reasons orally assigned on January 31, 2001;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Exceptions of No Cause of Action filed by the defendants, Treasure Chest Casino, L.L.C., and Robert Guidry are hereby granted and the petition of the plaintiff, Alvin C. Copeland is hereby dismissed with prejudice.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that all costs of these

1

*209*

REC'D C.P.

MAR 1 2 2001

proceedings be assessed to the petitioner, Alvin C. Copeland.

Judgment rendered in Baton Rouge, Louisiana, on January 31, 2001, and signed in

Chambers in Baton Rouge, Louisiana on the ⁷ day of March, 2001.

_Janice C Clark_
HONORABLE JUDGE, JANICE G. CLARK
19th JUDICIAL DISTRICT COURT

*Attorneys for Alvin C. Copeland:*

SLATER LAW FIRM
Benj. R. Slater, III - 12127
650 Poydras Street
Suite 2600
New Orleans, LA 70130

CHOPIN, WAGAR, COLE, RICHARD,
 REBOUL & KUTCHER, L.L.P.
Robert A. Kutcher (LSBA #7895)
Two Lakeway Center, Ste. 900
3850 Metairie, LA 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9573

**FILED**

MAR 6 2001

DEPUTY CLERK OF COURT

*Attorneys for Treasure Chest Casino, L.L.C. and Robert Guidry*

WINSTON G. DECUIR, SR. (Bar # 04795)
LINDA LAW CLARK (Bar #22305)
1961 Government Street
Baton Rouge, Louisiana 70806
Telephone: (225) 346-8716
Telecopier: (225) 336-1950

LANNY R. ZATZKIS, T.A. (#13781)
KAREN D. McCARTHY (#14193)
YVETTE A. D'AUNOY (#22761)
ANDREW N. LEE (#24154)
ZATZKIS & ASSOCIATES
Suite 2750 Poydras Center
650 Poydras Street
New Orleans, Louisiana 70130
Telephone: (504) 523-2266

PAUL S. WEST
McGlinchey Stafford
Ninth Floor, One American Place
Baton Rouge, LA 70825
Telephone: (225) 383-9000
Facsimile: (225) 343-3076

RALPH CAPITELLI
1100 Poydras Street
Energy Center, Ste. 2950
New Orleans, LA 70163

I hereby certify that on this day a notice of the above judgement was mailed by me, with sufficent postage affixed, to: _all parties_
Done and signed on _3 12-01_
_____ Deputy Clerk of Court

E. Barton Conradi, Esq.
LAW OFFICE OF E. BARTON CONRADI
343 Third Street, Ste. 506
Baton Rouge, LA 70801

Stephen A. Quidd, Esq.
Post Office Box 67148
Baton Rouge, LA 70896

Michael A. Patterson, Esq.
The Long Law Firm
4041 Essen Lane, Suite 500
Baton Rouge, LA 70809

ARTHUR A. LEMANN, III
938 Lafayette Street, Ste. 100
New Orleans, LA 70113

2

*210*

ALVIN C. COPELAND

V.

TREASURE CHEST CASINO,

LLC

NO. 464-607   DIVISION D

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

ORAL REASONS FOR JUDGMENT

WEDNESDAY, JANUARY 31, 2001

HONORABLE JANICE G. CLARK, JUDGE PRESIDING

THE COURT:  THIS MATTER IS **ALVIN C. COPELAND V. TREASURE CHEST CASINO, LLC AND ROBERT GUIDRY,** NO. 464-607.

THE COURT HAS CAREFULLY CONSIDERED THE EXCEPTION OF NO CAUSE OF ACTION FILED BY ROBERT GUIDRY, AND A SIMILAR EXCEPTION OF NO CAUSE OF ACTION FILED BY TREASURE CHEST, LLC.

THE COURT IS OF THE OPINION THAT THE EXCEPTIONS ARE NOT WELL FOUNDED INASMUCH AS PETITIONER HAS NOT NAMED THE COMMISSION OR THE DIVISION AS DEFENDANTS IN THIS ACTION, HAS NOT ALLEGED ANY WRONGDOING ON THEIR PART.

HE IS UNABLE TO SUSTAIN A CAUSE OF ACTION UNDER ANY SET OF FACTS BASED ON HIS FAILURE TO OBTAIN A RIVERBOAT GAMING LICENSE, WHEN THE SOLE AUTHORITY CHARGED WITH THE ISSUING OF SUCH LICENSES VESTS IN THE COMMISSION AND THE DIVISION.

JUDGMENT TO BE SIGNED ACCORDINGLY.

210-A

1

# C E R T I F I C A T E

I, DANIEL L. MARTIN, CCR, OFFICIAL COURT REPORTER,

NINETEENTH JUDICIAL DISTRICT COURT, PARISH OF EAST BATON,

STATE OF LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING ONE

PAGE CONSTITUTE A TRUE AND ACCURATE TRANSCRIPT OF THE

AFORESAID MATTER AS TAKEN BY ME ON THE STENOTYPE MACHINE, TO

THE BEST OF MY KNOWLEDGE AND ABILITY.

WITNESS MY HAND THIS 1ST DAY OF FEBRUARY, 2001.

OFFICIAL SEAL
DANIEL L. MARTIN
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 87148
Certificate expires 12-31-01

DANIEL L. MARTIN
OFFICIAL COURT REPORTER
19TH JUDICIAL DISTRICT COURT
CCR # 87148

210-B

2

# 19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

## STATE OF LOUISIANA

NO. 464607        DIV. "D"        DOCKET

### ALVIN C. COPELAND

**COST OK Amt.**
**MAR 1 3 2001**
**BY_____**
**DY. CLERK OF COURT**

VERSUS

### TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY

FILED:_____     DEPUTY CLERK:_____

## *JUDGMENT*

This matter came before this Honorable Court on November 13, 2000, for hearing on Exceptions of No Cause of Action, Prescription, and No Right of Action, and Alternatively, Vagueness filed by the defendant, Robert Guidry. Also before the Court was an Exception of No Cause of Action filed by the defendant, Treasure Chest Casino, L.L.C..

Present in Court were:    Robert A. Kutcher and Benjamin R. Slater, III, for the plaintiff, Alvin C. Copeland, and Paul S. West, for the defendant, Treasure Chest Casino, L.L.C., Lanny R. Zatzkis, Winston G. DeCuir, Sr. and Andrew N. Lee for the Defendant, Robert Guidry;

After examining the pleadings, memorandums and the arguments of counsel, the matter was taken under advisement by the Court. For reasons orally assigned on January 31, 2001;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Exceptions of No Cause of Action filed by the defendants, Treasure Chest Casino, L.L.C., and Robert Guidry are hereby granted and the petition of the plaintiff, Alvin C. Copeland is hereby dismissed with prejudice.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that all costs of these

1



REC'D C.P.
MAR 1 4 2001

proceedings be assessed to the petitioner, Alvin C. Copeland.

Judgment rendered in Baton Rouge, Louisiana, on January 31, 2001, and signed in

Chambers in Baton Rouge, Louisiana on the ____ day of _____, 2001.

_____
HONORABLE JUDGE, JANICE G. CLARK
19th JUDICIAL DISTRICT COURT

*Attorneys for Alvin C. Copeland:*

SLATER LAW FIRM
Benj. R. Slater, III - 12127
650 Poydras Street
Suite 2600
New Orleans, LA 70130

DUPLICATE
FILE AS IS ORIGINAL
3-13-01

CHOPIN, WAGAR, COLE, RICHARD,
 REBOUL & KUTCHER, L.L.P.
Robert A. Kutcher (LSBA #7895)
Two Lakeway Center, Ste. 900
3850 Metairie, LA 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9573

*Attorneys for Treasure Chest Casino, L.L.C. and Robert Guidry*

WINSTON G. DECUIR, SR. (Bar # 04795)
LINDA LAW CLARK (Bar #22305)
1961 Government Street
Baton Rouge, Louisiana 70806
Telephone: (225) 346-8716
Telecopier: (225) 336-1950

LANNY R. ZATZKIS, T.A. (#13781)
KAREN D. McCARTHY (#14193)
YVETTE A. D'AUNOY (#22761)
ANDREW N. LEE (#24154)
ZATZKIS & ASSOCIATES
Suite 2750 Poydras Center
650 Poydras Street
New Orleans, Louisiana 70130
Telephone: (504) 523-2266

PAUL S. WEST
McGlinchey Stafford
Ninth Floor, One American Place
Baton Rouge, LA 70825
Telephone: (225) 383-9000
Facsimile: (225) 343-3076

RALPH CAPITELLI
1100 Poydras Street
Energy Center, Ste. 2950
New Orleans, LA 70163

E. Barton Conradi, Esq.
LAW OFFICE OF E. BARTON CONRADI
343 Third Street, Ste. 506
Baton Rouge, LA 70801

Stephen A. Quidd, Esq.
Post Office Box 67148
Baton Rouge, LA 70896

Michael A. Patterson, Esq.
The Long Law Firm
4041 Essen Lane, Suite 500
Baton Rouge, LA 70809

ARTHUR A. LEMANN, III
938 Lafayette Street, Ste. 100
New Orleans, LA 70113

2

212

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                              DIVISION "D"

ALVIN C. COPELAND

-versus-

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

**COST OK Amt.**

Filed:_____          _____

Deputy Clerk     MAY 0 3 2001

BY_____

DY. CLERK OF COURT

## MOTION FOR APPEAL

**NOW INTO COURT,** through undersigned counsel, comes Alvin C. Copeland, Plaintiff, and pursuant to Louisiana Code of Civil Procedure Annotated art. 2121, files this Motion for Appeal, and respectfully represents that:

1)     A final judgment was signed in the above cause on March 7, 2001; and,

2)     Plaintiff desires to appeal devolutively from the final judgment rendered in this action.

**WHEREFORE,** the premises considered, Plaintiff prays that he be granted a devolutive appeal in the above cause of action returnable unto the Court of Appeal, First Circuit, Louisiana, within the applicable delays fixed by law.

Respectfully submitted,

*CHOPIN, WAGAR, COLE, RICHARD,*
*REBOUL & KUTCHER, LLP*

By: _____

**ROBERT A. KUTCHER** (LSBA #7895)
**NICOLE S. TYGIER** (LSBA #19814)
**VICKI A. TURKO** (LSBA #24677)
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9572

*Attorneys for Plaintiff Alvin C. Copeland*

*213*

# O R D E R

Upon consideration of the foregoing Motion for Appeal;

**IT IS HEREBY ORDERED** that Plaintiff, Alvin C. Copeland, is granted a devolutive

appeal from the judgment rendered in the above cause, returnable in the Court of Appeal, First

Circuit, Louisiana, on the ___3___ day of ___June___, 2001.

**BATON ROUGE, LOUISIANA,** this ___3___ day of ___May___, 2001.

_____
**JUDGE**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of

record in this proceeding:

| | | | | |
|---|---|---|---|---|
| ( ) | Hand Delivery | ( ✓ ) | Prepaid U.S. Mail |
| ( ✓ ) | Facsimile | ( ) | Overnight Delivery |

Metairie, Louisiana, this 1st day of May, 2001.

_____

CERTIFIED TRUE COPY

118433

DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH, LA
FILED

2001 MAY -3 AM 10: 20

DEPUTY CLERK & RECORDER FOR
DOUG WELBORN

214

# NOTICE OF APPEAL

ALVIN COPELAND

VS.

TREASURE CHEST CASINO

NO. 464,607
19TH JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

DIVISION D
JUDGE JANICE CLARK
REPORTER(S):   Nancy  Dawson,  Daniel
Martin
TO:  Benjamin Slater, Michael Patterson, Barton Conradi, Stephen Quidd, Paul West, Lanny Zatzkis, Winston Decuir, Ralph Capitelli, Arthur Lemann, III, Robert Kutcher

NOTICE is hereby given that on May 3, 2001, upon motion of, plaintiff; in the above numbered and entitled cause, an order of appeal was entered granting a devolutive appeal from the judgment of March 7, 2001, which appeal is returnable to First Circuit Court of Appeal on June 3, 2001.

Clerk's office, Baton Rouge, Louisiana, this 3 day of May, 2001.

_Deputy Clerk of Court for_
Doug Welborn, Clerk of Court

Trial date:  11/13/00; 1/31/01

Estimated Hours of Testimony Taken:  n/a

Estimated Costs of Testimony:  n/a

cc:  Civil Accounting (Clerk of Court)
Civil Appeal (Clerk of Court)
Reporter(s)
Judicial Administrator
All Counsel of Record
Divisional Office

RETURN DATE 6-3-01

Judge set Return

215

1053100

## ESTIMATED AND FINAL COST SHEET FOR APPEALS

TEST. _____     SUIT NO. *464,607*     RETURN DATE: *6-3-01*

(_____) VOLUMES.

_Alvin Copeland_

PLAINTIFF(S)

VERSUS

_Treasure Chest Casino L.L.C & Robert Guidry_

DEFENDANT(S)

COUNSEL FOR APPELLANT(S) _Robert Kutcher_

PHONE NUMBER OF COUNSEL FOR APPELLANT(S): _504-830-3838_

NUMBER OF APPEALS: _____.

APPELLANT(S):  (1.) _____
PLAINTIFF

or —    (2.) _____
DEFENDANT

or —    (3.) _____
INTERVENOR

### ORIGINAL

| | | |
|---|---|---|
| VOLUME I: ....... Binder (Title Page) | $~~1.60~~ | 1.60 |
| Certificate | 1.50 | 5.10 |
| Minutes of Court & Certification | | 5.10 |
| Pages Numbered @ 2¢ per page | | 4.32 |
| Index Items | | 15.60 |

VOLUME II: .......Binder (Title Page) ................. $_____
(If Applicable)

TOTAL ORIGINAL ..................... $ *31.52*

### COPY

| | | |
|---|---|---|
| VOLUME I: ....... Binder (Title Page) | $ | 1.60 |
| Certificate, (Seal Only) | | 5.00 |
| _____ Pages Numbered @ 2¢ per page | | 4.32 |
| _____ Pages Xeroxed (Pleadings Only) @ $1.00 Page | | 216.00 |

VOLUME II: ....... Binder (Title Page)................. $_____
(If Applicable)

TOTAL COPY .......................... $ *226.92*

TOTAL COST OF ORIGINAL ............. $ *31.52*

TOTAL COST OF COPY .................. $ *226.92*
*150.00*

GRAND TOTAL & FINAL COST OF
PREPARATION OF APPEAL .......... $ *408.44*

DATE THIS (ESTIMATED) (FINAL) COST SHEET SENT TO ACCOUNTING DEPARTMENT: *5-30-01*

NAME OF PERSON PREPARING APPEAL: _Elaine Powell_

# NOTICE OF APPEAL

**POSTED**

MAY 9 2001

| | |
|---|---|
| ALVIN COPELAND | NO. 464,607 |
| | 19TH JUDICIAL DISTRICT COURT |
| | PARISH OF EAST BATON ROUGE |
| VS. | STATE OF LOUISIANA |
| | |
| TREASURE CHEST CASINO | DIVISION D |
| | JUDGE JANICE CLARK |
| | REPORTER(S):   Nancy  Dawson,  Daniel |

Martin

TO:  Benjamin Slater, Michael Patterson, Barton Conradi, Stephen Quidd, Paul West, Lanny Zatzkis, Winston Decuir, Ralph Capitelli, Arthur Lemann, III, Robert Kutcher

NOTICE is hereby given that on May 3, 2001, upon motion of, plaintiff; in the above numbered and entitled cause, an order of appeal was entered granting a devolutive appeal from the judgment of March 7, 2001, which appeal is returnable to First Circuit Court of Appeal on June 3, 2001.

Clerk's office, Baton Rouge, Louisiana, this 3 day of May, 2001.

Deputy Clerk of Court for
Doug Welborn, Clerk of Court

Trial date:  11/13/00; 1/31/01

Estimated Hours of Testimony Taken:  n/a

Estimated Costs of Testimony:  n/a

cc:  Civil Accounting (Clerk of Court)
     Civil Appeal (Clerk of Court)
     Reporter(s)
     Judicial Administrator
     All Counsel of Record
     Divisional Office

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                              DIVISION "D"

## ALVIN C. COPELAND

-versus-

## TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

COST OK Amt. _____

Filed:_____              _____

Deputy Clerk       MAY 0 3 2001

BY_____
DY. CLERK OF COURT

## MOTION FOR APPEAL

**NOW INTO COURT,** through undersigned counsel, comes Alvin C. Copeland,

Plaintiff, and pursuant to Louisiana Code of Civil Procedure Annotated art. 2121, files this

Motion for Appeal, and respectfully represents that:

1)       A final judgment was signed in the above cause on March 7, 2001; and,

2)       Plaintiff desires to appeal devolutively from the final judgment rendered in this

action.

**WHEREFORE,** the premises considered, Plaintiff prays that he be granted a devolutive

appeal in the above cause of action returnable unto the Court of Appeal, First Circuit, Louisiana,

within the applicable delays fixed by law.

Respectfully submitted,

*CHOPIN, WAGAR, COLE, RICHARD,*
*REBOUL & KUTCHER, LLP*

By: _____
**ROBERT A. KUTCHER** (LSBA #7895)
**NICOLE S. TYGIER** (LSBA #19814)
**VICKI A. TURKO** (LSBA #24677)
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9577

*Attorneys for Plaintiff Alvin C. Copeland*

# O R D E R

Upon consideration of the foregoing Motion for Appeal;

**IT IS HEREBY ORDERED** that Plaintiff, Alvin C. Copeland, is granted a devolutive

appeal from the judgment rendered in the above cause, returnable in the Court of Appeal, First

Circuit, Louisiana, on the ___3___ day of ___June___, 2001.

**BATON ROUGE, LOUISIANA,** this ___3___ day of ___May___, 2001.

_____
**J U D G E**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of

record in this proceeding:

(   )    Hand Delivery      ( ✓ )    Prepaid U.S. Mail
( ✓ )    Facsimile         (   )    Overnight Delivery

Metairie, Louisiana, this 1st day of May, 2001.

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                    DIVISION "D"

**ALVIN C. COPELAND**

-versus-

**TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY**

Filed:_____          _____
                                                   Deputy Clerk

## NOTICE OF APPEAL

**TO:**   Lanny R. Zatzkis, Esq.                  Paul S. West, Esq.
          ZATZKIS & ASSOCIATES                    MCGLINCHEY STAFFORD
          Suite 2750 Poydras Center               One American Place, 9th Floor
          650 Poydras Street                      Baton Rouge, LA 70825
          New Orleans, LA 70130

          Winston G. DeCuir, Esq.                 Stephen A. Quidd, Esq.
          DECUIR & CLARK, L.L.P.                  P. O. Box 67148
          1961 Government Street                  Baton Rouge, LA 70896
          Baton Rouge, LA 70806

          Ralph Capitelli, Esq.                   E. Barton Conradi, Esq.
          CAPITELLI & WICKER                      LAW OFFICE OF E. BARTON CONRADI
          Suite 2950 Energy Centre                343 Third Street
          1100 Poydras Street                     Suite 506
          New Orleans, LA 70163                   Baton Rouge, LA 70801

          Arthur A. Lemann, III, Esq.             Michael A. Patterson, Esq.
          ARTHUR A. LEMANN, III & ASSOCIATES      THE LONG LAW FIRM
          938 Lafayette Street, Suite 100         4041 Essen Lane, Suite 500
          New Orleans, LA 70113                   Baton Rouge, LA 70809

          Benjamin R. Slater, III, Esq.
          SLATER LAW FIRM
          650 Poydras Street, Suite 2600
          New Orleans, LA 70130

Notice is hereby given that Plaintiff, Alvin C. Copeland, hereby appeals to the Court of Appeal for the First Circuit from the Judgment rendered in favor of Defendants, Treasure Chest Casino, L.L.C. and Robert Guidry, on January 31, 2001, and signed on March 7, 2001.

Respectfully submitted,

**_CHOPIN, WAGAR, COLE, RICHARD,_**
**_REBOUL & KUTCHER, L.L.P._**

By:_____
    **ROBERT A. KUTCHER, Bar No. 7895, TA**
    **NICOLE S. TYGIER, Bar No. 19814**
    **VICKI A. TURKO, Bar No. 24677**
    Two Lakeway Center, Suite 900
    3850 N. Causeway Boulevard
    Metairie, LA 70002
    Telephone: (504) 830-3838

*Attorneys for Plaintiff, Alvin C. Copeland*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record in this proceeding by facsimile or by depositing a copy of same in the United States Mail, postage prepaid, this 1st day of May, 2001.

_____

CERTIFIED TRUE COPY
118432
DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH, LA
FILED
2001 MAY -3 AM 10: 20

**No. 454,376**
**Michelle Anderson, et al**
**vs.**
**Blue Bell Creameries**

Trial passed and reassigned for October 16, 2001, at 9:30 a.m.
All counsel of record to be notified.


**No. 468,414**
**Melanie Clement**
**vs.**
**State Farm**

The jury trial docketed this date was compromised, settled and
removed from the docket.


**No. 464,607**
**Alvin Copeland**
**vs.**
**Treasure Chest Casino, et al**

On motion of counsel for plaintiff, a devolutive appeal is
entered herein from the judgment signed March 7, 2001,
returnable to Court of Appeal, First Circuit, on June 3, 2001.





MICRO-FILMED

JUL 2 6 01 ⊆ 6 2

EAST BATON ROUGE
PARISH
CLERK OF COURT



MICROFILMED

JUN 0 4 01 U 15



ENTERED

JUN 0 6 2001

E.B.R. CLERK OF COURT



POSTED
JUN - 5 2001

# CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP
### Attorneys at Law

Richard A. Chopin †‡
Nelson W. Wagar, III †‡
Kevin L. Cole ‡
Thomas M. Richard
Brian L. Reboul
Robert A. Kutcher ±
Elizabeth Smyth Sirgo
Nicole S. Tygier

*Of Counsel*
John B. Krentel

**Writer's Direct Numbers:**

**(504) 830-3824 Telephone**
**(504) 836-9573 Fax**
**ntygier@chopin.com**

Two Lakeway Center - Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: 504-830-3838
Telefax: 504-836-9540
_____

Three Sanctuary Boulevard - Suite 301
Mandeville, Louisiana 70471
Telephone: 504-674-6680
Telefax: 504-674-6681
_____

**Please Reply to
Metairie Office**

Michael L. Cohen
Vicki A. Turko ‡
Diana L. Tonagel
Patricia D. Tunmer
John S. Bair
Judith A. Miller
Matthew D. Monson
Keegan E. Chopin
Cynthia J. Thomas §°
Jason P. Foote
John G. Alsobrook

† Professional Corporation
‡ Also Admitted in Texas
± Also Admitted in New York
§ Also Admitted in D.C.
° Also Admitted in Puerto Rico

May 16, 2001

*Via Overnight Mail*

Clerk of Court
19th Judicial District Court
Parish of East Baton Rouge
222 St. Louis Street
Baton Rouge, LA 70802

> **Re:** **Alvin C. Copeland v. Treasure Chest Casino, LLC and Robert J. Guidry**
> **19th JDC No. 464-607(D)**
> **Our File No. 245.2433**

Dear Sir/Madam:

Enclosed please find our client's check in the amount of $646.20, which represents payment of the estimated appeal costs in the above matter.

Yours very truly,

Nicole S. Tygier

NST/csp
*Enclosure*

RECEIVED
MAY 21 2001
SUIT ACCNTG.
19TH JUDICIAL COURT

5-11-01
Rec ck# 111373
M Bowsley

Deputy Clerk of Court for
Doug Welborn, Clerk of Court



# DOUG WELBORN

**CLERK OF COURT**
**19TH JUDICIAL DISTRICT COURT**

P.O. BOX 1991
BATON ROUGE, LOUISIANA 70821

PARISH OF EAST BATON ROUGE
PHONE 504/389-4751

105100370000

## NOTICE OF ESTIMATED APPEALS CHARGES

NO. __464,697__ DIV. __D__

**POSTED**
MAY 1 0 2001

ALVIN COPELAND
_____
vs.

TREASURE CHEST CASINO
_____

☐ SUSPENSIVE (BOND AMOUNT _____)    ☐ DEVOLUTIVE

TO THE RESPECTIVE __ROBERT A. KUTCHER__, ATTORNEY-AT-LAW PURSUANT TO
*ACT NO. 198, HOUSE BILL NO. 408*, RECENTLY ENACTED BY THE LOUISIANA LEGISLATURE
DURING THE 1977 REGULAR SESSION, WE ARE SUBMITTING THE FOLLOWING ESTIMATED
APPEALS CHARGES. THE RETURN DATE TO THE COURT OF APPEAL WILL BE SENT PURSUANT
TO ACT 937, HOUSE BILL 1475, RECENTLY ENACTED BY THE LOUISIANA LEGISLATURE DURING
THE 1984 REGULAR SESSION. THE AMOUNT LISTED AS *BALANCE DUE* IS TO BE PAID WITHIN
upon receipt
TWENTY (20) DAYS OF THE MAILING OF THIS NOTICE IF YOU HAVE ANY QUESTIONS, PLEASE
XXXXXXXXXXXX
REFER TO THE ABOVE LEGISLATION OR CALL US AT THE ABOVE LISTED TELEPHONE
NUMBERS.

PLEASE SEND PAY-
MENT OF APPEAL COST
DIRECTLY TO THE
CLERK OF COURT,
CIVIL APPEALS DEPT.,
ROOM 1010

Estimated Court Reporter Fee ...........$ ____00.00____

Estimated Costs of Preparing Record..$ ____530.20____

Court of Appeals Filing Fee.................$ ____116.00____

TOTAL ESTIMATED CHARGES ...........$ ____646.20____

NOTE: COST ARE DUE UPON RECEIPT - RETURN DATE
HAS BEEN SET BY JUDGE CLARK

ESTIMATED COST BILL SUBMITTED ON __5__/__8__ __91__ AND MAILED ON __5__/__8__ __91__

_____
*Deputy Clerk of Court for*
*Doug Welborn, Clerk of Court*



# DOUG WELBORN
## CLERK OF COURT
### 19TH JUDICIAL DISTRICT COURT

P.O. BOX 1991
BATON ROUGE, LOUISIANA 70821

PARISH OF EAST BATON ROUGE
PHONE (225) 389-4751

## NOTICE OF RETURN DATE

ALVIN COPELAND

VS.

TREASURE CHEST CASINO

NO. _____464,607 D_____

JANICE CLARK

JUDGE PRESIDING
DAWSON/MARTIN

COURT REPORTER

TO:   ALL COUNSEL OF RECORD
JUDICIAL ADMINISTRATOR
COURT OF APPEAL
DISTRICT JUDGES
COURT REPORTER
CLERK OF COURT, ACCOUNTING DEPT.

BENJAMIN SLATER
MICHAEL PATTERSON
BARTON CONRADI
STEPHEN QUIDD
PAUL WEST
LANNY ZATZKIS

WINSTON DECUIR
RALPH CAPITELLI
ARTHUR LEMANN, III
ROBERT KUTCHER

NOTICE IS HEREBY GIVEN THAT THE APPEAL GRANTED FROM THE JUDGMENT OF ___MARCH 7, 2001___ IS RETURNABLE TO THE COURT OF APPEAL, FIRST CIRCUIT ON ___JUNE 3, 2001___ . CIVIL APPEALS SECTION, CLERK OF COURT, BATON ROUGE, LA., THIS ___29th___ DAY OF ___MAY___ , 20__01__ .

RETURN DATE SET BY JUDGE CLARK

*Deputy Clerk of Court for*
*Doug Welborn, Clerk of Court*

Civil No. 120 - Rev. 11/99
Clerk of Court/Civil Appeals

Original/Counselor of Record

*215-A*

# CERTIFICATE

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

**19th JUDICIAL DISTRICT COURT**

**CLERK'S OFFICE**

I, _____GLORIA T. FORREST_____, Deputy Clerk of the aforesaid

Court, do hereby certify that the foregoing ___TWO HUNDRED SIXTEEN (216)___ pages

contain a true, correct and complete copy of all pleadings and documents filed, evidence adduced

and proceedings had in said Court; all exhibits to be sent up under separate cover; in the cause

wherein:

_____ALVIN COPELAND_____ is the plaintiff and

_____DTREASURE CHEST CASINO_____ is the defendant, said

cause being NO. ___464,607___ on the docket of the Nineteenth Judicial District Court.

IN FAITH WHEREOF, witness my official signature

and seal, at the City of Baton Rouge, Louisiana

this _30_ day of _May_, 19 _2001_

_Gloria T. Forrest_

*Deputy Clerk for*
Doug Welborn, Clerk of Court

ACCOUNTING COSTS..............................$ *137.33*

COURT OF APPEAL FILING FEE....................$ *116.00*

LOUISIANA SUPREME COURT FILING FEE.............$_____

| | ESTIMATE | FINAL |
|---|---|---|
| TRANSCRIPT/ORAL REASONS.....$ | | $ |
| PREPARATION OF RECORD.......$ *530.20* | | $ *408.44* |
| ANSWER TO APPEAL................................$ | | |
| TOTAL...........................................$ | | |

*216*

Trial Form #74  Rev. 9/92
Clerk of Court/Appeals Dept.

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                    DIVISION "D"

ALVIN C. COPELAND

VERSUS                                    COST OK Amt 180.60

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY         JUL 2 0 2001

                                                          BY _____
FILED: _____                            _____
                                                    DY. CLERK OF COURT

                                    DEPUTY CLERK

**MOTION AND ORDER BY PLAINTIFF**
**TO SUPPLEMENT THE RECORD ON APPEAL**

**NOW INTO COURT**, through undersigned counsel, comes plaintiff, Alvin C. Copeland

("Copeland"), who respectfully moves this Court for an order supplementing the record on

appeal to the First Circuit Court of Appeal in the above-captioned matter.

The lower court record inadvertently omitted certain pleadings and/or memoranda listed

below, the consideration of which is pertinent to the disposition of this appeal:

1.   Memorandum in Support of Exception of No Cause of Action filed by
     defendant, Robert Guidry on or about October 6, 2000. (Exhibit "A")

2.   Memorandum in Support filed by defendant, Robert Guidry on or about
     October 6, 2000. (Exhibit "B")

3.   Memorandum in Opposition to Exception of No Cause of Action filed by
     plaintiff, Alvin C. Copeland, on November 6, 2000. (Exhibit "C")

4.   Memorandum in Opposition to Exception of No Right of Action or in the
     Alternative, Exception of Vagueness filed by plaintiff, Alvin C. Copeland,
     on November 6, 2000. (Exhibit "D")

**O R D E R**

Considering the foregoing Motion;

**IT IS ORDERED** by the Court that, for good cause shown, the record on appeal to the

First Circuit Court of Appeal be supplemented so as to include the memoranda and motions

referenced in the aforementioned Motion, together with exhibits, filed in the court below by

counsel for plaintiff, Alvin C. Copeland.

**BATON ROUGE, LOUISIANA**, this 2(/ day of _July_, 2001.

_____
              **JUDGE**

REC'D C.P.
JUL 2 5 2001

REC'D C.P.
JUL 2 0 2001

Respectfully submitted:

_____

**ROBERT A. KUTCHER** (LSBA #7895)
**NICOLE S. TYGIER** (LSBA #19814)
*CHOPIN, WAGAR, COLE, RICHARD,*
  *REBOUL & KUTCHER, LLP*
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone:  (504) 830-3838

*Attorney for Plaintiff, Alvin C. Copeland*


## CERTIFICATE OF SERVICE

I hereby certify that I have on this 19th day of July, 2001, served a copy

of the foregoing pleading on all counsel for all parties, by mailing same by United States Mail,

properly addressed, and first class postage prepaid.

_____

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 137 of 344

19TH JUDICIAL DISTRICT COURT
FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                    DIV. "D"                    DOCKET

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY

FILED:_____          _____
                                        DEPUTY CLERK

### MEMORANDUM IN SUPPORT OF EXCEPTION OF NO CAUSE OF ACTION

The petition fails to state a cause of action as to Mr. Guidry.

**Defendant declares evidence will be taken at the hearing on this Exception.**

### STATEMENT OF THE CASE

This action is brought by plaintiff, Alvin Copeland, alleged successor in interest of American International Gaming Association, Inc. ("AIGA"), for damages allegedly resulting from his corporation not being awarded a license by the State of Louisiana to operate a riverboat gaming vessel.   Copeland claims he is entitled to relief from defendants, Robert Guidry and Treasure Chest, L.L.C. under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. §1961, et seq., under the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401, et seq., as well as under theories of fraud and unjust enrichment.

Copeland prays for the value of a riverboat gaming license, the profits realized by the Treasure Chest, and out of pocket costs, from the defendants:

> **WHEREFORE,** premises considered, plaintiff prays that after due proceedings be had, there be judgment against defendants Treasure Chest Casino, L.L.C. and Robert J. Guidry, for all damages, both pecuniary and nonpecuniary, suffered as a result of defendants' actions as set forth herein, including plaintiff's out of pocket costs and all lost profits, as well as the value of the Treasure Chest's gaming license and

4



EXHIBIT
A

the value of Treasure Chest's success, legal interest, attorneys' fees, litigation costs, court costs, treble damages, and for all other appropriate legal and equitable relief.

(prayer of Copeland's petition.)

# FACTUAL BACKGROUND

## The Riverboat gaming licensing process[1]

In order to obtain a license to operate a gaming riverboat in a particular location, a potential licensee would apply for two separate regulatory approvals. First, the potential licensee would apply to the Riverboat Gaming Commission (hereinafter "the Commission"), a seven member panel appointed by the Governor of the State of Louisiana which evaluated applicants for the 15 available gaming licenses in Louisiana provided for under state law. See La. R.S. 4:511. The Commission would give approval for the route, duration, and stops of its riverboat excursions from a berth site approved by the Commission. The Commission and its staff received detailed applications and heard presentations from all of those applicants. The Commission would then issue a "Certificate of Preliminary Approval" (CPA) at its discretion.

The Riverboat Gaming Commission awarded 15 Certificates of Preliminary Approval to applicants: eight were awarded in March of 1993 and the remaining seven were awarded on June 18, 1993. Treasure Chest received one of the Certificates of Preliminary Approval on June 18, 1993. AIGA, along with twenty-eight other applicants, did not receive a Certificate of Preliminary Approval from the Commission.

The Riverboat Gaming Division of the Louisiana State Police (the "Division") would conduct a separate investigation prior to issuance of the license. See La.R.S.

---

[1] The Louisiana Riverboat Economic Development and Gaming Control Act, formerly La.R.S. 4:501 et seq. was redesignated as La.R.S. 27:41 et seq. pursuant to §3 of Acts, 1996, 1st Ex. Sess., No. 7. Reference will be made to the former designations, unless otherwise noted.

5

4:515 et seq. for the powers of the Division. "Suitability" means that the applicant is a person of good character, honesty, and integrity, whose activities, reputation, habits and associations do not pose a threat to the public interest of the State of Louisiana, as well as other criteria established to determine the suitability of the potential licensee to operate a riverboat gaming vessel. See La.R.S. 4:5:30. AIGA, along with twenty-eight other applicants, did not receive a license from the Division to operate a riverboat gaming vessel.

The plaintiff, Alvin Copeland, has alleged he is the successor in interest to AIGA, who was one of forty-three applicants that sought a license from the State of Louisiana to operate a riverboat gaming vessel. Copeland alleges AIGA first submitted an application to the Riverboat Gaming Commission on December 11, 1992, and submitted a second application form on February 22, 1993, containing supplemental information. (Paragraph 9 of the petition.) Copeland alleges his predecessor corporation, AIGA, sought to operate the riverboat in Kenner's Laketown Harbor Park.

The Treasure Chest, L.L.C. was a successful applicant for a riverboat gaming license and was awarded one of the 15 available licenses in May of 1994. Defendant Robert Guidry was the majority shareholder of Treasure Chest, L.L.C. Boyd Kenner, Inc., who managed the casino operations at all times, was a minority shareholder of The Treasure Chest Casino, L.L.C. The Treasure Chest, L.L.C. was subsequently conveyed in its entirety to Boyd Gaming, Inc. in 1997, the parent corporation of Boyd Kenner, Inc.

Copeland's only nexus to Guidry was that both Guidry and Copeland submitted applications to the Riverboat Gaming Commission to locate their riverboats in the City of Kenner. However, the City of Kenner recommended the Treasure Chest which applied for a location approved by the City of Kenner.

The Treasure Chest also applied to the Division for a riverboat gaming license

6

in 1993. Following the Division's licensing hearing, the Treasure Chest was awarded a riverboat gaming license in May of 1994.

Initially, The Treasure Chest planned to have its berth at Laketown Harbor ("Laketown") on the shores of Lake Pontchartrain. However, in March of 1993, Kenner city officials announced that they wished to have a gaming riverboat located in Rivertown, on the banks of the Mississippi River. The Treasure Chest, working in cooperation with Kenner city officials, modified its application by changing the berth site to Rivertown in April of 1993. At the time the Commission issued the Certificate of Preliminary Approval to the Treasure Chest, the Treasure Chest was to have its berth in Rivertown. Only after the U.S. Coast Guard and the U.S. Corps of Engineers found the Rivertown location was unsafe as a berth site in October of 1993, the Treasure Chest re-modified its application to place the riverboat's berth site in Laketown, located on Lake Pontchartrain. On November 13, 1993, the Commission approved the Treasure Chest's modification to have the riverboat's docking berth site at Laketown.

The State, through the aforementioned administrative process, could have, in its discretion, awarded licenses to either Copeland or Guidry, or to both of them, or to neither of them. The only restriction was that the Division could issue no more than 15 licenses, and no more than six licenses could be awarded for riverboats in any one parish. See La.R.S. 4:525(A).

All of the applicants, including AIGA and Guidry, made presentations to the Commission. On June 18, 1993, the Commission awarded seven Certificates of Preliminary Approval to various applicants by a vote of its seven members in an open hearing, including the Treasure Chest, bringing the total number of Certificates of Preliminary Approval issued by the Commission to 15. The Commission voted unanimously in favor of awarding the Treasure Chest a Certificate of Preliminary Approval.

7

Although Copeland's corporation, AIGA, never received either a Certificate of Preliminary Approval from the Commission or a riverboat gaming license from the Division, he now seeks reimbursement from Guidry of all of his out of pocket costs, the value of the Treasure Chest's riverboat gaming license, and lost profits based on his unsupported opinion that he would have received a license.

The plaintiff does not identify any of the members of the Commission or the State Police as part of the "overarching corrupt conspiracy".

As part of his civil RICO claim, Copeland alleges that:

> On information and belief, Edwin W. Edwards, Stephen Edwards, Andrew Martin, Robert Guidry and other unnamed persons and entities constituted an association in fact enterprise as defined in the Racketeering Influenced and Corrupt Organizations Act , 18 U.S.C. 1961, et seq. ("RICO").

Neither Edwin Edward, Stephen Edwards, Andrew Martin nor Robert Guidry awarded Certificates of Preliminary Approval and/or state licenses or had the power to do so.  Copeland's entire claim for damages is premised on the opinion that he would have received a license, but for the "overarching corrupt conspiracy".  Although the State of Louisiana, through the Commission and the Division, was solely responsible for evaluating applicants and awarding licenses, Copeland has not named the Commission, the Division or any of their members as part of the "overarching corrupt conspiracy."

Copeland has alleged Guidry made bribes and extortion payments to Andrew Martin, Stephen Edwards, and Edwin Edwards for their assistance in getting approval from the Division.  (See paragraphs 19-24 of Copeland's petition).  Copeland also alleges that Guidry violated the Act in failing to disclose the Treasure Chest's relationship with Edwin Edwards in a hearing before the Division on May 17, 1994. (paragraphs 25 and 26 of Copeland's petition.)  The plaintiff also alleges that Guidry failed to disclose his association with Governor Edwards on an "Affidavit of Full Disclosure" originally executed on February 26, 1993, and violated his continuing

8

duty to do so. (Paragraph 27 of the petition.)

Accepting all of the allegations of fact as true, Copeland's petition fails to state a cause of action. Copeland does not have standing to state a claim for damages when he was not injured in his business or property. All of Copeland's damages are based on the unsupported speculation that he *would have* obtained a license to operate a riverboat gaming facility. (Paragraph 29 of Copeland's petition.) Copeland also alleges that Treasure Chest would not have received a license but for the overarching corrupt conspiracy. (Paragraph 28 of Copeland's petition.)

Copeland further alleges that Guidry contacted Andrew Martin for help with obtaining fire marshall approval for his entertainment barge at the Treasure Chest site, and Andrew Martin demanded payment in return. (Paragraph 30 of the petition.) The plaintiff alleges Guidry made payments to Martin, Stephen Edwards, and Edwin Edwards beginning in February of 1996 (after Edwin Edwards left office), "for their influence and assistance with the Treasure Chest licensing procedure before the Division." (Paragraph 31 of the petition.)

All of the specific allegations of wrongful misconduct on the part of Guidry occurred *after* the Commission awarded the Certificate of Preliminary Approval to the Treasure Chest on June 18, 1993, and after the AIGA's application had been denied. Copeland's allegations concerning Andrew Martin's alleged extortion attempts of Mr. Guidry for State Fire Marshall Approval also occurred long after the Treasure Chest obtained the license to operate a riverboat gaming vessel, and almost a year after plaintiff's application had been denied.

Copeland's damages are purely speculative and based on a contingency which did not occur, the awarding of a license to AIGA. (paragraph 29 of Copeland's petition.) Even if all of the allegations of fact in Copeland's petition are accepted as true, Copeland cannot base his claim on the contingency of obtaining a riverboat gaming license from the State of Louisiana. **It is important to note that Louisiana**

9

law provides that the award of a riverboat gaming license does not create any right, property or otherwise, and further provides that no vested interest can be acquired in the license. La.R.S. 27:42(B), (formerly La. R.S. 4:502 (B)). Copeland is now claiming speculative damages based on his not being awarded a license, which is a purely revocable privilege, not a property right, in which a holder cannot acquire any vested interest. Therefore, Copeland's petition must fail, as the damages he claims are too remote and Copeland cannot claim any injury to his property.

## LAW AND ARGUMENT

### PLAINTIFF LACKS STANDING TO BRING THE INSTANT RICO ACTION

18 U.S.C. 1964(c), the statute which gives a private cause of action for RICO violations, states:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court....

In Price v. Pinnacle Brands, Inc., 138 F.3d 602, 606 (5th Cir. 1998), the United States Fifth Circuit Court of Appeals explained the requirements necessary to maintain a civil RICO claim, including the initial standing requirement. The Fifth Circuit stated:

> To state a RICO claim under § 1962, a plaintiff must allege: (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. [citation omitted] **As a preliminary matter, however, a plaintiff must establish that he has standing to sue.** 'The standing provision of civil RICO provides that '[any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore...and shall recover threefold the damages he sustains.' **Thus, a RICO plaintiff must satisfy two elements— injury and causation.**

Here, the plaintiff cannot meet either of the two prongs of the standing requirement as plaintiff fails to plead any injury compensable under RICO which was caused by an alleged RICO predicate offense allegedly committed by Mr. Guidry.

In his compliant, plaintiff alleges:

10

Copeland was injured in his business and property, which injury was proximately caused by reason of the RICO persons' violations of 18 U.S.C. 1962 (b),18 U.S.C. 1962 (c) and 18 U.S.C. 1962 (d), entitling him to recover threefold the damages he has sustained and the cost of the instant suit, including a reasonable attorney's fee, pursuant to 18 U.S.C. 1964 (c).

First, plaintiff's claim that he was deprived of future gaming revenue and the claim that he was deprived of the right to gaming profits do not state compensable injury sufficient to sustain a civil RICO claim. Second, plaintiff's petition contains only conclusory allegations, which are wholly insufficient to establish standing to bring a civil RICO action.

In order to satisfy the injury requirement of standing, a plaintiff must have sustained actual loss and the loss must be related to an **actual tangible property right.** "Injury to a mere expectancy interests or to an "intangible property interest" is not sufficient to confer RICO standing." Price, 138 F.3d at 607. **"Speculative damages are not compensable under RICO."** In re Taxable Municipal Bond Securities Litigation, 51 F.3d 518, 522-523 (5th Cir. 1995)(citing Hecht v. Commerce Clearing House, 897 F.2d 21,24 (2d Cir 1990)). **Thus, allegations of a lost opportunity, like plaintiff's claim that he was deprived of the opportunity to compete for a license, is too speculative to satisfy the injury requirement necessary to establish standing for a civil RICO cause of action.**

In In re Taxable Municipal Bond Securities Litigation, supra, the plaintiff argued that he was injured in the form of a lost opportunity to obtain a special type agricultural loan because of a RICO scheme allegedly perpetrated by the Defendants. Id. 51 F.3d at 521. In that case, the United States Fifth Circuit reasoned that even if plaintiff had been allowed to apply for such a loan, there was no guarantee the plaintiff would have gotten the loan. Accordingly, the Fifth Circuit held that such a lost opportunity claim was too speculative to constitute a RICO injury. Id. at 51 F.3d at 522.

Like the plaintiff in the In re Taxable Mun. Bond Securities Litigation case,

11

the plaintiff in this case alleges that he was injured by the lost opportunity of obtaining a riverboat gaming license. Like the plaintiff in In re Taxable Municipal Bond Securities Litigation, there was no guarantee that plaintiff would have ever obtained a license even if Guidry had never aquired one as the number of applicants far exceeded the number of riverboat gaming licenses available. Accordingly, like the plaintiff in In re Taxable Mun. Bond Securities Litigation, the plaintiff's damages in this matter are speculative in nature, too speculative to constitute injury for purposes of conferring standing to bring a civil RICO action.

Similarly, other jurisdictions also hold that speculative damages in the form of a lost opportunity of some sort are too speculative to constitute a RICO injury sufficient to confer standing. In Hecht v. Commerce Clearing House, 897 F.2d 21, 24 (2d Cir. 1990), the Second Circuit held that injury in the form of a lost business commission which would have been earned in the future is too speculative to confer standing.

In addition to the Second Circuit's holding, the Ninth Circuit Court of Appeals also agrees that speculative injury is not sufficient to confer standing to bring a civil RICO action: "a showing of 'injury' requires proof of concrete financial loss, and not mere 'injury to a valuable intangible property interest.'" Steele v. Hospital Corp of America, 36 F.3d 69, 70 (9th Cir. 1994). "We have held that speculative injuries do not serve to confer standing under RICO, unless they become concrete and actual." Id. at 71.

In Imagineering, Inc. v. Kiewit Pacific Co., 976 F 3d 1303, 1310 (9th Cir. 1992), a case analogous to the instant case, the court stated that a showing of injury necessary to maintain a RICO civil case requires proof of concrete financial loss. In that case, the plaintiffs alleged that a pattern of racketeering was used by certain defendants to deprive the plaintiffs of the opportunity to participate in certain government construction contracts. Id. at 1306. In Imagineering, the Ninth Circuit

12

held that loss of future revenue or profits due to the deprivation of the opportunity to participate in the contracts was not a compensable injury sufficient to confer RICO standing. Id. at 1310-1311.

Further, under state law, a riverboat gaming license is not a property right. Thus, the loss of the opportunity to obtain a riverboat gaming license cannot be characterized as damage to property sufficient to satisfy the injury/standing requirement of 18 U.S.C. 1964.

Louisiana Revised Statute 27:42(B), (formerly La. R.S. 4:502 (B)), which specifically provides that riverboat gaming licenses or permits are not property, states in pertinent part:

> Any license, permit, approval or thing obtained or issued pursuant to the provisions of this Chapter is expressly declared by the legislature to be a pure and absolute revocable privilege and not a right, property or otherwise under the constitutions of the United States or of the state of Louisiana. Further, the legislature declares that no holder of any license or permit acquires any vested interest or right therein or thereunder.

Because a riverboat gaming license is not property, plaintiff cannot argue that the loss of his opportunity to obtain a riverboat gaming license is injury to property as required by 18 U.S.C. 1964.

Moreover, particularly persuasive is the recent non-published decision by the United States District Court for the Western District of Louisiana, in the matter of Kenneth Guilbeaux v. Grand Casinos, Inc et al, civil action number 95-1167, which is very similar to the instant matter. The United States Fifth Circuit Court of Appeal affirmed the trial court's decision in a per curiam non-published opinion. Attached hereto as Exhibit "A" is a copy of the per curiam opinion of the United Stated Fifth Circuit Court of Appeal, No. 96-30799, along with Judge Doherty's Memorandum Ruling.

In Kenneth Guilbeaux, the plaintiff filed a civil RICO claim against several Defendants claiming the loss of opportunity to obtain the license to

13

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 147 of 344

operate a riverboat gaming establishment and the loss of any future profits that would have been derived from a riverboat gaming establishment. Page 10, Exhibit "A" attached hereto. The court in that case held that because the question of whether a riverboat gaming license would have been obtained by the plaintiff was uncertain, the loss of the opportunity to obtain a riverboat gaming license and the loss of any future profits from such a riverboat gaming business was too speculative to constitute a compensable injury.

Under the aforesaid Louisiana statute and the jurisprudence regarding the required injury necessary to maintain a civil RICO action, plaintiff's claims of injury to his lost opportunity to obtain a riverboat gaming license and his claim that he was injured in the form of lost profits that could have been earned, are speculative in nature and not sufficient to confer standing for purposes of a civil RICO action.

18 U.S.C. §1964 states that an individual may bring a civil RICO action when there is injury "by reason of a violation" of the RICO statute. 18. U.S.C.A. 1964(c) (West 1999). In addition to pleading actual injury, in order to have standing to sue under RICO, there must be a proximate causal connection between the RICO predicate acts and the plaintiffs' alleged damages. <u>Holmes v. Securities Investor Protection Corp.</u>, 503 U.S. 258, 112 S.Ct. 1131, 1319-1322 (1992); <u>Sedima v. Imrex</u>, 473 U.S. 479, 105 S.Ct 3275, 3285, 87 L.Ed 346 (1985); <u>Zervas v. Faulkner</u>, 861 F.2d 823, 832-833 (5th Cir. 1988).

In a recent United States Sixth Circuit Court of Appeals case, that court held the plaintiff's injuries must be directly related to the alleged predicate acts in order to satisfy the proximate cause element of a RICO claim. <u>Pik-Coal Co. v. Big Rivers Elec. Corp.</u>, 200 F.3d 884 (6th Cir. 2000). In <u>Pik-Coal</u>, the plaintiff, a coal broker, sued under RICO for loss commissions it would have earned if the alleged conspirators had not wrongfully denied a coal supplier a contract. The court held the plaintiff's alleged injuries were indirect and remote, and that plaintiff did not allege the direct

14

damage necessary as defined in Holmes, *supra*. Id. , 200 F. 3d at 889.

Plaintiff's mere conclusory statements that Mr. Guidry is liable to plaintiff for injury resulting from RICO violations falls short of establishing injury which is the proximate cause of RICO predicate acts. Plaintiff pleads no facts to support such conclusory allegations. "Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Montes-Fernandez v. Allied Pilots Association, 987 F.2d 278, 284 (5th Cir. 1993). Likewise, the plaintiff has failed to allege facts constituting a causal connection between the alleged predicate acts of the defendants herein and damage allegedly suffered by the plaintiff. The plaintiff has alleged that Guidry engaged in the overarching corrupt conspiracy in his contacts with Andrew Martin, Edwin Edwards and Stephen Edwards as related to Guidry seeking a licensing hearing in front of the Division. The alleged corruption in seeking a licensing hearing took place several months after the June 18, 1993 hearing before the Commission where the Treasure Chest was awarded the Certificate of Preliminary Approval and AIGA was denied its application along with 35 other applicants. Therefore, Guidry and Treasure Chest cannot be held liable as part of a conspiracy to deprive the plaintiff of a Certificate of Preliminary Approval when the plaintiff has alleged no facts that Guidry and the Treasure Chest were members of the "overarching corrupt conspiracy" at the time Certificates of Preliminary Approval were issued.

Copeland's injury, not receiving a license, is too indirect and remote to establish the requisite proximate causation. Copeland's "injury" is premised on an uncertain chain of events which did not occur. Copeland's allegation that Guidry agreed to make illegal payments to Martin and Edwards for their influence in having the State Police schedule a licensing hearing after Guidry was found suitable by Judge Tom Tanner does not directly relate to his allegations that the Treasure Chest would not have received a license, and that AIGA would have received a license, would have

15

operated the riverboat profitably and would have gained value in a riverboat gaming license. Therefore, there is no proximate causal connection between the alleged predicate acts and Copeland's alleged injury.

## PLAINTIFF'S STATE LAW CLAIMS FAIL TO STATE A CAUSE OF ACTION

### Unfair Trade Practices

The plaintiff's petition fails to state a cause of action under the Louisiana Unfair Trade Practices Act ("LUTPA"). LSA-R.S. 51:1409 provides, in pertinent part,

> Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in representative capacity to recover actual damages.

The plaintiff has failed to show any compensable loss, as all of the damages claimed by the plaintiff are the result of not receiving a riverboat gaming license. As a riverboat gaming license has been expressly declared by the legislature to be a revocable privilege and not a right, property or otherwise, the plaintiff has no standing to bring the instant action. The LUTPA requires a plaintiff to suffer "any ascertainable loss of money or movable property, corporeal or incorporeal". A plaintiff must assert sufficient facts supporting such ascertainable loss as a result of the alleged LUTPA violation. See Bolanos v. Madary, 609 So. 2d 972 (La.App. 4 Cir. 1992), writ denied 615 So.2d 339 (La. 1993). A plaintiff must incur actual damages due to the alleged unfair trade practice to recover under La.R.S. 51:1409. Abbyad v. Mathes Group, 671 So.2d 958 (La.App. 4 Cir. 1996).

In the case of Kenneth Guilbeaux v. Grand Casinos, et al, supra, the trial court relied on the aforementioned provision of the Louisiana Riverboat Economic Development and Gaming Control Act in concluding that the plaintiff had not demonstrated the necessary actual injury to plaintiff's business or property to support his civil RICO cause of action.

16

As the legislature has expressed that a riverboat gaming license is a privilege and not a right, *property or otherwise,* the plaintiff cannot demonstrate the requisite loss of money or movable property under the Unfair Trade Practices Act. The Court's reasoning in <u>Kenneth Guilbeaux</u> apply in the instant matter:

> Plaintiff's allegations are exceedingly tenuous as he does not allege even that defendants wrongfully deprived him of a license he possessed, rather, that they defamed him and thus blocked his proposed attempt to obtain a license for which there was no guarantee he would receive. page 13, <u>Kenneth Guilbeaux, supra.</u>

Therefore, because plaintiff has failed to allege facts evidencing the loss of property as required by the LUTPA, the plaintiff fails to state a cause of action.

## Fraud

The plaintiff has pled under a theory of fraud that the defendants herein:

> obtained a certificate and license by misrepresentations and/or suppressions of the truth concerning the overarching corrupt conspiracy, as well as their participation in extortion; these misrepresentations and/or suppressions were made with the intent to obtain an unjust advantage in obtaining a certificate and license. Robert J. Guidry and or Treasure Chest are therefore liable for fraud under La. Civ. Code art. 2315.

The plaintiff has pled that the defendants made false representations to the State of Louisiana in their effort to obtain a riverboat gaming license. The plaintiff has not pled that the defendants made those misrepresentations or suppressions of the truth to the plaintiff, but only to the State of Louisiana. In order to recover for negligent misrepresentation, there must be a legal duty on the part of a defendant to supply correct information; the breach of that duty; and the breach must have caused damage to plaintiff. <u>Beal v. Lomas and Nettleton Co.</u> ,410 So.2d, 318 (La. App. 4 Cir. 1982.) To prevail on a negligent misrepresentation claim under Louisiana law, there must be proof of actual reliance on the misrepresentations. <u>Abbott v. Equity Group, Inc.</u>, 2 F.3d 613. (U.S. 5th Cir. 1993.) The plaintiff herein has not pled that he relied on any of the alleged misrepresentations.

17

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 151 of 344

As argued hereinabove, the plaintiff cannot show any actual damage as his damage is too remote and speculative. All of plaintiff's damages arise from the State of Louisiana not awarding one of the 15 available riverboat gaming licenses to plaintiff.

**Unjust enrichment**

The plaintiff has also pled 'unjust enrichment'. The five requirements for a showing of an unjust enrichment are (1) there must be an enrichment (2) there must be an impoverishment (3) there must be a connection between the enrichment and resulting impoverishment (4) there must be an absence of "justification" or "cause" for the enrichment and impoverishment, and (5) there must be no other remedy at law available to plaintiff. Baker v. Maclay Properties Company, 648 So.2d 448 (La. 1995).

The Louisiana Legislature codified the theory of unjust enrichment in the Louisiana Civil Code, article 2298, as follows:

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause"" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy or declares a contrary rule.
> The amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is less.
> The extent of the enrichment or impoverishment is measured as of the time the suit is brought or, according to the circumstances, as of the time the judgment is rendered.

**The plaintiff has not pled any facts to constitute impoverishment.** As explained hereinabove, the plaintiff's damages are premised on the contingency of receiving a riverboat gaming license. The plaintiff cannot claim impoverishment because he did not receive a purely revocable privilege from the State.

Unjust enrichment is a subsidiary remedy and cannot provide a remedy where a positive declaration of law denies recovery. **As discussed hereinabove, the law does in fact declare a contrary rule in the present case.** The plaintiff has pled a

18

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 152 of 344

purely delictual action under article 2315 under the theory of fraud, as well as

violations of the LUTPA. The approach, as codified in the Civil Code, is that

> " Whenever the legislature speaks on a subject, whether or not a
> particular litigant has a viable remedy under the legislation, the actio de
> in rem verso is unavailable. A court should not resort to equity/quasi-
> contract unless "no rule for a particular situation can be derived from
> legislation or custom". A claim of unjust enrichment is "available
> merely to remedy the otherwise unaddressed". Ruminations on the
> Law: 1995-1996; Obligations, Bruce V. Schewe and Vanessa Richelle,
> 56 La.L.Rev. 663, 669 (Spring 1996).

The Defendant submits that the plaintiff herein has sought recovery under a

theory of unjust enrichment contrary to the rule of law. Resort to equity to create a

cause of action for the plaintiff herein, contrary to Louisiana Civil Code 2315 et. seq.,

and/or quasi-contract, is not and should not be available in this case.

Historically, the theory of "unjust enrichment" does not provide a remedy for

a purely delictual action; instead, the courts have allowed recovery under an unjust

enrichment theory for quasi-contract or quasi-delictual actions, where the elements

for the formation of a contract are not met, and without fault of the parties, a

defendant is enriched and the plaintiff is impoverished. Also known as the actio de

in rem verso, the courts will apply equitable principles to allow recovery. See Article

2298, The Codification of the Principle Forbidding Unjust Enrichment and the

Elimination of Quantum Meruit as a Basis of Recovery, Jeffrey L. Oakes, 56

La.L.Rev. 873. The plaintiff cannot rest a purely delictual cause of action on an

unjust enrichment theory.

Even if resort to equity is made, there is no justification for allowing the

plaintiff in this case a cause of action for the damages he claims. The plaintiff did

not receive a Certificate of Preliminary Approval or a license from the division. The

plaintiff chose to enter into a well-regulated industry and did not receive a purely

revocable privilege of a riverboat gaming license.

## CONCLUSION

For all of the reasons stated above, the plaintiff has failed to state a cause of

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 153 of 344

action against Guidry and/or the Treasure Chest Defendants and even accepting all of the allegations of the petition as true, the Petition must fail.

RESPECTFULLY SUBMITTED:

LANNY R. ZATZKIS, T.A. (Bar #13781)
KAREN D. McCARTHY (Bar #14193)
YVETTE A. D'AUNOY (Bar #22761)
ANDREW N LEE (Bar #24154)
ZATZKIS & ASSOCIATES
700 Camp Street
New Orleans, Louisiana 70130
Telephone: (504) 523-2266


WINSTON DECUIR (Bar #04795)
LINDA LAW CLARK (Bar #22305)
1951 Government Street
Baton Rouge, Louisiana 70806
Telephone (225) 346-8716
Attorneys for Robert Guidry


RALPH CAPITELLI (Bar # 3858)
CAPITELLI & WICKER
1100 Poydras Street
Energy Center Suite 2950
New Orleans, Louisiana 70163
Telephone: (504) 582-2425
Attorney for Robert Guidry


ARTHUR A. LEMANN, III (Bar #8296)
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, Louisiana 70113
Telephone (504) 522-8104
Attorney for Robert Guidry

20

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing document has

been served upon all parties, through counsel of record, via facsimile, hand delivery or

U.S. Mails postage prepaid and properly addressed, this 5th day of October, 2000.

22

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 155 of 344

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

U.S. COURT OF APPEALS
FILED

A▪▪ 7 1997

C▪RL▪ ▪▪LBRUGE III
CLERK

-----

No. 96-30799

-----

KENNETH J. GUILBEAUX,

Plaintiff-Appellant.

versus

GRAND CASINOS, INC.; GRAND CASINOS OF
LOUISIANA, INC.-COUSHATTA; GRAND CASINOS OF
LOUISIANA, INC.-TUNICA-BILOXI; and KEVIN KEAN,

Defendants-Appellees.

-----

Appeal from the United States District Court
For the Western District of Louisiana
(95-CV-1167)

-----

Before EMILIO M. GARZA, PARKER, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Plaintiff Kenneth J. Guilbeaux sued Grand Casinos, Inc., Grand Casinos of Louisiana, Inc.-Coushatta, Grand Casinos of Louisiana, Inc.-Tunica-Biloxi, and Kevin Kean ("the defendants") alleging violation of (1) certain provisions of the Sherman and Clayton Acts, 18 U.S.C. §§ 1, 2, 15, and 22; (2) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.; and (3) Louisiana law regarding unfair competition and trade practices as well as defamation. The defendants moved to dismiss the federal claims for failure to state a claim pursuant to Rule

-----

[*] Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

EXHIBIT

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 156 of 344

12(b)(6) of the Federal Rules of Civil Procedure and also requested that the court decline to exercise supplemental jurisdiction over the pendent state claims under 28 U.S.C. § 1367(c)(3). The district court granted the motions.

On appeal, Guilbeaux contends that the district court erred in dismissing his antitrust and RICO claims. In reviewing a district court's dismissal for failure to state a claim under Rule 12(b)(6), we accept all factual allegations in the pleadings as true and examine whether the allegations state a claim sufficient to avoid dismissal. *Kansa Reins. Co. v. Congressional Mortgage Corp.*, 20 F.3d 1362, 1366 (5th Cir. 1994). We may uphold a Rule 12(b)(6) dismissal only if it appears that, under any set of facts that could be proven consistent with the allegations in the pleadings, no relief could be granted. *Id.* While we must accept all factual allegations as true, we need not resolve unclear questions of law in favor of the plaintiff. *Grisham v. United States*, 103 F.3d 24, 25 (5th Cir. 1997).

For the reasons given by the district court, we AFFIRM the judgment below.

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 157 of 344

: 0 7 2 6 0 2 1 4



U.S. D...
WESTERN D...
FILED
JUL 2 1996
ROBERT H. SHEMWELL, CLERK
BY _____
DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE/OPELOUSAS DIVISION

KENNETH J. GUILBEAUX                CIVIL ACTION NUMBER: 95-1167

VERSUS                             JUDGE DOHERTY

GRAND CASINOS, INC., ET AL          MAGISTRATE JUDGE TYNES

## MEMORANDUM RULING

Before the Court is a Motion to Dismiss for Failure to State a Claim for Which Relief can be Granted, Motion to Dismiss under 28 U.S.C. § 1367(c)(3) or, in the Alternative, Motion for Stay filed by defendants, Grand Casinos.[1] Also before the Court is a Motion to Dismiss for Failure to State a Claim for Which Relief can be Granted, Motion to Dismiss under 28 U.S.C. § 1367(C)(3) filed by defendant, Kevin Kean. Plaintiff, Kenneth Guilbeaux, opposes the motions.

### History

On July 5, 1995, plaintiff filed this action against defendants[2] alleging antitrust violation under the Sherman and Clayton Acts, violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), and violation of Louisiana law regarding unfair competition and trade practices and defamation. Defendants seek dismissal of the federal claims and request this

---

[1]   The motion was filed on behalf of defendants, Grand Casinos, Inc., Grand Casinos of Louisiana, Inc. - Coushatta, and Grand Casinos of Louisiana, Inc. - Tunica - Biloxi. In defendants' motions and briefs and in this brief, those defendants are referred to collectively as Grand Casinos.

[2]   The allegations in the complaint appear to be made against all defendants as to all claims.



Court decline jurisdiction over the state law claims.

The crux of this lawsuit is plaintiff's allegation that defendants conspired to prevent him from entering the riverboat casino gambling business in Acadiana. The plaintiff's stated causes of action against the defendants resulted from the alleged conspiracy and the alleged actions taken by the defendants to effectuate the conspiracy.

The Court notes this suit apparently involves similar subject matter, although different legal theories, to a 1993 suit filed by plaintiff against some of defendants in Louisiana state court. Defendants Grand Casinos have attached petitions, pleadings, a judgment and a transcript from the state court case to the memorandum in support of their motion for a stay.[3] Plaintiff argues the submission of this material should operate to convert defendants' Motion to Dismiss under Fed. R. Civ. Pro. 12(b)(6) into a Motion for Summary Judgment under Fed. R. Civ. Pro. 56. However, except to note the matter at this point, this Court has neither considered nor relied upon this material in rendering this ruling. This Court looks only to plaintiff's pleadings, i.e., his complaint, his response to the standing RICO Order and his amended complaint, in evaluating plaintiff's

---

[3] The defendants have requested alternative relief in the form of a stay should this Court not grant their motions to dismiss.

[4] Although the items are attached to Grand Casino's motion, plaintiff does not distinguish between Defendant Grand Casino and Defendant Kevin Kean in arguing for the conversion of the Motion to Dismiss to a Motion for Summary Judgment.

2

allegations. Therefore, this Court will evaluate defendants' motion under the standards set forth in Fed. R. Civ. Pro. 12(b)(6) and its jurisprudential interpretation.

### Motion to Dismiss for Failure to State a Claim

I.   Standard for a Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows defendants to seek dismissal by motion of any complaint which fails to state a claim upon which relief may be granted. The well-pleaded allegations of plaintiff's complaints must be taken as true. Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp., 382 U.S. 172, 174-175, 86 S.Ct. 347, 349 (1965). The district court is limited to looking at the pleadings themselves rather than facts outside the pleadings. St. Paul Ins. of Bellaire v. AFIA Worldwide Insurance, 937 F.2d 274, 279 (5th Cir. 1991). A complaint is not to be dismissed for failure to state a claim unless there is no doubt that a plaintiff can prove no set of facts which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957). When considering a motion to dismiss for failure to state a claim, "a District Court must take the factual allegations on the complaint as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff." Fernandez-Montes v. Allied Pilots Assoc., 987 F.2d 278, 294 (5th Cir. 1993).

3

A.    Plaintiff's RICO Claims

Plaintiff alleges defendants have violated each section of the RICO statute, _i.e._, 18 U.S.C. § 1962(a), (b), (c), (d). Defendants have moved to dismiss plaintiff's RICO claims for failure to state a claim.

This Court is guided in its analysis of plaintiff's claim under the four separate RICO violations contained under 18 U.S.C. § 1962(a)-(d) by the Fifth Circuit case of In re Burzynski, 989 F.2d 733 (5th Cir. 1993), which states in plain English the essence of the four RICO subsections.  The four subsections of § 1962 in "plain English" are as follows:

(a)   18 U.S.C. § 1962(a), a person who has received income from a pattern of racketeering cannot invest that income in an enterprise;

(b)   13 U.S.C. § 1962(b), a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering;

(c)   18 U.S.C. § 1962(c), a person who is employed by or associated with an enterprise cannot conduct the enterprise's affairs through a pattern of racketeering; and

(d)   18 U.S.C. § 1962(d), a person cannot conspire to violate subsections (a), (b) or (c).

Further, the Fifth Circuit has stated that although the four subsections of RICO, _i.e._, § 1962(a-d), are distinct, all four require proof of the following three common essential elements:

1.    a _person_, who engages in

2.    a _pattern of racketeering activity_;

3.    connected to acquisition, establishment, conduct, or control of an _enterprise_.

Calcasieu Marine Nat. Bank v. Grant, 943 F.2d 1453, 1461 (5th

4

Cir. 1991); <u>In Re: Burzynski</u>, 989 F.2d at 741.
Therefore, this Court will first analyze plaintiff's claims
pursuant to the common elements of all RICO claims, and then
proceed, if necessary, to analyze each claim under the
appropriate subsection of RICO.

    1.   RICO Persons

    In his pleadings, plaintiff has alleged that the RICO
"persons" are Kevin Kean, Grand Casinos, Inc., Grand Casinos of
Louisiana, Inc. - Coushatta, Grand Casinos of Louisiana, Inc. -
Tunica, and the Kevin Kean Co.  The defendants are the RICO
persons in a civil RICO action.  <u>Crowe v. Henry</u>, 43 F.3d 198 (5th
Cir. 1995).  The plaintiff alleges these persons conspired to
prevent the plaintiff from entering the riverboat casino gambling
business in Acadiana and to defraud the plaintiff of future
gaming revenues.  The alleged goal of the conspiracy was the
destruction of the credibility of the plaintiff, elimination of
plaintiff from participation in and thus reduction or elimination
of gambling competition in the Lafayette area.

    Plaintiff further alleges the "enterprise" was comprised of
and among Kevin Kean, Grand Casinos, Inc., Grand Casinos of
Louisiana, Inc. - Coushatta, and Grand Casinos of Louisiana, Inc.
- Tunica - Biloxi.  Plaintiff asserts these defendants formed an
"association in fact."  An enterprise is defined as "any
individual, partnership, corporation, association or other legal
entity and any unit or group of individuals associated and in
fact not a legal entity."  18 U.S.C. § 1961(4) and <u>Calcasieu</u>, 943

5

F.2d at 1461.

This Court finds that plaintiff has properly pled "persons" for the purpose of a RICO claim. This Court notes for the purposes of § 1962(c) the RICO "person" and the RICO "enterprise" must be comprised of different entities and individuals. Therefore, plaintiff may not have sufficiently alleged "enterprise" for the purposes of all of his RICO claims, however, this Court need not make that determination at this time.

2.   Pattern of Racketeering Activity

A pattern of racketeering activity requires the following:

(a)   Predicate acts i.e. the requisite racketeering activity; and

(b)   A pattern of such acts.

Plaintiff has pled as his predicate acts numerous alleged instances of both mail and wire fraud.[5]  The Fifth Circuit cites the elements of a RICO mail/wire fraud claim as follows:

1.   A scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representation, or promises;

2.   Interstate or intrastate use of the mails (wires) for the purposes of furthering or executing the scheme or artifice to defraud;

3.   The use of the mails (wires) by the defendant connected with the scheme or artifice to defraud;

4.   Actual injury to the business or property of the plaintiff.

Landry v. Airline Pilots' Assoc. Int'l AFL-CIO, 901 F.2d 404, 428

---

[5]   Racketeering activity is defined as including any act which is indictable under 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud). 18 U.S.C. § 1961(1).

6

(5th Cir. 1990).[6]

The first element of the alleged predicate acts of mail and wire fraud is a scheme or artifice to defraud plaintiff or to obtain money or property from the plaintiff by means of false or fraudulent representations. The fourth element requires *actual injury* to the business or property of plaintiff. The allegations by plaintiff focus on an alleged scheme by defendants to publicly defame the plaintiff and to thereby prevent plaintiff from participation in and thus, plaintiff argues, control the gambling industry in Acadiana by preventing plaintiff from entering that industry. Specifically, the plaintiff alleges the defendants schemed to:

> 1. Politically and publically destroy the plaintiff and his reputation;
>
> 2. To defraud plaintiff of future gaming revenues; and
>
> 3. To monopolize the gaming business in Acadiana and prevent competition by the plaintiff and to deprive plaintiff of future profits.

Based on the factual allegations made by the plaintiff, the contents of plaintiff's complaint, plaintiff's response to the Court's Standing RICO Order, plaintiff's first amended complaint, and plaintiff's opposition to defendants' Motion to Dismiss for Failure to State a Claim, plaintiff basically alleges a scheme on the part of defendants to prevent plaintiff from entering into

---

[6]     The Supreme Court has noted that "[t]he mail and wire fraud statutes share the same language in relevant part, and accordingly, [the Supreme Court] applies the same analysis to both sets of offenses." Carpenter v. U.S., 484 U.S. 19, 25, n.6 108 S.Ct. 316, 320 n. 6 (1987).

7

the riverboat casino gambling business in Louisiana through a pattern of publicly defaming plaintiff and politically preventing plaintiff from being allowed to develop riverboat gambling in Acadiana.

This Court must therefore analyze whether the alleged scheme by the defendants to control the gambling industry in Acadiana and to prevent plaintiff from entering that industry constitutes a sufficient scheme or artifice to defraud plaintiff of business or property under the mail and wire fraud statutes and constitutes controlling gambling per se in Acadiana.

The United States Supreme Court grants guidance on the type of business and property protected by the mail and wire fraud statutes in analyzing whether the mail and wire fraud statutes protect the intangible right of a citizen to good government.[7] The Supreme Court stated, although the legislative history regarding the enactment of the mail fraud statute is sparse, it indicates the original purpose of the mail fraud statute was to protect people from schemes to deprive them of their *money or property*. McNally v. U.S., 483 U.S. 350, 356, 107 S.Ct. 2875, 2880 (1987). The Court further stated:

> The words "to defraud" commonly refer "to wronging one in his property rights by dishonest methods or schemes," and "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching."

Id. at 360, 107 S.Ct. at 2881 (citing Hammerschmidt v. U.S., 265

---

[7]     The Supreme Court applies the same analysis to mail and wire fraud. Carpenter v. U.S., 484 U.S. 19, 25, 108 S.Ct. 316, 320 n. 6 (1987).

8

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 165 of 344

U.S. 182, 188, 44 S.Ct. 511, 512 (1924)). Based on the
legislative and case history, the United States Supreme Court
read the mail and wire fraud statutes as limited in scope to the
protection of property rights.[3] This Court must therefore
examine whether plaintiff has alleged a scheme to defraud him of
*money or property* as required by the jurisprudential
interpretation of the mail and wire fraud statutes. This Court
must accept plaintiff's allegations as true; in order for
defendants' motion to prevail, this Court must find plaintiff can
prove no set of facts entitling him to relief.

As previously discussed, plaintiff's allegations focus on an
alleged scheme and conspiracy by defendants to publically defame
the plaintiff and to thereby prevent him from participation in
that industry, which plaintiff argues constitutes control of the
gambling industry in Acadiana. The plaintiff alleges the
defendants set forth on a plan to politically and publically
destroy the plaintiff's reputation in order to prevent him from
obtaining a permit to operate a riverboat gambling casino on the
Vermilion River near or at Lafayette, Louisiana. The first issue
is whether plaintiff has thereby alleged a scheme to defraud him
of *money and/or property* by way of trick, deceit, chicane or

---

[3]     This Court notes the McNally and Carpenter cases have
been legislatively overruled to some degree by defining scheme to
defraud as including a scheme to deprive another of the
intangible right of honest services. See 18 U.S.C. § 1346.
However, this limited statute has no application here and the
basic analysis of McNally and Carpenter remains viable, i.e., the
wire and mail fraud statutes were enacted in order to protect
money and property rights.

9

overreaching as required by the mail and wire fraud statutes.

The plaintiff argues the defendants conspired to publically defame the plaintiff and thereby block his meeting the necessary regulatory requirements to enter the gaming industry and thereby deprive him of:

(1) future gaming revenues,

(2) future profits,

(3) money, property and profits from a future riverboat gambling casino on the Vermilion River,

(4) the loss of plaintiff's investment and the deprivation and loss of the economic opportunity of a riverboat gaming casino on the Vermilion River.[9]

The riverboat gaming industry in Louisiana is a highly regulated field and is governed by the Louisiana Riverboat Economic Development and Gaming Control Act. The regulatory scheme lays out the manner by which one can enter the gaming industry in Louisiana and where that industry can exist within the state. The actions surrounding this case occurred, at least in part, within the parameters of those regulations. La. Rev. Stat. 4:501 (West Supp. 1996).[10]

The Riverboat Gaming Act specifically regulates the obtaining of licenses to operate riverboat gaming casinos and specifically states:

[a]ny license, permit, approval, or thing obtained or issued pursuant to the provisions of this Chapter is expressly

---

[9]    Plaintiff's Response to Standing Civil RICO Order.


[10]    This Court will hereinafter refer to the Act as the "Riverboat Gaming Act."

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 167 of 344

declared by the legislature to be a pure and absolute
revocable privilege and *not a right, property or otherwise*,
under the constitutions of the United States or the State of
Louisiana. Further, the legislature declares that no holder
of any license or permit acquires any vested interest or
right therein or thereunder.

La. Rev. Stat. § 502(B) (emphasis added).

In order to obtain a license to operate a riverboat casino,
a person must apply to the Riverboat Gaming Enforcement Division
of the Gaming Enforcement section of the Office of State Police,
Public Safety Services, Department of Public Safety and
Corrections. La. Rev. Stat. § 532(A) and La. Rev. Stat.
§ 504(6). The division initially examines the license
application to ensure the application is complete, the
information contained in the application and license is true, the
applicant meets the qualifications for a gaming license, and the
proposed activities, the proposed riverboat and the designated
gaming area meet all requirements of the Riverboat Gaming Act.
La. Rev. Stat. § 532(C). In order to be eligible to receive a
license, the division must find the applicant is a person of good
character, honesty, integrity, and his prior activities, criminal
record, if any, reputation, habits, and associations do not pose
a threat to the public interest of Louisiana or to the regulation
and control of gaming. The applicant must also show the
financial and physical resources necessary for operating a
riverboat casino. La. Rev. Stat. § 530. Finally, the division
holds a public hearing and after such hearing *may* issue a license
to a *qualified applicant* "if it deems it in the best interest of

11

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 168 of 344

the State." La. Rev. Stat. § 533.

Furthermore, the Vermilion River on which plaintiff proposed to establish his riverboat gaming establishment is not a designated river or waterway under the statute for the purpose of conducting gaming activities on a riverboat. See La. Rev. Stat. 4:503. The act provides that on and after June 20, 1995, the addition of a designated river or waterway to the list of approved waterways for conducting gaming activities requires the "approval by voters in an election held . . . in any parish which borders the proposed river's or waterway's banks." La. Rev. Stat. 4:503(2)(a). Consequently, plaintiff's proposed participation in the gaming industry could not occur, notwithstanding any actions of defendants, without plaintiff first meeting at least two regulatory hurdles -- i.e., obtaining a license, and having an election within the affected voting area declaring the Vermilion River within the designated waterways. The Louisiana legislature has specifically declared such a license, even if obtained, is not property. Neither the license -- by statute -- nor the election result -- by its very nature -- is money or property to plaintiff.

Further, based on the jurisprudential interpretation of money and property under the mail and wire fraud statute as well as the Louisiana Riverboat Gaming Act, this Court finds the alleged "loss of the opportunity to obtain the license" to operate an envisioned riverboat gaming establishment and any envisioned future profits from operating that envisioned

12

establishment cannot constitute *actual injury* to plaintiff's money or property as a basis for mail and wire fraud. Plaintiff's allegations are exceedingly tenuous as he does not allege even that defendants wrongfully deprived him of a license he possessed, rather, that they defamed him and thus blocked his proposed attempt to obtain a license for which there was no guarantee he would receive. The attainment of a license would hinge on several contingencies including regulatory and legislative approval of the license for the plaintiff. Even if the license were obtained, to be used as plaintiff envisioned, in Lafayette, the voters of Acadiana would have to approve the inclusion of the Vermilion River in the gaming arena before gambling could occur. Thereafter, whether any profits could have been realized by plaintiff would have further depended on many market factors -- not all riverboat gaming facilities in Louisiana have been profitable. Consequently, plaintiff's alleged loss of property and money is highly speculative at best, and as such cannot constitute "actual injury, property or money" as required.

The Fifth Circuit has stated the mail fraud statute reaches any plan which uses the mails in which "artifice or deceit is employed to obtain something of value with the intention of depriving the owner of his property." U.S. v. Kreimer, 609 F.2d 126, 128 (5th Cir. 1980). Plaintiff had no *property* of which defendants deprived him. Defendants deprived plaintiff of no money, only the speculative vision of hoped for profits.

13

Consequently, notwithstanding what trick, overreaching, or
chicanery might have occurred, the scheme alleged by the
plaintiff could under no set of facts constitute mail and wire
fraud as outlined by the Fifth Circuit. The plaintiff has not
alleged a scheme or artifice to defraud him of money or property
by means of false or fraudulent representation; the *property* and
*money* he alleges as the object of the scheme to defraud did not
exist nor was it certain or probable to have existed but for
defendants' actions. Plaintiff cannot present loss which
constitutes money or property under Louisiana law, or United
States Supreme Court jurisprudence. Therefore, there can be no
actual injury to plaintiff's money or property. The relationship
between the alleged scheme and alleged harm is simply too tenuous
and speculative to support charges of mail and wire fraud.

The plaintiff also alleges the loss of his "investment as a
basis for his wire fraud claims."[11] First, this Court notes the
term "investment" is vague at best and plaintiff does not provide
any additional factual support for this alleged loss.
Furthermore, this alleged loss is completely speculative also.
The alleged investment could only have "not been lost" if the
vision came to fruition -- the vision has been held to be so
speculative in nature so as not to constitute actual injury.
Consequently, any "investment's" return which relied upon the

---

[11]    This Court notes this allegation was only found in one
portion of plaintiff's response to the Standing RICO Order and
was not included in plaintiff's Complaint or plaintiff's First
Amended Complaint.

14

hope of future profits is a return which is wholly speculative as well. There is no way to determine whether the "investment" would have borne fruit or "been lost" notwithstanding any action of defendants, for as noted above, there is no way to determine if plaintiff's vision would have come to realization.

Furthermore, plaintiff can under no set of facts prove defendants caused plaintiff's loss of the investment itself, separate and apart from the vision. The gaming industry in Louisiana is highly regulated as to whom may enter the industry and where the industry may exist. Neither plaintiff nor his proposed location was within the regulations granting entry to that industry. There is no allegation that defendants conspired to take plaintiff's actual investment from him and retain it themselves or that defendants' objective was to defraud plaintiff of this money. At best, plaintiff alleges defendants conspired to attempt to block plaintiff from obtaining the necessary regulatory entry and thus deprive plaintiff of the potential which he might have realized from his desires thus causing the wasting of his initial investment. Even without defendants' actions it is unknown whether or not plaintiff's initial investment in his vision would have borne fruit. Rather, defendants did not take that "investment" from plaintiff, at best they contributed to the failure of plaintiff's vision, which was wholly speculative and which clearly is not property within the confines of the mail and wire fraud statutes.

Based on this Court's finding that plaintiff's allegations

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 172 of 344

allow for no possible set of facts to prove mail and wire fraud under the civil RICO statute, the plaintiff has not alleged sufficient predicate acts of racketeering activity under the civil RICO statute. In the absence of allegations of sufficient predicate acts, the plaintiff has not alleged a pattern of racketeering activity, a common element to all of the RICO violations alleged by plaintiff. Therefore, plaintiff's allegations under the civil RICO statutes, 18 U.S.C. § 1962(a-d) must be DISMISSED.

B.   Plaintiff's Antitrust Claims

Plaintiff alleges defendants have violated provisions of the Sherman and Clayton Acts, i.e., 15 U.S.C. §§ 1, 2, 15 and 22.[12]

_____

[12]   The statutes at issue read:

Every contract, combination in the form of trust or otherwise, conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.  15 U.S.C. § 1.

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by a fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.  15 U.S.C. § 2.

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United

16

The Sherman Act sets forth the substance of possible antitrust violations. The Clayton Act authorizes private parties to sue for treble damages to remedy federal antitrust violations. Successful plaintiffs also recover reasonable attorney's fees. The courts have established limits on the ability of private plaintiffs to obtain relief under the Clayton Act.

First, a private plaintiff must show defendant's conduct harmed his business or property.[13] The United States has broadly defined the term business to encompass "commercial interest or enterprises." Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 264, 92 S.Ct. 885, 892 (1972). Second, the private plaintiff must show his injury flowed from the type of anti-competitive act which the antitrust laws were intended to protect against. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697 (1977). In discussing this requirement, the Fifth Circuit has stated, "[t]he antitrust laws . . . were designed to protect competition, not merely competitors." Mahone v. Addicks Utility Dist. of Harris County, 836 F.2d 921, 939 (5th Cir.

---

States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee. 15 U.S.C. § 15.

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found. 15 U.S.C. § 22.

[13]    15 U.S.C. § 15.

17

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 174 of 344

1988). In <u>Mahone</u>, the Fifth Circuit dismissed plaintiff's complaint because the alleged injuries were only to the plaintiff, one competitor, as opposed to an injury to competition. Finally, the plaintiff must have standing as set forth by the United States Supreme Court in order to pursue a Clayton Act claim. <u>Associated General Contractors of California, Inc. v. California State Council of Carpenters</u>, 459 U.S. 519, 103 S.Ct. 897 (1983).[14]

In plaintiff's initial complaint filed on July 5, 1995, plaintiff alleges defendants operate two casinos in Louisiana and market those casinos in the Acadiana area.[15] Plaintiff alleges prior to the alleged actions of the defendants' he was "actively engaged in obtaining legislation and a gaming partner which would have allowed him to compete and be a competitor in the casino business in Acadiana and Lafayette, Louisiana."[16] Plaintiff alleges he received a political commitment to allow gambling.[17]

_____

[14]     The Supreme Court directed lower courts to analyze standing in light of five factors: (1) the causal connection between the antitrust violation and injury to the plaintiff, and whether the injury was intended; (2) the nature of the injury, including whether the plaintiff is a consumer or competitor in the relevant market; (3) the directness of the injury and whether claimed damages are too speculative; (4) the potential for duplicative recovery and whether apportioning damages would be too complex; and (5) the existence of more direct victims. <u>Associated General Contractors of California</u>, 459 U.S. at 537-38, 103 S.Ct. at 908-09.

[15]     Plaintiff's Complaint, July 5, 1995, paragraph 7, Record Document #1.

[16]     <u>Id.</u> at paragraph 8.

[17]     <u>Id.</u> at paragraph 9.

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 175 of 344

Plaintiff states he then entered into a business relationship with defendants regarding developing riverboat casino gambling in Lafayette, Louisiana.[18] Plaintiff alleges after entering into a business relationship with plaintiff, the defendants acted to prevent plaintiff from obtaining public support and legislative approval for riverboat gambling on the Vermilion River by "impugning plaintiff's reputation and creating a hostile public reaction" and that defendants "combined and conspired . . . to destroy plaintiff's efforts of becoming a gambling casino competitor in the South Central Louisiana area commonly known as Acadiana."[19] All of these allegations seem closely to resemble use of the political process within the confines of a regulatory system which contains a built in political process as a prerequisite to participate. However, of course, if slander or defamation occurred, that goes beyond the proper use of the political process; however, that is not the issue before this Court, except in part.

Based on the above factual allegations as set forth in his original petition, plaintiff set forth the following legal conclusions claiming defendants violated the antitrust laws of the United States:

---

However, no election had been held as required by law and this Court assumes no one within the law could deliver such an election result to amend Louisiana's riverboat gaming statutes to allow riverboat gambling on the Vermilion River in Lafayette, Louisiana.

[18]   Id. at paragraphs 10-14.

[19]   Id. at paragraphs 19 and 20.

19

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 176 of 344

A.   [t]hey created a combination of unreasonably restrain [sic] trade and created a monopoly for themselves;

B.   [t]hey created and determined to maintain a horizontal market allocation of casino gambling in Acadiana: a "per se" violation that is conclusively unreasonable;

C.   [t]heir practices and actions were designed to be unreasonably restrictive of competitive conditions.;

D.   [t]hey intended to harm plaintiff by their actions.[20]

Plaintiff stated that because of the alleged violations of antitrust laws, "there has been a substantial lessening of competition and a substantial impact on interstate commerce resulting from a loss of profits by plaintiff and plaintiff has been substantially damaged thereby in his business and property within the meaning of the antitrust laws of the United States."[21]

Finally, the plaintiff alleged the conduct of the defendants acted and continues to act as an appreciable restraint in the market availability for riverboat casino gambling."[22]

The regulatory process incorporates and contemplates the use of the political process as a limit to entry into gaming in Louisiana.  If defendants used the political process to block plaintiff from the process, they blocked plaintiff, one potential competitor, not competition as a whole.  Further, to the extent they might have blocked gaming on the Vermilion River, as a whole, by creating public support for refusal, the regulatory process not only contemplated this event, it requires the

---

[20]   Id. at paragraph 21.

[21]   Id. at paragraph 22.

[22]   Id. at paragraph 23.

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 177 of 344

political process to include such a decision -- yea nor nay, for nondesignated waterways. Consequently, given the loose nature of plaintiff's allegations, legal conclusions and vague allegations made, it became imperative plaintiff clearly delineate his claims under the laws pled.

Consequently, this Court's Standing Order for RICO cases was issued requiring plaintiff to submit a more detailed outline of his RICO claims, and defendants filed motions requesting a more definite statement as to plaintiff's Clayton Act claims. The plaintiff requested an extension of time to answer this Court's Standing RICO Order and voluntarily agreed to provide a more definite statement as to his Clayton Act claims. On September 26, 1995, this Court issued a Minute Entry stating the defendants' motions for a more definite statement had been rendered moot by plaintiff's voluntary agreement to provide same, and noting defendants could reurge their motions for a more definite statement if necessary after receipt of plaintiff's response to the RICO Standing Order and his voluntary compliance per the Clayton Act.

On October 11, 1995, the plaintiff filed a response to this Court's Standing Civil RICO Order. The plaintiff discussed at length the components of his RICO claim, however, did not make any specific factual claims regarding his antitrust claims. Specifically, plaintiff's Response to the Standing RICO Order, in which he had voluntarily agreed to make a more definite statement as to his antitrust claims, merely stated as to those claims,

21

"[c]ount I of the complaint sets out a violation of the Clayton Act, (15 U.S.C. § 15) for which the Court has jurisdiction under 15 U.S.C. § 1, 2, 15 and 22."[23] The plaintiff failed to designate whether any of the numerous factual allegations he set forth as to RICO applied to his Clayton Act claims, the form of the Response provides no insight in this regard, and plaintiff failed to further delineate his antitrust claims.

After plaintiff filed his response to this Court's Standing RICO Order, defendants again requested this Court order plaintiff to file a more definite statement stating his antitrust and pendant state claims with more particularity. On December 28, 1995, the Magistrate Judge issued a ruling finding the plaintiff's allegations with respect to the antitrust and pendant state claims contained within his complaint and his response to this Court's Standing RICO Order failed to satisfy Rule 12(e). The Magistrate Judge also found "an amended complaint setting forth more details of the antitrust and state law claims will enable the Court and the defendants to determine with greater certainty whether plaintiff has stated a cause of action under federal antitrust laws."[24] Therefore, the Magistrate Judge ordered the plaintiff to file an amended complaint setting forth his antitrust and state law claims with more particularity no later than January 19, 1996.

---

[23]     Plaintiff's Response to Standing Civil RICO Order, paragraph 18, Record Document #15.

[24]     Magistrate Judge's Ruling of December 28, 1995. Record Document #28.

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 179 of 344

On January 19, 1996, plaintiff filed a first amended complaint. The first amended complaint set forth the RICO claim, again listing a large number of factual allegations plaintiff claims constitute predicate acts for the RICO claim. With regard to the plaintiff's antitrust claim, the plaintiff set forth the following:

A. In addition to the foregoing [RICO claims], defendants and each of them have engaged in practices in violation of Section 1 of the Sherman Act in that the defendants and each of them entered into an agreement of concerted action or combination between them to restrain trade of the plaintiff in a casino business in the Acadiana area.

B. In this instance, there were agreements and concerted action which may be expressed or implied and as set forth hereinabove, the acts certainly constitute a concerted conduct restraint of trade and the monopoly was achieved.

C. There is the presence of horizontal market divisions between the defendants and an unreasonable restraint of trade having no purpose other than the elimination of plaintiff as a competitor which makes this type of activity illegal per se, especially when there is the presence of exclusionary or coercive conduct which means that the conduct is per se violative because of market division allocation and group boycotting and tying between the defendants.

D. In addition, under Louisiana State Law, all unfair methods of competition are declared unlawful and in this instance, the unfair method of competition is the agreement, combination and conspiracy to force plaintiff permanently out of business which has a direct effect on interstate commerce.

E. In addition, the defendants and each of them have violated Section 2 of the Sherman Act which provides that every person who shall monopolize or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade of commerce among several states with foreign nations . . . (is guilty of a violation of Section 2) and in this instance and as alleged the concerted refuses [sic] to deal especially where the combination of the defendants was to exclude a direct competitor from the market.

23

F.   It is obvious the plaintiff has lost any and all possibility or probability of any market standing and has lost any and all market advantage including good will and reputation.  It should also be obvious that the law favors free and open competition.

G.   In addition, because of the representations made by defendants and each of them with respect to the joint venture and financial and business interest between plaintiff and defendant in obtaining a casino for Acadiana and in plaintiff's reliance on such material representations made especially when defendants knew they were false and that the falsity would be relied on, defendants and each of them have economically and severely damaged the plaintiff and further have committed fraud as alleged hereinbelow.[25]

Further, plaintiff makes the conclusory statement that defendants have violated §§ 1 and 2 of the Sherman Antitrust Act and § 2 of the Clayton Antitrust Act.

Following the plaintiff's submission of his First Amended Complaint, defendants submitted motions to dismiss plaintiff's antitrust claims for failure to state a claim.  During the course of evaluating the defendants' motions to dismiss for failure to state a claim, this Court issued a Minute Entry on May 9, 1996 directing the plaintiff to submit a supplemental brief delineating with particularity the factual and legal basis for plaintiff's antitrust claims.  The Court stated, "based on plaintiff's Complaint, plaintiff's Response to the Standing RICO Order, or plaintiff's First Amended Complaint, [this Court can not determine] the exact nature of plaintiff's claims or legal theory under the Sherman and Clayton Acts."  Therefore, the Court ordered plaintiff to file a supplemental brief setting forth the

---

[25]   Plaintiff's First Amended Complaint, Section IV, Record Document #29.

24

specific claims, factually and legally, plaintiff was making under the Sherman and Clayton Acts. The Court then narrated the history of defendants' and this Court's attempts to force the plaintiff to state his claims with more particularity and stated, "if plaintiff again fails to set forth his antitrust claim with particularity, this Court will dismiss those claims and plaintiff will be precluded from raising antitrust claims against the defendants."

On May 28, 1996, the plaintiff filed a supplemental response in accordance with this Court's Minute Entry of May 9, 1996 which discussed only the legal concept of the Noerr-Pennington Doctrine and the Sham exception to that doctrine. The supplemental response does not set forth *in any form* the particular claims factually or legally, which plaintiff asserts under the antitrust acts.

Fed. R. Civ. Pro. 12(e) provides the basis for a motion for more definite statement. The Rule states:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. . . . If the motion is granted and the order of the court is not obeyed within 10 days after notice of the order or within such other time as the court may fix, the court may strike the pleading to which the motion was directed or make such order as it deems just.

The plaintiff in this instance has been afforded four opportunities to set forth a plain statement of his claim for relief under the antitrust laws, *i.e.*, the Sherman and Clayton Acts. After filing his first complaint, plaintiff voluntarily

25

agreed to set forth a more definite statement in his Response to the Standing Civil RICO Order. After his Response was ruled inadequate, the Magistrate Judge ordered plaintiff to submit an amended complaint. Finally, this Court stated plaintiff's previous pleadings were inadequate to allow this Court to evaluate whether plaintiff had a claim under the antitrust laws and ordered plaintiff to file a supplemental brief. Plaintiff has repeatedly failed to comply with this Court's orders to delineate his antitrust claims. The portions of the pleading setting out the antitrust claims are conclusory, vague, and ambiguous at best.

This Court is tempted merely to strike plaintiff's antitrust claims under Fed. R. Civ. Pro. 12(e) due to plaintiff's complete failure to respond to this Court's orders to clarify his antitrust claims. However, as such a dismissal would be without prejudice and as the defendants have answered plaintiff's complaint and have submitted motions to dismiss plaintiff's antitrust claims for failure to state a claim, this Court will consider plaintiff's antitrust claims under the standards set forth in Fed. R. Civ. Pro. 12(b)(6).

As a general rule, antitrust allegations are liberally construed. Ancar v. Sara Plasma, Inc., 964 F.2d 465 (5th Cir. 1992). However, as previously stated, the United States Supreme Court and the Fifth Circuit have established limits on the ability of private plaintiffs to obtain relief under the Clayton Act and therefore, the Sherman Act. In order to proceed with a

private antitrust complaint, the plaintiff must allege his injury
flowed from the type of anti-competitive act which the antitrust
laws were intended to protect against. <u>Brunswick Corp. v. Pueblo
Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 489, 97 S.Ct. 690, 697 (1977).
In other words, the plaintiff must allege an injury *to*
*competition* and not merely to himself. See <u>Mahone v. Addicks
Utility Dist. of Harris County</u>, 836 F.2d 921, 939 (5th Cir.
1988). (emphasis added)

Plaintiff's main argument alleges he was prevented from
competing in the Acadiana gaming market by defendants defaming
him and thus preventing him from obtaining legislative approval
to operate a riverboat casino on the Vermilion River.[26] Although
the plaintiff alleges this omission equates to control of the
gaming market in Acadiana, the plaintiff has failed to plead
actions toward or damage to anyone besides himself or any entity.
To the extent plaintiff contends defendants acted to turn public
opinion against gambling along the Vermilion River, the
regulatory scheme contemplates the political arena be used as a
limiting factor on gambling on nondesignated waterways.

The plaintiff specifically alleges the defendants violated
the antitrust laws and "intended to harm <u>plaintiff</u> by their
actions." Plaintiff also stated <u>he</u> had "been substantially
damaged [due to defendants' actions] in <u>his</u> *business and property*

_____

[26]    As discussed in the previous RICO section, such
approval would have required the statute regarding riverboat
gaming be amended to include the Vermilion River as well as the
Louisiana legislature's approval of plaintiff for a license.

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 184 of 344

within the meaning of the antitrust laws of the United States."
The plaintiff also stated the goal of the conspiracy was "to
*force plaintiff* permanently out of business." Plaintiff also
alleged *he* had "lost any and all possibility or probability of
any market standing and has lost any and all market advantage
including good will and reputation." Finally, plaintiff alleged
defendants "economically and severely *damaged the plaintiff*."

This Court finds the allegations of the plaintiff regarding
his antitrust claims are not sufficient to provide him with a
private cause of action under the Clayton Act or for violation of
the antitrust provisions of the Sherman Act. Further, this Court
notes plaintiff has had four opportunities in which to clearly
set forth his antitrust claims. Despite these opportunities, the
plaintiff has failed to allege any type of damage from the
alleged antitrust activity, except *to himself*. Rather, for the
most part, the plaintiff has merely set forth legal conclusions,
conclusory allegations and vague and ambiguous factual claims.
However, the plaintiff's allegations of damage clearly are for
*harm to plaintiff*; such is not sufficient under the law pled.
There is no allegation of harm to other competitors other than
vague allegations that defendants used public opinion and the
political arena to diminish or remove public approval -- if same
ever existed -- for gambling in the Acadiana area. Plaintiff has
made no true allegation of harm to *competition* except which might
result from *plaintiff's individual* failure to participate and
operation of the political process. Further, again, to the

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 185 of 344

extent plaintiff might have alleged that defendants' actions blocked gambling on the Vermilion River by creating a political climate where the electorate would not vote to include the Vermilion River, the regulatory scheme contemplates use of the political process -- to the extent this might have been abused one might urge violation of certain state laws but not in this context. Therefore, plaintiff's allegations, when viewed under applicable antitrust law, fail to state a claim upon which relief may be granted.

Furthermore, this Court fails to see how plaintiff could establish standing in order to pursue an antitrust claim. The United States Supreme Court has directed lower courts to analyze standing in antitrust cases considering factors which include "the directness of the injury and whether claimed damages are too speculative." Assoc. General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 537-38, 103 S.Ct. 897, 908-09 (1983). As previously discussed in the RICO section of this ruling, the riverboat gaming industry in Louisiana is a highly regulated field and is governed by statute. The Riverboat Gaming Act specifically regulates the obtaining of licenses to operate riverboat gaming casinos. Further, the Vermilion River is excluded from gambling unless the affected voters vote to allow gambling on the Vermilion River. They have not done so. The State of Louisiana has not issued plaintiff a license; everyone who applies for a license is not granted one. Every riverboat which opens for business is not successful or

29

profitable. The State of Louisiana tightly controls the gaming industry in Louisiana. Therefore, the regulations themselves presented hurdles to plaintiff which, evidently he could not overcome and plaintiff cannot establish his alleged injury, if any, was directly caused by the defendants' violation of the antitrust laws or what actual, non-speculative injury he sustained.

In short, any damages claimed by the plaintiff for failure to obtain a license to operate riverboat gaming and establish gaming on the Vermilion River are entirely too speculative to form the necessary basis under the law. In order to operate such an establishment, the plaintiff would have been required to obtain a license from the Louisiana legislature, to obtain a change in the Riverboat Gaming Act to include the Vermilion River in a list of approved waterways for riverboat gaming by way of the political process -- a vote by affected voters, position a riverboat and operate it at a profit. This Court finds that any possible damages alleged by the plaintiff as a result of the alleged antitrust scheme by the defendants are entirely too far removed and too speculative from the defendants' actions to give plaintiff standing to pursue a cause of action under the federal antitrust laws. Therefore, plaintiff's allegations under the federal antitrust statutes, 15 U.S.C. §§ 1, 2, 15 and 22 must be DISMISSED.

II. Remaining State Law Claims

Based on this Court's findings regarding the plaintiff's

30

antitrust law claims and the plaintiff's RICO claims, the only claims remaining before this Court are plaintiff's pendent state law claims. This Court has supplemental jurisdiction over those pendent state law claims pursuant to 28 U.S.C. § 1367(a). When the district court has dismissed all claims over which it has original jurisdiction, this Court may decline to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c)(3). The statute promotes judicial comity as well as a surer reading of the applicable law. Noble v. White, 996 F.2d 797, 799 (5th Cir. 1993). Therefore, this Court will decline to exercise supplemental jurisdiction over the plaintiff's pendant state law claims and same shall be DISMISSED WITHOUT PREJUDICE.

### Conclusion

Based on the foregoing, plaintiff's antitrust claims are DISMISSED; plaintiff's civil RICO claims are DISMISSED; and plaintiff's pendent state law claims are DISMISSED WITHOUT PREJUDICE.

THUS DONE AND SIGNED this _28TH_ day of _June_, 1996.

COPY SENT
DATE 7-3-96
BY SM
TO: Keene
Fazzio
Matthews
Abramson
Hill
Hurlburt

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

31

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 188 of 344

07260214

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

JUL 2 1996

ROBERT H. SHEMWELL, CLERK
BY _____
DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE/OPELOUSAS DIVISION

KENNETH J. GUILBEAUX                    CIVIL ACTION NUMBER: 95-1167

VERSUS                                  JUDGE DOHERTY

GRAND CASINOS, INC., ET AL              MAGISTRATE JUDGE TYNES

O R D E R

Considering the foregoing Memorandum Ruling;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that plaintiff's antitrust claims are DISMISSED; plaintiff's civil RICO claims are DISMISSED; and plaintiff's pendent state law claims are DISMISSED WITHOUT PREJUDICE.

Lafayette, Louisiana this _28_ day of _____, 1996.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

JUDGEMENT ENTERED 7-3-96

BY Suzanne Critchell

COPY TO Keene
Jasmine
Matthews
Abramsen
Sill
Hurlburt

32

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 189 of 344

19TH JUDICIAL DISTRICT COURT
FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                    DIV. "D"                    DOCKET

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY

FILED:_____        _____
                                        DEPUTY CLERK

## MEMORANDUM IN SUPPORT OF EXCEPTION OF NO RIGHT OF ACTION OR IN THE ALTERNATIVE, EXCEPTION OF VAGUENESS

The Plaintiff herein is Alvin C. Copeland ("Copeland"), a competent major who is a natural person. Copeland alleges he was the sole shareholder of American International Gaming Association, Inc. ("AIGA"). AIGA, on information and belief, was dissolved effective December 5, 1996.

**Defendant declares evidence will be taken at the hearing on this Exception.**

As party plaintiff, Copeland must have a real and actual interest in the claim he alleges. La.CCP art. 681. Copeland's petition is unclear as to whether he is suing directly for damages suffered by him, or suing as the successor to AIGA, the now-dissolved corporation he alleges to have been sole shareholder.

AIGA, not Copeland, applied for a license to conduct riverboat gaming operations. (Paragraph 9 of Plaintiff's petition). AIGA applied to the Riverboat Gaming Commission and the Division, and paid the required application fees to the Commission and the Division. Copeland individually never applied for a license, and has not alleged that he did so. Copeland also alleges that AIGA retained a sophisticated group of gaming professionals to coordinate activities necessary to obtain a certificate and license and to manage its proposed riverboat gaming

1

EXHIBIT
B

operation. The petition also alleges that "Plaintiff incurred approximately $2.2 million in expenses in preparing and processing AIGA's application for a license". (Paragraph 10 of Plaintiff's petition.) The petition indicates that AIGA objected to a requested modification by the Treasure Chest of its application to the Commission (Paragraph 18 of the petition). Finally, the petition states that, but for an overarching corrupt conspiracy, AIGA would have obtained a license to conduct gaming activities on a riverboat pursuant to the Act, and further alleges that AIGA would not have expended the funds necessary to prepare and submit its application, (Paragraph 29 of the petition) contradicting his allegation in paragraph 10 that Copeland incurred those expenses.

However, Copeland alleges that *he* was injured in his business and property, (Paragraph 72), and that the defendants are liable to Copeland. (Paragraphs 81, 84, 87, 88, and 89).

**Copeland confuses the interests of AIGA with his individual interest.** Although Copeland's petition disregards the distinction between the corporate form and its shareholder, this distinction is crucial for determining whether the party plaintiff has a "real and actual interest" to assert his claim. As discussed below, Copeland has no standing to sue on his own behalf, as the damages alleged to be suffered by him are the same as those suffered by the corporation. If, on the other hand, Copeland is suing for injuries suffered by AIGA, Copeland must have some "real and actual interest" recognized by law to assert his claim.

**Copeland has alleged no facts that he suffered any injury apart from the corporation.** As the damages claimed by Copeland arise from being deprived of a riverboat gaming license to AIGA, there is no set of facts under which Copeland, individually, could claim those damages. It is well settled that a plaintiff, even if he is the sole shareholder, may not sue in his individual capacity for damages suffered by a corporation. Mahfouz v. Ogden, 380 So.2d 646 (La.App. 1st Cir. 1979). When a

2

person operates their business in corporate form and reaps the benefits of incorporation, they cannot sue individually for damages incurred by the corporation. Id. In Mahfouz, the plaintiff was a sole shareholder of the corporation.

Accepting the facts as pled by Copeland in his petition as true, Copeland's efforts to obtain a riverboat gaming license were conducted entirely through AIGA. Copeland voluntarily sought the protections and benefits of incorporation. If any damages have been properly pled, which defendant vehemently denies, those damages were suffered by AIGA. Copeland has not pled any facts that he suffered damage apart from the damage suffered by AIGA. Copeland has failed to state a right of action, or a real and actual interest based on damage suffered directly by him.

Copeland has also alleged he is the successor to AIGA. First, it must be noted that Copeland's allegation that he is successor to AIGA is not supported by any facts or documentation other than those mentioned above. Copeland has failed to provide strict proof required that he is the successor of the corporation, or that the net assets of the corporation were transferred to him upon its dissolution. More specifically, Copeland has failed to provide any proof, if any exists, that the right to bring this action was ever properly listed as an asset in the liquidation of the corporation, and whether Copeland is entitled to bring this action following dissolution.

La. R.S. 12:148 provides that:

C.    Upon issuance of the certificate of dissolution, the corporate existence shall cease as of the effective date stated in the certificate, except for the sole purpose of any action or *suit commenced theretofore* by , or commenced timely against, the corporation.

D.    Any movable or immovable property inadvertently or otherwise omitted from the liquidation shall vest in the liquidator, for the benefit of the persons entitled thereto, and be distributed   accordingly. *(Emphasis added)*

In Mayfair Sales, Inc. v. Sams, 339 So.2d 1277, (La.App 1st Cir. 1977), the court held that where an action to revive a judgment was omitted from the liquidation, the right to revive the money judgment following dissolution vested in

3

the liquidator, pursuant to La.R.S. 12:148(D).

Therefore, the liquidator of AJGA, and not Copeland, is the proper party to bring suit, upon proof that the corporation was properly liquidated.

RESPECTFULLY SUBMITTED:

LANNY R. ZATZKIS, T.A. (Bar #13781)
KAREN D. McCARTHY (Bar #14193)
YVETTE A. D'AUNOY (Bar #22761)
ANDREW N LEE (Bar #24154)
ZATZKIS & ASSOCIATES
700 Camp Street
New Orleans, Louisiana 70130
Telephone: (504) 523-2266
Attorneys for Robert Guidry

WINSTON DECUIR (Bar #04795)
LINDA LAW CLARK (Bar #22305)
1951 Government Street
Baton Rouge, Louisiana 70806
Telephone (225) 346-8716
Attorneys for Robert Guidry

RALPH CAPITELLI (Bar # 3858)
CAPITELLI & WICKER
1100 Poydras Street
Energy Center Suite 2950
New Orleans, Louisiana 70163
Telephone: (504) 582-2425
Attorney for Robert Guidry

ARTHUR A. LEMANN, III (Bar #8296)
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, Louisiana 70113
Telephone (504) 522-8104
Attorney for Robert Guidry

4

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing discovery has been served on opposing counsel by mailing a copy of same in the U.S. Mail, certified, postage prepaid, this 5th day of October, 2000.

_____

LANNY R. ZATZKIS

5

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                         DIVISION "D"

ALVIN C. COPELAND

-versus-

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

Filed:_____        _____

                                                                   **Deputy Clerk**


**MEMORANDUM IN OPPOSITION TO**
**EXCEPTION OF NO CAUSE OF ACTION**

**MAY IT PLEASE THE COURT:**

Plaintiff, Alvin C. Copeland ("Copeland"), submits this Memorandum in Opposition to

the Exception of No Cause of Action filed herein by defendant, Robert Guidry.  Notwithstanding

Guidry's attempts to convert this exception into a summary trial of this procedure, Louisiana law

has established clear procedural guidelines for the hearing of an exception of No Cause of

Action, and when these procedural guidelines are properly administered, there is no doubt that

this exception should be overruled.


### I.      INTRODUCTION

Copeland filed this suit as a result of substantial losses incurred by him in his pursuit of a

license to operate a proposed riverboat gaming operation at the Kenner Laketown Harbor Park

on the shores of Lake Pontchartrain in Jefferson Parish.  As the result of "an overarching corrupt

conspiracy," i.e. a scheme to corrupt the entire process for issuing riverboat gaming licenses in

which both Treasure Chest Casino, LLC and Robert Guidry participated and engaged in overt

acts in furtherance of, the license was not awarded to Copeland, but to Treasure Chest Casino,

LLC.  Copeland has filed this suit, seeking to hold Defendants accountable for both the expenses

he incurred in attempting to fairly participate in the process subverted by Defendants' conduct, as

well lost profits, attorneys fees and costs, and the value of the corruptly obtained Treasure

Chest's gaming license and of its ill begotten success.

The method for Copeland's pursuit of these goals is his Petition for Damages, which

alleges the Defendants' civil responsibility for their actions under the Racketeering Influenced

**EXHIBIT**

*C*

and Corrupt Organizations Act, 18 U.S.C. §1961 *et seq.* ("RICO"), the Louisiana Unfair Trade Practices Act, La.R.S. 51:1401 *et seq.* ("LUTPA"), Louisiana Civil Code Article 2315 (Tortious Fraud), and 2298 (Unjust Enrichment). Copeland also alleges that Defendants are solidarily liable under 18 U.S.C. §1962 and Louisiana Civil Code Article 2324, and that Treasure Chest is liable for the actions of Robert Guidry under the doctrines of apparent authority, respondeat superior and La.C.C.art. 2320.

By means of this Exception of No Cause of Action, Guidry urges that Copeland's suit should be dismissed at the earliest possible stage. When the allegations of the Petition are taken as true, Plaintiff's Petition states a cause of action under each theory alleged, and this Exception is ill founded, and should be denied.

Alternatively, in the event that this Court is inclined to sustain this Exception, Copeland urges that he be allowed to amend pursuant to La.C.C.P. art. 934, so as to include in an Amended Petition facts as gleaned through the trial of Edwin W. Edwards, *et al.* As can be plainly seen from a review of Plaintiff's Petition, this lawsuit is grounded in large part upon the facts of the criminal case, and Plaintiff's Original Petition was limited largely to those facts set forth in Edwards' indictment and Guidry's guilty plea. If for some reason this Court feels that Copeland's initial pleading fails to set forth sufficient facts to state a cause of action, he should be allowed the opportunity to amend his pleadings so as to set forth additional facts gleaned from the Edwards' trial.

## II.    FACTUAL BACKGROUND

### A.    *Overview of the Gaming Licensure Process*

During its existence from 1992 through early 1996, the Louisiana Riverboat Gaming Commission ("the Commission") was composed of seven members, all of whom were appointed by Edwin W. Edwards while he was the Governor of the State of Louisiana. The Louisiana Riverboat Gaming Act, ("The Act"), originally enacted as La.R.S. 4:501 *et. seq.*, enabled the Gaming Commission to issue rules providing for and determining certain enumerated matters pertaining to riverboat gaming activities

The Act gave no authority to the Commission to grant riverboat gaming licenses. That power was given to the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, Department of Public Safety and

2

Corrections (the "Division"). The Division was granted the exclusive authority to "issue, deny, condition or restrict licensees and permits" to conduct riverboat gaming activities ("licenses"). LSA-R.S. 4:518(2). The Division was authorized to issue no more than 15 licenses. LSA-R.S. 4:525. Pursuant to this authority, the Division was empowered to conduct investigations and hearings, from which it alone was to determine the suitability of the applicant to be awarded a riverboat gaming license (Petition ¶7).

Although the Act gave the Division the sole power to issue licenses, the Commission nevertheless issued a set of rules providing for the issuance of Certificates of Preliminary Approval ("certificates") by vote of its members. These certificates purportedly demonstrated that the recipients were acceptable to the Commission and therefore should be candidates for actual licensure. (Petition, ¶8).

### B. *AIGA pursues its license by fair means*

Petitioner, Al Copeland is the successor to American International Gaming Association, Inc. (AIGA). Petitioner was the sole shareholder of AIGA at the time of its dissolution, and its net assets were transferred to him on its dissolution. (Petition, ¶2).[1]

On December 11, 1992, AIGA submitted its application to the Commission for a certificate, proposing a riverboat route and related operations at the Kenner Laketown Harbor Park on the shores of Lake Pontchartrain. In conjunction with its application, AIGA submitted a check in the amount of $30,000.00, comprised of a $25,000.00 application fee and a $5,000.00 evaluation fee. On February 14, 1993, AIGA submitted to the Division the filing fee of $50,000.00 required to fund the Division's background investigation of AIGA as an applicant for a license. The AIGA application was the first submitted to the Commission that proposed to conduct riverboat gaming in Kenner, Louisiana, and was among the first submitted to the Division for approval. (Petition, ¶9).

In connection with its application, AIGA retained a sophisticated group of gaming professionals with extensive prior experience in casino operations in New Jersey and Nevada, both to coordinate activities necessary to obtain a certificate and license and to then develop and manage its proposed riverboat gaming operation. Plaintiff incurred approximately $2.2 million in actual expenses in preparing and processing AIGA's application for a license. Had Plaintiff

---

[1] Defendant has also challenged Copeland's right to bring this suit by means of an Exception of No Cause of Action, or in the Alternative, Exception of Vagueness, which is the subject of a separate Memorandum in Opposition.

3

been aware of Guidry and the Treasure Chest's participation in the overarching corrupt conspiracy to garner the license, Plaintiff would not have incurred the expenses associated with the AIGA application. (Petition, ¶10).

### C.    Treasure Chest pursues its license by Other Means

In contrast to the straight forward and legitimate means by which AIGA sought a license for riverboat gaming in Kenner Louisiana, defendants, Guidry and Treasure Chest, utilized other methodologies, the details of which only came to light after the indictment of Edwards on November 6, 1998.

On or about February 9, 1993, Guidry formed Treasure Chest Casino, Incorporated (hereinafter "Treasure Chest"). Robert J. Guidry is alleged to have been the President and/or Chairman of the Board of Treasure Chest (Petition, ¶11).

On February 9, 1993 Guidry paid Stephen Edwards, the son of Governor Edwin Edwards, $25,000.00 for legal services relating to the preparation of the Treasure Chest license application (Petition, ¶12). Treasure Chest, Inc. submitted its application to the Commission on March 8, 1993, approximately three months after the AIGA application was submitted. The Treasure Chest application proposed to locate its gaming riverboat at Kenner's Laketown Harbor Park. On March 26, 1993, the Gaming Commission held a public hearing in Baton Rouge, Louisiana on the Treasure Chest application to operate a gaming riverboat; this hearing occurred fewer than three weeks after Treasure Chest filed its application, thereby granting priority to Treasure Chest's application over the application filed substantially earlier by AIGA.[2]

On June 4, 1993, a public hearing was held in Baton Rouge, La. At which AIGA made a presentation to the Commission on its application for a certificate (Petition, ¶14).

The Commission held another meeting in Baton Rouge, Louisiana, on June 18, 1993. By that date, it had approved eight application for certificates, none of which involved proposals to locate a gaming riverboat in Kenner. At this meeting, the Chairman of the Commission stated that he had "been asked by the Governor to make one comment on his behalf, and that is that the City of Kenner has expressed that it really desires only one boat and that boat to be located on the river." Also at this meeting, the Commission rescinded the resolution which it had

---

[2] Treasure Chest, Inc. later filed a modification to its application for a certificate, which proposed relocating the Treasure Chest, Inc.'s gambling riverboat from the Laketown Harbor Park site to Rivertown, U.S.A. on the banks of the Mississippi River in Kenner. (Petition, ¶13).

4

previously adopted on June 4th, which had stated that "a change of waterway" would be "more than a modification and requires a new application."

The Commission then adopted a motion "that would allow subsequent changes to applications or status of those applications leaving basically ... discretion as to whether new or not at the discretion of the Chairman with the consent of the Commission." Finally, the Commission then voted on eight applications for certificates and approved seven of them; the Treasure Chest's application for a certificate for its Rivertown location was one of the applications that was approved. As a result, AIGA's application to operate a gaming riverboat at the Laketown Harbor Park site on the shores of Lake Pontchartrain was never considered or voted on by the Commission. (Petition, ¶15).

As reported by the New Orleans Times-Picayune on June 5, 1998, Governor Edwards "did more than appoint the members of Louisiana's Riverboat Gaming Commission. He also sent clear messages about which bidders he favored. For example, Dr. Louis James, a former board member, has said he was called to the Governor's Mansion the day before the board was to award the last seven licenses in 1993. James has said Edwards gave him a typewritten list of about, a dozen casino boats, including three that involved friends of Edwards." (Petition, ¶16).

Treasure Chest Casino, L.L.C. was formed on August 27, 1993. On or about August 30, 1993, Boyd Kenner, a wholly owned subsidiary of Boyd Gaming, a public traded corporation domiciled in Las Vegas, Nevada, entered into a casino management agreement with Treasure Chest. Under this agreement Boyd Kenner would be paid a management fee representing ten (10%) percent of the Treasure Chest's net operating profit. In addition, on or about August 30, 1993, Boyd Kenner, Boyd Gaming and Treasure Chest entered into a subscription agreement wherein Boyd Kenner agreed to advance to Treasure Chest $10 million cash upon the granting of a riverboat gaming license to Treasure Chest. The commitment to advance those funds was guaranteed by Boyd Gaming. Subsequently, Boyd Kenner acquired a fifteen (15%) percent interest in Treasure Chest in exchange for a cash payment of $15 million. (Petition, ¶17).

On November 13, 1993, subsequent to the approval by the Commission of the Treasure Chest application for its Rivertown location, Treasure Chest sought permission to modify the previously filed application to move the site of its proposed route and operations to Lake Pontchartrain. The Commission granted this request over AIGA's objections. Despite the fact

5

that it had been Treasure Chest that had applied for the Certificate of Preliminary Approval, the Commission issued a certificate to Treasure Chest Casino, L.L.C. on March 15, 1994. (Petition, ¶18).

Andrew Martin ("Martin"), a close friend, confidant, and associate of then-governor Edwin Edwards, held the title of "Executive Assistant" to Edwin Edwards during Edwards' fourth term as Governor. Beginning no later than April, 1994. Martin solicited bribes and extortion payments on behalf of Edwin Edwards and further demand and received from Guidry and/or Treasure Chest monthly net payments to himself, Edwin Edwards and Stephen Edwards of approximately $30,000.00 each, in exchange for Martin's, Edwin Edwards', and Stephen Edwards' influence and assistance with the Treasure Chest licensing procedure. (Petition, ¶19).

In about April 1994, Robert Guidry, following a favorable decision regarding gaming suitability in connection with a video poker company Guidry owned, had conversations with Andrew Martin concerning the status of Guidry's efforts to obtain approval for his riverboat license from the LSP Gaming Division. At that time, Martin told Guidry that the Treasure Chest was not assured of getting LSP approval. Martin, however, stated that he could help Guidry with the licensing procedure pending before the LSP Gaming Division, but indicated by rubbing his fingers together that it would cost Guidry money for the assistance. Martin stated words to the effect that Governor Edwin Edwards owed him favors, and that he (Martin) would "cash in all my green stamps" to help Guidry. Martin further told Guidry that their assistance, to quote the Edwards indictment, "would cost Guidry 3% of gross revenue as per Louisiana statute, to be divided 1% each between Martin, Edwin Edwards and Stephen Edwards." (Petition, ¶20). At the time Martin first contacted Guidry, the State Police had not set a date for the hearing on Treasure Chest's application, which was a prerequisite for obtaining a license. (Petition, ¶21).

On or about April or May 1994, Robert Guidry had other conversations with Andrew Martin in which Martin revised his demand on Guidry. Martin, stating words to the effect that, "you only go around once, I gotta get what I can get," stated that he and Edwin Edwards would accept approximately $100,000 per month to be split between Martin, Edwin Edwards, and Stephen Edwards, and that payments should begin after Edwin Edwards finished his term as Governor. Guidry agreed to this arrangement, provided that Edwin Edwards himself would confirm the deal with Guidry. (Petition, ¶22).

6

Guidry met with Martin and Edwin Edwards in a hotel meeting room. Guidry and Edwin Edwards had a conversation while Martin guarded the door. Edwin Edwards asked Guidry if he agreed with the deal proposed by Martin. When Guidry indicated he did, Edwin Edwards responded that they had a deal and assured Guidry that Guidry would get his licensing hearing. (Petition, ¶23).

On information and belief, as the New Orleans Times-Picayune reported on December 9, 1997, "During Guidry's effort to license the Treasure Chest, Governor Edwards urged State Police to grant the proposal a licensing hearing, State Police sources have said, a critical step in the approval process." (Petition, ¶24).

The State Police held a hearing into Treasure Chest's application in Baton Rouge, La. On May 17, 1994. At this hearing, Robert Vosbein, counsel for Treasure Chest, testified under oath that there were no elected public officials doing business with Treasure Chest.

Although Guidry had a continuing duty to render a full and accurate disclosure of his association with Edwin Edwards, Guidry has never disclosed this association. (Petition, ¶27).

On May 17, 1994, the Division granted a license to Treasure Chest. Treasure Chest would not have received a license but for the overarching corrupt conspiracy. (Petition, ¶28).

Plaintiff submits that, but for the overarching corrupt conspiracy, AIGA would have obtained a license to conduct gaming activities on a riverboat pursuant to the Act, and was suitable to obtain such a license; AIGA, in fact, was granted a video gaming owner's license by the State of Louisiana in June 1994 and a gaming license by the State of Colorado in March 1995. Further, had AIGA known of the overarching corrupt conspiracy, it would not have expended the funds necessary to prepare and submits its application. (Petition, ¶29).

## III. LAW AND ARGUMENT

### A. *Exceptions Of No Cause Of Action*

The purpose of the peremptory exception of no cause of action is to determine the sufficiency in law of the petition. It questions whether the petition sufficiently alleges grievances for which the law affords a remedy. All well-pleaded allegations of fact must be accepted as true when considering an exception of no cause of action. The exception of no cause of action must be decided upon the face of the petition and any attached documents. *Hoskin v. Plaquemines Parish Government*, 98-1825, (La.App. 4 Cir. 8/4/99), 743 So.2d 736. No evidence may be

7

introduced at any time to, support or controvert the objection that the petition fails to state a cause of action. La.Code Civ. Proc. art. 931. *Wallace C. Drennan, Inc. v. Sewerage & Water Bd. of New Orleans*, 98-2423 (La.App. 4 Cir. 9/22/99), 753 So.2d 861. Pleadings must be construed reasonably so as to afford litigants their day in court, to arrive at the truth and to do substantial justice. LSA-C.C.P. art. 865; *Krebs v. Mull*, 97-2643 (La.App. 1 Cir. 12/28/98), 727 So.2d 564, 567.

When it can reasonably do so, the court should maintain a petition against a peremptory exception so as to afford the litigant an opportunity to present his evidence. *Kuebler v. Martin*, 578 So.2d 113, 114 (La.1991). Any reasonable doubt concerning the sufficiency of the petition must be resolved in favor of finding a cause of action stated. *Belle Pass Terminal, Inc. v. Jolin, Inc.*, 92-1544, 92-1545 (La.App. 1st Cir. 3/11/94); 634 So.2d 466, 493, *writ denied*, 94-0906 (La.6/17/94); 638 So.2d 1094. *Krebs*, 727 So.2d at 567.

The standard for granting an exception of no cause of action is as follows:

> The burden of demonstrating that no cause of action has been stated is upon the mover or exceptor. In deciding the exception of no cause of action, the court must presume all factual allegations of the petition to be true and all reasonable inferences are made in favor of the non-moving party. In reviewing a trial court's ruling sustaining an exception of no cause of action, the [appellate court] should subject the case to *de novo* review, because the exception raises a question of law and the lower court's decision is based only on the sufficiency of the petition.

A petition should not be dismissed for failure to state a cause of action unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of any claim which would entitle him to relief. The question therefore is whether viewed in the light most favorable to plaintiff, and with every doubt resolved in his behalf, the petition states any valid cause of action for relief. The petition should not be dismissed merely because plaintiff's allegations do not support the legal theory he intends to proceed on, since the court is under a duty to examine the petition to determine if the allegations provide relief on any possible theory. *Hoskin*, 98-1825, pp. 10-11, at 742 (quoting *City of New Orleans v. Board of Com'rs*, 93-0690 (La.7/5/94), 640 So.2d 237). *Wallace C. Drennan, Inc. v. Sewerage & Water Bd. of New Orleans* Excerpt from: 98-2423 (La.App. 4 Cir. 9/22/99), 753 So.2d 861, 864 to 98-2423 (La.App. 4 Cir. 9/22/99), 753 So.2d 861, 864.

8

Generally, the courts will not maintain an exception of no cause of action in part. If the petition states a cause of action as to any ground or portion of the demand, the exception of no cause of action generally should be overruled. The purpose of this general rule is to prevent a multiplicity of appeals which forces an appellate court to consider the merits of the action in a piecemeal fashion. *Everything On Wheels Subaru, Inc.*, 616 So.2d at 1236. *Prestage v. Clark*, 97-0524 (La.App. 1 Cir. 12/28/98), 723 So.2d 1086, 1089.

### B. Copeland's Factual Allegations Are Sufficient To Allege Standing Under 18 U.S.C. 1964(c).

Relying upon inapplicable case law regarding Federal Court pleadings and summary judgments, Defendants urge that this Court should find Copeland's allegations of both injury and causation lacking, thus entitling them to the dismissal of this action. Copeland sufficiently plead facts so as to entitle him to recovery under 18 U.S.C. 1964, and any difficulties in proof, quantification or allocation of damages are matters for later stages of litigation.

What Guidry purports to challenge in his Exception is solely Plaintiff's standing to bring a civil action for damages stemming from RICO violations. 18 U.S.C. 1964(c) allows for suits by any person "injured in his business or property by reason of a violation of section 1962. The Courts have held that this requires a Plaintiff to make two showings:

(1)    that he has suffered injury to his business or property; and

(2)    that this injury was caused by the predicate acts of racketeering activity that make up the violation of §1962.

*Brandenburg v. Seidel,* 859 F.2d 1179, 1187 (4th Cir.1988). These two elements, injury and causation are aspects of standing that must be established as a threshold matter by a civil RICO plaintiff in Federal Court. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496-497 (1985).

Predictably, Guidry cites this Court to the most draconian Federal Court precedents, urging that, notwithstanding the fact that their challenge is made on an exception of no cause of action, where the factual allegations of the plaintiff's petition must be deemed correct, and any reasonable doubt concerning the sufficiency of the petition must be resolved in favor of finding a cause of action stated, that this Court should pierce the Plaintiff's pleadings so as to find that Plaintiff will ultimately be unable to prove these elements at trial. Copeland has adequately plead both of these elements: injury to business or property and causation, and that this exception should be overruled.

9

Contrary to Guidry's assertions, Plaintiff has made more than conclusory allegations as to injury, and seeks to recover more than mere deprivation of future gaming revenue and the right to gaming profits. In addition to seeking recovery of these elements, and the value of the gaming license, Copeland has also alleged with specificity that he has incurred substantial expenses in preparing for and applying for a license.

While Copeland acknowledges that some Courts have imposed restrictions as against speculative damages, and have imposed requirements of such things as "concrete financial loss" and damages to "tangible property interests" to recover, the plain wording of 18 U.S.C. makes no such showing necessary. In pertinent part, 18 U.S.C. 1964(c) provides:

> (c)     Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee...

The United States Supreme Court has definitively indicated that the question of causation under 18 U.S.C. 1964(c) is merely one of proximate cause, *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 112 S.Ct. 1311; 117 L. Ed. 2d 532 (1992), and that there is no "heightened" standing threshold for a RICO plaintiff, other than that he has been, in the plain language of the statute, "injured in his business or property by the conduct constituting the violation." *Sedima*, 473 U.S. at 497.

Copeland's pleadings are sufficient to withstand Guidry's challenge of an exception of no cause of action, and further resort to federal authority addressing the issue of RICO standing either on Motions to Dismiss under Fed.R.Civ.Proc. 12 or Motions for Summary Judgment under Fed.R.Civ.Proc. 56 is unnecessary. However, if further analysis of federal case law is necessary, then the court's analysis of the appropriate determination of RICO standing on a Motion to Dismiss for Failure to State a Claim upon which Relief can be Granted under Fed.R.Civ.Proc. 12(b)(6) in *In re American Honda Motor Co.*, 941 F. Supp. 528 (D. Md. 1996) is most appropriate.

In that litigation, the essential allegations were by certain current and former Honda dealers that they had been given an inadequate allocation of cars by virtue of a scheme by certain other dealers who had paid bribes individuals within the Honda organization. Ultimately, the court at 941 F. Supp. 528 refused to dismiss the Honda claims on the basis of either "injury in fact" or causation on a Motion to Dismiss.

10

With respect to the injury in fact requirement, although the Court in acknowledged the existence of case law indicating that a mere "lost opportunity" is not sufficient injury to confer standing under RICO, *In re Taxable Mun. Bond Litig.*, 51 F.3d 518, 522-523 (5th Cir.1995), it opined that the issue presented was more of an eventual "daunting issue of proof for the plaintiffs," than one to be appropriately decided on a Motion to Dismiss. The *Honda* Court relied upon the Supreme Court's recitation of the applicable standard of review for a Motion to Dismiss:

> We have held that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." ... [Petitioners'] complaint must be sustained if relief could be granted "under any set of facts that could be proved consistent with the allegations."

> \* \* \*

> The *NOW* Court accordingly rejected the argument that a RICO claim brought by two health clinics should be dismissed for lack of standing. "[Petitioners] alleged in their complaint that the respondents conspired to use force to induce clinic staff and patients to stop working and obtain medical services elsewhere. Petitioners claimed that this conspiracy 'has injured the business and/or property interests of the [petitioners].' ... Nothing more is needed to confer standing ... at the pleading stage."

*In re American Honda Motor Co., Inc. Dealerships Relations Litigation*, 941 F.Supp. at 542-543, quoting *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (Internal citations omitted). Based upon this standard, the *Honda* Court concluded that the Plaintiffs had satisfied their pleading burden:

> Defendants' argument that plaintiffs have failed to allege injury is summarized by a single sentence from American Honda's moving papers: "To determine the fact of injury, it is necessary to compare some single, actual history with an invented model of a past which never occurred." Am. Honda's Mot. to Dismiss at 20. At the pleading stage, however, plaintiffs are not required "to determine the fact of injury." To survive a motion to dismiss, there need only be one set of facts consistent with plaintiffs' allegations that would entitle them to relief. Even if defendants are correct that plaintiffs will have some difficulty establishing to which dealer certain cars should have gone, it is clear that some sets of facts could support plaintiffs' claims.

*In re American Honda Motor Co., Inc. Dealerships Relations Litigation*, 941 F.Supp. at 543.

The *Honda* court decision is particularly appropriate to the instant case. While it may be that Copeland will ultimately be unsuccessful in proving that "but for" Defendants' actions, he would have been granted a license, he is not required to do so to survive an exception of no cause

of action. Rather, the Court must assume Plaintiff's well plead factual allegations as true, and overrule the exception if, assuming these allegations to be true, Plaintiff may be entitled to relief.

The *Honda* Court also dispensed with the defendants' challenge to proximate causation for RICO standing, rejecting arguments that "because no plaintiff dealer can establish a specific entitlement to a certain allocation of cars ... no plaintiff can show that any bribes received by Honda caused harm to any specific plaintiff." *In re American Honda Motor Co., Inc. Dealerships Relations Litigation*, 941 F.Supp. at 542. The Court's resolution of this issue correctly emphasized that, at least on a motion to dismiss, the sufficiency of the plaintiffs' pleading satisfied the proximate cause analysis:

> I therefore conclude that plaintiffs' allegations of allocation injury satisfy the proximate causation element required for RICO standing. Assuming plaintiffs' allegations of injury to be true, they have pled an obvious causal connection between their lost profits and the predicate acts constituting the bribery scheme. That plaintiff dealers would be deprived of profits is the direct and foreseeable result of the alleged scheme to give and receive bribes in exchange for higher allocations of cars. *See Mylan Labs.*, 770 F.Supp. at 1084 ("The bribes given and received were allegedly received for the purpose of advancing the bribing company's [interests] at the expense of other companies.... Thus, the injury caused those other companies ... is a foreseeable recognizable result of the predicate actions."). Even if other factors played a role in the allocation of cars, there is no doubt that plaintiffs have alleged that the bribery scheme played a "substantial role" in causing the allocation injuries they claim.

*In re American Honda Motor Co., Inc. Dealerships Relations Litigation*, 941 F.Supp. at 545, quoting *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F.Supp. 1053, 1084 (D.Md.1991).

Once again, the *Honda* court's analysis is applicable to the instant case. Copeland has alleged that defendants, Guidry and Treasure Chest, paid money to receive special treatment in the licensing process, and both the loss of Copeland's investment, and failure to realize the expected profits from a license are the direct and foreseeable consequences of the scheme. Even if there were other factors influencing the Commission and the Division in granting the Treasure Chest's license application, the monies paid by the Defendants were certainly a substantial factor in Copeland's losses, and this Exception should be overruled.

Against this background and the proper analysis for resolving the standing issue at the pleading stage, Guidry's attempts to glean support from the unpublished opinion of Judge Doherty in *Guilbeaux v. Grand Casinos, Inc.*, No. 95-1167 (W.D.La. 7/2/96), *aff'd*, 114 F.3d 1181 (5th Cir.1997), have no applicability whatsoever to the case at hand. Although the precise details of the *Guilbeaux* pleadings and their presentation to Judge Doherty are concealed by the

12

memorandum opinion and lack any illustration, as the Fifth Circuit explicitly determined that the matter was not an appropriate precedent for other decisions,[3] it is nevertheless apparent that the case is both factually and legally distinguishable from this case.

From a factual standpoint, the discrepancies are obvious. Guilbeaux alleged a conspiracy to destroy the plaintiff's reputation, to defraud him of future gaming revenues, and to "monopolize the gaming business in Acadiana and prevent competition by the plaintiff and to deprive him of future profits." Underlying these allegations are several significant distinctions. First, as noted by the *Guilbeaux* court on multiple occasions, at the time of the Court's decision there was no gaming in Acadiana, and any attempt to obtain a permit to operate a casino on the Vermillion River near Lafayette would have required a special election and approval by the voters, as the Vermillion River was not a designated river or waterway under La.R.S. 4:503. (Redesignated as La.R.S. 27:43). Unlike in *Guilbeaux*, both Lake Pontchartrain and the Mississippi River, the sites at issue in the instant case, are designated waterways, and no local voter approval would have been or was required. La. R.S. 27:43(B). Moreover, unlike in the *Guilbeaux*, wherein the profitability of a casino in Lafayette was an entirely speculative proposition, Kenner has proven itself, albeit partially by virtue of the Defendants' corrupt practices, to be entirely profitable, as evidenced by net profits exceeding $100 million for the calendar years 1996 and 1997, (Petition, paragraph 38), and $124 million for the year 1998 (Petition, ¶40).

Moreover, unlike Guilbeaux, who merely alleged the loss of a vague investment without apparently even pleading that he even applied for a license, Copeland has alleged concrete losses, including both the expenditure of $30,000 to the Commission for its application and evaluation fee, $50,000 to the Division for its filing fees (Petition, ¶9), and approximately $2.2 million in expenses in preparing and processing AIGA's application for a license as a result of his consultation with a sophisticated group of gaming professionals (Petition, ¶10). Moreover, unlike Kenneth Guilbeaux, Copeland's suitability for a gaming license was not completely an unknown quantity, as AIGA was in fact granted a video gaming license by the State of Louisiana in June, 1994, and a gaming license by the State of Colorado in March of 1995. (Petition, ¶29).

---

[3] The Fifth Circuit Court of Appeals, by reference to Local Rule 47.5.4 found that its decision was explicitly deemed to be "not precedent, except under the doctrine of res judicata, collateral estoppel or law of the case (or similarly to show double jeopardy, abuse of the writ, notice, sanctionable conduct, entitlement to attorney's fees, or the like). An unpublished opinion may, however, be persuasive." Fifth Circuit Rules, Rule 47.5, 28 U.S.C.A.

13

Notwithstanding these factual distinctions between *Guilbeaux* and the instant case, there is yet a further factual distinction which lead to not only the result in *Guilbeaux*, but which also makes Judge Doherty's reasoning wholly inapplicable to the instant case. Although Judge Doherty did concededly discuss the concepts of both actual injury and causation, **she did so solely in the context of the predicate acts of RICO activity plead in that case, i.e., mail fraud under 18 U.S.C. 1341 and wire fraud under 18 U.S.C. 1343**, which were apparently the only predicate acts plead by the plaintiff in that case.

In sharp contrast to *Guilbeaux*, however, in addition to wire fraud and mail fraud, Copeland has also alleged "repeated acts of bribery (in violation of 18 U.S.C. 1952 and LSA-R.S. 14:118), [and] extortion (in violation of 18 U.S.C. §1951, LSA R.S. 14:66 and LSA-R.S. 14:120)." (Petition, ¶69). Bluntly speaking, Judge Doherty dismissed Guilbeaux's claims based upon his failure to adequately plead these predicate acts, and did not even address the standing necessary to bring a civil RICO case under 18 U.S.C. §1964, which is precisely the basis of Guidry's Motion.

Accordingly, the *Guilbeaux* opinion is irrelevant and immaterial to the issues presented. Regardless of whether Copeland will ultimately be able to prove his entitlement to lost profits, he has clearly plead them. Moreover, he has certainly plead a concrete loss of over $2 million which would not have been invested had he known of the Defendants' overarching corrupt conspiracy and this Exception must be overruled.

### C.     Copeland Has Stated A Cause Of Action For Unfair Trade Practices

Similarly, Guidry's statement that Plaintiffs have failed to show any compensable loss so as to recover under La. R.S. 51:1409 is incorrect. In addition to the failure to obtain a gaming license presumably caused by Defendants' actions, Plaintiff has also suffered the loss of his investment. Notwithstanding the issue of whether a gaming license is a property right, Plaintiff is clearly entitled to recover the money damages sustained as a result of Defendants' actions, which, for the purposes of this motion are unchallenged as unfair trade practices.

### D.     Copeland Has Stated A Cause Of Action For Tortious Fraud

Guidry's Exception is perhaps most egregious in its assertion that Plaintiff has failed to plead a theory of tortious fraud under Louisiana Civil Code article 2315. While Plaintiff certainly does not object to the proposition that to recover for any tort under article 2315 there

14

must be a legal duty on the part of the Defendant, a breach of that duty and damage resulting from the breach, he vehemently denies the applicability of any cases regarding negligent misrepresentation. The actions of Defendants herein can in no way, manner, shape or form be deemed to be merely negligent. Rather, they are part of an actionable conspiracy to subvert the entire process for the licensing of gaming casinos.

Copeland respectfully submits that he certainly relied upon the integrity of these proceedings, and would not have invested the substantial sums he did, if he had known that substantial bribes were being paid to insure that only those friends of Edwin Edwards would be eligible to receive riverboat licenses. In the event that Copeland's pleadings that had he known of the overarching corrupt conspiracy are deemed insufficient to constitute actual reliance upon the misrepresentations of Defendants conducted under oath that no elected official was doing business with them, Copeland respectfully submits that he should be allowed leave to amend so as to clarify these allegations on the basis of evidence obtained through the trial of Edwin W. Edwards.

### E. *Copeland Has Stated A Cause Of Action For Unjust Enrichment*

Finally, notwithstanding the Court's decision in *Baker v. Maclay Properties Co.*, 648 So.2d 448 (La. 1995), Copeland respectfully submits that he has indeed plead facts sufficient to constitute all of the requisite elements of unjust enrichment as that cause of action is set forth in *Baker*. Defendants' arguments that Plaintiff has not plead facts to constitute impoverishment as all of Plaintiff's damages are premised on contingency of obtaining a riverboat gaming license is misguided. Clearly, Copeland has alleged that he sustained the loss of over $2 million dollars in investments in attempting to obtain such a license. If this is not impoverishment, what is?

As to Defendants' assertions that the doctrine of unjust enrichment has no application where there is in fact a tort remedy available, Plaintiff does not dispute this, but merely asserts alternatively that, in the event this Court somehow deems Plaintiff has no recovery for tortious fraud under article 2315 of the Civil Code, Copeland should nevertheless be allowed a remedy under article 2298.

15

## IV.  CONCLUSION

Notwithstanding any difficult issues of proof as to a determinable quantum of damages, it is apparent that Plaintiff has indeed plead facts sufficient to state a cause of action under Louisiana law, and accordingly, that this Exception must be overruled.

In the unlikely event that this Court does determine that Plaintiff's Petition fails to set forth a cause of action in any particulars, pursuant to Louisiana Code of Civil Procedure article 934, Copeland respectfully submits that the Court should allow an amendment to cure any defects in the pleadings, based upon the facts obtained through the full trial of the merits in the Edwards matter.

Respectfully submitted,

*CHOPIN, WAGAR, COLE, RICHARD,*
*REBOUL & KUTCHER, LLP*

By: _____

**ROBERT A. KUTCHER** (LSBA #7895)
**NICOLE S. TYGIER** (LSBA #19814)
**VICKI A. TURKO** (LSBA #24677)
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana  70002
Telephone:  (504) 830-3838
Facsimile:  (504) 836-9573

**BENJAMIN R. SLATER, JR.** (LSBA #12126)
**BENJAMIN R. SLATER, III, T.A.** (LSBA #12127)
**A. ELISE BROWN** (LSBA #19500)
**DONALD J. MEISLER, JR.** (LSBA #20294)
**S. JOSEPH WELBORN** (LSBA #25928)
**SLATER LAW FIRM**
650 Poydras Street, Suite 2600
New Orleans, Louisiana  70130
Telephone:  (504) 523-7333
Facsimile:  (504) 528-1080

*Attorneys for Plaintiff Alvin C. Copeland*

16

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

(    )    Hand Delivery         (    )    Prepaid U.S. Mail
(    )    Facsimile             (    )    Overnight Delivery

Metairie, Louisiana, this _____ day of _____, 2000.

_____

17

**19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

NO. 464-607                                                            DIVISION "D"

**ALVIN C. COPELAND**

-versus-

**TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY**

Filed:_____        _____
                                                          **Deputy Clerk**

**MEMORANDUM IN OPPOSITION TO
EXCEPTION OF NO RIGHT OF ACTION OR IN
THE ALTERNATIVE, EXCEPTION OF VAGUENESS**

MAY IT PLEASE THE COURT:

Plaintiff, Alvin C. Copeland ("Copeland"), submits this Memorandum in Opposition to

the Exception of Right of Action, or in the Alternative, Exception of Vagueness filed herein by

defendant, Robert Guidry.  Copeland's pleadings are not impermissibly vague, and validly state

that the rights he asserts herein are those to which he succeeded as the sole shareholder of

American International Gaming Association, Inc. ("AIGA"), who received the net assets of the

corporation upon its dissolution, and succeeded to the powers of the liquidator  in accordance

with La.R.S. 12:149(C).

### I.        STANDARDS OF REVIEW

In *Wallace C. Drennan, Inc. v. Sewerage & Water Bd. of New Orleans*, 98-2423 (La.App.

4 Cir. 9/22/99), 753 So.2d 861, 864, the Court succinctly stated the purpose of an exception of no

right of action:

> [T]he peremptory exception of no right of action questions whether the plaintiff
> has an interest in judicially enforcing the right alleged against the defendant. ...
> When considering the exception, the court must ask whether the plaintiff belongs
> to a particular class for which the law grants a remedy for a particular grievance
> or whether the plaintiff has an interest in judicially enforcing the right asserted.
> .... The exception raises neither the question of the plaintiff's ability to prevail on
> the merits of the cause nor the question of whether the defendant may have a valid
> defense.

*Wallace C. Drennan, Inc.*, 753 So.2d at 864.

On the other hand, "[t]he purpose of the Exception of Vagueness is to place the defender

on notice of the nature of the facts sought to be proved so as to enable him generally to prepare

**EXHIBIT**

D

his defense, as well as additionally by formal pleading to identify the cause of action so as to bar its future re-litigation after determination by the present suit." *Washington v. Flenniken Const. Co.*, 188 So.2d 46, 49 (La.App. 3 Cir. 1986).

## II. ARGUMENT AND LAW

In the instant case, Copeland's pleadings do demonstrate that he has presented a valid right of action, and clearly places Defendant on notice of the essential facts so as to prepare a defense and bar future re-litigation.

As noted in paragraph 2 of Copeland's Petition for Damages:

2.

At all pertinent times, AIGA was a Louisiana Corporation with its principal place of business located in the Parish of Jefferson, State of Louisiana. Copeland was the sole shareholder of AIGA, and its net assets were transferred to him upon its dissolution. As detailed below, AIGA was an applicant seeking authorization to conduct gaming activities on a riverboat in accordance with the Louisiana Riverboat Economic Development and Gaming Control Act (hereinafter the "Act"), LSA-R.S. 4:501, *et seq.*

Defendant's intimations that authority to bring suit may still rest with the liquidator are groundless. AIGA was dissolved by voluntary liquidation, effective December 5, 1996. (Please see Certificate of the Liquidator of AIGA attached as Exhibit "A". Moreover, as evidenced by the attached document entitled Action of Sole Liquidator, all remaining assets of the corporation were transferred to its sole shareholder, Alvin C. Copeland upon its dissolution. (Please see Action of Sole Liquidator, attached hereto as Exhibit "B".)

Under the law, during the liquidation, the corporation's liquidator was empowered to "take all action required to preserve the interests of the corporation, its creditors and shareholders," La.R.S. 12:148(E), and "[a]ny movable or immovable property inadvertently or otherwise omitted from the liquidation shall vest in the liquidator, *for the benefit of the persons entitled thereto*, and be distributed accordingly." La.R.S. 12:148 (D) (emphasis added). However, '[u]pon termination, the liquidator shall be divested of his powers, which shall revert to the directors, officers and shareholders." La.R.S. 12:149(C). Having received the net assets of the dissolved corporation, Copeland is the successor to AIGA, and has the right to bring this litigation for damages sustained by AIGA and to himself upon receipt of AIGA's net assets after liquidation.

2

No Louisiana case law disputes Copeland's right, as successor to AIGA to pursue this claim, including the cases cited by Defendant. *Mahfouz v. Ogden*, 380 So.2d 646 (La.App. 1st Cir.1979) concerned a sole shareholder of a corporation who brought suit for what might arguably have been a corporate debt without specifying whether he was bringing the action on personally on or behalf of the corporation. That case did not involve or even discuss a dissolved corporation.

*Mayfair Sales, Inc. v. Sams*, 339 So.2d 1277 (La.App.1st Cir.1976), *writ den.*, 342 So.2d 676 (La. 1977) is indeed deceptively similar to the instant case, but with crucial and significant differences—in that case, the action at issue was the revival of a judgment in the corporation's name resulting from an action commenced *before* the date of the dissolution. Significantly, that corporation was dissolved based upon an assertion by the liquidator that "there were no assets whatsoever remaining" and the appellate record reflected that the "person appointed liquidator ha[d] [n]ever been discharged of his responsibilities." *Mayfair Sales, Inc.,* 339 So.2d at 1280. Accordingly, in that case, the provisions of La.R.S. 12:149(C) were inapplicable, and the liquidator remained charged with the responsibility for pursuing the rights of the shareholders. In the instant case, however, the net assets, and upon termination of the dissolution proceeding, all rights of the liquidator have been succeeded to by the sole shareholder, Copeland.

### III. CONCLUSION

By virtue of his succession to the both the assets of AIGA and the powers of its liquidator, Copeland is the successor of AIGA and has a right of action to pursue this claim. Moreover, the pleadings clearly set forth sufficient facts for Defendant to prepare a defense, and to avoid re-litigation. Guidry's Exception must be overruled.

Respectfully submitted,

**CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP**

By: _____
**ROBERT A. KUTCHER** (LSBA #7895)
**NICOLE S. TYGIER** (LSBA #19814)
**VICKI A. TURKO** (LSBA #24677)
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9573

3

**BENJAMIN R. SLATER, JR.** (LSBA #12126)
**BENJAMIN R. SLATER, III, T.A.** (LSBA #12127)
**A. ELISE BROWN** (LSBA #19500)
**DONALD J. MEISLER, JR.** (LSBA #20294)
**S. JOSEPH WELBORN** (LSBA #25928)
**SLATER LAW FIRM**
650 Poydras Street, Suite 2600
New Orleans, Louisiana 70130
Telephone: (504) 523-7333
Facsimile: (504) 528-1080

*Attorneys for Plaintiff Alvin C. Copeland*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

( )    Hand Delivery      ( )    Prepaid U.S. Mail
( )    Facsimile      ( )    Overnight Delivery

Metairie, Louisiana, this _____ day of _____ 2000.

4



# UNITED STATES OF AMERICA
## State of Louisiana

### Fox McKeithen
#### SECRETARY OF STATE

*As Secretary of State, of the State of Louisiana, I do hereby Certify that*

a Certificate of the Liquidator of

AMERICAN INTERNATIONAL GAMING ASSOCIATION, INC.

Domiciled at METAIRIE, LOUISIANA,

Was filed and recorded in this Office on December 8, 1997,

And the corporation stands dissolved effective December 5, 1996.

*In testimony whereof, I have hereunto set my hand and caused the Seal of my Office to be affixed at the City of Baton Rouge on,*

December 8, 1997

*Fox McKeithen*

ABA 34420524D 34601545
*Secretary of State*



**EXHIBIT**

A



## UNITED STATES OF AMERICA
## State of Louisiana

### Fox McKeithen
#### SECRETARY OF STATE

*As Secretary of State, of the State of Louisiana, I do hereby Certify that the annexed transcript was prepared by and in this office from the record on file, of which purports to be a copy, and that it is full, true and correct.*

*In testimony whereof, I have hereunto set my hand and caused the Seal of my Office to be affixed at the City of Baton Rouge on,*

DEC - 8 1997



*Secretary of State*

## LIQUIDATOR'S CERTIFICATE OF COMPLETED DISSOLUTION

### OF

## AMERICAN INTERNATIONAL GAMING ASSOCIATION, INC.

I, the undersigned, hereby certify, pursuant to Section 148 of the Louisiana Business Corporation Law (La. R.S. 12:148) that:

1.    I was appointed as the sole liquidator of American International Gaming Association, Inc., a Louisiana corporation (the "Corporation").

2.    I have completed the liquidation of the Corporation.

3.    The Corporation is dissolved.

Dated: 12-5-96

Bryan White
Liquidator for American International
Gaming Association, Inc.

128855

## ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF JEFFERSON

On this _5th_ day of December, 1996, personally came and appeared Bryan White, to me personally known, who, being by me duly sworn, did certify and acknowledge that he executed the foregoing Liquidator's Certificate of Completed Dissolution in his capacity as the sole Liquidator of American International Gaming Association, Inc., that the facts stated therein are true, and that he acknowledged said instrument to be his free act and deed.

_____
Liquidator

[Seal] _____
Notary Public
My commission expires on _____

128855

# AMERICAN INTERNATIONAL GAMING ASSOCIATION, INC.

## ACTION OF SOLE LIQUIDATOR

Pursuant to Section 145 of the General Corporation law of the State of Louisiana (La. R.S. 12:145), the undersigned, being the sole liquidator of American International Gaming Association, Inc. (the "Corporation"), hereby consents to, authorizes and approves the following Resolutions, and the actions contemplated thereby, effective as of the date set forth herein.

### Distribution of Corporate Assets

WHEREAS, the Corporation is in the process of being liquidated and dissolved pursuant to the resolution of its sole shareholder, Al Copeland; and

WHEREAS, pursuant to Louisiana law, the liquidator has mailed and caused to be published certain notices informing any potential creditors or claimants of the Corporation that the Corporation is being liquidated and dissolved, and further demanding that the potential creditors or claimants assert any claims they may have against the Corporation; and

WHEREAS, the Corporation has received notice of certain claims and has adequately provided therefor; and

WHEREAS, the liquidator desires to complete the liquidation process by conveying to Al Copeland, as sole shareholder of the Corporation, all of the Corporation's remaining assets and claims against third-parties;

BE IT RESOLVED, that the liquidator of the Corporation hereby approves the distribution to Al Copeland of all of the Corporation's remaining assets and claims against third-parties.

143152



0 7 2 6 0 2 1 2 5 3

**Closure of Bank Account**

BE IT FURTHER RESOLVED, that the sole liquidator of the Corporation hereby approves the closure of any bank accounts held by the Corporation upon consummation of the foregoing distribution.

**Authorization of Agent**

BE IT FURTHER RESOLVED, that the sole liquidator of the Corporation hereby appoints and authorizes _Richard Talluto_ to act as agent for the Corporation for the sole and limited purposes of carrying out the foregoing resolutions and, in that capacity, the said _Richard Talluto_ is hereby authorized to execute any and all documents which he, in his sole discretion, may deem necessary or proper to effectuate the foregoing resolutions.

EXECUTED effective as of this _5th_ day of December, 1996.

> Bryan White, Liquidator for
> AMERICAN INTERNATIONAL GAMING
> ASSOCIATION, INC.

183152

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 221 of 344

07260212041

## CERTIFICATE

I certify that the subscriber to the action of the sole liquidator constitutes the sole liquidator entitled to vote on the above action.

Further, I certify that the foregoing is a true and correct copy of the action of the sole liquidator.

Dated this 5th day of December, 1996.

*Michelle Carroll*

**MICHELLE CARROLL, Secretary**

183152

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 222 of 344

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DIVISION "D"

COST OK Amt. *8*

*38520*

AUG 2 1 2001

BY _____

DY. CLERK OF COURT

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C.,
AND ROBERT J. GUIDRY

DOCKET NUMBER: 464,607

**POSTED**

AUG 2 2 2001

---

## DEFENDANT, TREASURE CHEST CASINO, L.L.C.'S OPPOSITION TO PLAINTIFF'S MOTION TO SUPPLEMENT THE RECORD

**NOW INTO COURT**, through undersigned counsel, comes defendant, Treasure Chest Casino, L.L.C., who hereby opposes the plaintiff's motion to supplement the record.

Plaintiff contends that the lower court inadvertently omitted pleadings or memoranda that are relevant to the appeal, however, the memoranda are irrelevant to the appeal. The plaintiff is appealing the district court's judgment granting a peremptory exception of no cause of action. An exception of no cause of action is determined solely based upon the pleadings and no evidence may be introduced at any time to support or controvert the exception of no cause of action. La. Code of Civil Procedure art. 931. Therefore, because the memoranda are not part of the petition they are irrelevant to the appeal of the judgement granting an exception of no cause of action. Thus, the Plaintiff's motion to supplement the record should be denied.

Respectfully Submitted:

**McGLINCHEY STAFFORD**
A Professional Limited Liability Company

By: _____
Paul S. West, Bar Roll No.: 13375
Juston M. O'Brien, Bar Roll No.: 26447
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825
Phone: (225) 383-9000

**Attorneys for Treasure Chest Casino, L.L.C.**

## CERTIFICATE

I hereby certify that a copy of the above and foregoing has been forwarded via U.S. Mail, postage prepaid to:

Lanny R. Zatkis, Esq.
ZATZKIS & ASSOCIATES
Suite 2750 Poydras Center
650 Poydras Street
New Orleans, LA 70130

Winston G. DeCuir, Esq.
DeCUIR & CLARK, L.L.P.
1961 Government Street
Baton Rouge, LA 70806

Ralph Capitelli, Esq.
CAPITELLI & WICKER
Suite 2950 Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Robert A. Kutcher
CHOPIN, WAGAR, COLE, RICHARD, REBOUL S. KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

Stephen A. Quidd, Esq.
P.O. Box 67148
Baton Rouge, LA 70896

Michael A. Patterson, Esq.
THE LONG LAW FIRM
4041 Essen Lane, Suite 500
Baton Rouge, LA 70809

Arthur A. Lemann, III, Esq.
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Benjamin R. Slater, III, Esq.
SLATER LAW FIRM
650 Poydras Street, Suite 2600
New Orleans, LA 70130

E. Barton Conradi, Esq.
LAW OFFICE OF E. BARTON CONRADI
343 Third Street, Suite 506
Baton Rouge, LA 70801

this 21st day of August, 2001.

_Juston O'Brien_
Juston M. O'Brien

**POSTED**

SEP - 5 2002

FROM: CIVIL APPEALS DEPARTMENT          TO: ACCOUNTING DEPARTMENT

## APPEALS COSTS DATA SHEET

FINAL DISPOSITION of all Suits sent to the FIRST CIRCUIT COURT OF APPEAL, showing a FINAL DECREE granted by the FIRST CIRCUIT; and then sent back to the CIVIL APPEALS DEPARTMENT for the COMPUTATION of ADDITIONAL COSTS to be submitted to the ACCOUNTING DEPARTMENT for posting.

SUIT NO. *464607*     DIV. *D*

*ALVIN C. COPELAND*

VERSUS

*TREASURE CHEST CASINO, L.L.C., AND Robert J. Guidry*

(PARTY RESPONSIBLE FOR COSTS ACCORDING TO DECREE)

| | | APPELLANT | APPELLEE | TO BE SHARED BY ALL PARTIES | PENDING |
|---|---|---|---|---|---|
| **FINAL DECREES:** | | | | | |
| AFFIRMED | $_____ | _____ | _____ | _____ | _____ |
| AMENDED & AFFIRMED | $_____ | _____ | _____ | _____ | _____ |
| AMENDED IN PART, REVERSED IN PART & RENDERED | $_____ | _____ | _____ | _____ | _____ |
| REVERSED & RENDERED | $_____ | _____ | _____ | _____ | _____ |
| OTHER VARIATIONS | $ *12.00* | _____ | ✓ | _____ | _____ |

*REVERSED AND REMANDED.*

_____

_____

| | | | | | |
|---|---|---|---|---|---|
| **REHEARINGS:** | | | | | |
| DENIED | $_____ | _____ | _____ | _____ | _____ |
| GRANTED | $_____ | _____ | _____ | _____ | _____ |

**THE SUPREME COURT OF LOUISIANA:**

**WRITS:**

| | | | | | |
|---|---|---|---|---|---|
| DENIED | $_____ | _____ | _____ | _____ | _____ |
| GRANTED | $_____ | _____ | _____ | _____ | _____ |
| **TOTAL COSTS:** | $ *12.00* | _____ | ✓ | _____ | _____ |

DATE THIS SHEET SENT TO ACCOUNTING & DATE RECORD SENT BACK TO RECORD ROOM: *8-28-2002*

NAME OF PERSON PREPARING THIS SHEET: *Mary Ebey*

2090962716 7          Div. D



Office Of The Clerk
## Court of Appeal, First Circuit
State of Louisiana
www.la-fcca.org

Christine L. Crow
Clerk of Court

Post Office Box 4408
Baton Rouge, LA
70821-4408
(225) 342-1500

### Notice of Judgment
June 21, 2002

Docket Number: 2001 - CA - 1122

ALVIN COPELAND
     versus
TREASURE CHEST CASINO, LLC, AND ROBERT J. GUIDRY

TO:  Arthur A. Lemann, III  Esq.
     The Law Offices of ARTHUR A. LEMA
     938 Lafayette Street
     Suite 100
     New Orleans, LA 70113

E. Barton Conradi Esq.
343 Third Street
Baton Rouge, LA  70801

Lanny R. Zatzkis Esq.
ZATZKIS & ASSOCIATES
650 Poydras Street
Suite 2750
New Orleans, LA  701306101

     Linda Jane Law Clark, Law,  Esq.
     DECUIR & CLARK
     1961 Government Street
     Baton Rouge, LA 70806

Michael A. Patterson Esq.
LONG LAW FIRM
4041 Essen Lane
Suite 500
Baton Rouge, LA  70809

Paul Slocomb West Esq.
McGLINCHEY, STAFFORD
One American Place
Ninth Floor
Baton Rouge, LA  70825

     Ralph Capitelli Esq.
     CAPITELLI & WICKER
     1100 Poydras St.
     Suite 2950
     New Orleans, LA  701632950

Ricardo A. Aguilar Esq.
McGLINCHEY, STAFFORD
643 Magazine St.
New Orleans, LA  70130

Robert A. Kutcher Esq.
CHOPIN, WAGAR, COLE, RICHARD & R
3850 N. Causeway Blvd., Suite 900
Two Lakeway Center
Metairie, LA  70002

     Stephen Alexander Quidd Esq.
     P.O. Box 66614
     Baton Rouge, LA  708966614

Winston Gerard DeCuir Esq.
DECUIR & CLARK
1961 Government Street
Baton Rouge, LA  70806

Hon. Janice  G.  Clark
222 St. Louis Street
Room 816
Baton Rouge, LA  70802

You are hereby served with a copy of the opinion in the above-entitled case.  Your attention is invited to Rule 2-18.
Rehearing of the Uniform Rules of Courts of Appeal.

I hereby certify that this opinion and notice of judgment were mailed this date to the trial judge, all counsel of record,
and all parties not represented by counsel as listed above.

*Peggy J. Landry*

CHRISTINE L. CROW
CLERK OF COURT

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2001 CA 1122

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C.,
AND ROBERT J. GUIDRY

**Judgment rendered June 21, 2002.**

* * * * * *

Appealed from the
19th Judicial District Court
in and for the Parish of East Baton Rouge, Louisiana
Trial Court No. 464,607
Honorable Janice Clark, Judge

* * * * * *

| | |
|---|---|
| ROBERT A. KUTCHER<br>METAIRIE, LA | ATTORNEY FOR<br>PLAINTIFF-APPELLANT<br>ALVIN C. COPELAND |
| PAUL S. WEST<br>JUSTIN M. O'BRIEN<br>BATON ROUGE, LA | ATTORNEYS FOR<br>DEFENDANT-APPELLEE<br>TREASURE CHEST CASINO,<br>L.L.C. |
| LANNY R. ZATZKIS<br>NEW ORLEANS, LA | ATTORNEYS FOR<br>DEFENDANT-APPELLEE<br>ROBERT J. GUIDRY |
| ARTHUR A. LEMANN, III<br>NEW ORLEANS, LA | |
| RALPH CAPITELLI<br>NEW ORLEANS, LA | |
| WINSTON DECUIR, SR.<br>BATON ROUGE, LA | |

FILED

AUG 2 8 2002

DEPUTY CLERK OF COURT

* * * * * *

**BEFORE: FOIL AND PETTIGREW, JJ., and KLINE[1], J. Pro Tem.**

---

[1] Judge William F. Kline, Jr., retired, is serving as judge *pro tempore* by special appointment of the Louisiana Supreme Court.

A TRUE
DEPUTY CLERK
COURT OF APPEAL, FIRST CIRCUIT
STATE OF LOUISIANA
FILED June 25, 2002

**PETTIGREW, J.**

In this case, plaintiff appeals the trial court's judgment sustaining the peremptory exceptions pleading the objection of no cause of action filed by defendants and dismissing his claim with prejudice.

## FACTS AND PROCEDURAL HISTORY

Alvin C. Copeland filed the instant suit on September 15, 1999, as a result of what he alleged was an "overarching corrupt conspiracy" by defendants, Treasure Chest Casino, L.L.C. ("Treasure Chest") and Robert J. Guidry. Mr. Copeland was the sole shareholder of American International Gaming Association, Inc., a Louisiana corporation that had applied for authorization to conduct gaming activities on a riverboat in accordance with the Louisiana Riverboat Economic Development and Gaming Control Act. According to Mr. Copeland's petition, Treasure Chest and Mr. Guidry conspired with various other individuals to corrupt the riverboat gaming licensing process and prevent him from entering the riverboat casino gambling business in Kenner, Louisiana. Seeking damages including, but not limited to, treble damages, lost profits, attorney fees, and court costs, Mr. Copeland alleged four separate causes of action; namely, a RICO claim, a claim under the Louisiana Unfair Trade Practices and Consumer Protection Law, a claim of fraud under La. Civ. Code art. 2315, and a claim of unjust enrichment. In response to Mr. Copeland's petition for damages, Treasure Chest and Mr. Guidry each filed an exception raising the objection of no cause of action.

The matter proceeded to hearing on November 13, 2000, at which time the trial court heard argument from all counsel and took the matter under advisement. The court rendered oral reasons for judgment on January 31, 2001, maintaining the no cause of action objections filed on behalf of Treasure Chest and Mr. Guidry. Thereafter, on March 7, 2001, the court rendered a written judgment as follows:

> **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Exceptions of No Cause of Action filed by the defendants, Treasure Chest Casino, L.L.C., and Robert Guidry are hereby granted and the petition of the plaintiff, Alvin C. Copeland is hereby dismissed with prejudice.

2

It is from this judgment that Mr. Copeland has appealed, assigning the following specifications of error:

    1.    The district court erred in sustaining the Exceptions of No Cause of Action.

    2.    The district court abused its discretion by refusing to allow Copeland an opportunity to amend his Petition.

Because we find merit to Mr. Copeland's first assignment of error, we need not address the remaining issue.

## NO CAUSE OF ACTION

The function of an exception raising the objection of no cause of action is to test the legal sufficiency of the petition by determining whether the law affords a remedy on the facts alleged in the pleading. **Everything on Wheels Subaru, Inc. v. Subaru South, Inc.**, 616 So.2d 1234, 1235 (La. 1993). No evidence may be introduced to support or controvert the objection that the petition fails to state a cause of action, and all well-pleaded allegations of fact are accepted by the court as true. La. Code Civ. P. art. 931. Thus, the only issue at the trial of the exception is whether, on the face of the petition, the plaintiff is legally entitled to the relief sought. **Perere v. Louisiana Television Broadcasting Corporation**, 97-2873, p. 3 (La. App. 1 Cir. 11/6/98), 721 So.2d 1075, 1077.

In reviewing a trial court's ruling sustaining an exception raising the objection of no cause of action, the appellate court should subject the case to a *de novo* review. The exception raises a question of law and the trial court's decision is based only on the sufficiency of the petition. **Fink v. Bryant**, 2001-0987, p. 4 (La. 11/29/01), 801 So.2d 346, 349. When a petition states a cause of action as to any ground or portion of the demand, an exception raising the objection of no cause of action must be overruled. Thus, if the petition sets forth a cause of action, none of the other causes of action may be dismissed based on an exception pleading the objection of no cause of action. **Pines v. Dr. Carlos D. Moreno, Inc.**, 569 So.2d 203, 206-207 (La. App. 1 Cir. 1990). Further, any doubts are resolved in favor of the sufficiency of the petition. **Treasure Chest Casino, L.L.C. v. Parish of Jefferson**, 96-1010, p. 5 (La. App. 1 Cir. 3/27/97), 691

3

So.2d 751, 755, writ denied, 97-1066 (La. 6/13/97), 695 So.2d 982. The question, therefore, is whether, in the light most favorable to plaintiff, and with every doubt resolved in his behalf, the petition states any valid cause of action for relief. **Home Distribution, Inc. v. Dollar Amusement, Inc.**, 98-1692, p. 5 (La. App. 1 Cir. 9/24/99), 754 So.2d 1057, 1060.

## ANALYSIS

As previously indicated, Mr. Copeland alleges four separate causes of action in the instant case; namely, a RICO claim, a claim under the Unfair Trade Practices and Consumer Protection Law, a claim of fraud under La. Civ. Code art. 2315, and a claim of unjust enrichment. Treasure Chest and Mr. Guidry assert that each of Mr. Copeland's claims fails to state a cause of action. Our review of the record reveals that Mr. Copeland has stated a cause of action under the Unfair Trade Practices and Consumer Protection Law, thus warranting reversal of the trial court's judgment.

A cause of action for unfair trade practices is governed by the provisions of the Unfair Trade Practices and Consumer Protection Law set forth in La. R.S. 51:1401, *et seq*. Louisiana Revised Statutes 51:1405(A) provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." This legislation is broadly and subjectively stated and does not specify particular violations. Rather, what constitutes an unfair trade practice is determined by the courts on a case-by-case basis. **Jarrell v. Carter**, 577 So.2d 120, 123 (La. App. 1 Cir.), writ denied, 582 So.2d 1311 (La. 1991). However, it is well settled that a practice is considered unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers or business competitors. **Inka's S'Coolwear, Inc. v. School Time, L.L.C.**, 97-2271, p. 10 (La. App. 1 Cir. 11/6/98), 725 So.2d 496, 501. Louisiana Revised Statutes 51:1409(A) confers a private right of action on "[a]ny person who suffers any ascertainable loss of money or moveable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405."

4

Accepting the well-pleaded allegations of fact in Mr. Copeland's petition as true, we are satisfied that he has stated a cause of action for unfair trade practices. Treasure Chest and Mr. Guidry both argue on appeal that Mr. Copeland failed to show how he has suffered an "ascertainable loss of money or moveable property," noting that a riverboat gaming license is not property. We agree with this argument insofar as it relates to status of a riverboat gaming license. Louisiana Revised Statutes 27:42(B) provides, in pertinent part, as follows:

> Any license, permit, approval, or thing obtained or issued pursuant to the provisions of this Chapter is expressly declared by the legislature to be a pure and absolute revocable privilege and not a right, property or otherwise, under the constitutions of the United States or of the state of Louisiana. Further, the legislature declares that no holder of any license or permit acquires any vested interest or right therein or thereunder.

Nonetheless, although Mr. Copeland may have not suffered a loss of property as a result of the unfair trade practices of Treasure Chest and Mr. Guidry, he was required to expend fees in the amount of $80,000.00 in furtherance of his application for a riverboat gaming license. Thus, Mr. Copeland has certainly set forth enough allegations in support his claim that he suffered "an ascertainable loss of money" as a result of the unfair trade practices of Treasure Chest and Mr. Guidry. Having determined that Mr. Copeland has stated at least one cause of action, the trial court's judgment must be reversed. See **Pines v. Dr. Carlos D. Moreno, Inc.**, 569 So.2d at 206-207.

## CONCLUSION

For the reasons set forth in this opinion, the judgment of the trial court is reversed, and the matter is remanded for further proceedings consistent with this opinion. All costs associated with this appeal are assessed equally against Treasure Chest and Mr. Guidry.

**REVERSED AND REMANDED.**

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 231 of 344

# ARTHUR A. LEMANN III
## & ASSOCIATES, INC.
### ATTORNEYS AT LAW

ARTHUR A. LEMANN III
————————
ARTHUR A. LEMANN IV

SUITE 100   938 LAFAYETTE STREET

NEW ORLEANS, LOUISIANA 70113
TELEPHONE (504) 522-8104
FACSIMILE (504) 525-4231
E-MAIL: notguiltyz@aol.com

B. LEMANN BUILDING
ONE CRESCENT PARK
DONALDSONVILLE, LOUISIANA 70346

December 13, 2002

Hon. Doug Welborn
Clerk of Court, East Baton Rouge Parish
P. O. Box 1991
Baton Rouge, LA 70821-1991

RE:   State of Louisiana v. Robert J. Guidry
      Docket No. ~~465,319-23~~ #464-607 - "27"
      19ᵗʰ JDC - Parish of East Baton Rouge

Dear Sir:

Please find enclosed the original and two copies of defendant's Exception of Prescription of Plaintiff's Law Claims which I would appreciate your filing on my behalf in the above-captioned matter. Also enclosed is a check in the amount of $120 to cover filing and service fees, as well as a self-addressed envelope for the return of a conformed copy.

Thank you for your time and attention to this matter.

Very truly yours,

Arthur A. Lemann IV

AALIV:edn

Encl.

REC'D C.P.
DEC 23 2002

**REC'D C.P.**
DEC 17 2002

Arthur A. Lemann III

-2-

123271069°

19TH JUDICIAL DISTRICT COURT

FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                    DIVISION "D"

ALVIN C. COPELAND

versus

TREASURE CHEST CASINO, L.L.C.  and ROBERT J. GUIDRY

Filed:_____                          _____
                                                              Deputy Clerk

_____

**EXCEPTION OF PRESCRIPTION
OF PLAINTIFF'S STATE LAW CLAIMS**

_____

Now into Court, through undersigned counsel, comes the defendant, Robert

Guidry, who hereby excepts to the Petition of plaintiff, Alvin C. Copeland, for the

foregoing reasons, and as more fully set forth in the attached memorandum:

Mr. Guidry hereby excepts to the plaintiff's Petition on the grounds that the

state law claims raised therein are prescribed.

WHEREFORE, defendant, Robert Guidry, prays that a rule nisi issue herein

ordering plaintiff, Alvin C. Copeland, to appear and show cause, if any he can, why

defendant Robert Guidry's Exceptions of Prescription of plaintiff's RICO claim,

previously filed, and of the plaintiff's state law claims, should not be maintained, and

further prays that after all legal delays, and due proceedings had, there be judgment

in favor of defendant, Robert Guidry, maintaining the aforementioned exceptions.

REC'D C.P.                                    **REC'D C.P.**

DEC 2 3 2002                                **DEC 1 7 2002**

19TH JUDICIAL DISTRICT COURT

FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                          DIVISION "D"

ALVIN C. COPELAND

versus

TREASURE CHEST CASINO, L.L.C.  and ROBERT J. GUIDRY

Filed:_____                    _____
                                                    Deputy Clerk

_____

**ORDER**

_____

Considering the above and foregoing motion,

IT IS ORDERED that plaintiff show cause on the _10_ day of _____, 200_3_, at _9:30_ o'clock_A_.M., why defendant's exceptions of prescription of plaintiff's civil RICO claim and of plaintiff's state law claims should not be maintained.

Baton Rouge, Louisiana, this _8_ day of ___Dec___, 2002.

_____
JUDGE

**PLEASE SERVE:**
Mr. Alvin C. Copeland
Through his attorney of record
Mr. Robert Kutcher
2 Lakeway Center, Ste. 900
3850 North Causeway Blvd.
Metairie, LA 70002

-3-

19TH JUDICIAL DISTRICT COURT

FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                    DIVISION "D"

ALVIN C. COPELAND

versus

TREASURE CHEST CASINO, L.L.C.  and ROBERT J. GUIDRY

Filed:_____                          _____
                                                              Deputy Clerk

## MEMORANDUM IN SUPPORT OF EXCEPTION OF PRESCRIPTION OF THE PLAINTIFF'S STATE LAW CLAIMS

**MAY IT PLEASE THE COURT:**

The defendant, Robert Guidry, submits this Memorandum in support of this peremptory exception of prescription of the plaintiff Alvin C. Copeland's ("Copeland") state law claims.  Copeland sets forth four causes of action against the defendant in his petition for damages: Count 1 alleges a violation of the Federal Racketeering Influenced and Corrupt Organizations Act; Count 2 alleges a violation of the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"); Count 3 alleges fraud under Louisiana Civil Code Article 2315; and Count 4 alleges unjust enrichment under Louisiana Civil Code Article 2298.  On October 6, 2000, Guidry filed into the record of this matter his exception and memoranda in support thereof of prescription of Copeland's civil RICO claims set forth in Count 1.  Guidry reurges this exception and now moves the Court to grant his Exception of

Prescription of each of Copeland's remaining three state law claims.[1]

### A.   Law

The prescriptive period provided for by LUTPA is one year. La. R.S. 51:1409(E) provides:

> "The action provided by this section shall be prescribed by one year running from the time of the transaction or act which gave rise to this right of action."

Louisiana courts hold that this time limitation is peremptive in nature, thus not susceptible of tolling, even under the doctrine of <u>contra non valentum</u>. <u>Fox v. Dupree</u>, 633 So.2d 612 (La.App. 1st Cir. 1993), <u>writ denied</u>, 635 So.2d 233 (La. 1994).

Tort causes of action, such as Copeland's Counts 3 and 4 brought under C.C.Arts. 2315 and 2298, are subject to liberative prescription of one year. Prescription on tort causes of action begins to run from the day the injury or damage was sustained. La.Civil Code Art. 3492.[2]

### B.   Argument

All of Copeland's alleged damages occurred on or before June 18, 1993, the day the Treasure Chest received the Certified of Preliminary Approval, or May 17, 1994, the date the Treasure Chest received the license. Therefore, all of Copeland's claims are perempted and/or prescribed on the face of the petition filed on September 15, 1999.

It is well established in Louisiana law that when a petition is prescribed on its face, a plaintiff bears the burden of proving the claim is not prescribed. <u>Perez v.</u>

---

[1] In his exceptions of no cause of action and of prescription of the plaintiff's RICO claim, Guidry set forth the underlying facts relevant to the present exception, which are adopted by reference herein.

[2] Copeland's unjust enrichment claim clearly sounds in tort and therefore is subject to a prescriptive period of one year. <u>Aetna Life & Cas. Co. v. Dotson</u>, 346 So.2d 762 (La.App. 1st Cir.), <u>writ denied</u>, 349 So.2d 1272 (1977).

-2-

Shook, 703 So.2d 821(La.Ct.App. 4th Cir. 1997), rehearing denied; Niklaus v. Bellina, 696 So.2d 120 (La.Ct.App. 4th Cir. 1997), writ denied, 703 So.2d 631 (La. 1997).

Regarding LUTPA, Copeland alleges that "the Treasure Chest has failed to notify the Division and/or the Gaming Control Board of the actions outlined above, which constitutes a violation of the Louisiana Gaming Control Law (including without limitation a violation of LSA R.S. 27:70). This non-compliance is an independent violation of the LUTPA, and continues each day Treasure Chest fails to disclose to the Gaming Control Board the facts surrounding Treasure Chest's acquisition of its license." (Petition, ¶83.)

Copeland presumably included this allegation in his petition in order to cite to the case of Capitol House Preservation v. Perryman Consultants, Inc., 745 So.2d 1194 (La.App. 1 Cir. 1999), writ denied, 754 So.2d 937 (La.2000) for the proposition that he may bring a claim under LUTPA after the expiration of one year. Capitol House held that a failure to disclose any misrepresentations on an application submitted pursuant to the Riverboat Economic Development and Gaming Control Act constituted a violation on a day-to-day basis and that a new one-year period ran anew each day the failure to disclose continued.

Capitol House is, however, distinguishable from the present case. Generally, prescription begins to run whenever a plaintiff acquires sufficient actual or constructive knowledge that a tortious act has occurred. Adams v. First Nat. Bank of Commerce, 644 So.2d 219 (La.App. 4 Cir. 1994). Capitol House holds that the failure to disclose is itself the tortious act, so that every passing day results in a new cause of action. What is not contemplated by Capitol House, however, is the situation such as the present, where the plaintiff learns of a defendant's alleged failure to honor its duty to disclose. In such a case, since the plaintiff has acquired the requisite

-3-

knowledge of the damage-producing act, prescription must begin to run from that time forward, since a plaintiff is charged with the duty to act in self-preservation.

In other words, a defendant's alleged failure to discharge its duty to disclose does not give a plaintiff complete absolution from the limitations provided for by prescription. For example, Our Lady of the Lake Hosp. v. Carboline, 632 So.2d 339 (La.App. 1 Cir. 1993), writ denied, 635 So.2d 228 (La. 1994) involved a manufacturer's duty to disclose a defect in its product upon learning of the defect after that product has left its control. The court held that "as long as a defendant with a duty to disclose possesses knowledge and yet fails to act, the tort is a continuing one which renews itself from day to day. **Prescription in such a case will not begin to run until the plaintiff learns that it has been injured by the failure to disclose.**" 632 So.2d at 343 (Citations omitted.) (Emphasis added.) The court based its decision on Bunge Corporation v. GATX Corporation, 557 So.2d 1376 (La. 1990), which found that a plaintiff's tort claim would be barred upon a defendant's showing that the plaintiff received notice of a defendant's failure to disclose over one year before suit was filed. Bunge, 557 So.2d at 1386, fn.5. [Bunge involved a builder's duty to disclose acquired knowledge of a hazardous situation in its construction.] See also, GHR Energy Corp. v. Carboline Company, 744 F.Supp. 1405 (E.D. La. 1990) [The continuing tort doctrine and the notion of abatement cannot logically be applied to a claim of a failure of a duty to disclose because these claims would never prescribe if the notion of abatement applied.] Since the record demonstrates that Copeland acquired the requisite knowledge of the alleged failure to disclose, Capitol House does not apply.

Copeland similarly charged in Paragraph 86 of the Petition that Guidry fraudulently concealed his alleged wrongful conduct so that Copeland's tort claims

-4-

would not be prescribed. However, since the record demonstrates that Copeland had or should have had the requisite knowledge, all of his claims remain barred.

The doctrine of <u>contra non valentum</u> provides that prescription may be suspended during the time that a plaintiff is unaware of his claim. <u>Rozas v. Dept. of Health & Human Resources</u>, 522 So.2d 1195 (La.Ct.App. 4th Cir. 1988). In determining whether a plaintiff was unaware of his claim the court must ask whether the plaintiff had knowledge of facts sufficient to give plaintiff notice of the claim. <u>Id</u>. It is not necessary that the plaintiff had knowledge of his claim, but rather the benchmark is notice created by the knowledge of facts such that he was put on notice of his claim. <u>Cartwright v. Chrysler Corp.</u>, 232 So.2d 285 (La. 1970). The rule is expressed as follows:

> "Whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of everything to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry is sufficient to start the running of prescription."

<u>Id</u>., at 287 (La. 1970); <u>Mastich v. Cordia Manufacturing Co.</u>, 607 So.2d 955 (La.App. 4th Cir. 1992); <u>Rozas v. Dept. of Health & Human Resources</u>, 522 So.2d 1195 (La.App. 4th Cir. 1988); <u>Gulf States Land & Development v. Acadia National Bank et al.</u>, 612 So.2d 1031 (La.App. 2nd Cir. 1993).

Additionally, when a plaintiff has knowledge of facts to put the plaintiff on notice of his claim, the fact that plaintiff did not have full knowledge of all facts is of no moment. <u>National Council on Compensation Insurance v. Quixx Temporary Services, Inc.</u>, 665 So.2d 120 (La.Ct.App. 4th Cir. 1995). Thus, even though a plaintiff may argue that facts were concealed from him by the defendant, the mere fact of concealment is of no moment if plaintiff was put on notice of his claim without the benefit of the concealed facts. <u>Rozas</u>, 522 So.2d at 1197.

-5-

In <u>Rozas</u>, the plaintiff argued that prescription did not run because the defendant concealed facts from him. <u>Id</u>. at 1197. However, the court found that the concealment was of no moment because plaintiff had notice of his claim without the concealed facts:

> "Whether or not L.S.U. [defendant] actually attempted to conceal plaintiff's file from him is not relevant, however...we agree with the trial court that plaintiff had sufficient facts to make him aware that he potentially had a claim...the plaintiff need not have actual knowledge of the conditions which might entitle him to bring suit, but only 'constructive notice.'" <u>Id</u>. at 1197.

Based on the allegations in the petition, it is clear Copeland acquired, either actually or constructively, sufficient knowledge to state a cause of action against Guidry and Treasure Chest, including that they allegedly did not honor their duty to disclose their alleged dealings, well over a year prior to the filing of the instant suit. The pertinent allegations include:

– On March 26, 1993, the Gaming Commission held a public hearing on Treasure Chest's application, thereby "granting priority" over the application "filed substantially earlier by AIGA." (Petition, ¶13.)

– The AIGA's application to operate a gaming riverboat at the Laketown Harbor Park site on Lake Ponchartrain was never considered or voted on by the Commission. (Petition, ¶15.)

– On June 18, 1993, the Commission approves Treasure Chest's application, and AIGA is not granted a certificate of preliminary approval. (Petition, ¶15.)

– On November 13, 1993, the Commission granted the Treasure Chest's request to modify its application to move the site of the proposed route and operations to Lake Ponchartrain, over AIGA's objections. (Petition,

-6-

¶18.)

– On March 15, 1994, the Commission issues a certificate to the Treasure Chest, L.L.C., even though the Treasure Chest, Inc., applied for it. (Petition, ¶18.)

– On May 17, 1994, Guidry does not disclose his association with Edwin Edwards to the State Police at the State Police licensing hearing. (Petition, ¶'s 25-26.)

– On May 17, 1994, the Treasure Chest is granted a license. (Petition, ¶28.)

– On December 5, 1994, the *Times-Picayune* reports that, "a Guidry-owned video poker company has paid Steven Edwards $20,000.00" and "Treasure Chest paid $9,000.00 to a merchandising company of which Steven Edwards was a director until he sold his interest in a settlement with the Ethics Commission, which was investigating whether the Governor's children could do business with riverboats." (Petition, ¶12.)

– On December 9, 1997, the *Times-Picayune* reports that "in all, Guidry paid Steven Edwards $75,000.00 for his work in Guidry's various companies." (Petition, ¶12.)

– On December 9, 1997, the *Times-Picayune* reported "that during Guidry's effort to license the Treasure Chest, Governor Edwards urged the State Police to grant the proposal a licensing hearing, State Police sources have said, a critical step in the approval process." (Petition, ¶24.)

– On June 5, 1998, the *Times-Picayune* reported that Governor Edwards "did more than appoint the members of Louisiana's Riverboat Gaming

-7-

Commission. He also sent clear messages about which bidders he favored. For example, Dr. Lewis James, a former board member, has said he was called to the Governor's mansion the day before the board was to award the last seven licenses in 1993. James has said Edwards gave him a type-written list of about a dozen casino boats, including three that involved friends of Edwards." (Petition, ¶16.)

The foregoing allegations demonstrate that by June 5, 1998, at the very latest, Copeland had acquired the requisite knowledge to compel him to file suit against Guidry and Treasure Chest within one year. In fact, Copeland did file a suit contesting his failure to receive and the Treasure Chest's receipt of a CPA. On November 22, 1993, Copeland filed the suit, "American International Gaming Association, Inc. v. The Louisiana Gaming and Enforcement Division, et al." Docket No. 400,750 (19th JDC, Parish of East Baton Rouge), which sought, inter alia, to "reverse the decision of the Commission to grant a certificate of Preliminary Approval to Treasure Chest." Copeland can hardly argue that he did not have notice or was not put on guard of a claim against the Treasure Chest and Guidry, since he actually filed a suit contesting their CPA.

A ruling granting Guidry's exception of prescription would be in harmony with the ruling in Astoria Entertainment, Inc. v. Edwards, 159 F.Supp.2d 303 (E.D. La. 2001), whereby the court dismissed the plaintiff's RICO claim as prescribed. The court found that prescription began to run on the date the riverboat licenses were awarded to the defendants in that case, including Guidry and the Treasure Chest. The court further found that any arguments of a continuing violation or fraudulent concealment were unavailing because the plaintiff, Astoria, had the requisite knowledge to file suit but did not act diligently, so therefore its federal cause of

-8-

action had prescribed.

For the foregoing reasons, Guidry moves the Court to grant his exception of prescription and dismiss the plaintiff's state law causes of action set forth in Counts 2, 3, and 4 of the Petition.

Respectfully submitted:

Arthur A. Lemann III (Bar # 8296)
Arthur A. Lemann, III & Associates, Inc.
938 Lafayette Street, Suite 100
New Orleans, LA 70113
Phone: (504) 522-8104

Ralph Capitelli (Bar # 3858)
Capitelli & Wicker
1100 Poydras Street
Energy Centre Suite 2950
New Orleans, LA 70163
Phone: (504) 582-2425

Winston Decuir (#04795)
1951 Government Street
Baton Rouge, LA 70806
Phone: (225) 346-8716

Lanny R. Zatzkis (#13781)
Zatzkis, McCarthy & Assoc.
650 Poydras Street, Suite 2750
New Orleans, LA 70130-6101
Phone: 523-2266

Attorneys for Defendant,
Robert J. Guidry

-9-

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 243 of 344

## CERTIFICATE

I hereby certify that a copy of the above document has been served upon all counsel of record by placing same in the U.S. Mail, postage prepaid, this _13_ day of December, 2002.



_____
Arthur A. Lemann III

-10-

ALVIN C. COPELAND

vs          Plaintiff

TREASURE CHEST CASINO, ET AL

Defendant

No: C 464607 Sec: 21
19th JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

TO: Plaintiff,
Alvin C Copeland, through
Mr. Robert Kutcher , 2 Lakeway Center, Ste 900
3850 North Causeway Blvd
Metairie La

The **DEFENDANT** in this case filed a **Exception of Prescription** which has been set for hearing. Certified copies of this document and the Court's order are attached

You MUST come to Court at **09:30** o'clock **AM** on the **10th** day of **February, 2003**, at Room **804** in the Governmental Building, 222 St. Louis St., and show cause why:
   **\*\*SEE ATTACHED ORDER\*\***

This Rule was issued by the Clerk of Court of East Baton Rouge Parish on the **26th** day of **December, 2002**

By: _____
          Deputy Clerk of Court for
          Doug Welborn, Clerk of Court

### SERVICE INFORMATION

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20____, served the above named party as follows:

PERSONAL SERVICE: on the party herein named
at _____

DOMICILIARY SERVICE: on the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in said domicile
at _____

SECRETARY OF STATE: by tendering same to the within named, by handing same

DUE AND DILIGENT: After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

RETURNED Parish of _____, this _____ day of _____, 20____

SERVICE $ _____
MILEAGE $ _____      _____
TOTAL   $ _____              Deputy Sheriff
                                 Parish of East Baton Rouge, Louisiana

2 . 2 2 7 1 0 7 3 0 ৹

**DOUG WELBORN**
CLERK OF COURT
19th JUDICIAL DISTRICT COURT
Parish Of East Baton Rouge
P. O. Box 1991
Baton Rouge, Louisiana 70821-1991
Phone (225) 389-3967
Fax   (225) 389-3392

December 26, 2002          Regarding Case Number: C 464607 Div: 21

TO    Jefferson Parish Sheriff's Office
      P. O. Box 277
      Gretna, LA 70054

      PHONE: (504) 363-5701

We are enclosing herein **Rule Nisi, on Exception of Prescription**  in the above numbered suit to be served as indicated herein.

Please make your return(s) on the duplicate(s) enclosed, and **find our check enclosed for payment of service.**

                              Thank You,

                              _____
                              Deputy Clerk of Court for
                              Doug Welborn, Clerk of Court

Reply:                              Date: _____

_____

_____

_____

_____

_____

                    By: _____

Form. C 003

No. C 464607 Sec. 24    10 R923
19th JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

ALVIN C. COPELAND
                    vs          Plaintiff

TREASURE CHEST CASINO, ET AL
                    Defendant

TO:  Plaintiff,
     Alvin C Copeland, through
     Mr. Robert Kutcher , 2 Lakeway Center, Ste. 900
     3850 North Causeway Blvd.
     Metairie, La

     The **DEFENDANT** in this case filed a **Exception of Prescription** which has
been set for hearing.  Certified copies of this document and the Court's order
are attached.

     You MUST come to Court at **09:30** o'clock **AM.** on the **10th** day of **February,
2003,** at Room **804** in the Governmental Building, 222 St. Louis St., and show
cause why.

     **\*\*SEE ATTACHED ORDER\*\***

     This Rule was issued by the Clerk of Court of East Baton Rouge Parish on
the 26th day of **December, 2002.**

                              By: _____
                                  Deputy Clerk of Court for
                                  Doug Welborn, Clerk of Court

195606

                         SERVICE INFORMATION

Received on the _____ day of _____ 20_____ and on the _____ day
of _____ 20_____, served the above named party as follows:

**PERSONAL SERVICE:** on the party herein named
at _____

**DOMICILIARY SERVICE:** on the within named _____, by leaving the
same at his domicile in this parish in the hands of _____, a person
of suitable age and discretion residing in said domicile
at _____

**SECRETARY OF STATE:** by tendering same to the within named, by handing same
to _____

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the
within named _____ or his domicile, or anyone
legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day
of _____ 20_____.

SERVICE:   $ _____      _____
MILEAGE:   $ _____               Deputy Sheriff
TOTAL:     $ _____      Parish of East Baton Rouge, Louisiana

301 28 0 2 3 7 0



# DOUG WELBORN
## CLERK OF COURT
### 19TH JUDICIAL DISTRICT
### PARISH OF EAST BATON ROUGE

P.O. Box 1991
Baton Rouge, LA 70821-1991

Phone
(225) 389-3960

_____

vs.

_____

_____, Attorneys

Date: _____

Number: _____

We have received your _____ in the above matter but are unable to process the pleading(s) due to lack of funds (see below):

(   )   the pauper motion was denied by the Judge.

( ✓ )   required funds not provided at the time of filing.

(   )   jury fee not received (the amount of $84.00 has been included in the amount below).

The pleading(s) is being forwarded to the Civil Suit Records Department and will not be processed until we receive the amount of $ _____ . **IT IS IMPERATIVE** that a copy of this notice be returned with your payment so that we may expedite service.

_____

A request for trial by jury has been noted in your_____ .
In accordance with LSA R.S. 13:3049 and the Local Rules of the 19th Judicial District Court, the jury fee should be paid upon request for trial by jury. **Your case will not be placed on a jury trial docket until the amount of $84.00 has been received in this office.** Upon payment, you will be given/mailed a receipt as proof of payment. **Your receipt should be presented at the pre-trial conference.**

Thank you,

_____
Deputy Clerk of Court

REC'D C.P.
JAN 1 5 2003

For information call:
Accounting Department
389-3982

REC'D C.P.
JAN 27 2003

Civil No. 130 Rev. 1/92
Clerk of Court/Accounting

19TH JUDICIAL DI
EAST BATON ROUGE
2003 JAN 14 PM

REC'D C.P.
JAN 27 2003

REC'D C.P.
JAN 1 5 2003

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 248 of 344

## CERTIFICATE OF SERVICE

I certify that a copy fo the above and foregoing has been mailed today, via United States Mail, postage prepaid and properly addressed, to the following counsel of record:

Robert A. Kutcher, Esquire (Via Certified Mail, Return Receipt Requested)
CHOPIN, WAGAR, COLE, RICHARD, REBOUL S. KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

Arthur A. Lemann, III, Esquire (Via Regular United States Mail)
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Baton Rouge, Louisiana on this 14th day of January, 2003.

Paul S. West

CERTIFIED TRUE COPY
278538
DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH, LA
2003 JAN 14 PM 4: 12

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 249 of 344

# NINETEENTH JUDICIAL DISTRICT COURT

# PARISH OF EAST BATON ROUGE

# STATE OF LOUISIANA

ALVIN C. COPELAND                                    NUMBER 464,607

VERSUS                                                       DIVISION D

TREASURE CHEST CASINO, LLC
and ROBERT GUIDRY

## ORDER

Considering Treasure Chest Casino, L.L.C.'s Peremptory Exceptions to Plaintiff's Petition for Damages;

**IT IS HEREBY ORDERED,** that the plaintiff appear before this Court on the _10_ day of _Feb._, 2003, at _9:30 AM_ to show cause why Treasure Chest Casino, L.L.C.'s Peremptory Exceptions should not be granted.

Baton Rouge, Louisiana, this _17_ day of _Jan_, 2003.

_Janice Clark_
JUDGE

Respectfully Submitted:

_Paul S. West_

Paul S. West, Bar Roll No. 13375
MCGLINCHEY STAFFORD, PLLC
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825
Telephone:        (225) 383-9000
Facsimile:         (225) 343-3076

**PLEASE NOTIFY:**

Lanny R. Zatkis, Esq.                    Winston G. DeCuir, Esq.          Ralph Capitelli, Esq.
ZATZKIS & ASSOCIATES                 DECUIR & CLARK, L.L.P.          CAPITELLI & WICKER
Suite 2750, Poydras Center            1961 Government Street             Suite 2950, Energy Centre
650 Poydras Street                          Baton Rouge, LA 70806           1100 Poydras Street
New Orleans, LA 70130                                                                New Orleans, LA 70163

Michael A. Patterson, Esq.            Arthur A. Lemann, III, Esq.      Benjamin R. Slater, III, Esq.
THE LONG LAW FIRM                       ARTHUR A. LEMANN, III            SLATER LAW FIRM
4041 Essen Lane, Suite 500                 & ASSOCIATES                      650 Poydras Street, Suite 2600
Baton Rouge, LA 70809                  938 Lafayette Street, Suite 100   New Orleans, LA 70130
                                                      New Orleans, LA 70113

Robert A. Kutcher, Esq.                  E. Barton Conradi, Esq.          Stephen A. Quidd, Esq.
CHOPIN, WAGAR, COLE, RICHARD,     LAW OFFICE OF E. BARTON CONRADI   Post Office Box 67148
REBOUL S. KUTCHER, LLP                343 Third Street, Suite 506        Baton Rouge, LA 70896
Two Lakeway Center, Suite 900        Baton Rouge, LA 70801
3850 North Causeway Blvd.
Metairie, Louisiana 70002

5 0 1 2 3 0 2 3 9 5 1

**PLEASE SERVE**

Robert A. Kutcher
CHOPIN, WAGAR, COLE, RICHARD, REBOUL S. KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

**NINETEENTH JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

ALVIN C. COPELAND                                          NUMBER  464,607

**VERSUS**                                                          **DIVISION D**

TREASURE CHEST CASINO, LLC
and ROBERT GUIDRY

**MEMORANDUM IN SUPPORT OF
TREASURE CHEST CASINO, L.L.C.'S PEREMPTORY
EXCEPTIONS TO PLAINTIFF'S  PETITION FOR DAMAGES**

**MAY IT PLEASE THE COURT:**

In response to the petition of Alvin C. Copeland ("Copeland"), Treasure Chest

Casino, L.L.C., ("TCC") has filed two separate peremptory exceptions.  The first is an exception of

prescription, which is quite similar to the exception filed by TCC's co-defendant, Robert Guidry.

Since the plaintiff knew or should have known of all facts giving rise to his alleged causes of action

by June 5, 1998 (at the very latest) this suit filed on September 15, 1999, was untimely.  The second

exception states that the claims of Copeland against TCC are barred by the doctrine of *res judicata*

since all such claims were required to be brought in the matter of *Alvin C. Copeland v. The*

*Louisiana Riverboat Gaming Commission, et al,* Suit Number 400,750, Nineteenth Judicial District

Court, Parish of East Baton Rouge.  In that matter, TCC intervened as a defendant and all issues

between Copeland and TCC relating to the licensing of TCC were required to have been asserted at

that time.  After a short recitation of the facts and procedural history of this matter, each exception

will be discussed separately.

**FACTUAL AND PROCEDURAL BACKGROUND**

This matter arises from the attempt of some forty-three applicants to obtain fifteen

riverboat licenses issued by Louisiana State Police in the mid-1990's.  Copeland was an applicant

as was TCC.  TCC was granted a license–Copeland was not.  Since the time that Copeland failed

to obtain one of the fifteen licenses, he has pursued actions to attempt to have a license issued to him

or be compensated by someone for the failure to do so.  In *Alvin C. Copeland v. The Louisiana*

*Riverboat Gaming Commission et al,* Suit Number 400,750, Nineteenth Judicial District Court,

Parish of East Baton Rouge, (the "Commission Suit"), filed on November 13, 1993, Copeland

-1-

originally sought to appeal a ruling by the Commission which allowed TCC to move its planned riverboat project from the Mississippi River in Kenner to Lake Ponchartrain in Kenner.[1]  The relief sought in the suit was changed several times and in January 1999, Copeland amended the suit to request, among other things, that TCC's riverboat license be declared "null, void and without continuing effect."  In June 1999, TCC intervened in the matter as a defendant.  TCC's exceptions of prescription and failure to exhaust administrative remedies and motion to dismiss the Commission Suit (as it related to TCC) were granted on May 31, 2000, and the causes of action against TCC were dismissed with prejudice (see **Exhibit A**, attached hereto).  That judgement was affirmed by the First Circuit Court of Appeal on September 11, 2002 (see, **Exhibit B**, attached hereto), and the dismissal with prejudice is now a final judgement.

The instant matter was brought by Copeland in September 1999, just two months after TCC intervened in the Commission suit.  Exceptions of no cause of action were maintained by this Court but reversed by the First Circuit Court of Appeal and the matter was remanded for further action.  In response to the remand, TCC has filed these three exceptions.

## EXCEPTION OF PRESCRIPTION

As noted above, this issue has been adequately briefed by TCC's co-defendant Robert Guidry.  TCC adopts the arguments of Guidry and supplements them as follows.  The cited case of *Astoria Entertainment, Inc. v. Edwards, et al,* 159 F. Supp.2nd  303 (E.D. La. 2001) is directly on point and certainly instructive in this matter.  There, Astoria Entertainment, another unsuccessful applicant for a riverboat gaming license, filed a suit similar to the instant matter.  In *Astoria,* the Court found that Astoria's injuries (as an applicant which, like Copeland, applied for but did not receive a license) "took place in June, 1993 when it did not win a CPA." *Astoria*, at 317.  Further, the Court found that, at the latest, Astoria suffered its injury when the 15th and final license was awarded in May, 1994 *Astoria,* at 318.    At that time, all unsuccessful applicants, including Copeland, knew that they were not going to be awarded a license, since no licenses remained.  These same arguments apply to Copeland and for these reasons and those set forth in Guidry's memorandum in support, the claims of Copeland should be dismissed on the basis of prescription.

---

[1]  The Coast Guard would not allow the project to be located on the river because of safety concerns.

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 253 of 344

## EXCEPTION OF *RES JUDICATA*

As stated above, both Copeland and TCC were parties in the Commission Suit–Copeland as a plaintiff and TCC as a defendant. In the Commission Suit, Copeland alleged that TCC's license was improperly issued and that the license was null, void and of no continuing effect. This action was dismissed with prejudice and that judgement is now final. LSA-RS 13:4231 states:

> § 4231. *Res judicata*
>
> Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
>
> (1)    If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
>
> (2)    If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.
>
> (3)    A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination is essential to that judgment.

At the time of the final judgement, December 2002, all of the causes of action pending in this instant matter between Copeland and TCC were in existence (this matter was filed in September 1999). The causes of action being pursued in this matter all arise "out of the transaction or occurrence that [was] the subject matter of the litigation." The "transaction or occurrence" was the award of the license to TCC and the failure to award a license to Copeland. Thus, per the cited statute, the judgement in the Commission Suit bars the instant action on all causes of action arising out of the award of the license. Recent jurisprudence mandates the dismissal of this matter on the basis of *res judicata*.

Under the rules of *res judicata* as set forth in the above cited statute, "the central inquiry is not whether the second action is based on the same cause or cause of action . . . but whether the second action asserts a cause of action which arises out of the transaction or occurrence which was the subject matter of the first action. This serves the purpose of judicial economy and fairness by requiring the plaintiff to seek all relief and to assert all rights which arise out of the same

-3-

transaction or occurrence." *Comments-1990, La. R.S. 13:4231; Terrebonne Fuel and Lube v. Placid Refining* 95-0654, 666 So.2d 624 (La. 1996). The doctrine of *res judicata* is not discretionary and mandates the effect be given to final judgements. *Leon v. Moore* 98-1792, 731 So.2d 502, First Circuit, 1998.

There is no issue as to whether the judgement in the Commission Suit is final or that the matter was dismissed with prejudice (see, **Exhibits A and B**, attached hereto). The only issue is whether the causes of action asserted in the instant matter arose out of the transaction which was the subject matter of the first matter. In the Commission Suit, Copeland alleged that: ". . . plaintiff has a specific pecuniary interest in the license awarded to Treasure Chest, for [Copeland] had sought a license to conduct gaming operations at the same location as Treasure Chest and *should have received the license ultimately awarded to Treasure Chest."* (Emphasis added). (See **Exhibit C**, at Paragraph 6). Additionally, although Copeland never brought an action against TCC for damages in the Commission suit, it did bring one against the state. In Paragraph 37 Copeland alleges: "The actions of the [State] in awarding a license to Treasure Chest, which license it has held continuously since May 17, 1994, have resulted in continuous damages to plaintiff and constitute a continuing tort." Since Copeland was asserting a tort against the state for the issuance of the license and since Treasure Chest was a party defendant, Copeland was obligated to bring all actions against Treasure Chest arising out of the license issuance. His failure to do so invokes the doctrine of *res judicata* in this matter.

Further proof that this instant action arises out of the same occurrence is found in a review of the petition in the instant matter. Copeland asserts that there was a "scheme to corrupt the entire process of *issuing riverboat gaming licenses* under the Act." (Emphasis added.) (See **Exhibit D** at Paragraph 5.) In Paragraph 15, Copeland alleges that, as a result of the *issuance of a riverboat gaming license* to TCC, "[Copeland]'s application to operate a riverboat at the Laketown Harbor Park site on the shores of Lake Ponchartrain was never considered or voted on by the Commission." Further, in Paragraph 28, Copeland alleges that the TCC *license would not have issued* but for the alleged conspiracy by Guidry and TCC. In Paragraph 81, Copeland alleges that he was damaged by the *issuance of the license to TCC*. This allegation tracks the language of the allegation in Paragraph 37 of the Commission Suit (See **Exhibit C**, attached hereto). Paragraph 82 of the instant petition claims that the acts of TCC *in obtaining the license* amounts to unfair trade practices–again,

-4-

an allegation arising out of *the issuance of TCC's license* and an allegation which could have been and should have been brought in the Commission Suit. Similarly, Paragraph 88 of the instant petition speaks of unjust enrichment arising out of *the issuance of the license* to TCC. There can be no doubt that this suit and the causes of action brought herein arise out of the same occurrence as the Commission Suit. Thus, the doctrine of *res judicata* mandates the dismissal of this suit.

## CONCLUSION

For the reasons set forth above, the exceptions of prescription and *res judicata* should be maintained and the suit dismissed with prejudice at plaintiff's cost.

Respectfully Submitted:

Paul S. West, La. Bar Roll No. 13375
Juston M. O'Brien, La. Bar Roll No. 26447
MCGLINCHEY STAFFORD, PLLC
9th Floor, One American Place
Baton Rouge, LA 70825
Telephone (225) 343-3076

## CERTIFICATE OF SERVICE

I certify that a copy fo the above and foregoing has been mailed today, via United States Mail, postage prepaid and properly addressed, to the following counsel of record:

Robert A. Kutcher, Esquire (Via Certified Mail, Return Receipt Requested)
CHOPIN, WAGAR, COLE, RICHARD, REBOUL S. KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

Arthur A. Lemann, III, Esquire (Via Regular United States Mail)
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Baton Rouge, Louisiana on this 14th day of January, 2003.

Paul S. West

**PLEASE SERVE**

Robert A. Kutcher
CHOPIN, WAGAR, COLE, RICHARD, REBOUL S. KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

CERTIFIED TRUE COPY
278540

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH, LA.
2003 JAN 14  PM 4: 13

-5-

# EXHIBIT A

ALVIN COPELAND            NUMBER 400,750 DIVISION "A"

VERSUS            19th JUDICIAL DISTRICT COURT

LOUISIANA GAMING CONTROL            PARISH OF EAST BATON ROUGE ~~COPY~~ Amt. STATE

BOARD, ET AL.            STATE OF LOUISIANA    MAY 2 3 2000

JUDGMENT         BY_____

~~BY CLERK OF COURT~~

This matter came on for hearing on the 17th day of April, 2000, pursuant to a Motion for Partial Summary Judgment filed by defendants, State of Louisiana through the Louisiana Gaming Control Board, the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, and the Department of Public Safety and Corrections; Motion for Summary Judgment and Motion for Leave to File Fourth Supplemental and Amending Petition on behalf of plaintiff, Alvin Copeland; and Exceptions of Prescription, Failure to Exhaust Administrative Remedies and Motion to Dismiss Appeal on behalf of intervenor, Treasure Chest Casino, L.L.C.:

Present were:

**Donald Miester** for plaintiff, Alvin Copeland;

**Michael A. Patterson** for defendants, State of Louisiana through the Louisiana Gaming Control Board, the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, and the Department of Public Safety and Corrections; and

**Donald Cravins** for intervenor, Treasure Chest Casino, L.L.C..

The court, after considering the evidence and law and hearing the argument of counsel, for oral reasons assigned this date,

**IT IS ORDERED, ADJUDGED AND DECREED** that the Exceptions of Prescription, Failure to Exhaust Administrative Remedies on behalf of intervenor, Treasure Chest Casino, L.L.C. are **GRANTED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Motion to Dismiss Appeal on behalf of intervenor, Treasure Chest Casino, L.L.C. is **GRANTED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Motion for Partial Summary Judgment filed on behalf of defendants, State of Louisiana through the Louisiana Gaming Control Board, the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, and the Department of Public Safety and Corrections

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 258 of 344

is **GRANTED** except as to the reimbursement of the $50,000 fee paid by American International Gaming Association to the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Motion for Summary Judgment filed on behalf of plaintiff, Alvin Copeland is **GRANTED IN PART**. The Clerk of Court is hereby directed to release the funds currently held in the registry of the Court that have been deposited by the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police being in the amount of TWENTY THOUSAND, EIGHT HUNDRED SEVENTY THREE AND NO/100 DOLLARS, ($20,873.00), to plaintiff Copeland, reserving unto Copeland his right to seek the remainder of the $50,000 paid by AIGA to the Division. In all other aspects, Copeland's Motion for Summary Judgment is **DENIED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Motion to File Fourth Supplemental and Amending Petition filed on behalf of plaintiff, Alvin Copeland is **DENIED**.

The court hereby expressly determines that there is no just reason for delay and therefore designates this judgment as a final judgment under La.C.C.P. art. 1915.

**JUDGMENT RENDERED AND SIGNED** in Baton Rouge, Louisiana, this 31ST day of May, 2000.

_____
JUDGE, 19th JUDICIAL DISTRICT COURT

Submitted by:

**RICHARD P. IEYOUB**
**Attorney General**

_____

**MICHAEL A. PATTERSON**
Special Assistant Attorney General
Bar Roll No. 10373
**DANIEL D. HOLLIDAY, III**
Special Assistant Attorney General
Bar Roll No. 23135
**LONG LAW FIRM, L.L.P.**
4041 Essen Lane, Suite 500
Baton Rouge, LA 70809
(225) 922-5110
**ATTORNEYS FOR THE STATE OF**
**LOUISIANA, ET AL.**

I HEREBY CERTIFY THAT ON THIS DAY A COPY OF THE WRITTEN REASONS FOR JUDGMENT / JUDGMENT / ORDER / WAS MAILED BY ME, WITH SUFFICIENT POSTAGE AFFIXED TO:
Benjamin Slater, III; Michael Patterson; Paul S. West
DONE AND SIGNED ON May 31, 2000

_____
DEPUTY CLERK OF COURT

Form: C 003

0 I 2 2 0 2 4 2 0

# RULE NISI

ALVIN C. COPELAND
              vs         **Plaintiff**

TREASURE CHEST CASINO, ET AL
              Defendant

No. C 464607 Sec 21
19th JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

TO: Plaintiff,
Robert A Kutcher
Chopin, Wagar, Cole, Richard, Reboul & Kutcher, LLP
Two Lakeway Center, Suite 900, 3850 North Causeway Blvd.
Metairie, La.

The **DEFENDANT** in this case filed a **Treasure Chest Casino, L.L.C. 'S Peremptory Exceptions to Plaintiffs Petition for Damages** which has been set for hearing. Certified copies of this document and the Court's order are attached

You MUST come to court at **09:30** o'clock **AM** on the **10th** day of **February**, **2003**, at Room **804** in the Governmental Building, 222 St. Louis St., and show cause why:

## **\*\*SEE ATTACHED ORDER\*\***

This Rule was issued by the Clerk of Court of East Baton Rouge Parish on the 27th day of **January, 2003**.

          By: _____
              Deputy Clerk of Court for
              Doug Welborn, Clerk of Court

## SERVICE INFORMATION

Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20____, served the above named party as follows:

PERSONAL SERVICE, on the party herein named at _____

DOMICILIARY SERVICE, on the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in said domicile at _____

SECRETARY OF STATE, by tendering same to the within named, by handing same to _____

DUE AND DILIGENT: After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

RETURNED Parish of _____, this _____ day of _____, 20____

SERVICE: $ _____
MILEAGE: $ _____          _____
TOTAL: $ _____              Deputy Sheriff
                        Parish of East Baton Rouge, Louisiana

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 260 of 344

3 0 1 2 8 0 2 4 3 0

DOUG WELBORN
CLERK OF COURT
19th JUDICIAL DISTRICT COURT
Parish Of East Baton Rouge
P.O. Box 1991
Baton Rouge, Louisiana 70821-1991
Phone (225) 389-3967
Fax   (225) 389-3372

January 27, 2003                     Regarding Case Number: C 464602 Div: 21

TO:   Jefferson Parish Sheriff's Office
      P. O. Box 277
      Gretna, LA 70064

      PHONE: (504) 363-5701

We are enclosing herein **Rule Nisi, Peremptory Exceptions**  in the above numbered
suit to be served as indicated herein.

Please make your return(s) on the duplicate(s) enclosed, and **find our check
enclosed for payment of service.**

Thank You.

_____
Deputy Clerk of Court for
Doug Welborn, Clerk of Court

Reply: _____        Date: _____

_____

_____

_____

_____

_____

         By: _____

3 0 1 2 3 0 2 4 4 9 6

# EXHIBIT B

**ORIGINAL**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2000 CA 2864

AMERICAN INTERNATIONAL GAMING ASSOCIATION, INC.

VERSUS

THE LOUISIANA RIVERBOAT GAMING COMMISSION AND
THE RIVERBOAT GAMING ENFORCEMENT DIVISION
OF THE GAMING ENFORCEMENT SECTION OF THE OFFICE
OF STATE POLICE, PUBLIC SAFETY SERVICES,
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

*DATE OF JUDGMENT:*   SEP 1 1 2002

ON APPEAL FROM THE NINETEENTH JUDICIAL DISTRICT COURT
(NUMBER 400,750), PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

HONORABLE ROBERT D. DOWNING, JUDGE

* * * * * *

| | |
|---|---|
| Benjamin R. Slater, III<br>New Orleans, Louisiana | Counsel for Plaintiff/Appellant<br>Alvin C. Copeland |
| Michael A. Patterson<br>Baton Rouge, Louisiana | Counsel for Appellee<br>The Louisiana Riverboat Gaming<br>Commission and the Riverboat<br>Gaming Enforcement Division of the<br>Gaming Enforcement Section of the<br>Office of State Police, Public Safety<br>Services, Department of Public<br>Safety and Corrections |
| Paul S. West<br>Baton Rouge, Louisiana | Counsel for Intervenor<br>Treasure Chest Casino, L.L.C. |

* * * * * *

BEFORE:  GONZALES, KUHN, AND CIACCIO[1], JJ.

Disposition:  JUDGMENT AFFIRMED IN PART, VACATED IN PART, AND RENDERED.
MATTER REMANDED FOR LIMITED FURTHER PROCEEDINGS.

[1] The Honorable Philip C. Ciaccio, Judge (retired), Fourth Circuit Court of Appeal, is serving as judge *pro tempore* by special appointment of the Louisiana Supreme Court. The Honorable Douglas M. Gonzales, Judge (retired), First Circuit Court of Appeal, is serving as judge ad hoc by special appointment of the Louisiana Supreme Court.

Kuhn, Judge.

In this appeal, we examine whether the trial court properly dismissed various claims asserted against the State of Louisiana by Alvin C. Copeland, the sole shareholder of a corporation that unsuccessfully applied for a riverboat gaming license. We also address whether the trial court properly sustained exceptions and a motion to dismiss raised by a competing applicant, Treasure Chest Casino Inc. ("Treasure Chest"), who intervened because this suit challenged the validity of the license issued to it. We affirm in part, vacate in part, and render. We also remand this matter to afford Copeland the right to amend his petition in a limited manner.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Louisiana Riverboat Gaming Act Enacted

Pursuant to Acts 1991, No. 753, § 1, the Louisiana Legislature enacted the Louisiana Riverboat Economic Development and Gaming Control Act, La. R.S. 4:501 et seq. ("the Riverboat Gaming Act" or "the Act") This legislation set forth a licensing process for those who sought authorization to conduct gaming activities on riverboats in Louisiana. The Act created two separate bodies within the Department of Public Safety and Corrections and vested each with separate duties and responsibilities to further the Act's purposes. The Riverboat Gaming Enforcement Division ("Division"), created by La. R.S. 4:515, was vested with the responsibility of issuing and denying licenses and investigating the qualifications of each license applicant. La. R.S. 4:518. The Division was authorized to issue up to fifteen licenses to conduct gaming activities upon a riverboat and up to six licenses could be granted for riverboats that operated from any one parish. La. R.S. 4:525. The Riverboat Gaming Commission ("Commission"), created by La. R.S. 4:510, was a rule and policy-making body comprised of seven members appointed by the governor and confirmed by the Louisiana State Senate. The Act gave

2

the Commission the power to promulgate rules and to determine riverboat sailing routes, minimum insurance levels for licensees, riverboat design specifications, and procedures for negotiable instruments transactions. Beyond that, the Act vested the Commission with oversight authority over the Division by giving the Commission the power to "hear and determine all appeals relative to the granting, suspension, revocation, condition, or renewal of all licenses, permits, and applications." La. R.S. 5:511(1).

## B. The Commission Promulgates Rules

The Commission promulgated rules to implement the Act.[2] Commission Rule § 303 provided that "each person seeking approval of riverboat plans" must "submit for advance approval by the Commission an application for a certificate of preliminary approval." Commission Rule § 315 provided that the Commission "shall evaluate each application" and "shall approve those applications . . . it deems to be in the best interest of the state and locale of the proposed operation . . . ."[3]

## C. Copeland Files Suit

This litigation arises from the following factual scenario set forth in Copeland's petition.[4] American International Gaming Association, Inc. ("AIGA") submitted an application for a certificate of preliminary approval ("Certificate") on December 11, 1992, and another application with supplemental information on February 22, 1993. AIGA proposed a riverboat route and other operations at the Kenner Laketown Harbor Park ("Laketown") on the shores of Lake Pontchartrain. Along with its application, AIGA

---

[2] These rules were designated as Title 42, Part XIII.101, et seq. of the Louisiana Administrative Code (published in Volume 19, No. 7 of the Louisiana Register at pp. 851-61.) These rules were promulgated as emergency rules on June 18, 1993, and became finally effective on July 20, 1993.

[3] The rules providing for the issuance of the certificates were later declared to be null and void on the basis that the Commission had exceeded its authority in promulgating them. *State of Louisiana v. Louisiana State Police Riverboat Gaming Enforcement Division*, 95-2355 (La. App. 1st Cir. 8/21/96), 694 So.2d 316, 319.

[4] American International Gaming Association Inc. ("AIGA") actually filed the initial petition but Copeland, the sole shareholder of AIGA's assets, was later substituted as plaintiff.

3

submitted its application and evaluation fees.[5] On February 14, 1993, AIGA also applied for a gaming license from the Division and submitted the filing fee required for its background investigation.[6]

AIGA further alleged that Treasure Chest submitted an application for a Certificate on March 8, 1993. It also proposed locating its gaming riverboat at Laketown. The Commission held a public hearing on the Treasure Chest application. On April 29, 1993, Treasure Chest modified its application, proposing that its riverboat would be located at Rivertown, U.S.A. on the banks of the Mississippi River in Kenner. On June 4, 1993, the Commission held a public hearing at which AIGA made a presentation on its application for a Certificate.

According to AIGA's allegations, the Commission received a total of 43 applications for Certificates, with six of those seeking preliminary approval to operate a riverboat in Kenner, Louisiana. Prior to a June 18, 1993 Commission meeting, the Commission had approved eight applications but none of those approved involved proposals to locate a riverboat in Kenner. During the meeting, the Commission approved seven more applications.[7] The Commission granted Treasure Chest's application for a Certificate for its Rivertown location as one of these seven but did not grant AIGA's application.

AIGA submits that several months later, Treasure Chest sought permission to modify its Certificate to move the site of its proposed operations back to Lake Pontchartrain as called for in the original Treasure Chest application. On November 13,

---

[5] Commission Rule § 303 required each applicant to remit a $25,000 application fee and $5,000 to defray the expenses of the commission in analyzing and evaluating a Certificate.

[6] Former La. R.S. 4:532 (redesignated by Acts 1996, 1st Ex. Sess., No. 7, § 3, eff. May 1, 1996, as La. R.S. 27:89) provided that an applicant was required to submit an initial application fee of $50,000.

[7] Since the Division was authorized to issue only fifteen licenses, the Commission apparently decided to likewise limit the number of Certificates it issued.

4

1993, the Commission granted Treasure Chest's request despite AIGA's objection. On November 23, 1993, AIGA filed suit in the Nineteenth Judicial District Court seeking the reversal of the Commission's decisions to grant Treasure Chest a Certificate and to grant its request to modify the location of its proposed operations.[8] Both the Commission and the Division were named as defendants.

In response, the Commission and the Division filed numerous exceptions. Before the trial court ruled on these exceptions, however, the Division issued a license to Treasure Chest on May 17, 1994. AIGA ultimately did not receive either a Certificate or a license.[9]

### C. Gaming Legislation Revised

While this suit was pending, the Louisiana legislature addressed the status of the various entities charged with oversight of gaming. By Act 7 of the First Extraordinary Session of 1996, the legislature enacted the provisions of La. R.S. 27:1 et seq., the Louisiana Gaming Control Law ("the Gaming Control Law"), which established the Louisiana Gaming Control Board ("the Board"). The Gaming Control Law became effective May 1, 1996. In accordance with its provisions, the Board became the sole and exclusive regulatory and supervisory board for gaming operations and activities

---

[8] AIGA's petition alternatively sought a declaratory judgment that the Gaming Commission Rules prohibited the modification of the Certificate.

At that time the petition was filed, former La. R.S. 5:548 provided:

> Any person adversely affected by an action, order, or decision of the commission may appeal to the nineteenth Judicial District Court in accordance with the provisions of the Administrative Procedure Act, except that notice of appeal shall be given to the commission and petition for appeal shall be filed with the district court within ten days of the action, order, or decision of the commission.

Acts 1996, 1st Ex. Sess., No. 7, § 3, eff. May 1, 1996, redesignated the former La. R.S. 4:548 as La. R.S. 27:89. Effective July 7, 2001, La. R.S. 27:89 was repealed by Act No. 1222 of 2001.

[9] According to the allegations of the petition, the Division issued licenses to the same 15 entities that had previously been issued Certificates by the Commission.

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 267 of 344

authorized by the Riverboat Gaming Act. La. R.S. 27:31. The Gaming Control Law abolished the Commission and transferred its powers, duties, functions and responsibilities to the Board. 27:31A(2) and 27:31B.

### E. Certificate Process Abrogated

During 1996, in an unrelated proceeding, this court ruled that the Commission's regulations that required a potential gaming riverboat licensee to obtain a certificate of preliminary approval from the Commission were null and void. This court concluded that the Commission had exceeded its statutory authority under the Riverboat Gaming Act when it adopted these particular regulations and assessed fees because the Act had granted licensing authority to the Division rather than the Commission. *State of Louisiana v. Louisiana State Police Riverboat Gaming Enforcement Division*, 95-2355 (La. App. 1st Cir. 8/21/96), 694 So.2d 316, 319.

### F. Copeland's Litigation Moves Forward

In July 1998, the trial court granted Copeland's motion to substitute himself as plaintiff because AIGA had been dissolved and he was the sole shareholder. Thereafter, on January 21, 1999, Copeland filed an amended petition that named the Board, as successor-in-interest to the Commission, as a defendant. Based on the provisions of the amended petition, Copeland no longer sought reversal of the Commission's action. Rather, he challenged the Division's action of issuing the license to Treasure Chest and asserted that he had been constructively denied a license (Count One). He further claimed that he was entitled to a judgment declaring that the license issued to Treasure Chest was null because the Division had awarded licenses to the applicants that had previously received Certificates from the Commission without independently determining which applicants deserved licenses (Count Two). Copeland also advanced claims for monetary damages, alleging that the Division's actions violated his due process and equal protection

6

rights and constituted a violation of 42 U.S.C. § 1983 (Count Three). He also sought the return of fees paid to the commission (Count Four) and the return of fees paid to the division (Count Five).[10]

On June 4, 1999, Treasure Chest intervened urging that Counts One and Two should be dismissed. It filed exceptions urging the objections of prescription and failure to exhaust administrative remedies. Treasure Chest alternatively raised a motion to dismiss these counts.

Copeland opposed Treasure Chest's exceptions and motions with respect to Count Two, the request for declaratory judgment relief, but conceded that Count One, his appeal of the grant of the original Treasure Chest license, was moot. The term of Treasure Chest's initial license was five years, and it expired on May 17, 1999.[11] Then, in June 1999, Treasure Chest filed a motion to stay discovery that was granted by the trial court "pending consideration of [Copeland's] constitutional claim . . . ."

In January 2000, the State, through the Board, the Division and the Department of Public Safety and Corrections ("the State") filed a motion for partial summary judgment,

---

[10] AIGA had previously amended its petition in June 1998 to request a refund of all fees paid to the Commission and in September of 1998, to request a refund of all fees that had been paid to the Division.

We note that the January 1999 supplemental and amending petition raised claims that attempted to invoke both the trial court's original and appellate jurisdiction. *See Metro Riverboat Associates, Inc. v. Louisiana Gaming Control Bd.*, 2001-0185 (La. 10/16/2001), 797 So.2d 656, 660, where the court distinguished between the "judicial review of the decision of an administrative agency" as the "exercise of a court's appellate jurisdiction pursuant to La. Const. art. V, § 16 (B)" and "judicial adjudications in the first instance" pursuant to La. Const. art. V, § 16 (A), which grants "original jurisdiction in all civil matters" to the district courts. Pursuant to the provisions of La. R.S. 4:547, Copeland was required to seek review of the division's issuance of the license to Treasure Chest by filing a notice of appeal with the Commission. But Copeland did not appeal the Division's action to the Commission before challenging the Division's action in the trial court. Thus, although Copeland postured his claims pertaining to the Division's action as an "appeal," the trial court actually had no appellate jurisdiction over the claims asserted in Count One because the Commission had not reviewed the claim. *Id.*

[11] Treasure Chest asserted in its opposition memorandum that the Division had conditionally renewed Treasure Chest's license on March 16, 1999. But Copeland did not amend his petition to contest the renewal. Also, Copeland's appeal counsel stated during oral arguments that Copeland waives his claim regarding the constructive denial of a license (addressed in Count One).

7

seeking dismissal of Counts Two and Three of Copeland's amended petition.[12]  Copeland

responded by filing a motion for summary judgment on his constitutional claims.

The Court held a hearing to dispose of: 1) the State's partial motion for summary

judgment; 2) Copeland's motion for summary judgment on the constitutional claims; and

3) the exceptions and motion filed by Treasure Chest.  By judgment dated May 31, 2000,

the trial court sustained Treasure Chest's exceptions raising the objections of prescription

and failure to exhaust administrative remedies and granted Treasure Chest's motion to

dismiss.  The trial court further granted the State's motion for partial judgment and denied

Copeland's motion for summary judgment with respect to the constitutional claims.[13]

Copeland has appealed, urging that the trial court erred by not maintaining his

constitutional claims (raised in Count Three).  First, he asserts that his petition alleges

"cognizable constitutional claims" based on his allegations that the Division's actions

violated his equal protection and procedural and substantive due process rights.  Based on

these constitutional violations, Copeland asserts he is entitled to a declaratory judgment

(Count Two), monetary damages (Count Three), and a return of all monies AIGA paid to

the Division (Count Five).  Second, he asserts that despite the abrogation of the

Commission's rules and the legislative revision of the statutes governing the Commission

and the Division, his claims against the State present a justiciable claim because he has

alleged that he is entitled to monetary relief.  Third, he asserts that he did not fail to

exhaust administrative remedies by not first presenting his constitutional claims to the

---

[12] The State had also previously filed a motion for summary judgment.

[13] Although Copeland's motion for summary judgment addressed only the constitutional claims, the judgment also granted his motion for summary judgment in part and directed the Clerk of Court to release to Copeland the amount of $20,873, which had been deposited into the Court's registry by the Division.  This amount represented the $50,000 application fee minus the costs of the Division's background investigation.  The trial court granted the State's motion for partial summary judgment "except as to the reimbursement of the $50,000 fee paid by [AIGA] to the . . . [Division] . . . " although the state's partial motion did not address Copeland's claims for reimbursement of the fees paid to the Division.  The judgment also denied Copeland's motion to file a fourth supplemental and amending petition.

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 270 of 344

Commission rather than the district court because the Commission did not have authority to dispose of these claims. Based on these contentions, Copeland prays for reversal of those portions of the trial court's judgment that sustain Treasure Chest's exceptions, grant Treasure Chest's motion to dismiss, and grant the State's motion for partial summary judgment.

## II. ANALYSIS

### A. Claims involving Treasure Chest

When Treasure Chest intervened, it challenged only the counts of Copeland's amended petition that could potentially impact its license, Counts One and Two. Because Copeland did not seek compensatory relief from Treasure Chest, Copeland's remaining claims did not impact Treasure Chest. During the proceedings below, Copeland acknowledged that Count One of his amended petition, which challenged the Division's action of issuing the license to Treasure Chest, was moot. We also conclude that Copeland's claim for a declaratory judgment, asserted in Count Two, is moot. Assuming, as Copeland alleges, that the Division issued a license to Treasure Chest on May 17, 1994, the license issued to Treasure Chest would have expired on May 17, 1999. The provisions of former La. R.S. 4:534 (redesignated as La. R.S. 27:74) provided that the term of an initial license to conduct gaming operations is five years. Thus, the license, which Copeland seeks to have declared invalid, has already expired. At this point, there is no practical significance to rendering a judgment on the issue of the validity of the original license. *Cat's Meow, Inc. v. City of New Orleans Through Dept. of Finance*, 98-0601 (La. 10/20/98), 720 So.2d 1186, 1193.[14]

---

[14] The collateral consequences exception to the mootness doctrine does not apply to the claims asserted against Treasure Chest because Copeland has not sought damages or other monetary relief from Treasure Chest. *Cat's Meow, Inc. v. City of New Orleans Through Dep't. of Finance*, 98-0601 (La. 10/20/98), 720 So.2d 1186, 1196.

9

The trial court should have dismissed the claims asserted in Count Two as moot. Accordingly, we find that the trial court erred in sustaining the exceptions raised by Treasure Chest, and we vacate those rulings. But because the matters raised in both Counts One and Two are moot, we conclude the trial court properly granted Treasure Chest's motion to dismiss.

### B. Claims against the State

Copeland contends the State violated his procedural due process and equal protection rights by failing to promulgate ascertainable standards to determine who would receive a license and by arbitrarily issuing licenses. Copeland also asserts that the Division's failure to hold a "meaningful hearing" to address AIGA's application and its failure to give notice that its application would be denied violates his procedural due process rights. In addition, he claims the arbitrary denial of his license violated his substantive due process rights.[15]

### 1. Jurisdiction of the Trial Court

The State argues that Copeland's appeal of the action of the Division's action was not properly raised before the district court. The State urges that former La. R.S. 4:547A required that Copeland appeal the Division's action to the Commission, as follows:

> Any person whose application for a license or permit has been denied by the division or *any person adversely affected by an action, order or decision of the division* may appeal the action, order, or decision of the division to the commission by filing a notice of appeal with the commission *within seven days of certified mailing of notice* of the action, order, or decision by the division.

> (Italics added.)

---

[15] As previously addressed, Copeland conceded in the proceedings below that Count One, his appeal of the grant of the original Treasure Chest license, was moot. Copeland asserts no arguments on appeal with respect to Count Four, his claim for return of fees paid to the Commission. The State asserts that it has refunded all funds that AIGA paid to the Commission in conjunction with the Certificate process. Otherwise, we note that Copeland's claims against the State are not moot because he seeks compensatory relief. Although the Commission and the certificate process it used no longer exists and the original Treasure Chest license has expired, Copeland's claims for damages are viable under the collateral consequences exception. *Cat's Meow, Inc. v. City of New Orleans Through Dep't of Finance*, 720 So.2d at 1196.

10

Neither AIGA nor Copeland filed an appeal with the Commission before presenting their claims to the district court. The State emphasizes that although the action of the Division that Copeland challenges occurred on May 18, 1994, he did not challenge that action until January, 1999, over four years after the Division's initial decision. And when he did take action, Copeland amended AIGA's original petition that appealed the Commission's action of issuing the license, which had been filed since 1993.

Copeland counters that his failure to appeal the Division's action to the Commission did not affect the validity of Counts Two and Three.[16] He maintains that these claims are based on the Division's violations of his constitutional rights, which could not have been asserted through an administrative appeal under La. R.S. 4:547. He further claims that an appeal to the Commission would have been a vain and useless act since the Division simply awarded licenses to those firms that had previously received Certificates from the Commission.

We find no merit in Copeland's arguments with respect to Count Two, the claim for declaratory relief regarding the validity of Treasure Chest's license. As stated above, since Treasure Chest's license has expired, Count Two is moot. The trial court properly granted the State's partial motion for summary judgment with respect to Count Two.

But we find that the constitutional claims raised in Count Three were properly presented to the trial court. The Commission, which functioned as an administrative agency in the executive branch of state government, did not have the authority to determine these questions of constitutionality. *See ANR Pipeline Company v. Louisiana Tax Commission*, 2001-2594 to 2001-2600 (La. App. 1st Cir. 3/20/02), 815 So.2d 178,

---

[16] Copeland also refers to Count Five but the State's partial motion for summary judgment only addressed Counts Two and Three, and Copeland's motion for summary judgment only addressed his due process and equal protection constitutional claims, which were raised in Count Three. Thus, the issue of whether Copeland is entitled to receive a return of the fees paid to the Division is not properly before us. Also, it was not specifically raised as an assignment of error on appeal.

11

184. Judicial power is vested in Louisiana courts by Article V, Section 1 of the Louisiana Constituion. While administrative agencies have rulemaking authority that shadows the powers of the legislature, they are not authorized to exercise "judicial power" under Art. 5, § 1, unless authorized by the Constitution. La. Const. Art. II, § 2; *Albe v. Louisiana Workers' Compensation Corp.*, 97-0581 (La. 10/21/97), 700 So.2d 824, 828.

La. Const. art. V, § 16A grants original jurisdiction in all civil matters to the district courts, unless otherwise authorized by the constitution. And since the Louisiana Constituion fixes the original jurisdiction of the district courts, that original jurisdiction cannot be changed by legislative act. The power to decide these constitutional claims was not and could not be conveyed to the Commission pursuant to La. R.S. 5:457, or any other provision of the River Boat Gaming Act. *See ANR Pipeline Company v. Louisiana Tax Commission*, 2001-2594, 815 So.2d at 184.

Accordingly, when Copeland amended AIGA's timely-filed original petition to assert his constitutional claims, he invoked the court's original jurisdiction, and the requirements of La. R.S. 4:547 did not apply. Because the State asserts no other basis for challenging the timeliness of Copeland's amendment, we conclude that the trial court properly considered Copeland's constitutional claims.

## 2. Procedural Context of the Constitutional Claims

The State challenged Copeland's constitutional claims via its motion for partial summary judgment. The State urges that Copeland is not entitled to recover because he has not demonstrated a taking of a constitutionally-protected property interest. Technically, the State has raised an exception of no cause of action but has labeled it as a motion for summary judgment. If we were to determine that the petition fails to state a cause of action regarding these constitutional claims, we would preclude a determination on the motion for partial summary judgment with respect to the claims asserted in Count

12

Three. Thus, on our own motion, we raise the objection of no cause of action. La. C.C.P. art. 927; *Treen v. Republican Party of Louisiana*, 99-2073 (La. App. 1st Cir. 9/26/00), 768 So.2d 273, 277. Also see *Noble v. Armstrong*, 93-841 (La. App. 5th Cir. 3/16/94), 635 So.2d 1199, 1203 (holding that a motion for summary judgment based on insufficiency of allegations cannot be used as a substitute for an exception of no cause of action).

The function of the peremptory exception of no cause of action is to question whether the law extends a remedy to anyone under the factual allegations of the petition. *Cleco Corp. v. Johnson*, 2001-0175 (La. 9/18/01), 795 So.2d 302, 304. La. Code Civ. P. art. 1915, as amended by 1997 La. Acts No. 483, § 2, now allows a partial judgment sustaining an exception of no cause of action. *See Graf v. Jim Walter Homes, Inc.*, 97-1143 (La. App. 1st Cir. 5/15/98), 713 So.2d 682, 685 n.2. The exception is tried on the face of the pleadings and the court accepts the facts alleged in the petition as true, determining whether the law affords relief to the plaintiff if those facts are proved at trial. *Cleco Corp. v. Johnson*, 795 So.2d at 304.

### 3. Due Process Claims

The Fourteenth Amendment to the United States Constitution provides, in pertinent part, "[n]or shall any State deprive any person of life, liberty or property, without due process of law...." Similarly, Article I, § 2 of the Louisiana Constitution provides that no person shall be deprived of life, liberty, or property, except by due process of law. To claim the protections of due process, a claimant must show the existence of some property or liberty interest which has been adversely affected by state action. *Delta Bank & Trust Co. v. Lassiter*, 383 So.2d 330, 334 (La. 1980); *Johnson v. Southern University*, 2000-2615 (La. App. 1st Cir. 12/28/01), 803 So.2d 1140, 1144-1145. Property interests are not created by the constitution. Rather they are created and

13

their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). To have a property interest protected by due process, a person must clearly have more than an abstract need or desire for it. He must have a legitimate claim of entitlement to it rather than a unilateral expectation of it. *Id.*

It is true that a license, once issued, may create a property interest in the holder that is traditionally protected by due process notions. *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed. 2d 90 (1971); *Montecino v. Louisiana*, 55 F.Supp.2d 547 (E.D. La. 1999). But our state law affords a license applicant no individual entitlement to a license that he seeks. *Durham v. Louisiana State Racing Com'n*, 458 So.2d 1292, 1295 (La. 1984). Accepting all of the allegations of the petition as true, we find no due process violation because neither AIGA nor Copeland had a protected property interest in the benefits conferred by a license that they did not actually hold. Absent a protected property interest, AIGA was not entitled to notice and a hearing before the denial of its application. *Board of Regents v. Roth*, 92 S.Ct. at 2710; *Durham v. Louisiana State Racing Com'n*, 458 So.2d at 1295. Likewise, Copeland's allegation that he was denied substantive due process rights by being arbitrarily denied a license fails due to the lack of a protected property interest.

Copeland further complains that the Division acted arbitrarily in granting a license to Treasure Chest and not AIGA. Again, we recognize that the State's action of granting a license to a competitor did not deprive AIGA or Copeland of a property interest. *See Delta Bank & Trust Company v. Lassiter*, 383 So.2d at 334 (La. 1980). Although the Division was authorized to issue only fifteen licenses, Copeland fails to even contend that

14

it was precluded from obtaining a license due to the Division's issuance of a license to Treasure Chest. We note also that Copeland does not allege that the license issued to Treasure Chest provided for its exclusive authorization to operate a gaming riverboat in the Lake Pontchartrain area.

Accordingly, we conclude that the amended petition fails to allege a violation of state or federal due process rights.

### 4. Equal Protection Claim

Both the Fourteenth Amendment to the U.S. Constitution and La. Const. art. I, § 3 provide that all persons are entitled to equal protection of the law. These provisions mandate "that persons similarly situated receive like treatment." *Whitnell v. Silverman*, 95-0112 (La. 12/6/96), 686 So.2d 23, 29-30. But the equal protection provisions of the state and federal constitutions do not require absolute equality or precisely equal advantages. *Ross v. Moffitt*, 417 U.S. 600, 612, 94 S.Ct. 2437, 2444, 41 L.Ed.2d 341 (1974); *Frederick v. Ieyoub*, 99-0616 (La. App. 2d Cir. 5/12/2000), 762 So.2d 144,148, *writ denied*, 2000-1811 (La. 4/12/2001), 789 So.2d 581.

While equal protection claims may be subject to a different analysis under the federal and state guarantees, a minimal standard of review applies under both provisions where, as here, there is no fundamental right, suspect class, or enumerated characteristic alleged as the basis for discrimination. *Progressive Security Ins. Co. v. Foster*, 97-2985 (La. 4/23/98), 711 So.2d 675, 685-87. Absent a "suspect class" of persons or a "fundamental right," classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the state's goals and only if no grounds can be conceived to justify them. *Frederick v. Ieyoub*, 762 So.2d at 148 (quoting *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed. 2d 508 (1982)).

15

Copeland's equal protection argument is premised on the assertion that AIGA was treated differently than Treasure Chest because the Division issued a license to Treasure Chest but did not issue one to AIGA. He asserts the Division had no ascertainable rules to distinguish between these two license applicants and, accordingly, there was no justification for treating them differently.

Former La. R.S. 4:530 (redesignated as La. R.S. 27:70 by Acts 1996, 1st Ex. Sess. No. 7, § 3) set forth suitability requirements for those seeking a license to conduct gaming operations on a riverboat. Section 530(A) provided that an applicant must be "a person of good character, honesty, and integrity" and "a person whose prior activities, . . . habits, and associations do not pose a threat to the public interest of this state or to the effective regulation and control of gaming . . . ." Section 530(B) also mandated that a license could not be issued to a person unless the division found that: 1) the applicant was capable of operating a gaming casino; 2) the proposed financing of the riverboat and its operations was adequate and was from a suitable source; 3) the applicant was able to operate a vessel comparable to a riverboat; 4) the applicant had submitted a detailed plan of the riverboat's design; 5) the applicant had designated the docking facilities to be used; 6) the applicant showed adequate financial ability to construct and maintain a riverboat; and 7) the applicant had a good faith plan to recruit, train, and upgrade minorities in all employment classifications.

In determining suitability pursuant to La. R.S. 4:530, the Division was required to consider numerous factors, many of which were subjective in nature. Thus, in order to state an equal protection claim, we find that Copeland must specifically allege how it was similarly situated to Treasure Chest based on those factors. Copeland's petition broadly contends that AIGA was treated differently than Treasure Chest. Yet, he makes no specific allegations addressing how AIGA was similarly situated to Treasure Chest, or

16

that AIGA was as suitable as Treasure Chest, based on the factors addressed in La. R.S. 4:530.

Additionally, to state an equal protection claim, the petition must specifically allege how the Division treated AIGA differently or less favorably than Treasure Chest during the licensing process and how that unjustified disparate treatment resulted in the constructive denial of a license to AIGA. The petition fails to do so.

Accordingly, we conclude that the amended petition also fails to allege a violation of state or federal equal protection rights.

### C. Amendment of the Petition

La. C.C.P. art. 934 directs that a judgment sustaining a peremptory exception shall permit amendment of the petition when the grounds of the objection may be removed by amendment, and when the grounds of the objection cannot be removed by amendment, the action shall be dismissed. Amendment is not permitted when it would constitute a vain and useless act. *Mercan, Inc. v. City of Baton Rouge*, 2000-0600 (La. App. 1st Cir. 5/11/2001), 797 So.2d 722, 724, *writ denied*, 2001-1685 (La. 9/21/2001), 797 So.2d 676 (quoting *Premier Games, Inc. v. State through Ieyoub*, 99-1297 (La. App. 1st Cir. 6/7/99), 739 So.2d 852, 855, *writ denied*, 99-1710, 99-1679 (La. 6/14/99), 745 So.2d 15 and 604, *cert. denied*, 528 U.S. 1062, 120 S.Ct. 617, 145 L.Ed.2d 512 (1999)). We can not contemplate any amendment that Copeland can make insofar as his due process claim is concerned. Any attempt to allege a deprivation of a property right would constitute a vain and useless act. However, with respect to Copeland's equal protection claim, we acknowledge that, after further discovery, it is possible that he will be able to state a valid claim. Accordingly, we remand this matter for the limited purpose of allowing Copeland the opportunity to amend his petition in order to state an equal protection claim.

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 279 of 344

### D. Propriety of the Partial Summary Judgment in favor of the State

Pursuant to its motion for partial summary judgment, the State sought dismissal of Counts Two and Three of Copeland's amended petition. As explained above, the trial court properly granted the State's partial motion for summary judgment with respect to Count Two because the claim for declaratory judgment was moot. With respect to the claims asserted in Count Three, the petition fails to state a cause of action based on a violation of due process and equal protection rights. Thus, the trial court should have dismissed these constitutional claims on that basis and precluded a ruling on the State's motion for partial summary judgment. Accordingly, we vacate that portion of the trial court's judgment.

### III. CONCLUSION

That portion of the judgment granting Treasure Chest's exceptions raising the objections of prescription and failure to exhaust administrative remedies is vacated. That portion of the judgment granting Treasure Chest's motion to dismiss is affirmed.

We affirm that portion of the trial court's judgment that granted the State's motion for summary judgment as it relates to Count Two. We render judgment finding that the petition fails to state a cause of action with respect to Copeland's constitutional claims, and we vacate that portion of the trial court's judgment that granted the State's motion for partial summary judgment as it relates to Count Three. We also affirm that portion of the judgment that denied Copeland's motion for summary judgment on his constitutional claims. Otherwise, the judgment is affirmed. We remand this matter for the limited purpose of allowing Copeland the opportunity to amend his petition to set forth a claim based on a violation of his equal protection rights.

**JUDGMENT AFFIRMED IN PART, VACATED IN PART, AND RENDERED. MATTER REMANDED FOR LIMITED FURTHER PROCEEDINGS.**

18

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2000 CA 2864

AMERICAN INTERNATIONAL GAMING ASSOCIATION, INC.

VERSUS

THE LOUISIANA RIVERBOAT GAMING COMMISSION AND
THE RIVERBOAT GAMING ENFORCEMENT DIVISION
OF THE GAMING ENFORCEMENT SECTION OF THE OFFICE
OF STATE POLICE, PUBLIC SAFETY SERVICES,
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

**SEP 1 1 2002**

GONZALES, J., concurring.

As far back as 1892, in a famous opinion by Justice Oliver Wendell Holmes, the second class status of a mere governmental privilege was engrained into our procedural due process concepts in the case of **McAuliffe v. Mayor of New Bedford**, 155 Mass. 216, 29 N.E. 517 (1892). The case involved a police officer that had been fired. The Supreme Court dismissed his complaints, holding that a governmental job was a mere privilege. The following excerpt 2 Kenneth C. Davis and Richard J. Pierce, Jr., Administrative Law Treatise § 9.3, at 11-13 (1994) summarizes the evolution of a mere privilege to the status of a constitutionally protected entitlement:

> Before 1970, due process applied only to deprivation of "rights," determined primarily with a reference to the common law. Anything else government provided was a mere "privilege," outside the scope of due process protection. Justice Holmes' opinion in McAuliffe v. Mayor of New Bedford, 29 N.E. 517 (1892), illustrates this approach. The Mayor fired a policeman for expressing views on an issue of public importance contrary to those of the Mayor. The court dismissed the policeman's complaint that the action violated both due process and the First Amendment because a government job is a mere privilege unprotected by the Constitution.
>
> Before 1970, the Court paid little attention to the nature of the decisionmaking procedure required by due process. Typically, the Court held only that due process required a "hearing," without describing the nature of the hearing required. In some cases, the Court's language seemed to imply that due process required an oral evidentiary hearing of the type routinely provided by courts. In ICC v. Louisville & Nashville Railroad, 227 U.S. 88, 93 (1913), for instance, the Court specifically referred to "opportunity to cross-examine witnesses." In other cases, however, the Court's language suggested that due process might be satisfied by a "hearing" less formal than the oral evidentiary hearing routinely available in a court. In Londoner v. Denver, 210 U.S. 373,

383 (1908), for instance, the Court stated only that "a hearing in its very essence requires that he who is entitled to it shall have the right to support his allegations by argument however brief, and, if need be, by proof, however informal."

The Court abandoned both of these approaches to due process decisionmaking in 1970. It rejected traditional distinction between protected rights and unprotected privileges, holding that at least some statutory entitlements are within the scope of due process protection. At the same time, the Court announced its intention to address explicitly and in detail the issue of how much process is due in each decisionmaking context to which due process applies. The opinions that best explain the Court's transition to its present approach to application of the Due Process Clause are Goldberg v. Kelly, 397 U.S. 254 (1970), and Mathews v. Eldridge, 424 U.S. 319 (1976).

Goldberg involved a claim by recipients of Aid to Families with Dependent Children (AFDC) that the procedures of the agency charged with responsibility to implement the AFDC program in New York violated the Due Process Clause. The agency provided an opportunity for an oral evidentiary hearing to determine a recipient's continued eligibility for AFDC payments, but that hearing was available only after the payments were discontinued. The agency first decided on the basis of less formal procedures that the recipient was ineligible and terminated benefits based on that initial decision. If the Court had followed its traditional approach to defining property rights, it would have dismissed the complaint of the welfare recipients in a brief opinion stating that welfare benefits are mere privileges that are entitled to no due process protection. Instead, the Court held that welfare payments are property interests within the scope of the Due Process Clause.

The Court reasoned that AFDC payments "are a matter of statutory entitlement for persons qualified to receive them." 397 U.S. at 262. It quoted from an article by Professor Reich in which he argued that (1) a high proportion of property in the United States consists of intangible entitlements to continuing benefits, (2) a high proportion of those entitlements flow from government, and (3) the traditional legal approach to property protects the entitlements of the rich but not the poor. Reich, Individual Rights and Social Welfare: The Emerging Legal Issues, 74 Yale L.J. 1245 (1965). See also Reich, The New Property, 73 Yale L.J. 733 (1964). Thus, for instance the Court had long extended due process protection to the governmental benefit of a license to practice law, characterizing that benefit as a "right." Schware v. Board of Bar Examiners, 353 U.S. 232 (1957); Ex Parte Garland, 71 U.S (4 Wall) 333, 379 (1866). Yet, until Goldberg, the Court had declined to extend due process protection to benefits like welfare or most forms of government employment. The Court found Reich's thesis persuasive, and used it as the basis for its holding in Goldberg that welfare benefits conferred by statute are "property" subject to due process protection. In later cases, the Court stated that it had "fully and finally rejected the wooden distinction between 'rights' and 'privileges.' . . ." Board of Regents v. Roth, 408 U.S. 564, 571 (1972).

In the present case, the majority opinion correctly determines that the petition fails to allege a violation of state or federal due process. The opinion is correct when it points out that "[o]ur state law affords a license applicant no individual entitlement to a license that he seeks."

The majority opinion says that "[a]bsent a protected property interest, AIGA was not entitled to notice and a hearing before the denial of its application," citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The inference I take issue with is the fact that only a vested property right would be entitled to the full protection of due process. Here the claim

2

was neither vested nor a property right, however a vested privilege when and if it arises, under the gaming statutes should be entitled to the same constitutional protection. The Gaming Board argues, as many have in similar settings, "The Louisiana legislature has clearly and explicitly stated that no property interests are created in conjunction with gaming licenses, contracts and permits," relying on the language of La. R.S. 27:2(B), which states in part that:

> Any license . . . or thing obtained or issued pursuant to the provisions of this Title or any other law relative to the jurisdiction of the board is expressly declared by the legislature to be a pure and absolute revocable privilege and not a right, property or otherwise, under the constitution of the United States or of the State of Louisiana.

This seems to indicate that because the license is a privilege, it somehow escapes the protection of due process. Apparently, the drafters of the gaming statutes were some twenty years behind in their constitutional law research and were under the impression that Justice Holmes' relegation of mere privilege to a second-class status somehow still controlled federal due process concepts.

I think the cases as cited in Professor Davis' treatise make it clear that a license, once issued, albeit a privilege cannot be withdrawn by state action without affording the holders of that license the full procedural protection of due process. The majority opinion in its analysis of the due process claim cites the case of **Roth**, 92 S.Ct. 2701, but omits any reference to the rejection of "the wooden distinction between 'rights' and 'privileges.'" The Supreme Court opinion in **Roth** provides an answer for both a property right analysis and a mere privilege analysis when it says: "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Roth*, 92 S.Ct. at 2708. Although this license by legislative pronouncement is a mere privilege, the protection afforded to that privilege only exists once it has been acquired. The United States Supreme Court has recently addressed the issue that an unissued riverboat gaming license is not property (or by inference not yet a privilege) in the case of **Cleveland v. U.S.,** 531 U.S. 12, 121 S.Ct. 365, 368, 148 L.Ed. 2d 221(11/7/00), finding "We conclude that permits or licenses of this order do not qualify as "property" within § 1341's compass."

3

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 283 of 344

# EXHIBIT C

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 400-750                    DIVISION "A"

ALVIN C. COPELAND

VERSUS

THE LOUISIANA GAMING CONTROL BOARD

and the

RIVERBOAT GAMING ENFORCEMENT DIVISION
OF THE GAMING ENFORCEMENT SECTION
OF THE OFFICE OF STATE POLICE, PUBLIC SAFETY SERVICES,
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

FILED:_____

DEPUTY CLERK _____

## THIRD SUPPLEMENTAL AND AMENDED PETITION

**NOW INTO COURT,** through undersigned counsel, comes plaintiff Alvin C.
Copeland, who hereby supplements and amends the "Petition for Appeal of Action Taken by
the Louisiana Riverboat Gaming Commission and for a Declaratory Judgment" filed on
November 22, 1993; the "Amended Petition of American International Gaming Association,
Inc." filed on June 29, 1998; and the "Second Amended Petition of American International
Gaming Association, Inc." filed on September 1, 1998 as follows:

1.

This suit involves (1) an appeal of action taken by the Riverboat Gaming Enforcement
Division of the Gaming Enforcement Section of the Office of State Police, Public Safety
Services, Department of Public Safety and Corrections (the "Division") pursuant to LSA-R.S.
4:548, LSA-R.S. 27:89, and the Louisiana Administrative Procedure Act, LSA-R.S. 49:950 *et
seq.*; (2) a request for a declaratory judgment that the license to conduct gaming activities on a
riverboat that was originally granted to Treasure Chest Casino, Inc. ("Treasure Chest") by the
Division (the "license") is null, void, and without continuing effect; (3) a request for monetary
damages from the Division for its violation of plaintiff's rights under the Louisiana and federal
Constitutions; and (4) a request for the return of all monies paid by plaintiff to the Louisiana
Riverboat Gaming Commission (the "Commission") and the Division. This suit commenced
on November 22, 1993, and the instant Third Supplemental and Amended Petition relates back
to and in part arises from the facts set forth in plaintiff's original Petition, as subsequently
amended.

2.

Plaintiff Alvin C. Copeland ("Copeland") is a competent major residing in Jefferson Parish, Louisiana. Copeland is the former sole shareholder of the stock of American International Gaming Association ("AIGA"). AIGA was a Louisiana corporation whose principal office was located in Jefferson Parish, Louisiana; AIGA was also an applicant seeking authorization to conduct gaming activities on a riverboat in accordance with the provisions of the Louisiana Riverboat Economic Development and Gaming Control Act (hereinafter "the Original Act"), LSA-R.S. 4:501, *et seq.* AIGA was dissolved effective December 5, 1996; all references to "plaintiff" in this Amended Petition shall refer to Copeland and/or AIGA.

3.

Made defendant herein is the Louisiana Gaming Control Board ("the Board"). The Board was created under the terms of the Louisiana Gaming Control Law, LSA-R.S. 27:1 *et seq.*, and has the capacity to sue and be sued. The Board is the successor-in-interest to the Commission.

4.

Made defendant is the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, Department of Public Safety and Corrections, which was created by the Original Act at LSA-R.S. 4:515. The Division has the capacity to sue and be sued.

5.

Venue for this action is appropriate in East Baton Rouge Parish pursuant to LSA-R.S. 4:506, LSA-R.S. 27:18, LSA-R.S. 27:46, LSA-R.S. 49:963-64, La. Code Civ. Proc. Art. 74, and former Commission Rule § 911.

6.

As an applicant seeking authorization to conduct gaming activities on a riverboat, and as a citizen of the state of Louisiana, plaintiff has a pecuniary interest in the licensing process and its integrity. Further, as detailed below, plaintiff has a specific pecuniary interest in the license awarded to Treasure Chest, for AIGA had sought a license to conduct gaming operations at the same location as Treasure Chest and should have received the license ultimately awarded to Treasure Chest.

7.

Under the Original Act, the Commission had the authority to issue rules "providing for and determining the following:"

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 286 of 344

(a)     The authorized routes of a riverboat upon designated rivers or waterways, the duration of riverboat excursions, and the stops which a riverboat may make.

(b)     The minimum levels of insurance to be maintained by the licensees.

(c)     In consultation with the U.S. Army Corps of Engineers and the U.S. Coast Guard, binding emergency orders regarding the navigability of rivers in the event of extreme weather conditions, act of God, or other extreme circumstances.

(d)     Specification for the design, appearance, accommodations, and constructions of riverboats, except for designated gaming area surveillance facilities and systems.

(e)     The procedures for negotiable instrument transactions involving patrons, including limits on the circumstances and amounts of the transaction, and the establishment of forms and procedures for negotiable instrument transactions, redemptions, and consolidations.

(f)     Mandatory periodic inspections to assure that a riverboat, licensed under the provisions of this Chapter is of new construction.

(g)     That preferential treatment is given to Louisiana firms to the extent allowed by law in the procurement of all resources and goods used in the operation of a riverboat come from Louisiana and that a preferential treatment to the extent allowable by law in the awarding of contracts for services and entertainment is given to Louisiana firms and residents.

LSA-R.S. 4:511.  The Original Act also gave the Commission the power to hear and determine certain appeals relating to permits; make an annual report to the Joint Legislative Committee on the Budget; and reject unacceptable rules proposed by the Division.

8.

The Division, on the other hand, had the authority to "Issue, deny, condition or restrict licenses and permits" to conduct riverboat gaming activities.  LSA-R.S. 4:518(2).  The Division had the statutory authority to issue no more than 15 licenses.  LSA-R.S. 4:525.  No more than six of these licenses could be issued for riverboats in any one given parish.

9.

Purportedly acting under its rulemaking authorization contained in the Original Act and the Administrative Procedure Act, the Commission promulgated rules and regulations that were published in Volume 19 of the Louisiana Register.  These rules were readopted as emergency rules on June 18, 1993, and became finally effective on July 20, 1993.  Upon information and belief, a draft version of these rules guided the Commission's actions prior to June 18, 1993.

10.

Commission Rule § 303 is entitled "Application for Certificate of Preliminary Approval," and provides that "each person seeking approval of riverboat plans" must "submit for advance approval of the Commission an application for a Certificate of Preliminary Approval" (a "Certificate").

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 287 of 344

11.

Commission Rule § 315, entitled "Criteria for Commission Action," sets forth the standards that the Commission must use in deciding whether to approve an application for a Certificate. Section 315 states that the Commission "shall evaluate each application based on the information provided therein. The commission shall approve those application for certificate [sic] of preliminary approval it deems to be in the best interest of the state and locale of the proposed operation. . . . "

12.

On December 11, 1992, AIGA submitted its application to the Commission for a Certificate of Preliminary Approval for a proposed riverboat route and other operations at the Kenner Laketown Harbor Park on the shores of Lake Pontchartrain. AIGA submitted a second application form on February 22, 1993 containing supplemental information.

13.

Commission Rule 303 required applicants to remit to the Commission an application fee of "$25,000 for the application and $5,000 to defray the expenses of the commission in analyzing and evaluating an application for certificate." AIGA paid the necessary $30,000 to the Commission along with its application.

14.

On February 14, 1993, AIGA applied for a gaming license from the Division and submitted to the Division the filing fee of $50,000 required to fund its background investigation into license applicants.

15.

Treasure Chest submitted an application for a Certificate to the Commission on March 8, 1993. Like that submitted by AIGA, Treasure Chest's application proposed to locate its gaming riverboat at Kenner's Laketown Harbor Park.

16.

On March 26, 1993 the Commission held a public hearing on the Treasure Chest application to operate a gaming riverboat. On April 29, 1993, subsequent to its public presentation before the Commission, Treasure Chest filed a modification to its application for a Certificate; this modification proposed locating its gaming riverboat at Rivertown, U.S.A. on the banks of the Mississippi River in Kenner. No hearing was ever held on the feasibility or suitability of this site as a location to base a gaming riverboat.

17.

On June 4, 1993, the Commission held a public hearing at which AIGA made a presentation on its application for a Certificate.

w:\djm\18457\5201\petition.app

- 4 -

18.

Upon information and belief, the Commission received a total of 43 applications for Certificates; six of these applications asked for preliminary approval to operate a gaming riverboat in Kenner, Louisiana.

19.

The Commission held a meeting on June 18, 1993. By that date, it had approved eight applications for Certificates; none of these eight approved applications involved proposals to locate a gaming riverboat in Kenner. This meeting was, according to Chairman Pickering's transcribed comments, to "choose seven out of the remaining thirty-five [applications]. Twenty-eight will go by the wayside." Although neither the Act nor the Commission's rules provided any numerical limitation on the number of Certificates that could be issued by the Commission, Pickering noted the Commission's belief that it could only approve fifteen applications by stating that "obviously, once we have chosen seven of those [remaining thirty-five] boats, there will be no need to go any further as there is nothing this commission can do at that point." Further, after seven boats were ultimately approved on June 18th, Chairman Pickering stated "That gives us seven boats. I assume there is no reason to consider any other boats."

20.

The Commission then voted on eight applications for Certificates at the June 18th meeting, and approved seven applications; the Treasure Chest application for a Certificate of Preliminary Approval of its Rivertown location was one of those applications that was approved. The Commission did not grant AIGA a Certificate.

21.

The Commission issued no rules delineating how it would decide which of the 43 applicants would receive Certificates. Upon information and belief, none of the 43 applicants was ever told why their applications were either approved or rejected. Further, upon information and belief, the Commission did not conduct an independent, comparative analysis of the applicants.

22.

On November 8, 1992, although its application for a Certificate had already been granted based on its submission of the Rivertown site as its gaming riverboat's docking location and base, Treasure Chest sought permission to modify its Certificate to move the site of its proposed riverboat route and operations back to Lake Pontchartrain as called for in the original Treasure Chest application. Treasure Chest's request for modification came for

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 289 of 344

hearing before the Commission on November 13, 1993. Although AIGA objected to Treasure Chest's request for a modification, the Commission granted Treasure Chest's request

23.

The Division issued licenses to exactly the same 15 entities that had previously been given a Certificate by the Commission; Treasure Chest itself, for example, subsequently received a license from the Division on May 17, 1994. Upon information and belief, the Division never reviewed or considered a license application unless and until the applicant received a Certificate from the Commission.

24.

In merely issuing licenses to the 15 entities that had previously been given Certificates, the Division improperly abrogated the duty to independently issue licenses that had been delegated to it by the Louisiana legislature. The Division did not rely on any objective criteria; did not conduct any comparative analysis of competing applicants; and did not prepare any documents evidencing or relating to its rationale in awarding licenses.

25.

The Original Act was silent concerning what guidelines or criteria would be used by the Division in selecting who would receive a license in the event more than 15 applicants existed.

26.

In addition, upon information and belief, the Division did not promulgate any rules delineating how it would go about deciding which of the 43 applicants would receive the 15 licenses authorized by the legislature, and did not embrace any objective criteria. Rather, it simply allowed the Commission to make the decision for it. Although the Division has issued rules discussing the criteria to be used in determining an applicant's suitability, none of these rules discuss how the Division would rank multiple applicants for the finite number of licenses.

27.

On August 21, 1996, the Louisiana First Circuit Court of Appeal rendered a decision holding that the Commission "exceeded its authority in promulgating certain of its rules." Consequently, the First Circuit held that Commission Rules 301-331, 503 through 509, 701 through 705, and 717 were "null, void, and without effect," and prohibited "any further application of them." *State of Louisiana v. Louisiana State Police Riverboat Gaming Enforcement Division,* 694 So. 2d 316, 322-23 (La. App. 1st Cir. 1996). Among the rules that the First Circuit declared to be null and void were the entire set of rules providing for the issuance of Certificates of Preliminary Approval, as well as those setting forth the fees for applying for a Certificate.

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 290 of 344

28.

To date, plaintiff has received neither a Certificate or a License. AIGA was a suitable applicant for a license, and plaintiff avers that, had the Division conducted an independent evaluation of the competing applicants, AIGA should have received a license to conduct gaming activity on a riverboat.

## COUNT ONE--APPEAL OF ACTIONS TAKEN BY THE DIVISION

29.

Copeland appeals the following actions taken by the Division pursuant to LSA-R.S. 4:548, LSA-R.S. 27:89, and the Louisiana Administrative Procedure Act, LSA-R.S. 49:950 *et seq.*: (1) its issuance of a license to Treasure Chest, and (2) its constructive denial of a license to plaintiff.

30.

Upon information and belief, the Division abrogated the authority granted to it by the legislature to issue licenses by allowing the Commission to usurp this process. Instead of independently determining which applicants deserved a license, the Division simply awarded licenses to those applicants that had previously received Certificates from the Commission. Because the Division did not properly exercise the authority granted to it by the legislature, the license issued to Treasure Chest is null and void.

31.

Plaintiff submits that the Division should be required to hold a hearing into his suitability to conduct gaming operating on a riverboat, and should therefore award him the license previously granted to Treasure Chest.

## COUNT TWO--DECLARATORY JUDGMENT

32.

Copeland respectfully submits that he is entitled to a declaratory judgment that the license to conduct gaming activities on a riverboat that was originally granted to Treasure Chest is null, void, and without continuing effect. Upon information and belief, the Division abrogated the authority granted to it by the legislature to issue licenses by allowing the Commission to usurp this process. Instead of independently determining which applicants deserved a license, the Division merely awarded licenses to those applicants that had previously received Certificates from the Commission. Because the Division did not exercise the authority granted to it by the legislature and never conducted an independent analysis of the competing applicants, the license issued to Treasure Chest is null and void.

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 291 of 344

33.

Further, as detailed below, the application process violated plaintiff's constitutional rights to due process and equal protection. Consequently, plaintiff is entitled to a declaratory judgement that the entire application process was flawed, and the license awarded to Treasure Chest, is null and void.

### COUNT THREE--VIOLATIONS OF CONSTITUTIONAL RIGHTS

34.

Plaintiff respectfully submits that the above enumerated actions taken by the Division violated his due process rights under the Fourteenth Amendment to the United States Constitution, as well as his rights secured by Art. I, Sec. 2 of the Louisiana Constitution. Procedural due process required that the Division's selection of who would be awarded a license be made in accordance with ascertainable standards, and not be left to the arbitrary and unfettered discretion of the Division.

35.

Plaintiff respectfully submits that the above enumerated actions taken by the Division violated his equal protection rights under the Fourteenth Amendment to the United States Constitution, as well as his rights secured by Art. I, Sec. 3 of the Louisiana Constitution. Equal protection required that the Division's selection of who would be awarded a license be made in accordance with ascertainable standards, and the Division had to adopt rules containing guidelines providing for the issuance of licenses to the applicants it considered the most worthy. In failing to delineate how it would analyze competing applications, the Division therefore deprived plaintiff of his rights to equal protection under the law.

36.

The actions of the Division were taken under color of state law, and deprived Copeland of rights, privileges, and immunities secured by the Constitution and laws of the United States. As a result, the Division's actions also constitute a violation of 42 U.S.C. 1983.

37.

The actions of the Division in awarding a license to Treasure Chest, which license it has held continuously since May 17, 1994, have resulted in continuous damages to plaintiff and constitute a continuing tort.

38.

The Division's violations of plaintiff's constitutional rights and/or Section 1983 entitle Copeland to monetary damages from the Division that are reasonable in the premises, but Copeland itemizes these damages as including, but not being limited to, lost past and future

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 292 of 344

profits; loss of reputation and goodwill; all expenses he has incurred; and attorney fees pursuant to 42 U.S.C. 1988.

COUNT FOUR--RETURN OF FEES PAID TO THE COMMISSION

39.

As the First Circuit Court of Appeal has found, the Commission had no authority to issue Certificates, and similarly had no authority to charge applicants fees in connection with the issuance of those Certificates. Plaintiff is therefore entitled to a refund of all fees paid by AIGA to the Commission.

COUNT FIVE--RETURN OF FEES PAID TO THE DIVISION

40.

Plaintiff is entitled to a refund of all fees paid by AIGA to the Division. As detailed above, the Division's issuance of licenses was a foregone conclusion; it merely awarded licenses to those entities that had obtained Certificates from the Commission. As a result, there was no justification for it to expend any monies in performing a background check on AIGA.

JURY DEMAND

41.

Plaintiff respectfully prays for a trial by jury.

**WHEREFORE,** premises considered, plaintiff Alvin C. Copeland prays that this amended petition be deemed good and sufficient, and that after due proceedings are had, there be judgment rendered herein in his favor and against the Louisiana Gaming Control Board and the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, Department of Public Safety and Corrections, which (1) declares that the license to conduct gaming activities on a riverboat that was originally granted to Treasure Chest Casino, Inc. is null, void, and without continuing effect; (2) awards plaintiff a fair hearing into whether he should be awarded a license to conduct gaming operations; (3) awards Copeland monetary damages in an amount reasonable in the premises from the Division for its violation of plaintiff's rights under the Louisiana and federal Constitutions, as well as its violation of 42 U.S.C. 1983; (4) awards plaintiff all monies paid by AIGA to the Commission and the Division; (5) awards Copeland all costs of these proceedings, as well as his attorney fees under 42 U.S.C. 1988; and (6) for all other legal and

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 293 of 344

equitable relief to which he may be entitled.

Respectfully Submitted,

SLATER LAW FIRM

Benj. R. Slater, III - 12127
Mark E. Van Horn - 14476
Donald J. Miester, Jr. - 20294

By _____

650 Poydras Street
Suite 2600
New Orleans, LA  70130
(504)523-7333
**ATTORNEYS FOR PLAINTIFF ALVIN C. COPELAND**

**PLEASE SERVE:**

(1)    The Louisiana Gaming Control Board (f/k/a The Louisiana Riverboat Gaming Commission), through its attorneys of record:

    L. Rand Dennis
    Thomas A. Warner
    339 Florida Street, Suite 500
    Baton Rouge, LA  70801

**- and -**

(2)    The Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, Department of Public Safety and Corrections, through its attorneys of record:

    L. Rand Dennis
    Thomas A. Warner
    339 Florida Street, Suite 500
    Baton Rouge, LA  70801



CERTIFIED TRUE COPY

19TH JUDICIAL DISTRICT
BATON ROUGE PARISH, LA

99 JAN 27 PM 3: 07

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 294 of 344

# EXHIBIT D

ALVIN C. COPELAND     *    DOCKET NO.

VERSUS     *    DIVISION " "

TREASURE CHEST CASINO,    *    JURY TRIAL REQUESTED
L.L.C., and ROBERT J. GUIDRY
          *

4646 607

**D**

COST OK Amt. 190.00

FILED: _____      _____ SEP 1 5 1999
              DEPUTY CLERK

BY _____
           DY. CLERK OF COURT

### Petition for Damages

**NOW INTO COURT,** through undersigned counsel, comes plaintiff Alvin C.

Copeland ("Copeland"), who respectfully represents the following:

#### The Parties

1.

Plaintiff Copeland, successor to American International Gaming Association, Inc.

("AIGA"), is a competent major and a resident of the Parish of Jefferson, State of Louisiana.

2.

At all pertinent times, AIGA was a Louisiana corporation with its principal place of

business located in the Parish of Jefferson, State of Louisiana; Copeland was the sole

shareholder of AIGA, and its net assets were transferred to him upon its dissolution. As

detailed below, AIGA was an applicant seeking authorization to conduct gaming activities on a

riverboat in accordance with the Louisiana Riverboat Economic Development and Gaming

Control Act (hereinafter the "Act"), LSA-R.S. 4:501, *et seq.*

3.

Made defendants are Treasure Chest Casino, L.L.C. ("Treasure Chest"), a Louisiana

limited liability company formed on August 27, 1993 that is registered to do and doing

business in the State of Louisiana; and Robert J. Guidry ("Guidry"), a person of the full age of

majority and a resident of Jefferson Parish, State of Louisiana. Defendant Robert J. Guidry

was an original member and manager of Treasure Chest, along with Dick J. Guidry. Upon

information and belief, Robert Guidry was also the President of Treasure Chest and/or

Treasure Chest Casino, Inc. All of the below-referenced acts by Robert Guidry were

REC'D O.B.

SEP 1 5 1999

undertaken in the course and scope of his position with Treasure Chest and/or Treasure Chest Casino, Inc., which gave him the actual and apparent authority to perform them; Robert Guidry's actions were also done in furtherance of these companies' business activities.

**Venue**

4.

As detailed below, the events and/or omissions giving rise to this action occurred in substantial part in this judicial district, and accordingly venue properly resides in this Court pursuant to La. Code Civ. Proc. arts 42, 73, and/or 74.

**Allegations Common to All Counts**

5.

As detailed below, on information and belief derived from (1) the factual basis of Robert Guidry's guilty plea in criminal case number 3:98cr00144-0, United States District Court for the Middle District of Louisiana (hereinafter "Guidry's guilty plea"), (2) the Superseding Indictment against Edwin Edwards, Stephen Edwards, Cecil Brown, Andrew Martin, Bobby Johnson, Gregory Tarver, and Ecotry Fuller in criminal case number 98-165, United States District Court for the Middle District of Louisiana, Section B-2 (hereinafter the "Edwards Indictment"), and (3) the Bill of Information for Conspiracy to Commit Extortion charged against Richard D. Shetler in criminal case number 98-142-A-M3, United States District Court for the Middle District of Louisiana (hereinafter the "Shetler Bill"), Copeland avers that there existed a scheme to corrupt the entire process for issuing riverboat gaming licenses under the Act (the "overarching corrupt conspiracy"). As detailed below, Treasure Chest and Robert Guidry joined, participated in, and engaged in overt acts in furtherance of the overarching corrupt conspiracy.

**The Guidry Scheme**

6.

During its existence from 1992 through early 1996, the Louisiana Riverboat Gaming Commission (the "Commission") was composed of seven members, all of whom were appointed by Edwin W. Edwards while he was the Governor of the State of Louisiana. The

-2-

Act enabled the Gaming Commission to issue rules providing for and determining certain enumerated matters pertaining to riverboat gaming activities.

7.

The Act did not give the Commission the authority to grant riverboat gaming licenses. Rather, the Act gave that power to the Riverboat Gaming Enforcement Division of the Gaming Enforcement section of the office of State Police, Public Safety Services, Department of Public Safety and Corrections (the "Division"). Under the Act, the Division was granted the exclusive authority to "Issue, deny, condition, or restrict licenses and permits" to conduct riverboat gaming activities ("licenses"). LSA-R.S. 4:518(2). The Division was authorized to issue no more than 15 licenses. LSA-R.S. 4:525. Pursuant to this authority, the Division was empowered to conduct investigations and hearings, from which it alone was to determine the suitability of the applicant to be awarded a riverboat gaming license.

8.

Although the Act gave the Division the sole power to issue licenses, the Commission nevertheless issued a set of rules providing for the issuance of Certificates of Preliminary Approval ("certificates") by vote of its members. These certificates purportedly demonstrated that the holders thereof were acceptable to the Commission and therefore should be candidates for actual licensure.

9.

On December 11, 1992, AIGA submitted its application to the Commission for a certificate, and submitted a second application form on February 22, 1993 containing supplemental information. The AIGA application proposed a riverboat route and related operations at the Kenner Laketown Harbor Park on the shores of Lake Pontchartrain. In conjunction with its application, AIGA submitted a check in the amount of $30,000.00, comprised of a $25,000.00 application fee and a $5,000.00 evaluation fee. On February 14, 1993, AIGA submitted to the Division the filing fee of $50,000.00 required to fund the Division's background investigation of applicants for a license. The AIGA application was the first submitted to the Commission that proposed to conduct riverboat gaming in Kenner, Louisiana, and was among the first submitted to the Division for approval.

-3-

10.

In connection with its application, AIGA retained a sophisticated group of gaming professionals, with extensive prior experience in casino operations in New Jersey and Nevada, both to coordinate activities necessary to obtain a certificate and license and to manage its proposed riverboat gaming operation. Plaintiff incurred approximately $2.2 million in expenses in preparing and processing AIGA's application for a license. Had plaintiff been aware of Guidry and the Treasure Chest's participation in the overarching corrupt conspiracy, plaintiff would not have incurred the expenses associated with the AIGA application.

11.

On or about February 9, 1993, Guidry formed Treasure Chest Casino, Incorporated (hereinafter "Treasure Chest, Inc."). Upon information and belief, Robert J. Guidry was the President and/or Chairman of the Board of Treasure Chest, Inc.

12.

On information and belief derived from the Edwards Indictment, on February 9, 1993 Guidry also paid Stephen Edwards $25,000.00 for legal services relating to the preparation of the Treasure Chest license application. Further, on information and belief, as the New Orleans Times-Picayune reported on December 5, 1994, "A Guidry-owned video poker company has paid Stephen Edwards $20,000," and "Treasure Chest paid $9,000 to a merchandising company of which Stephen Edwards was a director until he sold his interest in a settlement with the Ethics Commission, which was investigating whether the Governor's children could do business with riverboats." On information and belief, as the New Orleans Times-Picayune reported on December 9, 1997, "In all, Guidry paid Stephen Edwards $75,000 for his work in Guidry's various companies."

13.

Treasure Chest, Inc. submitted its application to the Commission on March 8, 1993, approximately three months after the AIGA application was submitted. The Treasure Chest, Inc. application proposed to locate its gaming riverboat at Kenner's Laketown Harbor Park. On March 26, 1993, the Gaming Commission held a public hearing in Baton Rouge, La. on the Treasure Chest, Inc. application to operate a gaming riverboat; this hearing occurred fewer

-4-

than three weeks after Treasure Chest, Inc. filed its application, thereby granting priority to the Treasure Chest, Inc. application over the application filed substantially earlier by AIGA. Treasure Chest, Inc. later filed a modification to its application for a certificate, which proposed re-locating the Treasure Chest, Inc.'s gaming riverboat from the Laketown Harbor Park site to Rivertown, U.S.A., on the banks of the Mississippi River in Kenner.

14.

On June 4, 1993, a public hearing was held in Baton Rouge, La. at which AIGA made a presentation to the Commission on its application for a certificate.

15.

The Commission held another meeting in Baton Rouge, La. on June 18, 1993. By that date, it had approved eight applications for certificates, although none of these eight approved applications involved proposals to locate a gaming riverboat in Kenner. At this meeting, the Chairman of the Commission stated that he had "been asked by the Governor to make one comment on his behalf, and that is that the City of Kenner has expressed that it really desires only one boat and that boat to be located on the river." In addition, at this meeting, the Commission rescinded the resolution that it had adopted on June 4th, which had stated that "a change of waterway" would be "more than a modification and requires a new application." The Commission then adopted a motion "that would allow subsequent changes to applications or status of those applications leaving basically ... discretion as to whether new or not at the discretion of the Chairman with the consent of the Commission." The Commission then voted on eight applications for certificates and approved seven of them; the Treasure Chest, Inc. application for a certificate for its Rivertown location was one of the applications that was approved. As a result, AIGA's application to operate a gaming riverboat at the Laketown Harbor Park site on the shores of Lake Pontchartrain was never considered or voted on by the Commission.

16.

On information and belief, as the New Orleans Times-Picayune reported on June 5, 1998, Governor Edwards "did more than appoint the members of Louisiana's Riverboat Gaming Commission. He also sent clear messages about which bidders he favored. For

-5-

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 300 of 344

example, Dr. Louis James, a former board member, has said he was called to the Governor's Mansion the day before the board was to award the last seven licenses in 1993. James has said Edwards gave him a typewritten list of about a dozen casino boats, including three that involved friends of Edwards."

17.

As detailed above, Treasure Chest Casino, L.L.C. was formed on August 27, 1993. On or about August 30, 1993, Boyd Kenner, a wholly owned subsidiary of Boyd Gaming, a publicly traded corporation domiciled in Las Vegas, Nevada, entered into a casino management agreement with Treasure Chest. Under this agreement Boyd Kenner would be paid a management fee representing ten (10%) percent of the Treasure Chest's net operating profit. In addition, on or about August 30, 1993, Boyd Kenner, Boyd Gaming and Treasure Chest entered into a subscription agreement wherein Boyd Kenner agreed to advance to Treasure Chest $10 million cash upon the granting of a riverboat gaming license to Treasure Chest. The commitment to advance those funds was guaranteed by Boyd Gaming. Subsequently, Boyd Kenner acquired a fifteen (15%) percent interest in Treasure Chest in exchange for a cash payment of $15 million.

18.

On November 13, 1993, subsequent to the approval by the Commission of the Treasure Chest, Inc. application for its Rivertown location, Treasure Chest sought permission to modify the previously filed application to move the site of its proposed route and operations to Lake Pontchartrain. The Commission granted this request over AIGA's objections. Despite the fact that it had been Treasure Chest, Inc. that had applied for the Certificate of Preliminary Approval, the Commission issued a certificate to Treasure Chest Casino, L.L.C. on March 15, 1994.

19.

On information and belief derived from the factual basis of Robert Guidry's guilty plea and/or the Edwards Indictment, Andrew Martin ("Martin"), a close friend, confidant, and associate of then-governor Edwin Edwards, held the title of "Executive Assistant" to Edwin Edwards during Edwards' fourth term as Governor. Beginning no later than April, 1994,

-6-

Martin solicited bribes and extortion payments on behalf of Edwin Edwards, and further demanded and received from Guidry and/or Treasure Chest monthly net payments to himself, Edwin Edwards, and Stephen Edwards of approximately $30,000.00 each, in exchange for Martin's, Edwin Edwards', and Stephen Edwards' influence and assistance with the Treasure Chest licensing procedure.

20.

On information and belief derived both from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, in or about April 1994, Robert Guidry, following a favorable decision regarding gaming suitability in connection with a video poker company Guidry owned, had conversations with Andrew Martin concerning the status of Guidry's efforts to obtain approval for his riverboat license from the LSP Gaming Division. At that time, Martin told Guidry that the Treasure Chest was not assured of getting LSP approval. Martin, however, stated that he could help Guidry with the licensing procedure pending before the LSP Gaming Division, but indicated by rubbing his fingers together that it would cost Guidry money for the assistance. Martin stated words to the effect that Governor Edwin Edwards owed him favors, and that he (Martin) would "cash in all my green stamps" to help Guidry. Martin further told Guidry that their assistance, to quote the Edwards indictment, "would cost Guidry 3% of gross revenue as per Louisiana statute, to be divided 1% each between Martin, Edwin Edwards, and Stephen Edwards."

21.

On information and belief, at the time Martin first contacted Guidry, the State Police had not set a date for the hearing on Treasure Chest's application, which was a prerequisite for obtaining a license.

22.

On information and belief derived both from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, in or about April or May 1994, Robert Guidry had other conversations with Andrew Martin in which Martin revised his demand on Guidry. Martin, stating words to the effect that, "you only go around once, I gotta get what I can get," stated that he and Edwin Edwards would accept approximately $100,000 per month to be split

-7-

between Martin, Edwin Edwards, and Stephen Edwards, and that payments should begin after Edwin Edwards finished his term as Governor. Guidry agreed to this arrangement, provided that Edwin Edwards himself would confirm the deal with Guidry.

23.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, Guidry met with Martin and Edwin Edwards in a hotel meeting room. Guidry and Edwin Edwards had a conversation while Martin guarded the door. Edwin Edwards asked Guidry if he agreed with the deal proposed by Martin. When Guidry indicated he did, Edwin Edwards responded that they had a deal and assured Guidry that Guidry would get his licensing hearing.

24.

On information and belief, as the New Orleans Times-Picayune reported on December 9, 1997, "During Guidry's effort to license the Treasure Chest, Governor Edwards urged State Police to grant the proposal a licensing hearing, State Police sources have said, a critical step in the approval process."

25.

The State Police held a hearing into Treasure Chest's application in Baton Rouge, La. on May 17, 1994. At this hearing, the following exchange took place between Captain Mark Oxley of the Division and Robert Vosbein, counsel for Treasure Chest, who was under oath:

Capt. Oxley: And are you testifying that there are no elected public officials doing business with Treasure Chest?

Mr. Vosbein: That's correct.

This statement was made by Mr. Vosbein as agent for Treasure Chest and/or Guidry; on information and belief, it was based on information supplied to him by Treasure Chest and/or Guidry. Treasure Chest's representations, through its agent Mr. Vosbein, violated LSA-R.S. 27:70 C. in failing to disclose Treasure Chest's relationship with Edwin Edwards, which was prohibited by LSA-R.S. 27:96 A.

-8-

At this same hearing, Captain Oxley and Lieutenant Colonel Kenneth Norris of the Division asked Robert Vosbein and Robert Guidry, both of whom were under oath, the following:

Capt. Oxley:   Is or was anyone actually involved in the applicant's business operations in any position or manner who is not listed in the application, who has not since been disclosed and who should be disclosed now?

Mr. Guidry:   Would you ask that question again please?

Mr. Vosbein:   You're talking about this application?

Capt. Oxley:   We're talking about Treasure Chest Casino.

Mr. Guidry:   Would you ask it again, please?

Capt. Oxley:   Yes, sir. Is or was anyone actually involved in the applicant's business operations in any position or manner and who is not listed in the application? Or has there been anyone not since disclosed that should be disclosed to the Division now?

Mr. Vosbein:   There is no such person.

Mr. Guidry:   I agree with that.

Capt. Oxley:   Is there anyone involved in Treasure Chest Casino who could not fulfill the requirements for a finding of suitability to the best of your knowledge?

Mr. Guidry:   No, sir, no one.

Mr. Vosbein:   Not to the best of my knowledge.

Capt Oxley:   To the best of your knowledge, is there any information or material fact that has not been furnished to State Police, that has not otherwise come to light that may yet be uncovered by the Division or others that may tend to cast doubt or reflect negatively on the qualifications of the applicant or anyone with an interest which you should bring forward at this point in time to the attention of the Division?

Mr. Guidry:   No, sir, no one.

-9-

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 304 of 344

Mr. Vosbein: Not to my knowledge.

Capt. Oxley: Thank you.

Lt. Booth: Point of clarification, please, Captain. Your first question dealing with disclosures, was that as to persons or firms? I misunderstood the answer.

Capt. Oxley: That was anyone, I suppose you could say person or persons in a legal sense, or in any other sense. And you answered negatively. Correct?

Mr. Guidry: That's right.

Lt. Booth: No individual or entity. Is that correct?

Mr. Vosbein: That's correct.

Lt. Booth: Okay. Thank you.

Mr. Guidry's testimony, which failed to reveal his association with Edwin Edwards as set forth herein, was in violation of LSA-R.S. 27:70 C.

27.

In conjunction with his submittal of the Treasure Chest application for a license, Guidry executed an "Affidavit of Full Disclosure" on February 26, 1993, wherein Guidry averred, in pertinent part:

... except as reported in the Application, I have no agreements or understandings with any person or entity and no present intent to pay any sums of money or give anything of value as, including but without limitation, a finder's fee or commission to any person or entity related to the acquisition of any interest in the Application ...

Pursuant to LSA-R.S. 27:70 C., Guidry had a continuing duty to render a full and accurate disclosure of his association with Edwin Edwards as set forth herein. Upon information and belief, Guidry has never disclosed this association, and has therefore violated his duty under LSA-R.S. 27:70 C.

28.

On May 17, 1994, the Division granted a license to Treasure Chest. On information and belief, Treasure Chest would not have received a license but for the overarching corrupt conspiracy.

-10-

29.

Plaintiff avers that, but for the overarching corrupt conspiracy, AIGA would have obtained a license to conduct gaming activities on a riverboat pursuant to the Act, and was suitable to obtain such a license; AIGA, in fact, was granted a video gaming owner's license by the State of Louisiana in June 1994 and a gaming license by the State of Colorado in March 1995. Further, had AIGA known of the overarching corrupt conspiracy, it would not have expended the funds necessary to prepare and submit its application.

30.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, in or about December, 1995, Guidry contacted Andrew Martin regarding his problem with obtaining State Fire Marshal approval for his entertainment barge at the Treasure Chest site. Guidry thereafter met with Martin and, at that meeting, Martin told Guidry that he (Martin) could assist with obtaining Fire Marshal approval. In exchange for his help with approval, Martin demanded that he be given a 2% interest in the net profits of the Treasure Chest and a high ranking employment position with the Treasure Chest after leaving office as Edwin Edwards' Executive Assistant. These payments were in addition to the payments Guidry previously agreed to make to Martin, Edwin Edwards, and Stephen Edwards. Guidry agreed to this arrangement. Shortly thereafter, Guidry received Fire Marshal approval for the entertainment barge.

31.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, commencing in February 1996 and continuing through April, 1997, Guidry made monthly cash payments in the approximate amount of $100,000.00, to be split evenly among Edwin Edwards, Stephen Edwards, and Martin, as payment for their influence and assistance with the Treasure Chest licensing procedure before the LSP Gaming Division. From February 1996 through approximately October 1996, Guidry paid the full $100,000.00 to Martin. Thereafter, Guidry began paying the Edwardses their shares directly, and paid Martin his share separately, often by leaving the cash payments in trash cans or dumpsters for Martin to retrieve.

-11-

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 306 of 344

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about November 6, 1996, Guidry cashed a check in the amount of $65,000.00.  On the same day, during a telephone conversation recorded by the Federal Bureau of Investigation ("FBI"), Guidry and Edwin Edwards made plans to meet each other along with Stephen Edwards.  At the meeting, Guidry delivered the cash to Edwin Edwards and Stephen Edwards as part of the payoff agreement.

33.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about November 13, 1996, during a telephone conversation recorded by the FBI, Martin arranged a meeting between himself, Guidry, and Edwin Edwards to take place on the following Monday in Baton Rouge, in order to discuss the proposed arrangement which Martin sought to execute with Guidry regarding employment with the Treasure Chest and to discuss Martin's receipt of a 2% interest in the net profits from the Treasure Chest in exchange for his assistance with the Fire Marshal.

34.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about November 19, 1996, during a telephone conversation, Edwin Edwards told Robert Guidry that Andrew Martin wanted to execute a "contract" to document Guidry's secret obligation to give Martin a 2% ownership in the Treasure Chest in exchange for Martin's assistance in obtaining Guidry's license.

35.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about November 21, 1996, during a telephone conversation, Andrew Martin and Edwin Edwards discussed the arrangement which Martin wanted Robert Guidry to execute.  Edwards informed Martin that Guidry had "kept his word" to all of them, referring to Guidry's agreement to pay them secretly.  Edwards further warned Martin that they didn't want to push Guidry too hard and thereby anger him, giving him an excuse to change his mind, and according to Edwards, "risk what's happening," which was, to quote the

-12-

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 307 of 344

Edwards Indictment, "a reference to the payoff split in which Guidry was funneling casino proceeds to Edwin Edwards, Stephen Edwards, and Martin as part of their agreed payoff."

36.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about January 9, 1997, Martin expressed to Edwin Edwards his understanding that Robert Guidry had agreed to give him a contract to "go to work for him" (referring to Guidry) after Edwin Edwards left office as Governor of Louisiana. Edwin Edwards made reference to the fact that " . . . if it wouldn't be for Andrew [Martin] he [Guidry] wouldn't have a boat . . .," referring to the Treasure Chest. Martin reminded Edwards that he [Martin] previously approached Edwards on Guidry's behalf for "all my green stamps from all that [sic] times I helped you [Edwards] in the past...." During the conversation, Martin told Edwards that his financial interest in obtaining the payments and 2% of the Treasure Chest from Guidry was his "retirement plan." Edwin Edwards went on to tell Martin that he knew Guidry paid Stephen Edwards $100,000.00 for Guidry's license, and further told Martin that even though Guidry had hired Stephen Edwards, they were "all . . . in the thing together." At that time, Edwin Edwards stated: " . . . it's not a question of whether you or Andrew or Stephen or me. This is something we worked out all for ourselves," referring to the licensing of the Treasure Chest and the receipt of cash from Guidry as payment for their assistance in helping Guidry obtain his license.

37.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about April 8, 1997, Guidry cashed a check in the amount of $65,000.00. On the same day, during a recorded telephone conversation, Edwin Edwards and Stephen Edwards agreed to meet Guidry at the Highland Road Café in Baton Rouge, Louisiana. At the meeting, Guidry delivered the cash to Edwin Edwards and Stephen Edwards as part of their agreed payoff.

38.

On information and belief, the Treasure Chest's net operating profits have exceeded $100 million for calendar years 1996 and 1997.

-13-

On or about October 27, 1997, Boyd Louisiana, L.L.C., a Nevada limited liability company ("Boyd Louisiana"), along with another wholly owned subsidiary of Boyd Gaming, purchased the interest in Treasure Chest not owned by Boyd Kenner for approximately $113 million from the selling members, namely Robert J. Guidry, Dick J. Guidry, Robert A. Vosbein, Pam Olson, Robert J. Guidry Family Trust, and Dick J. Guidry Family Trust. The Treasure Chest's "intangible license rights," which had been obtained solely as a result of the overarching corrupt conspiracy, were valued at $85 million of the total purchase price. On information and belief, defendant Robert J. Guidry individually received $73 million from this transaction; the remaining $12 million was distributed among the other selling members. As a result of this transaction, Treasure Chest became and remains a wholly owned subsidiary of Boyd Gaming.

Boyd Gaming's 1998 10K Statement, filed with the United States Securities and Exchange Commission, states that net revenues in Boyd Gaming's Central Region "increased 34% during the quarter ended June 30, 1998 compared to the quarter ended June 30, 1997 primarily as a result of the acquisition of Treasure Chest in October 1997. . . ." Boyd Gaming's 1998 10K Statement continues that "Treasure Chest produced net revenues for the Company of $31.2 million during the quarter ended June 30, 1998 . . . ." Further, Boyd Gaming's 1999 10K Statement provides that "Treasure Chest produced net revenues for the Company of $124 million during 1998 versus $26 million during the prior year."

### The Shetler Scheme

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, Richard D. Shetler ("Shetler") was hired in June 1993 by Players Lake Charles Riverboat Casino, Inc. ("Players"), as a consultant on a three (3) year retainer for approximately $60,000 per year, and upon the opening of the riverboat his salary would increase to $100,000 per year.

-14-

42.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on December 6, 1993, Players was granted a license to operate, and did open, a riverboat casino in Lake Charles, La.

43.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, pursuant to a "Compact" signed by Louisiana Governor Edwin W. Edwards and approved by the U.S. Division of Indian Affairs, Washington, D.C., the Coushatta Indian Tribe had received approval to open a casino on its Reservation, located approximately 50 miles from Lake Charles. During 1993/1994, the Coushatta Tribe sought approval from the U.S. Division of Indian Affairs to build the casino on the newly acquired 104 acres of land located near the Reservation. In order for the Tribe to get this approval, the Governor of Louisiana had to concur that these 104 acres were "contiguous" to the Reservation.

44.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, Players sought authorization from the Louisiana Riverboat Gaming Commission to purchase the Star Riverboat Casino in New Orleans, assume its license, and transfer the Star riverboat to a berth next to Players' original riverboat in Lake Charles. This transfer was approved by the Gaming Commission in February 1995.

45.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, Shetler's still valid contract with Players was superseded on December 1, 1994, by a seven (7) year retainer for $126,000 per year, complete with a $250,000 bonus and $200,000 loan.

46.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, from payments received by Players and related entities, Shetler gave Stephen Edwards cash and other property for Stephen Edwards and Edwin Edwards in the approximate amount of $550,000.

-15-

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, as explained herein, to quote the Shetler Bill, "from approximately April 1993 through April 1997, in the Middle District of Louisiana and elsewhere, Richard D. Shetler did knowingly, willfully and unlawfully combine, conspire, confederate, and agree with Stephen Edwards and Edwin Edwards to unlawfully obstruct, delay, and affect commerce by extortion, that is, by obtaining property, namely payments from Players, with Players' consent, induced by fear of economic loss, and under color of official right."

48.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in April or May 1993, Stephen Edwards told two Players officials to hire Shetler as a consultant. Edwards stated that if Players wanted to get its license approved by the Louisiana State Police, Players would have to pay Shetler $300,000; if Players wanted to have a monopoly in Lake Charles, it would have to pay Shetler $600,000. On or about June 6, 1993, Players hired Shetler as a consultant on terms including a three-year retainer at $100,000 per year.

49.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in or about August 1993, Shetler recorded a telephone conversation he had with Stephen Edwards. During the conversation, they discussed a $50,000 bonus Players was going to pay to Shetler to "look at these other sites" for gaming riverboats. Stephen Edwards explained to Shetler the bonus was a "way for them to pay you because they know that if they are paying you and you're happy, then you'll keep me from fucking with them."

50.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, during the same August 1993 recorded conversation, Shetler and Stephen Edwards discussed other contracts which various associates and family members of Stephen Edwards were to obtain in connection with Players.

-16-

51.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment,
commencing in May 1994 and continuing through and including September 1995, Shetler
caused another individual to pay approximately $75,000 for windows, air conditioning units,
kitchen appliances, and a metal shed to be delivered and installed in Stephen Edwards' house
and other residences.

52.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment,
in July or August 1994, Shetler, upon the instructions of Stephen Edwards, related to Players
that, in return for separate payments of $250,000 and $200,000, Governor Edwin Edwards
would take official action to hinder or prevent the opening of the Coushatta Indian Tribe
Casino, and Stephen Edwards would keep other riverboats from establishing in Lake Charles.

53.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment,
on or about November 23, 1994, in return for official action taken by Governor Edwards
regarding the Coushatta Tribe's Casino, Shetler purchased in his name from Don Shetler
Chevrolet, Inc., Crowley, LA. a $24,078 1994 Chevrolet Suburban. The car was then taken
for use at Governor Edwards' condominium in Vail, Colorado.

54.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment,
on or about December 1, 1994, in response to Shetler's demands, Players revised his contract,
·replacing it with a seven year retainer for $126,000 per year, complete with a $250,000 bonus
and a $200,000 loan.

55.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment,
in January 1995, Shetler, upon the instructions of Stephen Edwards, related to Players that, in
return for $250,000 per year, Governor Edwards would approve the transfer of the Star
Riverboat.

-17-

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 312 of 344

56.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in January 1995, Shetler entered into an agreement with another company with an economic interest in the approval of the Star transfer, whereby he was to receive 37.5 cents per passenger off the two Players boats.

57.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in or about February 1995, in connection with the Star transfer, Players agreed to pay a legal retainer to Stephen Edwards for $15,000 per month. Players, thereafter, paid a total of $150,000 pursuant to this agreement.

58.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about February 8, 1995, the Gaming Commission approved both the Star transfer and the establishment of the Crown Casino riverboat in Lake Charles.

59.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in or about August 1995, representatives of Players met with Edwin Edwards at the Governor's Mansion. The purpose of the meeting was to discuss a proposed Players riverboat casino in Shreveport. During the meeting, Edwards protested that although people said it was necessary for gaming companies to do business with his friends, relatives, and associates, that was not, in fact, true. Edwards then stated to the Players representatives that there were local people who could advance their business ventures, while at the same time gesturing with his finger toward an associate of his who was sitting nearby.

60.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about September 27 - 29, 1995, Richard D. Shetler accompanied Stephen Edwards and his wife and an interior decorator to various furniture showrooms in Dallas, Texas. The Edwardses selected and received furniture totaling approximately $74,267, a fireplace mantle at $2,250, and a chandelier for $1,957. Shetler paid for these items.

-18-

## 61.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about September 5 through 8, 1995, Shetler cashed six checks totaling $20,000, payable to "cash." He thereafter made a $20,000 cash payment to Stephen Edwards for Governor Edwin Edwards.

## 62.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about February 25, 1997, at their law offices, Stephen Edwards told his father Edwin Edwards that Shetler would come tomorrow "with your money."

## 63.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, the following day, February 26, 1997, Stephen Edwards met in his law office with Shetler. Stephen Edwards asked Shetler how much money he brought, and Shetler replied "47." They discussed that amount of revenue the riverboat made and the number of customers who had boarded the riverboat during the period. They then discussed possible methods through which Shetler could secretly purchase a $25,000 van for Stephen Edwards, who stated that the van deal could be structured so Shetler could use it "once a year just like the deal (referring to the Suburban) you had with my dad." Since the Chevrolet Suburban was at the Vail condo, Stephen Edwards told Shetler that "for the purposes of legitimacy, I think what you ought to do is make plans of calling ... for you to go up there and spend some time with him, or go up and use the place when he ain't there ... but you really ought to go up there at least once."

## 64.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about March 13, 1997, Shetler brought approximately $4,634 in cash to Stephen Edwards' office for Edwin Edwards. After entering the office, he told Stephen Edwards that he had put the money "in the bottom drawer," stating that the money was for "your Dad."

-19-

65.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about March 18, 1997, Richard D. Shetler purchased in Stephen Edwards' name from Don Shetler Ford, Inc., Sulphur, LA., a 1997 Ford Club Van.

66.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, from August 1996 through April 1997, Shetler delivered approximately $50,000 in cash for Edwin W. Edwards.

## Count One -- Racketeering Influenced and Corrupt Organizations Act

67.

On information and belief, Edwin W. Edwards, Stephen Edwards, Andrew Martin, Robert Guidry, Treasure Chest, and other unnamed persons and entities (collectively, "RICO persons") constituted an association-in-fact enterprise ("RICO enterprise") as defined in the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO").

68.

On information and belief, the RICO enterprise was engaged in and its activities affected interstate and foreign commerce.

69.

On information and belief, the RICO persons conducted and participated in the conduct of the affairs of the RICO enterprise through a pattern of racketeering activity in East Baton Rouge and other parishes, comprised of repeated acts of bribery (in violation of 18 U.S.C. § 1952 and LSA - R.S. 14:118), extortion (in violation of 18 U.S.C. § 1951, LSA - R.S. 14:66 and LSA - R.S. 14:120), wire fraud (in violation of 18 U.S.C. § 1343), and mail fraud (in violation of 18 U.S.C. § 1341)(collectively, "predicate acts") extending over a period of years, in violation of 18 U.S.C. § 1962(c).

70.

On information and belief, the RICO persons, through a pattern of racketeering activity, acquired and/or maintained an interest in and/or control of enterprises engaged in, and

-20-

the activities of which affected, interstate and foreign commerce, namely entities involved in riverboat gaming in Louisiana, in violation of 18 U.S.C. § 1962(b).

71.

On information and belief, the RICO persons conspired to violate 18 U.S.C. §§ 1962(b) and 1962(c), in violation of 18 U.S.C. § 1962(d).

72.

Copeland was injured in his business and property, which injury was proximately caused by reason of the RICO persons' violations of 18 U.S.C. §§ 1962(b), 1962(c) and 1962(d), entitling him to recover threefold the damages he has sustained and the cost of the instant suit, including a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c). Certain of the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the RICO enterprise are detailed in the following paragraphs.

73.

On information and belief, the RICO enterprise, which began prior to defendant Edwin Edwards' fourth and final term as Governor, centered around Edwin Edwards and the office of the Governor of Louisiana, and further depended upon the political and economic power, influence, control and notoriety of Governor Edwards to operate and to succeed in its purposes and objectives.

74.

On information and belief, the enterprise continued in existence through and beyond the conclusion of Edwin Edwards' final term as Governor, until and including the date of this Complaint. Thus, the RICO enterprise and its associates continued to exploit the political and economic power, influence, control, and notoriety of Edwin Edwards to operate and succeed in its purposes and objectives.

75.

On information and belief, Edwin Edwards and Stephen Edwards were the center or nucleus of the RICO enterprise. Other members and associates of the RICO enterprise would and did participate in various aspects of the RICO enterprise's purposes, objectives, and ventures, as sanctioned by Edwin Edwards and Stephen Edwards.

-21-

76.

On information and belief, to avoid detection by law enforcement and unmasking before the public, Edwin Edwards went to great lengths to ensure that his participation in the RICO enterprise and its racketeering activity remained hidden and insulated by having the other members and associates of the RICO enterprise perform overt acts in furtherance of the RICO enterprise's racketeering activity.

77.

The RICO persons fraudulently concealed their illegal activities, and plaintiff neither knew nor, in the exercise of due diligence, could reasonably have known of the offenses committed by the members of the RICO enterprise.

78.

On information and belief, the members and associates of the RICO enterprise would and did use their close relationships with Edwin Edwards and Stephen Edwards, thereby trading upon the Edwin Edwards name, notoriety, and power, in order to exercise influence and leverage over the victims of the RICO enterprise.

79.

On information and belief, commencing in or about 1993 and continuing through 1994, Edwin Edwards, on several occasions, assisted certain riverboat applicants in obtaining licenses from the Division by, among other things, demanding that the Division schedule speedy licensing hearings for those applicants he favored.

80.

On information and belief, on or about April 23, 1997, Edwin Edwards was interviewed by a Special Agent of the FBI and a Special Agent of the Internal Revenue Service (the "IRS") concerning the riverboat licensing process. Edwin Edwards stated that, in his opinion, legislators "got their friends on the Commission" to award Certificates of Preliminary Approval to certain riverboat applicants. Edwin Edwards stated that he appointed the Co-Chairman of the Gaming Commission at the request of a state legislator. Edwin Edwards also stated that he appointed other members of the Gaming Commission at the request of legislators who were close political allies of Edwin Edwards. Edwin Edwards also admitted to giving a

-22-

member of the Gaming Commission a list containing the riverboat applicants he wanted to receive certificates.

81.

Defendant Robert J. Guidry and/or Treasure Chest, are liable unto plaintiff Copeland for damages resulting from the RICO persons' violations of 18 U.S.C. §§1962(b),(c) and (d), including treble damages, attorneys' fees, court costs, litigation expenses, and all other legal and equitable relief.

**Count Two -- Unfair Trade Practices**

82.

The actions of defendants Robert J. Guidry and/or Treasure Chest, as outlined above, were unfair, immoral, unscrupulous, and violated public policy; defendants' actions were also deceptive. As a result, defendants Guidry and/or Treasure Chest are liable to plaintiff, a business competitor of Treasure Chest, for the unfair, deceptive, and illegal trade practices outlined above pursuant to the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, *et seq.* ("LUTPA").

83.

Upon information and belief, Treasure Chest has failed to notify the Division and/or the Gaming Control Board of the actions outlined above, which constitutes a violation of the Louisiana Gaming Control Law (including without limitation a violation of LSA-R.S. 27:70). This noncompliance is an independent violation of the LUTPA, and continues each day Treasure Chest fails to disclose to the Gaming Control Board the facts surrounding Treasure Chest's acquisition of its license.

84.

Defendants Robert J. Guidry and/or Treasure Chest are liable under the LUTPA for all damages sustained by the plaintiff, including without limitation his out of pocket costs, lost profits, attorneys' fees and costs, the value of Treasure Chest's gaming license, and the value of Treasure Chest's success.

-23-

## Count Three -- Fraud

### 85.

As detailed above, Robert J. Guidry and/or Treasure Chest obtained a certificate and license by misrepresentations and/or suppressions of the truth concerning the overarching corrupt conspiracy, as well as their participation in extortion; these misrepresentations and/or suppressions were made with the intent to obtain an unjust advantage in obtaining a certificate and license. Robert J. Guidry and/or Treasure Chest are therefore liable for fraud under La. Civ. Code art. 2315.

### 86.

Robert J. Guidry and/or Treasure Chest fraudulently concealed the formation of and their participation in the overarching corrupt conspiracy, and all acts taken in furtherance thereof, in order to avoid or prolong discovery thereof and in an attempt to prejudice the rights of the victims, including plaintiff, of the overarching corrupt conspiracy and the constituent elements thereof. Plaintiff learned of Robert J. Guidry and/or Treasure Chest's fraudulent conduct within one year of the filing of this Petition.

### 87.

Robert J. Guidry and/or Treasure Chest are liable unto plaintiff for the fraud effected by the overarching conspiracy and the damages to plaintiff resulting therefrom, including without limitation his lost profits, attorney fees, costs, the value of Treasure Chest's gaming license, and the value of Treasure Chests's success.

## Count Four -- Unjust Enrichment

### 88.

Guidry and/or Treasure Chest are liable to Copeland for their unjust enrichment. As detailed above, the license awarded to Treasure Chest as a result of the overarching corrupt conspiracy should have been awarded to AIGA. Defendants have reaped enormous profits under the license, while Copeland (1) has both had to forego the profits he would have made under the license, and (2) has never recouped his out-of-pocket costs and expenses incurred in applying for it. Consequently, defendants have been unjustifiably enriched, and Copeland has been impoverished.

-24-

89.

As a result of defendants' unjust enrichment, Copeland is entitled, without limitation, to recoup his out-of-pocket costs and lost profits or, alternatively, the profits made by the defendants, pursuant to La. Civ. Code art. 2298. He is also entitled to recover the value of Treasure Chest's gaming license and the value of Treasure Chest's success.

## Solidary Liability

90.

Pursuant to 18 U.S.C. § 1962 and Louisiana Civil Code Article 2324, defendants are each jointly and severally liable unto plaintiff.

91.

## Respondeat Superior

Because all of the above-referenced acts undertaken by Robert Guidry were in the course and scope of his position with Treasure Chest and were done with actual and/or apparent authority provided to Guidry by Treasure Chest, Treasure Chest is liable to plaintiffs for these acts through the doctrines of *respondeat superior* and/or La. Civ. Code article 2320. Guidry's actions were rooted in his position with Treasure Chest and were incidental to its activities, and were done with Treasure Chest's consent.

## Jury Demand

92.

Plaintiff prays for trial by jury.

**WHEREFORE**, premises considered, plaintiff prays that after due proceedings be had, there be judgment against defendants Treasure Chest Casino, L.L.C. and Robert J. Guidry, for all damages, both pecuniary and nonpecuniary, suffered as a result of defendants' actions as set forth herein, including plaintiff's out of pocket costs and all lost profits, as well as the value of the Treasure Chest's gaming license and the value of Treasure Chest's success, legal interest, attorneys' fees, litigation costs, court costs, treble damages, and for all other

-25-

appropriate legal and equitable relief.

Respectfully submitted,

**SLATER LAW FIRM**

Benj. R. Slater, Jr., Bar No. 12126
Benj. R. Slater, III, Bar No. 12127, T.A.
A. Elise Brown, Bar No. 19500
Donald J. Miester, Jr., Bar No. 20294
S. Joseph Welborn, Bar No. 25928

By _____

650 Poydras Street
Suite 2600
New Orleans, LA 70130
Telephone: (504) 523-7333
Facsimile: (504) 528-1080
**ATTORNEYS FOR PLAINTIFF ALVIN C.
COPELAND**

**PLEASE SERVE:**

1.　**Treasure Chest Casino, L.L.C., through its registered agent for service of process:**
　　Paul S. West
　　One American Place
　　Ninth Floor
　　Baton Rouge, Louisiana 70825

　　-and-

2.　**Robert J. Guidry**
　　3817 Spencer Street
　　Harvey, Louisiana 70058

CIVIL

☑ 01-DAMAGES
☐ 02-CONTRACT
☐ 03-PRISONER SUIT
☐ 04-EXECUTORY PROCESS
☐ 05-SUIT ON NOTES
☐ 06-EVICTION
☐ 07-WORKMENS COMPENSATION
☐ 08-JUDICIAL REVIEW
☐ 09-_____ RACING
☐ 10-_____ MANDAMUS

☐ 11-COMM. PROP. PARTITION
☐ 12-PUBLIC SERV. COMM.
☐ 13-OTHER PARTITIONS
☐ 14-OTHER
☐ 15-D.E.Q.
☐ 16-
☐ 17-
☐ 18-
☐ 19-
☐ 20-

CERTIFIED
TRUE COPY

SEP 2 2 1999

BY -26_____
DEPUTY CLERK

# ARTHUR A. LEMANN III
## & ASSOCIATES, INC.
### ATTORNEYS AT LAW

ARTHUR A. LEMANN III
-----------
ARTHUR A. LEMANN IV

SUITE 100   938 LAFAYETTE STREET

NEW ORLEANS, LOUISIANA 70113
TELEPHONE (504) 522-8104
FACSIMILE (504) 525-4231
E-MAIL: notguiltyz@aol.com

B. LEMANN BUILDING
ONE CRESCENT PARK
DONALDSONVILLE, LOUISIANA 70346

May 9, 2003

Hon. Doug Welborn
Clerk of Court, East Baton Rouge Parish
P. O. Box 1991
Baton Rouge, LA 70821-1991

RE:   Alvin C. Copeland v. Robert Guidry, et al.
      Docket No. 464,607 "D"
      19th JDC - Parish of East Baton Rouge

Dear Sir:

Please find enclosed the original and three copies of defendant's Motion to Stay Discovery which I would appreciate your filing on my behalf in the above-captioned matter. Also enclosed is a check in the amount of $28 to cover filing fees, as well as a self-addressed envelope for the return of a conformed copy.

Thank you for your time and attention to this matter.

Very truly yours,

Arthur A. Lemann IV

AALIV:edn

Encl.

REC'D C.P.

MAY 2 1 2003

REC'D C.P.

MAY 1 3 2003

including:

a. All documents reflecting or relating to any communication between the City of Kenner and Robert J. Guidry or any of his controlled entities, including without limitation Treasure Chest Casino, LLC and Treasure Chest Casino, Inc., regarding any aspect of riverboat gaming in the City of Kenner.

REC'D C.P.

MAY 2 1 2003

REC'D C.P.

MAY 1 3 2003

b. All documents reflecting or relating to the issuance of any license or certificate to Robert J. Guidry or any of his controlled entities, including without limitation Treasure Chest Casino, LLC and Treasure Chest Casino, Inc. for riverboat gaming in the City of Kenner.

c. All contracts, agreements, or other understandings entered into between any former or current employee, agent, elected official, or appointed official of the City of Kenner and Robert J. Guidry or any of his controlled entities including without limitation Treasure Chest Casino, LLC and Treasure Chest Casino, Inc, as well as any documents reflecting or relating to any such contract, agreement, or understanding.

d. All documents reflecting or relating to any payments or other consideration provided directly or indirectly to or on behalf of any former or current employee, agent, elected official or appointed official of the City of Kenner or their sponsors or children by Robert J. Guidry or any of his controlled entities including without limitation Treasure Chest Casino, LLC and Treasure Chest Casino, Inc.

e. All documents reflecting or relating to any renewal (including without limitation any conditional and/or temporary renewal) of Treasure Chest's license.

f. All documents reflecting or relating to any transfer(s) of any interest in Treasure Chest's License.

g. All documents reflecting or relating to the Treasure Chest's application for a License, as well as any amendments or modifications thereto.

h. All documents reflecting or relating to the investigation of Treasure Chest by the Louisiana State Police in connection with its application for either a Certificate or a License.

i. All documents reflecting or relating to any public hearing on Treasure Chest's application for a Certificate, including without limitation any transcript of any such hearings.

j. All documents exchanged between Treasure Chest and the Board at any time, including without limitation all correspondence, faxes and electronic mailings.

k. All documents exchanged between Treasure Chest and the Division at any time, including without limitation all correspondence, faxes and electronic mailings.

l. All documents exchanged between Treasure Chest and the Commission at any time, including without limitation all correspondence, faxes and electronic mailings.

m. Any and all documents introduced into evidence by any party at the criminal trial in the matter of United States of America v. Edwin Edwards, Criminal Docket No. 98-165-B-M2, United States District Court for the Middle District of Louisiana. (See Exhibit A).

3.

Copeland has also requested documents from the co-defendant Treasure Chest Casino which relate to riverboat gaming and beyond. (Exhibit B.)

4.

The above described requests involve a massive number of documents. Many of the documents contain highly sensitive information such as tax returns, financial information, trade secrets, etc.

5.

Guidry has filed a Writ Application to the First Circuit Court of Appeal on his exception of prescription as to Copeland's claim under the Louisiana Unfair Trade Practices Act, which, if granted, will obviate the need for any of the requested documents.

6.

Guidry has also filed other peremptory exceptions in this matter which are presently set for hearing on June 2, 2003, which if granted will also obviate the need

Guidry has also filed other peremptory exceptions in this matter which are presently set for hearing on June 2, 2003, which if granted will also obviate the need for the production of any of the requested documents.

For these reasons, all discovery in this matter should be stayed.

Wherefore, Robert Guidry prays that this motion be set for hearing and that after due proceedings, all discovery in this matter be stayed pending the resolution of Guidry's exceptions.

Respectfully submitted:

Arthur A. Lemann III (Bar # 8296)
Arthur A. Lemann, III & Associates, Inc.
938 Lafayette Street, Suite 100
New Orleans, LA 70113
Phone: (504) 522-8104

Ralph Capitelli (Bar # 3858)
Capitelli & Wicker
1100 Poydras Street
Energy Centre Suite 2950
New Orleans, LA 70163
Phone: (504) 582-2425

Winston Decuir (#04795)
1951 Government Street
Baton Rouge, LA 70806
Phone: (225) 346-8716

Attorneys for Defendant,
Robert J. Guidry

-4-

## CERTIFICATE

I hereby certify that a copy of the above document has been served upon all counsel of record by placing same in the U.S. Mail, postage prepaid, this 9 day of May, 2003.

_____
Arthur A. Lemann III

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 326 of 344

19TH JUDICIAL DISTRICT COURT

FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607  DIVISION "D"

ALVIN C. COPELAND

versus

TREASURE CHEST CASINO, L.L.C.  and ROBERT J. GUIDRY

Filed:_____

_____
Deputy Clerk

---

## MEMORANDUM IN SUPPORT OF MOTION TO STAY DISCOVERY

MAY IT PLEASE THE COURT:

Robert Guidry has filed a motion to stay discovery in this matter and respectfully submits this memorandum in support of the motion. Allowing discovery to proceed at this stage of the litigation would be unfairly and unduly burdensome and expensive for Guidry.

Guidry recently filed several peremptory exceptions in this matter, including exceptions of prescription of Copeland's state law claims, failure to join parties, and of res judicata. Guidry also has re-urged his exception of Prescription of Copeland's Civil RICO claims. On February 24, 2003, this Court rendered judgment overruling the exception of prescription as to Copeland's claim under the Louisiana Unfair Trade Practices Act. Guidry has filed a Writ Application with the First Circuit Court of Appeal requesting that the appeals court review this judgment, to which Copeland has filed an opposition. All of Guidry's remaining peremptory exceptions are set to be

heard by this Court on June 2, 2003.

Recently, Copeland has issued discovery requests to the defendants which are burdensome and involved. Copeland seeks for Guidry to produce the following documents:

a. All documents reflecting or relating to any communication between the City of Kenner and Robert J. Guidry or any of his controlled entities, including without limitation Treasure Chest Casino, LLC and Treasure Chest Casino, Inc., regarding any aspect of riverboat gaming in the City of Kenner.

b. All documents reflecting or relating to the issuance of any license or certificate to Robert J. Guidry or any of his controlled entities, including without limitation Treasure Chest Casino, LLC and Treasure Chest Casino, Inc. for riverboat gaming in the City of Kenner.

c. All contracts, agreements, or other understandings entered into between any former or current employee, agent, elected official, or appointed official of the City of Kenner and Robert J. Guidry or any of his controlled entities including without limitation Treasure Chest Casino, LLC and Treasure Chest Casino, Inc, as well as any documents reflecting or relating to any such contract, agreement, or understanding.

d. All documents reflecting or relating to any payments or other consideration provided directly or indirectly to or on behalf of any former or current employee, agent, elected official or appointed official of the City of Kenner or their sponsors or children by Robert J. Guidry or any of his controlled entities including without limitation Treasure Chest Casino, LLC and Treasure Chest Casino, Inc.

e. All documents reflecting or relating to any renewal (including without limitation any conditional and/or temporary renewal) of Treasure Chest's license.

f. All documents reflecting or relating to any transfer(s) of any interest in

-2-

Treasure Chest's License.

g. All documents reflecting or relating to the Treasure Chest's application for a License, as well as any amendments or modifications thereto.

h. All documents reflecting or relating to the investigation of Treasure Chest by the Louisiana State Police in connection with its application for either a Certificate or a License.

i. All documents reflecting or relating to any public hearing on Treasure Chest's application for a Certificate, including without limitation any transcript of any such hearings.

j. All documents exchanged between Treasure Chest and the Board at any time, including without limitation all correspondence, faxes and electronic mailings.

k. All documents exchanged between Treasure Chest and the Division at any time, including without limitation all correspondence, faxes and electronic mailings.

l. All documents exchanged between Treasure Chest and the Commission at any time, including without limitation all correspondence, faxes and electronic mailings.

m. Any and all documents introduced into evidence by any party at the criminal trial in the matter of <u>United States of America v. Edwin Edwards</u>, Criminal Docket No. 98-165-B-M2, United States District Court for the Middle District of Louisiana. (See Exhibit A).

This Court has the authority to make any order which justice requires to protect Guidry from this type of discovery. (See La. Code Civ. Proc. Art. 1426). The issuance of a protective order lies within the Court's reasonable discretion. <u>Michigan Wisconsin Pipeline v. Sugarled Development</u>, 221 So.2d 593 (La. App. 3rd Cir. 1969), <u>writ denied</u>, 223 So.2d 419 (La. 1970). Guidry's pending exceptions clearly

-3-

demonstrate the Copeland has not preserved any rights he may have had in presenting this litigation. Should this Court sustain any of Guidry's exceptions set for June 2, 2003, which Guidry submits would be the proper and correct course of action, the discovery requests recently issued would become moot. Moreover, should the First Circuit Court of Appeal rule in Guidry's favor and sustain his prescription exception as to Copeland's LUTPA claim, the only cause of action recognized by the First Circuit, then Copeland's discovery requests would likewise become moot.

Copeland's discovery requests are by no means insignificant. The production of the requested documents would entail extreme burden and expense, and involves documents that are personal, private, and privileged. Article 1426 is designed to protect parties from such undue burden and expense. Therefore, Guidry moves the Court to grant his Motion to Stay until such time as his pending peremptory exceptions have been ruled upon with finality.

Respectfully submitted:



Arthur A. Lemann III (Bar # 8296)
Arthur A. Lemann, III & Associates, Inc.
938 Lafayette Street, Suite 100
New Orleans, LA 70113
Phone: (504) 522-8104

Ralph Capitelli (Bar # 3858)
Capitelli & Wicker
1100 Poydras Street
Energy Centre Suite 2950
New Orleans, LA 70163
Phone: (504) 582-2425

Winston Decuir (#04795)
1951 Government Street
Baton Rouge, LA 70806
Phone: (225) 346-8716

Attorneys for Defendant,
Robert J. Guidry

-4-

## CERTIFICATE

I hereby certify that a copy of the above document has been served upon all counsel of record by placing same in the U.S. Mail, postage prepaid, this _9_ day of May, 2003.

_____
Arthur A. Lemann III

## ORDER

Considering the above and foregoing motion,

IT IS ORDERED that the plaintiff, Alvin C. Copeland, show cause on the _2_ day of _June_, 2003, at _30_ o'clock _A_.M. why the Motion to Stay Discovery should not be granted.

Baton Rouge, Louisiana, this _14_ day of May, 2003.

_____
JUDGE

CERTIFIED TRUE COPY

183303

DEPUTY CLERK OF COURT

2003 MAY 12 PM 4: 16

DOUG WELBORN
CLERK OF COURT, PARISH

-5-

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                            DIVISION "D"

**ALVIN C. COPELAND**

COST OK Amt. _69_

-versus-

12470

MAY 1 6 2003

**TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY**

BY_____

DY CLERK OF COURT

Filed:_____        _____

Deputy Clerk

## NOTICE OF DOCUMENT INSPECTION
## UNDER LOUISIANA CODE OF CIVIL PROCEDURE ART. 1463

TO:   Louisiana Riverboat Gaming Enforcement
      A Division of the Gaming Enforcement Section
      of the Office of the Louisiana State Police
      *through its Lieutenant Jules Pinero*
      *7919 Independence Blvd*
      *Baton Rouge, LA 70896*

Please take notice that plaintiff, Alvin C. Copeland, will inspect and copy the documents

in the possession of *Louisiana Riverboat Gaming Enforcement A Division of the Gaming*

*Enforcement Section of the Office of the Louisiana State Police that* are listed on Exhibit "A"

attached hereto on Monday, June 1, 2003, at 10:00 a.m., at the law offices of CHOPIN, WAGAR,

COLE, RICHARD, REBOUL & KUTCHER, LLP, Two Lakeway Center, Suite 900, 3850 North

Causeway Boulevard, Metairie, LA 70002. You are invited to appear, inspect and copy these

documents as you may deem appropriate.

Respectfully submitted,

*CHOPIN, WAGAR, COLE, RICHARD,*
*REBOUL & KUTCHER, LLP*

By:_____
      **ROBERT A. KUTCHER** (LSBA #7895)
      **NICOLE S. TYGIER** (LSBA #19814)
      Two Lakeway Center, Suite 900
      3850 North Causeway Boulevard
      Metairie, Louisiana 70002
      Telephone: (504) 830-3838
      Facsimile: (504) 836-9573
      *Attorneys for Plaintiff Alvin C. Copeland*

**ORIGINAL**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

(   )     Hand Delivery           (   )     Prepaid U.S. Mail
(   )     Facsimile               ( X )     Overnight Delivery

**Metairie, Louisiana**, this 15th day of May, 2003.

2

# EXHIBIT "A"

## DEFINITIONS

A.    In answering the items in this request for production, complete documentation must be divulged, regardless of whether it is in the possession of the named defendant or the defendant's attorneys, employees, agents, investigators, or other representatives.

B.    If you object to any of the items in this request for production on the grounds that the document requested is protected or otherwise privileged, please state the following with respect to each such document:  the privilege claimed; a brief description of the nature, subject, and contents of the document claimed to be privileged; the name, occupation, and capacity of the individual who authored such protected or privileged documentation; the date that the document bears; and the person or persons, if any, to whom the document was directed.

C.    The term "Plaintiff" means Alvin C. Copeland and/or American Gaming Association ("AIGA").

D.    The terms "you" and "your" include the named defendant to whom this request for production is directed and defendant's attorneys, employees, agents, investigators, and other representatives.

E.    As used herein, the words "and" and "or" shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the discovery request any document that otherwise might be deemed outside its cope by another construction.

F.    The term "document(s)" includes every wiring and record of every type and description in the possession, custody, control, or within the knowledge of any named defendant and the attorneys, employees, agents, investigators or other representatives, including but not limited to letters, correspondence, computer database or computer-generated information, telegrams, memoranda, notes, reports, calculations, ledgers, recordings (mechanical, electronic, typed or written), transcripts, drawings, blueprints, charts, maps, graphs, photographs, still moving picture films, studies, books, pamphlets, schedules, desk calendars, diaries, invoices, work sheets and all drafts of any kind.  Additionally, the term "document" means a copy where the original is not in your possession, custody or control.

G.    The term "person(s)" refers to every individual, partnership, firm, corporation, enterprise, entity, association, employer, employee, agent, investigator, attorney, party, accountant, engineer, expert witness, lay witness, photographer, police

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 334 of 344

# CHOPIN, WAGAR, COLE,
# RICHARD, REBOUL & KUTCHER, LLP
## ATTORNEYS AT LAW

RICHARD A. CHOPIN †‡
NELSON W. WAGAR, III ‡‡
KEVIN L. COLE ‡
THOMAS M. RICHARD
BRIAN L. REBOUL
ROBERT A. KUTCHER *
ELIZABETH SMYTH SIRGO
NICOLE S. TYGIER

—————————

MICHAEL L. COHEN
DIANA L. TONAGEL
PATRICIA D. TUNMER
JUDITH A. MILLER £
MATTHEW D. MONSON
CYNTHIA J. THOMAS Δ○
JASON P. FOOTE
JAMES A. PRATHER

TWO LAKEWAY CENTER
SUITE 900
3850 NORTH CAUSEWAY BOULEVARD
METAIRIE, LOUISIANA 70002
TELEPHONE 504-830-3838
FACSIMILE 504-836-9540
www.chopin.com

*Writer's Direct Number*
504-830-3994
*Writer's Direct Facsimile*
504-836-9594
agiacona@chopin.com

**NORTHSHORE OFFICE**

THREE SANCTUARY BOULEVARD
SUITE 301
MANDEVILLE, LOUISIANA 70471
TELEPHONE 985-674-6680
FACSIMILE 985-674-6681

† *Professional Corporation*
Δ *Also Admitted in D.C.*
* *Also Admitted in New York*
○ *Also Admitted in Puerto Rico*
‡ *Also Admitted in Texas*
£ *Registered Nurse, BSN*

*Please Reply to*
*Metairie Office*

May 15, 2003

The Honorable J Douglas Welborn
Clerk of Court
19th Judicial District Court
Parish of East Baton Rouge
P. O. Box 1991
Baton Rouge, LA 70821-1991

     **Re:**    *Alvin C. Copeland v. Treasure Chest Casino, LLC and Robert J. Guidry*
           *19th JDC No. 464-607(D)*
           *Our File No. 245.2433*

Dear Mr. Welborn:

In connection with the above captioned matter, please issue a Subpoena Duces Tecum, pursuant to La. C.C.P. art. 1463, to the following entities stating the below information:

(1)    Louisiana Riverboat Gaming Enforcement Division of the Gaming
       Enforcement Section of the Office of the Louisiana State Police,
       ***through its Lieutenant Jules Pinero***
       ***7919 Independence Blvd***
       ***Baton Rouge, LA 70896***

Plaintiff, Alvin C. Copeland, will inspect and copy the documents in the possession of the Louisiana Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of the Louisiana State Police; Louisiana Riverboat Gaming Commission; and the Louisiana Gaming Control Board respectively, as listed on Exhibit "A" on ***Monday, June 1, 2003, at 10:00 a.m.*** at the law offices of CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP, Two Lakeway Center, Suite 900, 3850 North Causeway Boulevard, Metairie, LA 70002.

We have enclosed our firm's check in the amount of $69.00 to cover the costs of preparing, filing and service of the Subpoena and Notices of Deposition with Exhibit "A" attached.

**_Please serve each Subpoena Duces Tecum and Notice of Deposition with Exhibit
"A" attached altogether._**

Should you have any questions, please do not hesitate to contact me.

Yours very truly,

Angela M. Giacona
Paralegal to Robert A. Kutcher

/amg
**_Enclosures_**

cc:    Michael A. Patterson, Esq.
       Arthur A. Lemann, III, Esq.
       Paul S. West, Esq.
       Ralph Capitelli, Esq.

Form C 132

COPELAND, ALVIN C. ,
___ vs ___ Plaintiff

TREASURE CHEST CASINO, ET AL
_____ Defendant

TO. Louisiana Riverboat Gaming Enforcement Division of
the Gaming Enforcement Section of the Office of the
Louisiana State Police, thorugh its Lieutenant Jules Pinero
7919 Independence Blvd ; Baton Rouge, La   70896

You have been ordered by the Court to Produce in the office of:
    Chopin, Wagar, Cole, Richard, Reboul & Kutcher
    Two Lakeway Center, Suite 900
    3850 North Causeway Boulevard,
    METAIRIE, LA 70002

At 10:00 o'clock AM. on the __1st__ day of __June__ , __2003__, produce the
following.
    **SEE ATTACHED EXHIBIT 'A'**

If this case is continued, you must bring these items back with you.

    If you do not come and do not bring these items, you will be violating the
law and may be subject to penalties.

    This SUBPOENA was ordered by Attorney **KUTCHER, ROBERT A.** and was issued by
the Clerk of Court on the 21st day of May, 2003.

                    _____
                    Deputy Clerk of Court for
                    Doug Welborn, Clerk of Court

                    SERVICE INFORMATION

Received on the __27__ day of __MAY__ , 20 __03__ and on the __27__ day
of ___MAY___ , 20 __03__, served the above named party as follows:

**PERSONAL SERVICE**. on the party herein named  LT. JULES PINERO
At 7929 INDEPENDENCE BLVD    THRU DPS LEGAL AFFAIRS (BETTY TERRY)

**DOMICILIARY SERVICE**: on the within named _____, by leaving the
same at his domicile in this parish in the hands of _____, a person
of suitable age and discretion residing in said domicile
at _____

**SECRETARY OF STATE**:  by tendering same to the within named, by handing same
to _____

**DUE AND DILIGENT**:  After diligent search and inquiry, was unable to find the
within named _____ or his domicile, or anyone
legally authorized to represent him.

**RETURNED**. Parish of _____ **FILED** _____, this _____ day
of _____ 20__

                        MAY 28 2003

SERVICE: $_____
MILEAGE: $_____          _____
TOTAL: $_____            Deputy Sheriff
        DEPUTY CLERK OF COURT    East Baton Rouge, Louisiana

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing has been mailed today, via United States Mail, postage prepaid and properly addressed, to the following counsel of record:

Robert A. Kutcher, Esquire
CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

Winston G. DeCuir, Esquire
DECUIR & CLARK, L.L.P.
1961 Government Street
Baton Rouge, LA 70806

Arthur A. Lemann, III, Esquire
ARTHUR A. LEMANN, III
   & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Ralph Capitelli, Esquire
CAPITELLI & WICKER
Suite 2950, Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Baton Rouge, Louisiana on this 20th day of April , 2004.

Paul S. West
Juliann L. Keenan

CERTIFIED TRUE COPY

010795

DEPUTY CLERK

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH

# NINETEENTH JUDICIAL DISTRICT COURT

## PARISH OF EAST BATON ROUGE

## STATE LOUISIANA

ALVIN C. COPELAND

SUIT NUMBER 464,607

VERSUS

DIVISION D

TREASURE CHEST CASINO, LLC
AND ROBERT GUIDRY

## ORDER

Considering the Treasure Chest Casino, L.L.C.'s Motion to Stay Discovery:

IT IS ORDERED that a hearing be set on Treasure Chest Casino, L.L.C.'s Motion to Stay Discovery for the _24_ day of _May_, 2004. @ 9:30 A.M.

SIGNED at Baton Rouge, Louisiana, this _10_ day of _May_, 2004.

_____
JUDGE
NINETEENTH JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

PLEASE NOTIFY

Paul S. West
McGLINCHEY STAFFORD, PLLC
Fourteenth Floor, One American Place
Baton Rouge, Louisiana 70825

Robert A. Kutcher, Esquire
CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

Arthur A. Lemann, III, Esquire
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Ralph Capitelli, Esquire
CAPITELLI & WICKER
Suite 2950 Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Winston G. DeCuir, Esquire
DECUIR & CLARK, L.L.P.
1961 Government Street
Baton Rouge, LA 70806

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE LOUISIANA

ALVIN C. COPELAND             SUIT NUMBER 464,607

VERSUS             DIVISION D

TREASURE CHEST CASINO, LLC
AND ROBERT GUIDRY

## TREASURE CHEST CASINO, LLC'S SUPPLEMENTAL
## EXCEPTION OF NO CAUSE OF ACTION

NOW INTO COURT, through undersigned counsel, comes Treasure Chest Casino, LLC, who hereby joins in Robert Guidry's exception of no cause of action.

Mr. Guidry filed an exception to the plaintiff's Petition, urging dismissal of this matter based on the *Noerr-Pennington* doctrine and the statutory immunity conferred on Mr. Guidry by Louisiana Revised Statute 15:468. TCC urges that the exception, insofar as it relies on the *Noerr-Pennington* doctrine, also would apply to Copeland's claims against Treasure Chest. As such, Treasure Chest adopts the *Noerr-Pennington* arguments set forth in Mr. Guidry's Supplemental Memorandum in Support of Exception of No Cause of Action.

WHEREFORE, Treasure Chest Casino, LLC prays for a rule to show cause be issued ordering Alvin C. Copeland to appear and show cause, if any, why this exception and the previously filed exception of prescription should not be granted and why his claims against Treasure Chest Casino, LLC should not be dismissed.

BY ATTORNEYS

*(signature)*

Paul S. West, La. Bar Roll No. 13375
Juliann L. Keenan, La. Bar Roll No. 25740
McGLINCHEY STAFFORD, PLLC
Fourteenth Floor, One American Place
Baton Rouge, Louisiana 70825
Telephone    225-383-9000
Facsimile    225-343-3076

CERTIFIED TRUE COPY

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing has been mailed today, via United

States Mail, postage prepaid and properly addressed, to the following counsel of record:

| | |
|---|---|
| Robert A. Kutcher, Esquire<br>CHOPIN, WAGAR, COLE, RICHARD, REBOUL &<br>KUTCHER, LLP<br>Two Lakeway Center, Suite 900<br>3850 North Causeway Blvd.<br>Metairie, Louisiana 70002 | Winston G. DeCuir, Esquire<br>DECUIR & CLARK, L.L.P.<br>1961 Government Street<br>Baton Rouge, LA 70806 |
| Arthur A. Lemann, III, Esquire<br>ARTHUR A. LEMANN, III<br>  & ASSOCIATES<br>938 Lafayette Street, Suite 100<br>New Orleans, LA 70113 | Ralph Capitelli, Esquire<br>CAPITELLI & WICKER<br>Suite 2950, Energy Centre<br>1100 Poydras Street<br>New Orleans, LA 70163 |

Baton Rouge, Louisiana on this 30ᵗʰ day of April, 2004.

Paul S. West
Juliann L. Keenan

CERTIFIED TRUE COPY

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH

# NINETEENTH JUDICIAL DISTRICT COURT

## PARISH OF EAST BATON ROUGE

## STATE LOUISIANA

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, LLC
AND ROBERT GUIDRY

SUIT NUMBER 464,607

DIVISION D

## ORDER

Considering the Treasure Chest Casino, L.L.C.'s Supplemental Exception of No Cause of Action:

IT IS ORDERED that a hearing be set on Treasure Chest Casino, L.L.C.'s Supplemental Exception of No Cause of Action for the _24_ day of _May_, 2004. _9:30 Am_

SIGNED at Baton Rouge, Louisiana, this _13_ day of _May_, 2004.

_Janice Clark_

JUDGE
NINETEENTH JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

PLEASE NOTIFY

Paul S. West
McGLINCHEY STAFFORD, PLLC
Fourteenth Floor, One American Place
Baton Rouge, Louisiana 70825

Robert A. Kutcher, Esquire
CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

Arthur A. Lemann, III, Esquire
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Ralph Capitelli, Esquire
CAPITELLI & WICKER
Suite 2950, Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Winston G. DeCuir, Esquire
DECUIR & CLARK, L.L.P.
1961 Government Street
Baton Rouge, LA 70806

CERTIFIED TRUE COPY

# MᶜGLINCHEY STAFFORD PLLC

**JULIANN LOUISE KEENAN**
Telephone (225) 382-3608
Facsimile (225) 346-8891
jkeenan@mcglinchey.com

BATON ROUGE

NEW ORLEANS

HOUSTON

JACKSON

CLEVELAND

MONROE

DALLAS

ALBANY

April 30, 2004

The Honorable Douglas Welborn, Clerk of Court
NINETEENTH JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
Governmental Building
222 St. Louis Street
Baton Rouge, Louisiana 70801

> RE: Alvin C. Copeland v. Treasure Chest Casino, L.L.C. and Robert Guidry, Suit Number 464,607, Division D, Nineteenth Judicial District Court, Parish of East Baton Rouge, State of Louisiana
> Our File Number 10128.0035

Dear Mr. Welborn:

Please find enclosed the original and two (2) copies of Treasure Chest Casino, L.L.C.'s Supplemental Exception of No Cause of Action and Motion to Stay Discovery, which I request be filed of record in the above-referenced matter.

By copy of this letter, I am sending these pleadings, along with Treasure Chest Casino, L.L.C.'s supporting memoranda to Judge Clark for her review and consideration.

Finally, enclosed is our firm's check to cover filing costs. Please provide our courier with one copy stamped with filing information. Thank you for your assistance in this matter.

Very truly yours,

MᶜGLINCHEY STAFFORD, PLLC

Juliann Louise Keenan

JLK/bsm
Enclosure
Copy to     The Honorable Janice G. Clark, Judge
            All Counsel of Record (List Attached)

FOURTEENTH FLOOR, ONE AMERICAN PLACE | BATON ROUGE, LA 70825 | (225) 383-9000 | FAX: (225) 343-3076 | www.mcglinchey.com

Case 3:10-cv-00603-BAJ-DLD   Document 5   10/07/10   Page 343 of 344

Robert A. Kutcher and Nicole S. Tygier
Chopin, Wager, Cole, Richard, et al
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002

Ralph Capitelli
Capitelli & Wicker
1100 Poydras Street
New Orleans, Louisiana 70163

Arthur A. Lemann, III
Arthur A. Lemann, III & Associates
938 Lafayette Street, Suite 1000
New Orleans, Louisiana 70113

Winston G. DeCuir, Esquire
DeCuir & Clark, L.L.P.
1961 Government Street
Baton Rouge, Louisiana 70806