19TH JUDICIAL DISTRICT COURT

FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                    DIVISION "D"

ALVIN C. COPELAND                    **COST OK Amt.** ___/

versus                                                FEB 2 6 2003

TREASURE CHEST CASINO, L.L.C.  and ROBERT J. ~~GUIDRY~~

Filed:_____                    _____
                                                    Deputy Clerk

---

## NOTICE OF INTENT TO SEEK SUPERVISORY REVIEW
## AND REQUEST FOR EXTENSION OF RETURN DATE

---

Now into Court, through undersigned counsel, comes the defendant, Robert J. Guidry, and gives notice of his intent to seek supervisory review of the Court's denial of the defendant's exception of prescription of the unfair trade practice claim.

Moreover, Guidry has filed other exceptions which may be dispositive of this proceeding which are set to be heard by this Court on April 14, 2003. Therefore, in the interest of judicial economy, Guidry requests that the return date be set after April 14, 2003. Alternatively, Guidry requests a thirty-day extension of the return date because he requires additional time within which to prepare the writ application.

-1-

Respectfully submitted:

DECUIR & CLARK, L.L.P.

BY: _____

Winston Decuir, Sr. (#04795)
1961 Government Street
Baton Rouge, LA 70806
Phone: (225) 346-8716

Arthur A. Lemann III (#8296)
938 Lafayette Street, Suite 100
New Orleans, Louisiana 70113
Phone: (504) 522-8104

Ralph Capitelli (#3858)
Capitelli & Wicker
1100 Poydras St., Ste. 2950
New Orleans, Louisiana 70163
Phone: (504) 582-2425

Lanny R. Zatzkis (#13781)
Zatzkis, McCarthy & Assoc.
650 Poydras Street, Suite 2750
New Orleans, LA 70130-6101
Phone: 523-2266

Attorneys for Defendant,
Robert J. Guidry

## CERTIFICATE

I hereby certify that a copy of the above document has been served upon opposing counsel by placing same in the U.S. Mail, postage prepaid, this _____ day of February, 2003.

_____
WINSTON G. DECUIR, SR.

-2-

19TH JUDICIAL DISTRICT COURT

FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                          DIVISION "D"

ALVIN C. COPELAND

versus

TREASURE CHEST CASINO, L.L.C.  and ROBERT J. GUIDRY


Filed:_____                         _____
                                              Deputy Clerk

                         _____

                          **ORDER**
                         _____

Considering the foregoing motion,

IT IS ORDERED that the return date in this matter be and the same is hereby set for the ____ day of _____, 2003.

Baton Rouge, Louisiana, this 27 day of _____, 2003.

                              _____
                                      JUDGE

REC'D C.P.
MAR 10 2003

-3-

er:Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 3 of 323

ALVIN C. COPELAND                                                NUMBER  464,607

VERSUS                                                                  DIVISION D

TREASURE CHEST CASINO, LLC
and ROBERT GUIDRY

## ORDER

Considering the foregoing motion,

**IT IS HEREBY ORDERED,** that the return date in this matter be and the same is hereby set for the _21st_ day of _April_, 2003, at _2:30_ _pm_.

Baton Rouge, Louisiana, this _7_ day of _March_, 2003.

_Jennie Clark_

JUDGE

Respectfully Submitted:

Paul S. West, Bar Roll No. 13375
McGLINCHEY STAFFORD, PLLC
Ninth Floor,  One American Place
Baton Rouge, Louisiana  70825
Telephone:    (225) 383-9000
Facsimile:    (225) 343-3076

**PLEASE NOTIFY:**

Paul S. West, Esquire
McGLINCHEY STAFFORD, PLLC
Ninth Floor,  One American Place
Baton Rouge, Louisiana  70825

Lanny R. Zatzkis, Esquire
ZATZKIS & ASSOCIATES
Suite 2750, Poydras Center
650 Poydras Street
New Orleans, LA 70130

Winston G. DeCuir, Esquire
DECUIR & CLARK, L.L.P.
1961 Government Street
Baton Rouge, LA 70806

Arthur A. Lemann, III, Esquire
ARTHUR A. LEMANN, III
  & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Ralph Capitelli, Esquire
CAPITELLI & WICKER
Suite 2950, Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Robert A. Kutcher, Esquire
CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

i hereby certify that on this day a notice of the above judgement was mailed by me, with sufficent postage affixed, to: B. Slatzn, M. Pattison, B. Connodei, S Quidd, P. West, L. Zatzkis, R. Capitelli, A. Leman, R. Hatch

Done and signed on _3-11-03_   W. De Cuir,

Deputy Clerk of Court

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, LLC
and ROBERT GUIDRY

NUMBER 464,607

DIVISION D

COST OK Amt. 30—
clH 46457
MAR - 5 2003
BY _____ DP. CLERK OF COURT

### TREASURE CHEST CASINO, L.L.C.'S
### NOTICE OF INTENT TO SEEK SUPERVISORY REVIEW
### AND REQUEST FOR EXTENSION OF RETURN DATE

**NOW INTO COURT**, through undersigned counsel, comes defendant, Treasure

Chest Casino, L.L.C. (sometimes hereinafter referred to as "TCC"), and gives notice of its intent to

seek supervisory review of the Court's denial of TCC's exception of prescription.

Moreover, TCC has filed other exceptions which may be dispositive in this

proceeding which are set to be heard by this Court on April 14, 2003. Therefore, in the interest of

judicial economy, TCC requests that the return date be set after April 14, 2003. Alternatively, TCC

requests a thirty (30) day extension of the return date, because TCC requires additional time within

which to prepare the writ application.

Respectfully Submitted:

Paul S. West, La. Bar Roll No. 13375
Juston M. O'Brien, La. Bar Roll No. 26447
MCGLINCHEY STAFFORD, PLLC
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825
Telephone (225) 383-9000
Facsimile (225) 343-3076

REC'D C.P.

MAR 6 2003

19TH JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA
GOVERNMENTAL BUILDING
222 ST. LOUIS STREET
PHONE: 225-389-5012
FAX: 225-389-5327

BATON ROUGE,LA.,  03/10/2003

TO: ARTHUR A. LEMANN, III    ON BEHALF OF  ROBERT GUIDRY
     938 LAFAYETTE ST.
     SUITE 100
     NEW ORLEANS, LA 70113


CASE NAME: ALVIN C. COPELAND VS. TREASURE CHEST CASINO, ET AL

CASE NUMBER: 464607              CIVIL DOCKET: "D"

                                JUDGE: JANICE CLARK

                                ROOM: 000


YOU ARE HEREBY NOTIFIED OF THE FOLLOWING ACTION FOR THE AFOREMENTIONED CASE

ON: 03/07/2003  AT:   00:00 00  FOR: SEE COMMENTS

ENCLOSED IS A COPY OF NOTICE OF INTENT TO SEEK
SUPERVISORY REVIEW AND REQUEST FOR EXTENSION OF RETURN
DATE FILED BY TREASURE CHEST CASINO, LLC




                              EILEEN KNIGHT
                              JUDICIAL ASSISTANT TO JUDGE CLARK
                              DEPUTY CLERK OF COURT

NOTIFIED:

     BENJAMIN R. SLATER, JR.  ON BEHALF OF  ALVIN COPELAND
     MICHAEL A. PATTERSON  ON BEHALF OF  LA. RIVERBOAT GAMING
     BARTON CONRADI  ON BEHALF OF  LA. RIVERBOAT GAMING
     STEPHEN QUIDD  ON BEHALF OF  LA. STATE PUBLIC SAFETY
     PAUL S. WEST  ON BEHALF OF  TREASURE CHEST CASINO
     LANNY R. ZATZKIS  ON BEHALF OF  ROBERT GUIDRY
     WINSTON G. DECUIR  ON BEHALF OF  ROBERT GUIDRY
     RALPH CAPITELLI  ON BEHALF OF  ROBERT GUIDRY
     ARTHUR A. LEMANN, III  ON BEHALF OF  ROBERT GUIDRY
     ROBERT A. KUTCHER  ON BEHALF OF  ALVIN COPELAND

# CERTIFICATE OF SERVICE

I certify that a copy fo the above and foregoing has been mailed today, via United States Mail, postage prepaid and properly addressed, to the following counsel of record:

Lanny R. Zatzkis, Esquire
ZATZKIS & ASSOCIATES
Suite 2750, Poydras Center
650 Poydras Street
New Orleans, LA 70130

Arthur A. Lemann, III, Esquire
ARTHUR A. LEMANN, III
  & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Robert A. Kutcher, Esquire
CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

Winston G. DeCuir, Esquire
DECUIR & CLARK, L.L.P.
1961 Government Street
Baton Rouge, LA 70806

Ralph Capitelli, Esquire
CAPITELLI & WICKER
Suite 2950, Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Baton Rouge, Louisiana on this ___5___ of March, 2003.

Paul S. West

RICHARD A. CHOPIN †‡
NELSON W. WAGAR, III †‡
KEVIN L. COLE ‡
THOMAS M. RICHARD
BRIAN L. REBOUL
ROBERT A. KUTCHER *
ELIZABETH SMYTH SIRGO
NICOLE S. TYGIER

MICHAEL L. CHOPIN
DIANA L. TONAGEL
PATRICIA D. TUNMER
JUDITH A. MILLER £
MATTHEW D. MONSON
CYNTHIA J. THOMAS △○
JASON P. FOOTE
JOHN G. ALSOBROOK
JAMES A. PRATHER
ANGELA M. HEATH
ALLEN K. TRIAL ‡

# CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP
## ATTORNEYS AT LAW

Two Lakeway Center
Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone 504-830-3838
Facsimile 504-836-9540
www.chopin.com

*Writer's Direct Number*
504-830-3820
*Writer's Direct Facsimile*
504-836-9573
rkutcher@chopin.com

NORTHSHORE OFFICE

Three Sanctuary Boulevard
Suite 301
Mandeville, Louisiana 70471
Telephone 985-674-6680
Facsimile 985-674-6681

† Professional Corporation
△ Also Admitted in D.C.
* Also Admitted in New York
○ Also Admitted in Puerto Rico
‡ Also Admitted in Texas
£ Registered Nurse, BSN

*Please Reply to
Metairie Office*

February 18, 2003

**POSTED**
FEB 2 1 2003

Clerk of Court
19th Judicial District Court
Parish of East Baton Rouge
P. O. Box 1991
Baton Rouge, LA 70821-1991

> **Re:** **Alvin C. Copeland v. Treasure Chest Casino, LLC and Robert J. Guidry**
> **19th JDC No. 464-607(D)**
> **Our File No. 245.2433**

Dear Sir or Madam:

Enclosed please find an original Judgment, signed by all counsel, which we ask that you please present to the Judge for signature and file in the above captioned matter. Also enclosed is our firm's check in the amount of $14.00 to cover the court costs incurred as a result of this request.

Should you have any questions, please do not hesitate to contact me.

Yours very truly,

**Robert A. Kutcher**

RAK/jjw
*Enclosures*

cc:    Arthur A. Lemann, III, Esq. *(w/enclosure via facsimile only)*
       Paul S. West, Esq. *(w/enclosure via facsimile only)*
       Ralph Capitelli, Esq. *(w/enclosure via facsimile only)*

REC'D O.P.
FEB 25 2003

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                          DIVISION "D"

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

COST OK Amt. $H$
CK# 11885
FEB 2 1 2003
BY
BY CLERK OF COURT

Filed:_____          _____
                                                              Deputy Clerk

**JUDGMENT**

**THIS MATTER** came for hearing on the 10th day of February, 2003, on the Exceptions of Prescription of defendants, Treasure Chest Casino, LLC and Robert J. Guidry, with respect to the unfair practices claim.

**PRESENT WERE:**          **ROBERT A. KUTCHER**
                                         *Attorneys for Plaintiff, Alvin C. Copeland*

                                         **ARTHUR A. LEMANN, III and RALPH CAPITELLI**
                                         *Attorneys for Defendant, Robert J. Guidry*

                                         **PAUL S. WEST**
                                         *Attorneys for Defendant, Treasure Chest Casino, LLC*

Considering the law, memoranda and arguments of counsel;

**IT IS HEREBY ORDERED** that the Exceptions of Prescription with respect to the unfair trade practices claim are overruled.

**BATON ROUGE, LOUISIANA,** this 24 day of _Feb_____, 2003.

Janice Clark
**JUDGE**

CERTIFIED TRUE COPY
DEPUTY CLERK OF COURT
15 018

2003 FEB 21 AM 11:49
FILED
EAST BATON ROUGE
DEPUTY CLERK & RECORDER FOR
DOUG WELBORN
CLERK OF COURT E.B.R. PARISH

REC'D C.P.
FEB 2 5 2003

REC'D C.P.
FEB 2 1 2003

I hereby certify that on this day a notice of the above judgement was mailed by me, with sufficient postage affixed, to: *all cob*

Done and signed on 2-24-03

Deputy Clerk of Court

030320860

**APPROVED AS TO FORM:**

_____

**ROBERT A. KUTCHER** (LSBA #7895)
CHOPIN, WAGAR, COLE, RICHARD,
    REBOUL & KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: (504) 830-3838

*Attorneys for Plaintiff, Alvin C. Copeland*

_____

**ARTHUR A. LEMANN, III** (LSBA #8296)
ARTHUR A. LEMANN, III & ASSOCIATES, INC.
938 Lafayette Street, Suite 100
New Orleans, Louisiana 70113
Telephone: (504) 522-8104

and

**RALPH CAPITELLI** (LSBA #3858)
CAPITELLI & WICKER
Energy Centre, Suite 2950
1100 Poydras Street
New Orleans, Louisiana 70163-2950
Telephone: (504) 582-2425

*Attorneys for Defendant, Robert J. Guidry*

_____  WEST by RHC w/ permission

**PAUL S. WEST** (LSBA #13375)
McGLINCHEY STAFFORD, PLLC
One American Place, 9th Floor
Baton Rouge, Louisiana 70825
Telephone: (225) 383-9000

*Attorneys for Treasure Chest Casino, LLC*

FILED
2003 FEB 21 AM 11:50
DEPUTY
DOUG WELBORN
CLERK OF COURT
EAST BATON ROUGE PARISH

2

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                    DIVISION "D"

ALVIN C. COPELAND              COST OK Amt. _224_
                                                          21692
VERSUS                                FEB 2 4 2003

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY
                                    BY_____
                                    DY, CLERK OF COURT

FILED: _____    ─────────────────────
                                    DEPUTY CLERK    POSTED

**EXCEPTION OF RES JUDICATA AND ALTERNATIVE**    FEB 2 4 2003
**PARTIAL EXCEPTION OF NO RIGHT OF ACTION**

NOW INTO COURT, through undersigned counsel, comes defendant, Robert J. Guidry,

who hereby excepts to the Petition of plaintiff, Alvin C. Copeland, on the grounds that the claims

asserted in plaintiff's Petition are barred by the doctrine of res judicata. Plaintiff has previously

litigated the transactions or occurrences at issue in the present lawsuit in a previous civil action

which was concluded with a final judgment against plaintiff and in favor of Treasure Chest,

L.L.C., a party for whom Robert J. Guidry is a privy, as is all explained in the attached

memorandum in support.

Additionally, the First Circuit made it clear in the present clase that the sole claim asserted

by plaintiff that is remaining for consideration is for the amount which plaintiff paid to the

Riverboat Gaming Commission and the Division for processing, consideration, investigation of his

application for a riverboat gaming license. In plaintiff's prior lawsuit, the same lawsuit in which

Treasure Chest obtained a judgment in its favor against Copeland, the State refunded $50,873.00

plus interest to Mr. Copeland. Insofar as the funds were tendered to Mr. Copeland and he has

actually received the funds, his claim has been reduced by the amount he received, either through

partial satisfaction of the alleged obligation or, more generally, through successful mitigation of his

damages. In light of Mr. Copeland having already received a refund of $50,873.00 of the

$80,000.00 plus interest  he sought from the State, the Court should order that Mr. Copeland's

damages in his unfair trade practices claim are limited to the remainder of the $80,000.00, that is,

$29,127.00 plus interest.

WHEREFORE, defendant, Robert J. Guidry, prays that a rule nisi issue herein ordering

plaintiff, Alvin C. Copeland, to appear and show cause, if any he can, why defendant Robert J.

Guidry's Exception of Res Judicata and Alternative Partial Exception of No Cause of Action

should not be maintained or granted, and further prays that after all legal delays, and due

proceedings be had, there be judgment in favor of defendant Robert J. Guidry, maintaining the

Exception of Res Judicata  and/or the Alternative Motion for Partial Summary Judgment.

Respectfully Submitted,

*Arthur A. Lemann III/jc*

ARTHUR A. LEMANN, III (8296)
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette St., Ste. 100
New Orleans, LA 70113
Telephone: (504) 522-8104

AND

RALPH CAPITELLI (3858)
CAPITELLI & WICKER
1100 Poydras Street
2950 Energy Centre
New Orleans, Louisiana 70163-2950
Telephone: (504) 582-2425

AND

WINSTON G. DECUIR, SR. (4795)
DECUIR & CLARK, L.L.P.
1951 Government Street
Baton Rouge, Louisiana 70806
Telephone: (504) 522-8104
***COUNSEL FOR DEFENDANT, ROBERT J.
GUIDRY***

CERTIFIED TRUE COPY
289702
DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH, LA

2003 FEB 24  PH 3: 51

2

3ʊ227124202

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been duly served upon all counsel of record ✓ by hand delivery, _ by facsimile transmission, or _ by depositing same in the U.S. MAIL, properly addressed, postage prepaid, this 24th day of _Feb_ 2003.

_[signature]_

CERTIFIED TRUE COPY
299703
DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRICT
BATON ROUGE PARISH, LA
2003 FEB 24 PM 3:51

3

3022712430

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                      DIVISION "D"

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

FILED: _____          _____
                                          DEPUTY CLERK

**ORDER**

Considering the above and foregoing Exception of Res Judicata and Alternative Motion for
Partial Exception of No Right of Action,

IT IS HEREBY ORDERED that plaintiff, Alvin C. Copeland appear and show cause on the
14 day of April, 2003, at 9:30 o'clock .m., why defendant Robert J. Guidry's
Exception of Res Judicata and Alternative Partial Exception of No Right of Action should not be
granted.

Baton Rouge, Louisiana, this 25 day of Feb , 2003

_____
JUDGE

CERTIFIED TRUE COPY
239704
DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH, LA
2003 FEB 24 PH 3:51

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607

DIVISION "D"

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

FILED: _____          _____
                                              DEPUTY CLERK

**MEMORANDUM IN SUPPORT OF EXCEPTION
OF RES JUDICATA AND ALTERNATIVE
PARTIAL EXCEPTION OF NO RIGHT OF ACTION**

**MAY IT PLEASE THE COURT:**

At root, the present suit is nothing more than an attempt by Mr. Copeland to relitigate whatever claims he may have arising out of the issuance of a riverboat gaming license to Treasure Chest, L.L.C. Although Mr. Copeland apparently believes the path to recovery is to sue repeatedly and simply recasting his claims, adding a new defendant, and making slight changes to his pleadings to correct any perceived problems with his earlier litigation efforts, his latest attempt to recover for his failure to obtain a riverboat gaming license is barred by the doctrine of res judicata and should therefore be dismissed. Alternatively, Mr. Copeland's unfair trade practice claim to recoup his application fees paid to the State has been reduced by the refund to Mr. Copeland of a significant portion of the funds at issue.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

This matter arises from the attempt of some forty-three applicants to obtain fifteen riverboat licenses issued by the Louisiana State Police in the mid-1990's. Copeland, like Treasure Chest, L.L.C., was an applicant. Unlike Treasure Chest, Copeland did not receive a license. Since that time he has pursued litigation for the purpose of either obtaining a license by court order or being compensated by someone, anyone, for his failure to obtain a license and whatever earnings he thinks he would have made.

In Alvin C. Copeland v. The Louisiana Riverboat Gaming Commission et al, Suit Number 400,750, Nineteenth Judicial District Court, Parish of East Baton Rouge (hereinafter "the Riverboat Gaming Commission suit"), filed on November 13, 1993, Copeland originally sought to appeal a ruling by the Commission which allowed Treasure Chest to move its planned riverboat project from the Mississippi River in Kenner to Lake Ponchartrain in Kenner. The relief sought in the suit was changed several times, and in January 1999, Copeland amended the suit for the third time. With the third amendment to the suit, Copeland sought, among other things, a declaration

that the Treasure Chest license was null and that his company should have been awarded the license.

Specifically, plaintiff pleaded in his Third Supplemental and Amended Petition[1] filed in the Riverboat Gaming Commission action as follows:

6.

> As an applicant seeking authorization to conduct gaming activities on a riverboat, and as a citizen of the state of Louisiana, plaintiff has a pecuniary interest in the licensing process and its integrity. Further, as detailed below, plaintiff has a specific pecuniary interest in the license awarded to Treasure Chest, for AIGA had sought a license to conduct gaming operations at the same location as Treasure Chest and should have received the license ultimately awarded to Treasure Chest.
>
> . . .

15.

> Treasure Chest submitted an application for a Certificate to the Commission on March 8, 1993. Like that submitted by AIGA, Treasure Chest's application proposed to locate its gaming riverboat at Kenner's Laketown Harbor Park.

16.

> On March 26, 1993 the Commission held a public hearing on the Treasure Chest application to operate a gaming riverboat. On April 29, 1993, subsequent to its public presentation before the Commission, Treasure Chest filed a modification to its application for a Certificate; This modification proposed locating its gaming riverboat at Riverboat, U.S.A. on the banks of the Mississippi River in Kenner. No hearing was ever held on the feasibility or suitability of this site as a location to base a gaming riverboat.
>
> . . .

22.

> On November 8, 1992 [sic], although its application for a Certificate had already been granted based on its submission of the Rivertown site as its gaming riverboat's docking location and base, Treasure Chest sought permission to modify its Certificate to move the site of its proposed riverboat route and operations back to Lake Ponchartrain as called for in the original Treasure Chest application. Treasure Chest's request for modification came for hearing before the Commission on November 13, 1993. Although AIGA objected to Treasure Chest's request for a modification, the Commission granted Treasure Chest's request.

23.

> The Division issued licenses to exactly the same 15 entities that had previously been given a Certificate by the Commission; Treasure Chest itself, for example, subsequently received a license from the Division on May 17, 1994. Upon information and belief, the Division never reviewed or considered a license application unless and until the application received a Certificate from the Commission.
>
> . . .

COUNT ONE APPEAL OF ACTIONS TAKEN BY THE DIVISION

29.

> Copeland appeals the following actions taken by the Division pursuant to LSA R.S. 4:548, LSA-R.S. 27.89, and the Louisiana Administrative Procedure Act, LSA-R.S. 49:950 *et seq.*: (1) its issuance of a license to Treasure Chest, and 92) its constructive denial of a license to plaintiff.

_____

[1] The Third Supplemental and Amended Petition was originally filed into the record attached to an Ex Parte Motion for Leave of Court to File Third Supplemental and Amending Petition on January 21, 1999.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 16 of 323

. . .

31.

Plaintiff submits that the Division should be required to hold a hearing into his suitability to conduct gaming operating [sic] on a riverboat, and should therefore award him the license previously awarded to Treasure Chest.

### COUNT TWO -- DECLARATORY JUDGMENT

32.

Copeland respectfully submits that he is entitled to a declaratory judgment that the license to conduct gaming activities on a riverboat that was originally granted to Treasure Chest is null, void, and without continuing effect. Upon information and belief, the Division abrogated the authority to usurp this process. Instead, of independently determining which applicants deserved a license, the Division merely awarded licenses to those applicants that had previously received Certificates from the Commission. Because the Division did not exercise the authority granted to it by the legislature and never conducted an independent analysis of the competing applicants, the license issued to Treasure Chest is null and void.

33.

Further, as detailed below, the application process violated plaintiff's constitutional rights to due process and equal protection. Consequently, plaintiff is entitled to a declaratory judgment that the entire application process was flawed, and the license awarded to Treasure Chest, is null and void.

### COUNT THREE -- VIOLATIONS OF CONSTITUTIONAL RIGHTS

. . .

38.

The Division's violations of plaintiff's constitutional rights and/or Section 1983 entitle Copeland to monetary damages from the Division that are reasonable in the premises, but Copeland itemizes these damages as including, but not limited to, lost past and future profits; loss of reputation and goodwill; all expenses he has incurred; and attorney fees pursuant to 42 U.S.C. 1988.

. . .

### COUNT FOUR -- RETURN OF FEES PAID TO THE COMMISSION

39

As the First Circuit Court of Appeal has found, the Commission had no authority to issue Certificates, and similarly had not authority to charge applicants fees in connection with the issuance of those Certificates. Plaintiff is therefore entitled to a refund of all fees paid by AIGA to the Commission.

### COUNT FIVE -- RETURN OF FEES PAID TO THE DIVISION

40.

Plaintiff is entitled to a refund of all fees paid by AIGA to the Division. As detailed above, the Division's issuance of licenses was a foregone conclusion; it merely awarded licenses to those entities that had obtained Certificates from the Commission. As a result, there was no justification for it to expend any moneys in performing a background check on AIGA. (See Ex. 1, Third Supplemental and Amended Petition.)

Treasure Chest Casino, L.L.C. intervened in the Riverboat Gaming Commission suit because of Copeland's claims that Treasure Chest's license had been improperly granted and that Treasure Chest's license should be declared null and void. Treasure Chest, in its intervention,

3

specifically denied Copeland's allegations that the license had improperly been granted a license and that the license should be awarded by the Court to Copeland. (See Ex. 2, Treasure Chest Intervention at ¶31.)

Subsequently, the <u>Riverboat Gaming Commission</u> litigation resulted in a final judgment in favor of Treasure Chest on Copeland's claims concerning its license. Treasure Chest's exceptions of prescription and failure to exhaust administrative remedies and motion to dismiss for mootness were granted on May 31, 2000, and the causes of action against Treasure Chest were dismissed with prejudice. (See Ex. 3, May 31, 2000, Judgment in <u>Riverboat Gaming Commission</u> suit.) On appeal, the First Circuit vacated the judgment insofar as it granted the exceptions of prescription and failure to exhaust administrative remedies, but it affirmed the portion of the trial court judgment that granted Treasure Chest's motion to dismiss. (See Ex. 4, Sept. 11, 2002, Opinion in <u>Riverboat Gaming Commission</u> appeal.) No further appeal was taken, and the First Circuit Opinion in the <u>Riverboat Gaming Commission</u> appeal is now a final judgment.

Subsequently, plaintiff filed suit against both Treasure Chest and Robert Guidry in the present action, claiming to have been damaged. Specifically, Copeland claims AIGA would have gotten the Kenner license but for alleged wrongdoing, and that he or his company would have made the profits from that license. In pertinent portion Copeland alleges in the present Petition that:

11.

On or about February 9, 1993, Guidry formed Treasure Chest Casino, Incorporated (hereinafter "Treasure Chest, Inc."). Upon information and belief, Robert J. Guidry was the President and/or Chairman of the Board of Treasure Chest, Inc.

. . .

13.

Treasure Chest, Inc. submitted its application to the Commission on March 8, 1993, approximately three months after the AIGA application was submitted. The Treasure Chest, Inc. application proposed to locate its gaming riverboat at Kenner's Laketown Harbor Park. On March 26, 1993, the Gaming Commission held a public hearing in Baton Rouge, LA. on the Treasure Chest, Inc. application to operate a gaming riverboat; this hearing occurred fewer than three weeks after the Treasure Chest, Inc. filed its application, thereby granting priority to the Treasure Chest, Inc. application over the application filed substantially earlier by AIGA. Treasure Chest, Inc. later filed a modification to its application for a certificate, which proposed re-locating the Treasure Chest, Inc.'s gaming riverboat from the Laketown Harbor Park site to Rivertown, U.S.A., on the banks of the Mississippi River in Kenner.

14.

On June 4, 1993, a public hearing was held in Baton Rouge, La. at which AIGA made a presentation to the Commission on its application for a certificate.

15.

The Commission held another meeting in Baton Rouge, La. on June 18, 1993. By that date it had approved eight applications for certificates, although none of these eight approved applications involved proposals to locate a gaming riverboat in Kenner. At this meeting, the Chairman of the commission stated that he had "been asked by the Governor to make a comment on his behalf, and that is that the

4

3 0 2 2 7 1 2 4 4 0 .

City of Kenner has expressed that it really desires only one boat and that boat to be located on the river." In addition, at this meeting, the Commission rescinded the resolution that it had adopted on June 4th, which had stated that "a change of waterway" would be "more than a modification and requires a new application." The Commission then adopted a motion "that would allow subsequent changes to applications or status of those applications leaving basically ... discretion as to whether new or not at the discretion of the Chairman with the consent of the Commission." The Commission then voted on eight applications for certificates and approved seven of them; the Treasure Chest, Inc. application for a certificate for its Rivertown location was one of the applications that was approved. As a result, AIGA's application to operate a gaming riverboat at the Laketown Harbor Park site on the shores of Lake Ponchartrain was never considered or voted on by the Commission.

. . . .

18.

On November 13, 1993, subsequent to the approval by the Commission of the Treasure Chest, Inc. application for its Rivertown location, Treasure Chest sought permission to modify the previously filed application to move the site of its proposed route and operations to Lake Ponchartrain. The Commission granted this request over AIGA's objections. Despite the fact that it had been Treasure Chest, Inc. that had applied for the Certificate of Preliminary Approval, the Commission issued a certificate to Treasure Chest Casino, L.L.C. on March 15, 1994.

. . . .

29.

Plaintiff avers that, but for the overarching corrupt conspiracy, AIGA would have obtained a license to conduct gaming activities on a riverboat pursuant to the Act, and was suitable to obtain such a license; AIGA, in fact, was granted a video gaming owner's license by the State of Louisiana in June 1994 and a gaming license by the State of Colorado in March 1995. Further, had AIGA known of the overarching corrupt conspiracy, it would not have expended the funds necessary to prepare and submit its application.

. . . .

39.

On or about October 27, 1997, Boyd Louisiana, L.L.C., a Nevada limited liability company ("Boyd Louisiana"), along with another wholly owned subsidiary of Boyd Gaming, purchased the interest in Treasure Chest not owned by Boyd Kenner for approximately $113 million from the selling members, namely Robert J. Guidry, Dick J. Guidry, Robert A. Vosbein, Pam Olson, Robert J. Guidry Family Trust, and Dick J. Guidry Family Trust. The Treasure Chest's "intangible license rights," which had been obtained solely as a result of the overarching corrupt conspiracy, were valued at $85 million of the total purchase price. On information and belief, defendant Robert J. Guidry individually received $73 million from this transaction; the remaining $12 million was distributed among the other selling members. As a result of this transaction, Treasure Chest became and remains a wholly owned subsidiary of Boyd Gaming.

. . . .

**Count One -- Racketeering Influenced and Corrupt Organizations Act**

67.

On information and belief, Edwin W. Edwards, Stephen Edwards, Andrew Martin, Robert Guidry, Treasure Chest, and other unnamed persons and entities (collectively, "RICO persons") constituted an association-in-fact enterprise ("RICO enterprise") as defined in the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, et seq. ("RICO").

. . . .

5

79.

On information and belief, commencing in or about 1993 and continuing
through 1994, Edwin Edwards, on several occasions, assisted certain riverboat
applicants in obtaining licenses from the Division by, among other things,
demanding that the Division schedule speedy licensing hearings for those applicants
he favored.

. . . .

### Count Three -- Fraud

As detailed above, Robert J. Guidry and/or Treasure Chest obtained a
certificate and license by misrepresentations and/or suppressions of the truth
concerning the overarching corrupt conspiracy, as well as their participation in
extortion; these misrepresentations and/or suppressions were made with the intent
to obtain an unjust advantage in obtaining a certificate and license. Robert J. Guidry
and/or Treasure Chest are therefore liable for fraud under La. Civ. Code art. 2315.

. . . .

87.

Robert J. Guidry and/or Treasure Chest are liable unto plaintiff for the fraud
effected by the overarching conspiracy and the damages to plaintiff resulting
therefrom, including without limitation his lost profits, attorney fees, costs, the
value of Treasure Chest's gambling license, and the value of Treasure Chest's
success.

### Count Four -- Unjust Enrichment

88.

Guidry and/or Treasure Chest are liable to Copeland for their unjust
enrichment. As detailed above, the license awarded to Treasure Chest as a result of
the overarching corrupt conspiracy should have been awarded to AIGA. Defendants
have reaped enormous profits under the license, while Copeland (1) has both had to
forego the profits he would have made under the license, and (2) has never
recouped his out-of-pocket costs and expenses incurred in applying for it.
Consequently, defendants have been unjustifiably enriched, and Copeland has been
impoverished.

89.

As a result of defendants' unjust enrichment, Copeland is entitled, without
limitation, to recoup his out-of-pocket costs and lost profits or, alternatively, the
profits made by the defendants, pursuant to La. Civ. Code art. 2298. He is also
entitled to recover the value of Treasure Chest's gaming license and the value of
Treasure Chest's success.

. . . .

91.

Because all of the above referenced acts undertaken by Robert Guidry were
in the course and scope of his position with Treasure Chest and were done with
actual and/or apparent authority provided to Guidry by Treasure Chest, Treasure
Chest is liable to plaintiffs for these acts through the doctrine of *respondeat superior*
and/or La. Civ. Code article 2320. Guidry's actions were rooted in his position
with Treasure Chest and were incidental to its activities, and were done with
Treasure Chest's consent. (See Ex. 5, Petition in instant action.)

While the language of the petitions (and even perhaps some of the "causes of action" or
"theories of recovery") in the Riverboat Gaming Commission suit and the instant lawsuit may be
different, the transactions and occurrences out of which the two lawsuits arise are the same. A

6

second lawsuit arising out of the same transactions or occurrences is precisely the event the 1990 revision of Louisiana's res judicata law was designed to prevent. This is true because a bar to relitigation of claims from the same transactions or occurrences "prevents needless relitigation of the underlying facts and will free the defendant from vexatious litigation . . . ." LSA R.S. 13:4231, Comment (A).

With regard to the plaintiff's sole remaining claim for reimbursement of the amounts he paid to the Commission and/or to the Division for processing, consideration, and investigation of his riverboat gaming application, it is identical to the claims he asserted in the Riverboat Gaming Commission suit. Indeed, in that action, on June 14, 2000, $20,873.00 of the money paid by plaintiff to the Division was ordered placed in the registry of the Court. Ultimately, by order of Judge Downing, dated May 31, 2000, it was ordered that $20,873.00, which represented a portion of fees paid by Copeland and/or AIGA to the Division, be placed in the registry of the Court. (See Ex. 3, May 31, 2000 Order in the Riverboat Gaming Commission suit.) According to the Registry Receipt for Withdrawal of Funds issued by the Clerk of this Honorable Court, Mr. Ben Slater, counsel for Mr. Copeland, signed for check number 5581633, payable to the Slater Law Firm and Alvin C. Copeland in the amount of $21,187.44 on November 13, 2000. (See Ex. 6, November 13, 2000 Registry Receipt for Withdrawal of Funds.) Additionally, the $30,000.00 paid by Mr. Copeland to the Commission was returned to him by way of a check for $30,000.00 dated July 29, 1999 made out to Alvin C. Copeland.[2]

## II.   THE PRIOR SUIT BARS THE PRESENT CLAIMS

The res judicata law set forth in LSA R.S. 13:4231 is applicable in the instant matter and provides:

> Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
>
> . . . .
>
> (2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action. See LSA R.S. 13:4231(2).

This amendment to the prior law, made substantial changes in the res judicata law. In addressing the changes, Comment (A) states that the "central inquiry is not whether the second action is based on the same cause or causes of action ... but whether the second action asserts a cause of action which arises out of the transaction or occurrence which was the subject matter of the first action."

---

[2] Previously, another $30,000.00 check had been issued made out to AIGA, but that check was voided. Copies of these documents are being obtained and will be submitted with a supplemental memorandum in support of these exceptions.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 21 of 323

The rationale of the amendment is to serve "the purpose of judicial economy and fairness by requiring the plaintiff to seek all relief and to assert all rights which arise out of the same transaction or occurrence." Id.

In applying R.S. 13:4231 to the instant matter, it becomes readily apparent that plaintiff's claims are barred by res judicata. First, there is no dispute that the judgment in favor of Treasure Chest in the Riverboat Gaming Commission suit is a final judgment. Second, all of the claims in the instant matter arise out of the same transactions or occurrences that were or could have been at issue in the Riverboat Gaming Commission suit. Third, Robert J. Guidry is a privy to Treasure Chest for the purposes of res judicata such that he receives the same res judicata protection from the prior judgment as Treasure Chest. Finally, because the doctrine of res judicata requires a plaintiff to present all claims arising out of one set of transactions or occurrences in one proceeding against all possible defendants, Copeland's failure to bring his claims against Guidry in the previous proceeding bars the present claims against him even if Robert J. Guidry is not a privy to Treasure Chest.

**A. THE SUITS WERE BETWEEN THE SAME PARTIES OR PRIVIES**

Although Robert J. Guidry is not the same entity or person as Treasure Chest, he, like Treasure Chest, is protected by the doctrine of res judicata from Copeland's relitigation of claims arising out of the Treasure Chest licensing transactions or occurrences. He received this protection because, as a corporate director and/or officer of Treasure Chest at the time of the transactions or occurrences, he is a privy of Treasure Chest for the purposes of res judicata.

After the 1990 revision of Louisiana's law of res judicata, our law is now "in line with federal provisions". Hudson v. City of Bossier, 766 So.2d 738, 743 (La. App. 2d Cir. 2000).Among other concepts borrowed from federal res judicata law, parties are now viewed as being of the same quality if they would be "in privity" or "privies" under federal law. The Second Circuit explained the concept thus:

> Under federal law, the preclusive effect of a judgment binds the parties to the action and nonparties who are deemed the "privies" of the parties in these limited circumstances: (1) the nonparty is the successor in interest of a party; (2) the nonparty controlled the prior litigation; or (3) the nonparty's interests were adequately represented by a party to the action who may be considered the "virtual representative" of the nonparty because the interests of the party and the nonparty are so closely aligned. (citations omitted) Id.

Applying these concepts, federal courts have held that officers or directors of a company were privies such that prior litigation against their company precluded subsequent litigation against them for RICO and related claims arising out of the same transactions or occurrences. Pedrina v. Chun, 97 F.3d 1296, 1302 (9th Cir. 1996) (Action against corporate officers for RICO barred by action against corporation arising out of same transactions or occurrences); In re Imperial Corp. of America, 92 F.3d 1503 (9th Cir. 1996) (Claims for mismanagement against officers and directors

8

barred by prior settlement of shareholder derivative suit); <u>Fox v. Maulding</u>, 112 F.3d 453 (10th Cir. 1997) (Prior state court foreclosure action between plaintiffs and bank barred subsequent RICO action against bank directors and officers).

The interests of Treasure Chest and Robert J. Guidry were so closely aligned in the prior proceedings that Treasure Chest was the virtual representative of Guidry in that proceeding. Both Treasure Chest and Guidry have maintained in all fora that Treasure Chest legally held the license and that the award of the license to Treasure Chest was not null and void as claimed by Copeland. As can be seen from the federal cases cited, it is difficult to find an alignment more close than in a situation where a corporate entity is sued for purported wrongdoing, and after losing the initial suit, the plaintiff attempts to sue the officers or directors involved in the same transactions or occurrences that were the subject of the first suit. Therefore, the Court should hold that Robert J. Guidry is a privy to Treasure Chest for the purposes of applying <u>res judicata</u> to the judgment in the <u>Riverboat Gaming Commission</u> suit.

### B. THE TWO SUITS ARISE OUT OF THE SAME TRANSACTIONS OR OCCURRENCES

The next inquiry in the <u>res judicata</u> analysis is whether the transactions or occurrences at issue in the present suit are the same as those from which the <u>Riverboat Gaming Commission</u> suit arose.

A "transaction" or "occurrence" for <u>res judicata</u> purposes is a common nucleus of operative facts upon which two suits are based, <u>de la Vergue v. de la Maze</u>, App. 4 Cir. 1996, 95-1866 (La. App. 4th Cir. 2/29/96), 670 So. 2d 599, and includes all issues relevant to the same transactions or occurrences, <u>whether raised or not</u>. <u>Id.</u> As will be seen, a common nucleus of operative facts in the <u>Riverboat Gaming Commission</u> suit and the instant lawsuit are the events which resulted in the granting of the license to the Treasure Chest casino.

Since R.S. 13:4231 did not apply to any lawsuit filed before January 1, 1991, there is a relative absence of Louisiana state jurisprudence interpreting the concept of "transaction or occurrence", and state courts have, therefore, adopted the federal courts interpretation of the term. <u>Terrebonne Fuel & Lube, Inc. v. Placid Refining Co.</u>, 666 So. 2d 624 (La. 1996); <u>Avenue Plaza, L.L.C. v. Falgoust</u>, 676 So. 2d 1077 (La. 1996). In <u>Durkin v. Quest, Inc.</u>, 724 So.2d 868 (La. App. 5th Cir. 1999), the court noted that the phrase "transaction or occurrence" has long "been subject to interpretation in the federal jurisprudence, especially in regard to compulsory counterclaims under Rule 13(a) of the Federal Rules of Civil Procedure." The <u>Durkin</u> Court then observed that the Court in <u>Park Club, Inc. v. Resolution Trust Corp.</u>, 967 F.2d 1053 (5th Cir.1992), had set forth a four part inquiry to be used to determine when a counterclaim arises out of the same "transaction or occurrence" as the main claim:

9

(1) Whether the issues of fact and law raised by the claim and counterclaim largely are the same; (2) whether res judicata would bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute plaintiff's claim as well as defendant's counterclaim; and (4) whether there is any logical relationship between the claim and the counterclaim. An affirmative answer to any of the four questions indicates the counterclaim is compulsory. This standard is taken from Fed.R.Civ.P. 13(a), which provides that a counterclaim is compulsory if it "arises out of the transaction or occurrence which is the subject matter of the opposing party's claim." Durkin, 724 So.2d at 870-871, quoting, Park Club, Inc. v. Resolution Trust Corp., 967 F.2d 10563 (5th Cir. 1992).

Importantly, the Durkin Court noted that "while the above test deals with whether compulsory counterclaims arise out of the same transaction or occurrence, in our opinion, a similar inquiry is appropriate in the context of La. R.S. 13:4231, to determine whether the claims in a second suit arise out of the same transaction or occurrence upon which the claims in a previous suit were based, so as to form the basis of an exception of res judicata." Thus, in light of the absence of state jurisprudence, the court may apply federal jurisprudence interpreting the term "same transaction or occurrence."

The common nucleus of operative facts in the instant case and in the Riverboat Gaming Commission case is the alleged improper issuance of the license to operate the Treasure Chest Casino. First, the issues of law and facts are essentially the same. As set forth in the chart below, all of plaintiffs' claims in the Riverboat Gaming Commission suit and the instant lawsuit arise out of the sequence of events which resulted in the issuance of a license to Treasure Chest to operate its casino:

| the Riverboat Gaming Commission Suit. | The Present Action. |
|---|---|
| On December 11, 1992, AIGA submitted its application to the Commission for a Certificate of Preliminary Approval for a proposed riverboat route and other operations at the Kenner Laketown Harbor Park on the shores of Lake Ponchartrain. AIGA submitted a second application form on February 22, 1993 containing supplemental information. (Third Supplemental and Amended Petition at ¶12.) and Commission Rule 303 required applicants to remit to the Commission an application fee of "$25,000 for the application and $5,000 to defray the expenses of the commission in analyzing and evaluating an application for certificate." AIGA paid the necessary $30,000 to the Commission along with its application. (Third Supplemental and Amended Petition at ¶13.) | On December 11, 1992, AIGA submitted its application to the Commission for a certificate, and submitted a second application form on February 22, 1993 containing supplemental information. The AIGA application proposed a riverboat route and related operations at the Kenner Laketown Harbor Park on the shores of Lake Ponchartrain. In conjunction with its application, AIGA submitted a check in the amount of $30,000.00, comprised of a $25,000.00 application fee and a $5,000.00 evaluation fee. On February 14, 1993, AIGA submitted to the Division the filing fee of $50,000.00 required to fund the Division's background investigation of applicants for a license. The AIGA application was the first submitted to the Commission that proposed to conduct riverboat gaming in Kenner, Louisiana, and was among the first submitted to the Division for approval. (Petition at ¶9.) |

10

| | |
|---|---|
| The Commission held a meeting on June 18, 1993. By that date, it had approved eight applications for Certificates; none of these eight approved applications involved proposals to locate a gaming riverboat in Kenner. This meeting was, according to Chairman Pickering's transcribed comments, to "choose seven out of the remaining thirty-five [applications]. Twenty-eight will go by the wayside." Although neither the Act nor the Commission's rules provided any numerical limitation on the number of Certificates that could be issued by the Commission, Pickering noted the Commission's belief that it could only approve fifteen applications by stating that "obviously, once we have chosen seven of those [remaining thirty-five] boats, there will be no need to go any further as there is nothing this commission can do at that point." Further, after seven boats were ultimately approved on June 18th, Chairman Pickering stated "That gives us seven boats. I assume there is no reason to consider any other boats." (Third Supplemental and Amended Petition at ¶19.) and The Commission then voted on eight applications for Certificates at the June 18th meeting, and approved seven applications; the Treasure Chest application for a Certificate of Preliminary Approval of its Rivertown locations was one of those applications that was approved. The Commission did not grant AIGA a Certificate. (Third Supplemental and Amended Petition at ¶20.) and On November 8, 1992 [sic], although its application for a Certificate had already been granted based on its submission of the Rivertown site as its gaming riverboat's docking location and base, Treasure Chest sought permission to modify its Certificate to move the site of its proposed riverboat route and operations back to Lake Ponchartrain as called for in the original Treasure Chest application. Treasure Chest's request for modification came for hearing before the Commission on November 13, 1993. Although AIGA objected to Treasure Chest's request for a modification, the Commission granted Treasure Chest's request[.] (Third Supplemental and Amended Petition at ¶22.) | The Commission held another meeting in Baton Rouge, La. on June 18, 1993. By that date, it had approved eight applications for certificates, although none of these eight approved applications involved proposals to locate a gaming riverboat in Kenner. At this meeting, the Chairman of the Commission stated that he had "been asked by the Governor to make one comment on his behalf, and that is that the City of Kenner has expressed that it really desires only one boat and that boat to be located on the river." In addition, at this meeting, the Commission rescinded the resolution that it had adopted on June 4th, which had stated that "a change of waterway" would be "more than a modification and requires a new application." The Commission then adopted a motion "that would allow subsequent changes to applications or status of those applications leaving basically ... discretion as to whether new or not at the discretion of the Chairman with the consent of the Commission." The Commission then voted on eight applications for certificates and approved seven of them; the Treasure Chest, Inc. application for a certificate for its Rivertown location was one of the applications that was approved. As a result, AIGA's application to operate a gaming riverboat at the Laketown Harbor Park site on the shores of Lake Ponchartrain was never considered or voted on by the Commission. (Petition at ¶15.) |
|     The Division issued licenses to exactly the same 15 entities that had previously been given a Certificate by the Commission; Treasure Chest itself, for example, subsequently received a license from the Division on May 17, 1994. Upon information and belief, the Division never reviewed or considered a license application unless and until the application received a Certificate from the Commission. (Third Supplemental and Amended Petition at ¶23.) |     On May 17, 1994, the Division granted a license to Treasure Chest. On information and belief, Treasure Chest would not have received a license but for the overarching corrupt conspiracy. (Petition at ¶28.) |

11

| | |
|---|---|
| Copeland respectfully submits that he is entitled to a declaratory judgment that the license to conduct gaming activities on a riverboat that was originally granted to Treasure Chest is null, void, and without continuing effect. Upon information and belief, the Division abrogated the authority granted to it by the legislature to issue licenses by allowing the Commission to usurp this process. Instead of independently determining which applicants deserved a license, the Division merely awarded licenses to those applicants that had previously received Certificates from the Commission. Because the Division did not exercise the authority granted to it by the legislature and never conducted an independent analysis of the competing applicants. (Third Supplemental and Amended Petition at ¶32.) | Guidry and/or Treasure Chest are liable to Copeland for their unjust enrichment. **As detailed above, the license awarded to Treasure Chest as a result of the overarching corrupt conspiracy should have been awarded to AIGA.** Defendants have reaped enormous profits under the license, while Copeland (1) has both had to forego the profits he would have made under the license, and (2) has never recouped his out-of-pocket costs and expenses incurred in applying for it. Consequently, defendants have been unjustifiably enriched, and Copeland has been impoverished. (bold emphasis added) (Petition at ¶88.) |

Second, the application of <u>res judicata</u> would bar the entire present suit in that plaintiff makes no claims that are unrelated to the alleged improper issuance of the Treasure Chest license. Third, substantially the same evidence that was or <u>could have been</u> used in the <u>Riverboat Gaming Commission</u> suit may be used to support plaintiff's claims in this second suit concerning the issuance of the Treasure Chest Casino. Fourth, there is a logical connection between the claims asserted in the <u>Riverboat Gaming Commission</u> suit and the instant suit. Specifically the logical connection or common thread is the proceedings before the Division and the Commission. The earlier suit alleges various improprieties in the proceedings, as does the present suit. Thus, not one, but all four of the factors are properly met, demonstrating that the present action arises from the same transactions or occurrences as the previously decided <u>Riverboat Gaming Commission</u> suit.

Ultimately a detailed analysis and a review of the pleadings in this matter only serve to confirm the common sense answer to the inquiry of identifying the transactions or occurrences at issue. In the <u>Riverboat Gaming Commission</u> suit AIGA, and later Mr. Copeland by substitution, sued for alleged wrongdoing and/or failure to follow procedures in the award of the license to Treasure Chest. Now, Mr. Copeland is suing Treasure Chest and Robert J. Guidry for alleged wrongdoing in the very same licensing proceedings. Therefore, both the <u>Riverboat Gaming Commission</u> suit and the present suit arise out of the same transactions or occurrences.

## C. ALL CLAIMS ARISING OUT OF THE TREASURE CHEST CASINO TRANSACTIONS OR OCCURRENCES ARE BARRED

Plaintiff may try to avoid having his claims dismissed in the present action by asserting that the claims, causes of action, theories of recovery, or defendants from whom recovery are sought are different. Such arguments will not protect Mr. Copeland's claims from dismissal. Mr. Copeland was obligated to present all of his claims arising out of the Treasure Chest licensing transactions or occurrences in one proceeding, and his failure to present them in the first proceeding arising out of those transactions or occurrences bars his subsequent presentation of

12

them in this suit.[3]

Along with the enactment of R.S. 13:4231, Louisiana Code of Civil Procedure Article 425 was amended effective January 1, 1991 to provide: "A party shall assert all causes of action arising out of the transaction or occurrence that is the subject matter of the litigation." The 1990 Comment to Art. 425 provides that "[t]his amendment expands the scope of this article to reflect the changes made in the defense of res judicata and puts the parties on notice that all causes of action arising out of the transaction or occurrence that is the subject matter of the litigation must be raised." Louisiana Code of Civil Proc., art. 425, cmt. - 1990. In amending Louisiana Civil Code Article 425, the Legislature placed an affirmative duty on plaintiffs to assert all claims that arise out of the same transaction or occurrence in one action. Wood v. May, 658 So.2d 8, (La. App. 4 Cir. 1995), rev'd on other grounds, 663 So.2d 739, (La. 1995). Thus, a judgment in an earlier suit now serves as a bar to all causes of action arising out of the same transactions or occurrences. Steptoe v. Lallie Kemp Hosp., 634 So.2d 331, 335 (La. 1994). Put another way, the judgment bar to all causes of action arising out of the same transaction or occurrence now specifically includes "foreclosure of matters that have never been litigated but should have been advanced in the earlier suit." Hudson, 776 So.2d at 743. To the extent plaintiffs contends that the present suit makes different claims and adds Robert J. Guidry as a defendant, these so-called new claims are also barred by Louisiana Code of Civil Procedure Article 425.[4] The res judicata bar of claims that

---

[3] Guidry notes that he previously opposed the attempt by plaintiff to transfer and consolidate the Riverboat Gaming Commission action with this action. Although alternative positions are allowed, the due to the different standards applicable to a motion to transfer and consolidate and an exception of res judicata, the positions taken are not inconsistent. La. Code of Civ. Proc. art. 1561 requires that common issues of fact "predominate" the two cases for consolidation to occur. The concept of two claims arising out of the same transactions or occurrences, as is the standard for res judicata is much broader and merely requires that there be a large commonality of fact and law, not a predomination of common issues. See La. R.S. 13:4231; Durkin, 724 So.2d at 870-871. Therefore, Guidry's prior opposition to the transfer and consolidation in no way bars his current assertion that res judicata, based upon the judgment in favor of Treasure Chest in the Riverboat Gaming Commission action, bars the present suit.

[4] Any argument that plaintiff did not make his claims in the Riverboat Gaming Commission suit because he was unaware of them at a time when he could plead them is unavailing. Plaintiff had prepared his Third Supplemental and Amended Petition and filed it attached to a motion for leave on January 21, 1999. At this juncture he should clearly have known that he might have a claim and should assert the claim if he so wished. Confronted by allegations very similar to Copeland's claims in this case, to wit, that absent corruption the plaintiff. Astoria Entertainment, Inc. would have obtained a license to operate a riverboat, Judge Duval held that the prescriptive period for a RICO claim began to run when losing applicants were denied licenses at the June 18, 1993 meeting, and in no event later than May 1994 when all of the licenses were issued. See Astoria Entertainment, L.L.C. v. Edwin W. Edwards et al., 159 F.Supp.2d 303, 318 (E.D.La. 2001). Moreover, Astoria had, based upon the same public facts and hearings, filed its original complaint alleging corruption on November 12, 1998, well before Copeland filed his Third Supplemental and Amended Petition. Additionally, numerous newspaper articles had raised the issue of influence and corruption in the riverboat licensing process in 1994-1997. (See Times-Picayune citations in Petition at ¶¶12, 16, and 24.) Moreover, Mr. Copeland would have to maintain that he had no notice of his need to amend his already pending suit in spite of front page coverage of the Edwards indictment that specifically set forth the extortion of Robert Guidry by Edwards and others. See Manuel Roig-Franzia, Ex-Governor Is Facing 350 Years, New Orleans Times-Picayune, November 7, 1998. (A copy is attached as Ex. 7.) Prior to the indictment, there was similar front-page coverage when Mr. Guidry testified as to the Edwards extortion at the time of Guidry's guilty plea. See Manuel Roig-Franzia, Edwards Paid Off, Former Crony Says Guidry Takes Please, Outlines Schemes, New Orleans Times-Picayune, October 17, 1998 (A copy is attached as Ex. 8.); Christopher Baughman, Witness Cites Cash in Trash, Advocate, October 17, 1998 (A copy is attached as Ex. 9.).In short, the only way Copeland can claim that he did not know of the alleged conspiracy at the time he prepared and filed the Third Supplemental and Amended

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 27 of 323

could have been presented extends to protect persons who were neither a party to the first action nor a privy to a party to the first action.

In a case similar to the instant matter, Compaux v. Plaisance Inspection & Enter's, Inc., 730 So.2d 1069 (La. App. 1st Cir. 1999), the First Circuit held that a plaintiff's second suit was barred by res judicata in light of the fact his earlier suit had been dismissed despite the plaintiff's attempt to resurrect his right to pursue the litigation by asserting new or different claims. In Compaux, the plaintiff was injured on March 5, 1991, while working at Halter Marine's Shipyard. In 1992, plaintiff timely sued defendant, Plaisance Inspection, alleging that he was injured as a result of the fault of an unnamed Plaisance employee. Over a year later, plaintiff amended his petition to name David Adams, the alleged unnamed employee, and his employer, Calais Welding, as defendants. The district court dismissed plaintiff's suit against Calais with prejudice on the grounds that the claim was prescribed since Calais was not a solidary obligor with Plaisance. Two years later, plaintiff filed a second suit based on the same allegations as in the 1992 suit naming defendants Adams and Calais. The defendants then filed a motion for summary judgment based on res judicata which the district court granted. In affirming, the First Circuit held that since the first suit was terminated by final judgment, it could not be resurrected two years later by asserting a claim that was not raised earlier. Id. at 1070. Similarly, in the instant case, there is already a final judgment dismissing the Riverboat Gaming Commission suit. Therefore, plaintiffs are barred from relitigating or newly litigating claims arising out of the transactions or occurrences at issue in the Riverboat Gaming Commission suit.

## III. COPELAND CANNOT PURSUE HIS CLAIM FOR REPAYMENT OF FEES PAID TO THE DIVISION OR THE COMMISSION BECAUSE HE HAS ALREADY BEEN REFUNDED A PORTION OF THOSE PAYMENTS

The only cause of action that the First Circuit held Mr. Copeland had remaining was his claim pursuant to the Unfair Trade Practices Act in which he alleged that unfair trade practices had forced him to expend $80,000.00 in furtherance of his application via fees paid to the Commission and Division. See Copeland v. Treasure Chest Casino, L.L.C. and Robert J. Guidry, 822 So.2d 68, 70-71 (La. App. 1st Cir. 2002). In an interesting omission, Mr. Copeland has failed to inform the Court to date, despite ample opportunity to do so, that a significant portion of the fees that he paid have already been refunded to him. Mr. Copeland has, by virtue of acceptance of payment, surrendered his right to pursue these claims.

As previously noted in the recitation of facts, by order of Judge Downing, dated May 31, 2000, it was ordered that $20,873.00 of the money paid by AIGA and/or Copeland to the Division be placed in the registry of the Court. (See Ex. 3, May 31, 2000 Order in the Riverboat Gaming

---

Complaint in the Riverboat Gaming Commission case is to argue that he ignores the headlines of all of the major papers in New Orleans and other major cities in Louisiana.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 28 of 323

Commission suit.) According to the Registry Receipt for Withdrawal of Funds issued by the Clerk of this Honorable Court, Mr. Ben Slater, counsel for Mr. Copeland signed for check number 5581633, payable to the Slater Law Firm and Alvin C. Copeland in the amount of $21,187.44 on November 13, 2000. (See Ex. 6, November 13, 2000 Registry Receipt for Withdrawal of Funds.) Additionally, the $30,000.00 paid by Mr. Copeland to the Commission was returned to him via check dated July 29, 1999.

This payment clearly serves to reduce Mr. Copeland's claims. The amounts returned to Mr. Copeland were portions of the fees that had not been expended by the Commission or Division in their processing and investigation. Thus, the return of funds represented the payment of an undisputed portion of an obligation, which extinguishes a portion of the obligation and reserves rights to obligee to seek the remainder or disputed portion of the obligation. See La. Civ. Code art. 1861. To the extent Mr. Copeland has any claim against Mr. Guidry for the $80,000.00, which is denied, payment by a third party inurs to Mr. Guidry's credit regardless of the state's motivation in making the payment. See La. Civ. Code art. 1855; Tumblin v. Gratech Corp., 448 So.2d 179 (La. App. 4th Cir. 1984). Alternatively, Mr. Copeland's successfully obtaining the return of funds from the state agencies is simply a successful mitigation of his damages. In either case, not counting the interest paid to Mr. Copeland for the time the money was held in the registry of the Court, Mr. Copeland has already been made whole for $50,873.00 of the alleged $80,000.00 harm in the unfair trade practices claim. Therefore, unless Mr. Copeland is to be allowed a double recovery for his alleged damages, the most Mr. Copeland can claim as damages in the unfair trade practices claim would be the remaining $29,127.00 and associated interest.

**IV.   CONCLUSION**

There is no dispute that there is a final judgment in favor of Treasure Chest in the Riverboat Gaming Commission suit. An examination of the pleadings makes it clear that both the Riverboat Gaming Commission suit and the present action arise out of the same transactions or occurrences, the licensing of the Treasure Chest Casino. Also, as an officer or director of the corporate defendant in the earlier suit, Robert J. Guidry was virtually represented by Treasure Chest in that earlier proceeding. Therefore, he is a privy to Treasure Chest and should be treated as the same party for res judicata purposes. All three of the elements for the application of res judicata having thus been met, the Court should dismiss Copeland's claims against Robert J. Guidry as being barred by res judicata.

Should the Court find that Robert J. Guidry is not a privy of Treasure Chest but still finds that the present suit arises out of the same transactions or occurrences as were at issue in the earlier suit, Copeland's claims are still barred. Under Louisiana law the judgment in favor of Treasure Chest in the Riverboat Gaming Commission suit extinguishes and bars all claims by Copeland

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 29 of 323

arising out of the same transactions or occurrences, even if those claims are against another individual not named in the prior suit or are framed differently, such as calling them a new cause of action.

This matter is a textbook example of a plaintiff who has sufficient resources attempting to get another bite at the apple. Mr. Copeland opted, for reasons unknown to defendant, to neither present his claims of racketeering or fraud in nor join defendant as a party to the Riverboat Gaming Commission suit. Having lost his claims against Treasure Chest in that suit and having squandered his opportunity to make claims against Mr. Guidry, Mr. Copeland cannot now sue again. In light of the foregoing, Mr. Copeland's claims against Mr. Guidry should be dismissed.

Respectfully Submitted,

ARTHUR A. LEMANN, III (8296)
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette St., Ste. 100
New Orleans, LA 70113
Telephone: (504) 522-8104

AND

RALPH CAPITELLI (3858)
CAPITELLI & WICKER
1100 Poydras Street
2950 Energy Centre
New Orleans, Louisiana 70163-2950
Telephone: (504) 582-2425

AND

WINSTON G. DECUIR, SR. (4795)
DECUIR & CLARK, L.L.P.
1951 Government Street
Baton Rouge, Louisiana 70806
Telephone: (504) 522-8104
***COUNSEL FOR DEFENDANT, ROBERT J. GUIDRY***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been duly served upon all counsel of record ✓ by hand delivery, _ by facsimile transmission, or _ by depositing same in the U.S. MAIL, properly addressed, postage prepaid, this 24th day of Feb 2003.

16

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 400-750                    DIVISION "A"


ALVIN C. COPELAND

VERSUS

THE LOUISIANA GAMING CONTROL BOARD

and the

RIVERBOAT GAMING ENFORCEMENT DIVISION
OF THE GAMING ENFORCEMENT SECTION
OF THE OFFICE OF STATE POLICE, PUBLIC SAFETY SERVICES,
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

FILED:_____          _____
                                          DEPUTY CLERK

## THIRD SUPPLEMENTAL AND AMENDED PETITION

**NOW INTO COURT**, through undersigned counsel, comes plaintiff Alvin C.

Copeland, who hereby supplements and amends the "Petition for Appeal of Action Taken by

the Louisiana Riverboat Gaming Commission and for a Declaratory Judgment" filed on

November 22, 1993; the "Amended Petition of American International Gaming Association,

Inc." filed on June 29, 1998; and the "Second Amended Petition of American International

Gaming Association, Inc." filed on September 1, 1998 as follows:

1.

This suit involves (1) an appeal of action taken by the Riverboat Gaming Enforcement

Division of the Gaming Enforcement Section of the Office of State Police, Public Safety

Services, Department of Public Safety and Corrections (the "Division") pursuant to LSA-R.S.

4:548, LSA-R.S. 27:89, and the Louisiana Administrative Procedure Act, LSA-R.S. 49:950 *et*

*seq.*; (2) a request for a declaratory judgment that the license to conduct gaming activities on a

riverboat that was originally granted to Treasure Chest Casino, Inc. ("Treasure Chest") by the

Division (the "license") is null, void, and without continuing effect; (3) a request for monetary

damages from the Division for its violation of plaintiff's rights under the Louisiana and federal

Constitutions; and (4) a request for the return of all monies paid by plaintiff to the Louisiana

Riverboat Gaming Commission (the "Commission") and the Division.  This suit commenced

on November 22, 1993, and the instant Third Supplemental and Amended Petition relates back

to and in part arises from the facts set forth in plaintiff's original Petition, as subsequently

amended.

EXHIBIT
1

2.

Plaintiff Alvin C. Copeland ("Copeland") is a competent major residing in Jefferson Parish, Louisiana. Copeland is the former sole shareholder of the stock of American International Gaming Association ("AIGA"). AIGA was a Louisiana corporation whose principal office was located in Jefferson Parish, Louisiana; AIGA was also an applicant seeking authorization to conduct gaming activities on a riverboat in accordance with the provisions of the Louisiana Riverboat Economic Development and Gaming Control Act (hereinafter "the Original Act"), LSA-R.S. 4:501, *et seq.* AIGA was dissolved effective December 5, 1996; all references to "plaintiff" in this Amended Petition shall refer to Copeland and/or AIGA.

3.

Made defendant herein is the Louisiana Gaming Control Board ("the Board"). The Board was created under the terms of the Louisiana Gaming Control Law, LSA-R.S. 27:1 *et seq.*, and has the capacity to sue and be sued. The Board is the successor-in-interest to the Commission.

4.

Made defendant is the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, Department of Public Safety and Corrections, which was created by the Original Act at LSA-R.S. 4:515. The Division has the capacity to sue and be sued.

5.

Venue for this action is appropriate in East Baton Rouge Parish pursuant to LSA-R.S. 4:506, LSA-R.S. 27:18, LSA-R.S. 27:46, LSA-R.S. 49:963-64, La. Code Civ. Proc. Art. 74, and former Commission Rule § 911.

6.

As an applicant seeking authorization to conduct gaming activities on a riverboat, and as a citizen of the state of Louisiana, plaintiff has a pecuniary interest in the licensing process and its integrity. Further, as detailed below, plaintiff has a specific pecuniary interest in the license awarded to Treasure Chest, for AIGA had sought a license to conduct gaming operations at the same location as Treasure Chest and should have received the license ultimately awarded to Treasure Chest.

7.

Under the Original Act, the Commission had the authority to issue rules "providing for and determining the following:"

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 32 of 323

(a)     The authorized routes of a riverboat upon designated rivers or waterways, the duration of riverboat excursions, and the stops which a riverboat may make.

(b)     The minimum levels of insurance to be maintained by the licensees.

(c)     In consultation with the U.S. Army Corps of Engineers and the U.S. Coast Guard, binding emergency orders regarding the navigability of rivers in the event of extreme weather conditions, act of God, or other extreme circumstances.

(d)     Specification for the design, appearance, accommodations, and constructions of riverboats, except for designated gaming area surveillance facilities and systems.

(e)     The procedures for negotiable instrument transactions involving patrons, including limits on the circumstances and amounts of the transaction, and the establishment of forms and procedures for negotiable instrument transactions, redemptions, and consolidations.

(f)     Mandatory periodic inspections to assure that a riverboat, licensed under the provisions of this Chapter is of new construction.

(g)     That preferential treatment is given to Louisiana firms to the extent allowed by law in the procurement of all resources and goods used in the operation of a riverboat come from Louisiana and that a preferential treatment to the extent allowable by law in the awarding of contracts for services and entertainment is given to Louisiana firms and residents.

LSA-R.S. 4:511. The Original Act also gave the Commission the power to hear and determine certain appeals relating to permits; make an annual report to the Joint Legislative Committee on the Budget; and reject unacceptable rules proposed by the Division.

8.

The Division, on the other hand, had the authority to "Issue, deny, condition or restrict licenses and permits" to conduct riverboat gaming activities. LSA-R.S. 4:518(2). The Division had the statutory authority to issue no more than 15 licenses. LSA-R.S. 4:525. No more than six of these licenses could be issued for riverboats in any one given parish.

9.

Purportedly acting under its rulemaking authorization contained in the Original Act and the Administrative Procedure Act, the Commission promulgated rules and regulations that were published in Volume 19 of the Louisiana Register. These rules were readopted as emergency rules on June 18, 1993, and became finally effective on July 20, 1993. Upon information and belief, a draft version of these rules guided the Commission's actions prior to June 18, 1993.

10.

Commission Rule § 303 is entitled "Application for Certificate of Preliminary Approval," and provides that "each person seeking approval of riverboat plans" must "submit for advance approval of the Commission an application for a Certificate of Preliminary Approval" (a "Certificate").

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 33 of 323

11.

Commission Rule § 315, entitled "Criteria for Commission Action," sets forth the
standards that the Commission must use in deciding whether to approve an application for a
Certificate. Section 315 states that the Commission "shall evaluate each application based on
the information provided therein. The commission shall approve those application for
certificate [sic] of preliminary approval it deems to be in the best interest of the state and locale
of the proposed operation. . . . "

12.

On December 11, 1992, AIGA submitted its application to the Commission for a
Certificate of Preliminary Approval for a proposed riverboat route and other operations at the
Kenner Laketown Harbor Park on the shores of Lake Pontchartrain. AIGA submitted a second
application form on February 22, 1993 containing supplemental information.

13.

Commission Rule 303 required applicants to remit to the Commission an application fee
of "$25,000 for the application and $5,000 to defray the expenses of the commission in
analyzing and evaluating an application for certificate." AIGA paid the necessary $30,000 to
the Commission along with its application.

14.

On February 14, 1993, AIGA applied for a gaming license from the Division and
submitted to the Division the filing fee of $50,000 required to fund its background
investigation into license applicants.

15.

Treasure Chest submitted an application for a Certificate to the Commission on March
8, 1993. Like that submitted by AIGA, Treasure Chest's application proposed to locate its
gaming riverboat at Kenner's Laketown Harbor Park.

16.

On March 26, 1993 the Commission held a public hearing on the Treasure Chest
application to operate a gaming riverboat. On April 29, 1993, subsequent to its public
presentation before the Commission, Treasure Chest filed a modification to its application for a
Certificate; this modification proposed locating its gaming riverboat at Rivertown, U.S.A. on
the banks of the Mississippi River in Kenner. No hearing was ever held on the feasibility or
suitability of this site as a location to base a gaming riverboat.

17.

On June 4, 1993, the Commission held a public hearing at which AIGA made a
presentation on its application for a Certificate.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 34 of 323

18.

Upon information and belief, the Commission received a total of 43 applications for Certificates; six of these applications asked for preliminary approval to operate a gaming riverboat in Kenner, Louisiana.

19.

The Commission held a meeting on June 18, 1993. By that date, it had approved eight applications for Certificates; none of these eight approved applications involved proposals to locate a gaming riverboat in Kenner. This meeting was, according to Chairman Pickering's transcribed comments, to "choose seven out of the remaining thirty-five [applications]. Twenty-eight will go by the wayside." Although neither the Act nor the Commission's rules provided any numerical limitation on the number of Certificates that could be issued by the Commission, Pickering noted the Commission's belief that it could only approve fifteen applications by stating that "obviously, once we have chosen seven of those [remaining thirty-five] boats, there will be no need to go any further as there is nothing this commission can do at that point." Further, after seven boats were ultimately approved on June 18th, Chairman Pickering stated "That gives us seven boats. I assume there is no reason to consider any other boats."

20.

The Commission then voted on eight applications for Certificates at the June 18th meeting, and approved seven applications; the Treasure Chest application for a Certificate of Preliminary Approval of its Rivertown location was one of those applications that was approved. The Commission did not grant AIGA a Certificate.

21.

The Commission issued no rules delineating how it would decide which of the 43 applicants would receive Certificates. Upon information and belief, none of the 43 applicants was ever told why their applications were either approved or rejected. Further, upon information and belief, the Commission did not conduct an independent, comparative analysis of the applicants.

22.

On November 8, 1992, although its application for a Certificate had already been granted based on its submission of the Rivertown site as its gaming riverboat's docking location and base, Treasure Chest sought permission to modify its Certificate to move the site of its proposed riverboat route and operations back to Lake Pontchartrain as called for in the original Treasure Chest application. Treasure Chest's request for modification came for

Case 3:10-cv-00603-BAJ-DLD    Document 6    10/07/10    Page 35 of 323

hearing before the Commission on November 13, 1993. Although AIGA objected to Treasure Chest's request for a modification, the Commission granted Treasure Chest's request

23.

The Division issued licenses to exactly the same 15 entities that had previously been given a Certificate by the Commission; Treasure Chest itself, for example, subsequently received a license from the Division on May 17, 1994. Upon information and belief, the Division never reviewed or considered a license application unless and until the applicant received a Certificate from the Commission.

24.

In merely issuing licenses to the 15 entities that had previously been given Certificates, the Division improperly abrogated the duty to independently issue licenses that had been delegated to it by the Louisiana legislature. The Division did not rely on any objective criteria; did not conduct any comparative analysis of competing applicants; and did not prepare any documents evidencing or relating to its rationale in awarding licenses.

25.

The Original Act was silent concerning what guidelines or criteria would be used by the Division in selecting who would receive a license in the event more than 15 applicants existed.

26.

In addition, upon information and belief, the Division did not promulgate any rules delineating how it would go about deciding which of the 43 applicants would receive the 15 licenses authorized by the legislature, and did not embrace any objective criteria. Rather, it simply allowed the Commission to make the decision for it. Although the Division has issued rules discussing the criteria to be used in determining an applicant's suitability, none of these rules discuss how the Division would rank multiple applicants for the finite number of licenses.

27.

On August 21, 1996, the Louisiana First Circuit Court of Appeal rendered a decision holding that the Commission "exceeded its authority in promulgating certain of its rules." Consequently, the First Circuit held that Commission Rules 301-331, 503 through 509, 701 through 705, and 717 were "null, void, and without effect," and prohibited "any further application of them." *State of Louisiana v. Louisiana State Police Riverboat Gaming Enforcement Division,* 694 So. 2d 316, 322-23 (La. App. 1st Cir. 1996). Among the rules that the First Circuit declared to be null and void were the entire set of rules providing for the issuance of Certificates of Preliminary Approval, as well as those setting forth the fees for applying for a Certificate.

w:\djm\18457\5201\petition.app

- 6 -

28.

To date, plaintiff has received neither a Certificate or a License. AIGA was a suitable applicant for a license, and plaintiff avers that, had the Division conducted an independent evaluation of the competing applicants, AIGA should have received a license to conduct gaming activity on a riverboat.

## COUNT ONE--APPEAL OF ACTIONS TAKEN BY THE DIVISION

29.

Copeland appeals the following actions taken by the Division pursuant to LSA-R.S. 4:548, LSA-R.S. 27:89, and the Louisiana Administrative Procedure Act, LSA-R.S. 49:950 *et seq.*: (1) its issuance of a license to Treasure Chest, and (2) its constructive denial of a license to plaintiff.

30.

Upon information and belief, the Division abrogated the authority granted to it by the legislature to issue licenses by allowing the Commission to usurp this process. Instead of independently determining which applicants deserved a license, the Division simply awarded licenses to those applicants that had previously received Certificates from the Commission. Because the Division did not properly exercise the authority granted to it by the legislature, the license issued to Treasure Chest is null and void.

31.

Plaintiff submits that the Division should be required to hold a hearing into his suitability to conduct gaming operating on a riverboat, and should therefore award him the license previously granted to Treasure Chest.

## COUNT TWO--DECLARATORY JUDGMENT

32.

Copeland respectfully submits that he is entitled to a declaratory judgment that the license to conduct gaming activities on a riverboat that was originally granted to Treasure Chest is null, void, and without continuing effect. Upon information and belief, the Division abrogated the authority granted to it by the legislature to issue licenses by allowing the Commission to usurp this process. Instead of independently determining which applicants deserved a license, the Division merely awarded licenses to those applicants that had previously received Certificates from the Commission. Because the Division did not exercise the authority granted to it by the legislature and never conducted an independent analysis of the competing applicants, the license issued to Treasure Chest is null and void.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 37 of 323

33.

Further, as detailed below, the application process violated plaintiff's constitutional rights to due process and equal protection. Consequently, plaintiff is entitled to a declaratory judgement that the entire application process was flawed, and the license awarded to Treasure Chest, is null and void.

## COUNT THREE--VIOLATIONS OF CONSTITUTIONAL RIGHTS

34.

Plaintiff respectfully submits that the above enumerated actions taken by the Division violated his due process rights under the Fourteenth Amendment to the United States Constitution, as well as his rights secured by Art. I, Sec. 2 of the Louisiana Constitution. Procedural due process required that the Division's selection of who would be awarded a license be made in accordance with ascertainable standards, and not be left to the arbitrary and unfettered discretion of the Division.

35.

Plaintiff respectfully submits that the above enumerated actions taken by the Division violated his equal protection rights under the Fourteenth Amendment to the United States Constitution, as well as his rights secured by Art. I, Sec. 3 of the Louisiana Constitution. Equal protection required that the Division's selection of who would be awarded a license be made in accordance with ascertainable standards, and the Division had to adopt rules containing guidelines providing for the issuance of licenses to the applicants it considered the most worthy. In failing to delineate how it would analyze competing applications, the Division therefore deprived plaintiff of his rights to equal protection under the law.

36.

The actions of the Division were taken under color of state law, and deprived Copeland of rights, privileges, and immunities secured by the Constitution and laws of the United States. As a result, the Division's actions also constitute a violation of 42 U.S.C. 1983.

37.

The actions of the Division in awarding a license to Treasure Chest, which license it has held continuously since May 17, 1994, have resulted in continuous damages to plaintiff and constitute a continuing tort.

38.

The Division's violations of plaintiff's constitutional rights and/or Section 1983 entitle Copeland to monetary damages from the Division that are reasonable in the premises, but Copeland itemizes these damages as including, but not being limited to, lost past and future

Case 3:10-cv-00603-BAJ-DLD    Document 6    10/07/10   Page 38 of 323

profits; loss of reputation and goodwill; all expenses he has incurred; and attorney fees pursuant to 42 U.S.C. 1988.

## COUNT FOUR--RETURN OF FEES PAID TO THE COMMISSION

### 39.

As the First Circuit Court of Appeal has found, the Commission had no authority to issue Certificates, and similarly had no authority to charge applicants fees in connection with the issuance of those Certificates. Plaintiff is therefore entitled to a refund of all fees paid by AIGA to the Commission.

## COUNT FIVE--RETURN OF FEES PAID TO THE DIVISION

### 40.

Plaintiff is entitled to a refund of all fees paid by AIGA to the Division. As detailed above, the Division's issuance of licenses was a foregone conclusion; it merely awarded licenses to those entities that had obtained Certificates from the Commission. As a result, there was no justification for it to expend any monies in performing a background check on AIGA.

## JURY DEMAND

### 41.

Plaintiff respectfully prays for a trial by jury.

**WHEREFORE,** premises considered, plaintiff Alvin C. Copeland prays that this amended petition be deemed good and sufficient, and that after due proceedings are had, there be judgment rendered herein in his favor and against the Louisiana Gaming Control Board and the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, Department of Public Safety and Corrections, which (1) declares that the license to conduct gaming activities on a riverboat that was originally granted to Treasure Chest Casino, Inc. is null, void, and without continuing effect; (2) awards plaintiff a fair hearing into whether he should be awarded a license to conduct gaming operations; (3) awards Copeland monetary damages in an amount reasonable in the premises from the Division for its violation of plaintiff's rights under the Louisiana and federal Constitutions, as well as its violation of 42 U.S.C. 1983; (4) awards plaintiff all monies paid by AIGA to the Commission and the Division; (5) awards Copeland all costs of these proceedings, as well as his attorney fees under 42 U.S.C. 1988; and (6) for all other legal and

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 39 of 323

equitable relief to which he may be entitled.

Respectfully Submitted,

SLATER LAW FIRM

Benj. R. Slater, III - 12127
Mark E. Van Horn - 14476
Donald J. Miester, Jr. - 20294

_____
650 Poydras Street
Suite 2600
New Orleans, LA 70130
(504)523-7333
**ATTORNEYS FOR PLAINTIFF ALVIN C.
COPELAND**

**PLEASE SERVE:**

(1)     The Louisiana Gaming Control Board (f/k/a The Louisiana Riverboat Gaming
        Commission), through its attorneys of record:

        L. Rand Dennis
        Thomas A. Warner
        339 Florida Street, Suite 500
        Baton Rouge, LA 70801

- and -

(2)     The Riverboat Gaming Enforcement Division of the Gaming Enforcement Section
        of the Office of State Police, Public Safety Services, Department of Public Safety and
        Corrections, through its attorneys of record:

        L. Rand Dennis
        Thomas A. Warner
        339 Florida Street, Suite 500
        Baton Rouge, LA 70801

CERTIFIED TRUE COPY
210592
C. COURT
19TH JUDICIAL DISTRICT
1ST BATON ROUGE PARISH, LA
99 JAN 21 PM 3:07

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 40 of 323

# 19ᵀᴴ JUDICIAL DISTRICT COURT

# PARISH OF EAST BATON ROUGE

# STATE OF LOUISIANA

*American Int. Gaming Asso.*

DIVISION "A"

ALVIN C. COPELAND          NUMBER: 400,750

VERSUS

THE LOUISIANA RIVERBOAT GAMING
COMMISSION AND THE RIVERBOAT
GAMING ENFORCEMENT DIVISION OF
THE GAMING ENFORCEMENT SECTION
OF THE OFFICE OF STATE POLICE, PUBLIC
SAFETY SERVICES, DEPARTMENT OF
PUBLIC SAFETY AND CORRECTIONS

*NOT OK Amt billed*

*JUN 0 4 1989*

*BY DY CLERK OF COURT*

---

## PETITION OF INTERVENTION

NOW INTO COURT, through undersigned counsel, comes Intervenor, Treasure

Chest Casino, L.L.C. ("Treasure Chest"), which respectfully represents:

1.

Plaintiff/Appellee, Alvin C. Copeland, ("Copeland") filed his "Third Supplemental

and Amended Complaint" on January 21, 1999.

2.

In Copeland's Third Supplemental and Amended Complaint, he

a)      Attempts to appeal the issuance of a license to conduct riverboat gaming to Treasure

        Chest (Count One);

b)      Seeks a declaratory judgment declaring the Treasure Chest's license to be "null and

        void" (Count Two);

c)      Seeks compensation for alleged violations of his civil rights (Count Three);

d)      Seeks return of all fees paid by him to the Louisiana Riverboat Gaming Commission

        (Count Four), and;

e)      Seeks return of all fees paid by him to the Louisiana State Police Gaming Division

        (Count Five).

1

REC'D C.P.

JUN - 7 1999

**EXHIBIT**

**2**

3.

The two requests for relief in Count One and Count Two attempt to revoke Treasure Chest's license to conduct riverboat gaming. The other three counts do not effect Treasure Chest.

4.

Treasure Chest has "an interest" in this action (as used in La. Code Civ. Proc. Art. 1091) since this action directly effects its license.

5.

Treasure Chest is, therefore, entitled to intervene in these proceedings as a defendant.

AND NOW ANSWERING the Third Supplemental and Amended Petition, Treasure Chest denies each and every allegation except as specifically admitted herein. Treasure Chest answers the allegations as follows:

6.

The claims of Copeland in Count One and Count Two have prescribed.

7.

The Third Supplemental and Amended Petition fails to state a cause of action.

8.

Copeland has no right of action to bring the claims in the Third Supplemental and Amended Petition.

9.

In response to the allegations contained in Paragraph 1, Treasure Chest admits that the suit involves the issues outlined but denies that the issues are meritorious or well founded. Specifically, Treasure Chest denies that the petition "relates back" to any prior petition of Copeland. Treasure Chest denies all other allegations of Paragraph 1.

10.

Treasure Chest denies the allegations of Paragraph 2 for lack of information sufficient to justify a belief.

11.

The allegations of Paragraph 3 and 4 do not involve Treasure Chest and therefore require no answer.

2

12.

Treasure Chest admits the allegations contained in Paragraph 5.

13.

Treasure Chest denies the allegations contained in Paragraph 6.

14.

The allegations of Paragraphs 7, 8, 9, 10 and 11 are mere legal conclusions and quotations of legislation. Treasure Chest admits the existence of the "Louisiana Riverboat Economic Development and Gaming Control Act" and the rules promulgated pursuant to the Act. Treasure Chest asserts that the acts and the rules are the best evidence of their contents.

15.

Treasure Chest denies the allegations of Paragraph 12 for lack of information sufficient to justify a belief.

16.

In response to the allegations of Paragraph 13, Treasure Chest admits the existence of a former Rule 303 but alleges that the rule has been found to be without effect. Treasure Chest denies all other allegations of Paragraph 13 for lack of information sufficient to justify a belief.

17.

Treasure Chest denies the allegations of Paragraph 14 for lack of information sufficient to justify a belief.

18.

In response to the allegations contained in Paragraph 15, Treasure Chest admits that its application was filed with the Commission but alleges that the application is the best evidence of its contents.

19.

In response to the allegations contained in Paragraph 16, Treasure Chest admits that it made a presentation to the Commission concerning its application but denies that it was a "public hearing." Treasure Chest admits that it modified its application but alleges that the modification is the best evidence of its contents. Treasure Chest denies all other allegations of Paragraph 16.

3

20.

Treasure Chest denies the allegations contained in Paragraphs 17 and 18 for lack of information sufficient to justify a belief.

21.

In response to the allegations contained in Paragraph 19 and 20, Treasure Chest admits that a meeting of the Commission was held on June 18, 1993 but alleges that a transcript of that meeting is available and is the best evidence of the proceedings.

22.

Treasure Chest denies the allegation of Paragraph 21 for lack of information sufficient to justify a belief.

23.

Treasure Chest admits that the Commission approved its request for modification concerning its berth site but denies all other allegations contained in Paragraph 22.

24.

Treasure Chest admits that it received a license but denies all other allegations of Paragraph 23 for lack of information sufficient to justify a belief.

25.

Treasure Chest denies the allegations of Paragraph 24.

26.

In response to the allegations contained in Paragraph 25, Treasure Chest alleges that the Act is the best evidence of its contents.

27.

Treasure Chest denies the allegations of Paragraph 26 for lack of information sufficient to justify a belief.

28.

In response to the allegations contained in Paragraph 27, Treasure Chest admits the existence of the opinion in the *State of Louisiana v. Louisiana State Police Riverboat Gaming Enforcement Division* but alleges that the opinion is the best evidence of its contents.

4

29.

Treasure Chest denies the allegations of Paragraph 28 for lack of information sufficient to justify a belief.

30.

In response to the allegations of Paragraph 29, Treasure Chest alleges that plaintiff has no right to appeal the actions of the Division since the time to appeal has expired.

31.

Treasure Chest denies the allegations of Paragraph 20 and 31.

32.

Treasure Chest denies the allegations of Paragraph 32 and 33.

33.

The allegations contained in Paragraphs 34 through 41 are not directed to Treasure Chest and, as such, do not necessitate a response. To the extent a response is deemed necessary, Treasure Chest denies the allegations.

**WHEREFORE**, Treasure Chest Casino, L.L.C. prays that this answer be deemed good and sufficient and that Counts One and Two of the petition of Alvin C. Copeland be dismissed at plaintiff's cost.

By Attorneys:

**McGLINCHEY STAFFORD**
A Professional Limited Liability Company

By: _____
   Paul S. West, Bar Roll No.: 13375
   Donald R. Cravins, Jr., Bar Roll No.: 25631
   Ninth Floor, One American Place
   Baton Rouge, Louisiana 70825
   Phone: (225) 383-9000



5

## CERTIFICATE

I hereby certify that a copy of the above and foregoing has been forwarded via U.S. Mail, postage prepaid to:

> Mr. Benjamin R. Slater, III
> Mr. Mark E. Van Horn
> Mr. Donald J. Miester, Jr.
> *Slater Law Firm*
> 650 Poydras Street, Suite 2600
> New Orleans, Louisiana 70130
>
> Mr. Michael A. Patterson
> *Long Law Firm*
> 8550 United Plaza Boulevard, Suite 800
> Baton Rouge, Louisiana 70809

this 24 day of June , 1999.

Paul S. West

6

0 6 1 5 1 3 3 4 1 0

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DIVISION "A"

ALVIN C. COPELAND           NUMBER: 400,750

VERSUS

THE LOUISIANA RIVERBOAT GAMING
COMMISSION AND THE RIVERBOAT
GAMING ENFORCEMENT DIVISION OF
THE GAMING ENFORCEMENT SECTION
OF THE OFFICE OF STATE POLICE, PUBLIC
SAFETY SERVICES, DEPARTMENT OF
PUBLIC SAFETY AND CORRECTIONS

---

## ORDER

Considering the foregoing petition of intervention by Treasure Chest Casino, L.L.C.,

leave is hereby granted for Treasure Chest Casino, L.L.C. to intervene in this matter.

Judge, 19th Judicial District Court

June 14, 1999

ALVIN COPELAND

NUMBER 400,750 DIVISION "A"

VERSUS

19th JUDICIAL DISTRICT COURT

LOUISIANA GAMING CONTROL
BOARD, ET AL.

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

## JUDGMENT

This matter came on for hearing on the 17th day of April, 2000, pursuant to a Motion for Partial Summary Judgment filed by defendants, State of Louisiana through the Louisiana Gaming Control Board, the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, and the Department of Public Safety and Corrections; Motion for Summary Judgment and Motion for Leave to File Fourth Supplemental and Amending Petition on behalf of plaintiff, Alvin Copeland; and Exceptions of Prescription, Failure to Exhaust Administrative Remedies and Motion to Dismiss Appeal on behalf of intervenor, Treasure Chest Casino, L.L.C.:

Present were:

**Donald Miester** for plaintiff, Alvin Copeland;

**Michael A. Patterson** for defendants, State of Louisiana through the Louisiana Gaming Control Board, the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, and the Department of Public Safety and Corrections; and

**Donald Cravins** for intervenor, Treasure Chest Casino, L.L.C..

The court, after considering the evidence and law and hearing the argument of counsel, for oral reasons assigned this date,

**IT IS ORDERED, ADJUDGED AND DECREED** that the Exceptions of Prescription, Failure to Exhaust Administrative Remedies on behalf of intervenor, Treasure Chest Casino, L.L.C. are **GRANTED.**

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Motion to Dismiss Appeal on behalf of intervenor, Treasure Chest Casino, L.L.C. is **GRANTED.**

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Motion for Partial Summary Judgment filed on behalf of defendants, State of Louisiana through the Louisiana Gaming Control Board, the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, and the Department of Public Safety and Corrections

EXHIBIT
3

is **GRANTED** except as to the reimbursement of the $50,000 fee paid by American International Gaming Association to the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Motion for Summary Judgment filed on behalf of plaintiff, Alvin Copeland is **GRANTED IN PART**. The Clerk of Court is hereby directed to release the funds currently held in the registry of the Court that have been deposited by the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police being in the amount of TWENTY THOUSAND, EIGHT HUNDRED SEVENTY THREE AND NO/100 DOLLARS, ($20,873.00), to plaintiff Copeland, reserving unto Copeland his right to seek the remainder of the $50,000 paid by AIGA to the Division. In all other aspects, Copeland's Motion for Summary Judgment is **DENIED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Motion to File Fourth Supplemental and Amending Petition filed on behalf of plaintiff, Alvin Copeland is **DENIED**.

The court hereby expressly determines that there is no just reason for delay and therefore designates this judgment as a final judgment under La.C.C.P. art. 1915.

**JUDGMENT RENDERED AND SIGNED** in Baton Rouge, Louisiana, this 31ST day of May, 2000.

_____
JUDGE, 19th JUDICIAL DISTRICT COURT

Submitted by:

**RICHARD P. IEYOUB**
Attorney General

_____
**MICHAEL A. PATTERSON**
Special Assistant Attorney General
Bar Roll No. 10373
**DANIEL D. HOLLIDAY, III**
Special Assistant Attorney General
Bar Roll No. 23135
**LONG LAW FIRM, L.L.P.**
4041 Essen Lane, Suite 500
Baton Rouge, LA 70809
(225) 922-5110
**ATTORNEYS FOR THE STATE OF LOUISIANA, ET AL.**

I HEREBY CERTIFY THAT ON THIS DAY A COPY OF THE WRITTEN REASONS FOR JUDGMENT / JUDGMENT / ORDER / WAS MAILED BY ME, WITH SUFFICIENT POSTAGE AFFIXED TO:
Benjamin Slater, III; Michael Patterson; Paul S. West
DONE AND SIGNED ON May 31, 2000

_____
DEPUTY CLERK OF COURT

**ORIGINAL**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2000 CA 2864

AMERICAN INTERNATIONAL GAMING ASSOCIATION, INC.

VERSUS

THE LOUISIANA RIVERBOAT GAMING COMMISSION AND
THE RIVERBOAT GAMING ENFORCEMENT DIVISION
OF THE GAMING ENFORCEMENT SECTION OF THE OFFICE
OF STATE POLICE, PUBLIC SAFETY SERVICES,
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

*DATE OF JUDGMENT:* SEP 1 1 2002

ON APPEAL FROM THE NINETEENTH JUDICIAL DISTRICT COURT
(NUMBER 400,750), PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

HONORABLE ROBERT D. DOWNING, JUDGE

* * * * * *

| | |
|---|---|
| Benjamin R. Slater, III<br>New Orleans, Louisiana | Counsel for Plaintiff/Appellant<br>Alvin C. Copeland |
| Michael A. Patterson<br>Baton Rouge, Louisiana | Counsel for Appellee<br>The Louisiana Riverboat Gaming<br>Commission and the Riverboat<br>Gaming Enforcement Division of the<br>Gaming Enforcement Section of the<br>Office of State Police, Public Safety<br>Services, Department of Public<br>Safety and Corrections |
| Paul S. West<br>Baton Rouge, Louisiana | Counsel for Intervenor<br>Treasure Chest Casino, L.L.C. |

* * * * * *

BEFORE: GONZALES, KUHN, AND CIACCIO[1], JJ.

Disposition: JUDGMENT AFFIRMED IN PART, VACATED IN PART, AND RENDERED.
MATTER REMANDED FOR LIMITED FURTHER PROCEEDINGS.

*concurs and assigns reasons.*

[1] The Honorable Philip C. Ciaccio, Judge (retired), Fourth Circuit Court of Appeal, is serving as judge *pro tempore* by special appointment of the Louisiana Supreme Court. The Honorable Douglas M. Gonzales, Judge (retired), First Circuit Court of Appeal, is serving as judge *ad hoc* by special appointment of the Louisiana Supreme Court.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 50 of 323

EXHIBIT
4

Kuhn, Judge.

In this appeal, we examine whether the trial court properly dismissed various claims asserted against the State of Louisiana by Alvin C. Copeland, the sole shareholder of a corporation that unsuccessfully applied for a riverboat gaming license. We also address whether the trial court properly sustained exceptions and a motion to dismiss raised by a competing applicant, Treasure Chest Casino Inc. ("Treasure Chest"), who intervened because this suit challenged the validity of the license issued to it. We affirm in part, vacate in part, and render. We also remand this matter to afford Copeland the right to amend his petition in a limited manner.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Louisiana Riverboat Gaming Act Enacted

Pursuant to Acts 1991, No. 753, § 1, the Louisiana Legislature enacted the Louisiana Riverboat Economic Development and Gaming Control Act, La. R.S. 4:501 et seq. ("the Riverboat Gaming Act" or "the Act") This legislation set forth a licensing process for those who sought authorization to conduct gaming activities on riverboats in Louisiana. The Act created two separate bodies within the Department of Public Safety and Corrections and vested each with separate duties and responsibilities to further the Act's purposes. The Riverboat Gaming Enforcement Division ("Division"), created by La. R.S. 4:515, was vested with the responsibility of issuing and denying licenses and investigating the qualifications of each license applicant. La. R.S. 4:518. The Division was authorized to issue up to fifteen licenses to conduct gaming activities upon a riverboat and up to six licenses could be granted for riverboats that operated from any one parish. La. R.S. 4:525. The Riverboat Gaming Commission ("Commission"), created by La. R.S. 4:510, was a rule and policy-making body comprised of seven members appointed by the governor and confirmed by the Louisiana State Senate. The Act gave

2

the Commission the power to promulgate rules and to determine riverboat sailing routes, minimum insurance levels for licensees, riverboat design specifications, and procedures for negotiable instruments transactions. Beyond that, the Act vested the Commission with oversight authority over the Division by giving the Commission the power to "hear and determine all appeals relative to the granting, suspension, revocation, condition, or renewal of all licenses, permits, and applications." La. R.S. 5:511(I).

### B. The Commission Promulgates Rules

The Commission promulgated rules to implement the Act.[2] Commission Rule § 303 provided that "each person seeking approval of riverboat plans" must "submit for advance approval by the Commission an application for a certificate of preliminary approval." Commission Rule § 315 provided that the Commission "shall evaluate each application" and "shall approve those applications . . . it deems to be in the best interest of the state and locale of the proposed operation . . . ."[3]

### C. Copeland Files Suit

This litigation arises from the following factual scenario set forth in Copeland's petition.[4] American International Gaming Association, Inc. ("AIGA") submitted an application for a certificate of preliminary approval ("Certificate") on December 11, 1992, and another application with supplemental information on February 22, 1993. AIGA proposed a riverboat route and other operations at the Kenner Laketown Harbor Park ("Laketown") on the shores of Lake Pontchartrain. Along with its application, AIGA

---

[2] These rules were designated as Title 42, Part XIII.101, et seq. of the Louisiana Administrative Code (published in Volume 19, No. 7 of the Louisiana Register at pp. 851-61.) These rules were promulgated as emergency rules on June 18, 1993, and became finally effective on July 20, 1993.

[3] The rules providing for the issuance of the certificates were later declared to be null and void on the basis that the Commission had exceeded its authority in promulgating them. *State of Louisiana v. Louisiana State Police Riverboat Gaming Enforcement Division*, 95-2355 (La. App. 1st Cir. 8/21/96), 694 So.2d 316, 319.

[4] American International Gaming Association Inc. ("AIGA") actually filed the initial petition but Copeland, the sole shareholder of AIGA's assets, was later substituted as plaintiff.

3

submitted its application and evaluation fees.[5]  On February 14, 1993, AIGA also applied for a gaming license from the Division and submitted the filing fee required for its background investigation.[6]

AIGA further alleged that Treasure Chest submitted an application for a Certificate on March 8, 1993.  It also proposed locating its gaming riverboat at Laketown.  The Commission held a public hearing on the Treasure Chest application.  On April 29, 1993, Treasure Chest modified its application, proposing that its riverboat would be located at Rivertown, U.S.A. on the banks of the Mississippi River in Kenner.  On June 4, 1993, the Commission held a public hearing at which AIGA made a presentation on its application for a Certificate.

According to AIGA's allegations, the Commission received a total of 43 applications for Certificates, with six of those seeking preliminary approval to operate a riverboat in Kenner, Louisiana.  Prior to a June 18, 1993 Commission meeting, the Commission had approved eight applications but none of those approved involved proposals to locate a riverboat in Kenner.  During the meeting, the Commission approved seven more applications.[7]  The Commission granted Treasure Chest's application for a Certificate for its Rivertown location as one of these seven but did not grant AIGA's application.

AIGA submits that several months later, Treasure Chest sought permission to modify its Certificate to move the site of its proposed operations back to Lake Pontchartrain as called for in the original Treasure Chest application.  On November 13,

---

[5] Commission Rule § 303 required each applicant to remit a $25,000 application fee and $5,000 to defray the expenses of the commission in analyzing and evaluating a Certificate.

[6] Former La. R.S. 4:532 (redesignated by Acts 1996, 1st Ex. Sess., No. 7, § 3, eff. May 1, 1996, as La. R.S. 27:89) provided that an applicant was required to submit an initial application fee of $50,000.

[7] Since the Division was authorized to issue only fifteen licenses, the Commission apparently decided to likewise limit the number of Certificates it issued.

4

1993, the Commission granted Treasure Chest's request despite AIGA's objection. On November 23, 1993, AIGA filed suit in the Nineteenth Judicial District Court seeking the reversal of the Commission's decisions to grant Treasure Chest a Certificate and to grant its request to modify the location of its proposed operations.[8] Both the Commission and the Division were named as defendants.

In response, the Commission and the Division filed numerous exceptions. Before the trial court ruled on these exceptions, however, the Division issued a license to Treasure Chest on May 17, 1994. AIGA ultimately did not receive either a Certificate or a license.[9]

### C. Gaming Legislation Revised

While this suit was pending, the Louisiana legislature addressed the status of the various entities charged with oversight of gaming. By Act 7 of the First Extraordinary Session of 1996, the legislature enacted the provisions of La. R.S. 27:1 et seq., the Louisiana Gaming Control Law ("the Gaming Control Law"), which established the Louisiana Gaming Control Board ("the Board"). The Gaming Control Law became effective May 1, 1996. In accordance with its provisions, the Board became the sole and exclusive regulatory and supervisory board for gaming operations and activities

---

[8] AIGA's petition alternatively sought a declaratory judgment that the Gaming Commission Rules prohibited the modification of the Certificate.

At that time the petition was filed, former La. R.S. 5:548 provided:

> Any person adversely affected by an action, order, or decision of the commission may appeal to the nineteenth Judicial District Court in accordance with the provisions of the Administrative Procedure Act, except that notice of appeal shall be given to the commission and petition for appeal shall be filed with the district court within ten days of the action, order, or decision of the commission.

Acts 1996, 1st Ex. Sess., No. 7, § 3, eff. May 1, 1996, redesignated the former La. R.S. 4:548 as La. R.S. 27:89. Effective July 7, 2001, La. R.S. 27:89 was repealed by Act No. 1222 of 2001.

[9] According to the allegations of the petition, the Division issued licenses to the same 15 entities that had previously been issued Certificates by the Commission.

5

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 54 of 323

authorized by the Riverboat Gaming Act. La. R.S. 27:31  The Gaming Control Law abolished the Commission and transferred its powers, duties, functions and responsibilities to the Board. 27:31A(2) and 27:31B.

### E. Certificate Process Abrogated

During 1996, in an unrelated proceeding, this court ruled that the Commission's regulations that required a potential gaming riverboat licensee to obtain a certificate of preliminary approval from the Commission were null and void. This court concluded that the Commission had exceeded its statutory authority under the Riverboat Gaming Act when it adopted these particular regulations and assessed fees because the Act had granted licensing authority to the Division rather than the Commission. *State of Louisiana v. Louisiana State Police Riverboat Gaming Enforcement Division*, 95-2355 (La. App. 1st Cir. 8/21/96), 694 So.2d 316, 319.

### F. Copeland's Litigation Moves Forward

In July 1998, the trial court granted Copeland's motion to substitute himself as plaintiff because AIGA had been dissolved and he was the sole shareholder. Thereafter, on January 21, 1999, Copeland filed an amended petition that named the Board, as successor-in-interest to the Commission, as a defendant. Based on the provisions of the amended petition, Copeland no longer sought reversal of the Commission's action. Rather, he challenged the Division's action of issuing the license to Treasure Chest and asserted that he had been constructively denied a license (Count One). He further claimed that he was entitled to a judgment declaring that the license issued to Treasure Chest was null because the Division had awarded licenses to the applicants that had previously received Certificates from the Commission without independently determining which applicants deserved licenses (Count Two). Copeland also advanced claims for monetary damages, alleging that the Division's actions violated his due process and equal protection

6

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 55 of 323

rights and constituted a violation of 42 U.S.C. § 1983 (Count Three). He also sought the return of fees paid to the commission (Count Four) and the return of fees paid to the division (Count Five).[10]

On June 4, 1999, Treasure Chest intervened urging that Counts One and Two should be dismissed. It filed exceptions urging the objections of prescription and failure to exhaust administrative remedies. Treasure Chest alternatively raised a motion to dismiss these counts.

Copeland opposed Treasure Chest's exceptions and motions with respect to Count Two, the request for declaratory judgment relief, but conceded that Count One, his appeal of the grant of the original Treasure Chest license, was moot. The term of Treasure Chest's initial license was five years, and it expired on May 17, 1999.[11] Then, in June 1999, Treasure Chest filed a motion to stay discovery that was granted by the trial court "pending consideration of [Copeland's] constitutional claim . . . ."

In January 2000, the State, through the Board, the Division and the Department of Public Safety and Corrections ("the State") filed a motion for partial summary judgment,

---

[10] AIGA had previously amended its petition in June 1998 to request a refund of all fees paid to the Commission and in September of 1998, to request a refund of all fees that had been paid to the Division.

We note that the January 1999 supplemental and amending petition raised claims that attempted to invoke both the trial court's original and appellate jurisdiction. *See Metro Riverboat Associates, Inc. v. Louisiana Gaming Control Bd.*, 2001-0185 (La. 10/16/2001), 797 So.2d 656, 660, where the court distinguished between the "judicial review of the decision of an administrative agency" as the "exercise of a court's appellate jurisdiction pursuant to La. Const. art. V, § 16 (B)" and "judicial adjudications in the first instance" pursuant to La. Const. art. V, § 16 (A), which grants "original jurisdiction in all civil matters" to the district courts. Pursuant to the provisions of La. R.S. 4:547, Copeland was required to seek review of the division's issuance of the license to Treasure Chest by filing a notice of appeal with the Commission. But Copeland did not appeal the Division's action to the Commission before challenging the Division's action in the trial court. Thus, although Copeland postured his claims pertaining to the Division's action as an "appeal," the trial court actually had no appellate jurisdiction over the claims asserted in Count One because the Commission had not reviewed the claim. *Id.*

[11] Treasure Chest asserted in its opposition memorandum that the Division had conditionally renewed Treasure Chest's license on March 16, 1999. But Copeland did not amend his petition to contest the renewal. Also, Copeland's appeal counsel stated during oral arguments that Copeland waives his claim regarding the constructive denial of a license (addressed in Count One).

7

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 56 of 323

seeking dismissal of Counts Two and Three of Copeland's amended petition.[12]  Copeland responded by filing a motion for summary judgment on his constitutional claims.

The Court held a hearing to dispose of: 1) the State's partial motion for summary judgment; 2) Copeland's motion for summary judgment on the constitutional claims; and 3) the exceptions and motion filed by Treasure Chest.  By judgment dated May 31, 2000, the trial court sustained Treasure Chest's exceptions raising the objections of prescription and failure to exhaust administrative remedies and granted Treasure Chest's motion to dismiss.  The trial court further granted the State's motion for partial judgment and denied Copeland's motion for summary judgment with respect to the constitutional claims.[13]

Copeland has appealed, urging that the trial court erred by not maintaining his constitutional claims (raised in Count Three).  First, he asserts that his petition alleges "cognizable constitutional claims" based on his allegations that the Division's actions violated his equal protection and procedural and substantive due process rights.  Based on these constitutional violations, Copeland asserts he is entitled to a declaratory judgment (Count Two), monetary damages (Count Three), and a return of all monies AIGA paid to the Division (Count Five).  Second, he asserts that despite the abrogation of the Commission's rules and the legislative revision of the statutes governing the Commission and the Division, his claims against the State present a justiciable claim because he has alleged that he is entitled to monetary relief.  Third, he asserts that he did not fail to exhaust administrative remedies by not first presenting his constitutional claims to the

_____

[12] The State had also previously filed a motion for summary judgment.

[13] Although Copeland's motion for summary judgment addressed only the constitutional claims, the judgment also granted his motion for summary judgment in part and directed the Clerk of Court to release to Copeland the amount of $20,873, which had been deposited into the Court's registry by the Division.  This amount represented the $50,000 application fee minus the costs of the Division's background investigation.  The trial court granted the State's motion for partial summary judgment "except as to the reimbursement of the $50,000 fee paid by [AIGA] to the . . . [Division] . . . " although the state's partial motion did not address Copeland's claims for reimbursement of the fees paid to the Division.  The judgment also denied Copeland's motion to file a fourth supplemental and amending petition.

8

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 57 of 323

Commission rather than the district court because the Commission did not have authority to dispose of these claims. Based on these contentions, Copeland prays for reversal of those portions of the trial court's judgment that sustain Treasure Chest's exceptions, grant Treasure Chest's motion to dismiss, and grant the State's motion for partial summary judgment.

## II. ANALYSIS

### A. Claims involving Treasure Chest

When Treasure Chest intervened, it challenged only the counts of Copeland's amended petition that could potentially impact its license, Counts One and Two. Because Copeland did not seek compensatory relief from Treasure Chest, Copeland's remaining claims did not impact Treasure Chest. During the proceedings below, Copeland acknowledged that Count One of his amended petition, which challenged the Division's action of issuing the license to Treasure Chest, was moot. We also conclude that Copeland's claim for a declaratory judgment, asserted in Count Two, is moot. Assuming, as Copeland alleges, that the Division issued a license to Treasure Chest on May 17, 1994, the license issued to Treasure Chest would have expired on May 17, 1999. The provisions of former La. R.S. 4:534 (redesignated as La. R.S. 27:74) provided that the term of an initial license to conduct gaming operations is five years. Thus, the license, which Copeland seeks to have declared invalid, has already expired. At this point, there is no practical significance to rendering a judgment on the issue of the validity of the original license. *Cat's Meow, Inc. v. City of New Orleans Through Dept. of Finance*, 98-0601 (La. 10/20/98), 720 So.2d 1186, 1193.[14]

---

[14] The collateral consequences exception to the mootness doctrine does not apply to the claims asserted against Treasure Chest because Copeland has not sought damages or other monetary relief from Treasure Chest. *Cat's Meow, Inc. v. City of New Orleans Through Dep't. of Finance*, 98-0601 (La. 10/20/98), 720 So.2d 1186, 1196.

9

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 58 of 323

The trial court should have dismissed the claims asserted in Count Two as moot. Accordingly, we find that the trial court erred in sustaining the exceptions raised by Treasure Chest, and we vacate those rulings. But because the matters raised in both Counts One and Two are moot, we conclude the trial court properly granted Treasure Chest's motion to dismiss.

## B. Claims against the State

Copeland contends the State violated his procedural due process and equal protection rights by failing to promulgate ascertainable standards to determine who would receive a license and by arbitrarily issuing licenses. Copeland also asserts that the Division's failure to hold a "meaningful hearing" to address AIGA's application and its failure to give notice that its application would be denied violates his procedural due process rights. In addition, he claims the arbitrary denial of his license violated his substantive due process rights.[15]

### 1. Jurisdiction of the Trial Court

The State argues that Copeland's appeal of the action of the Division's action was not properly raised before the district court. The State urges that former La. R.S. 4:547A required that Copeland appeal the Division's action to the Commission, as follows:

> Any person whose application for a license or permit has been *denied by the division* or *any person adversely affected by an action, order or decision of the division* may appeal the action, order, or decision of the division to the commission by filing a notice of appeal with the commission *within seven days of certified mailing of notice* of the action, order, or decision by the division.

> (Italics added.)

---

[15] As previously addressed, Copeland conceded in the proceedings below that Count One, his appeal of the grant of the original Treasure Chest license, was moot. Copeland asserts no arguments on appeal with respect to Count Four, his claim for return of fees paid to the Commission. The State asserts that it has refunded all funds that AIGA paid to the Commission in conjunction with the Certificate process. Otherwise, we note that Copeland's claims against the State are not moot because he seeks compensatory relief. Although the Commission and the certificate process it used no longer exists and the original Treasure Chest license has expired, Copeland's claims for damages are viable under the collateral consequences exception. *Cat's Meow, Inc. v. City of New Orleans Through Dep't of Finance*, 720 So.2d at 1196.

10

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 59 of 323

Neither AIGA nor Copeland filed an appeal with the Commission before presenting their claims to the district court. The State emphasizes that although the action of the Division that Copeland challenges occurred on May 18, 1994, he did not challenge that action until January, 1999, over four years after the Division's initial decision. And when he did take action, Copeland amended AIGA's original petition that appealed the Commission's action of issuing the license, which had been filed since 1993.

Copeland counters that his failure to appeal the Division's action to the Commission did not affect the validity of Counts Two and Three.[16] He maintains that these claims are based on the Division's violations of his constitutional rights, which could not have been asserted through an administrative appeal under La. R.S. 4:547. He further claims that an appeal to the Commission would have been a vain and useless act since the Division simply awarded licenses to those firms that had previously received Certificates from the Commission.

We find no merit in Copeland's arguments with respect to Count Two, the claim for declaratory relief regarding the validity of Treasure Chest's license. As stated above, since Treasure Chest's license has expired, Count Two is moot. The trial court properly granted the State's partial motion for summary judgment with respect to Count Two.

But we find that the constitutional claims raised in Count Three were properly presented to the trial court. The Commission, which functioned as an administrative agency in the executive branch of state government, did not have the authority to determine these questions of constitutionality. *See ANR Pipeline Company v. Louisiana Tax Commission*, 2001-2594 to 2001-2600 (La. App. 1st Cir. 3/20/02), 815 So.2d 178,

---

[16] Copeland also refers to Count Five but the State's partial motion for summary judgment only addressed Counts Two and Three, and Copeland's motion for summary judgment only addressed his due process and equal protection constitutional claims, which were raised in Count Three. Thus, the issue of whether Copeland is entitled to receive a return of the fees paid to the Division is not properly before us. Also, it was not specifically raised as an assignment of error on appeal.

11

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 60 of 323

184. Judicial power is vested in Louisiana courts by Article V, Section 1 of the Louisiana Constituion. While administrative agencies have rulemaking authority that shadows the powers of the legislature, they are not authorized to exercise "judicial power" under Art. 5, § 1, unless authorized by the Constitution. La. Const. Art. II, § 2; *Albe v. Louisiana Workers' Compensation Corp.*, 97-0581 (La. 10/21/97), 700 So.2d 824, 828.

La. Const. art. V, § 16A grants original jurisdiction in all civil matters to the district courts, unless otherwise authorized by the constitution. And since the Louisiana Constituion fixes the original jurisdiction of the district courts, that original jurisdiction cannot be changed by legislative act. The power to decide these constitutional claims was not and could not be conveyed to the Commission pursuant to La. R.S. 5:457, or any other provision of the River Boat Gaming Act. *See ANR Pipeline Company v. Louisiana Tax Commission*, 2001-2594, 815 So.2d at 184.

Accordingly, when Copeland amended AIGA's timely-filed original petition to assert his constitutional claims, he invoked the court's original jurisdiction, and the requirements of La. R.S. 4:547 did not apply. Because the State asserts no other basis for challenging the timeliness of Copeland's amendment, we conclude that the trial court properly considered Copeland's constitutional claims.

### 2. Procedural Context of the Constitutional Claims

The State challenged Copeland's constitutional claims via its motion for partial summary judgment. The State urges that Copeland is not entitled to recover because he has not demonstrated a taking of a constitutionally-protected property interest. Technically, the State has raised an exception of no cause of action but has labeled it as a motion for summary judgment. If we were to determine that the petition fails to state a cause of action regarding these constitutional claims, we would preclude a determination on the motion for partial summary judgment with respect to the claims asserted in Count

12

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 61 of 323

Three. Thus, on our own motion, we raise the objection of no cause of action. La. C.C.P. art. 927; *Treen v. Republican Party of Louisiana*, 99-2073 (La. App. 1st Cir. 9/26/00), 768 So.2d 273, 277. Also see *Noble v. Armstrong*, 93-841 (La. App. 5th Cir. 3/16/94), 635 So.2d 1199, 1203 (holding that a motion for summary judgment based on insufficiency of allegations cannot be used as a substitute for an exception of no cause of action).

The function of the peremptory exception of no cause of action is to question whether the law extends a remedy to anyone under the factual allegations of the petition. *Cleco Corp. v. Johnson*, 2001-0175 (La. 9/18/01), 795 So.2d 302, 304. La. Code Civ. P. art. 1915, as amended by 1997 La. Acts No. 483, § 2, now allows a partial judgment sustaining an exception of no cause of action. *See Graf v. Jim Walter Homes, Inc.*, 97-1143 (La. App. 1st Cir. 5/15/98), 713 So.2d 682, 685 n.2. The exception is tried on the face of the pleadings and the court accepts the facts alleged in the petition as true, determining whether the law affords relief to the plaintiff if those facts are proved at trial. *Cleco Corp. v. Johnson*, 795 So.2d at 304.

### 3. Due Process Claims

The Fourteenth Amendment to the United States Constitution provides, in pertinent part, "[n]or shall any State deprive any person of life, liberty or property, without due process of law...." Similarly, Article I, § 2 of the Louisiana Constitution provides that no person shall be deprived of life, liberty, or property, except by due process of law. To claim the protections of due process, a claimant must show the existence of some property or liberty interest which has been adversely affected by state action. *Delta Bank & Trust Co. v. Lassiter*, 383 So.2d 330, 334 (La. 1980); *Johnson v. Southern University*, 2000-2615 (La. App. 1st Cir. 12/28/01), 803 So.2d 1140, 1144-1145. Property interests are not created by the constitution. Rather they are created and

13

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 62 of 323

their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). To have a property interest protected by due process, a person must clearly have more than an abstract need or desire for it. He must have a legitimate claim of entitlement to it rather than a unilateral expectation of it. *Id.*

It is true that a license, once issued, may create a property interest in the holder that is traditionally protected by due process notions. *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed. 2d 90 (1971); *Montecino v. Louisiana*, 55 F.Supp.2d 547 (E.D. La. 1999). But our state law affords a license applicant no individual entitlement to a license that he seeks. *Durham v. Louisiana State Racing Com'n*, 458 So.2d 1292, 1295 (La. 1984). Accepting all of the allegations of the petition as true, we find no due process violation because neither AIGA nor Copeland had a protected property interest in the benefits conferred by a license that they did not actually hold. Absent a protected property interest, AIGA was not entitled to notice and a hearing before the denial of its application. *Board of Regents v. Roth*, 92 S.Ct. at 2710; *Durham v. Louisiana State Racing Com'n*, 458 So.2d at 1295. Likewise, Copeland's allegation that he was denied substantive due process rights by being arbitrarily denied a license fails due to the lack of a protected property interest.

Copeland further complains that the Division acted arbitrarily in granting a license to Treasure Chest and not AIGA. Again, we recognize that the State's action of granting a license to a competitor did not deprive AIGA or Copeland of a property interest. *See Delta Bank & Trust Company v. Lassiter*, 383 So.2d at 334 (La. 1980). Although the Division was authorized to issue only fifteen licenses, Copeland fails to even contend that

14

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 63 of 323

it was precluded from obtaining a license due to the Division's issuance of a license to Treasure Chest. We note also that Copeland does not allege that the license issued to Treasure Chest provided for its exclusive authorization to operate a gaming riverboat in the Lake Pontchartrain area.

Accordingly, we conclude that the amended petition fails to allege a violation of state or federal due process rights.

### 4. Equal Protection Claim

Both the Fourteenth Amendment to the U.S. Constitution and La. Const. art. I, § 3 provide that all persons are entitled to equal protection of the law. These provisions mandate "that persons similarly situated receive like treatment." *Whitnell v. Silverman,* 95-0112 (La. 12/6/96), 686 So.2d 23, 29-30. But the equal protection provisions of the state and federal constitutions do not require absolute equality or precisely equal advantages. *Ross v. Moffitt,* 417 U.S. 600, 612, 94 S.Ct. 2437, 2444, 41 L.Ed.2d 341 (1974); *Frederick v. Ieyoub,* 99-0616 (La. App. 2d Cir. 5/12/2000), 762 So.2d 144,148, *writ denied,* 2000-1811 (La. 4/12/2001), 789 So.2d 581.

While equal protection claims may be subject to a different analysis under the federal and state guarantees, a minimal standard of review applies under both provisions where, as here, there is no fundamental right, suspect class, or enumerated characteristic alleged as the basis for discrimination. *Progressive Security Ins. Co. v. Foster,* 97-2985 (La. 4/23/98), 711 So.2d 675, 685-87. Absent a "suspect class" of persons or a "fundamental right," classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the state's goals and only if no grounds can be conceived to justify them. *Frederick v. Ieyoub,* 762 So.2d at 148 (quoting *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed. 2d 508 (1982)).

15

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 64 of 323

Copeland's equal protection argument is premised on the assertion that AIGA was treated differently than Treasure Chest because the Division issued a license to Treasure Chest but did not issue one to AIGA. He asserts the Division had no ascertainable rules to distinguish between these two license applicants and, accordingly, there was no justification for treating them differently.

Former La. R.S. 4:530 (redesignated as La. R.S. 27:70 by Acts 1996, 1st Ex. Sess. No. 7, § 3) set forth suitability requirements for those seeking a license to conduct gaming operations on a riverboat. Section 530(A) provided that an applicant must be "a person of good character, honesty, and integrity" and "a person whose prior activities, . . . habits, and associations do not pose a threat to the public interest of this state or to the effective regulation and control of gaming . . . ." Section 530(B) also mandated that a license could not be issued to a person unless the division found that: 1) the applicant was capable of operating a gaming casino; 2) the proposed financing of the riverboat and its operations was adequate and was from a suitable source; 3) the applicant was able to operate a vessel comparable to a riverboat; 4) the applicant had submitted a detailed plan of the riverboat's design; 5) the applicant had designated the docking facilities to be used; 6) the applicant showed adequate financial ability to construct and maintain a riverboat; and 7) the applicant had a good faith plan to recruit, train, and upgrade minorities in all employment classifications.

In determining suitability pursuant to La. R.S. 4:530, the Division was required to consider numerous factors, many of which were subjective in nature. Thus, in order to state an equal protection claim, we find that Copeland must specifically allege how it was similarly situated to Treasure Chest based on those factors. Copeland's petition broadly contends that AIGA was treated differently than Treasure Chest. Yet, he makes no specific allegations addressing how AIGA was similarly situated to Treasure Chest, or

16

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 65 of 323

that AIGA was as suitable as Treasure Chest, based on the factors addressed in La. R.S. 4:530.

Additionally, to state an equal protection claim, the petition must specifically allege how the Division treated AIGA differently or less favorably than Treasure Chest during the licensing process and how that unjustified disparate treatment resulted in the constructive denial of a license to AIGA. The petition fails to do so.

Accordingly, we conclude that the amended petition also fails to allege a violation of state or federal equal protection rights.

### C. Amendment of the Petition

La. C.C.P. art. 934 directs that a judgment sustaining a peremptory exception shall permit amendment of the petition when the grounds of the objection may be removed by amendment, and when the grounds of the objection cannot be removed by amendment, the action shall be dismissed. Amendment is not permitted when it would constitute a vain and useless act. *Mercan, Inc. v. City of Baton Rouge*, 2000-0600 (La. App. 1st Cir. 5/11/2001), 797 So.2d 722, 724, *writ denied*, 2001-1685 (La. 9/21/2001), 797 So.2d 676 (quoting *Premier Games, Inc. v. State through Ieyoub*, 99-1297 (La. App. 1st Cir. 6/7/99), 739 So.2d 852, 855, *writ denied*, 99-1710, 99-1679 (La. 6/14/99), 745 So.2d 15 and 604, *cert. denied*, 528 U.S. 1062, 120 S.Ct. 617, 145 L.Ed.2d 512 (1999)). We can not contemplate any amendment that Copeland can make insofar as his due process claim is concerned. Any attempt to allege a deprivation of a property right would constitute a vain and useless act. However, with respect to Copeland's equal protection claim, we acknowledge that, after further discovery, it is possible that he will be able to state a valid claim. Accordingly, we remand this matter for the limited purpose of allowing Copeland the opportunity to amend his petition in order to state an equal protection claim.

17

### D. Propriety of the Partial Summary Judgment in favor of the State

Pursuant to its motion for partial summary judgment, the State sought dismissal of Counts Two and Three of Copeland's amended petition. As explained above, the trial court properly granted the State's partial motion for summary judgment with respect to Count Two because the claim for declaratory judgment was moot. With respect to the claims asserted in Count Three, the petition fails to state a cause of action based on a violation of due process and equal protection rights. Thus, the trial court should have dismissed these constitutional claims on that basis and precluded a ruling on the State's motion for partial summary judgment. Accordingly, we vacate that portion of the trial court's judgment.

### III. CONCLUSION

That portion of the judgment granting Treasure Chest's exceptions raising the objections of prescription and failure to exhaust administrative remedies is vacated. That portion of the judgment granting Treasure Chest's motion to dismiss is affirmed.

We affirm that portion of the trial court's judgment that granted the State's motion for summary judgment as it relates to Count Two. We render judgment finding that the petition fails to state a cause of action with respect to Copeland's constitutional claims, and we vacate that portion of the trial court's judgment that granted the State's motion for partial summary judgment as it relates to Count Three. We also affirm that portion of the judgment that denied Copeland's motion for summary judgment on his constitutional claims. Otherwise, the judgment is affirmed. We remand this matter for the limited purpose of allowing Copeland the opportunity to amend his petition to set forth a claim based on a violation of his equal protection rights.

JUDGMENT AFFIRMED IN PART, VACATED IN PART, AND RENDERED. MATTER REMANDED FOR LIMITED FURTHER PROCEEDINGS.

18

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 67 of 323

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2000 CA 2864

AMERICAN INTERNATIONAL GAMING ASSOCIATION, INC.

VERSUS

THE LOUISIANA RIVERBOAT GAMING COMMISSION AND
THE RIVERBOAT GAMING ENFORCEMENT DIVISION
OF THE GAMING ENFORCEMENT SECTION OF THE OFFICE
OF STATE POLICE, PUBLIC SAFETY SERVICES,
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

GONZALES, J., concurring.

SEP 1 1 2002

As far back as 1892, in a famous opinion by Justice Oliver Wendell Holmes, the second class status of a mere governmental privilege was engrained into our procedural due process concepts in the case of McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 29 N.E. 517 (1892). The case involved a police officer that had been fired. The Supreme Court dismissed his complaints, holding that a governmental job was a mere privilege. The following excerpt 2 Kenneth C. Davis and Richard J. Pierce, Jr., Administrative Law Treatise § 9.3, at 11-13 (1994) summarizes the evolution of a mere privilege to the status of a constitutionally protected entitlement:

> Before 1970, due process applied only to deprivation of "rights," determined primarily with a reference to the common law. Anything else government provided was a mere "privilege," outside the scope of due process protection. Justice Holmes' opinion in McAuliffe v. Mayor of New Bedford, 29 N.E. 517 (1892), illustrates this approach. The Mayor fired a policeman for expressing views on an issue of public importance contrary to those of the Mayor. The court dismissed the policeman's complaint that the action violated both due process and the First Amendment because a government job is a mere privilege unprotected by the Constitution.

> Before 1970, the Court paid little attention to the nature of the decisionmaking procedure required by due process. Typically, the Court held only that due process required a "hearing," without describing the nature of the hearing required. In some cases, the Court's language seemed to imply that due process required an oral evidentiary hearing of the type routinely provided by courts. In ICC v. Louisville & Nashville Railroad, 227 U.S. 88, 93 (1913), for instance, the Court specifically referred to "opportunity to cross-examine witnesses." In other cases, however, the Court's language suggested that due process might be satisfied by a "hearing" less formal than the oral evidentiary hearing routinely available in a court. In Londoner v. Denver, 210 U.S. 373,

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 68 of 323

01129



# DOUG WELBORN
## CLERK OF COURT
### 19TH JUDICIAL DISTRICT
### PARISH OF EAST BATON ROUGE
### (225) 389-5120

## Registry of the Court

### Registry Receipt for Withdrawal of Funds

**POSTED**
NOV 29 2000

Alvin C. Copeland                                    (A)

VS.

The Louisiana Gaming Control Board, et al   400~750

Suit Number

Received from  Doug Welborn,  Clerk of Court, 19TH Judicial District Court,

Check Number _558633_ Drawn on ___H N B___

Amount $ _21,187.44_

Check made payable to _Slater Law Firm and Alvin C. Copeland_

Baton Rouge, Louisiana, This ___13th___ Day of ___November___ 2000

✗ Received by _B Slater us_                    Filed _11-27-00_

✗ Company Name _SLATER LAW Firm_       Signed _Celestine G. Jemison_
                                                                    Deputy Clerk

✗ Name of Attorney _B Slater us_

✗ Telephone Number _504 - 523 - 7333_

White Copy - Registry of the Court    Yellow Copy - File Copy    Pink Copy - Customer

Administrative 17
Rev. 9/99

822

0 0 8 5 1 1 0 3 1 1 0

EXHIBIT
6

# EDWARDS IS HIT WITH 28 COUNTS



Former Gov. Edwin Edwards was indicted on charges of violating federal racketeering laws that carry a maximum sentence of 350 years in prison and more than $10 million in fines and forfeitures. He showed up at the federal courthouse in Baton Rouge to give his side of the story.     STAFF PHOTO BY G. ANDREW BOYD

## Ex-governor is facing 350 years

**By MANUEL ROIG-FRANZIA**
*Capital bureau*

BATON ROUGE — Edwin Edwards and a cadre of tough-talking "front men" wielded the vast power of the Louisiana governor's office to extort more than $3 million from riverboat casino companies during the frenzied early days of legalized gambling in the state and continued to shake down casino owners after Edwards retired in January 1996, according to a 93-page indictment issued Friday.

A federal grand jury capped 18 months of closed hearings in New Orleans and Baton Rouge by indicting Edwards on 28 counts of violating federal racketeering laws that carry a combined maximum sentence of 350 years in prison and more than $10 million in fines and forfeitures.

Edwards' oldest son, Stephen, and four associates, including state Sen.

See **INDICT, A-10**



'We do this in hopes that one day, Louisiana will be an open, attractive and free market to those people and companies who seek to do business,'
**U.S. Attorney Eddie Jordan said Friday.**

STAFF PHOTO BY G. ANDREW BOYD

## Friends of 'the boss' made deals

**By JOANNA WEISS**
*Capital bureau*

BATON ROUGE — When it came to casinos, Cecil Brown had pull, the best kind of pull, federal prosecutors say. He was tight with Edwin Edwards, part of the inner circle. He could sway decisions and make fortunes. He just had to find a way to prove it.

In 1993, Brown met with a pair of developers from St. Louis, and tried to convince them he could win a casino license for the right sum. To demonstrate his clout, Brown gave them a pair of photos, pictures of himself next to Edwards. He scribbled a proud inscription on each. One said, "Your escort to Baton Rouge." The other, "Your connection to the boss."

The boss: That was only one of the nicknames Edwards' associates

See **DEAL, A-12**

## THE OTHER DEFENDANTS

Five men were indicted with Edwin Edwards as part of a wide-ranging conspiracy to rig riverboat casino licensing. All deny the allegations:



**STEPHEN EDWARDS**
Ex-governor's son accused of shaking down casino hopefuls



**CECIL BROWN**
Cattleman reportedly funneled money to Edwards



**ANDREW MARTIN**
Former aide to Edwards said to have picked up payoffs from dumpsters



**SEN. GREGORY TARVER**
Lawmaker accused of helping Edwards get secret State Police documents

**BOBBY JOHNSON** Contractor allegedly involved in Belle of Baton Rouge casino extortion

---

Federal prosecutors have tried before to put Edwin Edwards behind bars: In 1985, he was acquitted of illegally selling state approvals for hospitals and nursing homes. **See story, A-14**

The Edwards indictment, see special 8-page report beginning on A-10.

UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA ... FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, EXTORTION, MAIL & MONEY LAUNDERING, INTERSTATE TRAVEL IN AID OF RACKETEERING ...

Outlining the case against Edwards: excerpts from the transcripts. **Coming Sunday**

---

| INDEX | | | | |
|---|---|---|---|---|
| | Comics E-8 | Editorial ... Living E Money ... | People ... Religion B-4 ... | World news A-6 ... |

**EXHIBIT**

**7**

CLOU
High:
Detai

From A-1

Greg Tarver, D-Shreveport, also were indicted for allegedly helping the former governor in five "schemes" to illegally influence the awarding of riverboat casino licenses.

Money extorted by Edwards and his followers paid for his luxury condominium in the ski resort town of Vail, Colo., a 44-foot yacht, a 206-acre Mississippi farm and shopping sprees at tony Dallas furniture stores, prosecution documents say.

The long-awaited indictments amount to a stinging rebuke of "the way it's done in Louisiana," a phrase that defendant Cecil Brown employed to explain payments he extorted from a group of Missouri investors who hoped to open casinos in New Orleans and Calcasieu Parish, according to the indictment.

"We do this in hopes that one day, Louisiana will be an open, attractive and free market to those people and companies who seek to do business in an environment free of extortion and fraud," said U.S. Attorney Eddie Jordan, who donned a stately Homburg felt hat for the occasion. "The indictment represents a landmark in not only our initiative committed to the eradication of public corruption in Louisiana, but also serves as a landmark in this state's history."

Prosecutors portrayed Edwards as the leader of a rough pack of colleagues, who called him "the big man" and "the boss," while plotting to threaten casino owners to pay up or lose their chance at a piece of what was expected to be a lucrative gambling market.

Stephen Edwards shared a spot with his father at the "center or nucleus" of the scheming and had a "managerial role" in the shakedowns, the indictment says.

## Confident Edwards

A defiant and relaxed Edwin Edwards wasted no time responding to the allegations.

Wearing an uncharacteristically conservative dark-blue suit, Edwards appeared at U.S. District Court in Baton Rouge to conduct a series of rambling interviews that started even before the end of a brief hearing finalizing the indictments and later spilled into the street, blocking midday traffic.

"It's less than I expected; I'm not charged at all with the Oklahoma City' bombing," Edwards quipped. "I can truthfully say if my sentence is 350 years, I don't intend to serve."

Asked whether prosecutors

were on a witch hunt, Edwards smiled broadly and said, "Well, it is the Halloween season."

But Edwards' eyes narrowed and his tone grew serious when he talked about three family friends who testified in rapid succession last month that he took part in schemes to extort bribes from casino companies.

San Francisco 49ers owner Eddie DeBartolo Jr., former Treasure Chest casino owner Robert Guidry and riverboat consultant Ricky Shetler each pleaded guilty to crimes under leniency deals and testified that Edwards played a prominent role in the extortion schemes.

"I have a minimum amount of high respect for them," Edwards said. "They got scared. The guys that plead guilty are the guys who made the money. These people couldn't take the pressure. ... I can't blame them."

DeBartolo, the multimillionaire heir to a shopping mall fortune, made the most money in Louisiana gambling deals among the witnesses, taking in more than $90 million in 1996 for selling his shares in two Isle of Capri casinos.

Guidry had his big payday one year later when he sold his piece of the Treasure Chest casino in Kenner for more than $80 million, collecting the lion's share of more than $30 million in net profits that he split with a handful of partners holding less than 20 percent of the firm.

## Friends' testimony key

Legal experts say the prosecution's case was buoyed by the testimony of Edwards' friends because members of his inner circle had never turned on him during the course of at least 15 grand jury investigations and during the fraud and racketeering trials that ended in a 1986 acquittal.

Edwards said he'll be able to prove at trial that any money he got from casino owners was for legitimate legal or lobbying services and that prosecutors have their facts wrong about payments his son received.

"I've been there before and I'm confident," he said.

But Edwards acknowledged that some of his dealings, such as stuffing $400,000 in cash from DeBartolo in an oversized money vest, might appear "a little bizarre and little bit strange ... but that's my nature."

The documents released Friday add to mounds of potentially damaging evidence revealed during last month's plea hearings and could shed light on unanswered questions about the length of Gov. Foster's investigation.



Robert Guidry sold his piece of the Treasure Chest casino, left, in Kenner for more than $80 million, collecting most of the more than $30 million in net profits that he split with partners holding less than 20 percent of the firm.
STAFF FILE PHOTO

The probe was widely believed to have started in 1996 when two Texas brothers, felons Michael and Patrick Graham, approached the FBI in New Orleans with tales of multimillion dollar payoff schemes involving Edwards and state contracts.

But an obscure paragraph in the lengthy indictment documents shows that FBI agents were looking into Edwards' involvement in the state's riverboat casino industry from the very beginning.

## May have started in 1992

According to the documents, Mark Bradley, an executive with the company that owns the Belle of Baton Rouge casino, "cooperated with special agents of the Federal Bureau of Investigation during and throughout the license application process." That could place the investigation as far back as 1992 when the first riverboat casino applications were filed with the state.

Bradley recorded "numerous conversations" during the licensing process, the indictment says.

Evidence gathered by Bradley is sure to be hotly disputed because he made and then recanted statements about alleged extortion attempts in 1995.

Defense attorney Pat Fanning, who represents defendant Bobby Johnson, recently called Bradley "a notorious liar."

Johnson, who is a Baton Rouge contractor and an Edwards political supporter, is quoted in indictment documents pressuring Bradley to give him a share of the casino and to buy land from him. In a series of increasingly threatening conversations, Johnson says Edwards is anxious for an answer about the payoffs.

"I've got to get my answer to the old man," Johnson said, according to the transcript.

Tarver and Stephen Edwards also figure into the alleged shakedown attempts involving Bradley's firm, Jazz Enterprises.

During a meeting at a Baton

Rouge restaurant, Stephen Edwards told an unnamed attorney for the company that there were "problems with the application" that could be resolved by hiring some "good local people," including an unnamed insurance agent who attended the meeting.

Indeed, the indictment documents are sprinkled with numerous references to unnamed people, such as legislators, political allies and gambling regulators.

One unnamed businessman links Tarver to the alleged Jazz shakedown effort.

Tarver is quoted telling a Jazz attorney that he would have to offer an ownership interest to "one of the governor's poker buddies." He later introduces the lawyer to one of his unnamed close associates, a businessman who demands part ownership of the casino.

Ironically, the casino goes on to win an operating license apparently without acceding to any of the demands by Stephen Edwards, Tarver or Johnson. In another twist, two firms mentioned in the indictment — Louisiana Riverboat Gaming Corp. and New Orleans Riverboat Corp. — gave $300,000 in payoffs to Brown, but did not win licenses.

Tarver is accused of controlling members of both Edwards' Riverboat Gaming Commission and its replacement, Gov. Foster's state Gaming Control Board. Edwards and Foster each appointed one member to their regulatory board on Tarver's recommendation. The members are referred to in prosecution documents as Tarver's "men on the board."

## Tarver talked of influence

In 1993, the documents say, Tarver boasted about his influence over the licensing process by telling the Jazz attorney: "'Do you think we'd let those birds make those decisions?' referring to members of the gaming commission."

Tarver, "Tarver or suspicions of the most expensive remarks

helping Edwards leak confidential background information about casino applicants to DeBartolo, who applied for and was granted the state's last riverboat casino license in March 1997 by Foster's board.

The allegation has tarnished a board that Foster promised would be corruption-free, and the governor has asked Tarver's recommended appointee, Ecotry Fuller, to recuse himself from voting until the case is resolved. Fuller denies wrongdoing and has said he will defy the governor by participating in board business.

Tarver's attorney, Mike Small, declined to answer questions, but issued a brief statement, saying Tarver recently was cleared of allegations about wrongdoing in the gambling industry by federal prosecutors in Shreveport and expects the same in Baton Rouge:

"Senator Tarver is innocent and will vigorously defend the charges in today's indictments and we are confident that he will be completely exonerated."

The allegations about DeBartolo's licensing deal are bolstered by recordings of several thousands of hours of phone conversations gathered by wiretaps of Edwin and Stephen Edwards' homes and offices, as well as Brown's home and business.

Jordan spoke confidently about the wiretap evidence and witnesses' recollections of conversations with Edwards and others.

"We intend to convict the former governor and other defendants on the basis of their own words," Jordan said.

## Defense studies indictment

Defense attorneys, on the other hand, had little to say Friday, reserving comments for next week after they've had a chance to review the voluminous indictment documents.

Attorneys for Edwin and Stephen Edwards declined to comment, and Johnson's attorney, Fanning, did not return phone calls.

came from attorney Sonny Garcia, who represents defendant Andrew Martin, a former Edwards governor's aide.

"I don't think there's any corruption involved in this case," Garcia said. "I think that's a figment of some people's imagination."

Garcia couldn't resist taking a poke at the length of indictment material, saying, "I've seen Stephen King novels that weren't that long."

Martin played a high-profile role in the alleged extortion of Guidry, who testified to making $1.4 million in payoffs that were split between Martin and the Edwardses. Martin served as a "gobetween," soliciting payments from Guidry to funnel to the Edwardses and later collecting some of his own rewards in trash bins.

It's unlikely that any of the defendants indicted Friday will decide to enter pleas and testify against Edwards, Garcia said.

And Edwards emphatically ruled out making a deal himself.

"I had an opportunity a year ago to make an incredibly sweet deal with my son getting total immunity," he said.

Edwards said prosecutors wanted him to provide evidence of criminal wrongdoing by members of the state Legislature, gambling regulators and other targets of the probe, but that to do so he would have had to make "false statements ... the truth wasn't acceptable to the government."

Eyebrows were raised Friday when U.S. District Judge John Parker granted lead prosecutor Jim Letten's request not to dismiss jurors because "we have additional work for the grand jury."

Letten declined to elaborate. The jury comprises 12 women and nine men. Three of the women are African-American.

Edwards' defense attorneys have complained that the process of selecting grand jurors in the Baton Rouge federal court district illegally excludes African-Americans and say they'll likely use that argument as their first pretrial line of defense.

Gambling opponents watched the proceedings from afar and said the case will have little impact on the state only if it prompts changes in the way gambling is regulated or perhaps an outright ban.

"This is showing that gambling has brought terminal political corruption to Louisiana," said C.B. Forgotston, a New Orleans lawyer and gambling foe. "And these indictments are an indication that the corruption is way beyond the magnitude that anybody expected."

# Conservative jury pool more likely in B.R.

## U.S. attorney picks where trial is held

**By MANUEL ROIG-FRANZIA**
*Capital bureau*

BATON ROUGE — It's a question invariably asked by newcomers to the Edwin Edwards case: Why are federal prosecutors from New Orleans handling a case before the grand jury in Baton Rouge, which has its own U.S. attorney's office?

Defense attorneys say it's forum shopping. Prosecutors call it proper use of discretion to try conspiracy cases in any of the districts where they say crimes were committed.

Both sides agree the case will probably stay in Baton Rouge, even though Edwards would rather go to trial in New Orleans, where he was acquitted of fraud and racketeering charges in a 1986 hospital licensing case.

"I am powerless legally to do anything as to where this case is," said Lewis Unglesby, an attorney for Edwards' son Stephen.

The Baton Rouge federal grand jury that indicted Edwards, his son Stephen and several close associates Friday started hearing from witnesses and reviewing evidence in October 1997. But it is not the only grand jury to look into Edwards' involvement in riverboat casino licensing since FBI agents raided the former governor's home and office in April 1997.

A separate grand jury at U.S. District Court in New Orleans looked into many of the same issues after the raid and subpoenaed several key players in the investigation, including Edwards and San Francisco 49ers owner Edward DeBartolo Jr.

But the New Orleans grand jury was disbanded without public explanation last October when prosecutors asked for a new grand jury to be impaneled at U.S. District Court in Baton Rouge. Tho shift became public as witnesses and government agencies began getting subpoenas, setting off a torrent of criticism from defense attorneys.

"That's the typical forum shopping that the government apparently has the opportunity to do in a case like this," said Sonny Garcia, an attorney for Edwards' former governor's aide, Andrew Martin.

Garcia and other defense attorneys accuse prosecutors of steering the case away from New Orleans because Edwards, a populist Democrat, is less popular in the more conservative Baton Rouge area.

"I'd like to see it back where it started in New Orleans," Unglesby said. "It is dead wrong for the U.S. Department of Justice to try to manipulate the forum."

New Orleans U.S. Attorney Eddie Jordan, who heads the probe, has said little about the shift to Baton Rouge, where Edwards lives, other than to defend it as legitimate use of a prosecutor's discretion.

"I've made it clear we will bring the case to the grand jury in the district where the criminal activity occurred," Jordan said. "That is a decision to be made by the prosecution. Defendants should not, cannot and will not dictate where the prosecution occurs."

Jordan declined to explain why the investigation started in New Orleans and then was moved to Baton Rouge. Jordan also won't discuss why L.J. Hymel, the U.S. attorney in Baton Rouge, was not involved in grand jury hearings that have taken place in the same courthouse building where Hymel's office is located.

Speculation centers on a call that sources close to Edwards say the former governor placed to Hymel. At the time, Edwards was representing the failed Cascade Insurance company, whose owner paid $100,000 in legal fees to Edwards. The grand jury has looked into the payment and some defense attorneys expect prosecutors to follow the riverboat indictments with a second set of indictments related to the insurance transactions.

Hymel has declined to comment directly about his recusal. But in November he said: "I would be disappointed in any system that would have a subject of an investigation have a U.S. attorney removed from a case by placement of a telephone call."

Others have speculated that Hymel might have recused himself because of past associations with two people involved with the Cascade liquidation.

Before becoming U.S. attorney, Hymel was a state district court judge at the same time as Judge A. Foster "Foxy" Sanders,

who oversaw insurance company liquidations, including the Cascade case, before retiring in 1996.

Ed Gonzales, a former assistant U.S. attorney under Hymel, was hired by Sanders to assess the liquidation of Cascade and other insurance companies.

The Hymel recusal makes for the unusual scenario of a federal prosecutor trying a case outside his district without the involvement of the local U.S. attorney, legal experts say.

"It's certainly a rare situation, but that's not to say it doesn't happen," said Harry Rosenberg, a former U.S. attorney in New Orleans. "You don't see this too often, except in cases when a defendant was arguing that he couldn't get a fair trial in a particular district."

While defense attorneys concede that Jordan has a legal right to try the Edwards case in Baton Rouge, they have hinted at another strategy to challenge indictments, or perhaps eventually push the case back to New Orleans.

Edwards' attorney Mike Fawer argued in an unrelated case this year that the process of selecting federal grand jurors in Baton Rouge excludes African-Americans, a demographic group that has strongly supported Edwards' political campaigns.

The argument failed to derail the prosecution of Fawer's client,



New Orleans U.S. Attorney Eddie Jordan said, "I've made it clear we will bring the case to the grand jury in the district where the criminal activity occurred. That is a decision to be made by the prosecution. Defendants should not, cannot and will not dictate where the prosecution occurs."

STAFF FILE PHOTOS BY ELLIS LUCIA

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 72 of 323



**Richard Stalder, secretary of the state Public Safety and Corrections Department, hauls a load of records into the federal courthouse in New Orleans for the grand jury to see on May 7, 1997. The New Orleans grand jury was disbanded last October when prosecutors asked for a new grand jury to be impaneled at U.S. District Court in Baton Rouge.**

but it did prompt changes in jury selection methods at the federal court in Baton Rouge. Fawer and Unglesby have said those changes amount to an admission by the court that its jury selection system is flawed. From there, the lawyers argue that the Edwards case would be better off in New Orleans, where they say the grand jury selection process does not discriminate against African-Americans.

Fawer said recently that he'll resurrect the jury discrimination argument in the early stages of preparation for the Edwards trial.

If the argument flies, Edwards would gain a huge advantage, said former U.S. Attorney John Volz, who prosecuted Edwards in the hospital licensing case.

"If I had a trial again, I certainly wouldn't go to New Orleans — that's Edwin Edwards' constituency," Volz said.

## THE EDWARDS INDICTMENTS

# THE FEDERAL RACKETEERING CASE

Federal prosecutors built their racketeering case on six "schemes" involving the licensing of riverboat casinos.

### 1. "THE LOUISIANA RIVERBOAT AND NEW ORLEANS RIVERBOAT SCHEME"

**The boats:** Casinos proposed by the Louisiana Riverboat Gaming Corp. in Calcasieu Parish and by New Orleans Riverboat Corp. at the Julia Street Wharf in New Orleans.

**Who's charged:** Edwin Edwards, Stephen Edwards, Cecil Brown

**The charges:** Mail and wire fraud, extortion, conspiracy to commit extortion and interstate travel in aid of racketeering.

**Background:** Edwards' friend Cecil Brown promoted the riverboat casino applications in 1993 of New Orleans Riverboat Corp. and Louisiana Riverboat Gaming Corp. Neither firm was granted a license. Prosecutors allege the companies paid Brown more than $300,000 and gave him an interest in the casinos to curry favor with Gov. Edwards.

### 2. "THE JAZZ SCHEME"

**The boat:** Belle of Baton Rouge

**Who's charged:** Edwin Edwards, Cecil Brown, Bobby Johnson, state Sen. Greg Tarver

**The charges:** Conspiracy to commit extortion, extortion, wire fraud and racketeering.

**Background:** The Belle originally was owned by a partnership of Jazz Enterprises and Argosy Gaming. Argosy later bought out Jazz. Mark Bradley, an executive with Jazz Enterprises, told reporters in 1995 that state officials had tried to extort money from the company. He later recanted. Prosecutors allege that Baton Rouge contractor Bobby Johnson threatened to use his influence with Edwards to thwart the casino's application if the firm's owners did not buy land from him and give him an interest in the casino's profits. A close associate of Tarver also tried to extort an ownership interest in the casino, prosecutors say.

### 3. "PLAYERS RIVERBOAT SCHEME"

**The boat:** Players Casino in Lake Charles

**Who's charged:** Edwin Edwards, Stephen Edwards

**The charges:** Extortion, conspiracy to commit extortion and interstate travel in aid of racketeering.

**Background:** Ricky Shetler, a lifelong friend of Stephen Edwards, pleaded guilty Oct. 9 to a felony charge of conspiracy to commit extortion. Shetler affirmed under oath that he funneled $550,000 in payoffs to Edwin and Stephen Edwards from Players while Edwards was governor and after he retired. Shetler attested under oath that he sought payoffs from Players to assure Edwards would use his power as governor to grant the company a riverboat casino license and to thwart competition after the casino opened.

### 4. "THE TREASURE CHEST SCHEME"

**The boat:** Treasure Chest Casino in Kenner, which won a license in 1993

**Who's charged:** Edwin Edwards, Stephen Edwards, C. Andrew Martin

**The charges:** Extortion and conspiracy to commit extortion

**Background:** Treasure Chest won a casino license from Edwin Edwards' hand-picked gambling board. Treasure Chest owner Robert Guidry pleaded guilty to a felony conspiracy charge Oct. 16 and affirmed under oath that he made $1.4 million in cash payoffs to be split between the Edwardses and Martin. The payoffs were made after Edwards left office, but the deal was cemented by Edwards while he was governor, according to prosecution documents.

### 5. "THE 15TH RIVERBOAT LICENSE SCHEME"

**The boat:** A casino in Bossier Parish proposed by DeBartolo Entertainment and Hollywood Casino

**Who's charged:** Edwin Edwards, Stephen Edwards, state Sen. Greg Tarver

**The charges:** Mail and wire fraud and extortion.

**Background:** Edwin Edwards got a $400,000 payment from DeBartolo Jr. in March 1997 on the day before a De-Bartolo/Hollywood partnership won the state's last riverboat casino license. DeBartolo pulled out of the deal after appearing before the grand jury in June 1997. The deal collapsed and the partners surrendered the license. Prosecutors allege that Tarver, D-Shreveport, helped Edwards leak confidential background information about casino applicants to DeBartolo.

### 6. "MONEY LAUNDERING PLOTS"

**Who's charged:** Edwin Edwards, Stephen Edwards, C. Andrew Martin

**The charges:** Money laundering conspiracy

**Background:** The Edwardses and former governor's aide Martin are accused of trying to hide cash payoffs from casinos that were funneled to them by Guidry, Shetler and others by buying real estate and cars, playing high-stake card games and creating a phony tugboat lease.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 74 of 323

# EDWARDS AND THE FEDS

Here are some of the key events in the federal investigation of former Gov. Edwin Edwards:

## 1996

**April:** Texas brothers Patrick and Michael Graham approach FBI in New Orleans with information about alleged criminal activity involving elected officials in Louisiana.

**October:** Federal investigators wire former Gov. Edwin Edwards' Baton Rouge home, and a few months later the law office he shares with his son, attorney Stephen Edwards.

## 1997

**March 9:** Undercover FBI agents, posing as charter pilots, fly Patrick Graham and an unsuspecting Edwards in a private plane from Edwards' Vail, Colo., vacation home to Baton Rouge. Edwards says later that the plane was bugged.

**March 13:** Edwards gets a $400,000 cash payment from Edward DeBartolo Jr. for legal and lobbying services.

**March 13:** A partnership of DeBartolo Entertainment and Hollywood Casino wins Louisiana's last riverboat casino license with a proposal for a $250 million casino and hotel complex in Bossier City.

**April 28:** After recording thousands of phone conversations involving Edwards and his associates, FBI agents seize nearly $470,000 in cash, including the DeBartolo payment, during raids of a Baton Rouge safe deposit box and the homes of Edwin and Stephen Edwards. Over two days, agents also raid the homes and businesses of Edwards associates in Texas and Louisiana.

**May 1:** "Upset at all that turned out to be such a disaster," Edwards says he returned $303,000 of the seized cash to DeBartolo and kept $97,000 to cover legal expenses racked up trying to get the money back from the federal government.

**May 5:** Edwards' friend Cecil Brown, a Eunice cattleman, gets a letter from the grand jury naming him a target of the probe.

**Sept. 14:** In a conference call with defense attorneys, prosecutors outline a series of racketeering and bribery charges they plan to seek against Edwards. Prosecutors describe five alleged "schemes" to illegally influence the awarding of riverboat casino licenses.

**Sept. 17:** Attorneys for Edwards and his son Stephen meet with U.S. Justice Department officials in Washington to discuss prosecutors' plans to seek indictments under the Racketeer Influenced and Corrupt Organization statute, known as RICO.

**Sept. 24:** DeBartolo agrees to cooperate with prosecutors and testifies before the grand jury investigating Edwards and others."

**September:** The lead prosecutor in the Edwards case predicts indictments within 90 days. Federal lawyers later downplay the prediction after the deadline passes without action.

**October:** The investigation shifts from federal court in New Orleans to federal court in Baton Rouge, moving from an area where Edwards is politically popular to one where he traditionally has had weak support.

**November:** The grand jury sends letters to six people naming them as targets and warning they could be indicted. Letters go to Edwin and Stephen Edwards, DeBartolo, former Treasure Chest casino owner Robert Guidry, former Edwards aide Andrew Martin and Lake Charles businessman Ricky Shetler.

## 1998

**Feb. 4:** After 10 months of legal wrangling, the Edwardses are reimbursed for the cash seized by federal agents. Edwin Edwards blames the investigation on "angry FBI people . . . still smarting from the thrashing they took" in 1986 when Edwards was acquitted of fraud and racketeering in a hospital licensing case.

**Oct. 9:** Shetler, Stephen Edwards' lifelong friend, affirms under oath that he funneled $550,000 in payoffs to Edwin and Stephen Edwards. Shetler pleads guilty to a felony charge of conspiring to commit extortion.

**Oct. 15:** White attests in court that he introduced Edwin Edwards to a man for the purpose of obtaining FBI wiretaps of Edwards. White pleads guilty to failing to report a crime and agrees to testify against Edwards.

**Oct. 16:** Guidry pleads guilty to conspiracy to commit extortion and agrees to testify that he paid Edwin and Stephen Edwards and one-time Edwards aide Andrew Martin $100,000 a month for assurances of winning a riverboat license. Guidry faces $3.5 million in fines and a possible prison sentence.

**Nov. 6:** A federal grand jury in Baton Rouge indicts Edwin Edwards on 28 counts of violating federal law, including racketeering, extortion and money laundering. Edwards' son, Stephen, also is indicted, along with Tarver, Brown, Martin and Baton Rouge contractor Bobby Johnson. The indictments center on allegations that the men illegally influenced the awarding of riverboat casino licenses during Edwards' last term in office and after he retired.

*Compiled by Manuel Roig-Franzia*

---

# Prosecutors have used broad brush with probe

## *Questions remain on where else feds might go*

By MANUEL ROIG-FRANZIA
Capital bureau

BATON ROUGE — A botched professional basketball deal. A juvenile prison contract and a failed insurance company. Even the New Orleans sanitation department.

In the past 1½ years, the investigation of former Gov. Edwin Edwards has touched on so many subjects that defense attorneys and other observers often have been left baffled. Fueled by dozens of subpoenas, the probe has spread into nearly every crevice of Louisiana's political system, rattling the Legislature and regulatory agencies, as well as the many lawyers and business people involved with the state.

With indictments issued Friday alleging Edwards and others illegally influenced the awarding of riverboat casino licenses, questions remain about other matters scrutinized by the grand jury.

A probe of payments Edwards received from the owner of a failed insurance company appears closest to completion, but lawyers and others familiar with the investigation are unsure whether it will produce indictments.

As recently as early October, some defense attorneys in the insurance probe were certain indictments were in the offing.

That line of inquiry was spurred by U.S. Attorney Eddie Jordan's decision to extend the term of the grand jury investigating Edwards. The jury's one-year term was scheduled to expire Oct. 7, but was extended to April 1998.

Others believe prosecutors have decided not to go forward with the insurance probe and noted that Sal Perricone, the lead prosecutor in the insurance investigation, recently was handling a prostitution-ring case in New Orleans. It would be uncharacteristic for the U.S. attorney's office to ask a prosecutor with a case involving such a high-profile figure as Edwards to handle other prosecutions at the same time, legal experts said.

"I would be surprised if there were indictments because I know the facts," said John DiGiulio, an attorney for Robert Bourgeois, who heads the state's insurance receivership office.

The insurance investigation centers on a $100,000 payment Edwards got in 1996 from David Disiere, the owner of Cascade Insurance Co. in Shreveport, which was being liquidated by the state.

Edwards has said the payment covered legal services, but defense sources say they expect prosecutors to allege it was a bribe for Edwards' help in reducing the amount of money Cascade would have to pay the state to settle claims.

At the time of the payment to Edwards, Cascade was being liquidated by the state receivership office, which was overseen by Baton Rouge state Judge A. Foster "Foxy" Sanders, who hired his longtime friend Bourgeois to manage the office.

The receivership office settled the case for $3.1 million in December 1996.

Two years earlier, Louisiana Insurance Secretary Jim Brown's staff had concluded the state would not be able to collect any money from Cascade. Brown lost control of the case in 1995 when Sanders seized authority of the receivership office.

Brown has acknowledged talking by phone with Edwards about the Cascade case and has appeared before the grand jury several times. Brown says he is not a target in the probe.

Prosecutors also have looked into the awarding of a $35 million juvenile prison construction contract to a company formed by former Houston Mayor Fred Hofheinz and Texas businessmen Michael and Patrick Graham.

In September 1996, a New Orleans prosecutor and an FBI agent told a Houston federal bankruptcy judge during a closed hearing that the Grahams helped

agents uncover a $1 million bribe related to the contract that was paid to an unnamed elected official in Louisiana. The hearing became public this summer when the judge unsealed transcripts of the proceeding.

Steve Irwin, the prosecutor who discussed the payoff scheme in Houston, has been removed from the case.

Hofheinz has denied wrongdoing and cut his ties with the Grahams, who are convicted felons and were each recently sentenced to prison for tax evasion.

The Hofheinz-Graham partnership eventually gave up the prison contract because of shaky financing and sold its interest in the project to Wackenhut Corp., which employed Edwards' niece Wanda Edwards as a lobbyist.

Some defense attorneys have speculated that that part of the investigation could be shifted to Texas because prosecutors have the legal right to seek indictments in any court district where they allege conspiracies took place.

Prosecutors also have looked into another Graham-Hofheinz venture, TopRank of Louisiana, which tried to bring a National Basketball Association franchise from Minnesota to New Orleans during Edwards' last term in office. The issue made headlines when it was included in search warrants made public last year, but it has not surfaced in recent events surrounding the case.

As for other matters examined by prosecutors, defense sources say they're puzzled.

Prosecutors in recent months have continued to ask questions about issues Edwards might have been involved in, prompting observers to wonder whether investigators might be looking into alleged laundering of payoffs. Investigators learned about environmental cleanup companies and the New Orleans sanitation department also has been sought, although it's unclear why.

"They've used a broad brush," said Mike Fawer, Edwards' attorney.

# THE EDWARDS INDICTMENTS

# THE DEFENDANTS

## EDWIN EDWARDS



**CHARGES:** 28 counts including RICO, conspiracy, extortion, mail and wire fraud, mail and wire fraud conspiracy, illegal wiretapping and money laundering conspiracy.

**MAXIMUM SENTENCE:** Up to 350 years and/or up to $10.3 million in fines. –

**BACKGROUND:** Edwards dominated Louisiana politics for almost 25 years, serving four terms as governor between January 1972 and January 1996.

He has maintained a strong following over the years despite a series of scandals and the jailing of several close associates. Edwards failed in only one campaign, withdrawing from the 1987 governors race against Buddy Roemer after a poor showing in the primary.

Edwards completed a stunning political comeback in 1991 by defeating former Ku Klux Klan Grand Wizard David Duke. Pro-Edwards bumper stickers called on residents to "Vote for the crook / It's important."

Known for his free-wheeling style, Edwards says he reveled in the enormous power and influence afforded Louisiana governors. He once boasted that the only way he could lose an election was "if I get caught in bed with a dead girl or a live boy."

While governor, Edwards oversaw the licensing of the state's riverboat casino industry in the early 1990s.

An avid gambler, Edwards is a regular at Nevada casinos, where he is granted high-roller status and privileges. While on trial in 1985, Edwards told jurors that he gambled at Nevada casinos under the aliases, Ed Neff and T. Wong. But Edwards says he has never gambled at a Louisiana casino.

Edwards, 71, was born in Marksville. After graduating from Louisiana State University law school, he practiced law in Crowley, where he won his first political victory by securing a spot on the City Council in 1954. In 1964, he was elected to the Louisiana Senate, where he was a floor leader for Gov. John McKeithen. In 1965, he won a seat in the U.S. House of Representatives.

Edwards lives in Baton Rouge. He recently said he's had a reverse vasectomy because he and his wife, Candy Picou, 34, hope to have their first child together. Edwards has four children from a previous marriage.

**ATTORNEY:** Mike Fawer, who has offices in New Orleans and Covington.

## STEPHEN EDWARDS



**EDWARDS CONNECTION:** The former governor's oldest son.

**CHARGES:** 25 counts including RICO, extortion, extortion conspiracy, mail and wire fraud, mail and wire fraud conspiracy, illegal wiretapping and money laundering conspiracy.

**MAXIMUM SENTENCE:** 305 years and/or $9.6 million in fines and forfeitures

**BACKGROUND:** Stephen Edwards, 44, is a Baton Rouge lawyer. He has collected fees for legal services provided to riverboat casinos and video poker companies. In one instance, Casino Magic paid Stephen Edwards $450,000 over 10 months for work that the company's General Counsel Robert Callaway called "insignificant" compared to the compensation.

San Francisco 49ers owner Edward DeBartolo Jr. has said Edwin Edwards tried to pressure him to sign "sham" riverboat casino consulting contracts with Stephen Edwards worth $600,000-a-year. In a separate matter, Stephen Edwards' friend Ricky Shetler has said in court that he funneled $550,000 in payoffs to the Edwardses from Players Casino in Lake Charles. Stephen Edwards also is accused of taking payoffs from former Treasure Chest casino owner Robert Guidry. The Edwardses have denied wrongdoing. Stephen Edwards and his three siblings owned companies that sold merchandise to riverboat casinos during Edwin Edwards' last term as governor from 1992 to 1996.

**ATTORNEYS:** Lewis Unglesby and Karl Koch of Baton Rouge

## ANDREW MARTIN



**EDWARDS CONNECTION:** Edwards appointed Martin as chairman of the Mineral Board in 1971. During Edwards' last term as governor, Martin was his executive assistant.

**CHARGES:** Six counts including RICO, RICO conspiracy, extortion, conspiracy to commit extortion and money laundering conspiracy.

**MAXIMUM SENTENCE:** 120 years and/or $4.1 million in fines and forfeitures

**BACKGROUND:** Martin once ruled a $150 million business empire that encompassed part ownership of the New Orleans Jazz professional basketball team, a popular Metairie seafood restaurant, offshore drilling interests and a seafood processing plant in Galliano. His business fortunes suffered in the 1980s.

Martin resigned from the Mineral Board in 1979 amid an investigation into conflicts of interest after acknowledging that he had done business with companies that bought mineral leases from the state. The ethics commission dropped charges against Martin after he resigned.

Martin is accused of extorting payoffs from former Treasure Chest casino owner Robert Guidry, who sometimes left the money to be picked up from trash Dumpsters.

**ATTORNEY:** Sonny Garcia of Metairie

## CECIL BROWN



**EDWARDS CONNECTION:** Longtime social pal of Edwards, who traveled extensively with him during the 1991 governor's campaign and has been involved with Edwards in cattle deals.

**CHARGES:** Four counts including RICO, extortion and extortion conspiracy.

**MAXIMUM SENTENCE:** 80 years and/or $3.4 million in fines and forfeitures.

**BACKGROUND:** Brown is a Eunice cattle rancher and auctioneer.

He is accused of funneling money to Edwards from companies interested in opening riverboat casinos.

Edwards has said Brown was given FBI sting money by Texas businessman Patrick Graham to set up a meeting related to a Louisiana juvenile prison contract. Edwards first said Graham and Brown each kept half the money. Edwards later said he briefly held $25,000 of the money, but gave it back to Brown. Brown also applied unsuccessfully with a group of Illinois businessmen to operate a riverboat casino in Calcasieu Parish and promoted the application of a closely related company to open a riverboat casino at the Julia Street Wharf in New Orleans.

**ATTORNEY:** Wayne Blanchard of the federal public defender's office in Lafayette. Brown's first attorney, Lou Merhige of New Orleans, asked the court to appoint another lawyer because Brown says he cannot afford legal fees.

## GREGORY TARVER



**EDWARDS CONNECTION:** A Democratic state senator from Shreveport, Tarver is a longtime political ally of Edwards.

**CHARGES:** 11 counts including mail and wire fraud and mail and wire fraud conspiracy.

**MAXIMUM SENTENCE:** 55 years and/or $2.75 million in fines.

**BACKGROUND:** The son of Shreveport funeral home owners, Tarver was active in civil rights-era protests. In 1978, he and two others became the first African Americans elected to the Shreveport City Council. Tarver has been a state senator since 1984 and is considered a powerful force in directing legislation through the process. He was recently named chairman of the Senate Insurance Committee. Tarver also is running for senate president pro tempore, the No. 2 spot in that body.

Tarver is accused of helping Edwards obtain confidential information about Edward DeBartolo's competitors for a riverboat casino license. Prosecutors said Tarver used his influence over a Louisiana Gaming Control Board member who introduced the motion to approve DeBartolo's application, which passed unanimously. Board records show the motion was introduced by Ecotry Fuller, who Tarver recommended to the Foster administration for appointment to the board. Fuller has not been accused of wrongdoing.

**ATTORNEY:** Mike Small and Camille Gravel of Alexandria. Tarver also hired former state Sen. Donald Kelly of Natchitoches and state Sen. Charles Jones, D-Monroe, to try to persuade prosecutors not to indict him and to discuss possible plea bargains.

## BOBBY JOHNSON

**EDWARDS CONNECTION:** Friend of Edwin and Stephen Edwards

**CHARGES:** Nine counts including extortion, extortion conspiracy, wire fraud and false statements.

**MAXIMUM SENTENCE:** 75 years and/or $2.25 million in fines

**BACKGROUND:** Johnson is a sand and gravel contractor who was involved in several major projects including paving the Mall of Louisiana in Baton Rouge. Johnson appeared before the Edwards grand jury Aug. 29 and invoked his Fifth Amendment rights.

Johnson is accused of extorting money from the Jazz Enterprises/Belle of Baton Rouge riverboat casino and of lying to federal agents during the investigation.

**ATTORNEY:** Pat Fanning of New Orleans

# THE WITNESSES

## EDDIE DEBARTOLO JR.



**EDWARDS CONNECTION:** DeBartolo's father, shopping mall magnate Edward DeBartolo Sr., developed a friendship with then-Gov. Edwin Edwards while building New Orleans Centre in the 1980s and the Louisiana Downs horse racing track in Bossier City in the 1970s. The younger DeBartolo and Edwards have traveled together in recent years to Florida and Las Vegas.

In a transaction that has been at the center of federal inquiries, DeBartolo paid Edwards $400,000 in cash one day before winning the state's last riverboat casino license in March 1997. Edwards has said the money was for legal and lobbying services.

**CHARGES:** DeBartolo pleaded guilty to a felony for failing to report a crime — his alleged shakedown by Edwards. He acknowledged under oath that the money was extorted by Edwards. DeBartolo was sentenced to two years probation in return for testifying against Edwards and will pay $1 million in fines and assessments.

**BACKGROUND:** DeBartolo and his sister, Denise DeBartolo York, inherited one of the nation's largest real estate empires when their father died in 1994.

They are co-owners of one of the National Football League's premier franchises, the San Francisco 49ers. The two have fought for control of the team since DeBartolo's name surfaced in the Edwards investigation in June 1997.

DeBartolo made more than $90 million in 1996 by selling his interests in two Louisiana riverboat casinos. Federal investigators have looked into the sale, but it does not appear that DeBartolo will face charges in that exchange. DeBartolo's gambling ventures in other states have for the most part been costly failures.

**ATTORNEY:** Aubrey Harwell of Nashville, whose partner Jim Neal represented Edwards in the first of two fraud and racketeering trials related to hospital licensing in 1985. DeBartolo's Louisiana attorney, Jack Martzell of New Orleans, dropped out of the case shortly before DeBartolo cemented a plea agreement.

## MICHAEL AND PATRICK GRAHAM



Patrick Graham's picture is shown; photo of Michael Graham was unavailable.

**EDWARDS CONNECTION:** The jet-setting Texas brothers helped the FBI in its probe of Edwards by acting as informants. Defense sources believe information provided by the Grahams was used by prosecutors to get wiretap authority. In 1995, the Grahams visited Edwards at the Governor's mansion during their ill-fated attempt to bring the Minnesota Timberwolves professional basketball team to New Orleans.

**CHARGES:** The Grahams have been granted immunity in Louisiana for their help in the Edwards investigation, according to courtroom statements by their lawyers and by prosecutors. Defense attorneys believe the Grahams were instrumental in helping prosecutors obtain court authorization to tap telephones in Edwards' home and office.

**BACKGROUND:** The Grahams made and lost millions of dollars developing private prisons. They formed partnerships with many of the political and social elite in Texas, but would run into trouble with the law. Each has been convicted of tax evasion and they were sentenced to prison this month. Patrick Graham also has been convicted of taking a bribe to help an inmate escape from prison.

Prosecutors have said the Grahams helped them uncover payoffs to unnamed elected officials in Louisiana. And Patrick Graham was on a wiretapped plane chartered in 1997 by the FBI that took Edwards from Colorado to Baton Rouge.

Edwards has said Patrick Graham was given money by the FBI as part of a sting operation to set up Edwards.

**ATTORNEY:** Charles Blau of Dallas.

## ROBERT GUIDRY



**EDWARDS CONNECTION:** Guidry was a regular at high-stakes Governor's Mansion poker games while Edwards was in office and won a riverboat casino license from Edwards' appointed gambling board. Guidry-owned companies have paid at least $45,000 in legal fees to Stephen Edwards.

**CHARGES:** Guidry pleaded guilty Oct. 16 to a felony conspiracy charge and affirmed under oath that he made more than $1.4 million in payoffs to be split between Edwin Edwards, Stephen Edwards and former gubernatorial aide Andrew Martin. Guidry agreed to pay $3.5 million in fines, forfeitures and restitution. Legal experts say he faces between three and five years in prison, but he will not be sentenced until after the Edwards case goes to trial.

**BACKGROUND:** Guidry made his fortune as the owner of a marine towing company before getting into the gambling business. Guidry once owned the Treasure Chest casino in Kenner and the A.-Ace video poker company. Guidry sold his share in the casino in 1997 for $88 million. A.-Ace investigated by State Police for doing business with a reputed organized crime figure; no charges were filed and Guidry later divested his video poker interests.

**ATTORNEYS:** Ralph Capitelli, Arthur "Buddy" Lemann and Robert Westling of New Orleans

## RICKY SHETLER



**EDWARDS CONNECTION:** Shetler and Stephen Edwards have been friends since grammar school and have been involved in various business partnerships.

**CHARGES:** Shetler pleaded guilty Oct. 9 to a felony charge of conspiracy to commit extortion. He attested under oath to funneling $550,000 in payoffs to Edwin and Stephen Edwards in Lake Charles. Shetler has not been sentenced, but his attorney expects him to go to prison for 2½ to three years.

**BACKGROUND:** Shetler was instrumental in bringing riverboat casinos to Lake Charles. At one time he was making more than $8,000 per month as a consultant to the Players Casino in Lake Charles. He also worked for JEBACO Corp. and Beeber Inc., firms that own the land where Players docks. Shetler now owns a pizza restaurant in Lake Charles.

**ATTORNEY:** Frank Holthaus of New Orleans

## DEMPSEY WHITE



**EDWARDS CONNECTION:** White, 76, was chief engineer of the state Transportation Department during several of Edwards' terms as governor.

**CHARGES:** White pleaded guilty to a felony charge of conspiring with Edwards to illegally wiretap FBI agents. His attorney says White will likely be sentenced to up to six months in prison or probation.

**BACKGROUND:** A sworn federal affidavit alleges that White helped Edwards plot to tape the home phones of FBI agents during the investigation of the former governor's business dealings. Edwards acknowledges meeting with White and an unnamed FBI informant, but says he was only interested in finding out whether the FBI was taping him without a court order.

**ATTORNEY:** Provino "Vinny" Mosca of Harahan.

*—compiled by Manuel Roig-Franzia*

# Edwards often probed, but rarely charged

## *Politically weakened in mid-1980s, he lived to wheel and deal again*

By MARK SCHLEIFSTEIN
Staff writer

Despite being investigated by more than 15 grand juries over the past 25 years, Edwin Edwards is facing charges for only the second time after being indicted Friday.

In 1985, a federal grand jury in New Orleans charged that Edwards and seven others participated in an illegal scheme to get state approvals for new hospitals and nursing homes.

A trial that year ended in a hung jury for Edwards and four co-defendants and acquittal for three others.

A second trial in 1986 ended in acquittal for Edwards and the rest of the defendants.

Prosecutors argued that between 1980 and 1984, while Edwards was out of office between his second and third terms, he made $1.9 million from the sale of four hospital corporations that obtained state licenses illegally.

That money, the prosecutors argued, was a bribe to get Edwards to favor future health-care projects proposed by co-defendants James J. Wyllie Jr. and Ronald F. Falgout, when Edwards returned to the Governor's Mansion for his third term.

In the end, it was clear the jurors believed Edwards and his associates when they described themselves as astute businessmen who recognized the dramatic changes occurring in the hospital industry and took advantage of them.

"I thought the government tried to tell a story that had neither a witness nor a victim," said writer and political observer John Maginnis. "The jury was stumbled by the paper chase the government put on.

"They couldn't make out who was victimized and there was no witness to stand up and say Edwards did anything wrong."

Other defendants included



Edwin Edwards is all smiles as he and his brother, Marion, acknowledge supporters' cheers on the courthouse steps minutes after being acquitted in 1986.    STAFF FILE PHOTO

Edwards' brother, Marion Edwards, and nephew, Charles David Isbell, who both handled real estate transactions for the hospital deals; New Iberia architect Perry Segura, who provided hospital building designs for the license applications; longtime Edwards friend and business associate Gus Mijalis, who was alleged to have been paid to

introduce owners of Shreveport nursing homes to Falgout and Wyllie, who later obtained permits for them; and Philip Brooks, a New Orleans lawyer, who was listed as the stockholder of record for the hospital corporations.

During the first trial, prosecutors argued that Edwards needed the money to offset almost $2

million in debts he ran up at Las Vegas casinos.

They introduced into evidence chits signed by Edwards with other names, which the prosecutors contended were aliases, including T. Wong and T. Lee.

But Edwards testified in his own defense, and said that although he lost between $10,000 and $50,000 a year during his

gambling jaunts to Nevada and Atlantic City, N.J., the chits he signed were simply a matter of convenience. He said he signed for money and distributed it to his friends at times, repaying it either before he left the casino or when the casino sent a collector to the Governor's Mansion.

And at times, he said, he won, and won big.

"One time, I won so much money they sent armed guards with me to the airport," Edwards testified, referring to a trip to Atlantic City.

The prosecutors' inability to connect Edwards' gambling to the money he received as part of the hospital projects resulted in the dropping of the gambling testimony during Edwards' retrial, but streamlining the prosecution made no difference.

"They trimmed it down, but it was still lame," Maginnis said.

However, being forced to sit in a courtroom for months on end had a significant effect on Edwards' third term.

"He's already had a bad economy and a 4-cent sales tax increase to deal with, and those things hurt him," Maginnis said. "But the trial put him under. Just the specter of Edwards on trial took away a lot of his luster and appeal, made him seem like a mortal politician."

The effect was most clear in the defeat of Edwards' most ambitious gambit during his third term. Edwards walked out of U.S. District Court after his acquittal and down Poydras Street to the Hilton Hotel, where he announced he would ask the Legislature to legalize casino gambling in New Orleans.

But Edwards' proposal to allow an unlimited number of traditional hotel-casinos was defeated.

"He wanted to go with gambling early in his third term but was sidetracked by the trial," Maginnis said. And the trial gave the public a new view of the controversial governor.

"Just because he was not convicted, Edwards thought he had a clean slate, but the people and the Legislature thought otherwise," Maginnis said.

Casino gambling wasn't approved by the Legislature until 1991 during the term of Edwards' successor, Gov. Buddy Roemer, and only on riverboats. The land-based casino law was approved by the Legislature in 1992 under Edwards.

## MAKING A DEAL

Robert Guidry is the fourth man to make a plea bargain promising to testify against Edwin Edwards at his upcoming extortion trial. Here's what they all will say:



**EDWARD DEBARTOLO**
The owner of the San Francisco 49ers said he paid Edwards $400,000 the day before DeBartolo's riverboat got a gambling license.



**RICKY SHETLER**
The Lake Charles man admitted he was the conduit for more than $500,000 in cash and gifts to Edwards and his son Stephen from the owners of the Players Casino.



**DEMPSEY WHITE**
The former state employee said he was the go-between in Edwards' attempt to hire an electronics expert to tap the phones of two FBI agents.

**ROBERT GUIDRY**
The former owner of Kenner's Treasure Chest casino said that he paid Edwards, Stephen Edwards and Andrew Martin $1.5 million in exchange for help with his casino license.

# Edwards paid off, former crony says



'This is by far the most important of all the guilty pleas reached so far,' U.S. Attorney Eddie Jordan said Friday after former Treasure Chest Casino owner Robert Guidry, above, admitted guilt in his dealings with former Gov. Edwin Edwards.

STAFF PHOTO BY BRYAN S. BERTEAUX

## Guidry takes plea, outlines schemes

By MANUEL ROIG-FRANZIA
Capital bureau

BATON ROUGE — Former Gov. Edwin Edwards, his son Stephen and one-time gubernatorial aide Andrew Martin split $100,000 a month in payoffs from the Treasure Chest Casino in exchange for Edwards' guarantee that the Kenner riverboat would win an operating license, according to documents released Friday during a court hearing.

The casino's former owner, Robert Guidry, affirmed under oath that he agreed to the payoffs in 1994 while Edwards was governor and began making secret cash payments — sometimes leaving the money in trash bins — in February 1996, one month after Edwards left office.

**Government report outlines case against Guidry. See A-8**

Prosecution documents indicate the monthly payments continued until at least April 1997, meaning the Edwardses and Martin each might have received more than $460,000. An undercover FBI agent staked out a Baton Rouge coffee shop to watch Guidry deliver the last payoff to the Edwardses in April 1997 after hearing about rendezvous plans in a wire-tapped phone conversation, the documents said.

After leaving office, Edwards schemed with Martin to concoct ways of hiding the money, rather than "stacking it up . . . and looking for places to throw it away," prosecution documents said.

Guidry, who forged a friendship with Edwards during $10,000-ante Governor's Mansion poker games, is the fourth major witness in two weeks to surface in the government's investigation of rigged river-

See PAYOFF, A-8

## Edwards' point man got his cash in trash

By JOANNA WEISS
Capital bureau

BATON ROUGE — He sometimes found his bribery payoffs in trash containers, guarded doors for Gov. Edwin Edwards and considered his spoils "retirement income," prosecutors say. In the government's sketch of graft and corruption at a Kenner casino, Andrew Martin — the onetime Metairie restaurateur, New Orleans Jazz owner and high-ranking aide to Edwards — is a point man in the scheming, but a tragic figure, too. He earned a fortune, records show, but often at the cost of his dignity.

Friday's court proceedings officially centered on Robert Guidry, the former Treasure Chest Casino owner who sealed his plea bargain deal.

See MARTIN, A-10

## OF DUMPSTERS AND DEALS

Guidry plea paints picture of payoffs, extortion



**ANDREW MARTIN**
Reports portray Martin as part security guard, part messenger, part gofer, part bully



**EDWIN EDWARDS**
He sealed deal with Guidry in hotel meeting room as Martin guarded the door, report says



**STEPHEN EDWARDS**
Report says he was to get 1 percent of Treasure Chest Casino's net profits

**EXHIBIT**

8

Case 3:10-cv-00603-BAJ-DLD    Document 6    10/07/10    Page 79 of 323

# Martin: Portrayed as tragic figure

From A-1

But Martin, 60, emerged as the central character in federal documents outlining the government's case, based on testimony from Guidry and conversations picked up by FBI wiretaps.

The reports paint Martin as a jack-of-all-trades conspirator: part security guard, part messenger, part gopher, part bully. And they say he wasn't altogether successful. Martin may have had the brass to deliver a casino license or a favorable fire marshal's report, prosecutors say, but he couldn't get a cut of the casino's profits, which he considered his due.

Indeed, the story of Martin's dealings with the Treasure Chest seems a cautionary tale about the trouble with secret arrangements and under-the-table deals: There's no guarantee you'll get what you demand. According to federal transcripts, when Martin once complained that Guidry hadn't honored a pledge for money and a job at the casino, Edwards was brutally frank.

"What the f--- can you do?" the former governor said, in a conversation recorded by the FBI. "If he don't wanna do it, you can't make him do it. You can't sue him."

The discontented Martin described in court records is a far cry from the Martin of the 1970s, a proud-talking, high-living

Cajun businessman. A Lafourche Parish native, Martin was once a serious player in south Louisiana: part-owner of New Orleans' NBA team, chairman of the state mineral board, member of the Lafourche Port Commission. He owned a small oil-drilling empire, a major seafood plant in Galliano and a restaurant in Metairie. The value of his assets surpassed $100 million.

Martin's fortunes suffered in the oil bust of the 1980s, but he maintained a close friendship with Edwards. And he turned up on the payroll during Edwards' fourth administration, with a job as special assistant to the governor. Eventually, Martin was making large sums of money again. But according to court documents, some of that new income — the payoff cash from Guidry — arrived in the trash.

Martin was not present Friday at the federal courthouse, and U.S. Attorney Eddie Jordan would not say whether Martin was negotiating a deal with the government. Martin's attorney, Sonny Garcia, vehemently rebutted the government's story and denied that Martin is making a deal.

According to federal documents, the Guidry-Martin deals began while Edwards was governor in the spring of 1994, when the two men discussed Guidry's efforts to open the Treasure Chest in Kenner. Martin offered

*The discontented Martin described in court records is a far cry from the Martin of the 1970s, a proud-talking, high-living Cajun businessman.*

to help Guidry increase his odds of winning a riverboat license. He said he would "cash in all my green stamps" for the favors Edwards owed him, provided Guidry paid a price. Prosecutors said Martin rubbed his fingers together, indicating that he wanted money.

At first, Martin requested 3 percent of the casino's net profits, court documents say: 1 percent each for him, Edwards and Edwards' son Stephen. Martin later revised his demands, prosecutors said, requesting $100,000 per month, to be divided evenly among the three men. The payoffs were to begin when Edwards finished his term as governor.

Guidry agreed to the terms, the documents said, but wanted confirmation that Edwards was on board. So one day in April or May of 1994, prosecutors said, Martin guarded the door of a hotel meeting room while Guidry and Edwards discussed the deal. The agreement was sealed. And soon, the Treasure Chest won its license.

In December 1995, the documents say, Guidry contacted Martin again. Guidry complained that he couldn't get state fire marshal approval for his entertainment barge on the Treasure Chest site. Once again, Martin offered to help. Again, the cost was high, records say, and this time, the payoff was meant for Martin alone: a 2 percent interest in the Treasure Chest's net profits and a "high ranking employment position" with the casino. Guidry agreed, documents say, and he soon won fire marshal approval.

The payments from Guidry's original bargain — the deal with Martin and the Edwardses that allegedly helped to win the Treasure Chest's license — began in February 1996, one month after Edwards left office, prosecutors say. For about eight months, Guidry gave Martin the full $100,000, and Martin passed the money to the Edwardses, according to investigators. That October, Guidry began to pay the Edwardses directly. From that point on, he would pay Martin separately, prosecutors say, "often by leaving the cash payments in trash cans or Dumpsters for Martin to retrieve."

By November 1996, Martin

still hadn't received any money from Guidry for his help with the fire marshal, prosecutors say. And he was starting to get impatient. Martin reportedly decided he wanted a "contract" to document the deal.

Edwards considered that a terrible idea. In a conversation recorded by the FBI, Edwards advised Guidry not to sign any papers. And later, Edwards told Martin to abandon his demands. Guidry had "kept his word" on the original deal, Edwards said. He warned Martin not to push Guidry too hard or anger him too much, for fear he'd "risk what's happening" with the $100,000-per-month payoffs.

Martin still wasn't satisfied. By January 1997, he still had no job at the Treasure Chest, and he still hadn't gotten his 2 percent of the riverboat's net profits. In a conversation with Edwards, prosecutors said, Martin called that money his "retirement plan."

Edwards seemed sympathetic. "If it wouldn't be for Andrew, (Guidry) wouldn't have a boat," the former governor said.

# Payoff: Exec pleads guilty to conspiracy

From A-1

boat casino licenses.

"This is by far the most important of all the guilty pleas reached so far," U.S. Attorney Eddie Jordan said after the hearing. "I believe this to be a devastating blow to the claim that the governor and his son engaged in no wrongdoing."

The Guidry allegations are considered damaging because Edwards for the first time is accused of directly approving payoffs. In other criminal schemes laid out by prosecutors, Edwards is portrayed as being aware of payoffs, but always using intermediaries to handle negotiations.

Guidry, 52, pleaded guilty to a felony for conspiring to violate federal extortion laws and will pay $3.5 million in fines, forfeitures and restitution. He faces up to five years in prison but will not be sentenced until after the Edwards case goes to trial. Legal experts said he likely will go to prison for one to three years, depending on his testimony at trial.

Guidry's attorney said the former casino owner was pressured by Edwards and Martin at a time when he was having financial trouble.

"He got squeezed by people I call 'so-called friends,'" Ralph Capitelli said.

Martin, whose role in the case was unclear until Friday, played a central role in the shakedown scheme, rubbing his fingers together to indicate he wanted money and offering "to cash in all my green stamps" to enlist Edwards' help in securing the casino license for Guidry, according to prosecution documents.

In one instance described by prosecutors, Guidry tells his longtime friend Martin that he won't finalize the payoff scheme without direct confirmation from the governor. That leads to a meeting in the spring of 1994 at a Baton Rouge hotel where Guidry and Edwards seal the deal while Martin guards the door, prosecution documents say.

Martin's attorney Sonny Garcia disputed the prosecution's allegations and said his client has not cut a deal with prosecutors nor does he plan to discuss a plea at this time.

"As far as I'm concerned, none of it is accurate and it strikes me as extremely peculiar that lifelong friends would exchange money in a garbage container," Garcia said.

Garcia said a different picture will emerge at trial.

"There's always two sides to the coin," Garcia said. "Basically what the government is doing now with these individuals is seeing who is frightened and who wants to get out of the kitchen."

A source who has seen a copy of the prosecutors' indictment documents said Martin is the only target of the investigation whose name is not listed. Legal experts said he could be charged under a separate indictment or it is possible that a plea deal could have been made under seal and that defense attorneys are prohibited from discussing the matter.

> **This is by far the most important of all the guilty pleas reached so far. I believe this to be a devastating blow to the claim that the governor and his son engaged in no wrongdoing.**
>
> **U.S. Attorney EDDIE JORDAN**

Friday's plea leaves five named targets in the case: the Edwardses, Martin, Baton Rouge contractor Bobby Johnson and state Sen. Greg Tarver, D-Shreveport.

Three targets besides Guidry who have entered pleas in return for testifying against Edwards are: San Francisco 49ers owner Edward DeBartolo Jr., riverboat consultant Ricky Shetler, and Dempsey White, the state's former chief highway engineer.

Tarver's attorney, Camille Gravel, has been meeting with prosecutors but did not return phone calls seeking comment.

Tarver appeared Friday at a legislative committee meeting at the Capitol. He slipped out without speaking to reporters, but sources said Tarver told committee members that he is continuing his bid to become president pro tempore of the Senate, the body's second-highest position.

A source familiar with the case said prosecutors suspect Tarver of helping Edwards leak DeBartolo confidential background information about riverboat casino applicants and of asserting his influence over a state Gaming Control Board member, described as Tarver's "man on the board."

DeBartolo won the state's last riverboat casino license in 1997, three years after Guidry's Treasure Chest Casino won a license.

Guidry appeared in court Friday with his three sons, Chad, Shaun and Shane, who sat in the audience stone-faced while their father pleaded guilty.

Guidry, who has a high school education, made millions in the 1970s and '80s as a tugboat operator in Harvey. He branched into gambling when video poker and riverboat casinos were legalized in the early 1990s. Guidry made more than $90 million in October 1997 by selling his majority share of the Treasure Chest Casino to Boyd Gaming, which had owned a 15 percent stake and operated the casino.

Guidry spoke loudly and clearly in entering his guilty plea, occasionally twitching his left shoulder and rocking back and forth while standing at the podium.

There were tense moments when Guidry's attorneys asked for a recess after Judge John Parker refused to approve all elements of the plea agreement.

"I don't understand," Guidry told his attorneys as they huddled during the recess.

See PAYOFF, A-10

## Payoff

From A-8

After a 15-minute conference in chambers, Parker agreed to guarantee that Guidry would not be fined more than the $3.5 million outlined in his plea agreement, but the judge said he would not make any decision about prison time until after the trial.

Outside the courtroom, Guidry said, "We're not gonna answer no questions.

"I apologize to my family and friends that I let myself get into a situation where I got involved in a crime," he said.

Prosecutors will be allowed to recommend the length of Guidry's sentence.

"It's clear we still have that hanging over his head," Jordan said after the hearing.

The case laid out by prosecutors Friday touched on the core elements of Louisiana's system of regulating riverboat casinos, alleging that Martin and Edwards extorted payments by citing influence over State Police, the riverboat gambling commission and the state fire marshal.

Martin first pressured Guidry in April 1994, a month before State Police were scheduled to consider whether Treasure Chest would be awarded a casino operating license, according to prosecution documents.

Martin demanded $100,000 monthly payments that he said would be split with the Edwardses and asked for a 3 percent cut of the casino's net profits to be shared by the three men, the documents said. The demand for a portion of profits, which Martin later reduced to 2

> **We're not gonna answer no questions. I apologize to my family and friends that I let myself get into a situation where I got involved in a crime.**
>
> **ROBERT GUIDRY**

percent that would not be shared with the Edwardses, was never accepted by Guidry, although it remained a matter for discussion as late as 1997.

Treasure Chest won the license but in December 1995 ran into difficulties getting approval from the state fire marshal. Again, the documents said, Martin stepped in and offered to resolve the problem in return for a cut of the profits. The approvals were granted shortly after Martin interceded, prosecutors said.

Jerry Jones, chief architect for the state fire marshal's office, said Friday that he remembers "a heated meeting" with Treasure Chest executives over safety problems with a temporary, tent-covered barge that the company had installed for patrons to use while waiting for the casino to return from sailing.

Jones said he had no contact with Martin or Edwards. Charlie Fredieu, who was the marshal at the time, did not return phone calls seeking comment.

After Edwards left office, prosecutors said, he and Martin found ways to hide the payments they were getting from Guidry.

Edwards came up with a plan for them to buy a tugboat and then "jack up the rental" they charged Guidry to use it.

Edwards said: "Then you've got some showable income," referring to income which appears to be legitimate, unlike other

under-the-table payments which were being made," the documents say.

Stephen Edwards' ex-wife also might have benefited from the schemes because her law firm was paid $5,000 a month by Guidry, prosecutors said.

Arlene Edwards, who is now remarried, said Friday that he firm got the payment as a retainer from Guidry's video poke outfit, A-Ace. Arlene Edwards who has three children with Stephen Edwards, said she wa asked about alimony payment during an appearance before th grand jury last year. She denie wrongdoing.

Edwin Edwards was out o town Friday celebrating his wif Candy Picou Edwards' 34t birthday and was unavailable fo comment. Through the flurry o plea bargains, Edwards ha maintained his innocence, sayin federal agents are playing ou vendetta because he was ac quitted of fraud charges in 198 and predicting that prosecuto will be embarrassed when th riverboat case goes to trial.

In an interview with a Bato Rouge television station thi week, Edwards, 71, compare himself to Richard Jewell, th security guard who was wrong implicated in a bombing at th 1996 Olympics in Atlanta.

*Capital bureau chief Jack Wardlaw contributed to this story.*

# THE GOVERNMENT'S CASE

In accepting former Treasure Chest owner Robert Guidry's guilty plea Friday to a charge of conspiracy to commit extortion, federal prosecutors provided the following account of how they would have proved the charges if the case had gone to trial:

## FACTUAL BASIS

If this matter were to proceed to trial, the Government would establish the defendant's guilt of the charges of conspiracy to commit Hobbs Act extortion beyond a reasonable doubt through the introduction of witness testimony, documentary and other evidence, and tape-recorded conversations intercepted via court order:

In March of 1993, the Louisiana Riverboat Gaming Commission awarded the first eight out of fifteen available certificates of preliminary approval for the fifteen available riverboat licenses in Louisiana. The Gaming Commission awarded the final seven certificates of preliminary approval on June 18, 1993. It was during this second approval round, in which there were approximately 35 applicants, that the Treasure Riverboat Casino was awarded a certificate of preliminary approval by a unanimous vote of the Gaming Commission.

Having received its certificate of preliminary approval from the Gaming Commission on June 18, 1993, the Treasure Chest license was thereafter granted by the Louisiana State Police Gaming Division on May 17, 1994. On September 5, 1994, the Treasure Chest was granted a certificate of final approval by the Gaming Commission and opened its door on the same date.

Robert J. Guidry, a friend and associate of former Governor Edwin Edwards, was, until October 1997, the president of a Louisiana-based tug boat business and was also the majority owner and principal of the Treasure Chest which was located on Lake Pontchartrain in Kenner, Louisiana. Guidry made extortion payments and commitments pursuant to an agreement with Edwin Edwards, Stephen Edwards, and Andrew Martin, in order to prevent them from jeopardizing the preliminary approval that Guidry had obtained from the Gaming Commission and/or sabotaging the approval of the riverboat gaming license for the Treasure Chest by the LSP Gaming Division.

Andrew Martin, a close friend and associate of former-Governor Edwin Edwards, held the title of "Executive Assistant" to Edwin Edwards during his fourth term as Governor at a salary of $60,000 per year. Martin, a counsel and confidant to Edwin Edwards, engaged in extortionate activities and solicited bribes on behalf of Edwin Edwards, and further demanded and received from Guidry monthly net payments for himself, Edwin Edwards, and Stephen Edwards of approximately $30,000 each in exchange for Martin's, Edwin Edwards', and Stephen Edwards' assistance with the Treasure Chest licensing procedure before the LSP Gaming Division, and a commitment of a 2 percent interest in the net profits of the Treasure Chest for Martin in exchange for his assistance with the Fire Marshal.

In or about April 1994, Robert J. Guidry, following a favorable court decision regarding gaining suitability in connection with a video poker company Guidry owned, had a few conversations with Andrew Martin concerning the status of Guidry's efforts to obtain approval for a riverboat license from the LSP Gaming Division. At that time Martin told Guidry that the Treasure Chest was not assured of getting LSP approval. Martin, however, stated that he could help Guidry with the licensing procedure pending before the LSP Gaming Division, but indicated by rubbing his fingers together that it would cost Guidry money for the assistance. Martin stated words to the effect that Governor Edwin Edwards owed him favors, and that he (Martin) would "cash in all my green stamps" to help

Guidry. Martin also told Guidry that this would cost him 3 percent of net profits to be divided 1 percent each between Martin, Edwin Edwards and Stephen Edwards.

In or about April or May 1994, Robert J. Guidry had other conversations with Andrew Martin in which Martin revised his demand on Guidry, stating words to the effect that, "You only go around once, I gotta get what I can get," stated that he and Edwin Edwards would accept approximately $100,000 per month to be split between Martin, Edwin Edwards, and Stephen Edwards and that payments would begin after Edwin Edwards finished his term as Governor and Martin left office as Edwin Edwards' Executive Assistant. At the time Guidry was in the process of building his riverboat and had spent a large amount of money on the project. Guidry agreed to this arrangement because he was afraid of significant economic loss to his project if he refused to pay and the negative influence Edwin Edwards, as Governor, could have on the license approval process. Guidry requested, however, that Edwin Edwards himself confirm the deal with Guidry.

In or about April or May 1994, Robert J. Guidry met with Andrew Martin and Edwin Edwards in a hotel meeting room. Guidry and Edwards had a conversation while Andrew Martin guarded the door. Edwards asked Guidry if he agreed with the deal proposed by Martin. When Guidry indicated he did, Edwards responded that they had a deal and he would get his hearing.

In or about December 1995, Guidry contacted Martin regarding his problem with obtaining State Fire Marshal approval for his entertainment barge at the Treasure Chest site. Later that month, Guidry met with Martin and, at that meeting, Martin told Guidry that he (Martin) could arrange for Fire Marshal approval. Martin went on to say that he (Martin) would be out of office shortly. In exchange for his help with approval, Martin demanded that he be given a 2 percent interest in the net profits of the Treasure Chest and a high ranking employment position with the Treasure Chest after leaving office as Edwards' Executive Assistant, in addition to payments Guidry previously agreed to make to Martin, Edwin Edwards and Stephen Edwards. Guidry agreed to this arrangement. Shortly thereafter, Guidry received Fire Marshal approval. Despite Martin's extortionate demands, Guidry never paid any money to Martin based on this agreement.

Commencing in February 1996, Robert J. Guidry secretly made cash payments scheduled to be paid monthly, in the approximate amount of $100,000, to be split between Edwin Edwards, Stephen Edwards, and Andrew Martin, as payment for their influence and assistance with the Treasure Chest licensing procedure before the LSP Gaming Division. From February 1996 through approximately October 1996, Guidry paid the full $100,000 to Andrew Martin. Thereafter, Guidry began paying the Edwardses their shares directly, and paid Martin his share separately, often by leaving the cash payments in trash cans or dumpsters for Martin to retrieve.

On November 8, 1996, Robert J. Guidry cashed a check in the amount of $65,000. On the same day, during a recorded telephone conversation, Guidry and Edwin Edwards made plans to meet each other along with Stephen Edwards. At the meeting, Guidry delivered the cash to Edwin Edwards and Stephen Edwards pursuant to the agreed upon pay-off split.

On or about November 13, 1996,

during a recorded telephone conversation, Andrew Martin arranged a meeting between himself, Robert J. Guidry and Edwin Edwards to take place on the following Monday in Baton Rouge, in order to discuss the proposed arrangement which Martin sought to execute with Guidry regarding employment with the Treasure Chest and to discuss Martin's receipt of a 2 percent interest in the net profits from the Treasure Chest in exchange for his assistance with the Fire Marshal.

On or about November 19, 1996, during a recorded telephone conversation, Edwin Edwards told Robert J. Guidry that Andrew Martin wanted to execute a "contract" to document Guidry's secret obligation to give Andrew Martin a 2 percent interest. Andrew Martin demanded a 2 percent interest in the net profits from the Treasure Chest in exchange for Martin's past assistance with the Fire Marshal. During the conversation, Edwards discouraged Guidry from formalizing the secret agreement with Martin, and advised Guidry to put off Martin by stating ". . . I don't want to do anything that might upset the apple cart or cause me to have to file any additional reports or documents with anybody."

On or about November 21, 1996, during a recorded telephone conversation, Andrew Martin and Edwin Edwards discussed the arrangement which Martin wanted Robert J. Guidry to execute. Edwards informed Martin that Guidry "kept his word" to all of them, referring to Guidry's agreement to pay them secretly. Edwards further warned Martin that they don't want to push Guidry too hard and thereby anger him, giving him an excuse to change his mind, and according to Edwards "risk what's happening," a reference to the payoff split in which Guidry was funneling to Edwin Edwards, Stephen Edwards, and Martin casino proceeds as part of their agreed pay-off.

On or about November 21, 1996, Edwin Edwards and Andrew Martin discussed a meeting with Robert J. Guidry which was to take place later that morning. Later, Stephen Edwards confirmed for Edwin Edwards the existence of the aforementioned meeting by telling Edwin Edwards that he (Stephen), Andrew Martin and Robert J. Guidry are waiting for him at the restaurant.

On or about January 9, 1997, Andrew Martin expressed to Edwin Edwards his understanding that Robert J. Guidry had agreed to give him a contract to "go to work for him" (referring to Guidry) after Edwards left office as Governor of Louisiana. During the conversation, Edwards made reference to the fact that ". . . if it wouldn't be for Andrew (Martin), he (Guidry) wouldn't have a boat . . ." referring to the Treasure Chest. Martin told Edwards that he (Martin) previously approached Edwards on Guidry's behalf for "all my green stamps from all that times I helped you (Edwards) in the past" . . . During the conversation, Martin told Edwards that his financial interest in obtaining the payments and 2 percent of the net profit from the Treasure Chest from Guidry was his "retirement plan. Edwards went on to tell Martin that he knew that Guidry paid Stephen Edwards $100,000 for Guidry's license, and further told Martin that even though Guidry had hired Stephen Edwards, they were "all in the thing together." At that time Edwin Edwards stated: ". . . it's not a question of whether you or Andrew or Stephen or me. This is something we worked out all for ourselves," referring to the receipt of cash from Guidry as payment for their assistance in getting the receipt of cash from Guidry as payment for their assistance in getting the LSP Gaming Division licensing hearing

and approval. Edwards concluded by telling Martin that if Guidry doesn't want to make good on his obligation to Martin, there is nothing they can do to compel it, stating, "But what the f—— can you do if he, if he don't wanna do it, you can't make him do it. You can't sue him."

On or about February 25, 1997, Edwin Edwards, in a recorded conversation with Stephen Edwards, made reference to the fact that "Bobby" is giving Stephen's ex-wife's law firm $5,000 a month.

In or about February 1997, Edwin Edwards, Stephen Edwards, and Andrew Martin discussed Martin's plans to provide a plausible, concealable method for Robert J. Guidry to make payments to them disguised as legitimate income. While the Edwardses and Martin discussed using tug boats to conceal the payments, Guidry was unaware of this tug boat scheme.

On or about February 25, 1997, during a conversation, Martin explained that he was interested in obtaining some tug boats to do "rig moving." Edwin Edwards responded that if they purchased a tug boat, they could thereafter rent the boat to Guidry and "jack up the rental" in order to provide what would appear to be a legal basis for the payments, thus concealing the otherwise under-the-table payments. Edwin Edwards told Martin to "put it together." Edwards later told them that he was worried about Guidry taking the large amount of money that he was paying them out of the bank every month, because Guidry could have a hard time explaining what happened to all of that money. Martin went on to tell Edwin Edwards that they are getting "30/30/30" from Guidry (a reference to the appropriately $30,000 per month that Edwin Edwards, Stephen Edwards and Andrew Martin were each receiving. In further making the plans to obtain and lease a tug boat to Guidry, Edwin Edwards stated that the boat rental deal is desirable because "then you've got some showable income," referring to income which appears to be legitimate, unlike the under-the-table payments which were being made, concluding "this other stuff you to hide it . . ."

On or about February 25,1997, shortly following their meeting with Andrew Martin that day, Edwin Edwards and Stephen Edwards further discussed specifics of the tug boat plan, with Edwin Edwards advising Stephen how they should finance the purchase of the boat without incurring personal liability.

On or about February 25, 1997, Edwin Edwards and Stephen Edwards further discussed plans to finance the purchase of a tugboat. During the recorded conversation, they made plans to lease the boat to Robert J. Guidry for enough money to pay the note on the boat plus additional monies to cover the split that Guidry owed them "out of the other operations," a reference to the Treasure Chest. In this conversation, Edwards expressed his interest in finding a method through which they could get their money from Guidry in what appeared to be legal transactions, and put it in the bank instead of "stacking it up" and "looking for places to throw it away."

On or about April 9,1997, Robert J. Guidry cashed a check in the amount of $65,000. On the same day, during a recorded telephone conversation, Edwin Edwards and Stephen Edwards agreed to meet Guidry at the Highland Road Cafe in Baton Rouge, Louisiana. At the meeting, Guidry delivered the cash to Edwin and Stephen Edwards as part of their agreed pay-off. An FBI Agent observed the meeting.

STAFF GRAPHIC

## ANATOMY OF A CASE

Here are some of the key events in the federal investigation of former Gov. Edwin Edwards:

**April 1996:** Texas brothers Patrick and Michael Graham approach FBI in New Orleans with information about alleged criminal activity involving elected officials in Louisiana.

**October 1996:** Federal investigators wiretap former Gov. Edwin Edwards' Baton Rouge home, and a few months later the law office he shares with his son, attorney Stephen Edwards.

**March 12, 1997:** Edwards gets a $400,000 cash payment from Edward DeBartolo Jr. for legal and lobbying services.

**March 13, 1997:** A partnership of DeBartolo Entertainment and Hollywood Casino wins Louisiana's last riverboat casino license with a proposal for a $250 million casino and hotel complex in Bossier City.

**April 28, 1997:** After recording thousands of phone conversations involving Edwards and his associates, FBI agents seize nearly $470,000 in cash, including the DeBartolo payment, during raids of a Baton Rouge safe deposit box and the homes of Edwin and Stephen Edwards. Over two days, agents also raid the homes and businesses of Edwards associates in Texas and Louisiana.

**June 17, 1997:** DeBartolo's company pulls out of the Bossier riverboat casino project after he appears before the federal grand jury investigating Edwards.

**Aug. 15, 1997:** The case nets its first guilty plea when Karl Derouen, a former aide to U.S. Rep. Chris John, D-Crowley, admits to failing to report a kickback scheme involving state contracts.

**September 1997:** The lead prosecutor in the Edwards case provides indictments within 90 days. Federal lawyers later downplay the prediction after the deadline passes without action.

**November 1997:** The grand jury sends letters to six people naming them as targets and warning they could be indicted. Letters go to Edwin and Stephen Edwards, DeBartolo, former Treasure Chest casino owner Robert Guidry, former Edwards aide Andrew Martin and businessman Ricky Shetler.

**May 1:** "Since it all turned out to be such a disaster," Edwards says he returned $303,000 of the seized cash to DeBartolo and kept $97,000 to cover legal expenses racked up trying to get the money back from the federal government.

**Sept. 14:** In a conference call with defense attorneys, prosecutors outline a series of racketeering and bribery charges they plan to seek against Edwards. Prosecutors describe five alleged "schemes" to illegally influence the awarding of riverboat casino licenses.

**Sept. 24:** DeBartolo agrees to cooperate with prosecutors and testifies before the grand jury regarding Edwards after cementing an agreement to plead guilty to a minor offense, avoid prison and pay fines for his role in what prosecutors say was a "scheme" to illegally influence the awarding of his riverboat casino license.

**Oct. 6:** DeBartolo appears in court and acknowledges under oath that Edwards extorted a $400,000 payoff. DeBartolo pleads guilty to concealing the alleged shakedown, is sentenced to two years probation and agrees to pay $1 million in fines, forfeitures and restitution.

**Oct. 9:** Stephen Edwards' lifelong friend, Ricky Shetler, affirms under oath that he funneled $550,000 in payoffs to Edwin and Stephen Edwards. Shetler pleads guilty to a felony charge of conspiring to commit extortion.

**Oct. 15:** Dempsey White attests in court that he introduced Edwin Edwards to a man for the purpose of obtaining FBI wiretaps of Edwards. White pleads guilty to failing to report a crime and agrees to testify against Edwards.

**Oct. 16:** Former Treasure Chest owner Robert Guidry pleads guilty to conspiracy to commit extortion and agrees to testify against Edwin and Stephen Edwards and one-time Edwards aide Andrew Martin.

— compiled by Manuel Roig-Franzia

## EDWARDS INVESTIGATION

# Witness cites cash in trash



Robert Guidry, center, apologizes to his friends and family Friday for committing a crime. Guidry pleaded guilty to a felony in federal court, testifying that he took part in an extortion conspiracy with Edwin and Stephen Edwards and former Edwards' aide Andrew Martin.

*Associated staff photo by Bill Feig*

**By CHRISTOPHER BAUGHMAN**
*Advocate staff writer*

Edwin Edwards and others concocted a riverboat extortion scheme that included picking up payments in trash bins and plans to form a tugboat company to hide $100,000 monthly payoffs, a friend of the former governor testified in court Friday.

Robert Guidry, former owner of the Treasure Chest riverboat casino in Kenner, testified that he paid Edwin and Stephen Edwards and former Edwards aide Andrew Martin $100,000 a month to split three ways.

Details of the alleged plot came to light when Guidry, 52, pleaded guilty in U.S. District Court to conspiracy to commit extortion.

U.S. Attorney Eddie Jordan said a "ballpark figure" of the total extortion payments is $1.5 million.

Guidry's admission in court Friday marks the fourth time in two weeks that a former friend of Edwards or his son Stephen has gone over to the prosecution.

Guidry, who agreed to pay penalties totaling $3.5 million, faces up to five years in prison after he testifies at any upcoming trials. Judge John Parker will decide the prison time later.

"It's clear that we still have that hanging

over his head," Jordan said after court.

"That's a tremendous incentive for him to tell the truth."

Jordan hailed Guidry's plea as a "breakthrough."

"The blow to the claim that the former governor engaged in no wrongdoing is powerful and overwhelming," Jordan said after court.

Guidry would not answer questions after court. But he made a short statement, apologizing to his family and friends.

"I let myself get in a situation where I committed a crime," Guidry said.

Guidry's lawyer, Ralph Capitelli, said Guidry went along with the extortion plot because his financial situation was "precarious" and he feared economic loss.

"Mr. Guidry was in a position where he got squeezed ... by so-called friends," Capitelli said.

Edwards released a statement saying he was out-of-town Friday celebrating his wife's birthday.

□ See WITNESS, Page 6A

### INSIDE

■ Profiles of probe figures, Page 6A
■ Bill of information text, Page 7A

EXHIBIT
9

CONTINUED FROM PAGE 1A

Karl Koch, one of Stephen Edwards' lawyers, referred a call to Lewis Unglesby, Unglesby, another of Stephen Edwards' attorneys, did not return the call.

The extortion plot was set up in 1994, while Edwards was still governor, prosecutors claim.

But the governor finished his last term, the prosecution says in its outline of the case.

The outline, called a "factual basis" is read in court so the judge can decide whether enough evidence exists to support a guilty plea. Guidry said under oath that the government's account of the case is true, and Parker accepted his guilty plea.

In April 1994, Guidry talked with Martin, then Edwards' executive assistant, about the state's approval of a riverboat gaming license, according to the plea. The license was being reviewed by the Louisiana State Police Gaming Division.

Martin, who also is a target of the probe, told Guidry the license was not a sure thing and said he could help, prosecutors contend.

Saying Edwards owed him favors, Martin "indicated by his hand and his fingers together that it would cost Guidry money for his assistance," the factual basis says.

In a later meeting, Martin told Guidry that Edwards "would accept approximately $100,000 and it would be split between Martin, Edwin and Stephen Edwards," the factual basis says.

Martin's attorney, Sonny Garcia, called the government's allegation "nonsense" and inaccurate.

"It doesn't make any sense," Garcia said. "How do lifelong friends exchange payments through a garbage Dumpster?"

By 1996, and 1997, Martin mentioned to Edwards at least four times that Guidry never paid him after the Fire Marshal's Office approved the entertainment license, the factual basis says. The FBI recorded Edwards' phone conversations in parts of 1996 and 1997.

Edwards referred to the payments as his "retirement money," the document says.

Edwards finally told Martin there was nothing they could do to make Guidry pay, prosecutors claim.

"But what the [expletive deleted] can you do if he, if he [expletive deleted] if you can't make him do it," Edwards is quoted as saying. "You can't sue him."

In February 1997, the Edwardses and Martin began to devise another way to make the money from Guidry look like legitimate income, the factual basis says.

After Martin mentioned buying a tugboat, Edwards suggested renting the boat to Guidry and "jacking up" the price to provide a legal basis for the payments, the document says.

"Edwin Edwards told Martin to put it together," the factual basis says.

He profited $30 million, his lawyer said at the time of the sale.

Despite Guidry's plea, Garcia, Martin's lawyer, said he had a reason to appear in the case.

The extortion plot was set up in 1994, while Edwards was still governor, prosecutors claim.

It doesn't make any sense.
How do lifelong friends
exchange payments through
a garbage Dumpster?

— Sonny Garcia, attorney
for Andrew Martin

---

# Guidry had casino, video poker ties

**Advocate staff report**

Robert Guidry, a multi-millionaire who ran a tugboat company and once was a regular at Edwin Edwards' poker games at the Governor's Mansion, was a big player in Louisiana's gambling industry.

Guidry, 52, a friend of both Edwards and the former governor's son, Stephen, was the majority owner of Treasure Chest Casino in Kenner and owned A-Ace Video Gaming Co.

Guidry's actions in opening the Treasure Chest riverboat casino lie at the heart of the extortion conspiracy case against him.

But for that casino surfaced in the ongoing investigation of Edwin and Stephen Edwards, it was Guidry's other gambling business, A-Ace, that drew the most attention.

A-Ace was targeted by regulators five years ago when State Police looked into possible links between the company and Frank Caracci, a reputed New Orleans Mafia associate.

In 1993, State Police told Guidry they were suspending A-Ace's video poker license, claiming Caracci had what amounted to a hidden ownership interest in the company.

Caracci, who died in 1996, and his sons got involved in video poker through a contract with A-Ace. A-Ace paid their company 25 percent of the take on video poker machines they installed in bars and restaurants.

State police claimed A-Ace was a front for Caracci.

---

# Martin given board job by Edwards

**Advocate staff report**

At 34, Andrew Martin became the youngest person to be chairman of the State Mineral Board — a position he owed to then-Gov. Edwin Edwards, who was taking office in 1972 for what would be the first of four terms.

Martin would go on to become the governor's executive assistant during Edwards' last term in office.

Martin, now 61, a Galliano native, had been in the offshore towing and seafood businesses when Edwards first named him to the mineral board, which handles the leasing of state lands for oil and gas exploration.

In 1979, Martin resigned from the board during a state ethics commission investigation of conflicts of interest between board members and people they regulate.

When the ethics issue arose, Martin — who rented boats to oil company workers — said he saw nothing wrong with the practice as long as he didn't buy state leases or directly benefit from them.

When he stepped down as the ethics probe intensified, he questioned how members could be found with the expertise to qualify for them for handling the state's oil

and gas leases.

"Maybe they can get bus drivers and school teachers, or the Milk Commission," said Martin, an old friend of Edwards.

In 1992, Martin came out of what he called "semi-retirement" to work on Edwards' transition team and wound up as a top aide to the governor, earning a salary of $60,000 a year.

Martin screened thousands of job applications for government positions and was in charge of the state's boards and commissions.

Martin was also a longtime friend of Robert Guidry, who was the main owner of the Treasure Chest Casino in Kenner.

Guidry pleaded guilty Friday to an extortion conspiracy involving a gambling license for Treasure Chest. Prosecutors say the conspiracy also involved Martin and Edwin and Stephen Edwards.

Martin played a role in another business proposal that has surfaced in the wide-ranging federal probe.

In 1994, he was part of a New Orleans Jazz professional basketball team during its five seasons in the Crescent City before moving to Utah in 1979.

Edwin Edwards has said that a lot of work on a deal that almost led the Minnesota Timberwolves basketball team to move to New Orleans. That deal fell through when the NBA questioned the venture's financing.

---

Edwin Edwards has acknowledged summoning State Police to the Governor's Mansion to voice his concerns about their effort to revoke the license. Edwards said he was worried about the cost of the video machines if the lawsuit if the revocation was pursued.

He also questioned allegations that Caracci was involved in organized crime. Edwards said he wanted to know what evidence State Police had to support that claim.

"I've been hearing that about me for 22 years and I know I'm not involved in the mob," Edwards said in a 1994 interview.

At a appeal hearing on the license, Guidry said Caracci had no ownership in A-Ace. The hearing officer — retired Covington District Judge Thomas Tanner, a longtime associate of Edwards' — reinstated A-Ace's license.

Guidry said he never knew of the allegations that Caracci, who died in 1995, had ties to organized crime.

Guidry has said that in trying to launch his riverboat venture, the Treasure Chest, he hired Stephen Edwards as a lawyer. Stephen Edwards was knowledgeable about riverboat regulations and financing for the project, Guidry said.

In 1994, a state revenue department report done for the licensing of the Treasure Chest estimated Guidry's net worth at $41.7 million.

In 1997, Guidry sold his and his family's interest in the Treasure Chest for $112.9 million. An attorney for Guidry at the time said the family saw a profit of about $30 million from the sale.

Later that year, Guidry began selling A-Ace's video poker machines. His attorney said Guidry planned to divest himself of A-Ace's gambling assets.

---

Guidry

Martin

# In the crosshairs of the federal investigation

The ongoing investigation of Edwin Edwards and others has netted four guilty pleas from major players who testified to breaking the law in their dealings with the former four-term Louisiana governor. Below is a rundown of what has happened to 10 people targeted in the probe so far. Though many have not been charged, prosecutors have outlined their alleged wrongdoing in the cases against those who have made plea bargains.

## Remaining targets of the investigation

**Edwin Edwards**
The former governor allegedly was involved in schemes to influence the awarding of at least three riverboat licenses. Prosecutors also claim Edwards conspired to wiretap FBI agents and prosecutors who were wiretapping him. Edwards hasn't been charged. He denies any wrongdoing, and says he has no plans to pursue a plea bargain.

**Stephen Edwards**
One of Edwin Edwards' two sons, Stephen's role as an attorney for riverboat casinos has been under scrutiny. He too has been implicated in extortion schemes associated with three riverboats and in the wiretapping conspiracy, but hasn't been charged. His lawyers deny the government's allegations, and say he isn't contemplating a plea bargain.

**Cecil Brown**
A Eunice rancher and auctioneer and a longtime friend of the former governor, Brown has been involved in many of the business ventures under investigation by the federal grand jury. Those ventures include a project to build a juvenile prison and the proposed relocation of a professional basketball team. He also allegedly has ties to three riverboat license applications, including one in Baton Rouge. Brown says he has done nothing wrong and doesn't plan to pursue a plea bargain.



**Andrew Martin**
Executive assistant to the governor during Edwards' last term as governor, Martin allegedly solicited bribes for Edwards and engaged in a conspiracy to extort money from the former owner of the Treasure Chest riverboat casino. Martin has not been charged. His attorney has said he did nothing wrong and has no plans to cut a deal with prosecutors.

**Greg Tarver**
A Democratic state senator from Shreveport and a close ally of Edwards when the former governor was in office, Tarver is under investigation in connection with riverboat licensing, his attorney said. The attorney has said he met with federal prosecutors to try to convince them that Tarver shouldn't be charged, but was unavailable this week to discuss any progress made in that effort.



**Bobby Johnson**
A Baton Rouge contractor and real estate developer, Johnson's alleged activities in the licensing of the Belle of Baton Rouge Casino have made him the target of federal investigators, his attorney said. The attorney has said he argues his client is innocent of wrongdoing, adding he doesn't foresee Johnson making a plea agreement.

## Targets of the investigation who have pleaded guilty and agreed to testify in future trials

**Edward DeBartolo Jr.**
An owner of the San Francisco 49ers football team and friend of Edwin Edwards, DeBartolo pleaded guilty to misprision of a felony. DeBartolo admitted he failed to tell authorities that the former governor and others extorted $400,000 from him during the licensing process for a riverboat project that included DeBartolo. He was put on probation for two years and assessed $1 million in penalties.

**Richard D. Shetler**
A Lake Charles businessman and lifelong friend of Stephen Edwards, Shetler pleaded guilty to conspiracy to commit extortion in the licensing of two riverboats for a Lake Charles casino company. He faces up to five years in prison and a $250,000 fine.



**Dempsey White**
A 76-year-old former chief engineer for the state highway department, White pleaded guilty to misprision of a felony. He faces up to three years in prison and a fine of up to $250,000. While admitted he failed to report to authorities that Edwin and Stephen Edwards planned with others to illegally wiretap the telephones of FBI agents.

**Robert J. Guidry**
A longtime friend of Edwin Edwards and former riverboat casino owner, Guidry pleaded guilty to conspiracy to commit extortion in the licensing of the Treasure Chest riverboat casino. He has agreed to pay penalties of $3.5 million and faces up to five years in prison.



Advocate graphic

United States District Court   B.M. Advocate
Middle District of Louisiana   10/17/98

Bill of Information for Conspiracy to Violate
The Hobbs Act - Extortion

United States of America
     v.
Robert J. Guidry

Criminal Docket No.:
Section:
Violation: 18 USC 371

The United States Attorney charges:

Count 1

A. At All Times Material Herein:

1. The Louisiana Riverboat Gaming Commission ("Gaming Commission"), during its existence from 1993 through early 1996, was a seven member panel appointed by Edwin Edwards while Governor of the State of Louisiana to evaluate applicants for the 15 riverboat gaming licenses available in Louisiana under state law.

2. The Gaming Commission did not have authority to grant actual riverboat gaming licenses. It did, however, award certificates of preliminary approval by vote of its members. These certificates demonstrated that the holders thereof were acceptable to the Gaming Commission and therefore should be licensed. The Gaming Commission awarded 15 certificates of preliminary approval.

3. Only the Louisiana State Police, Riverboat Gaming Division ("LSP Gaming Division"), was authorized by law to grant the actual riverboat gaming licenses. The LSP Gaming Division would conduct an investigation and hearing, in which it determined the suitability of the applicant to be awarded a riverboat gaming license.

4. The Gaming Commission awarded the first eight certificates of preliminary approval in March of 1993.

5. The Gaming Commission awarded the final seven certificates of preliminary approval on June 18, 1993. The Treasure Chest received one of these seven certificates of preliminary approval. During the second approval round, there were approximately 35 applicants.

6. Thereafter, 14 of the initial 15 awardees of the certificates of preliminary approval were granted licenses by the LSP Gaming Division. The one awardee which was initially rejected by the State Police was ultimately awarded a license after a successful appeal to the Gaming Commission.

7. Edwin Edwards was the elected governor of the State of Louisiana, serving his fourth term beginning on or about January 13, 1992 and continuing until January 8, 1996. Thereafter, he shared a law office in Baton Rouge, Louisiana with his son, Stephen Edwards.

8. Stephen Edwards, a Baton Rouge attorney and son of Edwin Edwards, received attorney's fees and other payments from several successful and unsuccessful riverboat applicants. He also formed a company to sell merchandise and promotional trinkets to riverboat casinos and casino applicants. Stephen Edwards used both his status as Edwin Edwards' son and as a lawyer to extort and defraud riverboat applicants, in order to enrich himself, his father, and others.

9. Andrew Martin (Martin) was and is a close friend and associate of Edwin Edwards and Robert J. Guidry. He held the title of "Executive Assistant" to Edwin Edwards during his fourth term as Governor at a salary of $60,000 per year. Martin was a counselor and confidant to Edwin Edwards, and solicited bribes on behalf of Edwin Edwards, among others.

10. Robert J. Guidry (Guidry) was and is a friend and associate of Edwin Edwards and Martin. He was the owner of a Louisiana-based tug-boat business and was also the majority owner and principal of the Treasure Chest Riverboat Casino (the Treasure Chest) located in Kenner, Louisiana. Guidry paid extortion payments pursuant to an agreement with Edwin Edwards, Stephen Edwards and Andrew Martin in order to protect the preliminary approval the Treasure Chest obtained and/or to prevent sabotaging the approval of the riverboat gaming license for the Treasure Chest pending before the LSP Gaming Division.

11. The Treasure Chest was granted a certificate of preliminary approval by the Gaming Commission on June 18, 1993. Its license was thereafter granted by the LSP Gaming Division on May 17, 1994. On September 5, 1994, the Treasure Chest was granted a Certificate of Final Approval by the Gaming Commission and opened for business.

B. The Conspiracy

Commencing in 1994, and continuing through and including the date of this Bill of Information, in the Middle District of Louisiana and elsewhere, the defendant Robert J. Guidry did knowingly, willfully and unlawfully combine, conspire, confederate and agree with Edwin Edwards, Stephen Edwards and Andrew Martin to unlawfully obstruct, delay, and affect commerce by extortion, that is, by providing property, namely payments of U.S. currency to Edwin Edwards, Stephen Edwards, and Andrew Martin, and a commitment to give a 2 percent interest in the net profits of Treasure Chest Casino to Andrew Martin, with his consent, induced through wrongful use of fear of economic loss and under color of official right; in violation of Title 18, United States Code, Section 1951.

C. Overt Acts

In furtherance of the said conspiracy and to accomplish the objects thereof, the conspirators committed the following overt acts, among others, in the Middle District of Louisiana and elsewhere:

1. In or about April 1994, Robert J. Gu... v, following a favorable deci-

net profits of the Treasure Chest and a high ranking employment position with the Treasure Chest after leaving office as Edwards' Executive Assistant, in addition to the payments Guidry previously agreed to make to Martin, Edwin Edwards and Stephen Edwards. Guidry agreed to this arrangement. Shortly thereafter, Guidry received Fire Marshall approval. Despite Martin's extortionate demands, Guidry never paid any money to Martin based on this agreement.

5. Commencing in February 1996, Robert J. Guidry secretly made cash payments scheduled to be paid monthly, in the approximate amount of $100,000, to be split between Edwin Edwards, Stephen Edwards, and Andrew Martin, as payment for their influence and assistance with the Treasure Chest licensing procedure before the LSP Gaming Division. From February 1996 through approximately October 1996, Guidry paid the full $100,000 to Andrew Martin. Thereafter, Guidry began paying the Edwardses their shares directly, and paid Martin his share separately, often by leaving the cash payments in trash cans or dumpsters for Martin to retrieve.

6. On or about November 6, 1996, Robert J. Guidry cashed a check in the amount of $65,000. On the same day, during a telephone conversation, Guidry and Edwin Edwards made plans to meet each other along with Stephen Edwards. At the meeting, Guidry delivered the cash to Edwin Edwards and Stephen Edwards as part of the payoff agreement.

7. On or about November 13, 1996, during a telephone conversation, Andrew Martin arranged a meeting between himself, Robert J. Guidry, and Edwin Edwards to take place on the following Monday in Baton Rouge. They planned to discuss the proposed arrangement which Martin sought to execute with Guidry regarding employment with the Treasure Chest, and to discuss Martin's receipt of a 2 percent interest in the net profits from the Treasure Chest in exchange for his assistance with the Fire Marshal.

8. On or about November 19, 1996, during a telephone conversation, Edwin Edwards told Robert J. Guidry that Andrew Martin wanted to execute a "contract" to document Guidry's secret obligation to give Andrew Martin a 2 percent interest in the net profits from the Treasure Chest in exchange for Martin's assistance with the Fire Marshal. During the conversation, Edwards discouraged Guidry from formalizing the secret agreement with Martin, and advised Guidry to put off Martin by stating, "...I don't want to do anything that might upset the apple cart or cause me to have to file any additional reports or documents with anybody."

9. On or about November 21, 1996, during a telephone conversation, Andrew Martin and Edwin Edwards discussed the arrangement which Martin wanted Robert J. Guidry to execute. Edwards informed Martin that Guidry has "kept his word" to all of them, referring to Guidry's agreement to pay them secretly. Edwards further warned Martin that they don't want to push Guidry too hard and thereby anger him, giving him an excuse to change his mind, and according to Edwards "risk what's happening," a reference to the pay-off split in which Guidry was funneling to Edwin Edwards, Stephen Edwards, and Martin casino proceeds as part of their agreed pay-off.

10. On or about November 21, 1996, Edwin Edwards and Andrew Martin discussed a meeting with Robert J. Guidry which was to take place later that morning. Later, Stephen Edwards confirmed for Edwin Edwards the existence of the aforementioned meeting by telling Edwin Edwards that he (Stephen), Andrew Martin and Robert J. Guidry were waiting for him at a restaurant.

11. On or about January 9, 1997, Andrew Martin expressed to Edwin Edwards his understanding that Robert J. Guidry had agreed to give him a contract to "go to work for him" (referring to Guidry) after Edwards left office as Governor of Louisiana and Martin left office as Executive Assistant to Edwin Edwards. During the conversation, Edwards made reference to the fact that "...if it wouldn't be for Andrew [Martin] he [Guidry] wouldn't have a boat..." referring to the Treasure Chest. Martin told Edwards that he (Martin) previously approached Edwards on Guidry's behalf for "all my green stamps from all the times I helped you [Edwards] in the past..." During the conversation, Martin told Edwards that his financial interest in obtaining the payments and 2 percent of the net profits from the Treasure Chest from Guidry was his "retirement plan." Edwards went on to tell Martin that he knew that Guidry paid Stephen Edwards $100,000 for Guidry's license, and further told Martin that even though Guidry had hired Stephen Edwards, they were "...all in the thing together." At that time, Edwin Edwards stated: "...it's not a question of whether you or Andrew or Stephen or me. This is something we worked out all for ourselves," referring to the receipt of cash from Guidry as payment for their assistance in getting the final LSP Gaming Division hearing and license approval. Edwards concluded by telling martin that if Guidry doesn't want to make good on his obligation to Martin there is nothing they can do to compel it, stating, "But what that [expletive deleted] can you do if he, if he don't wanna do it you can't make him do it. You can't sue him."

12. On or about February 25, 1997, Edwin Edwards in a conversation with Stephen Edwards, made a reference to the fact that "Bobby" was giving Stephen's ex-wife's law firm $5,000 a month.

13. In or about February 1997, Edwin Edwards, Stephen Edwards, and Andrew Martin discussed Martin's plans to provide a plausible, concealable method for Robert J. Guidry to make payments to them disguised as legitimate income. While the Edwardses and Martin discussed using tug boats to conceal the payments, Guidry was unaware of this tug boat scheme.

14. On or about February 25, 1997, during a conversation, Martin explained that he was interested in obtaining some tug boats to do "rig moving." Edwin Edwards responded that if they purchased a tug boat, they could thereafter rent the boat to Guidry and "jack up the rental" in order to provide what would appear to be a legal basis for the payments, thereby concealing the ...[illegible] payments. Edwin Edwards told Martin to "put ...ether." Edwards later told them that he was worried about Guidry taking the large amount of money that he was paying

U.S. v. EDWARDS, et al. — SCANNED WORLD   Documents... ...   Page ...

approval by vote of its members. These certificates demonstrated that the holders thereof were acceptable to the Gaming Commission and therefore should be licensed. The Gaming Commission awarded 15 certificates of preliminary approval.

3. Only the Louisiana State Police, Riverboat Gaming Division ("LSP Gaming Division"), was authorized by law to grant the actual riverboat gaming licenses. The LSP Gaming Division would conduct an investigation and hearing, in which it determined the suitability of the applicant to be awarded a riverboat gaming license.

4. The Gaming Commission awarded the first eight certificates of preliminary approval in March of 1993.

5. The Gaming Commission awarded the final seven certificates of preliminary approval on June 18, 1993. The Treasure Chest received one of these seven certificates of preliminary approval. During the second approval round, there were approximately 35 applicants.

6. Thereafter, 14 of the initial 15 awardees of the certificates of preliminary approval were granted licenses by the LSP Gaming Division. The one awardee which was initially rejected by the State Police was ultimately awarded a license after a successful appeal to the Gaming Commission.

7. Edwin Edwards was the elected governor of the State of Louisiana, serving his fourth term beginning on or about January 13, 1992 and continuing until January 8, 1996. Thereafter, he shared a law office in Baton Rouge, Louisiana with his son, Stephen Edwards.

8. Stephen Edwards, a Baton Rouge attorney and son of Edwin Edwards, received attorney's fees and other payments from several successful and unsuccessful riverboat applicants. He also formed a company to sell merchandise and promotional trinkets to riverboat casinos and casino applicants. Stephen Edwards used both his status as Edwin Edwards' son and as a lawyer to extort and defraud riverboat applicants, in order to enrich himself, his father, and others.

9. Andrew Martin (Martin) was and is a close friend and associate of Edwin Edwards and Robert J. Guidry. He held the title of "Executive Assistant" to Edwin Edwards during his fourth term as Governor at a salary of $60,000 per year. Martin was a counselor and confidant to Edwin Edwards, and solicited bribes on behalf of Edwin Edwards, among others.

10. Robert J. Guidry (Guidry) was and is a friend and associate of Edwin Edwards and Martin. He was the owner of a Louisiana-based tug-boat business and was also the majority owner and principal of the Treasure Chest Riverboat Casino (the Treasure Chest) located in Kenner, Louisiana. Guidry paid extortion payments pursuant to an agreement with Edwin Edwards, Stephen Edwards and Andrew Martin in order to protect the preliminary approval the Treasure Chest obtained and/or to prevent sabotaging the approval of the riverboat gaming license for the Treasure Chest pending before the LSP Gaming Division.

11. The Treasure Chest was granted a certificate of preliminary approval by the Gaming Commission on June 18, 1993. Its license was thereafter granted by the LSP Gaming Division on May 17, 1994. On September 5, 1994, the Treasure Chest was granted a Certificate of Final Approval by the Gaming Commission and opened for business.

B. The Conspiracy

Commencing in 1994, and continuing through and including the date of this Bill of Information, in the Middle District of Louisiana and elsewhere, the defendant Robert J. Guidry did knowingly, willfully and unlawfully combine, conspire, confederate and agree with Edwin Edwards, Stephen Edwards and Andrew Martin to unlawfully obstruct, delay, and affect commerce by extortion, that is, by wrongful obtaining payments of U.S. currency to Edwin Edwards, Stephen Edwards, and Andrew Martin, and a commitment to give a 2 percent interest in the net profits of Treasure Chest Casino to Andrew Martin, with his consent, induced through wrongful use of fear of economic loss and under color of official right; in violation of Title 18, United States Code, Section 1951.

C. Overt Acts

In furtherance of the said conspiracy and to accomplish the objects thereof, the conspirators committed the following overt acts, among others, in the Middle District of Louisiana and elsewhere:

1. In or about April 1994, Robert J. Guidry, following a favorable decision regarding gaming suitability in connection with a video poker company Guidry owned, had conversations with Andrew Martin concerning the status of Guidry's efforts to obtain approval for his riverboat license from the LSP Gaming Division. At that time, Martin told Guidry that the Treasure Chest was not assured of getting LSP approval. Martin, however, stated that he could help Guidry with the licensing procedure pending before the LSP Gaming Division, but indicated by rubbing his fingers together that it would cost Guidry money for the assistance. Martin stated words to the effect that Governor Edwin Edwards owed him favors, and that he (Martin) would "cash in all my green stamps" to help Guidry. Martin further told Guidry that their assistance would cost Guidry 3 percent of net profits to be divided 1 percent each between Martin, Edwin Edwards and Stephen Edwards.

2. In or about April or May 1994, Robert J. Guidry had other conversations with Andrew Martin in which Martin revised his demand on Guidry. Martin, stating words to the effect that, "you only go around once, I gotta get what I can get," stated that he and Edwin Edwards would accept approximately $100,000 per month to be split between Martin, Edwin Edwards and Stephen Edwards and that payments would begin after Edwin Edwards finished his term as Governor. Guidry agreed to this arrangement, provided Edwin Edwards himself would confirm the deal with Guidry.

3. In or about April or May 1994, Robert J. Guidry met with Andrew Martin and Edwin Edwards in a hotel meeting room. Guidry and Edwards had a conversation while Andrew Martin guarded the door. Edwards asked Guidry if he agreed with the deal proposed by Martin. When Guidry indicated he did, Edwards responded that they had a deal and that Guidry would get his hearing.

4. In or about December 1995, Guidry contacted Andrew Martin regarding a problem with obtaining State Fire Marshal approval for his entertainment barge at the Treasure Chest site. Later that month, Guidry met with Martin and, at that meeting, Martin told Guidry that he (Martin) could arrange for Fire Marshal approval. Martin went on to say that he (Martin) would be out of office shortly. In exchange for his help with approval, Martin demanded that he be given a 2 percent interest in the

Andrew Martin arranged a meeting between himself, Robert J. Guidry, and Edwin Edwards to take place on the following Monday in Baton Rouge. They planned to discuss the proposed arrangement which Martin sought to execute with Guidry regarding employment with the Treasure Chest, and to discuss Martin's receipt of a 2 percent interest in the net profits from the Treasure Chest in exchange for his assistance with the Fire Marshal.

8. On or about November 19, 1996, during a telephone conversation, Edwin Edwards told Robert J. Guidry that Andrew Martin wanted to execute a "contract" to document Guidry's secret obligation to give Andrew Martin a 2 percent interest in the net profits from the Treasure Chest in exchange for Martin's assistance with the Fire Marshal. During the conversation, Edwards discouraged Guidry from formalizing the secret agreement with Martin, and advised Guidry to put off Martin by stating, "...I don't want to do anything that might upset the apple cart or cause me to have to file any additional reports or documents with anybody."

9. On or about November 21, 1996, during a telephone conversation, Andrew Martin and Edwin Edwards discussed the arrangement which Martin wanted Robert J. Guidry to execute. Edwards informed Martin that Guidry has "kept his word" to aid of them, referring to Guidry's agreement to pay them secretly. Edwards further warned Martin that they don't want to push Guidry too hard and thereby anger him, giving him an excuse to change his mind, and according to Edwards "risk what's happening," a reference to the pay-off split in which Guidry was funneling to Edwin Edwards, Stephen Edwards, and Martin casino proceeds as part of their agreed pay-off.

10. On or about November 21, 1996, Edwin Edwards and Andrew Martin discussed a meeting with Robert J. Guidry which was to take place later that morning. Later, Stephen Edwards confirmed for Edwin Edwards the existence of the aforementioned meeting by telling Edwin Edwards that he (Stephen), Andrew Martin and Robert J. Guidry were waiting for him at a restaurant.

11. On or about January 9, 1997, Andrew Martin expressed to Edwin Edwards his understanding that Robert J. Guidry had agreed to give him a contract to "go to work for him" (referring to Guidry) after Edwards left office as Governor of Louisiana and Martin left office as Executive Assistant to Edwin Edwards. During the conversation, Edwards made reference to the fact that "...if it wouldn't be for Andrew [Martin] he [Guidry] wouldn't have a boat..." referring to the Treasure Chest. Martin told Edwards that he (Martin) previously approached Edwards on Guidry's behalf for "all my green stamps from all the times I helped you [Edwards] in the past..." During the conversation, Martin told Edwards that his financial interest in obtaining the payments and 2 percent of the net profits from the Treasure Chest from Guidry was his "retirement plan." Edwards went on to tell Martin that he knew that Guidry paid Stephen Edwards $100,000 for Guidry's license, and further told Martin that even though Guidry had hired Stephen Edwards, they were "all...in the thing together." At that time, Edwin Edwards stated: "...it's not a question of whether you or Andrew or Stephen or me. This is something we worked out all for ourselves," referring to the receipt of cash from Guidry as payment for their assistance in getting the final LSP Gaming Division hearing and license approval. Edwards concluded by telling martin that if Guidry doesn't want to make good on his obligation to Martin there is nothing they can do to compel it, stating, "But what the [expletive deleted] can you do if he, if he don't wanna do it you can't make him do it. You can't sue him."

12. On or about February 25, 1997, Edwin Edwards in a conversation with Stephen Edwards, made a reference to the fact that "Bobby" was giving Stephen's ex-wife's law firm $5,000 a month.

13. In or about February 1997, Edwin Edwards, Stephen Edwards, and Andrew Martin discussed Martin's plans to provide a plausible, concealable method for Robert J. Guidry to make payments to them disguised as legitimate income. While the Edwardses and Martin discussed using tug boats to conceal the payments, Guidry was unaware of this tug boat scheme.

14. On or about February 25, 1997, during a conversation, Martin explained that he was interested in obtaining some tug boats to do "rig moving." Edwin Edwards responded that if they purchased a tug boat, they could thereafter rent the boat to Guidry and "jack up the rental" in order to provide what would appear to be a legal basis for the payments, thus concealing the otherwise under-the-table payments. Edwin Edwards told Martin to "put it together." Edwards later told them that he was worried about Guidry taking the large amount of money that he was paying them out of the bank every month, because Guidry could have a hard time explaining what happened to all of that money. Martin went on to tell Edwin Edwards that they are getting "30/30/30" from Guidry, a reference to the approximately $30,000 per month that Edwin Edwards, Stephen Edwards, and Andrew Martin were each receiving. In further making the plans to obtain and lease a tug boat from Guidry, Edwin Edwards stated that the boat rental deal is desirable because "then you've got some showable income," referring to income which appears to be legitimate, unlike the under-the-table payments which were being made, concluding "this other stuff you got to hide it..."

15. On or about February 25, 1997, shortly following their meeting with Andrew Martin that day, Edwin Edwards and Stephen Edwards further discussed specifics of the boat plan, with Edwin Edwards advising Stephen how he should finance the purchase of the boat without incurring personal liability.

16. On or about February 25, 1997, Edwin Edwards and Stephen Edwards further discussed plans to finance the purchasing of a tug boat. During the conversation, they made plans to lease the boat to Robert J. Guidry for enough money to pay the note on the boat plus additional monies to cover the split Guidry owed them "out of the other operations," a reference to the Treasure Chest. In this conversation, Edwards expressed his interest in finding a method through which they could get their money from Guidry in what appeared to be legal transactions, and put it in the back instead of "stacking it up" and "looking for places to throw it away."

17. On or about April 8, 1997, Robert J. Guidry cashed a check in the amount of $65,000. On the same day, during a telephone conversation, Edwin Edwards and Stephen Edwards agreed to meet Guidry at the Highland Road Cafe in Baton Rouge, Louisiana. At the meeting, Guidry delivered the cash to Edwin and Stephen Edwards as part of their agreed pay-off. An FBI Agent observed the meeting.

18. Although unknown to Robert J. Guidry, in April 1997, Gulf Dumar, Inc., a company formed by Andrew Martin, contracted for the construction of tug boats.

383 (1908), for instance, the Court stated only that "a hearing in its very essence requires that he who is entitled to it shall have the right to support his allegations by argument however brief, and, if need be, by proof, however informal."

The Court abandoned both of these approaches to due process decisionmaking in 1970. It rejected traditional distinction between protected rights and unprotected privileges, holding that at least some statutory entitlements are within the scope of due process protection. At the same time, the Court announced its intention to address explicitly and in detail the issue of how much process is due in each decisionmaking context to which due process applies. The opinions that best explain the Court's transition to its present approach to application of the Due Process Clause are Goldberg v. Kelly, 397 U.S. 254 (1970), and Mathews v. Eldridge, 424 U.S. 319 (1976).

*Goldberg* involved a claim by recipients of Aid to Families with Dependent Children (AFDC) that the procedures of the agency charged with responsibility to implement the AFDC program in New York violated the Due Process Clause. The agency provided an opportunity for an oral evidentiary hearing to determine a recipient's continued eligibility for AFDC payments, but that hearing was available only after the payments were discontinued. The agency first decided on the basis of less formal procedures that the recipient was ineligible and terminated benefits based on that initial decision. If the Court had followed its traditional approach to defining property rights, it would have dismissed the complaint of the welfare recipients in a brief opinion stating that welfare benefits are mere privileges that are entitled to no due process protection. Instead, the Court held that welfare payments are property interests within the scope of the Due Process Clause.

The Court reasoned that AFDC payments "are a matter of statutory entitlement for persons qualified to receive them." 397 U.S. at 262. It quoted from an article by Professor Reich in which he argued that (1) a high proportion of property in the United States consists of intangible entitlements to continuing benefits, (2) a high proportion of those entitlements flow from government, and (3) the traditional legal approach to property protects the entitlements of the rich but not the poor. Reich, Individual Rights and Social Welfare: The Emerging Legal Issues, 74 Yale L.J. 1245 (1965). See also Reich, The New Property, 73 Yale L.J. 733 (1964). Thus, for instance the Court had long extended due process protection to the governmental benefit of a license to practice law, characterizing that benefit as a "right." Schware v. Board of Bar Examiners, 353 U.S. 232 (1957); Ex Parte Garland, 71 U.S (4 Wall) 333, 379 (1866). Yet, until *Goldberg*, the Court had declined to extend due process protection to benefits like welfare or most forms of government employment. The Court found Reich's thesis persuasive, and used it as the basis for its holding in *Goldberg* that welfare benefits conferred by statute are "property" subject to due process protection. In later cases, the Court stated that it had "fully and finally rejected the wooden distinction between 'rights' and 'privileges.' . . ." Board of Regents v. Roth, 408 U.S. 564, 571 (1972).

In the present case, the majority opinion correctly determines that the petition fails to allege a violation of state or federal due process. The opinion is correct when it points out that "[o]ur state law affords a license applicant no individual entitlement to a license that he seeks."

The majority opinion says that "[a]bsent a protected property interest, AIGA was not entitled to notice and a hearing before the denial of its application," citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The inference I take issue with is the fact that only a vested property right would be entitled to the full protection of due process. Here the claim

2

was neither vested nor a property right, however a vested privilege when and if it arises, under the gaming statutes should be entitled to the same constitutional protection. The Gaming Board argues, as many have in similar settings, "The Louisiana legislature has clearly and explicitly stated that no property interests are created in conjunction with gaming licenses, contracts and permits," relying on the language of La. R.S. 27:2(B), which states in part that:

> Any license . . . or thing obtained or issued pursuant to the provisions of this Title or any other law relative to the jurisdiction of the board is expressly declared by the legislature to be a pure and absolute revocable privilege and not a right, property or otherwise, under the constitution of the United States or of the State of Louisiana.

This seems to indicate that because the license is a privilege, it somehow escapes the protection of due process. Apparently, the drafters of the gaming statutes were some twenty years behind in their constitutional law research and were under the impression that Justice Holmes' relegation of mere privilege to a second-class status somehow still controlled federal due process concepts.

I think the cases as cited in Professor Davis' treatise make it clear that a license, once issued, albeit a privilege cannot be withdrawn by state action without affording the holders of that license the full procedural protection of due process. The majority opinion in its analysis of the due process claim cites the case of **Roth**, 92 S.Ct. 2701, but omits any reference to the rejection of "the wooden distinction between 'rights' and 'privileges.'" The Supreme Court opinion in **Roth** provides an answer for both a property right analysis and a mere privilege analysis when it says: "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Roth*, 92 S.Ct. at 2708. Although this license by legislative pronouncement is a mere privilege, the protection afforded to that privilege only exists once it has been acquired. The United States Supreme Court has recently addressed the issue that an unissued riverboat gaming license is not property (or by inference not yet a privilege) in the case of **Cleveland v. U.S.**, 531 U.S. 12, 121 S.Ct. 365, 368, 148 L.Ed. 2d 221(11/7/00), finding "We conclude that permits or licenses of this order do not qualify as "property" within § 1341's compass."

3

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 89 of 323

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

464607

| | | |
|---|---|---|
| ALVIN C. COPELAND | * | DOCKET NO. |
| VERSUS | * | DIVISION " " |
| TREASURE CHEST CASINO, L.L.C., and ROBERT J. GUIDRY | * | JURY TRIAL REQUESTED |
| | * | |

D

J# 3719

COST OK Amt. 190.00

FILED: _____    _____ SEP 15 1999

DEPUTY CLERK

BY_____
DY. CLERK OF COURT

## Petition for Damages

NOW INTO COURT, through undersigned counsel, comes plaintiff Alvin C.

Copeland ("Copeland"), who respectfully represents the following:

### The Parties

1.

Plaintiff Copeland, successor to American International Gaming Association, Inc.

("AIGA"), is a competent major and a resident of the Parish of Jefferson, State of Louisiana.

2.

At all pertinent times, AIGA was a Louisiana corporation with its principal place of

business located in the Parish of Jefferson, State of Louisiana; Copeland was the sole

shareholder of AIGA, and its net assets were transferred to him upon its dissolution. As

detailed below, AIGA was an applicant seeking authorization to conduct gaming activities on a

riverboat in accordance with the Louisiana Riverboat Economic Development and Gaming

Control Act (hereinafter the "Act"), LSA-R.S. 4:501, *et seq.*

3.

Made defendants are Treasure Chest Casino, L.L.C. ("Treasure Chest"), a Louisiana

limited liability company formed on August 27, 1993 that is registered to do and doing

business in the State of Louisiana; and Robert J. Guidry ("Guidry"), a person of the full age of

majority and a resident of Jefferson Parish, State of Louisiana. Defendant Robert J. Guidry

was an original member and manager of Treasure Chest, along with Dick J. Guidry. Upon

information and belief, Robert Guidry was also the President of Treasure Chest and/or

Treasure Chest Casino, Inc. All of the below-referenced acts by Robert Guidry were

EXHIBIT

5

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 90 of 323

REC'D O.P.

SEP 15 1999

undertaken in the course and scope of his position with Treasure Chest and/or Treasure Chest Casino, Inc., which gave him the actual and apparent authority to perform them; Robert Guidry's actions were also done in furtherance of these companies' business activities.

## Venue

### 4.

As detailed below, the events and/or omissions giving rise to this action occurred in substantial part in this judicial district, and accordingly venue properly resides in this Court pursuant to La. Code Civ. Proc. arts 42, 73, and/or 74.

## Allegations Common to All Counts

### 5.

As detailed below, on information and belief derived from (1) the factual basis of Robert Guidry's guilty plea in criminal case number 3:98cr00144-0, United States District Court for the Middle District of Louisiana (hereinafter "Guidry's guilty plea"), (2) the Superseding Indictment against Edwin Edwards, Stephen Edwards, Cecil Brown, Andrew Martin, Bobby Johnson, Gregory Tarver, and Ecotry Fuller in criminal case number 98-165, United States District Court for the Middle District of Louisiana, Section B-2 (hereinafter the "Edwards Indictment"), and (3) the Bill of Information for Conspiracy to Commit Extortion charged against Richard D. Shetler in criminal case number 98-142-A-M3, United States District Court for the Middle District of Louisiana (hereinafter the "Shetler Bill"), Copeland avers that there existed a scheme to corrupt the entire process for issuing riverboat gaming licenses under the Act (the "overarching corrupt conspiracy"). As detailed below, Treasure Chest and Robert Guidry joined, participated in, and engaged in overt acts in furtherance of the overarching corrupt conspiracy.

## The Guidry Scheme

### 6.

During its existence from 1992 through early 1996, the Louisiana Riverboat Gaming Commission (the "Commission") was composed of seven members, all of whom were appointed by Edwin W. Edwards while he was the Governor of the State of Louisiana. The

-2-

Act enabled the Gaming Commission to issue rules providing for and determining certain enumerated matters pertaining to riverboat gaming activities.

7.

The Act did not give the Commission the authority to grant riverboat gaming licenses. Rather, the Act gave that power to the Riverboat Gaming Enforcement Division of the Gaming Enforcement section of the office of State Police, Public Safety Services, Department of Public Safety and Corrections (the "Division"). Under the Act, the Division was granted the exclusive authority to "Issue, deny, condition, or restrict licenses and permits" to conduct riverboat gaming activities ("licenses"). LSA-R.S. 4:518(2). The Division was authorized to issue no more than 15 licenses. LSA-R.S. 4:525. Pursuant to this authority, the Division was empowered to conduct investigations and hearings, from which it alone was to determine the suitability of the applicant to be awarded a riverboat gaming license.

8.

Although the Act gave the Division the sole power to issue licenses, the Commission nevertheless issued a set of rules providing for the issuance of Certificates of Preliminary Approval ("certificates") by vote of its members. These certificates purportedly demonstrated that the holders thereof were acceptable to the Commission and therefore should be candidates for actual licensure.

9.

On December 11, 1992, AIGA submitted its application to the Commission for a certificate, and submitted a second application form on February 22, 1993 containing supplemental information. The AIGA application proposed a riverboat route and related operations at the Kenner Laketown Harbor Park on the shores of Lake Pontchartrain. In conjunction with its application, AIGA submitted a check in the amount of $30,000.00, comprised of a $25,000.00 application fee and a $5,000.00 evaluation fee. On February 14, 1993, AIGA submitted to the Division the filing fee of $50,000.00 required to fund the Division's background investigation of applicants for a license. The AIGA application was the first submitted to the Commission that proposed to conduct riverboat gaming in Kenner, Louisiana, and was among the first submitted to the Division for approval.

-3-

10.

In connection with its application, AIGA retained a sophisticated group of gaming

professionals, with extensive prior experience in casino operations in New Jersey and Nevada,

both to coordinate activities necessary to obtain a certificate and license and to manage its

proposed riverboat gaming operation. Plaintiff incurred approximately $2.2 million in

expenses in preparing and processing AIGA's application for a license. Had plaintiff been

aware of Guidry and the Treasure Chest's participation in the overarching corrupt conspiracy,

plaintiff would not have incurred the expenses associated with the AIGA application.

11.

On or about February 9, 1993, Guidry formed Treasure Chest Casino, Incorporated

(hereinafter "Treasure Chest, Inc."). Upon information and belief, Robert J. Guidry was the

President and/or Chairman of the Board of Treasure Chest, Inc.

12.

On information and belief derived from the Edwards Indictment, on February 9, 1993

Guidry also paid Stephen Edwards $25,000.00 for legal services relating to the preparation of

the Treasure Chest license application. Further, on information and belief, as the New Orleans

Times-Picayune reported on December 5, 1994, "A Guidry-owned video poker company has

paid Stephen Edwards $20,000," and "Treasure Chest paid $9,000 to a merchandising

company of which Stephen Edwards was a director until he sold his interest in a settlement

with the Ethics Commission, which was investigating whether the Governor's children could

do business with riverboats." On information and belief, as the New Orleans Times-Picayune

reported on December 9, 1997, "In all, Guidry paid Stephen Edwards $75,000 for his work in

Guidry's various companies.'"

13.

Treasure Chest, Inc. submitted its application to the Commission on March 8, 1993,

approximately three months after the AIGA application was submitted. The Treasure Chest,

Inc. application proposed to locate its gaming riverboat at Kenner's Laketown Harbor Park.

On March 26, 1993, the Gaming Commission held a public hearing in Baton Rouge, La. on

the Treasure Chest, Inc. application to operate a gaming riverboat; this hearing occurred fewer

-4-

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 93 of 323

than three weeks after Treasure Chest, Inc. filed its application, thereby granting priority to the Treasure Chest, Inc. application over the application filed substantially earlier by AIGA. Treasure Chest, Inc. later filed a modification to its application for a certificate, which proposed re-locating the Treasure Chest, Inc.'s gaming riverboat from the Laketown Harbor Park site to Rivertown, U.S.A., on the banks of the Mississippi River in Kenner.

14.

On June 4, 1993, a public hearing was held in Baton Rouge, La. at which AIGA made a presentation to the Commission on its application for a certificate.

15.

The Commission held another meeting in Baton Rouge, La. on June 18, 1993. By that date, it had approved eight applications for certificates, although none of these eight approved applications involved proposals to locate a gaming riverboat in Kenner. At this meeting, the Chairman of the Commission stated that he had "been asked by the Governor to make one comment on his behalf, and that is that the City of Kenner has expressed that it really desires only one boat and that boat to be located on the river." In addition, at this meeting, the Commission rescinded the resolution that it had adopted on June 4th, which had stated that "a change of waterway" would be "more than a modification and requires a new application." The Commission then adopted a motion "that would allow subsequent changes to applications or status of those applications leaving basically ... discretion as to whether new or not at the discretion of the Chairman with the consent of the Commission." The Commission then voted on eight applications for certificates and approved seven of them; the Treasure Chest, Inc. application for a certificate for its Rivertown location was one of the applications that was approved. As a result, AIGA"s application to operate a gaming riverboat at the Laketown Harbor Park site on the shores of Lake Pontchartrain was never considered or voted on by the Commission.

16.

On information and belief, as the New Orleans Times-Picayune reported on June 5, 1998, Governor Edwards "did more than appoint the members of Louisiana's Riverboat Gaming Commission. He also sent clear messages about which bidders he favored. For

-5-

example, Dr. Louis James, a former board member, has said he was called to the Governor's Mansion the day before the board was to award the last seven licenses in 1993. James has said Edwards gave him a typewritten list of about a dozen casino boats, including three that involved friends of Edwards."

17.

As detailed above, Treasure Chest Casino, L.L.C. was formed on August 27, 1993. On or about August 30, 1993, Boyd Kenner, a wholly owned subsidiary of Boyd Gaming, a publicly traded corporation domiciled in Las Vegas, Nevada, entered into a casino management agreement with Treasure Chest. Under this agreement Boyd Kenner would be paid a management fee representing ten (10%) percent of the Treasure Chest's net operating profit. In addition, on or about August 30, 1993, Boyd Kenner, Boyd Gaming and Treasure Chest entered into a subscription agreement wherein Boyd Kenner agreed to advance to Treasure Chest $10 million cash upon the granting of a riverboat gaming license to Treasure Chest. The commitment to advance those funds was guaranteed by Boyd Gaming. Subsequently, Boyd Kenner acquired a fifteen (15%) percent interest in Treasure Chest in exchange for a cash payment of $15 million.

18.

On November 13, 1993, subsequent to the approval by the Commission of the Treasure Chest, Inc. application for its Rivertown location, Treasure Chest sought permission to modify the previously filed application to move the site of its proposed route and operations to Lake Pontchartrain. The Commission granted this request over AIGA's objections. Despite the fact that it had been Treasure Chest, Inc. that had applied for the Certificate of Preliminary Approval, the Commission issued a certificate to Treasure Chest Casino, L.L.C. on March 15, 1994.

19.

On information and belief derived from the factual basis of Robert Guidry's guilty plea and/or the Edwards Indictment, Andrew Martin ("Martin"), a close friend, confidant, and associate of then-governor Edwin Edwards, held the title of "Executive Assistant" to Edwin Edwards during Edwards' fourth term as Governor. Beginning no later than April, 1994,

-6-

Martin solicited bribes and extortion payments on behalf of Edwin Edwards, and further demanded and received from Guidry and/or Treasure Chest monthly net payments to himself, Edwin Edwards, and Stephen Edwards of approximately $30,000.00 each, in exchange for Martin's, Edwin Edwards', and Stephen Edwards' influence and assistance with the Treasure Chest licensing procedure.

<div align="center">20.</div>

On information and belief derived both from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, in or about April 1994, Robert Guidry, following a favorable decision regarding gaming suitability in connection with a video poker company Guidry owned, had conversations with Andrew Martin concerning the status of Guidry's efforts to obtain approval for his riverboat license from the LSP Gaming Division. At that time, Martin told Guidry that the Treasure Chest was not assured of getting LSP approval. Martin, however, stated that he could help Guidry with the licensing procedure pending before the LSP Gaming Division, but indicated by rubbing his fingers together that it would cost Guidry money for the assistance. Martin stated words to the effect that Governor Edwin Edwards owed him favors, and that he (Martin) would "cash in all my green stamps" to help Guidry. Martin further told Guidry that their assistance, to quote the Edwards indictment, "would cost Guidry 3% of gross revenue as per Louisiana statute, to be divided 1% each between Martin, Edwin Edwards, and Stephen Edwards."

<div align="center">21.</div>

On information and belief, at the time Martin first contacted Guidry, the State Police had not set a date for the hearing on Treasure Chest's application, which was a prerequisite for obtaining a license.

<div align="center">22.</div>

On information and belief derived both from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, in or about April or May 1994, Robert Guidry had other conversations with Andrew Martin in which Martin revised his demand on Guidry. Martin, stating words to the effect that, "you only go around once, I gotta get what I can get," stated that he and Edwin Edwards would accept approximately $100,000 per month to be split

<div align="center">-7-</div>

between Martin, Edwin Edwards, and Stephen Edwards, and that payments should begin after Edwin Edwards finished his term as Governor. Guidry agreed to this arrangement, provided that Edwin Edwards himself would confirm the deal with Guidry.

23.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, Guidry met with Martin and Edwin Edwards in a hotel meeting room. Guidry and Edwin Edwards had a conversation while Martin guarded the door. Edwin Edwards asked Guidry if he agreed with the deal proposed by Martin. When Guidry indicated he did, Edwin Edwards responded that they had a deal and assured Guidry that Guidry would get his licensing hearing.

24.

On information and belief, as the New Orleans Times-Picayune reported on December 9, 1997, "During Guidry's effort to license the Treasure Chest, Governor Edwards urged State Police to grant the proposal a licensing hearing, State Police sources have said, a critical step in the approval process."

25.

The State Police held a hearing into Treasure Chest's application in Baton Rouge, La. on May 17, 1994. At this hearing, the following exchange took place between Captain Mark Oxley of the Division and Robert Vosbein, counsel for Treasure Chest, who was under oath:

Capt. Oxley:  And are you testifying that there are no elected public officials doing

business with Treasure Chest?

Mr. Vosbein:  That's correct.

This statement was made by Mr. Vosbein as agent for Treasure Chest and/or Guidry; on information and belief, it was based on information supplied to him by Treasure Chest and/or Guidry. Treasure Chest's representations, through its agent Mr. Vosbein, violated LSA-R.S. 27:70 C. in failing to disclose Treasure Chest's relationship with Edwin Edwards, which was prohibited by LSA-R.S. 27:96 A.

-8-

26.

At this same hearing, Captain Oxley and Lieutenant Colonel Kenneth Norris of the Division asked Robert Vosbein and Robert Guidry, both of whom were under oath, the following:

Capt. Oxley:   Is or was anyone actually involved in the applicant's business operations in any position or manner who is not listed in the application, who has not since been disclosed and who should be disclosed now?

Mr. Guidry:   Would you ask that question again please?

Mr. Vosbein:   You're talking about this application?

Capt. Oxley:   We're talking about Treasure Chest Casino.

Mr. Guidry:   Would you ask it again, please?

Capt. Oxley:   Yes, sir. Is or was anyone actually involved in the applicant's business operations in any position or manner and who is not listed in the application? Or has there been anyone not since disclosed that should be disclosed to the Division now?

Mr. Vosbein:   There is no such person.

Mr. Guidry:   I agree with that.

Capt. Oxley:   Is there anyone involved in Treasure Chest Casino who could not fulfill the requirements for a finding of suitability to the best of your knowledge?

Mr. Guidry:   No, sir, no one.

Mr. Vosbein:   Not to the best of my knowledge.

Capt Oxley:   To the best of your knowledge, is there any information or material fact that has not been furnished to State Police, that has not otherwise come to light that may yet be uncovered by the Division or others that may tend to cast doubt or reflect negatively on the qualifications of the applicant or anyone with an interest which you should bring forward at this point in time to the attention of the Division?

Mr. Guidry:   No, sir, no one.

-9-

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 98 of 323

Mr. Vosbein: Not to my knowledge.

Capt. Oxley: Thank you.

Lt. Booth: Point of clarification, please, Captain. Your first question dealing with disclosures, was that as to persons or firms? I misunderstood the answer.

Capt. Oxley: That was anyone, I suppose you could say person or persons in a legal sense, or in any other sense. And you answered negatively. Correct?

Mr. Guidry: That's right.

Lt. Booth: No individual or entity. Is that correct?

Mr. Vosbein: That's correct.

Lt. Booth: Okay. Thank you.

Mr. Guidry's testimony, which failed to reveal his association with Edwin Edwards as set forth herein, was in violation of LSA-R.S. 27:70 C.

27.

In conjunction with his submittal of the Treasure Chest application for a license, Guidry executed an "Affidavit of Full Disclosure" on February 26, 1993, wherein Guidry averred, in pertinent part:

... except as reported in the Application, I have no agreements or understandings with any person or entity and no present intent to pay any sums of money or give anything of value as, including but without limitation, a finder's fee or commission to any person or entity related to the acquisition of any interest in the Application ...

Pursuant to LSA-R.S. 27:70 C., Guidry had a continuing duty to render a full and accurate disclosure of his association with Edwin Edwards as set forth herein. Upon information and belief, Guidry has never disclosed this association, and has therefore violated his duty under LSA-R.S. 27:70 C.

28.

On May 17, 1994, the Division granted a license to Treasure Chest. On information and belief, Treasure Chest would not have received a license but for the overarching corrupt conspiracy.

-10-

29.

Plaintiff avers that, but for the overarching corrupt conspiracy, AIGA would have obtained a license to conduct gaming activities on a riverboat pursuant to the Act, and was suitable to obtain such a license; AIGA, in fact, was granted a video gaming owner's license by the State of Louisiana in June 1994 and a gaming license by the State of Colorado in March 1995. Further, had AIGA known of the overarching corrupt conspiracy, it would not have expended the funds necessary to prepare and submit its application.

30.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, in or about December, 1995, Guidry contacted Andrew Martin regarding his problem with obtaining State Fire Marshal approval for his entertainment barge at the Treasure Chest site. Guidry thereafter met with Martin and, at that meeting, Martin told Guidry that he (Martin) could assist with obtaining Fire Marshal approval. In exchange for his help with approval, Martin demanded that he be given a 2% interest in the net profits of the Treasure Chest and a high ranking employment position with the Treasure Chest after leaving office as Edwin Edwards' Executive Assistant. These payments were in addition to the payments Guidry previously agreed to make to Martin, Edwin Edwards, and Stephen Edwards. Guidry agreed to this arrangement. Shortly thereafter, Guidry received Fire Marshal approval for the entertainment barge.

31.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, commencing in February 1996 and continuing through April, 1997, Guidry made monthly cash payments in the approximate amount of $100,000.00, to be split evenly among Edwin Edwards, Stephen Edwards, and Martin, as payment for their influence and assistance with the Treasure Chest licensing procedure before the LSP Gaming Division. From February 1996 through approximately October 1996, Guidry paid the full $100,000.00 to Martin. Thereafter, Guidry began paying the Edwardses their shares directly, and paid Martin his share separately, often by leaving the cash payments in trash cans or dumpsters for Martin to retrieve.

-11-

32.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about November 6, 1996, Guidry cashed a check in the amount of $65,000.00. On the same day, during a telephone conversation recorded by the Federal Bureau of Investigation ("FBI"), Guidry and Edwin Edwards made plans to meet each other along with Stephen Edwards. At the meeting, Guidry delivered the cash to Edwin Edwards and Stephen Edwards as part of the payoff agreement.

33.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about November 13, 1996, during a telephone conversation recorded by the FBI, Martin arranged a meeting between himself, Guidry, and Edwin Edwards to take place on the following Monday in Baton Rouge, in order to discuss the proposed arrangement which Martin sought to execute with Guidry regarding employment with the Treasure Chest and to discuss Martin's receipt of a 2% interest in the net profits from the Treasure Chest in exchange for his assistance with the Fire Marshal.

34.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about November 19, 1996, during a telephone conversation, Edwin Edwards told Robert Guidry that Andrew Martin wanted to execute a "contract" to document Guidry's secret obligation to give Martin a 2% ownership in the Treasure Chest in exchange for Martin's assistance in obtaining Guidry's license.

35.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about November 21, 1996, during a telephone conversation, Andrew Martin and Edwin Edwards discussed the arrangement which Martin wanted Robert Guidry to execute. Edwards informed Martin that Guidry had "kept his word" to all of them, referring to Guidry's agreement to pay them secretly. Edwards further warned Martin that they didn't want to push Guidry too hard and thereby anger him, giving him an excuse to change his mind, and according to Edwards, "risk what's happening," which was, to quote the

-12-

Edwards Indictment, "a reference to the payoff split in which Guidry was funneling casino proceeds to Edwin Edwards, Stephen Edwards, and Martin as part of their agreed payoff."

<div align="center">36.</div>

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about January 9, 1997, Martin expressed to Edwin Edwards his understanding that Robert Guidry had agreed to give him a contract to "go to work for him" (referring to Guidry) after Edwin Edwards left office as Governor of Louisiana. Edwin Edwards made reference to the fact that " . . . if it wouldn't be for Andrew [Martin] he [Guidry] wouldn't have a boat . . .," referring to the Treasure Chest. Martin reminded Edwards that he [Martin] previously approached Edwards on Guidry's behalf for "all my green stamps from all that [sic] times I helped you [Edwards] in the past...." During the conversation, Martin told Edwards that his financial interest in obtaining the payments and 2% of the Treasure Chest from Guidry was his "retirement plan." Edwin Edwards went on to tell Martin that he knew Guidry paid Stephen Edwards $100,000.00 for Guidry's license, and further told Martin that even though Guidry had hired Stephen Edwards, they were "all . . . in the thing together." At that time, Edwin Edwards stated: " . . . it's not a question of whether you or Andrew or Stephen or me. This is something we worked out all for ourselves," referring to the licensing of the Treasure Chest and the receipt of cash from Guidry as payment for their assistance in helping Guidry obtain his license.

<div align="center">37.</div>

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about April 8, 1997, Guidry cashed a check in the amount of $65,000.00. On the same day, during a recorded telephone conversation, Edwin Edwards and Stephen Edwards agreed to meet Guidry at the Highland Road Café in Baton Rouge, Louisiana. At the meeting, Guidry delivered the cash to Edwin Edwards and Stephen Edwards as part of their agreed payoff.

<div align="center">38.</div>

On information and belief, the Treasure Chest's net operating profits have exceeded $100 million for calendar years 1996 and 1997.

<div align="center">-13-</div>

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 102 of 323

39.

On or about October 27, 1997, Boyd Louisiana, L.L.C., a Nevada limited liability company ("Boyd Louisiana"), along with another wholly owned subsidiary of Boyd Gaming, purchased the interest in Treasure Chest not owned by Boyd Kenner for approximately $113 million from the selling members, namely Robert J. Guidry, Dick J. Guidry, Robert A. Vosbein, Pam Olson, Robert J. Guidry Family Trust, and Dick J. Guidry Family Trust. The Treasure Chest's "intangible license rights," which had been obtained solely as a result of the overarching corrupt conspiracy, were valued at $85 million of the total purchase price. On information and belief, defendant Robert J. Guidry individually received $73 million from this transaction; the remaining $12 million was distributed among the other selling members. As a result of this transaction, Treasure Chest became and remains a wholly owned subsidiary of Boyd Gaming.

40.

Boyd Gaming's 1998 10K Statement, filed with the United States Securities and Exchange Commission, states that net revenues in Boyd Gaming's Central Region "increased 34% during the quarter ended June 30, 1998 compared to the quarter ended June 30, 1997 primarily as a result of the acquisition of Treasure Chest in October 1997. . . ." Boyd Gaming's 1998 10K Statement continues that "Treasure Chest produced net revenues for the Company of $31.2 million during the quarter ended June 30, 1998 . . . ." Further, Boyd Gaming's 1999 10K Statement provides that "Treasure Chest produced net revenues for the Company of $124 million during 1998 versus $26 million during the prior year."

The Shetler Scheme

41.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, Richard D. Shetler ("Shetler") was hired in June 1993 by Players Lake Charles Riverboat Casino, Inc. ("Players"), as a consultant on a three (3) year retainer for approximately $60,000 per year, and upon the opening of the riverboat his salary would increase to $100,000 per year.

-14-

42.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on December 6, 1993, Players was granted a license to operate, and did open, a riverboat casino in Lake Charles, La.

43.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, pursuant to a "Compact" signed by Louisiana Governor Edwin W. Edwards and approved by the U.S. Division of Indian Affairs, Washington, D.C., the Coushatta Indian Tribe had received approval to open a casino on its Reservation, located approximately 50 miles from Lake Charles. During 1993/1994, the Coushatta Tribe sought approval from the U.S. Division of Indian Affairs to build the casino on the newly acquired 104 acres of land located near the Reservation. In order for the Tribe to get this approval, the Governor of Louisiana had to concur that these 104 acres were "contiguous" to the Reservation.

44.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, Players sought authorization from the Louisiana Riverboat Gaming Commission to purchase the Star Riverboat Casino in New Orleans, assume its license, and transfer the Star riverboat to a berth next to Players' original riverboat in Lake Charles. This transfer was approved by the Gaming Commission in February 1995.

45.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, Shetler's still valid contract with Players was superseded on December 1, 1994, by a seven (7) year retainer for $126,000 per year, complete with a $250,000 bonus and $200,000 loan.

46.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, from payments received by Players and related entities, Shetler gave Stephen Edwards cash and other property for Stephen Edwards and Edwin Edwards in the approximate amount of $650,000.

-15-

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 104 of 323

47.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, as explained herein, to quote the Shetler Bill, "from approximately April 1993 through April 1997, in the Middle District of Louisiana and elsewhere, Richard D. Shetler did knowingly, willfully and unlawfully combine, conspire, confederate, and agree with Stephen Edwards and Edwin Edwards to unlawfully obstruct, delay, and affect commerce by extortion, that is, by obtaining property, namely payments from Players, with Players' consent, induced by fear of economic loss, and under color of official right."

48.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in April or May 1993, Stephen Edwards told two Players officials to hire Shetler as a consultant. Edwards stated that if Players wanted to get its license approved by the Louisiana State Police, Players would have to pay Shetler $300,000; if Players wanted to have a monopoly in Lake Charles, it would have to pay Shetler $600,000. On or about June 6, 1993, Players hired Shetler as a consultant on terms including a three-year retainer at $100,000 per year.

49.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in or about August 1993, Shetler recorded a telephone conversation he had with Stephen Edwards. During the conversation, they discussed a $50,000 bonus Players was going to pay to Shetler to "look at these other sites" for gaming riverboats. Stephen Edwards explained to Shetler the bonus was a "way for them to pay you because they know that if they are paying you and you're happy, then you'll keep me from fucking with them."

50.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, during the same August 1993 recorded conversation, Shetler and Stephen Edwards discussed other contracts which various associates and family members of Stephen Edwards were to obtain in connection with Players.

-16-

51.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, commencing in May 1994 and continuing through and including September 1995, Shetler caused another individual to pay approximately $75,000 for windows, air conditioning units, kitchen appliances, and a metal shed to be delivered and installed in Stephen Edwards' house and other residences.

52.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in July or August 1994, Shetler, upon the instructions of Stephen Edwards, related to Players that, in return for separate payments of $250,000 and $200,000, Governor Edwin Edwards would take official action to hinder or prevent the opening of the Coushatta Indian Tribe Casino, and Stephen Edwards would keep other riverboats from establishing in Lake Charles.

53.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about November 23, 1994, in return for official action taken by Governor Edwards regarding the Coushatta Tribe's Casino, Shetler purchased in his name from Don Shetler Chevrolet, Inc., Crowley, LA. a $24,078 1994 Chevrolet Suburban. The car was then taken for use at Governor Edwards' condominium in Vail, Colorado.

54.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about December 1, 1994, in response to Shetler's demands, Players revised his contract, replacing it with a seven year retainer for $126,000 per year, complete with a $250,000 bonus and a $200,000 loan.

55.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in January 1995, Shetler, upon the instructions of Stephen Edwards, related to Players that, in return for $250,000 per year, Governor Edwards would approve the transfer of the Star Riverboat.

-17-

56.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in January 1995, Shetler entered into an agreement with another company with an economic interest in the approval of the Star transfer, whereby he was to receive 37.5 cents per passenger off the two Players boats.

57.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in or about February 1995, in connection with the Star transfer, Players agreed to pay a legal retainer to Stephen Edwards for $15,000 per month. Players, thereafter, paid a total of $150,000 pursuant to this agreement.

58.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about February 8, 1995, the Gaming Commission approved both the Star transfer and the establishment of the Crown Casino riverboat in Lake Charles.

59.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in or about August 1995, representatives of Players met with Edwin Edwards at the Governor's Mansion. The purpose of the meeting was to discuss a proposed Players riverboat casino in Shreveport. During the meeting, Edwards protested that although people said it was necessary for gaming companies to do business with his friends, relatives, and associates, that was not, in fact, true. Edwards then stated to the Players representatives that there were local people who could advance their business ventures, while at the same time gesturing with his finger toward an associate of his who was sitting nearby.

60.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about September 27 - 29, 1995, Richard D. Shetler accompanied Stephen Edwards and his wife and an interior decorator to various furniture showrooms in Dallas, Texas. The Edwardses selected and received furniture totaling approximately $74,267, a fireplace mantle at $2,250, and a chandelier for $1,957. Shetler paid for these items.

-18-

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 107 of 323

61.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about September 5 through 8, 1995, Shetler cashed six checks totaling $20,000, payable to "cash." He thereafter made a $20,000 cash payment to Stephen Edwards for Governor Edwin Edwards.

62.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about February 25, 1997, at their law offices, Stephen Edwards told his father Edwin Edwards that Shetler would come tomorrow "with your money."

63.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, the following day, February 26, 1997, Stephen Edwards met in his law office with Shetler. Stephen Edwards asked Shetler how much money he brought, and Shetler replied "47." They discussed that amount of revenue the riverboat made and the number of customers who had boarded the riverboat during the period. They then discussed possible methods through which Shetler could secretly purchase a $25,000 van for Stephen Edwards, who stated that the van deal could be structured so Shetler could use it "once a year just like the deal (referring to the Suburban) you had with my dad." Since the Chevrolet Suburban was at the Vail condo, Stephen Edwards told Shetler that "for the purposes of legitimacy, I think what you ought to do is make plans of calling ... for you to go up there and spend some time with him, or go up and use the place when he ain't there ... but you really ought to go up there at least once."

64.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about March 13, 1997, Shetler brought approximately $4,634 in cash to Stephen Edwards' office for Edwin Edwards. After entering the office, he told Stephen Edwards that he had put the money "in the bottom drawer," stating that the money was for "your Dad."

-19-

65.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about March 18, 1997, Richard D. Shetler purchased in Stephen Edwards' name from Don Shetler Ford, Inc., Sulphur, LA., a 1997 Ford Club Van.

66.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, from August 1996 through April 1997, Shetler delivered approximately $50,000 in cash for Edwin W. Edwards.

### Count One -- Racketeering Influenced and Corrupt Organizations Act

67.

On information and belief, Edwin W. Edwards, Stephen Edwards, Andrew Martin, Robert Guidry, Treasure Chest, and other unnamed persons and entities (collectively, "RICO persons") constituted an association-in-fact enterprise ("RICO enterprise") as defined in the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq, ("RICO").

68.

On information and belief, the RICO enterprise was engaged in and its activities affected interstate and foreign commerce.

69.

On information and belief, the RICO persons conducted and participated in the conduct of the affairs of the RICO enterprise through a pattern of racketeering activity in East Baton Rouge and other parishes, comprised of repeated acts of bribery (in violation of 18 U.S.C.§ 1952 and LSA - R.S. 14:118), extortion (in violation of 18 U.S.C. § 1951, LSA - R.S. 14:66 and LSA - R.S. 14:120), wire fraud (in violation of 18 U.S.C. § 1343), and mail fraud (in violation of 18 U.S.C. § 1341)(collectively, "predicate acts") extending over a period of years, in violation of 18 U.S.C. § 1962(c).

70.

On information and belief, the RICO persons, through a pattern of racketeering activity, acquired and/or maintained an interest in and/or control of enterprises engaged in, and

-20-

the activities of which affected, interstate and foreign commerce, namely entities involved in riverboat gaming in Louisiana, in violation of 18 U.S.C. § 1962(b).

71.

On information and belief, the RICO persons conspired to violate 18 U.S.C. §§ 1962(b) and 1962(c), in violation of 18 U.S.C. § 1962(d).

72.

Copeland was injured in his business and property, which injury was proximately caused by reason of the RICO persons' violations of 18 U.S.C. §§ 1962(b), 1962(c) and 1962(d), entitling him to recover threefold the damages he has sustained and the cost of the instant suit, including a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c). Certain of the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the RICO enterprise are detailed in the following paragraphs.

73.

On information and belief, the RICO enterprise, which began prior to defendant Edwin Edwards' fourth and final term as Governor, centered around Edwin Edwards and the office of the Governor of Louisiana, and further depended upon the political and economic power, influence, control and notoriety of Governor Edwards to operate and to succeed in its purposes and objectives.

74.

On information and belief, the enterprise continued in existence through and beyond the conclusion of Edwin Edwards' final term as Governor, until and including the date of this Complaint. Thus, the RICO enterprise and its associates continued to exploit the political and economic power, influence, control, and notoriety of Edwin Edwards to operate and succeed in its purposes and objectives.

75.

On information and belief, Edwin Edwards and Stephen Edwards were the center or nucleus of the RICO enterprise. Other members and associates of the RICO enterprise would and did participate in various aspects of the RICO enterprise's purposes, objectives, and ventures, as sanctioned by Edwin Edwards and Stephen Edwards.

-21-

76.

On information and belief, to avoid detection by law enforcement and unmasking before the public, Edwin Edwards went to great lengths to ensure that his participation in the RICO enterprise and its racketeering activity remained hidden and insulated by having the other members and associates of the RICO enterprise perform overt acts in furtherance of the RICO enterprise's racketeering activity.

77.

The RICO persons fraudulently concealed their illegal activities, and plaintiff neither knew nor, in the exercise of due diligence, could reasonably have known of the offenses committed by the members of the RICO enterprise.

78.

On information and belief, the members and associates of the RICO enterprise would and did use their close relationships with Edwin Edwards and Stephen Edwards, thereby trading upon the Edwin Edwards name, notoriety, and power, in order to exercise influence and leverage over the victims of the RICO enterprise.

79.

On information and belief, commencing in or about 1993 and continuing through 1994, Edwin Edwards, on several occasions, assisted certain riverboat applicants in obtaining licenses from the Division by, among other things, demanding that the Division schedule speedy licensing hearings for those applicants he favored.

80.

On information and belief, on or about April 23, 1997, Edwin Edwards was interviewed by a Special Agent of the FBI and a Special Agent of the Internal Revenue Service (the "IRS") concerning the riverboat licensing process. Edwin Edwards stated that, in his opinion, legislators "got their friends on the Commission" to award Certificates of Preliminary Approval to certain riverboat applicants. Edwin Edwards stated that he appointed the Co-Chairman of the Gaming Commission at the request of a state legislator. Edwin Edwards also stated that he appointed other members of the Gaming Commission at the request of legislators who were close political allies of Edwin Edwards. Edwin Edwards also admitted to giving a

-22-

member of the Gaming Commission a list containing the riverboat applicants he wanted to receive certificates.

<p style="text-align:center">81.</p>

Defendant Robert J. Guidry and/or Treasure Chest, are liable unto plaintiff Copeland for damages resulting from the RICO persons' violations of 18 U.S.C. §§1962(b),(c) and (d), including treble damages, attorneys' fees, court costs, litigation expenses, and all other legal and equitable relief.

<p style="text-align:center"><u>Count Two -- Unfair Trade Practices</u></p>

<p style="text-align:center">82.</p>

The actions of defendants Robert J. Guidry and/or Treasure Chest, as outlined above, were unfair, immoral, unscrupulous, and violated public policy; defendants' actions were also deceptive. As a result, defendants Guidry and/or Treasure Chest are liable to plaintiff, a business competitor of Treasure Chest, for the unfair, deceptive, and illegal trade practices outlined above pursuant to the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, *et seq.* ("LUTPA").

<p style="text-align:center">83.</p>

Upon information and belief, Treasure Chest has failed to notify the Division and/or the Gaming Control Board of the actions outlined above, which constitutes a violation of the Louisiana Gaming Control Law (including without limitation a violation of LSA-R.S. 27:70). This noncompliance is an independent violation of the LUTPA, and continues each day Treasure Chest fails to disclose to the Gaming Control Board the facts surrounding Treasure Chest's acquisition of its license.

<p style="text-align:center">84.</p>

Defendants Robert J. Guidry and/or Treasure Chest are liable under the LUTPA for all damages sustained by the plaintiff, including without limitation his out of pocket costs, lost profits, attorneys' fees and costs, the value of Treasure Chest's gaming license, and the value of Treasure Chest's success.

<p style="text-align:center">-23-</p>

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 112 of 323

## Count Three -- Fraud

### 85.

As detailed above, Robert J. Guidry and/or Treasure Chest obtained a certificate and license by misrepresentations and/or suppressions of the truth concerning the overarching corrupt conspiracy, as well as their participation in extortion; these misrepresentations and/or suppressions were made with the intent to obtain an unjust advantage in obtaining a certificate and license. Robert J. Guidry and/or Treasure Chest are therefore liable for fraud under La. Civ. Code art. 2315.

### 86.

Robert J. Guidry and/or Treasure Chest fraudulently concealed the formation of and their participation in the overarching corrupt conspiracy, and all acts taken in furtherance thereof, in order to avoid or prolong discovery thereof and in an attempt to prejudice the rights of the victims, including plaintiff, of the overarching corrupt conspiracy and the constituent elements thereof. Plaintiff learned of Robert J. Guidry and/or Treasure Chest's fraudulent conduct within one year of the filing of this Petition.

### 87.

Robert J. Guidry and/or Treasure Chest are liable unto plaintiff for the fraud effected by the overarching conspiracy and the damages to plaintiff resulting therefrom, including without limitation his lost profits, attorney fees, costs, the value of Treasure Chest's gaming license, and the value of Treasure Chests's success.

## Count Four -- Unjust Enrichment

### 88.

Guidry and/or Treasure Chest are liable to Copeland for their unjust enrichment. As detailed above, the license awarded to Treasure Chest as a result of the overarching corrupt conspiracy should have been awarded to AIGA. Defendants have reaped enormous profits under the license, while Copeland (1) has both had to forego the profits he would have made under the license, and (2) has never recouped his out-of-pocket costs and expenses incurred in applying for it. Consequently, defendants have been unjustifiably enriched, and Copeland has been impoverished.

-24-

89.

As a result of defendants' unjust enrichment, Copeland is entitled, without limitation, to recoup his out-of-pocket costs and lost profits or, alternatively, the profits made by the defendants, pursuant to La. Civ. Code art. 2298. He is also entitled to recover the value of Treasure Chest's gaming license and the value of Treasure Chest's success.

### Solidary Liability

90.

Pursuant to 18 U.S.C. § 1962 and Louisiana Civil Code Article 2324, defendants are each jointly and severally liable unto plaintiff.

91.

### Respondeat Superior

Because all of the above-referenced acts undertaken by Robert Guidry were in the course and scope of his position with Treasure Chest and were done with actual and/or apparent authority provided to Guidry by Treasure Chest, Treasure Chest is liable to plaintiffs for these acts through the doctrines of *respondeat superior* and/or La. Civ. Code article 2320. Guidry's actions were rooted in his position with Treasure Chest and were incidental to its activities, and were done with Treasure Chest's consent.

### Jury Demand

92.

Plaintiff prays for trial by jury.

**WHEREFORE**, premises considered, plaintiff prays that after due proceedings be had, there be judgment against defendants Treasure Chest Casino, L.L.C. and Robert J. Guidry, for all damages, both pecuniary and nonpecuniary, suffered as a result of defendants' actions as set forth herein, including plaintiff's out of pocket costs and all lost profits, as well as the value of the Treasure Chest's gaming license and the value of Treasure Chest's success, legal interest, attorneys' fees, litigation costs, court costs, treble damages, and for all other

-25-

appropriate legal and equitable relief.

Respectfully submitted,

**SLATER LAW FIRM**

Benj. R. Slater, Jr., Bar No. 12126
Benj. R. Slater, III, Bar No. 12127, T.A.
A. Elise Brown, Bar No. 19500
Donald J. Miester, Jr., Bar No. 20294
S. Joseph Welborn, Bar No. 25928

650 Poydras Street
Suite 2600
New Orleans, LA 70130
Telephone: (504) 523-7333
Facsimile: (504) 528-1080
**ATTORNEYS FOR PLAINTIFF ALVIN C.
COPELAND**

**PLEASE SERVE:**

1.  **Treasure Chest Casino, L.L.C., through its registered agent for service of process:**
    Paul S. West
    One American Place
    Ninth Floor
    Baton Rouge, Louisiana 70825

    -and-

2.  **Robert J. Guidry**
    3817 Spencer Street
    Harvey, Louisiana   70058

CIVIL

☑ 01-DAMAGES
☐ 02-CONTRACT
☐ 03-PRISONER SUIT
☐ 04-EXECUTORY PROCESS
☐ 05-SUIT ON NOTES
☐ 06-EVICTION
☐ 07-WORKMENS COMPENSATION
☐ 08-JUDICIAL REVIEW
☐ 09-PROPERTY RIGHTS
☐ 10-INJUNCTION MANDAMUS

☐ 11-COMM. PROP. PARTITION
☐ 12-PUBLIC SERV. COMM.
☐ 13-OTHER PARTITIONS
☐ 14-OTHER
☐ 15-D.E.Q.
☐ 16-
☐ 17-
☐ 18-
☐ 19-
☐ 20-

CERTIFIED TRUE COPY

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH, LA

1999 SEP 15 PM 2: 32

DEPUTY CLERK OF COURT

DOUG WELBORN
CLERK OF COURT E.B.R. PARISH

CERTIFIED
TRUE COPY

SEP 2 2 1999

BY _____
DEPUTY CLERK

021017530

# CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP
## ATTORNEYS AT LAW

RIC~ ARD A. CHOPIN †‡
NELSON W. WAGAR, III †‡
KEVIN L. COLE ‡
THOMAS M. RICHARD
BRIAN L. REBOUL
ROBERT A. KUTCHER *
ELIZABETH SMYTH SIRGO
NICOLE S. TYGIER

MICHAEL L. COHEN
DIANA L. TONAGEL
PATRICIA D. TUNMER
JUDITH A. MILLER £
MATTHEW D. MONSON
CYNTHIA J. THOMAS Δ○
JASON P. FOOTE
JOHN G. ALSOBROOK
JAMES A. PRATHER
ANGELA M. HEATH
ALLEN K. TRIAL ‡

TWO LAKEWAY CENTER
SUITE 900
3850 NORTH CAUSEWAY BOULEVARD
METAIRIE, LOUISIANA 70002
TELEPHONE 504-830-3838
FACSIMILE 504-836-9540
www.chopin.com

Writer's Direct Number
504-830-3820
Writer's Direct Facsimile
504-836-9573
rkutcher@chopin.com

NORTHSHORE OFFICE

THREE SANCTUARY BOULEVARD
SUITE 301
MANDEVILLE, LOUISIANA 70471
TELEPHONE 985-674-6680
FACSIMILE 985-674-6681

† Professional Corporation
Δ Also Admitted in D.C.
* Also Admitted in New York
○ Also Admitted in Puerto Rico
‡ Also Admitted in Texas
£ Registered Nurse, BSN

464 607

POST *Please Reply to Metairie Office*

JAN 31 2003

January 30, 2003

## *VIA OVERNIGHT MAIL*

The Honorable J. Douglas Welborn
Clerk of Court
19th Judicial District Court
Parish of East Baton Rouge
222 St. Louis Street
Baton Rouge, LA 70802

**Attn: *Tracey Viola***

> **Re:** *Alvin C. Copeland v.*
> *Treasure Chest Casino, LLC and Robert J. Guidry*
> *19th JDC No. 464-607(D)*
> *Our File No. 245.2433*

Dear Tracey:

As per your conversation of this date with my secretary, enclosed please find the original and two copies of an Unopposed Motion and Order to Continue Hearing on Exceptions on behalf of plaintiff, Alvin C. Copeland, which we ask that you file into the record of the above captioned matter.

Please submit the same to the Judge for signature and return a signed/stamped copy to me in the enclosed self-addressed, postage prepaid envelope.

Should you have any questions, please do not hesitate to contact me.

REC'D C.P.
FEB ¨5 2003

REC'D C.P.
JAN 3 1 2003

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 116 of 323

COST OK Amt.

JAN 3 1 20

BY_____
DY CLERK OF COURT

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                        DIVISION "D"

ALVIN C. COPELAND

-versus-

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

Filed:_____          _____
                                                        Deputy Clerk

**UNOPPOSED MOTION TO CONTINUE HEARING ON EXCEPTIONS**

**NOW INTO COURT,** through undersigned counsel, comes plaintiff, Alvin C. Copeland, who respectfully avers as follows:

1.

The hearing on Robert Guidry's Exception of Prescription to Plaintiff's State Law Claims is currently set for hearing on February 10, 2003.

2.

Defendant, Treasure Chest Casino, LLC's Peremptory Exceptions to Plaintiff's Petition for Damages has also recently been set for hearing on February 10, 2003.

3.

Counsel for Guidry has advised that he shortly intends to file another peremptory exception.

4.

Counsel for all parties involved have conferred and agree that in the interest of judicial economy and minimizing undue expenses, the hearing on both Exceptions currently set for February 10, 2003 should be continued, to be reset following the filing of Guidry's additional exception.

REC'D C.P.
JAN 3 1 2003

REC'D C.P.
FEB ·· 5 2003

FAX COPY FILED  1-28-03
ORIGINAL FILED  1-31-03

Respectfully submitted,

**CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP**

By: _____
    **ROBERT A. KUTCHER** (LSBA #7895)
    **NICOLE S. TYGIER** (LSBA #19814)
    Two Lakeway Center, Suite 900
    3850 North Causeway Boulevard
    Metairie, Louisiana 70002
    Telephone: (504) 830-3838
    Facsimile: (504) 836-9573

*Attorneys for Plaintiff, Alvin C. Copeland*

## O R D E R

Considering the foregoing Unopposed Motion to Continue Hearing on Exceptions;

**IT IS HEREBY ORDERED** that the hearing on Treasure Chest Casino, LLC's

Peremptory Exceptions to Plaintiff's Petition for Damages and Guidry's Exception of Prescription

of Plaintiff's State Law Claims currently set for hearing on February 10, 2003, be continued, to be

reset by any party following the filing of the additional exception contemplated by Defendant,

Guidry.

~~DENIED~~

**BATON ROUGE, LOUISIANA,** this 3/ day of _____, 2003.

_____
                 **J U D G E**

*PLEASE NOTIFY:*

Paul S. West, Esq.
McGLINCHEY STAFFORD
One American Place, 9th Floor
Baton Rouge, LA 70825

Arthur A. Lemann, III, Esq.
ARTHUR A. LEMANN, III &
ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this

proceeding

            XX      Hand Delivery     ( )     Prepaid U.S. Mail
                   Facsimile        ( )     Overnight Delivery

Metairie, Louisiana, this 30th day of _____ 2003.

_____

2

TRANSMITTED/STORED : JAN. 28. 2003 4:58PM

| FILE | MODE | OPTION | ADDRESS | RESULT | PAGE |
|------|------|--------|---------|--------|------|
| 740 | MEMORY TX | | 915048369573 | OK | 1/1 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL          E-2) BUSY
E-3) NO ANSWER                      E-4) NO FACSIMILE CONNECTION

# POSTED
JAN 2 8 2003



## DOUG WELBORN
### CLERK OF COURT
19TH JUDICIAL DISTRICT
PARISH OF EAST BATON ROUGE

Suit Accounting Dept.
P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3392
Fax: (225) 389-3392
www.ebrclerkofcourt.org

## FAX RECEIPT

From:          Suit Accounting Department       Date: 1-28-03
Fax Number: (225) 389-3392                      Suit No.: 464607
To:            R. Kutcher                        Division: D

Copeland vs. Treasure Chest

Item(s) Received: mt to Continue

Amount Due (includes $5.00 Fax Fee and $.50 per page) $ 21.50

The Clerk of Court's office has received, by facsimile transmission, documents in the above referenced case. It has been filed as of this date. In accordance with R.S. 13:850 (B), the original and applicable fees should be forwarded to this office within five (5) days.

In accordance with 13:850 (B) (3), a transmission fee of $5.00 should be forwarded to the Clerk of Court with the original document. The fax filing fee is necessary even if filing in forma pauperis.

**NO FURTHER ACTION WILL BE TAKEN WITH THIS DOCUMENT UNTIL THE ORIGINAL AND NECESSARY FILING FEES ARE RECEIVED IN THIS OFFICE.**

**SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX-ISSUANCE BY ORIGINAL REQUESTS ONLY!**

**PLEASE ATTACH THIS RECEIPT TO YOUR ORIGINAL.
IF FILING IN PERSON, NOTIFY FILING CLERK OF PREVIOUS FAX.**

*Deputy Clerk of Court for*
*Doug Welborn, Clerk of Court*

Acct. Dept. Form #6
Rev. 1.2000

February 10, 2003 should be continued, to be reset following the filing of Guidry's additional exception.

Respectfully submitted,

CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP

By: _____

ROBERT A. KUTCHER (LSBA #7895)
NICOLE S. TYGIER (LSBA #19814)
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9573

*Attorneys for Plaintiff, Alvin C. Copeland*

## ORDER

Considering the foregoing Unopposed Motion to Continue Hearing on Exceptions;

IT IS HEREBY ORDERED that the hearing on Treasure Chest Casino, LLC's Peremptory Exceptions to Plaintiff's Petition for Damages and Guidry's Exception of Prescription of Plaintiff's State Law Claims currently set for hearing on February 10, 2003, be continued, to be reset by any party following the filing of the additional exception contemplated by Defendant, Guidry.

BATON ROUGE, LOUISIANA, this _____ day of _____, 2003.

_____
**J U D G E**

PLEASE NOTIFY:

Paul S. West, Esq.
McGLINCHEY STAFFORD
One American Place, 9th Floor
Baton Rouge, LA 70825

Arthur A. Lemann, III, Esq.
ARTHUR A. LEMANN, III &
ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

| | | | |
|---|---|---|---|
| ( ) | Hand Delivery | ( ) | Prepaid U.S. Mail |
| ( XX ) | Facsimile | ( ) | Overnight Delivery |

Metairie, Louisiana, this 16th day of _____, 2003.

_____

2

POSTED

FEB - 3 2003

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                        DIVISION "D"

**ALVIN C. COPELAND**

**-versus-**

**TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY**

Filed:_____                    _____
                                          Deputy Clerk        FEB 0 3 2003

                                          BY_____
                                          BY CLERK OF COURT

**MEMORANDUM IN OPPOSITION TO TREASURE CHEST CASINO, L.L.C.'S**
**PEREMPTORY EXCEPTIONS TO PLAINTIFF'S PETITION FOR DAMAGES**

**MAY IT PLEASE THE COURT:**

Plaintiff, Alvin C. Copeland ("Copeland"), submits this Memorandum in Opposition to
Treasure Chest Casino, L.L.C.'s Peremptory Exceptions to Plaintiff's Petition for Damages,
urging that this Court overrule these exceptions. Each of these Exceptions, prescription, non-
joinder of necessary parties, and *res judicata* is ill founded.

## I.        Prescription

Treasure Chest Casino, L.L.C. ("Treasure Chest") now urges that Plaintiff's Petition for
Damages should be dismissed on grounds of prescription, adopting the arguments of co-
defendant, Robert Guidry ("Guidry"). In the interests of economy, Copeland attaches hereto and
adopts the arguments contained in copies of his Memorandum in Opposition to the Exception of
Prescription of Plaintiff's State Law Claims (Exhibit "1") and his Memorandum in Opposition to
Exception of Prescription of Plaintiff's Civil RICO claim (Exhibit "2") which fully address
Treasure Chest's erroneous arguments, and urges that the Court consider these memoranda in
opposition to Treasure Chest's current exception. Like Copeland's claims against Guidry, his
claims against Treasure Chest are not prescribed by virtue of defendants' intentional concealment
and this Exception must be overruled.

FAX COPY FILED    1-31-03
ORIGINAL FILED    2-3-03

## II.    Non-Joinder of a Necessary Party

Treasure Chest's Exception states that "Plaintiff has failed to join parties in compliance with Articles 641 and 642 of the Louisiana Code of Civil Procedure." However, Treasure Chest has failed to identify who these parties are, and has failed to even brief this Exception. Under the circumstances, Copeland urges that this Exception must be overruled.

## III.    *Res Judicata*

Treasure Chest's final exception urges that the opinion of the First Circuit Court of Appeal in *Alvin C. Copeland v. Louisiana Gaming Control Board, et al*, 2000-2864 (La.App. 1 Cir. 9/11/02) constitutes *res judicata*. Copeland respectfully urges that this Exception be overruled.

### A.    *Factual Background*

When the instant suit was filed, it was accompanied by an Ex Parte Motion to Transfer and Consolidate (Exhibit "3") this case with the already pending action in Division "A" against the Gaming Control Board, *Alvin C. Copeland v. Louisiana Gaming Control Board, et al*, No. 400,750 (hereinafter "the Gaming Control Board" suit). Although the judge in division "A" accepted the transfer of this case, Treasure Chest filed a Memorandum in Opposition to Consolidation of Cases (Exhibit "4") in which it asserted that: "[t]he two actions involve **different types of actions**,[1] standards of review, **different defendants**[2] and are **based on different facts**" (p. 1), that the actions **"do not involve common issues of law and fact** as both involve different complex federal claims – constitutional and RICO claims, as well as numerous state claims **against different defendants** based on different allegations" and that **"common issues of law and fact do not predominate"** (pp. 3, 4). Following a similar opposition by the Gaming Control Board, (Exhibit "5"), and a hearing on November 15, 1999, this Court denied Copeland's Motion for Consolidation. (Exhibit "6").

Ignoring its earlier admissions to the contrary, Treasure Chest now abandons the arguments advanced to avoid consolidation and now urges that this case arises out of the same transaction or occurrence as the Gaming Control Board suit in order to maintain that the decision

---

[1] In the Gaming Control Board suit, Copeland sought both declaratory relief as well as damages against the Gaming Control Board. Treasure Chest intervened solely with respect to the Counts relating to declaratory relief, both of which were declared moot by the First Circuit Court of Appeal.
[2] The only common defendant to both suits is Treasure Chest, which intervened and was not sued by Copeland. Guidry was not a party to the Gaming Control Board suit and the Gaming Control Board is not a party to this suit.

of the First Circuit in *Alvin C. Copeland v. Louisiana Gaming Control Board, et al*, 2000-2864 (La.App. 1 Cir. 9/11/02) is *res judicata* as to Plaintiff's claims herein.

**B.    Law**

Until recently, the law of *res judicata* in Louisiana barred a second action only when the plaintiff sought the same relief based on the same cause of action.  LSA-C.C. Art. 2286.[3]  The law was revised and re-designated as present LSA-R.S. 13:4231.  See **Comments-1990(a)** to 13:4231 which now provides:

> Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
>
> (1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
>
> (2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment *bars a **subsequent action** on those causes of action.*
>
> (3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.

(Emphasis added).  While *res judicata* now focuses on transaction or occurrence rather than on demands, Louisiana courts still strictly construe the doctrine.

"*Res judicata* cannot be invoked unless all its essential elements are present and each necessary element has been established beyond all question.  The *res judicata* doctrine must be strictly construed, and any doubt concerning its applicability is to be resolved against the party raising the objection."  *Mandalay Oil & Gas, L.L.C. v. Energy Development Corp.,* 2001-0993 (La.App. 1 Cir. 7/3/02), 2002 WL 1434422, *4, *citing Berrigan v. Deutsch, Kerrigan & Stiles,* LLP, 2001-0612, (La.App. 4th Cir.1/2/02), 806 So.2d 163, 167, *writs denied*, 2002-0388, 2002-0341 (La.4/12/02), 813 So.2d 410.  *See also Griffin v. BSFI Western E & P, Inc.,* 2000-2122 (La.App. 1 Cir. 2/15/02), 812 So.2d 726, 730; *Kelty v. Brumfield*, 93-1142, (La.2/25/94), 633 So.2d 1210, 1215.

---

[3] "The authority of the thing adjudged takes place only with respect to what was the object of the judgment.  The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality."

3

Moreover, "[w]hile *res judicata* is a useful tool, it should not be used as a scythe applied mechanically to mow down claims where the party asserting the claim is not at fault for the lack of adjudication of that claim in the first suit." *Griffin*, 812 So.2d at 730-731, *quoting Terrebonne Fuel & Lube, Inc. v. Placid Refining Company*, 95-0654 (La.1/16/96), 666 So.2d 624, 635. In addition to strictly construing the elements of *res judicata*, La.R.S. 13:4232A specifically provides for exceptions to the general rule: "[w]hen exceptional circumstances justify relief," "the judgment dismissed the first action without prejudice," or "reserved the right of the plaintiff to bring another action." *Griffin*, 812 So.2d at 730, n. 2.

### 1. The suits do not arise out of the same "transaction or occurrence."

As Treasure Chest originally admitted and argued to this Court, this suit and the Gaming Control Board suit do not arise out of the same set of facts. La. R.S. 13:4231 does not define the term "transaction or occurrence," a pivotal term in determining whether either *Res judicata* or *Lis Pendens* applies. However, Louisiana Courts have relied upon the federal standard for guidance. In *Hy-Octane Investments, Ltd. v. G & B Oil Products, Inc.*, 97-28 (La. App. 3 Cir. 10/29/97), 702 So.2d 1057, 1060, it was noted that:

> *Black's Law Dictionary* defines "transaction" as, *inter alia*, "a broader term than 'contract," and "a group of facts so connected together as to be referred to by a single legal name; as a crime, a contract, a wrong." Among the definitions of "transaction or occurrence" found in 42 Words and Phrases, Supp. p. 201 (1997), is "whether pertinent facts of different claims are so logically related that issues of judicial economy and fairness mandate that all issues be tried in one suit." The federal courts have given the words "transaction or occurrence" a broad and liberal interpretation in order to avoid a multiplicity of suits. All logically related events entitling a person to institute legal action against another generally are regarded as comprising a "transaction or occurrence." *Lasa Per L'Industria Del Marmo Soc. Per Azioni v. Alexander*, 414 F.2d 143 (6th Cir. 1969).

*Hy-Octane Investments, Ltd. v. G & B Oil Products, Inc.*, 97-28 (La.App. 3 Cir. 10/29/97), 702 So.2d 1057, 1060.

Under this standard, adopted from the federal law, "the critical issue is not the relief requested or the theory asserted, but whether the plaintiff bases the two actions on the same nucleus of operative facts." *In re Howe*, 913 F.2d 1138, 1144 (5th Cir. 1990) (emphasis added). Treasure Chest's current position that the two suits arise out of the same transaction or occurrence and hence the same nucleus of operative facts is disingenuous and directly contrary to its prior admissions and with this Court's prior ruling. If the set of facts giving rise to the Gaming Control Board suit in 1999 was different from those in the instant suit when the Motion

4

to Transfer and Consolidate was denied in November 1999, they remain so today and Treasure Chest's Exception of *Res Judicata* must be overruled.

### 2. *This suit is not a "subsequent action."*

As previously noted, the *res judicata* statute must be strictly construed. A strict reading of the statute reveals that it is not applicable, as in the instant case, to operate to bar an action which was instituted prior to the judgment alleged to be *res judicata*. The statute provides:

> (2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment *bars a subsequent action* on those causes of action.

(Emphasis added). As the statute speaks only of barring a subsequent action, the Court of Appeal's September 2002 Judgment cannot operate to bar an action which was filed prior to the judgment. Accordingly, Treasure Chest's Exception of *res judicata* must be overruled because it has failed to prove this element of the statute.

### 3. *Exceptional circumstances justify relief from res judicata effect.*

Finally, even if this Court should somehow find that the elements set forth in La.R.S. 13:4231 have been proven by a preponderance of the evidence, and that no doubts exist as to its application, Copeland alternatively urges that the provisions of La.R.S. 13:4232 justify relief from the application of *res judicata* under the unique circumstances of this case. That statute provides, in pertinent part:

> § 4232. Exceptions to the general rule of *res judicata*
>
> A. A judgment does not bar another action by the plaintiff:
>
> (1) When exceptional circumstances justify relief from the *res judicata* effect of the judgment;

This statute gives a court authority to exercise its equitable discretion to balance principles of *res judicata* with interests of justice. *Fine v. Regional Transit Authority*, 95-2603 (La.App. 4 Cir. 6/26/96), 676 So.2d 1134. It is appropriately invoked to avoid the pitfalls of the procedural rule[4] regarding mandatory joinder of claims in the interests of justice. *Craig v. Adams Interiors, Inc.*, 34,591 (La.App. 2 Cir. 4/6/01), 785 So.2d 997, 1002, citing *Hudson v. City of Bossier*, 33,620 (La.App. 2 Cir. 8/25/00), 766 So.2d 738, *writ denied* 00-2687 (La.11/27/00), 775 So.2d 450.

---

[4] La. C.C.P. art. 425A. provides: "A party shall assert all causes of action arising out of the transaction or occurrence that is the subject matter of the litigation."

5

Although Copeland maintains that the provisions of La. R.S. 13:4231 do not apply, even if this Court were to so find, a more compelling circumstance for the application of La. R.S. 13:4232A(1) would be difficult to even imagine. Copeland filed the Gaming Control Board Suit in 1993, and after Treasure Chest intervened as a defendant in that suit, attempted to consolidate that action with this one, urging the predominance of common issues of law and fact. Treasure Chest opposed the consolidation, and yet now comes before this same court urging that the two suits concern the same transaction or occurrence, and that it should be entitled to the dismissal of this suit based on the common issues of fact. Under the circumstances, justice clearly justifies relief from *res judicata*.

## IV. Conclusion

All three of Treasure Chest's exceptions must be overruled. Prescription was interrupted by the defendants' fraud and intentional concealment of facts, as set forth in Copeland's separate memoranda on the issue of both RICO and state law claims. Treasure Chest has not even briefed its Exception of Non-Joinder, which must be overruled for that reason alone. Finally, this suit is not barred by *res judicata* as the required elements are not met: this suit concerns a different transaction or occurrence, and is not a "subsequent action" to the judgment urged to bar it. Moreover, even if *res judicata* were to apply, exceptional circumstances exist for which this Court should overrule this Exception.

Respectfully submitted,

**CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP**

By: _____
**ROBERT A. KUTCHER** (LSBA #7895)
**NICOLE S. TYGIER** (LSBA #19814)
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9573

*Attorneys for Plaintiff, Alvin C. Copeland*

6

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

(    )     Hand Delivery          (    )     Prepaid U.S. Mail
(  L  )     Facsimile              (    )     Overnight Delivery

**Metairie, Louisiana**, this 31st day of January , 2003.

7

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607  ·                                              DIVISION "D"

## ALVIN C. COPELAND

### -versus-

### TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

Filed:_____        _____
                                         Deputy Clerk

## MEMORANDUM IN OPPOSITION TO EXCEPTION OF PRESCRIPTION OF PLAINTIFF'S STATE LAW CLAIMS BY DEFENDANT, ROBERT J. GUIDRY

**MAY IT PLEASE THE COURT:**

Plaintiff, Alvin C. Copeland ("Copeland"), submits this Memorandum in Opposition to the Exception of Prescription of Plaintiff's State Law Claims herein on behalf of defendant, Robert J. Guidry ("Guidry"). Although the state law causes of action bear different prescriptive periods, this Exception, like Guidry's previously filed and now reurged Exception of Prescription of Plaintiff's RICO Claim, ultimately must be denied based upon the defendant's intentional fraudulent concealment of the conspiracy and plaintiff's pled and demonstrated reasonable diligence with respect to his attempts to discover the defendant's conduct. The legal sources and terminology used with respect to the issues of federal statutes of limitation and state prescription vary, but the analysis and ultimately the result are the same. Plaintiff's claims are timely, and both[1] of these Exceptions must be overruled.

## I.    INTRODUCTION

Copeland filed this suit as a result of substantial losses incurred by him in his pursuit of a license to operate a proposed riverboat gaming operation at the Kenner Laketown Harbor Park

---

[1] A copy of the previously filed Opposition to Exception of Prescription of Plaintiff's Civil RICO Claim is attached hereto as Exhibit "A."

EXHIBIT

1

on the shores of Lake Pontchartrain in Jefferson Parish. As the result of "an overarching corrupt conspiracy," *i.e.* a scheme to corrupt the entire process for issuing riverboat gaming licenses in which both Treasure Chest Casino, LLC ("Treasure Chest") and Guidry participated and engaged in overt acts in furtherance of, the license was not awarded to Copeland, but to Treasure Chest. Copeland has filed this suit, seeking to hold Defendants accountable for both the expenses he incurred in attempting to fairly participate in the process subverted by Defendants' conduct, as well lost profits, attorneys' fees and costs, and the value of the corruptly obtained Treasure Chest gaming license and of its ill begotten success.

The method for Copeland's pursuit of these goals is his Petition for Damages, which alleges the Defendants' civil responsibility for their actions under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 *et seq.* ("RICO"), the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401 *et seq.* ("LUTPA"), Louisiana Civil Code Articles 2315 (Tortious Fraud), and 2298 (Unjust Enrichment). Copeland also alleges that Defendants are solidarily liable under 18 U.S.C. §1962 and Louisiana Civil Code Article 2324, and that Treasure Chest is liable for the actions of Robert Guidry under the doctrines of apparent authority, *respondeat superior* and La. C.C. art. 2320.

Copeland filed his Petition for Damages on September 15, 1999, less than a year after defendant, Robert Guidry pled guilty and the details of Guidry's conspiracy came to light with the indictment of Edwards on November 6, 1998. On that same date, September 15, 1999, Copeland also filed an Ex Parte Motion to Transfer and Consolidate the case filed with a related action pending in Division "A", *Alvin C. Copeland v. Louisiana Gaming Control Board, et al*, bearing docket number 400-750. Prior to the hearing on the Motion for Consolidation, defendant, Guidry, filed a Motion to Stay all matters in this action until the disposition of the federal criminal proceeding in *United States of America v. Edwin Edwards*, criminal docket number 98-165-B-M2, United States District Court for the Middle District of Louisiana. A Consent Judgment was entered on December 7, 1999, staying this matter up to and including March 14, 2000. This Stay was subsequently extended by a Joint Motion for Entry of Consent Judgment on April 5, 2000, until fifteen days following the return of a jury verdict in the *Edwards* matter.

2

Following the Edwards guilty verdict, on or about October 6, 2000, defendant, Robert Guidry filed an Exception of No Cause of Action and an Exception of Prescription as to plaintiff's civil RICO claim, and an Exception of No Right of Action or in the Alternative, Exception of Vagueness in this matter. Plaintiff opposed all of these Exceptions. A hearing was held in this matter on November 13, 2000 and on March 6, 2001, the Court rendered a Judgment dismissing plaintiff's Petition solely on the basis on the Exceptions of No Cause of Action. The Court of Appeal reversed that matter, ruling that Copeland had stated a cause of action, and remanded on June 21, 2002. Subsequently, Guidry re-urged the Exception of Prescription of Civil RICO Claims which was never ruled on, and filed the instant Exceptions, urging that plaintiff's state claims should be dismissed as well.

## II. LAW AND ARGUMENT

Contrary to the representation made by Guidry in his Memorandum in Support of Exception of Prescription of State Law Claims, as with his RICO claims, none of Copeland's claims are prescribed. Although each of the claims is subject to a different prescriptive period, none of those prescriptive periods expired prior to the filing of this suit.

### A. Unjust Enrichment.

Contrary to the defendant's citation of *Aetna Life and Casualty Company v. Dotson*, 346 So.2d 762 (La. App. 1st Cir.) *writ denied*, 349 So.2d 1272 (La. 1977), there is substantial jurisprudence to the effect that an action for unjust enrichment is prescribed by ten (10) years. *Safeco Insurance Company v. Farm Bureau Insurance Companies*, 490 So.2d 565 (La. App. 3rd Cir. 1986). Even following the *Dotson* decision, the First Circuit continued to rule that claims such as unjust enrichment, which are quasi contractual, are subject to a ten-year prescriptive period, making the precedential value of the *Dotson* decision extremely dubious. *Julien v. Wayne*, 415 So.2d 540 (La.App. 1 Cir. 1982), citing *State ex rel. Guste v. Estate of Himbert*, 327 So.2d 698 (La.App. 1st Cir. 1976), *writ den.* 330 So.2d 308, 311 (La.1976); *Smith v. Phillips*, 175 La. 198, 143 So. 47 (1932); *Lagarde v. Dabon*, 155 La. 25, 98 So. 744 (1924).

"The commentators are divided on the issue" of whether quasi contractual claims are subject to a one or ten year prescriptive period, *Fidelity & Deposit Co. of Maryland v. Smith*, 730 F.2d 1026 (5th Cir.1984), and while the First Circuit appears to have not addressed the issue in recent years, those courts that have done so **subsequent to the 1984 obligations revision** have

3

ruled that actions in quasi contract are subject to a **ten-year prescriptive period**. *Burns v. Sabine River Authority,* 1998-1536 (La.App. 3 Cir. 5/5/99), 736 So.2d 977, citing *Kilpatrick v. Kilpatrick,* 27,241 (La.App. 2 Cir. 8/23/95); 660 So.2d 182, *writ denied,* 95-2579 (La.12/15/95); 664 So.2d 444; *Taylor v. Smith,* 619 So.2d 881 (La.App. 3 Cir.), *writ denied,* 625 So.2d 1038 (La.1993).

Copeland's unjust enrichment claim is subject to a ten-year prescriptive period, which clearly did not expire prior to the filing of this suit. Of course, even if defendants' contention is correct and the court should determine that a one-year prescriptive period under La. C.C. art. 3492 should apply with respect to claims for unjust enrichment, then this claim would still be viable by virtue of the doctrine of *contra non-valentem* as set forth later in this memo with respect to Copeland's other claims.

### B.     Unfair Trade Practices.

Copeland's petition states a claim under the Louisiana Unfair Practices Act, which as correctly noted by Guidry, is generally subject to a one-year peremptive statute of limitations under La. R.S. 51:1409(E). However, counsel for Guidry's fanciful attempts to "distinguish" the recent ruling of the First Circuit Court of Appeal in *Capitol House Preservation Company, LLC v. Perryman Consultants, Inc.,* 1998-2216 (La. App. 1st Cir. 11/5/99), 745 So.2d 1194, *writ denied,* 1999-3446 (La. 2/11/2000), 754 So.2d 937, are in reality nothing more than a statement of counsel's disagreement with the holding of that case as applied to the instant case, and a citation to irrelevant case law from other courts of appeal. The fact is that *Capitol House Preservation Company* is binding authority on this Court, and is directly on point with respect to the instant case. In that case, citing its previous decision the Court of Appeal noted:

> The duty to disclose violations of the Riverboat ... Act under La. R.S. 27:70(C) is a continuing one which does not end with the receipt of a license and is equally applicable whether a "person" is an applicant, or subsequently, a licensee. Each day that a "person" fails to disclose a violation of the Act of which he is aware constitutes a new breach of the statutory duty to disclose which breach continues anew each day until the disclosure occurs.

*Capitol House Preservation Company,* 745 So.2d at 1196.   Guidry's argument as to inapplicability of this case to the facts at hand are simply erroneous and the cases which he relies to support this distinction do not do so.

Contrary to Guidry's contention, there is no reason to conclude that the First Circuit in *Capitol House Preservation Company* did not contemplate the case law cited by Guidry, all of

4

02031187011

which was decided prior to the *Capitol House Preservation Company* decision. In fact, a review of these cases reveals that they, unlike *Capitol House Preservation Company* itself, are wholly inapplicable and distinguishable.

*Our Lady of the Lake Hospital v. Carboline*, 92-2121 (La.App. 1 Cir. 12/29/93), 632 So.2d 339, *writ denied*, 94-0287, (La. 3/25/94), 635 So.2d 228, for example, was a products liability suit in which the Court of Appeal reversed the dismissal on prescription grounds based on the discovery of documents tending to establish that the manufacturer made deliberate misrepresentations which "may have had the effect of lulling [the plaintiff] into a false belief that the corrosion problems had been effectively eliminated." *Our Lady of the Lake Hospital,* 632 So.2d at 344. To the extent this case is relevant at all, it stands for the proposition that an exception of prescription is improperly granted without appropriate "consideration of this crucial evidence as it applies to the doctrines **of *contra non valentem*** and continuing tort." *Id.*

Similarly, *Bunge Corp. v. GATX Corporation*, 557 So.2d 1376 (La.1990), dealt with different facts, a different statute, and was effectively legislatively overruled. *GHR Energy Corp. v. Carboline Company*, 744 F.Supp. 1405, 1406 (E.D.La.1990). In short, while the facts in the instant case do not establish that Copeland received notice of "defendant's failure to disclose over one year before suit was filed," 744 F.Supp. at 1407, n. 4, these cases were decided almost ten years prior to the binding decision in *Capitol House Preservation Company* and counsel for Guidry relies upon these cases merely to attack the clear and binding determination by the First Circuit in that case which establishes that each of Guidry's failures to disclose violations of the Act is a new breach of the statutory violation which continues anew each day until the disclosure occurs. Copeland's unfair trade practices claims are not perempted.

### C.    *Contra Non-Valentem – Delictual Claims.*

The remainder of Copeland's state court claims, tortious fraud, (and unjust enrichment in the unlikely event that it is not subject to a ten-year prescriptive period) are governed by the one-year prescriptive, rather than peremptive period under La. C.C. art. 3492. However, just as the federal courts have recognized that the RICO statute of limitations is subject to tolling on the basis of a defendant's fraudulent concealment, so to have Louisiana courts repeatedly recognized that the doctrine of *contra non-valentem agere nulla currit praescriptio* applies to suspend

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 132 of 323

liberative prescription when there is a legal cause which prevents the running of prescription under four discrete circumstances or categories.

> (1) When there is a legal cause that prevented courts or their offices from taking cognizes of or acting on the plaintiff's actions; (2) where there is a condition coupled with the contract or connected with the proceeding that prevented the creditor from suing or acting; (3) **when the debtor himself did some act that effectually prevented the creditor from availing himself of his cause of action;** (4) when the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by defendant. (Emphasis added.)

*Hendrick v. A.B.C. Insurance Company*, 2000-2403 (La. 5/15/01), 787 So.2d 283, 290, quoting *Corsey v. State, through Dept. of Corrections*, 375 So.2d 1319, 1321-22 (La. 1979). It is this third species of *contra non-valentem* which is plainly applicable to the facts of the case at hand, and functions identically to the doctrine of fraudulent concealment, previously noted by defendant with respect to Guidry's Exception of Prescription of Plaintiff's Civil RICO claim. Notably, in Paragraph 77 of his petition, plaintiff specifically noted:

77.

> The RICO persons fraudulently concealed their illegal activities, and plaintiff neither knew nor, in the exercise of due diligence, could reasonably have known of the offenses committed by the members of the RICO enterprise.

In addition to this general allegation and the allegations that Guidry and others concealed their involvement in the overarching corrupt conspiracy noted by Guidry in his Memorandum in Support, Plaintiff has also noted specific affirmative acts of fraudulent concealment. In particular, Paragraph 25 of the Petition specifically alleges:

25.

> The State Police held a hearing into Treasure Chest's application in Baton Rouge, La. on May 17, 1994. At this hearing, the following exchange took place between Captain Mark Oxley of the Division and Robert Vosbein, counsel for Treasure Chest, who was under oath:

Capt. Oxley: And are you testifying that there are no elected public officials doing business with Treasure Chest?

Mr. Vosbein: That's correct.

> This statement was made by Mr. Vosbein as agent for Treasure Chest and/or Guidry; on information and belief, it was based on information supplied to him by Treasure Chest and/or Guidry. Treasure Chest's representations, through its agent Mr. Vosbein, violated LSA-R.S. 27:70C in failing to disclose Treasure Chest's relationship with Edwin Edwards, which was prohibited by LSA-R.S. 27:96A.

6

Plaintiff also specifically pled that Guidry further committed another affirmative act of concealment by executing an Affidavit of Full Disclosure on February 2, 1993, falsely representing the involvement of Edwards in the overarching corrupt conspiracy:

> 27.
>
> > In conjunction with his submittal of the Treasure Chest application for a license, Guidry executed an "Affidavit of Full Disclosure" on February 26, 1993, wherein Guidry averred, in pertinent part:
> >
> > > ... except as reported in the Application, I have no agreements or understandings with any person or entity and no present intent to pay any sums of money or given anything of value as, including but without limitation, a finder's fee or commission to any person or entity related to the acquisition of any interest in the Application ...
> >
> > Pursuant to LSA-R.S. 27:70C, Guidry had a continuing duty to render a full and accurate disclosure of his association with Edwin Edwards as set forth herein. Upon information and belief, Guidry has never disclosed this association, and has therefore violated his duty under LSA-R.S. 27:70C.

In the instant case, Plaintiff has clearly and unequivocally alleged that Defendants actively concealed their fraudulent conduct so as to prevent Plaintiff from realizing that the injury he suffered on or about May 17, 1994, was the result of an overarching corrupt conspiracy prohibited by and punishable under the RICO statute.

While Guidry notes that Plaintiff has not belabored in his pleadings the facts supporting his "due diligence" with respect to his discovery of the Defendants' conduct, a review of the Petition establishes that Plaintiff diligently attempted to keep himself abreast of developments with respect to the processes involving the issuance of licenses and certificates of preliminary approval. In fact, it is specifically noted that Plaintiff objected to Treasure Chest's request for permission to modify its previously filed application to move the site of its proposed route and operations to Lake Pontchartrain (Petition, para. 18). Moreover, a review of the Petition clearly reveals that Plaintiff in fact diligently monitored local newspapers, including the Times-Picayune.

Just as the degree of due diligence to plead fraudulent concealment with respect to a RICO claim is a question of fact depending upon the totality of the circumstances, so to is the question of whether a plaintiff exercised reasonable diligence in the discovery of fraud a factual question under Louisiana law. In *Hospital Service District No. 1 of Jefferson Parish v. Alas*, 94-

7

897 (La. App. 5th Cir. 6/28/95), 657 So.2d 1378, 1383, *writ denied*, 95-1959 (La. 11/13/95), 662

So.2d 473:

> Jurisprudence tells us that to avoid the running of prescription, a plaintiff must show he did not know of facts upon which to base a claim nor did he have reason to know or discover such facts, and that the lack of knowledge is not attributable to his fault ...
>
> For purposes of the discovery doctrine of *contra non valentem*, a plaintiff will be deemed to know that which he could have learned from reasonable diligence. ... If an opportunity is afforded to a party to know and to learn about a certain matter bearing on his interest and he fails or refuses to profit by it, if he closes his eyes to the notice spread before him and shuts his ears to oral information directly imparted to him, the law will hold him as bound by the same, and as fully notified as if he had taken thorough personal cognizance at the time of the information imparted and of the notice given.

The same facts which would support due diligence with respect to RICO equally demonstrates reasonable diligence for Louisiana prescriptive period purposes. Copeland's petition establishes his diligence in keeping himself informed by monitoring newspapers and events, and neither the pleadings nor any evidence submitted by Guidry establishes that he closed his eyes or shut his ears.

In fact, the instant case is in all pertinent matters indistinguishable from the decision of the First Circuit in *Paragon Development Group, Inc. v. Skeins*, 96-2125 (La. App. 1st Cir. 9/19/97), 700 So.2d 1279, wherein the First Circuit held in a suit to recover damages from a subcontractor resulting from theft at a construction site that prescription was suspended pursuant to the theory of *contra non valentem* until such time as the company was alerted that there may have been an arrest for the thefts.

In *Paragon Development Group, Inc.*, the plaintiff-developer suffered losses from theft at a construction site in June or July of 1994. Paragon did not file suit until August 31, 1995, claiming that it first learned the identity of the party responsible in May of 1995 when it received a restitution check from the district attorney's office. The defendant, the father of the perpetrator, filed an exception of prescription, urging that a principal of the plaintiff company was aware of the perpetrator's involvement soon after the incident occurred, that he had called the perpetrator the day after the theft, and even given the boy's name to the police officers investigating the crime. *Paragon Development Group, Inc.*, 700 So.2d at 1282.

While the trial court agreed with the defendant and granted the exception of prescription,

the First Circuit disagreed, beginning its analysis with a quotation from the Louisiana Supreme

Court:

> Prescription will not begin to run at the earliest possible indication that a plaintiff
> may have suffered some wrong. Prescription should not be used to force a person
> who believes he may have been damaged in some way to rush to file suit against
> all parties who might have caused that damage. On the other hand, a plaintiff will
> be responsible to seek out those whom he believes may be responsible for a
> specific injury.
>
> When prescription begins to run depends on the reasonableness of a plaintiff's
> action or inaction.

*Paragon Development Group, Inc.*, 700 So.2d at 1282, quoting *Jordan v. Employee Transfer

Corporation,* 509 So.2d 420, 423 (La.1987). The First Circuit's analysis of the issue was telling:

> The trial judge found, according to his written reasons for judgment, that
> appellant's inaction was unreasonable and that it had failed to properly "seek out
> those whom [it] believ[ed] responsible" for the thefts against Putt-Putt. We
> disagree. It is apparent, based upon testimony that Eddie Horridge telephoned
> Scott the morning after the first theft and that Bryan Horridge provided Scott's
> name to the police, **that the brothers suspected Scott's involvement** in these
> crimes from the onset. **However, it is equally apparent that they lacked actual
> proof to support their suspicions,** otherwise the minor Skeins would likely have
> been arrested immediately following the thefts. **The issue then becomes
> whether the mere suspicion that a party** *may* **be responsible for a crime is
> sufficient to support bringing a cause of action for damages. We conclude
> that it is not.**
>
> Applying the principles enounced in *Jordan* to the present circumstances, we find
> that the discovery rule prevented commencement of the running of prescription
> until principals of Paragon had sufficient notice to pursue a claim against a
> particular defendant. *See Jordan v. Employee Transfer Corp.,* 509 So.2d at 424.
> At the earliest, this occurred in September of 1994 when Scott Skeins' mother
> contacted Eddie Horridge. This incident was probably sufficient to alert appellant
> to make further inquiry concerning whether there had been an arrest for the thefts
> against Putt-Putt. Prior to this point, appellant's inaction was reasonable.
> Therefore, until September of 1994, prescription was suspended pursuant the
> theory of *contra non valentem,* and appellant's suit, filed on August 31, 1995, was
> timely.

*Paragon Development Group, Inc.*, 700 So.2d at 1282 (emphasis added). Although the crimes in

the instant case are far more complicated than a simple theft, the reasoning is equally applicable

to the instant case. Copeland was certainly aware well prior to the filing of this suit of

irregularities in the licensing process, and in fact, instituted *Alvin C. Copeland v. Louisiana

Gaming Control Board, et al,* No. 400-750 in 1993. However, Copeland knew virtually nothing

of the scheme, the particular players involved, and certainly lacked proof until such time as the

Edwards/Guidry indictments were handed down. Insofar as Plaintiff filed suit on September 15,

9

1999, within one-year from the date of these indictments, his suit is timely, and Guidry's exceptions must be overruled.

### D.    Astoria is irrelevant.

Finally, Plaintiff respectfully urges that this Court is not bound by the district court's ruling in *Astoria Entertainment, Inc. v. Edwards*, 159 F.Supp.2d 303 (E.D.La.2001), nor is that court's analysis of the prescription of a different alleged victim of Guidry's conduct particularly helpful or relevant to the case at hand. Astoria's attempts to pursue Guidry by means of an antitrust suit, the pleadings dealt with on the motion to dismiss presented to the district court, and the facts of that case, particularly the facts as to Astoria's knowledge and diligence with respect to the filing of the action, are completely different from those presented in the instant suit.

Leaving aside the fact that the district court did not even address the merits of the pendent state law claims other than to dismiss them based in part on the pendency of another state lawsuit, *Astoria*, 159 F.Supp.2d at 329, the *Astoria* court's analysis of Astoria's pleadings reveals some startling dissimilarities. Unlike Copeland's petition, the Astoria complaint did not sufficiently plead that "the defendants concealed the conduct complained of ... [or] ... that the [Astoria] failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim." *Id.* As Copeland has previously noted in his Memorandum in Opposition to Exception of Prescription to Plaintiff's RICO Claim, Copeland has done this. Moreover, a review of that opinion also reveals that Astoria pled other allegations not at all contained in Copeland's complaint, such as that "Robert Guidry and Robert List boasted of their involvement in the illicit activity," which lead the *Astoria* court to conclude that as to Astoria, presumably the audience of those boasts, the scheme was "an overt scheme as opposed to a covert scheme." *Id.*

What Copeland knew and what Astoria knew, what diligence they exercised, and what they pled are entirely different, notwithstanding the fact that they both claim to have been the victims of Guidry's wrongdoing. This Court should not forsake its judicial duty to examine the merits of the case at hand merely so as to fashion a ruling "in harmony" with Guidry's partial victory over another alleged victim.

### III.    CONCLUSION

Neither Copeland's petition, nor any evidence submitted by Guidry supports the proposition that any of Copeland's claims are prescribed or perempted. To the contrary,

10

Copeland's petition, unrefuted by any evidence to the contrary, clearly establishes that as a result of Guidry's intentional concealment of his crimes, Copeland's diligence was unable to reveal facts sufficient to trigger the running of prescription until Guidry admitted to those facts in his guilty plea and the resulting Edwards indictment. Considering the foregoing, Guidry's exception must be denied.

Respectfully submitted,

**CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP**

By: _____
    **ROBERT A. KUTCHER** (LSBA #7895)
    **NICOLE S. TYGIER** (LSBA #19814)
    Two Lakeway Center, Suite 900
    3850 North Causeway Boulevard
    Metairie, Louisiana 70002
    Telephone: (504) 830-3838
    Facsimile: (504) 836-9573

*Attorneys for Plaintiff, Alvin C. Copeland*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

| ( ) | Hand Delivery | ( ) | Prepaid U.S. Mail |
| ( L ) | Facsimile | ( ) | Overnight Delivery |

**Metairie, Louisiana**, this 31s day of January , 2003.

_____

19ᵀᴴ JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                           DIVISION "D"

ALVIN C. COPELAND

-versus-

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

Filed:_____        _____
                                                           Deputy Clerk

## MEMORANDUM IN OPPOSITION TO EXCEPTION OF PRESCRIPTION OF PLAINTIFF'S CIVIL RICO CLAIM

**MAY IT PLEASE THE COURT:**

Plaintiff, Alvin C. Copeland ("Copeland"), the successor to American International Gaming Association, Inc. ("AIGA"), submits this Memorandum in Opposition to the Exception of Prescription of Plaintiff's Civil RICO Claim filed herein by Defendant, Robert Guidry.

## I.    INTRODUCTION

Copeland filed this suit as a result of substantial losses incurred by him in his pursuit of a license to operate a proposed riverboat gaming operation at the Kenner Laketown Harbor Park on the shores of Lake Pontchartrain in Jefferson Parish. As the result of "an overarching corrupt conspiracy," i.e. a scheme to corrupt the entire process for issuing riverboat gaming licenses in which both Treasure Chest Casino, LLC and Robert Guidry joined, participated and engaged in overt acts in furtherance of, the license was not awarded to Copeland, but to Treasure Chest Casino, LLC. Copeland has filed this suit, seeking to hold Defendants accountable for both the expenses he incurred in attempting to fairly participate in the process subverted by Defendants' conduct, as well lost profits, attorneys fees and costs, and the value of the corruptly obtained Treasure Chest's gaming license and of its ill begotten success.

The method for Copeland's pursuit of these goals is his Petition for Damages, which alleges the Defendants' civil responsibility for their actions under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 *et seq.*, the Louisiana Unfair Trade Practices Act, La.R.S. 51:1401 *et seq.*, Louisiana Civil Code Article 2315 (Tortious Fraud), and 2298 (Unjust Enrichment). Copeland also alleges that Defendants are solidarily liable under 18 U.S.C.

EXHIBIT
2

§1962 and Louisiana Civil Code Article 2324, and that Treasure Chest is liable for the actions of Robert Guidry under the doctrines of apparent authority, respondeat superior and La.C.C.art. 2320. Despite the fact that Plaintiff neither knew nor could have known of the overarching corrupt conspiracy until it became public knowledge on or about November 6, 1998, Guidry now claims that Plaintiff's claim sunder the RICO act are prescribed.

## II.    LAW AND ARGUMENT

Although Plaintiff does not dispute that the holding of the United States Supreme Court in *Rotella v. Wood*, 120 S.Ct. 1075 (2000) provides for a four year statute of limitation applying to Civil RICO claims which runs from the date the Plaintiff knew or should have known of the injury caused by Defendant's acts in violation of RICO, he nevertheless submits that the claims brought herein are not prescribed by virtue of the Doctrine of Fraudulent Concealment and Equitable Tolling as set forth in *Klehr v. AO Smith Corp.*, 117 S.Ct. 1984 (1997). The key issue, therefore, is when the Plaintiff should have known of the injury caused by the Defendants. Contrary to Guidry's contention, that period was not triggered by the loss of the license awarded to Treasure Chest. At that time, due to the active concealment of the Defendants, which facts are a matter of public record, Plaintiff was not and could not have been aware that he suffered a RICO injury. Instead, Plaintiff's injury only accrued when the scheme to defraud became public knowledge. That occurred in November of 1998, less than four years prior to the institution of this action by Plaintiff, and as such, Plaintiff's claim has not prescribed. Clearly, the rulings on RICO limitations periods were not intended to reward fraudulent acts on behalf of those who have positively and actively violated the law and then purposefully concealed those acts from their victims.

As correctly noted by Guidry, since the filing of this lawsuit, the United States Supreme Court has twice addressed a split between the circuits regarding the choice of appropriate applications of statutes of limitations for Civil RICO claims. However, as Guidry also admits, the Supreme Court's indication that the pattern discovery rule does not apply in no way was meant to obviate the settled "understanding that the federal statutes of limitations are generally subject to principles of **equitable tolling**...and where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer to a plaintiff's difficulty...." *Rotella*, 120 S.Ct. at 1084, *citing Klehr*, 117 S.Ct. 1984 (emphasis added)

2

Under this doctrine, to avail itself of fraudulent concealment, a Plaintiff has the burden of proving that the Defendants concealed the conduct complained of, that the Plaintiff failed, despite the exercise due diligence on their part to discover the facts that form the basis of his claim. *Morton Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823 (11 Cir. 1999), *amended in part*, 211 F.3d 1224 (11 Cir. 2000), *cert. den.*, 120 S.Ct. 3724 (2000); *Blue Cross & Blue Shield of New Jersey, Inc. v. Phillip Morris, Inc.*, 113 F.Supp. 2d 345 (E.D.N.Y. 2000); *Tanaka v. First Hawaiian Bank*, 104 F.Supp. 2d 1243, 1252-1253 (D.Hawaii 2000).

In the instant case, Copeland has alleged facts sufficient to invoke the Doctrine of Fraudulent Concealment. In general terms, Plaintiff, in his Petition, Paragraph 77, specifically noted:

77.

> The RICO persons fraudulently concealed their illegal activities, and plaintiff neither knew nor, in the exercise of due diligence, could reasonably have known of the offenses committed by the members of the RICO enterprise.

In addition to this general allegation and the allegations that Guidry and others concealed their involvement in the overarching corrupt conspiracy noted by Guidry in his Memorandum in Support, Plaintiff has also noted specific affirmative acts of fraudulent concealment. In particular, Paragraph 25 of the Petition specifically alleges:

25.

> The State Police held a hearing into Treasure Chest's application in Baton Rouge, La. On May 17, 1994. At this hearing, the following exchange took place between Captain Mark Oxley of the Division and Robert Vosbein, counsel for Treasure Chest, who was under oath:

> Capt. Oxley:  And are you testifying that there are no elected public officials doing business with Treasure Chest?

> Mr. Vosbein:  That's correct.

> This statement was made by Mr. Vosbein as agent for Treasure Chest and/or Guidry; on information and belief, it was based on information supplied to him by Treasure Chest and/or Guidry. Treasure Chest's representations, through its agent Mr. Vosbein, violated LSA-R.S. 27:70 C. in failing to disclose Treasure Chest's relationship with Edwin Edwards, which was prohibited by LSA-R.S. 27:96 A.

3

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 141 of 323

Plaintiff also specifically pled that Guidry further committed another affirmative act of concealment by executing an Affidavit of Full Disclosure on February 2, 1993, falsely representing the involvement of Edwards in the overarching corrupt conspiracy:

27.

>        In conjunction with his submittal of the Treasure Chest application for a license, Guidry executed an "Affidavit of Full Disclosure" on February 26, 1993, wherein Guidry averred, in pertinent part:
>
> > ... except as reported in the Application, I have no agreements or understandings with any person or entity and no present intent to pay any sums of money or given anything of value as, including but without limitation, a finder's fee or commission to any person or entity related to the acquisition of any interest in the Application ...
>
> Pursuant to LSA-R.S. 27:70 C., Guidry had a continuing duty to render a full and accurate disclosure of his association with Edwin Edwards as set forth herein. Upon information and belief, Guidry has never disclosed this association, and has therefore violated his duty under LSA-R.S. 27:70 C.

In the instant case, Plaintiff has clearly and unequivocally alleged that Defendants actively concealed their fraudulent conduct so as to prevent Plaintiff from realizing that the injury he suffered on or about May 17, 1994, was the result of an overarching corrupt conspiracy prohibited by and punishable under the RICO statute.

While Guidry notes that Plaintiff has not belabored in his pleadings the facts supporting his "due diligence" with respect to his discovery of the Defendants' conduct, a review of the Petition establishes that Plaintiff diligently attempted to keep himself abreast of developments with respect to the processes involving the issuance of licenses and certificates of preliminary approval. In fact, it is specifically noted that Plaintiff objected to Treasure Chest's request for permission to modify its previously filed application to move the site of its proposed route and operations to Lake Pontchartrain (Petition, para. 18). Moreover, a review of the Petition clearly reveals that Plaintiff in fact diligently monitored local newspapers, including the Times-Picayune.

The degree of due diligence required to plead fraudulent concealment with respect to a RICO claim is a question of fact and is dependent upon the question of "when, under the totality of the circumstances, [a reasonable person] of ordinary intelligence would have discovered the existence of the fraud." *Blue Cross & Blue Shield of New Jersey, Inc.*, 113 F.Supp. 2d at 382.

4

The federal government, with all of its resources, did not immediately discover this fraud. Yet, Guidry complaints that the Plaintiff should have done so earlier. That argument comes with ill grace from a convicted felon who purposely hid his criminal activity.

In the instant case, Copeland respectfully submits that he has sufficiently alleged that he acted reasonably in filing this lawsuit at the earliest possible time after learning of credible evidence to support a claim of conspiracy. This evidence was in the form of the series of newspaper articles referred to throughout the Petition, and the issuance of Guidry's guilty plea and the Edwards indictment.

Guidry has indicated that he desires to present evidence at the trial of this Exception. Plaintiff stands ready to, and will introduce at this hearing, evidence and testimony that he acted diligently in keeping abreast of the licensing process. However, due to the nature of Defendants' affirmative acts of concealment, such reasonable efforts were non-availing, and Plaintiff did not learn of the Defendants' conduct until it became public knowledge.

### III. CONCLUSION

Considering the foregoing, and based on the evidence to be presented at the hearing of this Exception, Plaintiff respectfully submits that this Court should overrule the Exception of Prescription in RICO filed herein by Guidry.

Respectfully submitted,

*CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP*

By: _____
**ROBERT A. KUTCHER** (LSBA #7895)
**NICOLE S. TYGIER** (LSBA #19814)
**VICKI A. TURKO** (LSBA #24677)
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9573

5

**BENJAMIN R. SLATER, JR.** (LSBA #12126)
**BENJAMIN R. SLATER, III, T.A.** (LSBA #12127)
**A. ELISE BROWN** (LSBA #19500)
**DONALD J. MEISLER, JR.** (LSBA #20294)
**S. JOSEPH WELBORN** (LSBA #25928)
**SLATER LAW FIRM**
650 Poydras Street, Suite 2600
New Orleans, Louisiana 70130
Telephone: (504) 523-7333
Facsimile: (504) 528-1080

*Attorneys for Plaintiff Alvin C. Copeland*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

( ) Hand Delivery          ( ) Prepaid U.S. Mail
( ) Facsimile              ( ) Overnight Delivery

New Orleans, Louisiana, this 3rd day of _____ 2000.

6

## 19TH JUDICIAL DISTRICT COURT

## PARISH OF EAST BATON ROUGE

### STATE OF LOUISIANA

4l4l607

| | | |
|---|---|---|
| ALVIN C. COPELAND | * | DOCKET NO. |
| VERSUS | * | DIVISION "B" |
| TREASURE CHEST CASINO, L.L.C., and ROBERT J. GUIDRY | * | JURY TRIAL REQUESTED |
| | * | |

COST OK Amt._____

FILED: _____ _____ SEP 15 1998

DEPUTY CLERK

BY_____
DY. CLERK OF COURT

### EX PARTE MOTION TO TRANSFER
### CASE AND CONSOLIDATE

NOW INTO COURT, through undersigned counsel, comes plaintiff Alvin C. Copeland, and upon suggesting to the Court that he has this day filed an original proceeding against defendants Treasure Chest Casino, L.L.C. and Robert J. Guidry; that this suit is related to an action already pending before Division "A" of this Court, namely *Alvin C. Copeland v. The Louisiana Gaming Control Board, et al.,* bearing docket number 400-750; and that in the interest of judicial efficiency, there is good cause for this suit to be transferred to Division "A" and consolidated with the previously filed and pending suit no. 400-750, now moves to transfer this suit under Local Rule IV, Section 5, and consolidate it for all purposes with civil action no. 400-750, all as more particularly described in the attached memorandum.

Respectfully submitted,

SLATER LAW FIRM

Benj. R. Slater, Jr., Bar No. 12126
Benj. R. Slater, III, Bar No. 12127, T.A.
A. Elise Brown, Bar No. 19500
Donald J. Miester, Jr., Bar No. 20294
S. Joseph Welborn, Bar No. 25928

By _____

650 Poydras Street
Suite 2600
New Orleans, LA 70130
Telephone: (504) 523-7333
Facsimile: (504) 528-1080
ATTORNEYS FOR PLAINTIFF ALVIN C. COPELAND

CERTIFIED
TRUE COPY

SEP 28 1999

BY _____
DEPUTY CLERK

EXHIBIT
3

202031187025

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

ALVIN C. COPELAND            *        DOCKET NO.

VERSUS                       *        DIVISION " "

TREASURE CHEST CASINO,       *        JURY TRIAL REQUESTED
L.L.C., and ROBERT J. GUIDRY
                             *

FILED: _____      _____
                                          DEPUTY CLERK

MEMORANDUM IN SUPPORT OF
EX PARTE MOTION TO TRANSFER CASE AND CONSOLIDATE

In this action plaintiff Alvin C. Copeland has sued defendants Treasure Chest Casino,

L.L.C. and Robert J. Guidry.  Copeland has alleged a variety of causes of action against these

two defendants in connection with the issuance of a license to conduct gaming activities on a

riverboat to Treasure Chest in 1994.  Copeland notes that this suit is therefore related to an

action already pending before Division "A" of this Court, namely *Alvin C. Copeland v. The*

*Louisiana Gaming Control Board, et al.,* bearing docket number 400-750. This previously

pending suit alleges separate causes of action against the Louisiana Gaming Control Board and

the Louisiana State Police Riverboat Gaming Division as a result of certain statutory and

constitutional violations in connection with the issuance of riverboat gaming licenses.

Accordingly, in the interest of judicial efficiency, Copeland suggests that there is good

cause for this suit to be transferred to Division "A" and consolidated for all purposes with the

previously filed and pending suit under Local Rule IV, Section 5.

Respectfully submitted,

SLATER LAW FIRM

Benj. R. Slater, Jr., Bar No. 12126
Benj. R. Slater, III, Bar No. 12127, T.A.
A. Elise Brown, Bar No. 19500
Donald J. Miester, Jr., Bar No. 20294
S. Joseph Welborn, Bar No. 25928

650 Poydras Street
Suite 2600
New Orleans, LA  70130
Telephone: (504) 523-7333
Facsimile: (504) 528-1080
ATTORNEYS FOR PLAINTIFF ALVIN C.
COPELAND

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

| | | |
|---|---|---|
| ALVIN C. COPELAND | * | DOCKET NO. |
| VERSUS | * | DIVISION " " |
| TREASURE CHEST CASINO, | * | JURY TRIAL REQUESTED |
| L.L.C., and ROBERT J. GUIDRY | * | |

FILED: _____   _____
                                                    DEPUTY CLERK

## ORDER

Considering the foregoing Ex Parte Motion to Transfer Case and Consolidate, **IT IS**

**HEREBY ORDERED** pursuant to 19th Judicial District Court Rule IV that this action, styled

*Alvin C . Copeland v. Treasure Chest Casino, L.L.C., and Robert J. Guidry,* (1) be transferred

to Division "A" of the 19th Judicial District Court, and (2) consolidated for all purposes with

the previously filed and pending case *Alvin C. Copeland v. The Louisiana Gaming Control*

*Board, et al.,* bearing docket number 400-750, Division "A."

Thus done and signed in Baton Rouge, Louisiana, this ___ day of _____, 1999.

_____
JUDGE ROBERT D. DOWNING, DIVISION "A"
(TRANSFEREE DIVISION)


_____
JUDGE FOR THE DIVISION TO WHICH THIS
CASE HAS BEEN RANDOMLY ASSIGNED
(TRANSFEROR DIVISION)

9:30 Am   99   Sept, 1999

CERTIFIED
TRUE COPY

02031187027

NINETEENTH JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA
DIVISION "D"

ALVIN C. COPELAND                    NUMBER: 464,607

VERSUS

TREASURE CHEST CASINO, L.L.C.,
AND ROBERT J. GUIDRY

### MEMORANDUM IN OPPOSITION TO CONSOLIDATION OF CASES

NOW INTO COURT, through undersigned counsel, comes defendant, Treasure Chest

Casino, L.L.C. ("Treasure Chest"), who respectfully files this Memorandum in Opposition to the

plaintiff's Ex Parte Motion to Transfer and Consolidate which contradictory hearing has been set for

November 15, 1999, by Order of the Court. (See Exhibit 1).

The plaintiff, Copeland, has instituted two separate and distinct actions in the 19th Judicial

District Court of Louisiana. These actions are as follows:

1)    *Alvin C. Copeland v. The Louisiana Riverboat Gaming Commission and the
      Riverboat Gaming Enforcement Division of the Gaming Enforcement Section
      of the Office of State Police, Public Safety Services, Department of Public
      Safety and Corrections, No. 400,750, Division "A"* (hereinafter referred to
      as the **"First Filed Action"**); and

2)    *Alvin C. Copeland v. Treasure Chest Casino, LLC and Robert J. Guidry, No. 464,
      607, Division "D"* (hereinafter referred to as "**This Action**").

At the onset, it is important to note that the two actions involve different types of actions with

different standards of review, different defendants and are based on different facts. In the First Filed

Action, Copeland seeks (1) an appeal of administrative action; (2) a request for a declaratory

judgment; (3) a request for monetary damages against the State for constitutional violations; and (4)

a request for the return of all monies he has paid to the State.  On the other hand, This Action

involves a purported complex RICO scheme, alleges violations of the Louisiana Unfair Trade

Practices Act found at LSA-R.S. 51:1401 et seq. ("LUPTA"), and alleges fraud and unjust

enrichment pursuant to the Louisiana Civil Code.  It is quite obvious from the faces of the plaintiff's

two petitions that these actions do not involve common issues of law and fact as both involve

different complex federal claims - constitutional and RICO claims, as well as numerous state claims

against different defendants based on different allegations. Therefore, consolidation of said actions



would be contrary to Louisiana law and would only lead to jury confusion.

I.    **Factual and Procedural Background.**

The First Filed Action originally consisted of two Defendants: (1) The Louisiana Riverboat Gaming Commission (the "Commission") and the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police (the "Division"). The First Filed Action was initiated in 1993 as an appeal by the plaintiff of action taken by the Commission when it approved the relocation of the site for the Treasure Chest in Kenner, Louisiana.  Since filing his original appeal in November, 1993, Copeland has amended the petition on three separate occasions.[1] Defendant, State of Louisiana, through the Louisiana Gaming Control Board, the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the office of the State Police, Public Safety Services, and the Department of Public Safety and Corrections (the "State"), has filed a Motion for Summary Judgment in the First Filed Action and the Motion is set for hearing for November, 29 1999. (See Exhibit 2). The State's Motion is based upon the fact that the plaintiff failed to timely exhaust his administrative remedies and therefore his action has prescribed on its face.

Moreover, in November, 1998, through his attorney, Copeland threatened Treasure Chest and Boyd Gaming Corporation ("Boyd," Treasure Chest's parent through companies) that, unless Treasure Chest and Boyd paid Copeland several tens of millions of dollars, Copeland would sue Treasure Chest and Boyd and accuse each of corruption and racketeering (See Exhibit 3).
On September 15, 1999, Copeland fulfilled his promise and instituted This Action naming only Treasure Chest and Robert Guidry as defendants.

A Motion to Transfer and Consolidate was filed in this matter on September 15, 1999 seeking to consolidate these separate and distinct cases. This Honorable Court has set this matter for contradictory hearing and Treasure Chest's Opposition is the subject matter of this Memorandum.

II.    **Law and Argument**

L.SA-C.C.P. art. 1561 was recently amended and now states:

---

[1] As amended for the third time, Copeland's petition, among other things, attempts to appeal the granting of Treasure Chest's license by the Division which was rendered in 1994.  As a result of this attempt, Treasure Chest intervened on June 14, 1999 as a defendant in the First Filed Action since the plaintiff's action directly affected Treasure Chest's license.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 149 of 323

A.  When two or more separate actions are pending in the same court, the section or division of the court in which the first action is pending may order consolidation of the actions for trial after a contradictory hearing, and **upon a finding that common issues of fact and law predominate.**

B.  Consolidation **shall not be ordered** if it would do any of the following:

(1)  Cause jury confusion.
(2)  Prevent a fair and impartial trial.
(3)  Give one party an undue advantage.
(4)  Prejudice the rights of any party.

La. Civ. Code art. 1561 (West Supp. 1999) (emphasis added).

Part B of the article was added by Acts 1997, No. 968, § 1. The addition deviates from prior jurisprudence which favored consolidation. Prior to the amendment of LSA-C.C.P. art. 1561, the granting of consolidation was within the trial court's discretion with no specific guidelines being imposed. Under the present law, in order to grant consolidation, the court <u>must</u> find that common issues of fact and law predominate. Assuming that threshold burden is met, the court is statutorily prohibited from ordering consolidation if <u>any one</u> of the criteria listed in Section B is met.

Treasure Chest respectfully contends that (1) common issues of law and fact do not predominate in these cases and (2) even if this court determines that common issues of law and fact do predominate, it is prohibited from ordering consolidation pursuant to the provisions of LSA-C.C.P. art. 1561(B).

A.  **Common Issues of Fact and Law Do Not Predominate.**

LSA-C.C.P. art. 1561 was recently amended and thus, there is little jurisprudence interpreting its provisions. In determining whether common issues of fact and law predominate, it is analogous to look at cases involving certification for class actions. For a class action to be certified, three elements must be satisfied: (i) numerosity; (ii) adequacy of representation; (iii) and common character. *Dumas vs. Angus Chemical Co*, 25,632 (La.App. 2 Cir. 3/30/94), 635 So.2d 446, 451, *writ den.*, 94-1120 (La. 6/24/94), 640 So.2d 1349. In evaluating the third element, courts have addressed whether the case presents common questions of law and fact and if certification would promote uniformity of decision without sacrificing fairness to the parties. *Id.* at 451-52.

The purpose of the common character criteria is to assist the court in using the class action device for "economy of effort and uniformity of result **without unduly affecting procedural**

safeguards for all parties." *Livingston Parish Policy Jury v. Acadiana Shipyards*, 598 So.2d 1177, 1182 (La. App. 1st Cir. 1992), *writ den.*, 605 So.2d 1122 (La.1992) (quoting *McCastle v. Rollins Environmental Services of Louisiana, Inc.*, 456 So.2d 612, 616 (La. 1984) (emphasis added).

In *Brown v. New Orleans Public Service, Inc.*, 506 So.2d 621 (La. App. 4th Cir. 1987), *writ den.*, 508 So.2d 67 (La. 1987), the court analyzed the cause of action and the relief sought by the plaintiffs to determine if a common character existed. *Id.* at 622. In *Brown*, the plaintiffs consisted of ratepayers of the New Orleans Public Service, Inc. (NOPSI) who brought action against NOPSI for personal and property damages sustained while plaintiffs were without electrical power for several hours when the temperature in New Orleans was sixteen degrees. *Id.* The court concluded that rights of a common character did not predominate over individual issues involved because the element of causation varied. *Id.* at 623.

The court opined "that there [were] individual issues of fact and law to be considered in determining whether the power failure caused damage to each" plaintiff and therefore "many questions when answered as to one class member are not answered as to all and that the merits of each claim will turn on the particular facts and circumstances involved." The *Brown* court also held that the "causative link between this power failure, which was not the same for all plaintiffs, and the alleged injuries . . . must be proven under the specific facts of each claim." *Id.*

Just as in the *Brown* case, the merits of each of the Copeland's claims as to each defendant will turn on the particular facts and circumstances. Individual issues will have to be closely examined to determine whether the alleged causes of action against each of the defendants actually exist and/or caused damage to the plaintiff. Therefore, Treasure Chest respectfully submits that common questions of law and fact do not predominate, thus precluding consolidation pursuant to LSA-C.C.P. art. 1561.

## B. LSA-C.C.P. art. 1561 Mandates That These Actions Should Not Be Consolidated.

Even if this court should determine that common questions of fact and law predominate, which Treasure Chest adamantly denies, consolidation is improper pursuant to Paragraph B of LSA-C.C.P. art. 1561 which prohibits consolidation if any one of the following four criteria are present:

(1)     Cause jury confusion;
(2)     Prevent a fair and impartial trial;
(3)     Give one party an undue advantage;
(4)     Prejudice the rights of any party.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 151 of 323

Each of the above four factors is present, thereby prohibiting consolidation of these cases.

1.    **Jury Confusion**.

If these two actions are consolidated jury confusion is likely to occur. As stated above, these cases are separate and distinct. The First Filed Action consists of an administrative appeal as well as federal constitutional issues. To the contrary, This Action consists of highly complex RICO and state law claims. Any attempt to consolidate these very separate and diverse actions consisting of federal as well as state law claims would only lead to jury confusion.

2.    **Preventing a Fair and Impartial Trial**.

Defendants will clearly be unable to receive a fair and impartial adjudication of the issues if these matters are tried together. The plaintiff will be required to establish his case by a preponderance of the evidence as to each defendant and as to each claim. If the plaintiff is able to succeed in establishing that burden as to any one of the defendants or as to any one of the claims, the other defendants will be prejudiced because there will be a great danger that the jury will assume the other defendants committed the other acts even if the plaintiff is unable to meet his burden of proof. The only means by which any of the defendants can be granted a fair and impartial adjudication by the trier of fact is for these matters to be tried separately.

3.    **Undue Advantage**.

Obviously, the plaintiff obtains an undue advantage if these matters are tried together. The plaintiff is simply seeking to "gang-up" his claims on the defendants to make his cases appear stronger than each may stand on its own individual merits. The danger that the cumulative effect of the multiple allegations committed against multiple individuals will influence the jury is compelling.

4.    **Prejudice**.

For all of the reasons set forth above, the rights of the defendants will clearly be prejudiced if these matters are allowed to be tried together.

C.    **To The Extent That The Local Rules of the 19th Judicial District Court Conflict With the Provisions of the Louisiana Code of Civil Procedure, the Local Rules are not Enforceable.**

Section 5 of Civil Rule IV of the 19th Judicial District Court authorizes the transfer and consolidation of cases based on the court's discretion, similar to the language previously contained

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 152 of 323

in LSA-C.C.P. art. 1561 prior to its amendment in 1997. The amended article clearly imposes a requirement that the court make an independent determination that common issues of law and fact predominate and, even if they do, the court is mandated not to order consolidation if any one of the factors contained in Section B is present. This represents a clear and unambiguous expression of legislative intent to remove the court's discretion and preclude consolidation where it is not appropriate.

LSA-C.C.P. art. 193 provides in pertinent part:

> A court may adopt rules for the conduct of judicial business before it, including those governing matters of practice and procedure **which are not contrary to the rules provided by law. . .** (emphasis supplied).

Where a local rule or local practice conflicts with a provision of the Code of Civil Procedure, the local rule is null and void. See *State vs. Sprint Communications Co.*, 96-3094 (La.9/9/97), 699 So.2d 1058; *Rodrigue vs. Rodrigue*, 591 So.2d 1171 (La. 1992); *Dawson vs. Eppley*, 562 So.2d 1084, 1085 (La. App. 4th Cir. 1990); *Futch vs. Commes*, 347 So.2d 1121, 1123 (La. 1977).

Some guidance can be obtained from the Louisiana Supreme Court in *State vs. Sprint Communications Co.*, 96-3094 (La.9/9/97), 699 So.2d 1058. That case involved the 1995 enactment of LSA-C.C.P. art. 253.1 providing for random allotment of cases. Although the statute did not conflict with the local rule of the 18th Judicial Court which likewise provided for random allotment, the judges of the 18th Judicial District engaged in a practice of non-randomly swapping cases originally allotted to them. The Court held that this practice was impermissible stating:

> . . . This statute expresses the legislative mandate to end the practice of non-random assignment. The statute is clear and unambiguous. The requirement to randomly assign must apply to the transfer as well as the initial allotment of cases to deter attempts to manipulate the assignment of lawsuits. Here the initial assignments of the cases at issue were random in compliance with article 253.1 and therefore proper. The subsequent transfers, however, were not. The fact that case swapping is routinely done in this district does not justify nor legitimize it.
>
>        \*       \*       \*       \*       \*
>
> When clear and unambiguous, laws are to be interpreted and applied as written. La. Civ. Code 9. 699 So.2d at 1052.

Similarly, LSA-C.C.P. art. 1561 was amended in 1997 for the specific purpose of **removing** the trial

Case 3:10-cv-00603-BAJ-DLD    Document 6    10/07/10    Page 153 of 323

court's discretion in transferring and consolidating cases, imposing a specific threshold burden that must be met, and prohibiting transfer and consolidation altogether in certain instances. Treasure Chest respectfully contends that this legislative mandate must be obeyed and any local rule to the contrary be declared null and void.

**D. Judicial Economy Would Not Be Served By The Consolidation of These Cases.**

Despite any claim made by plaintiff to the contrary, judicial economy would not be served by the consolidation of these cases which will be heard by a jury or juries. Consolidation of these cases would not constitute harmless error and would result in the distinct possibility that the case would ultimately be remanded and separate trials ordered a number of years down the road, rather than simply allowing each claim to proceed on its own merits at this time. For these reasons, Treasure Chest respectfully maintains that the consolidation of these matters will not serve judicial economy.

**III.    Conclusion.**

The recent changes to LSA-C.C.P. art. 1561 mandate that plaintiff's Ex Parte Motion to Consolidate these cases be denied. Common issues of law and fact do not predominate. Even if this court should determine that common issues of law and fact do predominate, pursuant to Paragraph B of LSA-C.C.P. art. 1561, the court is prohibited from granting the order of consolidation because it would cause jury confusion, prevent a fair and impartial trial, give an undue advantage to the plaintiff and prejudice the rights of Treasure Chest. To the extent that the Local Rules of the 19th Judicial Court conflict with the legislative mandate of the Code of Civil Procedure, the Local Rules are not enforceable. Judicial economy will not be served by consolidating these actions. Treasure Chest respectfully requests that plaintiff's Ex Parte Motion to Consolidate be denied.

By Attorneys:

McGLINCHEY STAFFORD
A Professional Limited Liability Company

By: _____
Paul S. West, Bar Roll No.: 13375
Donald R. Cravins, Jr., Bar Roll No.: 25631
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825
Phone: (225) 383-9000

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 154 of 323

302031187034

## CERTIFICATE

I hereby certify that a copy of the above and foregoing has been forwarded via U.S. Mail, postage prepaid to:

Mr. Benjamin R. Slater, III
Mr. Mark E. Van Horn
Mr. Donald J. Miester, Jr.
*Slater Law Firm*
650 Poydras Street, Suite 2600
New Orleans, Louisiana 70130

Mr. Michael A. Patterson
*Long Law Firm*
8550 United Plaza Boulevard, Suite 800
Baton Rouge, Louisiana 70809

this ___ day of November, 1999.

Donald R. Cravins, Jr.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 155 of 323

| ALVIN COPELAND | NUMBER 400,750 DIVISION "A" |
| VERSUS | 19th JUDICIAL DISTRICT COURT |
| LOUISIANA GAMING CONTROL | PARISH OF EAST BATON ROUGE |
| BOARD, ET AL. | STATE OF LOUISIANA |

| ALVIN COPELAND | NUMBER 464,607 DIVISION "D" |
| VERSUS | 19th JUDICIAL DISTRICT COURT |
| | PARISH OF EAST BATON ROUGE |
| TREASURE CHEST CASINO, L.L.C. AND ROBERT J. GUIDRY | STATE OF LOUISIANA |

<div align="center">

**MEMORANDUM IN OPPOSITION TO**
**MOTION TO CONSOLIDATE**
**SUIT NUMBERS 400,750 AND 464,607**

</div>

**MAY IT PLEASE THE COURT:**

Defendants, the State of Louisiana through the Louisiana Gaming Control Board, the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, and the Department of Public Safety and Corrections, ("the State"), respectfully file this memorandum in opposition to the Motion to Consolidate filed by plaintiff, Alvin Copeland.

Plaintiff, Alvin Copeland, seeks to consolidate two separate suits that are currently pending in this judicial district. The suits involve different issues of fact and law and as such, consolidation is improper in this matter.

## I. BACKGROUND

On December 11, 1992, American International Gaming Association ("AIGA"), a company owned by Copeland, submitted an application to the Riverboat Gaming Commission (hereinafter the "Commission"), for a Certificate of Preliminary Approval for a proposed riverboat route. The Riverboat Gaming Enforcement Division (hereinafter the "Division") had the power to issue no more than fifteen licenses to conduct Riverboat gaming activity. LSA-R.S. 27:65. On June 18, 1993 the Commission considered and voted on eight applications for Certificates, and approved seven applications. The AIGA application was not granted. Subsequently, on May 18, 1994, AIGA's application for a license was not considered because the statutory limitation of 15 licenses had already been reached. (*See* LSA-R.S. 27:65.)

1

<div align="right">

EXHIBIT

5

</div>

Copeland subsequently filed this suit against the State alleging certain statutory and constitutional violations in connection with the issuance of riverboat gaming licenses. Copeland filed a separate suit against Treasure Chest Casino, L.L.C. ("Treasure Chest") and Robert J. Guidry ("Guidry"), but alleged racketeering, unfair trade practices, fraud, and unjust enrichment. As such, these two suits cannot be consolidated pursuant to La.C.C.P. art. 1561.

## II. LAW AND ARGUMENT

Louisiana Code of Civil Procedure Article 1561 sets forth the requirements for the consolidations of two lawsuits. Article 1561 reads:

> A. When two or more separate actions are pending in the same court, the section or division of the court in which the first filed action is pending may order consolidation of the actions for trial after a contradictory hearing, and upon a finding that common issues of fact and law predominate.
>
> B. Consolidation shall not be ordered if it would do any of the following:
>
> 1.    Cause jury confusion.
> 2.    Prevent a fair and impartial trial.
> 3.    Give one party an undue advantage.
> 4.    Prejudice the rights of any party.

Copeland alleges that the two cases should be consolidated in the interest of judicial efficiency. However, when attempting to consolidate cases where the issues of law and fact are different, efficiency is not served.

### A. The suits have different issues of fact and law

The two suits should not be consolidated because they have different issues of fact and law. Copeland's suit against the state alleges a violation of due process rights, which will require a constitutional analysis of state action and limited fact witnesses. Conversely, Copeland's suit against Treasure Chest and Guidry alleges a broad spectrum of tortious injuries, which will require proof of many specific acts via fact witnesses and the production of documents. The two suits are so distinct as to compel a denial of consolidation.

Copeland's suit against the state alleges certain statutory and constitutional violations of due process. The issues in that suit involve whether Copeland's due process rights were violated, and whether the procedures that the Commission and the Division used were inherently unconstitutional. The legal analysis of Copeland's claims against the state will be under the purview of the Louisiana

2

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 157 of 323

Constitution. The inquiry will consist of a determination of what procedure the Commission and the Division followed when granting the riverboat licenses. The proof will generally be found in the official record of the proceedings. The witnesses and discovery will be <u>very</u> limited due to the nature of the claim.

In contrast, Copeland's suit against Treasure Chest and Guidry involves claims of alleged racketeering, unfair trade practices, fraud, and unjust enrichment. These claims are grounded in Federal Racketeering Law (*see* 18 U.S.C.§ 1961, *et seq*), state Trade and Commerce law (*see* title 51 of the La. Revised statutes), and Louisiana civil law (see La. Civ. Code arts. 2315 and 2298), respectively. At issue will be specific acts by Treasure Chest and Guidry to corrupt the riverboat gaming licensing process. Copeland will have to prove these acts through a host of fact witnesses and complex fact patterns. Discovery will be elaborate and involved, requiring an overwhelming production of documents.

As such, not only do the suits relate to different questions of law and legal analysis, but also, the suits arise out of different facts. Copeland's suit against the State involves a rather limited constitutional analysis as to whether the procedure the Commission used violated Copeland's due process. The witnesses will be, at most, the employees of the division, while the exhibits will be the official record of the proceeding at the Division. On the other hand, Copeland's suit against Treasure Chest and Guidry will involve a complex analysis of whether the defendant's actions constituted "Unfair Trade Practices," and fraud, and proving that the defendant's were unjustly enriched. The witnesses will be employees of Treasure Chest and AIGA. Corporate board members, secretaries and a variety of others. Further proof will have to be gleamed from the vast amount of documents related to the two applications. Copeland wishes to combine the suits by arguing that these two suits arise from the same facts. Do not be deceived, though, these two cases are distinct and diverse. While both suits arise out of the awarding of riverboat licenses, the questions of fact and law are so different as to compel a denial of consolidation.

### III. CONCLUSION

The state strenuously objects to having these actions consolidated for trial, as consolidation serves no purpose other than to create additional confusion. Combining these two lawsuits has the effect of enmeshing a fairly simple constitutional claim against the state that will require very little

3

discovery with a very complicated claim against Treasure Chest and Guidry that will require a great deal of discovery. Nothing can be gained by having Copeland's claim against the State joined with Copeland's claim against Treasure Chest and Guidry. Contrary to Copeland's insisting, these two cases are so different in fact and law as to compel the denial of consolidation. As such, the state requests that Copeland's Motion to Consolidate be dismissed.

Submitted by:

RICHARD P. IEYOUB
Attorney General


_____
MICHAEL A. PATTERSON
Special Assistant Attorney General
Bar Roll No. 10373
DANIEL D. HOLLIDAY, III
Special Assistant Attorney General
Bar Roll No. 23135
LONG LAW FIRM, L.L.P.
8550 United Plaza Blvd, Suite 800
Baton Rouge, LA 70809
(225) 922-5110
ATTORNEYS FOR LOUISIANA GAMING CONTROL
BOARD AND THE RIVERBOAT GAMING
ENFORCEMENT DIVISION OF THE GAMING
ENFORCEMENT SECTION OF THE OFFICE OF STATE
POLICE, PUBLIC SAFETY SERVICES, DEPARTMENT OF
PUBLIC SAFETY AND CORRECTIONS


## CERTIFICATE

I do hereby certify that a copy of the Opposition to Motion to Consolidate has been mailed this date, postage prepaid, to all counsel of record.

Baton Rouge, Louisiana, this 8th day of November, 1999.


_____
MICHAEL A. PATTERSON

4

## 19ᵀᴴ JUDICIAL DISTRICT COURT

## PARISH OF EAST BATON ROUGE

## STATE OF LOUISIANA

## DIVISION "D"



COST OK Amt.____
DEC 16 1999
BY ____
DY. CLERK OF COURT

ALVIN C. COPELAND                         NUMBER: 464,607

**VERSUS**

**TREASURE CHEST CASINO, L.L.C.,
AND ROBERT J. GUIDRY**

---

### JUDGMENT

The Motion for Consolidation filed by Alvin C. Copeland came before the Court on Monday, November 15, 1999.

Present were:

1.  Benjamin R. Slater, III on behalf of Alvin C. Copeland;

2.  Paul S. West and Donald R. Cravins, Jr. on behalf of Treasure Chest Casino, LLC;

3.  Lanny R. Zatzkis and Andrew N. Lee on behalf of Robert J. Guidry; and

4.  Michael A. Patterson on behalf of the State of Louisiana through the Louisiana Control Board, the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, and the Department of Public Safety and Corrections.

Having considered the law and the evidence:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, that the Motion for Consolidation filed by Alvin C. Copeland is DENIED.

**THUS RENDERED** in open court on November 15, 1999 and

**THUS DONE AND SIGNED** on this 20 day of _Dec_, 1999 in Chambers in Baton Rouge, Louisiana.

_____
Honorable Janice Clark, Judge
19ᵗʰ Judicial District Court

CERTIFIED TRUE COPY
1517

I hereby certify that on this day a notice of the above judgement was mailed by me, with sufficent postage affixed, to: all COR

Done and signed on 12-23-99

E. Knight
Deputy Clerk of Court

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH, LA
FILED
DEC 16 PM 3 30
DEPUTY CLERK OF COURT

**EXHIBIT
6**

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                          DIVISION "D"

### ALVIN C. COPELAND

#### -versus-

### TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

Filed:_____          _____
                                         Deputy Clerk

### MEMORANDUM IN OPPOSITION TO EXCEPTION OF PRESCRIPTION OF PLAINTIFF'S STATE LAW CLAIMS BY DEFENDANT, ROBERT J. GUIDRY

**MAY IT PLEASE THE COURT:**

Plaintiff, Alvin C. Copeland ("Copeland"), submits this Memorandum in Opposition to the Exception of Prescription of Plaintiff's State Law Claims herein on behalf of defendant, Robert J. Guidry ("Guidry"). Although the state law causes of action bear different prescriptive periods, this Exception, like Guidry's previously filed and now reurged Exception of Prescription of Plaintiff's RICO Claim, ultimately must be denied based upon the defendant's intentional fraudulent concealment of the conspiracy and plaintiff's pled and demonstrated reasonable diligence with respect to his attempts to discover the defendant's conduct. The legal sources and terminology used with respect to the issues of federal statutes of limitation and state prescription vary, but the analysis and ultimately the result are the same. Plaintiff's claims are timely, and both[1] of these Exceptions must be overruled.

### I.      INTRODUCTION

Copeland filed this suit as a result of substantial losses incurred by him in his pursuit of a license to operate a proposed riverboat gaming operation at the Kenner Laketown Harbor Park

---

[1] A copy of the previously filed Opposition to Exception of Prescription of Plaintiff's Civil RICO Claim is attached hereto as Exhibit "A."

on the shores of Lake Pontchartrain in Jefferson Parish. As the result of "an overarching corrupt conspiracy," *i.e.* a scheme to corrupt the entire process for issuing riverboat gaming licenses in which both Treasure Chest Casino, LLC ("Treasure Chest") and Guidry participated and engaged in overt acts in furtherance of, the license was not awarded to Copeland, but to Treasure Chest. Copeland has filed this suit, seeking to hold Defendants accountable for both the expenses he incurred in attempting to fairly participate in the process subverted by Defendants' conduct, as well lost profits, attorneys' fees and costs, and the value of the corruptly obtained Treasure Chest gaming license and of its ill begotten success.

The method for Copeland's pursuit of these goals is his Petition for Damages, which alleges the Defendants' civil responsibility for their actions under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 *et seq.* ("RICO"), the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401 *et seq.* ("LUTPA"), Louisiana Civil Code Articles 2315 (Tortious Fraud), and 2298 (Unjust Enrichment). Copeland also alleges that Defendants are solidarily liable under 18 U.S.C. §1962 and Louisiana Civil Code Article 2324, and that Treasure Chest is liable for the actions of Robert Guidry under the doctrines of apparent authority, *respondeat superior* and La. C.C. art. 2320.

Copeland filed his Petition for Damages on September 15, 1999, less than a year after defendant, Robert Guidry pled guilty and the details of Guidry's conspiracy came to light with the indictment of Edwards on November 6, 1998. On that same date, September 15, 1999, Copeland also filed an Ex Parte Motion to Transfer and Consolidate the case filed with a related action pending in Division "A", *Alvin C. Copeland v. Louisiana Gaming Control Board, et al*, bearing docket number 400-750. Prior to the hearing on the Motion for Consolidation, defendant, Guidry, filed a Motion to Stay all matters in this action until the disposition of the federal criminal proceeding in *United States of America v. Edwin Edwards*, criminal docket number 98-165-B-M2, United States District Court for the Middle District of Louisiana. A Consent Judgment was entered on December 7, 1999, staying this matter up to and including March 14, 2000. This Stay was subsequently extended by a Joint Motion for Entry of Consent Judgment on April 5, 2000, until fifteen days following the return of a jury verdict in the *Edwards* matter.

2

Following the Edwards guilty verdict, on or about October 6, 2000, defendant, Robert Guidry filed an Exception of No Cause of Action and an Exception of Prescription as to plaintiff's civil RICO claim, and an Exception of No Right of Action or in the Alternative, Exception of Vagueness in this matter. Plaintiff opposed all of these Exceptions. A hearing was held in this matter on November 13, 2000 and on March 6, 2001, the Court rendered a Judgment dismissing plaintiff's Petition solely on the basis on the Exceptions of No Cause of Action. The Court of Appeal reversed that matter, ruling that Copeland had stated a cause of action, and remanded on June 21, 2002. Subsequently, Guidry re-urged the Exception of Prescription of Civil RICO Claims which was never ruled on, and filed the instant Exceptions, urging that plaintiff's state claims should be dismissed as well.

## II.    LAW AND ARGUMENT

Contrary to the representation made by Guidry in his Memorandum in Support of Exception of Prescription of State Law Claims, as with his RICO claims, none of Copeland's claims are prescribed. Although each of the claims is subject to a different prescriptive period, none of those prescriptive periods expired prior to the filing of this suit.

### A.    *Unjust Enrichment.*

Contrary to the defendant's citation of *Aetna Life and Casualty Company v. Dotson*, 346 So.2d 762 (La. App. 1st Cir.) *writ denied*, 349 So.2d 1272 (La. 1977), there is substantial jurisprudence to the effect that an action for unjust enrichment is prescribed by ten (10) years. *Safeco Insurance Company v. Farm Bureau Insurance Companies*, 490 So.2d 565 (La. App. 3rd Cir. 1986). Even following the *Dotson* decision, the First Circuit continued to rule that claims such as unjust enrichment, which are quasi contractual, are subject to a ten-year prescriptive period, making the precedential value of the *Dotson* decision extremely dubious. *Julien v. Wayne*, 415 So.2d 540 (La.App. 1 Cir. 1982), citing *State ex rel. Guste v. Estate of Himbert*, 327 So.2d 698 (La.App. 1st Cir. 1976), *writ den.* 330 So.2d 308, 311 (La.1976); *Smith v. Phillips*, 175 La. 198, 143 So. 47 (1932); *Lagarde v. Dabon*, 155 La. 25, 98 So. 744 (1924).

"The commentators are divided on the issue" of whether quasi contractual claims are subject to a one or ten year prescriptive period, *Fidelity & Deposit Co. of Maryland v. Smith*, 730 F.2d 1026 (5th Cir.1984), and while the First Circuit appears to have not addressed the issue in recent years, those courts that have done so **subsequent to the 1984 obligations revision** have

3

ruled that actions in quasi contract are subject to a **ten-year prescriptive period**. *Burns v.*
*Sabine River Authority,* 1998-1536 (La.App. 3 Cir. 5/5/99), 736 So.2d 977, citing *Kilpatrick v.*
*Kilpatrick,* 27,241 (La.App. 2 Cir. 8/23/95); 660 So.2d 182, *writ denied,* 95-2579 (La.12/15/95);
664 So.2d 444; *Taylor v. Smith,* 619 So.2d 881 (La.App. 3 Cir.), *writ denied,* 625 So.2d 1038
(La.1993).

Copeland's unjust enrichment claim is subject to a ten-year prescriptive period, which
clearly did not expire prior to the filing of this suit. Of course, even if defendants' contention is
correct and the court should determine that a one-year prescriptive period under La. C.C. art.
3492 should apply with respect to claims for unjust enrichment, then this claim would still be
viable by virtue of the doctrine of *contra non-valentem* as set forth later in this memo with
respect to Copeland's other claims.

**B.     Unfair Trade Practices.**

Copeland's petition states a claim under the Louisiana Unfair Practices Act, which as
correctly noted by Guidry, is generally subject to a one-year peremptive statute of limitations
under La. R.S. 51:1409(E). However, counsel for Guidry's fanciful attempts to "distinguish" the
recent ruling of the First Circuit Court of Appeal in *Capitol House Preservation Company, LLC*
*v. Perryman Consultants, Inc.,* 1998-2216 (La. App. 1st Cir. 11/5/99), 745 So.2d 1194, *writ*
*denied,* 1999-3446 (La. 2/11/2000), 754 So.2d 937, are in reality nothing more than a statement
of counsel's disagreement with the holding of that case as applied to the instant case, and a
citation to irrelevant case law from other courts of appeal. The fact is that *Capitol House*
*Preservation Company* is binding authority on this Court, and is directly on point with respect to
the instant case. In that case, citing its previous decision the Court of Appeal noted:

> The duty to disclose violations of the Riverboat … Act under La. R.S. 27:70(C) is
> a continuing one which does not end with the receipt of a license and is equally
> applicable whether a "person" is an applicant, or subsequently, a licensee. Each
> day that a "person" fails to disclose a violation of the Act of which he is aware
> constitutes a new breach of the statutory duty to disclose which breach continues
> anew each day until the disclosure occurs.

*Capitol House Preservation Company,* 745 So.2d at 1196. Guidry's argument as to
inapplicability of this case to the facts at hand are simply erroneous and the cases which he relies
to support this distinction do not do so.

Contrary to Guidry's contention, there is no reason to conclude that the First Circuit in
*Capitol House Preservation Company* did not contemplate the case law cited by Guidry, all of

4

which was decided prior to the *Capitol House Preservation Company* decision. In fact, a review of these cases reveals that they, unlike *Capitol House Preservation Company* itself, are wholly inapplicable and distinguishable.

*Our Lady of the Lake Hospital v. Carboline*, 92-2121 (La.App. 1 Cir. 12/29/93), 632 So.2d 339, *writ denied*, 94-0287, (La. 3/25/94), 635 So.2d 228, for example, was a products liability suit in which the Court of Appeal reversed the dismissal on prescription grounds based on the discovery of documents tending to establish that the manufacturer made deliberate misrepresentations which "may have had the effect of lulling [the plaintiff] into a false belief that the corrosion problems had been effectively eliminated." *Our Lady of the Lake Hospital*, 632 So.2d at 344. To the extent this case is relevant at all, it stands for the proposition that an exception of prescription is improperly granted without appropriate "consideration of this crucial evidence as it applies to the doctrines **of *contra non valentem*** and continuing tort." *Id.*

Similarly, *Bunge Corp. v. GATX Corporation*, 557 So.2d 1376 (La.1990), dealt with different facts, a different statute, and was effectively legislatively overruled. *GHR Energy Corp. v. Carboline Company*, 744 F.Supp. 1405, 1406 (E.D.La.1990). In short, while the facts in the instant case do not establish that Copeland received notice of "defendant's failure to disclose over one year before suit was filed," 744 F.Supp. at 1407, n. 4, these cases were decided almost ten years prior to the binding decision in *Capitol House Preservation Company* and counsel for Guidry relies upon these cases merely to attack the clear and binding determination by the First Circuit in that case which establishes that each of Guidry's failures to disclose violations of the Act is a new breach of the statutory violation which continues anew each day until the disclosure occurs. Copeland's unfair trade practices claims are not perempted.

### C. *Contra Non-Valentem – Delictual Claims.*

The remainder of Copeland's state court claims, tortious fraud, (and unjust enrichment in the unlikely event that it is not subject to a ten-year prescriptive period) are governed by the one-year prescriptive, rather than peremptive period under La. C.C. art. 3492. However, just as the federal courts have recognized that the RICO statute of limitations is subject to tolling on the basis of a defendant's fraudulent concealment, so to have Louisiana courts repeatedly recognized that the doctrine of *contra non-valentem agere nulla currit praescriptio* applies to suspend

5

liberative prescription when there is a legal cause which prevents the running of prescription under four discrete circumstances or categories.

> (1) When there is a legal cause that prevented courts or their offices from taking cognizes of or acting on the plaintiff's actions; (2) where there is a condition coupled with the contract or connected with the proceeding that prevented the creditor from suing or acting; (3) **when the debtor himself did some act that effectually prevented the creditor from availing himself of his cause of action**; (4) when the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by defendant. (Emphasis added.)

*Hendrick v. A.B.C. Insurance Company*, 2000-2403 (La. 5/15/01), 787 So.2d 283, 290, quoting *Corsey v. State, through Dept. of Corrections*, 375 So.2d 1319, 1321-22 (La. 1979). It is this third species of *contra non-valentem* which is plainly applicable to the facts of the case at hand, and functions identically to the doctrine of fraudulent concealment, previously noted by defendant with respect to Guidry's Exception of Prescription of Plaintiff's Civil RICO claim. Notably, in Paragraph 77 of his petition, plaintiff specifically noted:

77.

> The RICO persons fraudulently concealed their illegal activities, and plaintiff neither knew nor, in the exercise of due diligence, could reasonably have known of the offenses committed by the members of the RICO enterprise.

In addition to this general allegation and the allegations that Guidry and others concealed their involvement in the overarching corrupt conspiracy noted by Guidry in his Memorandum in Support, Plaintiff has also noted specific affirmative acts of fraudulent concealment. In particular, Paragraph 25 of the Petition specifically alleges:

25.

> The State Police held a hearing into Treasure Chest's application in Baton Rouge, La. on May 17, 1994. At this hearing, the following exchange took place between Captain Mark Oxley of the Division and Robert Vosbein, counsel for Treasure Chest, who was under oath:

Capt. Oxley: And are you testifying that there are no elected public officials doing business with Treasure Chest?

Mr. Vosbein: That's correct.

> This statement was made by Mr. Vosbein as agent for Treasure Chest and/or Guidry; on information and belief, it was based on information supplied to him by Treasure Chest and/or Guidry. Treasure Chest's representations, through its agent Mr. Vosbein, violated LSA-R.S. 27:70C in failing to disclose Treasure Chest's relationship with Edwin Edwards, which was prohibited by LSA-R.S. 27:96A.

6

Plaintiff also specifically pled that Guidry further committed another affirmative act of concealment by executing an Affidavit of Full Disclosure on February 2, 1993, falsely representing the involvement of Edwards in the overarching corrupt conspiracy:

27.

> In conjunction with his submittal of the Treasure Chest application for a license, Guidry executed an "Affidavit of Full Disclosure" on February 26, 1993, wherein Guidry averred, in pertinent part:
>
>> ... except as reported in the Application, I have no agreements or understandings with any person or entity and no present intent to pay any sums of money or given anything of value as, including but without limitation, a finder's fee or commission to any person or entity related to the acquisition of any interest in the Application ...
>
> Pursuant to LSA-R.S. 27:70C, Guidry had a continuing duty to render a full and accurate disclosure of his association with Edwin Edwards as set forth herein. Upon information and belief, Guidry has never disclosed this association, and has therefore violated his duty under LSA-R.S. 27:70C.

In the instant case, Plaintiff has clearly and unequivocally alleged that Defendants actively concealed their fraudulent conduct so as to prevent Plaintiff from realizing that the injury he suffered on or about May 17, 1994, was the result of an overarching corrupt conspiracy prohibited by and punishable under the RICO statute.

While Guidry notes that Plaintiff has not belabored in his pleadings the facts supporting his "due diligence" with respect to his discovery of the Defendants' conduct, a review of the Petition establishes that Plaintiff diligently attempted to keep himself abreast of developments with respect to the processes involving the issuance of licenses and certificates of preliminary approval. In fact, it is specifically noted that Plaintiff objected to Treasure Chest's request for permission to modify its previously filed application to move the site of its proposed route and operations to Lake Pontchartrain (Petition, para. 18). Moreover, a review of the Petition clearly reveals that Plaintiff in fact diligently monitored local newspapers, including the Times-Picayune.

Just as the degree of due diligence to plead fraudulent concealment with respect to a RICO claim is a question of fact depending upon the totality of the circumstances, so to is the question of whether a plaintiff exercised reasonable diligence in the discovery of fraud a factual question under Louisiana law. In *Hospital Service District No. 1 of Jefferson Parish v. Alas*, 94-

7

897 (La. App. 5th Cir. 6/28/95), 657 So.2d 1378, 1383, *writ denied*, 95-1959 (La. 11/13/95), 662

So.2d 473:

> Jurisprudence tells us that to avoid the running of prescription, a plaintiff must show he did not know of facts upon which to base a claim nor did he have reason to know or discover such facts, and that the lack of knowledge is not attributable to his fault ...
>
> For purposes of the discovery doctrine of *contra non valentem*, a plaintiff will be deemed to know that which he could have learned from reasonable diligence. ... If an opportunity is afforded to a party to know and to learn about a certain matter bearing on his interest and he fails or refuses to profit by it, if he closes his eyes to the notice spread before him and shuts his ears to oral information directly imparted to him, the law will hold him as bound by the same, and as fully notified as if he had taken thorough personal cognizance at the time of the information imparted and of the notice given.

The same facts which would support due diligence with respect to RICO equally demonstrates reasonable diligence for Louisiana prescriptive period purposes. Copeland's petition establishes his diligence in keeping himself informed by monitoring newspapers and events, and neither the pleadings nor any evidence submitted by Guidry establishes that he closed his eyes or shut his ears.

In fact, the instant case is in all pertinent matters indistinguishable from the decision of the First Circuit in *Paragon Development Group, Inc. v. Skeins*, 96-2125 (La. App. 1st Cir. 9/19/97), 700 So.2d 1279, wherein the First Circuit held in a suit to recover damages from a subcontractor resulting from theft at a construction site that prescription was suspended pursuant to the theory of *contra non valentem* until such time as the company was alerted that there may have been an arrest for the thefts.

In *Paragon Development Group, Inc.*, the plaintiff-developer suffered losses from theft at a construction site in June or July of 1994. Paragon did not file suit until August 31, 1995, claiming that it first learned the identity of the party responsible in May of 1995 when it received a restitution check from the district attorney's office. The defendant, the father of the perpetrator, filed an exception of prescription, urging that a principal of the plaintiff company was aware of the perpetrator's involvement soon after the incident occurred, that he had called the perpetrator the day after the theft, and even given the boy's name to the police officers investigating the crime. *Paragon Development Group, Inc.*, 700 So.2d at 1282.

8

While the trial court agreed with the defendant and granted the exception of prescription,

the First Circuit disagreed, beginning its analysis with a quotation from the Louisiana Supreme

Court:

> Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.
>
> When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction.

*Paragon Development Group, Inc.*, 700 So.2d at 1282, quoting *Jordan v. Employee Transfer*

*Corporation,* 509 So.2d 420, 423 (La.1987). The First Circuit's analysis of the issue was telling:

> The trial judge found, according to his written reasons for judgment, that appellant's inaction was unreasonable and that it had failed to properly "seek out those whom [it] believ[ed] responsible" for the thefts against Putt-Putt. We disagree. It is apparent, based upon testimony that Eddie Horridge telephoned Scott the morning after the first theft and that Bryan Horridge provided Scott's name to the police, **that the brothers suspected Scott's involvement** in these crimes from the onset. **However,** it is equally apparent **that they lacked actual proof to support their suspicions,** otherwise the minor Skeins would likely have been arrested immediately following the thefts. **The issue then becomes whether the mere suspicion that a party *may* be responsible for a crime is sufficient to support bringing a cause of action for damages. We conclude that it is not.**
>
> Applying the principles enounced in *Jordan* to the present circumstances, we find that the discovery rule prevented commencement of the running of prescription until principals of Paragon had sufficient notice to pursue a claim against a particular defendant. *See Jordan v. Employee Transfer Corp.,* 509 So.2d at 424. At the earliest, this occurred in September of 1994 when Scott Skeins' mother contacted Eddie Horridge. This incident was probably sufficient to alert appellant to make further inquiry concerning whether there had been an arrest for the thefts against Putt-Putt. Prior to this point, appellant's inaction was reasonable. Therefore, until September of 1994, prescription was suspended pursuant the theory of *contra non valentem*, and appellant's suit, filed on August 31, 1995, was timely.

*Paragon Development Group, Inc.*, 700 So.2d at 1282 (emphasis added). Although the crimes in

the instant case are far more complicated than a simple theft, the reasoning is equally applicable

to the instant case. Copeland was certainly aware well prior to the filing of this suit of

irregularities in the licensing process, and in fact, instituted *Alvin C. Copeland v. Louisiana*

*Gaming Control Board, et al,* No. 400-750 in 1993. However, Copeland knew virtually nothing

of the scheme, the particular players involved, and certainly lacked proof until such time as the

Edwards/Guidry indictments were handed down. Insofar as Plaintiff filed suit on September 15,

9

02031 188009

1999, within one-year from the date of these indictments, his suit is timely, and Guidry's exceptions must be overruled.

### D.    *Astoria is irrelevant.*

Finally, Plaintiff respectfully urges that this Court is not bound by the district court's ruling in *Astoria Entertainment, Inc. v. Edwards*, 159 F.Supp.2d 303 (E.D.La.2001), nor is that court's analysis of the prescription of a different alleged victim of Guidry's conduct particularly helpful or relevant to the case at hand.  Astoria's attempts to pursue Guidry by means of an antitrust suit, the pleadings dealt with on the motion to dismiss presented to the district court, and the facts of that case, particularly the facts as to Astoria's knowledge and diligence with respect to the filing of the action, are completely different from those presented in the instant suit.

Leaving aside the fact that the district court did not even address the merits of the pendent state law claims other than to dismiss them based in part on the pendency of another state lawsuit, *Astoria*, 159 F.Supp.2d at 329, the *Astoria* court's analysis of Astoria's pleadings reveals some startling dissimilarities.  Unlike Copeland's petition, the Astoria complaint did not sufficiently plead that "the defendants concealed the conduct complained of ... [or] ... that the [Astoria] failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim." *Id.*  As Copeland has previously noted in his Memorandum in Opposition to Exception of Prescription to Plaintiff's RICO Claim, Copeland has done this.  Moreover, a review of that opinion also reveals that Astoria pled other allegations not at all contained in Copeland's complaint, such as that "Robert Guidry and Robert List boasted of their involvement in the illicit activity," which lead the *Astoria* court to conclude that as to Astoria, presumably the audience of those boasts, the scheme was "an overt scheme as opposed to a covert scheme." *Id.*

What Copeland knew and what Astoria knew, what diligence they exercised, and what they pled are entirely different, notwithstanding the fact that they both claim to have been the victims of Guidry's wrongdoing.  This Court should not forsake its judicial duty to examine the merits of the case at hand merely so as to fashion a ruling "in harmony" with Guidry's partial victory over another alleged victim.

## III.    CONCLUSION

Neither Copeland's petition, nor any evidence submitted by Guidry supports the proposition that any of Copeland's claims are prescribed or perempted.  To the contrary,

Copeland's petition, unrefuted by any evidence to the contrary, clearly establishes that as a result of Guidry's intentional concealment of his crimes, Copeland's diligence was unable to reveal facts sufficient to trigger the running of prescription until Guidry admitted to those facts in his guilty plea and the resulting Edwards indictment. Considering the foregoing, Guidry's exception must be denied.

<div align="center">

Respectfully submitted,

*CHOPIN, WAGAR, COLE, RICHARD,*
*REBOUL & KUTCHER, LLP*

By: _____
**ROBERT A. KUTCHER** (LSBA #7895)
**NICOLE S. TYGIER** (LSBA #19814)
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9573

*Attorneys for Plaintiff, Alvin C. Copeland*

## CERTIFICATE OF SERVICE

</div>

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

( )  Hand Delivery     ( )  Prepaid U.S. Mail
( )  Facsimile     ( )  Overnight Delivery

Metairie, Louisiana, this 31s day of January, 2003.

_____

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                              DIVISION "D"

ALVIN C. COPELAND

-versus-

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

Filed:_____        _____
                                              Deputy Clerk

MEMORANDUM IN OPPOSITION TO EXCEPTION OF
PRESCRIPTION OF PLAINTIFF'S CIVIL RICO CLAIM

MAY IT PLEASE THE COURT:

    Plaintiff, Alvin C. Copeland ("Copeland"), the successor to American International

Gaming Association, Inc. ("AIGA"), submits this Memorandum in Opposition to the Exception

of Prescription of Plaintiff's Civil RICO Claim filed herein by Defendant, Robert Guidry.

## I.  INTRODUCTION

    Copeland filed this suit as a result of substantial losses incurred by him in his pursuit of a

license to operate a proposed riverboat gaming operation at the Kenner Laketown Harbor Park

on the shores of Lake Pontchartrain in Jefferson Parish.  As the result of "an overarching corrupt

conspiracy," i.e. a scheme to corrupt the entire process for issuing riverboat gaming licenses in

which both Treasure Chest Casino, LLC and Robert Guidry joined, participated and engaged in

overt acts in furtherance of, the license was not awarded to Copeland, but to Treasure Chest

Casino, LLC.  Copeland has filed this suit, seeking to hold Defendants accountable for both the

expenses he incurred in attempting to fairly participate in the process subverted by Defendants'

conduct, as well lost profits, attorneys fees and costs, and the value of the corruptly obtained

Treasure Chest's gaming license and of its ill begotten success.

    The method for Copeland's pursuit of these goals is his Petition for Damages, which

alleges the Defendants' civil responsibility for their actions under the Racketeering Influenced

and Corrupt Organizations Act, 18 U.S.C. §1961 *et seq.*, the Louisiana Unfair Trade Practices

Act, La.R.S. 51:1401 *et seq.*, Louisiana Civil Code Article 2315 (Tortious Fraud), and 2298

(Unjust Enrichment).  Copeland also alleges that Defendants are solidarily liable under 18 U.S.C.

EXHIBIT
A

§1962 and Louisiana Civil Code Article 2324, and that Treasure Chest is liable for the actions of Robert Guidry under the doctrines of apparent authority, respondeat superior and La.C.C.art. 2320. Despite the fact that Plaintiff neither knew nor could have known of the overarching corrupt conspiracy until it became public knowledge on or about November 6, 1998, Guidry now claims that Plaintiff's claim sunder the RICO act are prescribed.

## II.    LAW AND ARGUMENT

Although Plaintiff does not dispute that the holding of the United States Supreme Court in *Rotella v. Wood*, 120 S.Ct. 1075 (2000) provides for a four year statute of limitation applying to Civil RICO claims which runs from the date the Plaintiff knew or should have known of the injury caused by Defendant's acts in violation of RICO, he nevertheless submits that the claims brought herein are not prescribed by virtue of the Doctrine of Fraudulent Concealment and Equitable Tolling as set forth in *Klehr v. AO Smith Corp.*, 117 S.Ct. 1984 (1997). The key issue, therefore, is when the Plaintiff should have known of the injury caused by the Defendants. Contrary to Guidry's contention, that period was not triggered by the loss of the license awarded to Treasure Chest. At that time, due to the active concealment of the Defendants, which facts are a matter of public record, Plaintiff was not and could not have been aware that he suffered a RICO injury. Instead, Plaintiff's injury only accrued when the scheme to defraud became public knowledge. That occurred in November of 1998, less than four years prior to the institution of this action by Plaintiff, and as such, Plaintiff's claim has not prescribed. Clearly, the rulings on RICO limitations periods were not intended to reward fraudulent acts on behalf of those who have positively and actively violated the law and then purposefully concealed those acts from their victims.

As correctly noted by Guidry, since the filing of this lawsuit, the United States Supreme Court has twice addressed a split between the circuits regarding the choice of appropriate applications of statutes of limitations for Civil RICO claims. However, as Guidry also admits, the Supreme Court's indication that the pattern discovery rule does not apply in no way was meant to obviate the settled "understanding that the federal statutes of limitations are generally subject to principles of **equitable tolling**...and where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer to a plaintiff's difficulty...." *Rotella*, 120 S.Ct. at 1084, *citing Klehr*, 117 S.Ct. 1984 (emphasis added)

2

Under this doctrine, to avail itself of fraudulent concealment, a Plaintiff has the burden of proving that the Defendants concealed the conduct complained of, that the Plaintiff failed, despite the exercise due diligence on their part to discover the facts that form the basis of his claim. *Morton Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823 (11 Cir. 1999), *amended in part*, 211 F.3d 1224 (11 Cir. 2000), *cert. den.*, 120 S.Ct. 3724 (2000); *Blue Cross & Blue Shield of New Jersey, Inc. v. Phillip Morris, Inc.*, 113 F.Supp. 2d 345 (E.D.N.Y. 2000); *Tanaka v. First Hawaiian Bank*, 104 F.Supp. 2d 1243, 1252-1253 (D.Hawaii 2000).

In the instant case, Copeland has alleged facts sufficient to invoke the Doctrine of Fraudulent Concealment. In general terms, Plaintiff, in his Petition, Paragraph 77, specifically noted:

77.

  The RICO persons fraudulently concealed their illegal activities, and plaintiff neither knew nor, in the exercise of due diligence, could reasonably have known of the offenses committed by the members of the RICO enterprise.

In addition to this general allegation and the allegations that Guidry and others concealed their involvement in the overarching corrupt conspiracy noted by Guidry in his Memorandum in Support, Plaintiff has also noted specific affirmative acts of fraudulent concealment. In particular, Paragraph 25 of the Petition specifically alleges:

25.

  The State Police held a hearing into Treasure Chest's application in Baton Rouge, La. On May 17, 1994. At this hearing, the following exchange took place between Captain Mark Oxley of the Division and Robert Vosbein, counsel for Treasure Chest, who was under oath:

Capt. Oxley:  And are you testifying that there are no elected public officials doing business with Treasure Chest?

Mr. Vosbein:  That's correct.

  This statement was made by Mr. Vosbein as agent for Treasure Chest and/or Guidry; on information and belief, it was based on information supplied to him by Treasure Chest and/or Guidry. Treasure Chest's representations, through its agent Mr. Vosbein, violated LSA-R.S. 27:70 C. in failing to disclose Treasure Chest's relationship with Edwin Edwards, which was prohibited by LSA-R.S. 27:96 A.

3

Plaintiff also specifically pled that Guidry further committed another affirmative act of concealment by executing an Affidavit of Full Disclosure on February 2, 1993, falsely representing the involvement of Edwards in the overarching corrupt conspiracy:

27.

In conjunction with his submittal of the Treasure Chest application for a license, Guidry executed an "Affidavit of Full Disclosure" on February 26, 1993, wherein Guidry averred, in pertinent part:

... except as reported in the Application, I have no agreements or understandings with any person or entity and no present intent to pay any sums of money or given anything of value as, including but without limitation, a finder's fee or commission to any person or entity related to the acquisition of any interest in the Application ...

Pursuant to LSA-R.S. 27:70 C., Guidry had a continuing duty to render a full and accurate disclosure of his association with Edwin Edwards as set forth herein. Upon information and belief, Guidry has never disclosed this association, and has therefore violated his duty under LSA-R.S. 27:70 C.

In the instant case, Plaintiff has clearly and unequivocally alleged that Defendants actively concealed their fraudulent conduct so as to prevent Plaintiff from realizing that the injury he suffered on or about May 17, 1994, was the result of an overarching corrupt conspiracy prohibited by and punishable under the RICO statute.

While Guidry notes that Plaintiff has not belabored in his pleadings the facts supporting his "due diligence" with respect to his discovery of the Defendants' conduct, a review of the Petition establishes that Plaintiff diligently attempted to keep himself abreast of developments with respect to the processes involving the issuance of licenses and certificates of preliminary approval. In fact, it is specifically noted that Plaintiff objected to Treasure Chest's request for permission to modify its previously filed application to move the site of its proposed route and operations to Lake Pontchartrain (Petition, para. 18). Moreover, a review of the Petition clearly reveals that Plaintiff in fact diligently monitored local newspapers, including the Times-Picayune.

The degree of due diligence required to plead fraudulent concealment with respect to a RICO claim is a question of fact and is dependent upon the question of "when, under the totality of the circumstances, [a reasonable person] of ordinary intelligence would have discovered the existence of the fraud." *Blue Cross & Blue Shield of New Jersey, Inc.*, 113 F.Supp. 2d at 382.

4

The federal government, with all of its resources, did not immediately discover this fraud. Yet, Guidry complains that the Plaintiff should have done so earlier. That argument comes with ill grace from a convicted felon who purposely hid his criminal activity.

In the instant case, Copeland respectfully submits that he has sufficiently alleged that he acted reasonably in filing this lawsuit at the earliest possible time after learning of credible evidence to support a claim of conspiracy. This evidence was in the form of the series of newspaper articles referred to throughout the Petition, and the issuance of Guidry's guilty plea and the Edwards indictment.

Guidry has indicated that he desires to present evidence at the trial of this Exception. Plaintiff stands ready to, and will introduce at this hearing, evidence and testimony that he acted diligently in keeping abreast of the licensing process. However, due to the nature of Defendants' affirmative acts of concealment, such reasonable efforts were non-availing, and Plaintiff did not learn of the Defendants' conduct until it became public knowledge.

## III.    CONCLUSION

Considering the foregoing, and based on the evidence to be presented at the hearing of this Exception, Plaintiff respectfully submits that this Court should overrule the Exception of Prescription in RICO filed herein by Guidry.

Respectfully submitted,

*CHOPIN, WAGAR, COLE, RICHARD,*
*REBOUL & KUTCHER, LLP*

By: _____
     **ROBERT A. KUTCHER** (LSBA #7895)
     **NICOLE S. TYGIER** (LSBA #19814)
     **VICKI A. TURKO** (LSBA #24677)
     Two Lakeway Center, Suite 900
     3850 North Causeway Boulevard
     Metairie, Louisiana 70002
     Telephone: (504) 830-3838
     Facsimile: (504) 836-9573

**BENJAMIN R. SLATER, JR.** (LSBA #12126)
**BENJAMIN R. SLATER, III, T.A.** (LSBA #12127)
**A. ELISE BROWN** (LSBA #19500)
**DONALD J. MEISLER, JR.** (LSBA #20294)
**S. JOSEPH WELBORN** (LSBA #25928)
**SLATER LAW FIRM**
650 Poydras Street, Suite 2600
New Orleans, Louisiana 70130
Telephone: (504) 523-7333
Facsimile: (504) 528-1080

*Attorneys for Plaintiff Alvin C. Copeland*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of

record in this proceeding:

|   |   |   |   |   |
|---|---|---|---|---|
| ( | ) | Hand Delivery | ( ) | Prepaid U.S. Mail |
| ( | ) | Facsimile | (✗) | Overnight Delivery |

New Orleans, Louisiana, this ___ day of _____ 2000.

6

# CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP
## ATTORNEYS AT LAW

RICHARD A. CHOPIN †‡
NELSON W. WAGAR, III †‡
KEVIN L. COLE ‡
THOMAS M. RICHARD
BRIAN L. REBOUL
ROBERT A. KUTCHER *
ELIZABETH SMYTH SIRGO
NICOLE S. TYGIER

MICHAEL L. COHEN
DIANA L. TONAGEL
PATRICIA D. TUNMER
JUDITH A. MILLER £
MATTHEW D. MONSON
CYNTHIA J. THOMAS Δ○
JASON P. FOOTE
JOHN G. ALSOBROOK
JAMES A. PRATHER
ANGELA M. HEATH
ALLEN K. TRIAL ‡

TWO LAKEWAY CENTER
SUITE 900
3850 NORTH CAUSEWAY BOULEVARD
METAIRIE, LOUISIANA 70002
TELEPHONE 504-830-3838
FACSIMILE 504-836-9540
www.chopin.com

*Writer's Direct Number*
504-830-3820
*Writer's Direct Facsimile*
504-836-9573
rkutcher@chopin.com

NORTHSHORE OFFICE

THREE SANCTUARY BOULEVARD
SUITE 301
MANDEVILLE, LOUISIANA 70471
TELEPHONE 985-674-6680
FACSIMILE 985-674-6681

† *Professional Corporation*
Δ *Also Admitted in D.C.*
* *Also Admitted in New York*
○ *Also Admitted in Puerto Rico*
‡ *Also Admitted in Texas*
£ *Registered Nurse, BSN*

*Please Reply to*
*Metairie Office*

January 31, 2003

**<u>VIA FACSIMILE & OVERNIGHT MAIL</u>**

The Honorable J. Douglas Welborn
Clerk of Court
19th Judicial District Court
Parish of East Baton Rouge
222 St. Louis Street
Baton Rouge, LA 70802

> Re: *Alvin C. Copeland v.*
> *Treasure Chest Casino, LLC and Robert J. Guidry*
> *19[th] JDC No. 464-607(D)*
> *Our File No. 245.2433*

Dear Mr. Welborn:

Enclosed please find the original and four copies of a Memorandum in Opposition to Exception of Prescription of Plaintiff's State Law Claims by Defendant, Robert J. Guidry and a Memorandum in Opposition to Treasure Chest Casino, L.L.C.'s Peremptory Exceptions to Plaintiff's Petition for Damages on behalf of plaintiff, Alvin C. Copeland, which we ask that you *FAX FILE* into the record of the above captioned matter.

Please return a signed/stamped copy of each to me in the enclosed self-addressed, postage prepaid envelope. I have enclosed our check in the amount of $79.00 to cover the court costs of these filings.

Should you have any questions, please do not hesitate to contact me.



The Honorable J. Douglas Welborn
Clerk of Court
January 31, 2003
Page 2

Yours very truly,

**Robert A. Kutcher**

RAK/eb
***Enclosures***

cc:   The Honorable Janice Clark, Attn:  Linda *(w/enclosure, via facsimile only)*
      Arthur A. Lemann, III, Esq. *(w/enclosure, via facsimile only)*
      Paul S. West, Esq. *(w/enclosure, via facsimile only)*
      Michael A. Patterson, Esq. *(w/enclosure, via facsimile only)*

P. 1

✕ ✕ ✕ COMMUNICATION RESULT REPORT ( JAN.31.2003 5:20PM ) ✕ ✕ ✕

FAX HEADER: SUIT ACCT

| TRANSMITTED/STORED : JAN. 31. 2003  5:19PM | | | RESULT | PAGE |
|---|---|---|---|---|
| FILE MODE | OPTION | ADDRESS | | |
| 904  MEMORY TX | | 915048369540 | OK | 1/1 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL          E-2) BUSY
E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION



POSTED
JAN 3 1 2003



# DOUG WELBORN
## CLERK OF COURT

19TH JUDICIAL DISTRICT
PARISH OF EAST BATON ROUGE

Suit Accounting Dept.
P. O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3392
Fax: (225) 389-3392
www.ebrclerkofcourt.org

## FAX RECEIPT

From:      Suit Accounting Department      Date:    1-31-03
Fax Number:  (225) 389-3392              Suit No.:   464607
To:        Robert A. Kutcher        Division:

Alvin C. Copeland   vs.   Treasure Chest Casino

Item(s) Received:   Memo

Amount Due (includes $5.00 Fax Fee and $.50 per page) $   55.50

The Clerk of Court's office has received, by facsimile transmission, documents in the above referenced case. It has been filed as of this date. In accordance with R.S. 13:850 (B), the original and applicable fees should be forwarded to this office within five (5) days.

In accordance with 13:850 (B) (3), a transmission fee of $5.00 should be forwarded to the Clerk of Court with the original document. The fax filing fee is necessary even if filing in forma pauperis.

**NO FURTHER ACTION WILL BE TAKEN WITH THIS DOCUMENT
UNTIL THE ORIGINAL AND NECESSARY FILING FEES ARE RECEIVED
IN THIS OFFICE.**

**SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX-
ISSUANCE BY ORIGINAL REQUESTS ONLY!**

**PLEASE ATTACH THIS RECEIPT TO YOUR ORIGINAL.
IF FILING IN PERSON, NOTIFY FILING CLERK OF PREVIOUS FAX.**

*Deputy Clerk of Court for*
*Doug Welborn, Clerk of Court*

Acct. Dept. Form #6
Rev. 1-2000





# DOUG WELBORN
## CLERK OF COURT

### 19TH JUDICIAL DISTRICT
### PARISH OF EAST BATON ROUGE

Suit Accounting Dept.
P. O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-5992
Fax: (225) 389-5392
www.ebrclerkofcourt.org

## FAX RECEIPT

From:     Suit Accounting Department     Date: _1-31-03_

Fax Number: (225) 389-3392     Suit No.: _464607_

To: _Robert A. Kutcher_     Division: _____

_Alvin C. Copeland_ vs. _Treasure Chest Casino_

Item(s) Received: _Memo_

Amount Due (includes $5.00 Fax Fee and $.50 per page) $ _55.50_

The Clerk of Court's office has received, by facsimile transmission, documents in the above referenced case. It has been filed as of this date. In accordance with R.S. 13:850 (B), the original and applicable fees should be forwarded to this office within five (5) days.

In accordance with 13:850 (B) (3), a transmission fee of $5.00 should be forwarded to the Clerk of Court with the original document. The fax filing fee is necessary even if filing in forma pauperis.

### NO FURTHER ACTION WILL BE TAKEN WITH THIS DOCUMENT
### UNTIL THE ORIGINAL AND NECESSARY FILING FEES ARE RECEIVED
### IN THIS OFFICE.

### SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX-
### ISSUANCE BY ORIGINAL REQUESTS ONLY!

### PLEASE ATTACH THIS RECEIPT TO YOUR ORIGINAL.
### IF FILING IN PERSON, NOTIFY FILING CLERK OF PREVIOUS FAX.

_Deputy Clerk of Court for_
_Doug Welborn, Clerk of Court_

Acct. Dept. Form #6
Rev. 1. 2000

# CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP
### Attorneys at Law

# FAX COVER SHEET

**THIS COMMUNICATION IS CONFIDENTIAL AND INTENDED ONLY FOR THE ADDRESSEE. ANY DISTRIBUTION OR DUPLICATION OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU RECEIVE THIS TELECOPY IN ERROR, PLEASE CALL SENDER IMMEDIATELY**

DATE: <u>January 31, 2003</u>

A TOTAL OF _21_ PAGES (INCLUDING THIS COVER SHEET) IS BEING SENT

Sender's Direct Dial: **(504) 830-3820/830-3824**
Sender: **Robert A. Kutcher/Nicole S. Tygier**
File No.: **245.2433**

TO: **Clerk of Court, 19th JDC – East Baton Rouge Parish**

FAX NO.: **1-225-389-3392**

RE: **Copeland v. Treasure Chest Casino, LLC**
**19th JDC #464-607 (D)**

COMMENTS:

### *PLEASE SEE ATTACHED FAX FILING*

Should you have any problems receiving this transmission, call Julie Wisecarver at (504) 830-3987.



# CHOPIN, WAGAR, COLE,
# RICHARD, REBOUL & KUTCHER, LLP
### ATTORNEYS AT LAW

RICHARD A. CHOPIN ✝‡
NELSON W. WAGAR, III ✝‡
KEVIN L. COLE ‡
THOMAS M. RICHARD
BRIAN L. REBOUL
ROBERT A. KUTCHER *
ELIZABETH SMYTH SIRGO
NICOLE S. TYGIER

MICHAEL L. COHEN
DIANA L. TONAGEL
PATRICIA D. TUNMER
JUDITH A. MILLER £
MATTHEW D. MONSON
CYNTHIA J. THOMAS ∆◊
JASON P. FOOTE
JOHN G. ALSOBROOK
JAMES A. PRATHER
ANGELA M. HEATH
ALLEN K. TRIAL ‡

TWO LAKEWAY CENTER
SUITE 900
3850 NORTH CAUSEWAY BOULEVARD
METAIRIE, LOUISIANA 70002
TELEPHONE 504-830-3838
FACSIMILE 504-836-9540
www.chopin.com

*Writer's Direct Number*
504-830-3820
*Writer's Direct Facsimile*
504-836-9573
rkutcher@chopin.com

**NORTHSHORE OFFICE**

THREE SANCTUARY BOULEVARD
SUITE 301
MANDEVILLE, LOUISIANA 70471
TELEPHONE 985-674-0680
FACSIMILE 985-674-0681

✝   *Professional Corporation*
∆   *Also Admitted in D.C.*
*   *Also Admitted in New York*
◊   *Also Admitted in Puerto Rico*
‡   *Also Admitted in Texas*
£   *Registered Nurse, BSN*

*Please Reply to*
*Metairie Office*

January 31, 2003

### *VIA FACSIMILE & OVERNIGHT MAIL*

The Honorable J. Douglas Welborn
Clerk of Court
19th Judicial District Court
Parish of East Baton Rouge
222 St. Louis Street
Baton Rouge, LA 70802

> *Re:*   *Alvin C. Copeland v.*
> *Treasure Chest Casino, LLC and Robert J. Guidry*
> *19th JDC No. 464-607(D)*
> *Our File No. 245.2433*

Dear Mr. Welborn:

Enclosed please find the original and four copies of a Memorandum in Opposition to Exception of Prescription of Plaintiff's State Law Claims by Defendant, Robert J. Guidry and a Memorandum in Opposition to Treasure Chest Casino, L.L.C.'s Peremptory Exceptions to Plaintiff's Petition for Damages on behalf of plaintiff, Alvin C. Copeland, which we ask that you *FAX FILE* into the record of the above captioned matter.

Please return a signed/stamped copy of each to me in the enclosed self-addressed, postage prepaid envelope. I have enclosed our check in the amount of $79.00 to cover the court costs of these filings.

Should you have any questions, please do not hesitate to contact me.

Yours very truly,

Robert A. Kutcher

RAK/eb
*Enclosures*

cc:   The Honorable Janice Clark, Attn:  Linda *(w/enclosure, via facsimile only)*
      Arthur A. Lemann, III, Esq. *(w/enclosure, via facsimile only)*
      Paul S. West, Esq. *(w/enclosure, via facsimile only)*
      Michael A. Patterson, Esq. *(w/enclosure, via facsimile only)*

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607

DIVISION "D"

COST OK Amt.

ALVIN C. COPELAND

JAN 3 1 2003

-versus-

BY

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY DEP. CLERK OF COURT

Filed: _____

_____
Deputy Clerk

**MEMORANDUM IN OPPOSITION TO EXCEPTION OF PRESCRIPTION OF
PLAINTIFF'S STATE LAW CLAIMS BY DEFENDANT, ROBERT J. GUIDRY**

**MAY IT PLEASE THE COURT:**

Plaintiff, Alvin C. Copeland ("Copeland"), submits this Memorandum in Opposition to

the Exception of Prescription of Plaintiff's State Law Claims herein on behalf of defendant,

Robert J. Guidry ("Guidry"). Although the state law causes of action bear different prescriptive

periods, this Exception, like Guidry's previously filed and now reurged Exception of Prescription

of Plaintiff's RICO Claim, ultimately must be denied based upon the defendant's intentional

fraudulent concealment of the conspiracy and plaintiff's pled and demonstrated reasonable

diligence with respect to his attempts to discover the defendant's conduct. The legal sources and

terminology used with respect to the issues of federal statutes of limitation and state prescription

vary, but the analysis and ultimately the result are the same. Plaintiff's claims are timely, and

both[1] of these Exceptions must be overruled.

## I.    INTRODUCTION

Copeland filed this suit as a result of substantial losses incurred by him in his pursuit of a

license to operate a proposed riverboat gaming operation at the Kenner Laketown Harbor Park

---

[1] A copy of the previously filed Opposition to Exception of Prescription of Plaintiff's Civil RICO Claim is attached
hereto as Exhibit "A."

on the shores of Lake Pontchartrain in Jefferson Parish. As the result of "an overarching corrupt conspiracy," *i.e.* a scheme to corrupt the entire process for issuing riverboat gaming licenses in which both Treasure Chest Casino, LLC ("Treasure Chest") and Guidry participated and engaged in overt acts in furtherance of, the license was not awarded to Copeland, but to Treasure Chest. Copeland has filed this suit, seeking to hold Defendants accountable for both the expenses he incurred in attempting to fairly participate in the process subverted by Defendants' conduct, as well lost profits, attorneys' fees and costs, and the value of the corruptly obtained Treasure Chest gaming license and of its ill begotten success.

The method for Copeland's pursuit of these goals is his Petition for Damages, which alleges the Defendants' civil responsibility for their actions under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 *et seq.* ("RICO"), the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401 *et seq.* ("LUTPA"), Louisiana Civil Code Articles 2315 (Tortious Fraud), and 2298 (Unjust Enrichment). Copeland also alleges that Defendants are solidarily liable under 18 U.S.C. §1962 and Louisiana Civil Code Article 2324, and that Treasure Chest is liable for the actions of Robert Guidry under the doctrines of apparent authority, *respondeat superior* and La. C.C. art. 2320.

Copeland filed his Petition for Damages on September 15, 1999, less than a year after defendant, Robert Guidry pled guilty and the details of Guidry's conspiracy came to light with the indictment of Edwards on November 6, 1998. On that same date, September 15, 1999, Copeland also filed an Ex Parte Motion to Transfer and Consolidate the case filed with a related action pending in Division "A", *Alvin C. Copeland v. Louisiana Gaming Control Board, et al*, bearing docket number 400-750. Prior to the hearing on the Motion for Consolidation, defendant, Guidry, filed a Motion to Stay all matters in this action until the disposition of the federal criminal proceeding in *United States of America v. Edwin Edwards*, criminal docket number 98-165-B-M2, United States District Court for the Middle District of Louisiana. A Consent Judgment was entered on December 7, 1999, staying this matter up to and including March 14, 2000. This Stay was subsequently extended by a Joint Motion for Entry of Consent Judgment on April 5, 2000, until fifteen days following the return of a jury verdict in the *Edwards* matter.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 186 of 323

Following the Edwards guilty verdict, on or about October 6, 2000, defendant, Robert Guidry filed an Exception of No Cause of Action and an Exception of Prescription as to plaintiff's civil RICO claim, and an Exception of No Right of Action or in the Alternative, Exception of Vagueness in this matter. Plaintiff opposed all of these Exceptions. A hearing was held in this matter on November 13, 2000 and on March 6, 2001, the Court rendered a Judgment dismissing plaintiff's Petition solely on the basis on the Exceptions of No Cause of Action. The Court of Appeal reversed that matter, ruling that Copeland had stated a cause of action, and remanded on June 21, 2002. Subsequently, Guidry re-urged the Exception of Prescription of Civil RICO Claims which was never ruled on, and filed the instant Exceptions, urging that plaintiff's state claims should be dismissed as well.

## II.    LAW AND ARGUMENT

Contrary to the representation made by Guidry in his Memorandum in Support of Exception of Prescription of State Law Claims, as with his RICO claims, none of Copeland's claims are prescribed. Although each of the claims is subject to a different prescriptive period, none of those prescriptive periods expired prior to the filing of this suit.

### A.    Unjust Enrichment.

Contrary to the defendant's citation of *Aetna Life and Casualty Company v. Dotson*, 346 So.2d 762 (La. App. 1st Cir.) *writ denied*, 349 So.2d 1272 (La. 1977), there is substantial jurisprudence to the effect that an action for unjust enrichment is prescribed by ten (10) years. *Safeco Insurance Company v. Farm Bureau Insurance Companies*, 490 So.2d 565 (La. App. 3rd Cir. 1986). Even following the *Dotson* decision, the First Circuit continued to rule that claims such as unjust enrichment, which are quasi contractual, are subject to a ten-year prescriptive period, making the precedential value of the *Dotson* decision extremely dubious. *Julien v. Wayne*, 415 So.2d 540 (La.App. 1 Cir. 1982), citing *State ex rel. Guste v. Estate of Himbert*, 327 So.2d 698 (La.App. 1st Cir. 1976), *writ den.* 330 So.2d 308, 311 (La.1976); *Smith v. Phillips*, 175 La. 198, 143 So. 47 (1932); *Lagarde v. Dabon*, 155 La. 25, 98 So. 744 (1924).

"The commentators are divided on the issue" of whether quasi contractual claims are subject to a one or ten year prescriptive period, *Fidelity & Deposit Co. of Maryland v. Smith*, 730 F.2d 1026 (5th Cir.1984), and while the First Circuit appears to have not addressed the issue in recent years, those courts that have done so **subsequent to the 1984 obligations revision** have

3

ruled that actions in quasi contract are subject to a **ten-year prescriptive period**. *Burns v. Sabine River Authority*, 1998-1536 (La.App. 3 Cir. 5/5/99), 736 So.2d 977, citing *Kilpatrick v. Kilpatrick*, 27,241 (La.App. 2 Cir. 8/23/95); 660 So.2d 182, *writ denied*, 95-2579 (La.12/15/95); 664 So.2d 444; *Taylor v. Smith*, 619 So.2d 881 (La.App. 3 Cir.), *writ denied*, 625 So.2d 1038 (La.1993).

Copeland's unjust enrichment claim is subject to a ten-year prescriptive period, which clearly did not expire prior to the filing of this suit. Of course, even if defendants' contention is correct and the court should determine that a one-year prescriptive period under La. C.C. art. 3492 should apply with respect to claims for unjust enrichment, then this claim would still be viable by virtue of the doctrine of *contra non-valentem* as set forth later in this memo with respect to Copeland's other claims.

### B.    Unfair Trade Practices.

Copeland's petition states a claim under the Louisiana Unfair Practices Act, which as correctly noted by Guidry, is generally subject to a one-year peremptive statute of limitations under La. R.S. 51:1409(E). However, counsel for Guidry's fanciful attempts to "distinguish" the recent ruling of the First Circuit Court of Appeal in *Capitol House Preservation Company, LLC v. Perryman Consultants, Inc.*, 1998-2216 (La. App. 1st Cir. 11/5/99), 745 So.2d 1194, *writ denied*, 1999-3446 (La. 2/11/2000), 754 So.2d 937, are in reality nothing more than a statement of counsel's disagreement with the holding of that case as applied to the instant case, and a citation to irrelevant case law from other courts of appeal. The fact is that *Capitol House Preservation Company* is binding authority on this Court, and is directly on point with respect to the instant case. In that case, citing its previous decision the Court of Appeal noted:

> The duty to disclose violations of the Riverboat ... Act under La. R.S. 27:70(C) is a continuing one which does not end with the receipt of a license and is equally applicable whether a "person" is an applicant, or subsequently, a licensee. Each day that a "person" fails to disclose a violation of the Act of which he is aware constitutes a new breach of the statutory duty to disclose which breach continues anew each day until the disclosure occurs.

*Capitol House Preservation Company*, 745 So.2d at 1196. Guidry's argument as to inapplicability of this case to the facts at hand are simply erroneous and the cases which he relies to support this distinction do not do so.

Contrary to Guidry's contention, there is no reason to conclude that the First Circuit in *Capitol House Preservation Company* did not contemplate the case law cited by Guidry, all of

4

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 188 of 323

which was decided prior to the *Capitol House Preservation Company* decision. In fact, a review of these cases reveals that they, unlike *Capitol House Preservation Company* itself, are wholly inapplicable and distinguishable.

Our Lady of the Lake Hospital v. Carboline, 92-2121 (La.App. 1 Cir. 12/29/93), 632 So.2d 339, *writ denied*, 94-0287, (La. 3/25/94), 635 So.2d 228, for example, was a products liability suit in which the Court of Appeal reversed the dismissal on prescription grounds based on the discovery of documents tending to establish that the manufacturer made deliberate misrepresentations which "may have had the effect of lulling [the plaintiff] into a false belief that the corrosion problems had been effectively eliminated." *Our Lady of the Lake Hospital*, 632 So.2d at 344. To the extent this case is relevant at all, it stands for the proposition that an exception of prescription is improperly granted without appropriate "consideration of this crucial evidence as it applies to the doctrines of *contra non valentem* and continuing tort." *Id.*

Similarly, *Bunge Corp. v. GATX Corporation*, 557 So.2d 1376 (La.1990), dealt with different facts, a different statute, and was effectively legislatively overruled. *GHR Energy Corp. v. Carboline Company*, 744 F.Supp. 1405, 1406 (E.D.La.1990). In short, while the facts in the instant case do not establish that Copeland received notice of "defendant's failure to disclose over one year before suit was filed." 744 F.Supp. at 1407, n. 4, these cases were decided almost ten years prior to the binding decision in *Capitol House Preservation Company* and counsel for Guidry relies upon these cases merely to attack the clear and binding determination by the First Circuit in that case which establishes that each of Guidry's failures to disclose violations of the Act is a new breach of the statutory violation which continues anew each day until the disclosure occurs. Copeland's unfair trade practices claims are not perempted.

### C.     *Contra Non-Valentem – Delictual Claims.*

The remainder of Copeland's state court claims, tortious fraud, (and unjust enrichment in the unlikely event that it is not subject to a ten-year prescriptive period) are governed by the one-year prescriptive, rather than peremptive period under La. C.C. art. 3492. However, just as the federal courts have recognized that the RICO statute of limitations is subject to tolling on the basis of a defendant's fraudulent concealment, so to have Louisiana courts repeatedly recognized that the doctrine of *contra non-valentem agere nulla currit praescriptio* applies to suspend

5

liberative prescription when there is a legal cause which prevents the running of prescription under four discrete circumstances or categories.

> (1) When there is a legal cause that prevented courts or their offices from taking cognizes of or acting on the plaintiff's actions; (2) where there is a condition coupled with the contract or connected with the proceeding that prevented the creditor from suing or acting; (3) **when the debtor himself did some act that effectually prevented the creditor from availing himself of his cause of action;** (4) when the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by defendant. (Emphasis added.)

*Hendrick v. A.B.C. Insurance Company*, 2000-2403 (La. 5/15/01), 787 So.2d 283, 290, quoting *Corsey v. State, through Dept. of Corrections*, 375 So.2d 1319, 1321-22 (La. 1979). It is this third species of *contra non-valentem* which is plainly applicable to the facts of the case at hand, and functions identically to the doctrine of fraudulent concealment, previously noted by defendant with respect to Guidry's Exception of Prescription of Plaintiff's Civil RICO claim. Notably, in Paragraph 77 of his petition, plaintiff specifically noted:

> 77.

> The RICO persons fraudulently concealed their illegal activities, and plaintiff neither knew nor, in the exercise of due diligence, could reasonably have known of the offenses committed by the members of the RICO enterprise.

In addition to this general allegation and the allegations that Guidry and others concealed their involvement in the overarching corrupt conspiracy noted by Guidry in his Memorandum in Support, Plaintiff has also noted specific affirmative acts of fraudulent concealment. In particular, Paragraph 25 of the Petition specifically alleges:

> 25.

> The State Police held a hearing into Treasure Chest's application in Baton Rouge, La. on May 17, 1994. At this hearing, the following exchange took place between Captain Mark Oxley of the Division and Robert Vosbein, counsel for Treasure Chest, who was under oath:

Capt. Oxley:  And are you testifying that there are no elected public officials doing business with Treasure Chest?

Mr. Vosbein:  That's correct.

> This statement was made by Mr. Vosbein as agent for Treasure Chest and/or Guidry; on information and belief, it was based on information supplied to him by Treasure Chest and/or Guidry. Treasure Chest's representations, through its agent Mr. Vosbein, violated LSA-R.S. 27:70C in failing to disclose Treasure Chest's relationship with Edwin Edwards, which was prohibited by LSA-R.S. 27:96A.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 190 of 323

Plaintiff also specifically pled that Guidry further committed another affirmative act of concealment by executing an Affidavit of Full Disclosure on February 2, 1993, falsely representing the involvement of Edwards in the overarching corrupt conspiracy:

27.

> In conjunction with his submittal of the Treasure Chest application for a license, Guidry executed an "Affidavit of Full Disclosure" on February 26, 1993, wherein Guidry averred, in pertinent part:
>
>> ... except as reported in the Application, I have no agreements or understandings with any person or entity and no present intent to pay any sums of money or given anything of value as, including but without limitation, a finder's fee or commission to any person or entity related to the acquisition of any interest in the Application ...
>
> Pursuant to LSA-R.S. 27:70C, Guidry had a continuing duty to render a full and accurate disclosure of his association with Edwin Edwards as set forth herein. Upon information and belief, Guidry has never disclosed this association, and has therefore violated his duty under LSA-R.S. 27:70C.

In the instant case, Plaintiff has clearly and unequivocally alleged that Defendants actively concealed their fraudulent conduct so as to prevent Plaintiff from realizing that the injury he suffered on or about May 17, 1994, was the result of an overarching corrupt conspiracy prohibited by and punishable under the RICO statute.

While Guidry notes that Plaintiff has not belabored in his pleadings the facts supporting his "due diligence" with respect to his discovery of the Defendants' conduct, a review of the Petition establishes that Plaintiff diligently attempted to keep himself abreast of developments with respect to the processes involving the issuance of licenses and certificates of preliminary approval. In fact, it is specifically noted that Plaintiff objected to Treasure Chest's request for permission to modify its previously filed application to move the site of its proposed route and operations to Lake Pontchartrain (Petition, para. 18). Moreover, a review of the Petition clearly reveals that Plaintiff in fact diligently monitored local newspapers, including the Times-Picayune.

Just as the degree of due diligence to plead fraudulent concealment with respect to a RICO claim is a question of fact depending upon the totality of the circumstances, so to is the question of whether a plaintiff exercised reasonable diligence in the discovery of fraud a factual question under Louisiana law. In *Hospital Service District No. 1 of Jefferson Parish v. Alas*, 94-

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 191 of 323

897 (La. App. 5th Cir. 6/28/95), 657 So.2d 1378, 1383, *writ denied*, 95-1959 (La. 11/13/95), 662

So.2d 473:

> Jurisprudence tells us that to avoid the running of prescription, a plaintiff must
> show he did not know of facts upon which to base a claim nor did he have reason
> to know or discover such facts, and that the lack of knowledge is not attributable
> to his fault ...
>
> For purposes of the discovery doctrine of *contra non valentem*, a plaintiff will be
> deemed to know that which he could have learned from reasonable diligence. ...
> If an opportunity is afforded to a party to know and to learn about a certain matter
> bearing on his interest and he fails or refuses to profit by it, if he closes his eyes to
> the notice spread before him and shuts his ears to oral information directly
> imparted to him, the law will hold him as bound by the same, and as fully notified
> as if he had taken thorough personal cognizance at the time of the information
> imparted and of the notice given.

The same facts which would support due diligence with respect to RICO equally

demonstrates reasonable diligence for Louisiana prescriptive period purposes. Copeland's

petition establishes his diligence in keeping himself informed by monitoring newspapers and

events, and neither the pleadings nor any evidence submitted by Guidry establishes that he

closed his eyes or shut his ears.

In fact, the instant case is in all pertinent matters indistinguishable from the decision of

the First Circuit in *Paragon Development Group, Inc. v. Skeins*, 96-2125 (La. App. 1st Cir.

9/19/97), 700 So.2d 1279, wherein the First Circuit held in a suit to recover damages from a

subcontractor resulting from theft at a construction site that prescription was suspended pursuant

to the theory of *contra non valentem* until such time as the company was alerted that there may

have been an arrest for the thefts.

In *Paragon Development Group, Inc.*, the plaintiff-developer suffered losses from theft at

a construction site in June or July of 1994. Paragon did not file suit until August 31, 1995,

claiming that it first learned the identity of the party responsible in May of 1995 when it received

a restitution check from the district attorney's office. The defendant, the father of the perpetrator,

filed an exception of prescription, urging that a principal of the plaintiff company was aware of

the perpetrator's involvement soon after the incident occurred, that he had called the perpetrator

the day after the theft, and even given the boy's name to the police officers investigating the

crime. *Paragon Development Group, Inc.*, 700 So.2d at 1282.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 192 of 323

While the trial court agreed with the defendant and granted the exception of prescription, the First Circuit disagreed, beginning its analysis with a quotation from the Louisiana Supreme Court:

> Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.
>
> When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction.

*Paragon Development Group, Inc.*, 700 So.2d at 1282, quoting *Jordan v. Employee Transfer Corporation*, 509 So.2d 420, 423 (La.1987). The First Circuit's analysis of the issue was telling:

> The trial judge found, according to his written reasons for judgment, that appellant's inaction was unreasonable and that it had failed to properly "seek out those whom [it] believ[ed] responsible" for the thefts against Putt-Putt. We disagree. It is apparent, based upon testimony that Eddie Horridge telephoned Scott the morning after the first theft and that Bryan Horridge provided Scott's name to the police, **that the brothers suspected Scott's involvement in these crimes from the onset. However, it is equally apparent that they lacked actual proof to support their suspicions**, otherwise the minor Skeins would likely have been arrested immediately following the thefts. **The issue then becomes whether the mere suspicion that a party *may* be responsible for a crime is sufficient to support bringing a cause of action for damages. We conclude that it is not.**
>
> Applying the principles enounced in *Jordan* to the present circumstances, we find that the discovery rule prevented commencement of the running of prescription until principals of Paragon had sufficient notice to pursue a claim against a particular defendant. *See Jordan v. Employee Transfer Corp.*, 509 So.2d at 424. At the earliest, this occurred in September of 1994 when Scott Skeins' mother contacted Eddie Horridge. This incident was probably sufficient to alert appellant to make further inquiry concerning whether there had been an arrest for the thefts against Putt-Putt. Prior to this point, appellant's inaction was reasonable. Therefore, until September of 1994, prescription was suspended pursuant the theory of *contra non valentem*, and appellant's suit, filed on August 31, 1995, was timely.

*Paragon Development Group, Inc.*, 700 So.2d at 1282 (emphasis added). Although the crimes in the instant case are far more complicated than a simple theft, the reasoning is equally applicable to the instant case. Copeland was certainly aware well prior to the filing of this suit of irregularities in the licensing process, and in fact, instituted *Alvin C. Copeland v. Louisiana Gaming Control Board, et al*, No. 400-750 in 1993. However, Copeland knew virtually nothing of the scheme, the particular players involved, and certainly lacked proof until such time as the Edwards/Guidry indictments were handed down. Insofar as Plaintiff filed suit on September 15,

9

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 193 of 323

1999, within one-year from the date of these indictments, his suit is timely, and Guidry's exceptions must be overruled.

### D. Astoria is irrelevant.

Finally, Plaintiff respectfully urges that this Court is not bound by the district court's ruling in *Astoria Entertainment, Inc. v. Edwards*, 159 F.Supp.2d 303 (E.D.La.2001), nor is that court's analysis of the prescription of a different alleged victim of Guidry's conduct particularly helpful or relevant to the case at hand. *Astoria's* attempts to pursue Guidry by means of an antitrust suit, the pleadings dealt with on the motion to dismiss presented to the district court, and the facts of that case, particularly the facts as to Astoria's knowledge and diligence with respect to the filing of the action, are completely different from those presented in the instant suit.

Leaving aside the fact that the district court did not even address the merits of the pendent state law claims other than to dismiss them based in part on the pendency of another state lawsuit, *Astoria*, 159 F.Supp.2d at 329, the *Astoria* court's analysis of Astoria's pleadings reveals some startling dissimilarities. Unlike Copeland's petition, the Astoria complaint did not sufficiently plead that "the defendants concealed the conduct complained of ... [or] ... that the [Astoria] failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim." *Id.* As Copeland has previously noted in his Memorandum in Opposition to Exception of Prescription to Plaintiff's RICO Claim, Copeland has done this. Moreover, a review of that opinion also reveals that Astoria pled other allegations not at all contained in Copeland's complaint, such as that "Robert Guidry and Robert List boasted of their involvement in the illicit activity," which lead the *Astoria* court to conclude that as to Astoria, presumably the audience of those boasts, the scheme was "an overt scheme as opposed to a covert scheme." *Id.*

What Copeland knew and what Astoria knew, what diligence they exercised, and what they pled are entirely different, notwithstanding the fact that they both claim to have been the victims of Guidry's wrongdoing. This Court should not forsake its judicial duty to examine the merits of the case at hand merely so as to fashion a ruling "in harmony" with Guidry's partial victory over another alleged victim.

### III.   CONCLUSION

Neither Copeland's petition, nor any evidence submitted by Guidry supports the proposition that any of Copeland's claims are prescribed or perempted. To the contrary,

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 194 of 323

Copeland's petition, unrefuted by any evidence to the contrary, clearly establishes that as a result of Guidry's intentional concealment of his crimes, Copeland's diligence was unable to reveal facts sufficient to trigger the running of prescription until Guidry admitted to those facts in his guilty plea and the resulting Edwards indictment. Considering the foregoing, Guidry's exception must be denied.

Respectfully submitted,

**CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP**

By: _____
**ROBERT A. KUTCHER** (LSBA #7895)
**NICOLE S. TYGIER** (LSBA #19814)
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9573

*Attorneys for Plaintiff, Alvin C. Copeland*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

| Hand Delivery | ( ) | Prepaid U.S. Mail |
| Facsimile | ( ) | Overnight Delivery |

Metairie, Louisiana, this 31s day of January, 2003.

_____

11

oci

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607 DIVISION "D"

**ALVIN C. COPELAND**

-versus-

**TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY**

Filed:_____ _____
Deputy Clerk

**MEMORANDUM IN OPPOSITION TO TREASURE CHEST CASINO, L.L.C.'S
PEREMPTORY EXCEPTIONS TO PLAINTIFF'S PETITION FOR DAMAGES**

**MAY IT PLEASE THE COURT:**

Plaintiff, Alvin C. Copeland ("Copeland"), submits this Memorandum in Opposition to Treasure Chest Casino, L.L.C.'s Peremptory Exceptions to Plaintiff's Petition for Damages, urging that this Court overrule these exceptions. Each of these Exceptions, prescription, non-joinder of necessary parties, and *res judicata* is ill founded.

## I. Prescription

Treasure Chest Casino, L.L.C. ("Treasure Chest") now urges that Plaintiff's Petition for Damages should be dismissed on grounds of prescription, adopting the arguments of co-defendant, Robert Guidry ("Guidry"). In the interests of economy, Copeland attaches hereto and adopts the arguments contained in copies of his Memorandum in Opposition to the Exception of Prescription of Plaintiff's State Law Claims (Exhibit "1") and his Memorandum in Opposition to Exception of Prescription of Plaintiff's Civil RICO claim (Exhibit "2") which fully address Treasure Chest's erroneous arguments, and urges that the Court consider these memoranda in opposition to Treasure Chest's current exception. Like Copeland's claims against Guidry, his claims against Treasure Chest are not prescribed by virtue of defendants' intentional concealment and this Exception must be overruled.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 196 of 323

## II.   Non-Joinder of a Necessary Party

Treasure Chest's Exception states that "Plaintiff has failed to join parties in compliance with Articles 641 and 642 of the Louisiana Code of Civil Procedure." However, Treasure Chest has failed to identify who these parties are, and has failed to even brief this Exception. Under the circumstances, Copeland urges that this Exception must be overruled.

## III.   *Res Judicata*

Treasure Chest's final exception urges that the opinion of the First Circuit Court of Appeal in *Alvin C. Copeland v. Louisiana Gaming Control Board, et al*, 2000-2864 (La.App. 1 Cir. 9/11/02) constitutes *res judicata*. Copeland respectfully urges that this Exception be overruled.

### A.   *Factual Background*

When the instant suit was filed, it was accompanied by an Ex Parte Motion to Transfer and Consolidate (Exhibit "3") this case with the already pending action in Division "A" against the Gaming Control Board, *Alvin C. Copeland v. Louisiana Gaming Control Board, et al*, No. 400,750 (hereinafter "the Gaming Control Board" suit). Although the judge in division "A" accepted the transfer of this case, Treasure Chest filed a Memorandum in Opposition to Consolidation of Cases (Exhibit "4") in which it asserted that:  "[t]he two actions involve **different types of actions**,[1] standards of review, **different defendants**[2] and are **based on different facts**" (p. 1), that the actions "**do not involve common issues of law and fact** as both involve different complex federal claims – constitutional and RICO claims, as well as numerous state claims **against different defendants** based on different allegations" and that "**common issues of law and fact do not predominate**" (pp. 3, 4). Following a similar opposition by the Gaming Control Board, (Exhibit "5"), and a hearing on November 15, 1999, this Court denied Copeland's Motion for Consolidation. (Exhibit "6").

Ignoring its earlier admissions to the contrary, Treasure Chest now abandons the arguments advanced to avoid consolidation and now urges that this case arises out of the same transaction or occurrence as the Gaming Control Board suit in order to maintain that the decision

---

[1] In the Gaming Control Board suit, Copeland sought both declaratory relief as well as damages against the Gaming Control Board. Treasure Chest intervened solely with respect to the Counts relating to declaratory relief, both of which were declared moot by the First Circuit Court of Appeal.
[2] The only common defendant to both suits is Treasure Chest, which intervened and was not sued by Copeland. Guidry was not a party to the Gaming Control Board suit and the Gaming Control Board is not a party to this suit.

2

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 197 of 323

of the First Circuit in *Alvin C. Copeland v. Louisiana Gaming Control Board, et al*, 2000-2864

(La.App. 1 Cir. 9/11/02) is *res judicata* as to Plaintiff's claims herein.

**B.    Law**

Until recently, the law of *res judicata* in Louisiana barred a second action only when the

plaintiff sought the same relief based on the same cause of action.  LSA-C.C. Art. 2286.[3]  The

law was revised and re-designated as present LSA-R.S. 13:4231.  See **Comments-1990(a)** to

13:4231 which now provides:

> Except as otherwise provided by law, a valid and final judgment is
> conclusive between the same parties, except on appeal or other direct
> review, to the following extent:
>
> (1) If the judgment is in favor of the plaintiff, all causes of action existing
> at the time of final judgment arising out of the transaction or occurrence
> that is the subject matter of the litigation are extinguished and merged in
> the judgment.
>
> (2) If the judgment is in favor of the defendant, all causes of action
> existing at the time of final judgment arising out of the transaction or
> occurrence that is the subject matter of the litigation are extinguished and
> the judgment *bars a **subsequent action** on those causes of action*.
>
> (3) A judgment in favor of either the plaintiff or the defendant is
> conclusive, in any subsequent action between them, with respect to any
> issue actually litigated and determined if its determination was essential to
> that judgment.

(Emphasis added).  While *res judicata* now focuses on transaction or occurrence rather than on

demands, Louisiana courts still strictly construe the doctrine.

"*Res judicata* cannot be invoked unless all its essential elements are present and each

necessary element has been established beyond all question.  The *res judicata* doctrine must be

strictly construed, and any doubt concerning its applicability is to be resolved against the party

raising the objection." *Mandalay Oil & Gas, L.L.C. v. Energy Development Corp.*, 2001-0993

(La.App. 1 Cir. 7/3/02), 2002 WL 1434422, *4, *citing Berrigan v. Deutsch, Kerrigan & Stiles*,

LLP, 2001-0612, (La.App. 4th Cir.1/2/02), 806 So.2d 163, 167, *writs denied*, 2002-0388, 2002-

0341 (La.4/12/02), 813 So.2d 410.  *See also Griffin v. BSFI Western E & P, Inc.*, 2000-2122

(La.App. 1 Cir. 2/15/02), 812 So.2d 726, 730; *Kelty v. Brumfield*, 93-1142, (La.2/25/94), 633

So.2d 1210, 1215.

---

[3] "The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality."

3

Moreover, "[w]hile *res judicata* is a useful tool, it should not be used as a scythe applied mechanically to mow down claims where the party asserting the claim is not at fault for the lack of adjudication of that claim in the first suit." *Griffin*, 812 So.2d at 730-731, *quoting Terrebonne Fuel & Lube, Inc. v. Placid Refining Company*, 95-0654 (La.1/16/96), 666 So.2d 624, 635. In addition to strictly construing the elements of *res judicata*, La.R.S. 13:4232A specifically provides for exceptions to the general rule: "[w]hen exceptional circumstances justify relief," "the judgment dismissed the first action without prejudice," or "reserved the right of the plaintiff to bring another action." *Griffin*, 812 So.2d at 730, n. 2.

1.     *The suits do not arise out of the same "transaction or occurrence."*

As Treasure Chest originally admitted and argued to this Court, this suit and the Gaming Control Board suit do not arise out of the same set of facts. La. R.S. 13:4231 does not define the term "transaction or occurrence," a pivotal term in determining whether either *Res judicata* or *Lis Pendens* applies. However, Louisiana Courts have relied upon the federal standard for guidance. In *Hy-Octane Investments, Ltd. v. G & B Oil Products, Inc.*, 97-28 (La. App. 3 Cir. 10/29/97), 702 So.2d 1057, 1060, it was noted that:

> *Black's Law Dictionary* defines "transaction" as, *inter alia*, "a broader term than 'contract," and "a group of facts so connected together as to be referred to by a single legal name; as a crime, a contract, a wrong." Among the definitions of "transaction or occurrence" found in 42 Words and Phrases, Supp. p. 201 (1997), is "whether pertinent facts of different claims are so logically related that issues of judicial economy and fairness mandate that all issues be tried in one suit." The federal courts have given the words "transaction or occurrence" a broad and liberal interpretation in order to avoid a multiplicity of suits. All logically related events entitling a person to institute legal action against another generally are regarded as comprising a "transaction or occurrence." *Lasa Per L'Industria Del Marmo Soc. Per Azioni v. Alexander*, 414 F.2d 143 (6th Cir. 1969).

*Hy-Octane Investments, Ltd. v. G & B Oil Products, Inc.*, 97-28 (La.App. 3 Cir. 10/29/97), 702 So.2d 1057, 1060.

Under this standard, adopted from the federal law, "the critical issue is not the relief requested or the theory asserted, but whether the plaintiff bases the two actions on the same nucleus of operative facts." *In re Howe*, 913 F.2d 1138, 1144 (5th Cir. 1990) (emphasis added). Treasure Chest's current position that the two suits arise out of the same transaction or occurrence and hence the same nucleus of operative facts is disingenuous and directly contrary to its prior admissions and with this Court's prior ruling. If the set of facts giving rise to the Gaming Control Board suit in 1999 was different from those in the instant suit when the Motion

4

to Transfer and Consolidate was denied in November 1999, they remain so today and Treasure

Chest's Exception of *Res Judicata* must be overruled.

### 2. *This suit is not a "subsequent action."*

As previously noted, the *res judicata* statute must be strictly construed. A strict reading

of the statute reveals that it is not applicable, as in the instant case, to operate to bar an action

which was instituted prior to the judgment alleged to be *res judicata*. The statute provides:

> (2) If the judgment is in favor of the defendant, all causes of action existing at the
> time of final judgment arising out of the transaction or occurrence that is the
> subject matter of the litigation are extinguished and the judgment *bars a*
> *subsequent action on those causes of action.*

(Emphasis added). As the statute speaks only of barring a subsequent action, the Court of

Appeal's September 2002 Judgment cannot operate to bar an action which was filed prior to the

judgment. Accordingly, Treasure Chest's Exception of *res judicata* must be overruled because it

has failed to prove this element of the statute.

### 3. *Exceptional circumstances justify relief from res judicata effect.*

Finally, even if this Court should somehow find that the elements set forth in La.R.S.

13:4231 have been proven by a preponderance of the evidence, and that no doubts exist as to its

application, Copeland alternatively urges that the provisions of La.R.S. 13:4232 justify relief

from the application of *res judicata* under the unique circumstances of this case. That statute

provides, in pertinent part:

> **§ 4232. Exceptions to the general rule of *res judicata***
>
> A. A judgment does not bar another action by the plaintiff:
>
> (1) When exceptional circumstances justify relief from the *res judicata* effect of
> the judgment;

This statute gives a court authority to exercise its equitable discretion to balance

principles of *res judicata* with interests of justice. *Fine v. Regional Transit Authority*, 95-2603

(La.App. 4 Cir. 6/26/96), 676 So.2d 1134. It is appropriately invoked to avoid the pitfalls of the

procedural rule[4] regarding mandatory joinder of claims in the interests of justice. *Craig v.*

*Adams Interiors, Inc.*, 34,591 (La.App. 2 Cir. 4/6/01), 785 So.2d 997, 1002, citing *Hudson v.*

*City of Bossier*, 33,620 (La.App. 2 Cir. 8/25/00), 766 So.2d 738, *writ denied* 00-2687

(La.11/27/00), 775 So.2d 450.

---

[4] La. C.C.P. art. 425A. provides: "A party shall assert all causes of action arising out of the transaction or
occurrence that is the subject matter of the litigation."

Although Copeland maintains that the provisions of La. R.S. 13:4231 do not apply, even if this Court were to so find, a more compelling circumstance for the application of La. R.S. 13:4232A(1) would be difficult to even imagine. Copeland filed the Gaming Control Board Suit in 1993, and after Treasure Chest intervened as a defendant in that suit, attempted to consolidate that action with this one, urging the predominance of common issues of law and fact. Treasure Chest opposed the consolidation, and yet now comes before this same court urging that the two suits concern the same transaction or occurrence, and that it should be entitled to the dismissal of this suit based on the common issues of fact. Under the circumstances, justice clearly justifies relief from *res judicata*.

## IV.   Conclusion

All three of Treasure Chest's exceptions must be overruled. Prescription was interrupted by the defendants' fraud and intentional concealment of facts, as set forth in Copeland's separate memoranda on the issue of both RICO and state law claims. Treasure Chest has not even briefed its Exception of Non-Joinder, which must be overruled for that reason alone. Finally, this suit is not barred by *res judicata* as the required elements are not met: this suit concerns a different transaction or occurrence, and is not a "subsequent action" to the judgment urged to bar it. Moreover, even if *res judicata* were to apply, exceptional circumstances exist for which this Court should overrule this Exception.

Respectfully submitted,

**CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP**

By: _____
ROBERT A. KUTCHER (LSBA #7895)
NICOLE S. TYGIER (LSBA #19814)
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone:  (504) 830-3838
Facsimile:  (504) 836-9573

*Attorneys for Plaintiff, Alvin C. Copeland*

6

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

(   )    Hand Delivery          (   )    Prepaid U.S. Mail
( ∟ )    Facsimile               (   )    Overnight Delivery

**Metairie, Louisiana,** this ___31st___ day of ___January___, 2003.



Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 202 of 323

# NINETEENTH JUDICIAL DISTRICT COURT

## PARISH OF EAST BATON ROUGE

## STATE OF LOUISIANA

ALVIN C. COPELAND                                    NUMBER  464,607

**VERSUS**                                                      DIVISION D

**TREASURE CHEST CASINO, LLC**
**and ROBERT GUIDRY**

### TREASURE CHEST CASINO, L.L.C.'S
### MOTION FOR CONTINUANCE OF HEARING

**NOW INTO COURT**, through undersigned counsel, comes defendant, Treasure

Chest Casino, L.L.C. (sometimes hereinafter referred to as "TCC"), and respectfully moves this

Honorable Court for a continuance of the hearing scheduled for April 14, 2003, at 9:30 AM, as

counsel for TCC has a trial scheduled in another matter in another jurisdiction on April 14, 2003.

Respectfully Submitted:

Paul S. West, La. Bar Roll No. 13375
Juston M. O'Brien, La. Bar Roll No. 26447
MCGLINCHEY STAFFORD, PLLC
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825
Telephone (225) 383-9000
Facsimile (225) 343-3076

REC'D C.P.
MAR 13 2003

REC'D C.P.
MAR 11 2003

## CERTIFICATE OF SERVICE

      I certify that a copy fo the above and foregoing has been mailed today, via United States Mail, postage prepaid and properly addressed, to the following counsel of record:

Lanny R. Zatzkis, Esquire
ZATZKIS & ASSOCIATES
Suite 2750, Poydras Center
650 Poydras Street
New Orleans, LA 70130

Arthur A. Lemann, III, Esquire
ARTHUR A. LEMANN, III
  & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Robert A. Kutcher, Esquire
CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

Winston G. DeCuir, Esquire
DECUIR & CLARK, L.L.P.
1961 Government Street
Baton Rouge, LA 70806

Ralph Capitelli, Esquire
CAPITELLI & WICKER
Suite 2950, Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Baton Rouge, Louisiana on this _____ of March, 2003.

                                Paul S. West



NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

ALVIN C. COPELAND                                        NUMBER 464,607

VERSUS                                                        DIVISION D

TREASURE CHEST CASINO, LLC
and ROBERT GUIDRY

ORDER

Considering the foregoing motion,

**IT IS HEREBY ORDERED,** that the hearing scheduled for April 14, 2003, at 9:30

AM, is hereby rescheduled ~~DENIED~~ day of _____, 2003, at

_____ _____.

Baton Rouge, Louisiana, this _0_ day of _____, 2003.

_____
JUDGE

Respectfully Submitted:

_____
Paul S. West, Bar Roll No. 13375
MCGLINCHEY STAFFORD, PLLC
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825
Telephone:     (225) 383-9000
Facsimile:     (225) 343-3076

**PLEASE NOTIFY:**

Paul S. West, Esquire
MCGLINCHEY STAFFORD, PLLC
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825

Winston G. DeCuir, Esquire
DECUIR & CLARK, L.L.P.
1961 Government Street
Baton Rouge, LA 70806

Ralph Capitelli, Esquire
CAPITELLI & WICKER
Suite 2950, Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Lanny R. Zatzkis, Esquire
ZATZKIS & ASSOCIATES
Suite 2750, Poydras Center
650 Poydras Street
New Orleans, LA 70130

Arthur A. Lemann, III, Esquire
ARTHUR A. LEMANN, III
  & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Robert A. Kutcher, Esquire
CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

**FILED**

MAR 5 2003

DEPUTY CLERK OF COURT

POSTED

NINETEENTH JUDICIAL DISTRICT COURT

MAR - 6 2003

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

ALVIN C. COPELAND                                    NUMBER 464,607

VERSUS                                                    DIVISION D

TREASURE CHEST CASINO, LLC
and ROBERT GUIDRY

COST OK Amt. 30—
CLH 46457
MAR - 5 2003
BY
DY. CLERK OF COURT

### TREASURE CHEST CASINO, L.L.C.'S
### NOTICE OF INTENT TO SEEK SUPERVISORY REVIEW
### AND REQUEST FOR EXTENSION OF RETURN DATE

**NOW INTO COURT**, through undersigned counsel, comes defendant, Treasure

Chest Casino, L.L.C. (sometimes hereinafter referred to as "TCC"), and gives notice of its intent to

seek supervisory review of the Court's denial of TCC's exception of prescription.

Moreover, TCC has filed other exceptions which may be dispositive in this

proceeding which are set to be heard by this Court on April 14, 2003. Therefore, in the interest of

judicial economy, TCC requests that the return date be set after April 14, 2003. Alternatively, TCC

requests a thirty (30) day extension of the return date, because TCC requires additional time within

which to prepare the writ application.

Respectfully Submitted:

Paul S. West, La. Bar Roll No. 13375
Juston M. O'Brien, La. Bar Roll No. 26447
McGLINCHEY STAFFORD, PLLC
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825
Telephone (225) 383-9000
Facsimile (225) 343-3076

REC'D C.P.
MAR  6 2003

303 1709 620

## CERTIFICATE OF SERVICE

I certify that a copy fo the above and foregoing has been mailed today, via United States Mail, postage prepaid and properly addressed, to the following counsel of record:

Lanny R. Zatzkis, Esquire
ZATZKIS & ASSOCIATES
Suite 2750, Poydras Center
650 Poydras Street
New Orleans, LA 70130

Arthur A. Lemann, III, Esquire
ARTHUR A. LEMANN, III
  & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Robert A. Kutcher, Esquire
CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

Winston G. DeCuir, Esquire
DECUIR & CLARK, L.L.P.
1961 Government Street
Baton Rouge, LA 70806

Ralph Capitelli, Esquire
CAPITELLI & WICKER
Suite 2950, Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Baton Rouge, Louisiana on this _____ of March, 2003.

Paul S. West

# NINETEENTH JUDICIAL DISTRICT COURT

## PARISH OF EAST BATON ROUGE

## STATE OF LOUISIANA

ALVIN C. COPELAND                                NUMBER  464,607

**VERSUS**                                          DIVISION D

TREASURE CHEST CASINO, LLC
and ROBERT GUIDRY

## ORDER

Considering the foregoing motion,

**IT IS HEREBY ORDERED,** that the return date in this matter be and the same is

hereby set for the _21st_ day of _April_, 2003, at _2.30 p.m._.

Baton Rouge, Louisiana, this _7_ day of _March_, 2003.

_(signature)_

J U D G E

Respectfully Submitted:

_(signature)_

Paul S. West, Bar Roll No. 13375
MCGLINCHEY STAFFORD, PLLC
Ninth Floor,  One American Place
Baton Rouge, Louisiana  70825
Telephone:     (225) 383-9000
Facsimile:      (225) 343-3076

**PLEASE NOTIFY:**

Paul S. West, Esquire
MCGLINCHEY STAFFORD, PLLC
Ninth Floor,  One American Place
Baton Rouge, Louisiana 70825

Lanny R. Zatzkis, Esquire
ZATZKIS & ASSOCIATES
Suite 2750, Poydras Center
650 Poydras Street
New Orleans, LA 70130

Winston G. DeCuir, Esquire
DECUIR & CLARK, L.L.P.
1961 Government Street
Baton Rouge, LA 70806

Arthur A. Lemann, III, Esquire
ARTHUR A. LEMANN, III
  & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Ralph Capitelli, Esquire
CAPITELLI & WICKER
Suite 2950, Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Robert A. Kutcher, Esquire
CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

_(vertical stamp, left margin)_
EAST BATON ROUGE PARISH, LA.
FILED
2003 MAR -5  PM 2: 05
DOUG WELBORN
DEPUTY CLERK ... PARISH

I hereby certify that on this day a notice of the
above judgement was mailed by me, with sufficent
postage affixed, to: B. Slattery, M. Patterson,
B. Conrad, S. Quidd, P. West, L. Zatzkis,
Done and signed on _3-11-03_    W. DeCuir,
_(signature)_                         R. Capitelli
                              A. Lemann
                              Deputy Clerk of Court    R. Kutcher

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 208 of 323

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607

DIVISION "D"

ALVIN C. COPELAND

**POSTED**

VERSUS

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

COST OK Amt. *126*
21692
FEB 2 4 2003
BY
DY. CLERK OF COURT

FILED: _____

_____
DEPUTY CLERK

## EXCEPTION OF NON-JOINDER OF A
## PARTY UNDER ARTICLES 641 AND 642

NOW INTO COURT, through undersigned counsel, comes defendant, Robert J. Guidry,

who hereby excepts to the Petition of plaintiff, Alvin C. Copeland, on the grounds that plaintiff has

failed to join parties needed for a just adjudication of the action before the Court, as explained more

fully in the memorandum in support hereof. Defendant respectfully urges the Court to dismiss the

action or give such other relief as is available pursuant to Louisiana Code of Civil Procedure

Articles 641, 642, 927, and 934.

Respectfully Submitted,

*Arthur A. Lemann III / cc*
ARTHUR A. LEMANN, III (8296)
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette St., Ste. 100
New Orleans, LA 70113
Telephone: (504) 522-8104

AND

RALPH CAPITELLI (3858)
CAPITELLI & WICKER
1100 Poydras Street
2950 Energy Centre
New Orleans, Louisiana 70163-2950
Telephone: (504) 582-2425

REC'D C.P.
FEB 2 5 2003

AND

WINSTON G. DECUIR, SR. (4795)
DECUIR & CLARK, L.L.P.
1951 Government Street
Baton Rouge, Louisiana 70806
Telephone: (504) 522-8104
*COUNSEL FOR DEFENDANT, ROBERT J.
GUIDRY*

CERTIFIED TRUE COPY
299707
DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRICT
BATON ROUGE PARISH LA
2003 FEB 24 PM 3:52

REC'D C.P.
FEB 2 4 2003

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been duly served upon all counsel of record ___/by hand delivery, __ by facsimile transmission, or __ by depositing same in the U.S. MAIL, properly addressed, postage prepaid, this 24th day of Feb 2003.

_Rolph Capilletti_

CERTIFIED TRUE COPY

289708

DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRIC-
EAST BATON ROUGE PARISH, LA

2003 FEB 24 PM 3: 53

2

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                          DIVISION "D"

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

FILED: _____          _____
                                              DEPUTY CLERK

## **ORDER**

Considering the above and foregoing Exception of Nonjoinder of a Party Under Articles 641 and 642,

IT IS HEREBY ORDERED that plaintiff, Alvin C. Copeland appear and show cause on the 14 day of April , 2003, at 9:30 o'clock A.m., why defendant Robert J. Guidry's Exception of Nonjoinder of a Party Under Articles 641 and 642 should not be granted.

Baton Rouge, Louisiana, this 25 day of Feb , 2003.


Janice Clark
JUDGE

CERTIFIED TRUE COPY
239709
DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH, LA
2003 FEB 24 PH 3:53

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                    DIVISION "D"

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

FILED: _____        _____
                                            DEPUTY CLERK

## MEMORANDUM IN SUPPORT OF
## EXCEPTION OF NONJOINDER OF A
## PARTY UNDER ARTICLES 641 AND 642

**MAY IT PLEASE THE COURT:**

Plaintiff, Alvin C. Copeland, has alleged that the defendants, Treasure Chest Casino and Robert Guidry, obtained the license to operate the Treasure Chest Casino through improper means of influencing the licensing process. Critically, Mr. Copeland has opted to not join the Riverboat Gaming Commission, the Riverboat Gaming Enforcement Division, or the subsequent Gaming Control Board as parties to the action. If Mr. Copeland is to prove causation, that is to say if he is to actually prove that the aforementioned bodies awarded the Treasure Chest license because of improper influence, then he must logically show that the state agencies were part of the same alleged scheme. For unknown reasons, Mr. Copeland decided not to name the state agencies as parties in this, his latest litigation effort, arising out of the Treasure Chest licensing proceedings. Guidry, however, respectfully urges the Court to grant his exception of nonjoinder and order joinder of the Commission and the Division and dismiss the action if nonjoinder is impossible because a failure to join the state agencies will preclude the rendition of complete relief, potentially result in a judgment impairing the interests of the agencies who are not currently before the Court, and allow for the possibility of inconsistent adjudications.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

This matter arises from the attempt of some forty-three applicants to obtain fifteen riverboat licenses issued by the Louisiana State Police in the mid-1990's. Copeland, like Treasure Chest, L.L.C., was an applicant. Unlike Treasure Chest, Copeland did not receive a license. Since that time he has pursued litigation for the purpose of either obtaining a license by court order or being compensated by someone, anyone, for his failure to obtain a license and whatever earnings he thinks he would have made.

In Alvin C. Copeland v. The Louisiana Riverboat Gaming Commission et al, Suit Number 400,750, Nineteenth Judicial District Court, Parish of East Baton Rouge (hereinafter "the

<u>Riverboat Gaming Commission</u> suit"), filed on November 13, 1993, Copeland originally sought to appeal a ruling by the Commission which allowed Treasure Chest to move its planned riverboat project from the Mississippi River in Kenner to Lake Ponchartrain in Kenner. The relief sought in the suit was changed several times, and in January 1999, Copeland amended the suit for the third time. With the third amendment to the suit, Copeland sought the following relief:

| | |
|---|---|
| Count One - | Adjudication that Copeland had constructively been denied a license, |
| Count Two - | A judgment declaring that the license issued to Treasure Chest was null because the Division allegedly abdicated its authority to the Commission, |
| Count Three - | Monetary damages to compensation Copeland for alleged equal protection and due process violations by the Division, |
| Count Four - | Return of the fees paid to the Commission, |
| Count Five - | Return of the fees paid to the Division. |

The common thread underlying all five of Copeland's counts in the <u>Riverboat Gaming Commission</u> action is that Copeland claimed improper actions resulted in the awarding of the Treasure Chest license, Copeland contended he would have received the license but for the alleged improper actions, and Copeland wanted some relief to make him whole from his alleged damages.

Treasure Chest Casino, L.L.C. intervened in the Riverboat Gaming Commission suit because of Copeland's claims that Treasure Chest's license had been improperly granted and that Treasure Chest's license should be declared null and void. Treasure Chest, in its intervention, specifically denied Copeland's allegations that the license had improperly been granted a license and that the license should be awarded by the Court to Copeland.

Subsequently, the <u>Riverboat Gaming Commission</u> litigation resulted in a final judgment in favor of Treasure Chest on Copeland's claims concerning its license. Treasure Chest's exceptions of prescription and failure to exhaust administrative remedies and motion to dismiss for mootness the claims against Treasure Chest in the Riverboat Gaming Commission suit were granted on May 31, 2000, and the causes of action against Treasure Chest were dismissed with prejudice. On appeal, the First Circuit vacated the judgment insofar as it granted the exceptions of prescription and failure to exhaust administrative remedies, but it affirmed the portion of the trial court judgment that granted Treasure Chest's motion to dismiss. (<u>See</u> Ex. 1, Sept. 11, 2002, Opinion in <u>Riverboat Gaming Commission</u> appeal.) No further appeal was taken, and the First Circuit Opinion in the <u>Riverboat Gaming Commission</u> appeal is now a final judgment as to Treasure Chest. A careful reading of the opinion, however, reveals that Copeland can still pursue, however, his claim for return of some or all of the fees paid to the Commission and the Division.

Subsequently, plaintiff filed suit against both Treasure Chest and Robert Guidry in the present action, claiming to have been damaged. Specifically, Copeland claims AIGA would have

2

gotten the Kenner license but for alleged wrongdoing, and that he or his company would have made the profits from that license. The specific theories of recovery pleaded by Copeland in his petition in this action include:

| | |
|---|---|
| Count One - | Claim for damages pursuant to RICO (Ex. 2, Petition at ¶¶ 67-81), |
| Count Two - | Claim for damages for unfair trade practices (Ex. 2, Petition at ¶¶ 82-84), |
| Count Three - | Claim for lost profits and other damages for fraud (Ex. 2, Petition at ¶¶ 85-87), and |
| Count Four - | Claim for lost profits and other damages for unjust enrichment (Ex. 2, Petition at ¶¶ 88-89). |

As with the <u>Riverboat Gaming Commission</u> suit, the common thread underlying all four of Copeland's counts in the present action is that Copeland claims improper actions resulted in the awarding of the Treasure Chest license, Copeland contends he would have received the license but for the alleged improper actions, and Copeland wants some relief to make him whole from his alleged damages.

## II. JUST ADJUDICATION IS NOT POSSIBLE IN THE PRESENT ACTION WITHOUT JOINDER OF THE STATE ENTITIES

The public policy underlying a nonjoinder exception is both grounded in common sense and clearly applicable to the present matter. Allowing litigation to go forward without joining parties necessary for the rendition of complete relief, parties whose interests will be practically impaired, or parties such that there may be inconsistent judgments is to invite both inconsistency and waste in the judicial system.

The touchstone for consideration of this exception is Article 641, which provides as follows:

Art. 641 Joinder of parties needed for just adjudication

A person shall be joined as a party in the action when either:

(1) In his absence complete relief cannot be accorded among those already parties.

(2) He claims an interest relating to the subject matter of the action and is so situated that the adjudication of the action in his absence may either:

(a) As a practical matter, impair or impede his ability to protect that interest.

(b) Leave any of the persons already parties subject to a substantial risk of incurring multiple or inconsistent obligations.

The 1995 revision of the codal articles pertaining to nonjoinder of parties was a substantial change in the law which eliminated the distinction between indispensable and necessary parties. <u>See</u> Frank L. Maraist and Harry T. Lemmon, <u>Louisiana Civil Law Treatise: Volume 1 Civil Procedure</u> (1999) at § 6.7(4) (general discussion of 1995 revision). After the revision the focus is

3

now on the identification of a single category of "parties needed for just adjudication." Industrial
Companies, Inc. v. Durbin, 2003 WL 183272 at n. 6 (La. Jan. 28, 2003). The First Circuit
explained the application of Article 641 as follows:

> Parties are no longer referred to as "necessary" or "indispensable" under the
> Louisiana Code of Civil Procedure. The code now mandates an analysis of the
> interests of the joined and non-joined parties with respect to the action to determine
> whether the action may proceed. *Succession of Populus*, 95-1469, p. 3 (La.App. 1
> Cir. 2/23/96), 668 So.2d 747, 748. La. C.C.P. art. 641 requires a *person* to be
> joined as a party when: 1) in his absence, complete relief cannot be accorded among
> those already parties; 2) He claims an interest relating to the subject matter of the
> action and is so situated that the adjudication of the action in his absence may either
> (a) impair or impede his ability to protect that interest, or (b) leave any of the
> persons already parties subject to a substantial risk of incurring multiple or
> inconsistent obligations. In re Succession of Daigle, 822 So.2d 83, 90 (La. App.
> 1st Cir. 2002); see also, Industrial Companies, 2003 WL 183272 at pp. 14-15.

Resolution of nonjoinder issues under Article 641 generally turns on a careful consideration
of the particular facts and practical implications and necessity of joinder in the individual case. See,
e.g., Williams v. Williams, 818 So.2d 900 (La. App. 1st Cir. 2002) (consideration of necessity of
joinder of a property buyer to litigation about a prior donation of the property under impairment of
interest prong); Harris v. Henderson, 745 So.2d 1202 (La. App. 1st Cir. 1999) (consideration of
necessity of joinder of property buyer to litigation about prior succession dispute concerning
property under complete relief prong).

As explained above, the heart of Copeland's claims in the present suit is his allegations that
the defendants illegally obtained the Treasure Chest license through racketeering or other illegal
means. In short, Copeland is claiming that the decisions of the Commission and the Division were
improperly influenced through illegal actions. Louisiana courts have repeatedly held under one or
another of the nonjoinder theories that a state government agency or subdivision must be joined as
a party to an action when an action taken by the governmental entity is directly implicated in the
litigation. See Coulon v. Slidell Mun. Fire and Police Civil Service Bd., 542 So.2d 151 (La. App.
1st Cir. 1989) (Failure to join discharged civil service employee's former employer precluded
rendering of complete relief); Firemen's Pension and Relief Fund v. Sudduth, 276 So.2d 727, 733
(La. App. 3d Cir. 1973) (Failure to join City of Lake Charles precluded rendering of complete
relief in action concerning statute directing it to pay funds); Fuselier v. State Market Commission,
231 So.2d 652 (La. App. 3d Cir. 1970) (Failure to join state commission precluded rendering of
complete relief in action seeking to enjoin loans by commission); c.f., Latour v. State, 741 So.2d
819 (La. App. 3d Cir. 1999) (Louisiana Gaming Control Board need not be joined to suit
challenging statute placing age limitation on lottery because state agencies had same interests as
defendants and actions by boards were not at issue).

Obviously, the present litigation posture is merely the inverse of the procedural posture that
existed in the Riverboat Gaming Commission action. When Treasure Chest was ordered joined to

4

the <u>Riverboat Gaming Commission</u> action Copeland was seeking a declaratory judgment that his company was the proper recipient of the Treasure Chest license, which he alleged would have been awarded to him but for improper actions by the Riverboat Gaming Commission and the Division. Unsurprisingly, as he was seeking to take away Treasure Chest's license, Treasure Chest had to be joined for there to be a full adjudication and on the basis of Treasure Chest's claim to rightfully possess the license. <u>See</u> <u>Chalmette General Hospital v. Cherry</u>, 398 So.2d 599 (La. App. 1981) (In litigation questioning validity of certificate of need issued to a hospital, the hospital holding certificate must be joined for full adjudication of the matter). The obvious logic to the joinder decision in the <u>Riverboat Gaming Commission</u> action was that the agencies who allegedly made improper decisions and the alleged beneficiary of the improper decision should be before the Court in litigation concerning the licensing decisions in order to: (1) allow for complete relief (Copeland's declaratory judgment claim concerning the proper license holder); (2) joinder required all parties whose rights were implicated to be represented; and (3) it removed the possibility of subjecting the parties to inconsistent adjudications in separate proceedings concerning the Treasure Chest license. There is absolutely no difference in the logic that should be applied in the present proceedings.

The Commission and the Division, as well as their successor agency, clearly have an interest in vindicating their decision making that would be impaired if they are not joined. Moreover, Copeland still has a claim in the <u>Riverboat Gaming Commission</u> action for the return of some or all of his fees paid to the Commission and the Division. The First Circuit based its reversal of this Honorable Court's prior grant of an Exception of No Cause of Action on the unfair trade practice claim in this action relating to the very same fees. Clearly, without joinder the possibility of inconsistent adjudications exists and is sufficient to justify granting this exception.

Should the Court determine that the Commission and the Division should be joined, but for some reason they cannot be joined, the Court must then determine whether the action will go forward without the additional parties or be dismissed. In making this decision the Court must consider whether a judgment would be prejudicial to the missing parties, whether the judgment can be shaped to avoid prejudice to missing parties, the adequacy of the available relief absent the missing parties, and the adequacy of the remedies available to the plaintiff without the missing parties. <u>See</u> La. Code Civ. Proc. art. 642. Guidry respectfully urges that dismissal would be appropriate if joinder cannot be accomplished, but reserves the right to further argue that point based upon the posture of the case in the future event that joinder has been ordered and attempted but has not been accomplished.

## III.  Conclusion

The Court should grant Guidry's Exception of Nonjoinder of a Party Under Articles 641 and 642. It seems that Copeland has avoided naming the Commission and the Division as

5

defendants for the simple reason that he does not want them in the litigation producing evidence as to lack of causation. Ultimately, joinder should be ordered because a failure to join the state agencies will preclude the rendition of complete relief, potentially result in a judgment impairing the interests of the agencies who are not currently before the Court, and allow for the possibility of inconsistent adjudications. Therefore, Guidry respectfully urges the Court to grant his Exception of Nonjoinder of a Party Under Articles 641 and 642 and order joinder of the Commission, the Division, and their successor Board, or, should joinder be impossible, dismissal of the action.

Respectfully Submitted,

ARTHUR A. LEMANN, III (8296)
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette St., Ste. 100
New Orleans, LA 70113
Telephone: (504) 522-8104

AND

RALPH CAPITELLI (3858)
CAPITELLI & WICKER
1100 Poydras Street
2950 Energy Centre
New Orleans, Louisiana 70163-2950
Telephone: (504) 582-2425

AND

WINSTON G. DECUIR, SR. (4795)
DECUIR & CLARK, L.L.P.
1951 Government Street
Baton Rouge, Louisiana 70806
Telephone: (504) 522-8104
***COUNSEL FOR DEFENDANT, ROBERT J. GUIDRY***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been duly served upon all counsel of record ✓ by hand delivery, __ by facsimile transmission, or __ by depositing same in the U.S. MAIL, properly addressed, postage prepaid, this 24ᵗʰ day of _Feb_ 2003.

CERTIFIED TRUE COPY
DEPUTY CLERK OF COURT
289710

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH
2003 FEB 24 PH 3:53

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 217 of 323

**ORIGINAL**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2000 CA 2864

AMERICAN INTERNATIONAL GAMING ASSOCIATION, INC.

VERSUS

THE LOUISIANA RIVERBOAT GAMING COMMISSION AND
THE RIVERBOAT GAMING ENFORCEMENT DIVISION
OF THE GAMING ENFORCEMENT SECTION OF THE OFFICE
OF STATE POLICE, PUBLIC SAFETY SERVICES,
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

*DATE OF JUDGMENT:* SEP 1 1 2002

ON APPEAL FROM THE NINETEENTH JUDICIAL DISTRICT COURT
(NUMBER 400,750), PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

HONORABLE ROBERT D. DOWNING, JUDGE

* * * * * *

| | |
|---|---|
| Benjamin R. Slater, III<br>New Orleans, Louisiana | Counsel for Plaintiff/Appellant<br>Alvin C. Copeland |
| Michael A. Patterson<br>Baton Rouge, Louisiana | Counsel for Appellee<br>The Louisiana Riverboat Gaming<br>Commission and the Riverboat<br>Gaming Enforcement Division of the<br>Gaming Enforcement Section of the<br>Office of State Police, Public Safety<br>Services, Department of Public<br>Safety and Corrections |
| Paul S. West<br>Baton Rouge, Louisiana | Counsel for Intervenor<br>Treasure Chest Casino, L.L.C. |

* * * * * *

BEFORE: GONZALES, KUHN, AND CIACCIO[1], JJ.

Disposition: JUDGMENT AFFIRMED IN PART, VACATED IN PART, AND RENDERED.
MATTER REMANDED FOR LIMITED FURTHER PROCEEDINGS.

[1] The Honorable Philip C. Ciaccio, Judge (retired), Fourth Circuit Court of Appeal, is serving as judge
*pro tempore* by special appointment of the Louisiana Supreme Court. The Honorable Douglas M.
Gonzales, Judge (retired), First Circuit Court of Appeal, is serving as judge
ad hoc by special appointment of the Louisiana Supreme Court.

EXHIBIT
1

Kuhn, Judge.

In this appeal, we examine whether the trial court properly dismissed various claims asserted against the State of Louisiana by Alvin C. Copeland, the sole shareholder of a corporation that unsuccessfully applied for a riverboat gaming license. We also address whether the trial court properly sustained exceptions and a motion to dismiss raised by a competing applicant, Treasure Chest Casino Inc. ("Treasure Chest"), who intervened because this suit challenged the validity of the license issued to it. We affirm in part, vacate in part, and render. We also remand this matter to afford Copeland the right to amend his petition in a limited manner.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Louisiana Riverboat Gaming Act Enacted

Pursuant to Acts 1991, No. 753, § 1, the Louisiana Legislature enacted the Louisiana Riverboat Economic Development and Gaming Control Act, La. R.S. 4:501 et seq. ("the Riverboat Gaming Act" or "the Act") This legislation set forth a licensing process for those who sought authorization to conduct gaming activities on riverboats in Louisiana. The Act created two separate bodies within the Department of Public Safety and Corrections and vested each with separate duties and responsibilities to further the Act's purposes. The Riverboat Gaming Enforcement Division ("Division"), created by La. R.S. 4:515, was vested with the responsibility of issuing and denying licenses and investigating the qualifications of each license applicant. La. R.S. 4:518. The Division was authorized to issue up to fifteen licenses to conduct gaming activities upon a riverboat and up to six licenses could be granted for riverboats that operated from any one parish. La. R.S. 4:525. The Riverboat Gaming Commission ("Commission"), created by La. R.S. 4:510, was a rule and policy-making body comprised of seven members appointed by the governor and confirmed by the Louisiana State Senate. The Act gave

2

the Commission the power to promulgate rules and to determine riverboat sailing routes, minimum insurance levels for licensees, riverboat design specifications, and procedures for negotiable instruments transactions. Beyond that, the Act vested the Commission with oversight authority over the Division by giving the Commission the power to "hear and determine all appeals relative to the granting, suspension, revocation, condition, or renewal of all licenses, permits, and applications." La. R.S. 5:511(1).

### B. The Commission Promulgates Rules

The Commission promulgated rules to implement the Act.[2] Commission Rule § 303 provided that "each person seeking approval of riverboat plans" must "submit for advance approval by the Commission an application for a certificate of preliminary approval." Commission Rule § 315 provided that the Commission "shall evaluate each application" and "shall approve those applications . . . it deems to be in the best interest of the state and locale of the proposed operation . . . ."[3]

### C. Copeland Files Suit

This litigation arises from the following factual scenario set forth in Copeland's petition.[4] American International Gaming Association, Inc. ("AIGA") submitted an application for a certificate of preliminary approval ("Certificate") on December 11, 1992, and another application with supplemental information on February 22, 1993. AIGA proposed a riverboat route and other operations at the Kenner Laketown Harbor Park ("Laketown") on the shores of Lake Pontchartrain. Along with its application, AIGA

---

[2] These rules were designated as Title 42, Part XIII.101, et seq. of the Louisiana Administrative Code (published in Volume 19, No. 7 of the Louisiana Register at pp. 851-61.) These rules were promulgated as emergency rules on June 18, 1993, and became finally effective on July 20, 1993.

[3] The rules providing for the issuance of the certificates were later declared to be null and void on the basis that the Commission had exceeded its authority in promulgating them. *State of Louisiana v. Louisiana State Police Riverboat Gaming Enforcement Division*, 95-2355 (La. App. 1st Cir. 8/21/96), 694 So.2d 316, 319.

[4] American International Gaming Association Inc. ("AIGA") actually filed the initial petition but Copeland, the sole shareholder of AIGA's assets, was later substituted as plaintiff.

3

submitted its application and evaluation fees.[5] On February 14, 1993, AIGA also applied for a gaming license from the Division and submitted the filing fee required for its background investigation.[6]

AIGA further alleged that Treasure Chest submitted an application for a Certificate on March 8, 1993. It also proposed locating its gaming riverboat at Laketown. The Commission held a public hearing on the Treasure Chest application. On April 29, 1993, Treasure Chest modified its application, proposing that its riverboat would be located at Rivertown, U.S.A. on the banks of the Mississippi River in Kenner. On June 4, 1993, the Commission held a public hearing at which AIGA made a presentation on its application for a Certificate.

According to AIGA's allegations, the Commission received a total of 43 applications for Certificates, with six of those seeking preliminary approval to operate a riverboat in Kenner, Louisiana. Prior to a June 18, 1993 Commission meeting, the Commission had approved eight applications but none of those approved involved proposals to locate a riverboat in Kenner. During the meeting, the Commission approved seven more applications.[7] The Commission granted Treasure Chest's application for a Certificate for its Rivertown location as one of these seven but did not grant AIGA's application.

AIGA submits that several months later, Treasure Chest sought permission to modify its Certificate to move the site of its proposed operations back to Lake Pontchartrain as called for in the original Treasure Chest application. On November 13,

---

[5] Commission Rule § 303 required each applicant to remit a $25,000 application fee and $5,000 to defray the expenses of the commission in analyzing and evaluating a Certificate.

[6] Former La. R.S. 4:532 (redesignated by Acts 1996, 1st Ex. Sess., No. 7, § 3, eff. May 1, 1996, as La. R.S. 27:89) provided that an applicant was required to submit an initial application fee of $50,000.

[7] Since the Division was authorized to issue only fifteen licenses, the Commission apparently decided to likewise limit the number of Certificates it issued.

4

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 221 of 323

1993, the Commission granted Treasure Chest's request despite AIGA's objection. On November 23, 1993, AIGA filed suit in the Nineteenth Judicial District Court seeking the reversal of the Commission's decisions to grant Treasure Chest a Certificate and to grant its request to modify the location of its proposed operations.[8] Both the Commission and the Division were named as defendants.

In response, the Commission and the Division filed numerous exceptions. Before the trial court ruled on these exceptions, however, the Division issued a license to Treasure Chest on May 17, 1994. AIGA ultimately did not receive either a Certificate or a license.[9]

### C. Gaming Legislation Revised

While this suit was pending, the Louisiana legislature addressed the status of the various entities charged with oversight of gaming. By Act 7 of the First Extraordinary Session of 1996, the legislature enacted the provisions of La. R.S. 27:1 et seq., the Louisiana Gaming Control Law ("the Gaming Control Law"), which established the Louisiana Gaming Control Board ("the Board"). The Gaming Control Law became effective May 1, 1996. In accordance with its provisions, the Board became the sole and exclusive regulatory and supervisory board for gaming operations and activities

---

[8] AIGA's petition alternatively sought a declaratory judgment that the Gaming Commission Rules prohibited the modification of the Certificate.

At that time the petition was filed, former La. R.S. 5:548 provided:

> Any person adversely affected by an action, order, or decision of the commission may appeal to the nineteenth Judicial District Court in accordance with the provisions of the Administrative Procedure Act, except that notice of appeal shall be given to the commission and petition for appeal shall be filed with the district court within ten days of the action, order, or decision of the commission.

Acts 1996, 1st Ex. Sess., No. 7, § 3, eff. May 1, 1996, redesignated the former La. R.S. 4:548 as La. R.S. 27:89. Effective July 7, 2001, La. R.S. 27:89 was repealed by Act No. 1222 of 2001.

[9] According to the allegations of the petition, the Division issued licenses to the same 15 entities that had previously been issued Certificates by the Commission.

5

authorized by the Riverboat Gaming Act. La. R.S. 27:31 The Gaming Control Law abolished the Commission and transferred its powers, duties, functions and responsibilities to the Board. 27:31A(2) and 27:31B.

### E. Certificate Process Abrogated

During 1996, in an unrelated proceeding, this court ruled that the Commission's regulations that required a potential gaming riverboat licensee to obtain a certificate of preliminary approval from the Commission were null and void. This court concluded that the Commission had exceeded its statutory authority under the Riverboat Gaming Act when it adopted these particular regulations and assessed fees because the Act had granted licensing authority to the Division rather than the Commission. *State of Louisiana v. Louisiana State Police Riverboat Gaming Enforcement Division*, 95-2355 (La. App. 1st Cir. 8/21/96), 694 So.2d 316, 319.

### F. Copeland's Litigation Moves Forward

In July 1998, the trial court granted Copeland's motion to substitute himself as plaintiff because AIGA had been dissolved and he was the sole shareholder. Thereafter, on January 21, 1999, Copeland filed an amended petition that named the Board, as successor-in-interest to the Commission, as a defendant. Based on the provisions of the amended petition, Copeland no longer sought reversal of the Commission's action. Rather, he challenged the Division's action of issuing the license to Treasure Chest and asserted that he had been constructively denied a license (Count One). He further claimed that he was entitled to a judgment declaring that the license issued to Treasure Chest was null because the Division had awarded licenses to the applicants that had previously received Certificates from the Commission without independently determining which applicants deserved licenses (Count Two). Copeland also advanced claims for monetary damages, alleging that the Division's actions violated his due process and equal protection

6

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 223 of 323

rights and constituted a violation of 42 U.S.C. § 1983 (Count Three). He also sought the return of fees paid to the commission (Count Four) and the return of fees paid to the division (Count Five).[10]

On June 4, 1999, Treasure Chest intervened urging that Counts One and Two should be dismissed. It filed exceptions urging the objections of prescription and failure to exhaust administrative remedies. Treasure Chest alternatively raised a motion to dismiss these counts.

Copeland opposed Treasure Chest's exceptions and motions with respect to Count Two, the request for declaratory judgment relief, but conceded that Count One, his appeal of the grant of the original Treasure Chest license, was moot. The term of Treasure Chest's initial license was five years, and it expired on May 17, 1999.[11] Then, in June 1999, Treasure Chest filed a motion to stay discovery that was granted by the trial court "pending consideration of [Copeland's] constitutional claim . . . ."

In January 2000, the State, through the Board, the Division and the Department of Public Safety and Corrections ("the State") filed a motion for partial summary judgment,

---

[10] AIGA had previously amended its petition in June 1998 to request a refund of all fees paid to the Commission and in September of 1998, to request a refund of all fees that had been paid to the Division.

We note that the January 1999 supplemental and amending petition raised claims that attempted to invoke both the trial court's original and appellate jurisdiction. *See Metro Riverboat Associates, Inc. v. Louisiana Gaming Control Bd.,* 2001-0185 (La. 10/16/2001), 797 So.2d 656, 660, where the court distinguished between the "judicial review of the decision of an administrative agency" as the "exercise of a court's appellate jurisdiction pursuant to La. Const. art. V, § 16 (B)" and "judicial adjudications in the first instance" pursuant to La. Const. art. V, § 16 (A), which grants "original jurisdiction in all civil matters" to the district courts. Pursuant to the provisions of La. R.S. 4:547, Copeland was required to seek review of the division's issuance of the license to Treasure Chest by filing a notice of appeal with the Commission. But Copeland did not appeal the Division's action to the Commission before challenging the Division's action in the trial court. Thus, although Copeland postured his claims pertaining to the Division's action as an "appeal," the trial court actually had no appellate jurisdiction over the claims asserted in Count One because the Commission had not reviewed the claim. *Id.*

[11] Treasure Chest asserted in its opposition memorandum that the Division had conditionally renewed Treasure Chest's license on March 16, 1999. But Copeland did not amend his petition to contest the renewal. Also, Copeland's appeal counsel stated during oral arguments that Copeland waives his claim regarding the constructive denial of a license (addressed in Count One).

7

seeking dismissal of Counts Two and Three of Copeland's amended petition.[12] Copeland responded by filing a motion for summary judgment on his constitutional claims.

The Court held a hearing to dispose of: 1) the State's partial motion for summary judgment; 2) Copeland's motion for summary judgment on the constitutional claims; and 3) the exceptions and motion filed by Treasure Chest. By judgment dated May 31, 2000, the trial court sustained Treasure Chest's exceptions raising the objections of prescription and failure to exhaust administrative remedies and granted Treasure Chest's motion to dismiss. The trial court further granted the State's motion for partial judgment and denied Copeland's motion for summary judgment with respect to the constitutional claims.[13]

Copeland has appealed, urging that the trial court erred by not maintaining his constitutional claims (raised in Count Three). First, he asserts that his petition alleges "cognizable constitutional claims" based on his allegations that the Division's actions violated his equal protection and procedural and substantive due process rights. Based on these constitutional violations, Copeland asserts he is entitled to a declaratory judgment (Count Two), monetary damages (Count Three), and a return of all monies AIGA paid to the Division (Count Five). Second, he asserts that despite the abrogation of the Commission's rules and the legislative revision of the statutes governing the Commission and the Division, his claims against the State present a justiciable claim because he has alleged that he is entitled to monetary relief. Third, he asserts that he did not fail to exhaust administrative remedies by not first presenting his constitutional claims to the

---

[12] The State had also previously filed a motion for summary judgment.

[13] Although Copeland's motion for summary judgment addressed only the constitutional claims, the judgment also granted his motion for summary judgment in part and directed the Clerk of Court to release to Copeland the amount of $20,873, which had been deposited into the Court's registry by the Division. This amount represented the $50,000 application fee minus the costs of the Division's background investigation. The trial court granted the State's motion for partial summary judgment "except as to the reimbursement of the $50,000 fee paid by [AIGA] to the ... [Division] ... " although the state's partial motion did not address Copeland's claims for reimbursement of the fees paid to the Division. The judgment also denied Copeland's motion to file a fourth supplemental and amending petition.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 225 of 323

Commission rather than the district court because the Commission did not have authority to dispose of these claims. Based on these contentions, Copeland prays for reversal of those portions of the trial court's judgment that sustain Treasure Chest's exceptions, grant Treasure Chest's motion to dismiss, and grant the State's motion for partial summary judgment.

## II. ANALYSIS

### A. Claims involving Treasure Chest

When Treasure Chest intervened, it challenged only the counts of Copeland's amended petition that could potentially impact its license, Counts One and Two. Because Copeland did not seek compensatory relief from Treasure Chest, Copeland's remaining claims did not impact Treasure Chest. During the proceedings below, Copeland acknowledged that Count One of his amended petition, which challenged the Division's action of issuing the license to Treasure Chest, was moot. We also conclude that Copeland's claim for a declaratory judgment, asserted in Count Two, is moot. Assuming, as Copeland alleges, that the Division issued a license to Treasure Chest on May 17, 1994, the license issued to Treasure Chest would have expired on May 17, 1999. The provisions of former La. R.S. 4:534 (redesignated as La. R.S. 27:74) provided that the term of an initial license to conduct gaming operations is five years. Thus, the license, which Copeland seeks to have declared invalid, has already expired. At this point, there is no practical significance to rendering a judgment on the issue of the validity of the original license. *Cat's Meow, Inc. v. City of New Orleans Through Dept. of Finance,* 98-0601 (La. 10/20/98), 720 So.2d 1186, 1193.[14]

---

[14] The collateral consequences exception to the mootness doctrine does not apply to the claims asserted against Treasure Chest because Copeland has not sought damages or other monetary relief from Treasure Chest. *Cat's Meow, Inc. v. City of New Orleans Through Dep't. of Finance,* 98-0601 (La. 10/20/98), 720 So.2d 1186, 1196.

9

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 226 of 323

The trial court should have dismissed the claims asserted in Count Two as moot. Accordingly, we find that the trial court erred in sustaining the exceptions raised by Treasure Chest, and we vacate those rulings. But because the matters raised in both Counts One and Two are moot, we conclude the trial court properly granted Treasure Chest's motion to dismiss.

### B. Claims against the State

Copeland contends the State violated his procedural due process and equal protection rights by failing to promulgate ascertainable standards to determine who would receive a license and by arbitrarily issuing licenses. Copeland also asserts that the Division's failure to hold a "meaningful hearing" to address AIGA's application and its failure to give notice that its application would be denied violates his procedural due process rights. In addition, he claims the arbitrary denial of his license violated his substantive due process rights.[15]

### 1. Jurisdiction of the Trial Court

The State argues that Copeland's appeal of the action of the Division's action was not properly raised before the district court. The State urges that former La. R.S. 4:547A required that Copeland appeal the Division's action to the Commission, as follows:

> Any person whose application for a license or permit has been denied by the division or *any person adversely affected by an action, order or decision of the division* may appeal the action, order, or decision of the division to the commission by filing a notice of appeal with the commission *within seven days of certified mailing of notice* of the action, order, or decision by the division.

(Italics added.)

---

[15] As previously addressed, Copeland conceded in the proceedings below that Count One, his appeal of the grant of the original Treasure Chest license, was moot. Copeland asserts no arguments on appeal with respect to Count Four, his claim for return of fees paid to the Commission. The State asserts that it has refunded all funds that AIGA paid to the Commission in conjunction with the Certificate process. Otherwise, we note that Copeland's claims against the State are not moot because he seeks compensatory relief. Although the Commission and the certificate process it used no longer exists and the original Treasure Chest license has expired, Copeland's claims for damages are viable under the collateral consequences exception. *Cat's Meow, Inc. v. City of New Orleans Through Dep't of Finance*, 720 So.2d at 1196.

10

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 227 of 323

Neither AIGA nor Copeland filed an appeal with the Commission before presenting their claims to the district court. The State emphasizes that although the action of the Division that Copeland challenges occurred on May 18, 1994, he did not challenge that action until January, 1999, over four years after the Division's initial decision. And when he did take action, Copeland amended AIGA's original petition that appealed the Commission's action of issuing the license, which had been filed since 1993.

Copeland counters that his failure to appeal the Division's action to the Commission did not affect the validity of Counts Two and Three.[16] He maintains that these claims are based on the Division's violations of his constitutional rights, which could not have been asserted through an administrative appeal under La. R.S. 4:547. He further claims that an appeal to the Commission would have been a vain and useless act since the Division simply awarded licenses to those firms that had previously received Certificates from the Commission.

We find no merit in Copeland's arguments with respect to Count Two, the claim for declaratory relief regarding the validity of Treasure Chest's license. As stated above, since Treasure Chest's license has expired, Count Two is moot. The trial court properly granted the State's partial motion for summary judgment with respect to Count Two.

But we find that the constitutional claims raised in Count Three were properly presented to the trial court. The Commission, which functioned as an administrative agency in the executive branch of state government, did not have the authority to determine these questions of constitutionality. *See ANR Pipeline Company v. Louisiana Tax Commission*, 2001-2594 to 2001-2600 (La. App. 1st Cir. 3/20/02), 815 So.2d 178,

---

[16] Copeland also refers to Count Five but the State's partial motion for summary judgment only addressed Counts Two and Three, and Copeland's motion for summary judgment only addressed his due process and equal protection constitutional claims, which were raised in Count Three. Thus, the issue of whether Copeland is entitled to receive a return of the fees paid to the Division is not properly before us. Also, it was not specifically raised as an assignment of error on appeal.

11

184. Judicial power is vested in Louisiana courts by Article V, Section 1 of the Louisiana Constituion. While administrative agencies have rulemaking authority that shadows the powers of the legislature, they are not authorized to exercise "judicial power" under Art. 5, § 1, unless authorized by the Constitution. La. Const. Art. II, § 2; *Albe v. Louisiana Workers' Compensation Corp.*, 97-0581 (La. 10/21/97), 700 So.2d 824, 828.

La. Const. art. V, § 16A grants original jurisdiction in all civil matters to the district courts, unless otherwise authorized by the constitution. And since the Louisiana Constituion fixes the original jurisdiction of the district courts, that original jurisdiction cannot be changed by legislative act. The power to decide these constitutional claims was not and could not be conveyed to the Commission pursuant to La. R.S. 5:457, or any other provision of the River Boat Gaming Act. *See ANR Pipeline Company v. Louisiana Tax Commission*, 2001-2594, 815 So.2d at 184.

Accordingly, when Copeland amended AIGA's timely-filed original petition to assert his constitutional claims, he invoked the court's original jurisdiction, and the requirements of La. R.S. 4:547 did not apply. Because the State asserts no other basis for challenging the timeliness of Copeland's amendment, we conclude that the trial court properly considered Copeland's constitutional claims.

## 2. Procedural Context of the Constitutional Claims

The State challenged Copeland's constitutional claims via its motion for partial summary judgment. The State urges that Copeland is not entitled to recover because he has not demonstrated a taking of a constitutionally-protected property interest. Technically, the State has raised an exception of no cause of action but has labeled it as a motion for summary judgment. If we were to determine that the petition fails to state a cause of action regarding these constitutional claims, we would preclude a determination on the motion for partial summary judgment with respect to the claims asserted in Count

12

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 229 of 323

Three. Thus, on our own motion, we raise the objection of no cause of action. La. C.C.P. art. 927; *Treen v. Republican Party of Louisiana*, 99-2073 (La. App. 1st Cir. 9/26/00), 768 So.2d 273, 277. Also see *Noble v. Armstrong*, 93-841 (La. App. 5th Cir. 3/16/94), 635 So.2d 1199, 1203 (holding that a motion for summary judgment based on insufficiency of allegations cannot be used as a substitute for an exception of no cause of action).

The function of the peremptory exception of no cause of action is to question whether the law extends a remedy to anyone under the factual allegations of the petition. *Cleco Corp. v. Johnson*, 2001-0175 (La. 9/18/01), 795 So.2d 302, 304. La. Code Civ. P. art. 1915, as amended by 1997 La. Acts No. 483, § 2, now allows a partial judgment sustaining an exception of no cause of action. *See Graf v. Jim Walter Homes, Inc.*, 97-1143 (La. App. 1st Cir. 5/15/98), 713 So.2d 682, 685 n.2. The exception is tried on the face of the pleadings and the court accepts the facts alleged in the petition as true, determining whether the law affords relief to the plaintiff if those facts are proved at trial. *Cleco Corp. v. Johnson*, 795 So.2d at 304.

### 3. Due Process Claims

The Fourteenth Amendment to the United States Constitution provides, in pertinent part, "[n]or shall any State deprive any person of life, liberty or property, without due process of law...." Similarly, Article I, § 2 of the Louisiana Constitution provides that no person shall be deprived of life, liberty, or property, except by due process of law. To claim the protections of due process, a claimant must show the existence of some property or liberty interest which has been adversely affected by state action. *Delta Bank & Trust Co. v. Lassiter*, 383 So.2d 330, 334 (La. 1980); *Johnson v. Southern University*, 2000-2615 (La. App. 1st Cir. 12/28/01), 803 So.2d 1140, 1144-1145. Property interests are not created by the constitution. Rather they are created and

13

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 230 of 323

their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). To have a property interest protected by due process, a person must clearly have more than an abstract need or desire for it. He must have a legitimate claim of entitlement to it rather than a unilateral expectation of it. *Id.*

It is true that a license, once issued, may create a property interest in the holder that is traditionally protected by due process notions. *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed. 2d 90 (1971); *Montecino v. Louisiana*, 55 F.Supp.2d 547 (E.D. La. 1999). But our state law affords a license applicant no individual entitlement to a license that he seeks. *Durham v. Louisiana State Racing Com'n*, 458 So.2d 1292, 1295 (La. 1984). Accepting all of the allegations of the petition as true, we find no due process violation because neither AIGA nor Copeland had a protected property interest in the benefits conferred by a license that they did not actually hold. Absent a protected property interest, AIGA was not entitled to notice and a hearing before the denial of its application. *Board of Regents v. Roth*, 92 S.Ct. at 2710; *Durham v. Louisiana State Racing Com'n*, 458 So.2d at 1295. Likewise, Copeland's allegation that he was denied substantive due process rights by being arbitrarily denied a license fails due to the lack of a protected property interest.

Copeland further complains that the Division acted arbitrarily in granting a license to Treasure Chest and not AIGA. Again, we recognize that the State's action of granting a license to a competitor did not deprive AIGA or Copeland of a property interest. *See Delta Bank & Trust Company v. Lassiter*, 383 So.2d at 334 (La. 1980). Although the Division was authorized to issue only fifteen licenses, Copeland fails to even contend that

14

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 231 of 323

it was precluded from obtaining a license due to the Division's issuance of a license to Treasure Chest. We note also that Copeland does not allege that the license issued to Treasure Chest provided for its exclusive authorization to operate a gaming riverboat in the Lake Pontchartrain area.

Accordingly, we conclude that the amended petition fails to allege a violation of state or federal due process rights.

### 4. Equal Protection Claim

Both the Fourteenth Amendment to the U.S. Constitution and La. Const. art. I, § 3 provide that all persons are entitled to equal protection of the law. These provisions mandate "that persons similarly situated receive like treatment." *Whitnell v. Silverman*, 95-0112 (La. 12/6/96), 686 So.2d 23, 29-30. But the equal protection provisions of the state and federal constitutions do not require absolute equality or precisely equal advantages. *Ross v. Moffitt*, 417 U.S. 600, 612, 94 S.Ct. 2437, 2444, 41 L.Ed.2d 341 (1974); *Frederick v. Ieyoub*, 99-0616 (La. App. 2d Cir. 5/12/2000), 762 So.2d 144,148, *writ denied*, 2000-1811 (La. 4/12/2001), 789 So.2d 581.

While equal protection claims may be subject to a different analysis under the federal and state guarantees, a minimal standard of review applies under both provisions where, as here, there is no fundamental right, suspect class, or enumerated characteristic alleged as the basis for discrimination. *Progressive Security Ins. Co. v. Foster*, 97-2985 (La. 4/23/98), 711 So.2d 675, 685-87. Absent a "suspect class" of persons or a "fundamental right," classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the state's goals and only if no grounds can be conceived to justify them. *Frederick v. Ieyoub*, 762 So.2d at 148 (quoting *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed. 2d 508 (1982)).

15

Copeland's equal protection argument is premised on the assertion that AIGA was treated differently than Treasure Chest because the Division issued a license to Treasure Chest but did not issue one to AIGA. He asserts the Division had no ascertainable rules to distinguish between these two license applicants and, accordingly, there was no justification for treating them differently.

Former La. R.S. 4:530 (redesignated as La. R.S. 27:70 by Acts 1996, 1st Ex. Sess. No. 7, § 3) set forth suitability requirements for those seeking a license to conduct gaming operations on a riverboat. Section 530(A) provided that an applicant must be "a person of good character, honesty, and integrity" and "a person whose prior activities, . . . habits, and associations do not pose a threat to the public interest of this state or to the effective regulation and control of gaming . . . ." Section 530(B) also mandated that a license could not be issued to a person unless the division found that: 1) the applicant was capable of operating a gaming casino; 2) the proposed financing of the riverboat and its operations was adequate and was from a suitable source; 3) the applicant was able to operate a vessel comparable to a riverboat; 4) the applicant had submitted a detailed plan of the riverboat's design; 5) the applicant had designated the docking facilities to be used; 6) the applicant showed adequate financial ability to construct and maintain a riverboat; and 7) the applicant had a good faith plan to recruit, train, and upgrade minorities in all employment classifications.

In determining suitability pursuant to La. R.S. 4:530, the Division was required to consider numerous factors, many of which were subjective in nature. Thus, in order to state an equal protection claim, we find that Copeland must specifically allege how it was similarly situated to Treasure Chest based on those factors. Copeland's petition broadly contends that AIGA was treated differently than Treasure Chest. Yet, he makes no specific allegations addressing how AIGA was similarly situated to Treasure Chest, or

16

that AIGA was as suitable as Treasure Chest, based on the factors addressed in La. R.S. 4:530.

Additionally, to state an equal protection claim, the petition must specifically allege how the Division treated AIGA differently or less favorably than Treasure Chest during the licensing process and how that unjustified disparate treatment resulted in the constructive denial of a license to AIGA. The petition fails to do so.

Accordingly, we conclude that the amended petition also fails to allege a violation of state or federal equal protection rights.

### C. Amendment of the Petition

La. C.C.P. art. 934 directs that a judgment sustaining a peremptory exception shall permit amendment of the petition when the grounds of the objection may be removed by amendment, and when the grounds of the objection cannot be removed by amendment, the action shall be dismissed. Amendment is not permitted when it would constitute a vain and useless act. *Mercan, Inc. v. City of Baton Rouge*, 2000-0600 (La. App. 1st Cir. 5/11/2001), 797 So.2d 722, 724, *writ denied*, 2001-1685 (La. 9/21/2001), 797 So.2d 676 (quoting *Premier Games, Inc. v. State through Ieyoub*, 99-1297 (La. App. 1st Cir. 6/7/99), 739 So.2d 852, 855, *writ denied*, 99-1710, 99-1679 (La. 6/14/99), 745 So.2d 15 and 604, *cert. denied*, 528 U.S. 1062, 120 S.Ct. 617, 145 L.Ed.2d 512 (1999)). We can not contemplate any amendment that Copeland can make insofar as his due process claim is concerned. Any attempt to allege a deprivation of a property right would constitute a vain and useless act. However, with respect to Copeland's equal protection claim, we acknowledge that, after further discovery, it is possible that he will be able to state a valid claim. Accordingly, we remand this matter for the limited purpose of allowing Copeland the opportunity to amend his petition in order to state an equal protection claim.

17

### D. Propriety of the Partial Summary Judgment in favor of the State

Pursuant to its motion for partial summary judgment, the State sought dismissal of Counts Two and Three of Copeland's amended petition. As explained above, the trial court properly granted the State's partial motion for summary judgment with respect to Count Two because the claim for declaratory judgment was moot. With respect to the claims asserted in Count Three, the petition fails to state a cause of action based on a violation of due process and equal protection rights. Thus, the trial court should have dismissed these constitutional claims on that basis and precluded a ruling on the State's motion for partial summary judgment. Accordingly, we vacate that portion of the trial court's judgment.

### III. CONCLUSION

That portion of the judgment granting Treasure Chest's exceptions raising the objections of prescription and failure to exhaust administrative remedies is vacated. That portion of the judgment granting Treasure Chest's motion to dismiss is affirmed.

We affirm that portion of the trial court's judgment that granted the State's motion for summary judgment as it relates to Count Two. We render judgment finding that the petition fails to state a cause of action with respect to Copeland's constitutional claims, and we vacate that portion of the trial court's judgment that granted the State's motion for partial summary judgment as it relates to Count Three. We also affirm that portion of the judgment that denied Copeland's motion for summary judgment on his constitutional claims. Otherwise, the judgment is affirmed. We remand this matter for the limited purpose of allowing Copeland the opportunity to amend his petition to set forth a claim based on a violation of his equal protection rights.

**JUDGMENT AFFIRMED IN PART, VACATED IN PART, AND RENDERED. MATTER REMANDED FOR LIMITED FURTHER PROCEEDINGS.**

18

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 235 of 323

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2000 CA 2864

AMERICAN INTERNATIONAL GAMING ASSOCIATION, INC.

VERSUS

THE LOUISIANA RIVERBOAT GAMING COMMISSION AND
THE RIVERBOAT GAMING ENFORCEMENT DIVISION
OF THE GAMING ENFORCEMENT SECTION OF THE OFFICE
OF STATE POLICE, PUBLIC SAFETY SERVICES,
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

SEP 1 1 2002

GONZALES, J., concurring.

As far back as 1892, in a famous opinion by Justice Oliver Wendell Holmes, the second class status of a mere governmental privilege was engrained into our procedural due process concepts in the case of McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 29 N.E. 517 (1892). The case involved a police officer that had been fired. The Supreme Court dismissed his complaints, holding that a governmental job was a mere privilege. The following excerpt 2 Kenneth C. Davis and Richard J. Pierce, Jr., Administrative Law Treatise § 9.3, at 11-13 (1994) summarizes the evolution of a mere privilege to the status of a constitutionally protected entitlement:

> Before 1970, due process applied only to deprivation of "rights," determined primarily with a reference to the common law. Anything else government provided was a mere "privilege," outside the scope of due process protection. Justice Holmes' opinion in McAuliffe v. Mayor of New Bedford, 29 N.E. 517 (1892), illustrates this approach. The Mayor fired a policeman for expressing views on an issue of public importance contrary to those of the Mayor. The court dismissed the policeman's complaint that the action violated both due process and the First Amendment because a government job is a mere privilege unprotected by the Constitution.

> Before 1970, the Court paid little attention to the nature of the decisionmaking procedure required by due process. Typically, the Court held only that due process required a "hearing," without describing the nature of the hearing required. In some cases, the Court's language seemed to imply that due process required an oral evidentiary hearing of the type routinely provided by courts. In ICC v. Louisville & Nashville Railroad, 227 U.S. 88, 93 (1913), for instance, the Court specifically referred to "opportunity to cross-examine witnesses." In other cases, however, the Court's language suggested that due process might be satisfied by a "hearing" less formal than the oral evidentiary hearing routinely available in a court. In Londoner v. Denver, 210 U.S. 373,

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 236 of 323

383 (1908), for instance, the Court stated only that "a hearing in its very essence requires that he who is entitled to it shall have the right to support his allegations by argument however brief, and, if need be, by proof, however informal."

The Court abandoned both of these approaches to due process decisionmaking in 1970. It rejected traditional distinction between protected rights and unprotected privileges, holding that at least some statutory entitlements are within the scope of due process protection. At the same time, the Court announced its intention to address explicitly and in detail the issue of how much process is due in each decisionmaking context to which due process applies. The opinions that best explain the Court's transition to its present approach to application of the Due Process Clause are Goldberg v. Kelly, 397 U.S. 254 (1970), and Mathews v. Eldridge, 424 U.S. 319 (1976).

*Goldberg* involved a claim by recipients of Aid to Families with Dependent Children (AFDC) that the procedures of the agency charged with responsibility to implement the AFDC program in New York violated the Due Process Clause. The agency provided an opportunity for an oral evidentiary hearing to determine a recipient's continued eligibility for AFDC payments, but that hearing was available only after the payments were discontinued. The agency first decided on the basis of less formal procedures that the recipient was ineligible and terminated benefits based on that initial decision. If the Court had followed its traditional approach to defining property rights, it would have dismissed the complaint of the welfare recipients in a brief opinion stating that welfare benefits are mere privileges that are entitled to no due process protection. Instead, the Court held that welfare payments are property interests within the scope of the Due Process Clause.

The Court reasoned that AFDC payments "are a matter of statutory entitlement for persons qualified to receive them." 397 U.S. at 262. It quoted from an article by Professor Reich in which he argued that (1) a high proportion of property in the United States consists of intangible entitlements to continuing benefits, (2) a high proportion of those entitlements flow from government, and (3) the traditional legal approach to property protects the entitlements of the rich but not the poor. Reich, Individual Rights and Social Welfare: The Emerging Legal Issues, 74 Yale L.J. 1245 (1965). See also Reich, The New Property, 73 Yale L.J. 733 (1964). Thus, for instance the Court had long extended due process protection to the governmental benefit of a license to practice law, characterizing that benefit as a "right." Schware v. Board of Bar Examiners, 353 U.S. 232 (1957); Ex Parte Garland, 71 U.S (4 Wall) 333, 379 (1866). Yet, until *Goldberg*, the Court had declined to extend due process protection to benefits like welfare or most forms of government employment. The Court found Reich's thesis persuasive, and used it as the basis for its holding in *Goldberg* that welfare benefits conferred by statute are "property" subject to due process protection. In later cases, the Court stated that it had "fully and finally rejected the wooden distinction between 'rights' and 'privileges.' . . ." Board of Regents v. Roth, 408 U.S. 564, 571 (1972).

In the present case, the majority opinion correctly determines that the petition fails to allege a violation of state or federal due process. The opinion is correct when it points out that "[o]ur state law affords a license applicant no individual entitlement to a license that he seeks."

The majority opinion says that "[a]bsent a protected property interest, AIGA was not entitled to notice and a hearing before the denial of its application," citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The inference I take issue with is the fact that only a vested property right would be entitled to the full protection of due process. Here the claim

2

was neither vested nor a property right, however a vested privilege when and if it arises, under the gaming statutes should be entitled to the same constitutional protection. The Gaming Board argues, as many have in similar settings, "The Louisiana legislature has clearly and explicitly stated that no property interests are created in conjunction with gaming licenses, contracts and permits," relying on the language of La. R.S. 27:2(B), which states in part that:

> Any license . . . or thing obtained or issued pursuant to the provisions of this Title or any other law relative to the jurisdiction of the board is expressly declared by the legislature to be a pure and absolute revocable privilege and not a right, property or otherwise, under the constitution of the United States or of the State of Louisiana.

This seems to indicate that because the license is a privilege, it somehow escapes the protection of due process. Apparently, the drafters of the gaming statutes were some twenty years behind in their constitutional law research and were under the impression that Justice Holmes' relegation of mere privilege to a second-class status somehow still controlled federal due process concepts.

I think the cases as cited in Professor Davis' treatise make it clear that a license, once issued, albeit a privilege cannot be withdrawn by state action without affording the holders of that license the full procedural protection of due process. The majority opinion in its analysis of the due process claim cites the case of Roth, 92 S.Ct. 2701, but omits any reference to the rejection of "the wooden distinction between 'rights' and 'privileges.'" The Supreme Court opinion in Roth provides an answer for both a property right analysis and a mere privilege analysis when it says: "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." Roth, 92 S.Ct. at 2708. Although this license by legislative pronouncement is a mere privilege, the protection afforded to that privilege only exists once it has been acquired. The United States Supreme Court has recently addressed the issue that an unissued riverboat gaming license is not property (or by inference not yet a privilege) in the case of Cleveland v. U.S., 531 U.S. 12, 121 S.Ct. 365, 368, 148 L.Ed. 2d 221(11/7/00), finding "We conclude that permits or licenses of this order do not qualify as "property" within § 1341's compass."

3

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

| | | |
|---|---|---|
| ALVIN C. COPELAND | * | DOCKET NO. |
| VERSUS | * | DIVISION " " |
| TREASURE CHEST CASINO, L.L.C., and ROBERT J. GUIDRY | * | JURY TRIAL REQUESTED |
| | * | |

FILED: _____     _____
                                         DEPUTY CLERK

464607

**D**

J# 3719

COST OK Amt. 190.00

SEP 15 1999

BY _____
DY. CLERK OF COURT

<u>Petition for Damages</u>

NOW INTO COURT, through undersigned counsel, comes plaintiff Alvin C. Copeland ("Copeland"), who respectfully represents the following:

<u>The Parties</u>

1.

Plaintiff Copeland, successor to American International Gaming Association, Inc. ("AIGA"), is a competent major and a resident of the Parish of Jefferson, State of Louisiana.

2.

At all pertinent times, AIGA was a Louisiana corporation with its principal place of business located in the Parish of Jefferson, State of Louisiana; Copeland was the sole shareholder of AIGA, and its net assets were transferred to him upon its dissolution. As detailed below, AIGA was an applicant seeking authorization to conduct gaming activities on a riverboat in accordance with the Louisiana Riverboat Economic Development and Gaming Control Act (hereinafter the "Act"), LSA-R.S. 4:501, *et seq.*

3.

Made defendants are Treasure Chest Casino, L.L.C. ("Treasure Chest"), a Louisiana limited liability company formed on August 27, 1993 that is registered to do and doing business in the State of Louisiana; and Robert J. Guidry ("Guidry"), a person of the full age of majority and a resident of Jefferson Parish, State of Louisiana. Defendant Robert J. Guidry was an original member and manager of Treasure Chest, along with Dick J. Guidry. Upon information and belief, Robert Guidry was also the President of Treasure Chest and/or Treasure Chest Casino, Inc. All of the below-referenced acts by Robert Guidry were

**EXHIBIT**
2

REC'D O.P.
SEP 15 1999

undertaken in the course and scope of his position with Treasure Chest and/or Treasure Chest Casino, Inc., which gave him the actual and apparent authority to perform them; Robert Guidry's actions were also done in furtherance of these companies' business activities.

<div align="center">Venue</div>

<div align="center">4.</div>

As detailed below, the events and/or omissions giving rise to this action occurred in substantial part in this judicial district, and accordingly venue properly resides in this Court pursuant to La. Code Civ. Proc. arts 42, 73, and/or 74.

<div align="center">Allegations Common to All Counts</div>

<div align="center">5.</div>

As detailed below, on information and belief derived from (1) the factual basis of Robert Guidry's guilty plea in criminal case number 3:98cr00144-0, United States District Court for the Middle District of Louisiana (hereinafter "Guidry's guilty plea"), (2) the Superseding Indictment against Edwin Edwards, Stephen Edwards, Cecil Brown, Andrew Martin, Bobby Johnson, Gregory Tarver, and Ecotry Fuller in criminal case number 98-165, United States District Court for the Middle District of Louisiana, Section B-2 (hereinafter the "Edwards Indictment"), and (3) the Bill of Information for Conspiracy to Commit Extortion charged against Richard D. Shetler in criminal case number 98-142-A-M3, United States District Court for the Middle District of Louisiana (hereinafter the "Shetler Bill"), Copeland avers that there existed a scheme to corrupt the entire process for issuing riverboat gaming licenses under the Act (the "overarching corrupt conspiracy"). As detailed below, Treasure Chest and Robert Guidry joined, participated in, and engaged in overt acts in furtherance of the overarching corrupt conspiracy.

<div align="center">The Guidry Scheme</div>

<div align="center">6.</div>

During its existence from 1992 through early 1996, the Louisiana Riverboat Gaming Commission (the "Commission") was composed of seven members, all of whom were appointed by Edwin W. Edwards while he was the Governor of the State of Louisiana. The

<div align="center">-2-</div>

Act enabled the Gaming Commission to issue rules providing for and determining certain enumerated matters pertaining to riverboat gaming activities.

7.

The Act did not give the Commission the authority to grant riverboat gaming licenses. Rather, the Act gave that power to the Riverboat Gaming Enforcement Division of the Gaming Enforcement section of the office of State Police, Public Safety Services, Department of Public Safety and Corrections (the "Division"). Under the Act, the Division was granted the exclusive authority to "Issue, deny, condition, or restrict licenses and permits" to conduct riverboat gaming activities ("licenses"). LSA-R.S. 4:518(2). The Division was authorized to issue no more than 15 licenses. LSA-R.S. 4:525. Pursuant to this authority, the Division was empowered to conduct investigations and hearings, from which it alone was to determine the suitability of the applicant to be awarded a riverboat gaming license.

8.

Although the Act gave the Division the sole power to issue licenses, the Commission nevertheless issued a set of rules providing for the issuance of Certificates of Preliminary Approval ("certificates") by vote of its members. These certificates purportedly demonstrated that the holders thereof were acceptable to the Commission and therefore should be candidates for actual licensure.

9.

On December 11, 1992, AIGA submitted its application to the Commission for a certificate, and submitted a second application form on February 22, 1993 containing supplemental information. The AIGA application proposed a riverboat route and related operations at the Kenner Laketown Harbor Park on the shores of Lake Pontchartrain. In conjunction with its application, AIGA submitted a check in the amount of $30,000.00, comprised of a $25,000.00 application fee and a $5,000.00 evaluation fee. On February 14, 1993, AIGA submitted to the Division the filing fee of $50,000.00 required to fund the Division's background investigation of applicants for a license. The AIGA application was the first submitted to the Commission that proposed to conduct riverboat gaming in Kenner, Louisiana, and was among the first submitted to the Division for approval.

-3-

In connection with its application, AIGA retained a sophisticated group of gaming professionals, with extensive prior experience in casino operations in New Jersey and Nevada, both to coordinate activities necessary to obtain a certificate and license and to manage its proposed riverboat gaming operation. Plaintiff incurred approximately $2.2 million in expenses in preparing and processing AIGA's application for a license. Had plaintiff been aware of Guidry and the Treasure Chest's participation in the overarching corrupt conspiracy, plaintiff would not have incurred the expenses associated with the AIGA application.

11.

On or about February 9, 1993, Guidry formed Treasure Chest Casino, Incorporated (hereinafter "Treasure Chest, Inc."). Upon information and belief, Robert J. Guidry was the President and/or Chairman of the Board of Treasure Chest, Inc.

12.

On information and belief derived from the Edwards Indictment, on February 9, 1993 Guidry also paid Stephen Edwards $25,000.00 for legal services relating to the preparation of the Treasure Chest license application. Further, on information and belief, as the New Orleans Times-Picayune reported on December 5, 1994, "A Guidry-owned video poker company has paid Stephen Edwards $20,000," and "Treasure Chest paid $9,000 to a merchandising company of which Stephen Edwards was a director until he sold his interest in a settlement with the Ethics Commission, which was investigating whether the Governor's children could do business with riverboats." On information and belief, as the New Orleans Times-Picayune reported on December 9, 1997, "In all, Guidry paid Stephen Edwards $75,000 for his work in Guidry's various companies."

13.

Treasure Chest, Inc. submitted its application to the Commission on March 8, 1993, approximately three months after the AIGA application was submitted. The Treasure Chest, Inc. application proposed to locate its gaming riverboat at Kenner's Laketown Harbor Park. On March 26, 1993, the Gaming Commission held a public hearing in Baton Rouge, La. on the Treasure Chest, Inc. application to operate a gaming riverboat; this hearing occurred fewer

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 242 of 323

than three weeks after Treasure Chest, Inc. filed its application, thereby granting priority to the Treasure Chest, Inc. application over the application filed substantially earlier by AIGA. Treasure Chest, Inc. later filed a modification to its application for a certificate, which proposed re-locating the Treasure Chest, Inc.'s gaming riverboat from the Laketown Harbor Park site to Rivertown, U.S.A., on the banks of the Mississippi River in Kenner.

14.

On June 4, 1993, a public hearing was held in Baton Rouge, La. at which AIGA made a presentation to the Commission on its application for a certificate.

15.

The Commission held another meeting in Baton Rouge, La. on June 18, 1993. By that date, it had approved eight applications for certificates, although none of these eight approved applications involved proposals to locate a gaming riverboat in Kenner. At this meeting, the Chairman of the Commission stated that he had "been asked by the Governor to make one comment on his behalf, and that is that the City of Kenner has expressed that it really desires only one boat and that boat to be located on the river." In addition, at this meeting, the Commission rescinded the resolution that it had adopted on June 4th, which had stated that "a change of waterway" would be "more than a modification and requires a new application." The Commission then adopted a motion "that would allow subsequent changes to applications or status of those applications leaving basically ... discretion as to whether new or not at the discretion of the Chairman with the consent of the Commission." The Commission then voted on eight applications for certificates and approved seven of them; the Treasure Chest, Inc. application for a certificate for its Rivertown location was one of the applications that was approved. As a result, AIGA's application to operate a gaming riverboat at the Laketown Harbor Park site on the shores of Lake Pontchartrain was never considered or voted on by the Commission.

16.

On information and belief, as the New Orleans Times-Picayune reported on June 5, 1998, Governor Edwards "did more than appoint the members of Louisiana's Riverboat Gaming Commission. He also sent clear messages about which bidders he favored. For

-5-

example, Dr. Louis James, a former board member, has said he was called to the Governor's Mansion the day before the board was to award the last seven licenses in 1993. James has said Edwards gave him a typewritten list of about a dozen casino boats, including three that involved friends of Edwards."

17.

As detailed above, Treasure Chest Casino, L.L.C. was formed on August 27, 1993. On or about August 30, 1993, Boyd Kenner, a wholly owned subsidiary of Boyd Gaming, a publicly traded corporation domiciled in Las Vegas, Nevada, entered into a casino management agreement with Treasure Chest. Under this agreement Boyd Kenner would be paid a management fee representing ten (10%) percent of the Treasure Chest's net operating profit. In addition, on or about August 30, 1993, Boyd Kenner, Boyd Gaming and Treasure Chest entered into a subscription agreement wherein Boyd Kenner agreed to advance to Treasure Chest $10 million cash upon the granting of a riverboat gaming license to Treasure Chest. The commitment to advance those funds was guaranteed by Boyd Gaming. Subsequently, Boyd Kenner acquired a fifteen (15%) percent interest in Treasure Chest in exchange for a cash payment of $15 million.

18.

On November 13, 1993, subsequent to the approval by the Commission of the Treasure Chest, Inc. application for its Rivertown location, Treasure Chest sought permission to modify the previously filed application to move the site of its proposed route and operations to Lake Pontchartrain. The Commission granted this request over AIGA's objections. Despite the fact that it had been Treasure Chest, Inc. that had applied for the Certificate of Preliminary Approval, the Commission issued a certificate to Treasure Chest Casino, L.L.C. on March 15, 1994.

19.

On information and belief derived from the factual basis of Robert Guidry's guilty plea and/or the Edwards Indictment, Andrew Martin ("Martin"), a close friend, confidant, and associate of then-governor Edwin Edwards, held the title of "Executive Assistant" to Edwin Edwards during Edwards' fourth term as Governor. Beginning no later than April, 1994,

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 244 of 323

Martin solicited bribes and extortion payments on behalf of Edwin Edwards, and further

demanded and received from Guidry and/or Treasure Chest monthly net payments to himself,

Edwin Edwards, and Stephen Edwards of approximately $30,000.00 each, in exchange for

Martin's, Edwin Edwards', and Stephen Edwards' influence and assistance with the Treasure

Chest licensing procedure.

20.

On information and belief derived both from the factual basis of Guidry's guilty plea

and/or the Edwards Indictment, in or about April 1994, Robert Guidry, following a favorable

decision regarding gaming suitability in connection with a video poker company Guidry

owned, had conversations with Andrew Martin concerning the status of Guidry's efforts to

obtain approval for his riverboat license from the LSP Gaming Division. At that time, Martin

told Guidry that the Treasure Chest was not assured of getting LSP approval. Martin,

however, stated that he could help Guidry with the licensing procedure pending before the LSP

Gaming Division, but indicated by rubbing his fingers together that it would cost Guidry

money for the assistance. Martin stated words to the effect that Governor Edwin Edwards

owed him favors, and that he (Martin) would "cash in all my green stamps" to help Guidry.

Martin further told Guidry that their assistance, to quote the Edwards indictment, "would cost

Guidry 3% of gross revenue as per Louisiana statute, to be divided 1% each between Martin,

Edwin Edwards, and Stephen Edwards."

21.

On information and belief, at the time Martin first contacted Guidry, the State Police

had not set a date for the hearing on Treasure Chest's application, which was a prerequisite for

obtaining a license.

22.

On information and belief derived both from the factual basis of Guidry's guilty plea

and/or the Edwards Indictment, in or about April or May 1994, Robert Guidry had other

conversations with Andrew Martin in which Martin revised his demand on Guidry. Martin,

stating words to the effect that, "you only go around once, I gotta get what I can get," stated

that he and Edwin Edwards would accept approximately $100,000 per month to be split

-7-

between Martin, Edwin Edwards, and Stephen Edwards, and that payments should begin after

Edwin Edwards finished his term as Governor.  Guidry agreed to this arrangement, provided

that Edwin Edwards himself would confirm the deal with Guidry.

<div align="center">23.</div>

On information and belief derived from the factual basis of Guidry's guilty plea and/or

the Edwards Indictment, Guidry met with Martin and Edwin Edwards in a hotel meeting room.

Guidry and Edwin Edwards had a conversation while Martin guarded the door.  Edwin

Edwards asked Guidry if he agreed with the deal proposed by Martin.  When Guidry indicated

he did, Edwin Edwards responded that they had a deal and assured Guidry that Guidry would

get his licensing hearing.

<div align="center">24.</div>

On information and belief, as the New Orleans Times-Picayune reported on December

9, 1997, "During Guidry's effort to license the Treasure Chest, Governor Edwards urged State

Police to grant the proposal a licensing hearing, State Police sources have said, a critical step

in the approval process."

<div align="center">25.</div>

The State Police held a hearing into Treasure Chest's application in Baton Rouge, La.

on May 17, 1994.  At this hearing, the following exchange took place between Captain Mark

Oxley of the Division and Robert Vosbein, counsel for Treasure Chest, who was under oath:

Capt. Oxley:  And are you testifying that there are no elected public officials doing

business with Treasure Chest?

Mr. Vosbein: That's correct.

This statement was made by Mr. Vosbein as agent for Treasure Chest and/or Guidry; on

information and belief, it was based on information supplied to him by Treasure Chest and/or

Guidry.  Treasure Chest's representations, through its agent Mr. Vosbein, violated LSA-R.S.

27:70 C. in failing to disclose Treasure Chest's relationship with Edwin Edwards, which was

prohibited by LSA-R.S. 27:96 A.

<div align="center">-8-</div>

26.

At this same hearing, Captain Oxley and Lieutenant Colonel Kenneth Norris of the Division asked Robert Vosbein and Robert Guidry, both of whom were under oath, the following:

Capt. Oxley: Is or was anyone actually involved in the applicant's business operations in any position or manner who is not listed in the application, who has not since been disclosed and who should be disclosed now?

Mr. Guidry: Would you ask that question again please?

Mr. Vosbein: You're talking about this application?

Capt. Oxley: We're talking about Treasure Chest Casino.

Mr. Guidry: Would you ask it again, please?

Capt. Oxley: Yes, sir. Is or was anyone actually involved in the applicant's business operations in any position or manner and who is not listed in the application? Or has there been anyone not since disclosed that should be disclosed to the Division now?

Mr. Vosbein: There is no such person.

Mr. Guidry: I agree with that.

Capt. Oxley: Is there anyone involved in Treasure Chest Casino who could not fulfill the requirements for a finding of suitability to the best of your knowledge?

Mr. Guidry: No, sir, no one.

Mr. Vosbein: Not to the best of my knowledge.

Capt Oxley: To the best of your knowledge, is there any information or material fact that has not been furnished to State Police, that has not otherwise come to light that may yet be uncovered by the Division or others that may tend to cast doubt or reflect negatively on the qualifications of the applicant or anyone with an interest which you should bring forward at this point in time to the attention of the Division?

Mr. Guidry: No, sir, no one.

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 247 of 323

Mr. Vosbein: Not to my knowledge.

Capt. Oxley: Thank you.

Lt. Booth:   Point of clarification, please, Captain. Your first question dealing with

disclosures, was that as to persons or firms? I misunderstood the

answer.

Capt. Oxley: That was anyone, I suppose you could say person or persons in a legal

sense, or in any other sense. And you answered negatively. Correct?

Mr. Guidry:  That's right.

Lt. Booth:   No individual or entity. Is that correct?

Mr. Vosbein: That's correct.

Lt. Booth:   Okay. Thank you.

Mr. Guidry's testimony, which failed to reveal his association with Edwin Edwards as set forth

herein, was in violation of LSA-R.S. 27:70 C.

27.

In conjunction with his submittal of the Treasure Chest application for a license, Guidry

executed an "Affidavit of Full Disclosure" on February 26, 1993, wherein Guidry averred, in

pertinent part:

... except as reported in the Application, I have no agreements or understandings with

any person or entity and no present intent to pay any sums of money or give anything

of value as, including but without limitation, a finder's fee or commission to any person

or entity related to the acquisition of any interest in the Application ...

Pursuant to LSA-R.S. 27:70 C., Guidry had a continuing duty to render a full and accurate

disclosure of his association with Edwin Edwards as set forth herein. Upon information and

belief, Guidry has never disclosed this association, and has therefore violated his duty under

LSA-R.S. 27:70 C.

28.

On May 17, 1994, the Division granted a license to Treasure Chest. On information

and belief, Treasure Chest would not have received a license but for the overarching corrupt

conspiracy.

-10-

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 248 of 323

Plaintiff avers that, but for the overarching corrupt conspiracy, AIGA would have obtained a license to conduct gaming activities on a riverboat pursuant to the Act, and was suitable to obtain such a license; AIGA, in fact, was granted a video gaming owner's license by the State of Louisiana in June 1994 and a gaming license by the State of Colorado in March 1995. Further, had AIGA known of the overarching corrupt conspiracy, it would not have expended the funds necessary to prepare and submit its application.

30.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, in or about December, 1995, Guidry contacted Andrew Martin regarding his problem with obtaining State Fire Marshal approval for his entertainment barge at the Treasure Chest site. Guidry thereafter met with Martin and, at that meeting, Martin told Guidry that he (Martin) could assist with obtaining Fire Marshal approval. In exchange for his help with approval, Martin demanded that he be given a 2% interest in the net profits of the Treasure Chest and a high ranking employment position with the Treasure Chest after leaving office as Edwin Edwards' Executive Assistant. These payments were in addition to the payments Guidry previously agreed to make to Martin, Edwin Edwards, and Stephen Edwards. Guidry agreed to this arrangement. Shortly thereafter, Guidry received Fire Marshal approval for the entertainment barge.

31.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, commencing in February 1996 and continuing through April, 1997, Guidry made monthly cash payments in the approximate amount of $100,000.00, to be split evenly among Edwin Edwards, Stephen Edwards, and Martin, as payment for their influence and assistance with the Treasure Chest licensing procedure before the LSP Gaming Division. From February 1996 through approximately October 1996, Guidry paid the full $100,000.00 to Martin. Thereafter, Guidry began paying the Edwardses their shares directly, and paid Martin his share separately, often by leaving the cash payments in trash cans or dumpsters for Martin to retrieve.

-11-

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about November 6, 1996, Guidry cashed a check in the amount of $65,000.00. On the same day, during a telephone conversation recorded by the Federal Bureau of Investigation ("FBI"), Guidry and Edwin Edwards made plans to meet each other along with Stephen Edwards. At the meeting, Guidry delivered the cash to Edwin Edwards and Stephen Edwards as part of the payoff agreement.

33.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about November 13, 1996, during a telephone conversation recorded by the FBI, Martin arranged a meeting between himself, Guidry, and Edwin Edwards to take place on the following Monday in Baton Rouge, in order to discuss the proposed arrangement which Martin sought to execute with Guidry regarding employment with the Treasure Chest and to discuss Martin's receipt of a 2% interest in the net profits from the Treasure Chest in exchange for his assistance with the Fire Marshal.

34.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about November 19, 1996, during a telephone conversation, Edwin Edwards told Robert Guidry that Andrew Martin wanted to execute a "contract" to document Guidry's secret obligation to give Martin a 2% ownership in the Treasure Chest in exchange for Martin's assistance in obtaining Guidry's license.

35.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about November 21, 1996, during a telephone conversation, Andrew Martin and Edwin Edwards discussed the arrangement which Martin wanted Robert Guidry to execute. Edwards informed Martin that Guidry had "kept his word" to all of them, referring to Guidry's agreement to pay them secretly. Edwards further warned Martin that they didn't want to push Guidry too hard and thereby anger him, giving him an excuse to change his mind, and according to Edwards, "risk what's happening," which was, to quote the

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 250 of 323

Edwards Indictment, "a reference to the payoff split in which Guidry was funneling casino proceeds to Edwin Edwards, Stephen Edwards, and Martin as part of their agreed payoff."

36.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about January 9, 1997, Martin expressed to Edwin Edwards his understanding that Robert Guidry had agreed to give him a contract to "go to work for him" (referring to Guidry) after Edwin Edwards left office as Governor of Louisiana. Edwin Edwards made reference to the fact that " . . . if it wouldn't be for Andrew [Martin] he [Guidry] wouldn't have a boat . . .," referring to the Treasure Chest. Martin reminded Edwards that he [Martin] previously approached Edwards on Guidry's behalf for "all my green stamps from all that [sic] times I helped you [Edwards] in the past...." During the conversation, Martin told Edwards that his financial interest in obtaining the payments and 2% of the Treasure Chest from Guidry was his "retirement plan." Edwin Edwards went on to tell Martin that he knew Guidry paid Stephen Edwards $100,000.00 for Guidry's license, and further told Martin that even though Guidry had hired Stephen Edwards, they were "all . . . in the thing together." At that time, Edwin Edwards stated: " . . . it's not a question of whether you or Andrew or Stephen or me. This is something we worked out all for ourselves," referring to the licensing of the Treasure Chest and the receipt of cash from Guidry as payment for their assistance in helping Guidry obtain his license.

37.

On information and belief derived from the factual basis of Guidry's guilty plea and/or the Edwards Indictment, on or about April 8, 1997, Guidry cashed a check in the amount of $65,000.00. On the same day, during a recorded telephone conversation, Edwin Edwards and Stephen Edwards agreed to meet Guidry at the Highland Road Café in Baton Rouge, Louisiana. At the meeting, Guidry delivered the cash to Edwin Edwards and Stephen Edwards as part of their agreed payoff.

38.

On information and belief, the Treasure Chest's net operating profits have exceeded $100 million for calendar years 1996 and 1997.

-13-

On or about October 27, 1997, Boyd Louisiana, L.L.C., a Nevada limited liability company ("Boyd Louisiana"), along with another wholly owned subsidiary of Boyd Gaming, purchased the interest in Treasure Chest not owned by Boyd Kenner for approximately $113 million from the selling members, namely Robert J. Guidry, Dick J. Guidry, Robert A. Vosbein, Pam Olson, Robert J. Guidry Family Trust, and Dick J. Guidry Family Trust. The Treasure Chest's "intangible license rights," which had been obtained solely as a result of the overarching corrupt conspiracy, were valued at $85 million of the total purchase price. On information and belief, defendant Robert J. Guidry individually received $73 million from this transaction; the remaining $12 million was distributed among the other selling members. As a result of this transaction, Treasure Chest became and remains a wholly owned subsidiary of Boyd Gaming.

40.

Boyd Gaming's 1998 10K Statement, filed with the United States Securities and Exchange Commission, states that net revenues in Boyd Gaming's Central Region "increased 34% during the quarter ended June 30, 1998 compared to the quarter ended June 30, 1997 primarily as a result of the acquisition of Treasure Chest in October 1997. . . ." Boyd Gaming's 1998 10K Statement continues that "Treasure Chest produced net revenues for the Company of $31.2 million during the quarter ended June 30, 1998 . . . ." Further, Boyd Gaming's 1999 10K Statement provides that "Treasure Chest produced net revenues for the Company of $124 million during 1998 versus $26 million during the prior year."

<u>The Shetler Scheme</u>

41.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, Richard D. Shetler ("Shetler") was hired in June 1993 by Players Lake Charles Riverboat Casino, Inc. ("Players"), as a consultant on a three (3) year retainer for approximately $60,000 per year, and upon the opening of the riverboat his salary would increase to $100,000 per year.

-14-

42.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment,
on December 6, 1993, Players was granted a license to operate, and did open, a riverboat
casino in Lake Charles, La.

43.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment,
pursuant to a "Compact" signed by Louisiana Governor Edwin W. Edwards and approved by
the U.S. Division of Indian Affairs, Washington, D.C., the Coushatta Indian Tribe had
received approval to open a casino on its Reservation, located approximately 50 miles from
Lake Charles. During 1993/1994, the Coushatta Tribe sought approval from the U.S. Division
of Indian Affairs to build the casino on the newly acquired 104 acres of land located near the
Reservation. In order for the Tribe to get this approval, the Governor of Louisiana had to
concur that these 104 acres were "contiguous" to the Reservation.

44.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment,
Players sought authorization from the Louisiana Riverboat Gaming Commission to purchase
the Star Riverboat Casino in New Orleans, assume its license, and transfer the Star riverboat to
a berth next to Players' original riverboat in Lake Charles. This transfer was approved by the
Gaming Commission in February 1995.

45.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment,
Shetler's still valid contract with Players was superseded on December 1, 1994, by a seven (7)
year retainer for $126,000 per year, complete with a $250,000 bonus and $200,000 loan.

46.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment,
from payments received by Players and related entities, Shetler gave Stephen Edwards cash
and other property for Stephen Edwards and Edwin Edwards in the approximate amount of
$650,000.

-15-

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 253 of 323

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, as explained herein, to quote the Shetler Bill, "from approximately April 1993 through April 1997, in the Middle District of Louisiana and elsewhere, Richard D. Shelter did knowingly, willfully and unlawfully combine, conspire, confederate, and agree with Stephen Edwards and Edwin Edwards to unlawfully obstruct, delay, and affect commerce by extortion, that is, by obtaining property, namely payments from Players, with Players' consent, induced by fear of economic loss, and under color of official right."

48.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in April or May 1993, Stephen Edwards told two Players officials to hire Shetler as a consultant. Edwards stated that if Players wanted to get its license approved by the Louisiana State Police, Players would have to pay Shetler $300,000; if Players wanted to have a monopoly in Lake Charles, it would have to pay Shetler $600,000. On or about June 6, 1993, Players hired Shetler as a consultant on terms including a three-year retainer at $100,000 per year.

49.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in or about August 1993, Shetler recorded a telephone conversation he had with Stephen Edwards. During the conversation, they discussed a $50,000 bonus Players was going to pay to Shetler to "look at these other sites" for gaming riverboats. Stephen Edwards explained to Shetler the bonus was a "way for them to pay you because they know that if they are paying you and you're happy, then you'll keep me from fucking with them."

50.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, during the same August 1993 recorded conversation, Shetler and Stephen Edwards discussed other contracts which various associates and family members of Stephen Edwards were to obtain in connection with Players.

-16-

51.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, commencing in May 1994 and continuing through and including September 1995, Shetler caused another individual to pay approximately $75,000 for windows, air conditioning units, kitchen appliances, and a metal shed to be delivered and installed in Stephen Edwards' house and other residences.

52.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in July or August 1994, Shetler, upon the instructions of Stephen Edwards, related to Players that, in return for separate payments of $250,000 and $200,000, Governor Edwin Edwards would take official action to hinder or prevent the opening of the Coushatta Indian Tribe Casino, and Stephen Edwards would keep other riverboats from establishing in Lake Charles.

53.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about November 23, 1994, in return for official action taken by Governor Edwards regarding the Coushatta Tribe's Casino, Shetler purchased in his name from Don Shetler Chevrolet, Inc., Crowley, LA. a $24,078 1994 Chevrolet Suburban. The car was then taken for use at Governor Edwards' condominium in Vail, Colorado.

54.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about December 1, 1994, in response to Shetler's demands, Players revised his contract, replacing it with a seven year retainer for $126,000 per year, complete with a $250,000 bonus and a $200,000 loan.

55.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in January 1995, Shetler, upon the instructions of Stephen Edwards, related to Players that, in return for $250,000 per year, Governor Edwards would approve the transfer of the Star Riverboat.

-17-

56.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in January 1995, Shetler entered into an agreement with another company with an economic interest in the approval of the Star transfer, whereby he was to receive 37.5 cents per passenger off the two Players boats.

57.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in or about February 1995, in connection with the Star transfer, Players agreed to pay a legal retainer to Stephen Edwards for $15,000 per month. Players, thereafter, paid a total of $150,000 pursuant to this agreement.

58.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about February 8, 1995, the Gaming Commission approved both the Star transfer and the establishment of the Crown Casino riverboat in Lake Charles.

59.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, in or about August 1995, representatives of Players met with Edwin Edwards at the Governor's Mansion. The purpose of the meeting was to discuss a proposed Players riverboat casino in Shreveport. During the meeting, Edwards protested that although people said it was necessary for gaming companies to do business with his friends, relatives, and associates, that was not, in fact, true. Edwards then stated to the Players representatives that there were local people who could advance their business ventures, while at the same time gesturing with his finger toward an associate of his who was sitting nearby.

60.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about September 27 - 29, 1995, Richard D. Shetler accompanied Stephen Edwards and his wife and an interior decorator to various furniture showrooms in Dallas, Texas. The Edwardses selected and received furniture totaling approximately $74,267, a fireplace mantle at $2,250, and a chandelier for $1,957. Shetler paid for these items.

-18-

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 256 of 323

61.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about September 5 through 8, 1995, Shetler cashed six checks totaling $20,000, payable to "cash." He thereafter made a $20,000 cash payment to Stephen Edwards for Governor Edwin Edwards.

62.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about February 25, 1997, at their law offices, Stephen Edwards told his father Edwin Edwards that Shetler would come tomorrow "with your money."

63.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, the following day, February 26, 1997, Stephen Edwards met in his law office with Shetler. Stephen Edwards asked Shetler how much money he brought, and Shetler replied "47." They discussed that amount of revenue the riverboat made and the number of customers who had boarded the riverboat during the period. They then discussed possible methods through which Shetler could secretly purchase a $25,000 van for Stephen Edwards, who stated that the van deal could be structured so Shetler could use it "once a year just like the deal (referring to the Suburban) you had with my dad." Since the Chevrolet Suburban was at the Vail condo, Stephen Edwards told Shetler that "for the purposes of legitimacy, I think what you ought to do is make plans of calling ... for you to go up there and spend some time with him, or go up and use the place when he ain't there ... but you really ought to go up there at least once."

64.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about March 13, 1997, Shetler brought approximately $4,634 in cash to Stephen Edwards' office for Edwin Edwards. After entering the office, he told Stephen Edwards that he had put the money "in the bottom drawer," stating that the money was for "your Dad."

-19-

65.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, on or about March 18, 1997, Richard D. Shetler purchased in Stephen Edwards' name from Don Shetler Ford, Inc., Sulphur, LA., a 1997 Ford Club Van.

66.

On information and belief derived from the Shetler Bill and/or the Edwards Indictment, from August 1996 through April 1997, Shetler delivered approximately $50,000 in cash for Edwin W. Edwards.

### Count One -- Racketeering Influenced and Corrupt Organizations Act

67.

On information and belief, Edwin W. Edwards, Stephen Edwards, Andrew Martin, Robert Guidry, Treasure Chest, and other unnamed persons and entities (collectively, "RICO persons") constituted an association-in-fact enterprise ("RICO enterprise") as defined in the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq, ("RICO").

68.

On information and belief, the RICO enterprise was engaged in and its activities affected interstate and foreign commerce.

69.

On information and belief, the RICO persons conducted and participated in the conduct of the affairs of the RICO enterprise through a pattern of racketeering activity in East Baton Rouge and other parishes, comprised of repeated acts of bribery (in violation of 18 U.S.C. § 1952 and LSA - R.S. 14:118), extortion (in violation of 18 U.S.C. § 1951, LSA - R.S. 14:66 and LSA - R.S. 14:120), wire fraud (in violation of 18 U.S.C. § 1343), and mail fraud (in violation of 18 U.S.C. § 1341)(collectively, "predicate acts") extending over a period of years, in violation of 18 U.S.C. § 1962(c).

70.

On information and belief, the RICO persons, through a pattern of racketeering activity, acquired and/or maintained an interest in and/or control of enterprises engaged in, and

-20-

the activities of which affected, interstate and foreign commerce, namely entities involved in riverboat gaming in Louisiana, in violation of 18 U.S.C. § 1962(b).

71.

On information and belief, the RICO persons conspired to violate 18 U.S.C. §§ 1962(b) and 1962(c), in violation of 18 U.S.C. § 1962(d).

72.

Copeland was injured in his business and property, which injury was proximately caused by reason of the RICO persons' violations of 18 U.S.C. §§ 1962(b), 1962(c) and 1962(d), entitling him to recover threefold the damages he has sustained and the cost of the instant suit, including a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c). Certain of the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the RICO enterprise are detailed in the following paragraphs.

73.

On information and belief, the RICO enterprise, which began prior to defendant Edwin Edwards' fourth and final term as Governor, centered around Edwin Edwards and the office of the Governor of Louisiana, and further depended upon the political and economic power, influence, control and notoriqty of Governor Edwards to operate and to succeed in its purposes and objectives.

74.

On information and belief, the enterprise continued in existence through and beyond the conclusion of Edwin Edwards' final term as Governor, until and including the date of this Complaint. Thus, the RICO enterprise and its associates continued to exploit the political and economic power, influence, control, and notoriety of Edwin Edwards to operate and succeed in its purposes and objectives.

75.

On information and belief, Edwin Edwards and Stephen Edwards were the center or nucleus of the RICO enterprise. Other members and associates of the RICO enterprise would and did participate in various aspects of the RICO enterprise's purposes, objectives, and ventures, as sanctioned by Edwin Edwards and Stephen Edwards.

-21-

76.

On information and belief, to avoid detection by law enforcement and unmasking before the public, Edwin Edwards went to great lengths to ensure that his participation in the RICO enterprise and its racketeering activity remained hidden and insulated by having the other members and associates of the RICO enterprise perform overt acts in furtherance of the RICO enterprise's racketeering activity.

77.

The RICO persons fraudulently concealed their illegal activities, and plaintiff neither knew nor, in the exercise of due diligence, could reasonably have known of the offenses committed by the members of the RICO enterprise.

78.

On information and belief, the members and associates of the RICO enterprise would and did use their close relationships with Edwin Edwards and Stephen Edwards, thereby trading upon the Edwin Edwards name, notoriety, and power, in order to exercise influence and leverage over the victims of the RICO enterprise.

79.

On information and belief, commencing in or about 1993 and continuing through 1994, Edwin Edwards, on several occasions, assisted certain riverboat applicants in obtaining licenses from the Division by, among other things, demanding that the Division schedule speedy licensing hearings for those applicants he favored.

80.

On information and belief, on or about April 23, 1997, Edwin Edwards was interviewed by a Special Agent of the FBI and a Special Agent of the Internal Revenue Service (the "IRS") concerning the riverboat licensing process. Edwin Edwards stated that, in his opinion, legislators "got their friends on the Commission" to award Certificates of Preliminary Approval to certain riverboat applicants. Edwin Edwards stated that he appointed the Co-Chairman of the Gaming Commission at the request of a state legislator. Edwin Edwards also stated that he appointed other members of the Gaming Commission at the request of legislators who were close political allies of Edwin Edwards. Edwin Edwards also admitted to giving a

-22-

member of the Gaming Commission a list containing the riverboat applicants he wanted to receive certificates.

<div align="center">81.</div>

Defendant Robert J. Guidry and/or Treasure Chest, are liable unto plaintiff Copeland for damages resulting from the RICO persons' violations of 18 U.S.C. §§1962(b),(c) and (d), including treble damages, attorneys' fees, court costs, litigation expenses, and all other legal and equitable relief.

<div align="center">Count Two -- Unfair Trade Practices</div>

<div align="center">82.</div>

The actions of defendants Robert J. Guidry and/or Treasure Chest, as outlined above, were unfair, immoral, unscrupulous, and violated public policy; defendants' actions were also deceptive. As a result, defendants Guidry and/or Treasure Chest are liable to plaintiff, a business competitor of Treasure Chest, for the unfair, deceptive, and illegal trade practices outlined above pursuant to the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, *et seq.* ("LUTPA").

<div align="center">83.</div>

Upon information and belief, Treasure Chest has failed to notify the Division and/or the Gaming Control Board of the actions outlined above, which constitutes a violation of the Louisiana Gaming Control Law (including without limitation a violation of LSA-R.S. 27:70). This noncompliance is an independent violation of the LUTPA, and continues each day Treasure Chest fails to disclose to the Gaming Control Board the facts surrounding Treasure Chest's acquisition of its license.

<div align="center">84.</div>

Defendants Robert J. Guidry and/or Treasure Chest are liable under the LUTPA for all damages sustained by the plaintiff, including without limitation his out of pocket costs, lost profits, attorneys' fees and costs, the value of Treasure Chest's gaming license, and the value of Treasure Chest's success.

<div align="center">-23-</div>

## Count Three -- Fraud

85.

As detailed above, Robert J. Guidry and/or Treasure Chest obtained a certificate and license by misrepresentations and/or suppressions of the truth concerning the overarching corrupt conspiracy, as well as their participation in extortion; these misrepresentations and/or suppressions were made with the intent to obtain an unjust advantage in obtaining a certificate and license. Robert J. Guidry and/or Treasure Chest are therefore liable for fraud under La. Civ. Code art. 2315.

86.

Robert J. Guidry and/or Treasure Chest fraudulently concealed the formation of and their participation in the overarching corrupt conspiracy, and all acts taken in furtherance thereof, in order to avoid or prolong discovery thereof and in an attempt to prejudice the rights of the victims, including plaintiff, of the overarching corrupt conspiracy and the constituent elements thereof. Plaintiff learned of Robert J. Guidry and/or Treasure Chest's fraudulent conduct within one year of the filing of this Petition.

87.

Robert J. Guidry and/or Treasure Chest are liable unto plaintiff for the fraud effected by the overarching conspiracy and the damages to plaintiff resulting therefrom, including without limitation his lost profits, attorney fees, costs, the value of Treasure Chest's gaming license, and the value of Treasure Chests's success.

## Count Four -- Unjust Enrichment

88.

Guidry and/or Treasure Chest are liable to Copeland for their unjust enrichment. As detailed above, the license awarded to Treasure Chest as a result of the overarching corrupt conspiracy should have been awarded to AIGA. Defendants have reaped enormous profits under the license, while Copeland (1) has both had to forego the profits he would have made under the license, and (2) has never recouped his out-of-pocket costs and expenses incurred in applying for it. Consequently, defendants have been unjustifiably enriched, and Copeland has been impoverished.

-24-

89.

As a result of defendants' unjust enrichment, Copeland is entitled, without limitation, to recoup his out-of-pocket costs and lost profits or, alternatively, the profits made by the defendants, pursuant to La. Civ. Code art. 2298. He is also entitled to recover the value of Treasure Chest's gaming license and the value of Treasure Chest's success.

## Solidary Liability

90.

Pursuant to 18 U.S.C. § 1962 and Louisiana Civil Code Article 2324, defendants are each jointly and severally liable unto plaintiff.

91.

## Respondeat Superior

Because all of the above-referenced acts undertaken by Robert Guidry were in the course and scope of his position with Treasure Chest and were done with actual and/or apparent authority provided to Guidry by Treasure Chest, Treasure Chest is liable to plaintiffs for these acts through the doctrines of *respondeat superior* and/or La. Civ. Code article 2320. Guidry's actions were rooted in his position with Treasure Chest and were incidental to its activities, and were done with Treasure Chest's consent.

## Jury Demand

92.

Plaintiff prays for trial by jury.

WHEREFORE, premises considered, plaintiff prays that after due proceedings be had, there be judgment against defendants Treasure Chest Casino, L.L.C. and Robert J. Guidry, for all damages, both pecuniary and nonpecuniary, suffered as a result of defendants' actions as set forth herein, including plaintiff's out of pocket costs and all lost profits, as well as the value of the Treasure Chest's gaming license and the value of Treasure Chest's success, legal interest, attorneys' fees, litigation costs, court costs, treble damages, and for all other

-25-

appropriate legal and equitable relief.

Respectfully submitted,

SLATER LAW FIRM

Benj. R. Slater, Jr., Bar No. 12126
Benj. R. Slater, III, Bar No. 12127, T.A.
A. Elise Brown, Bar No. 19500
Donald J. Miester, Jr., Bar No. 20294
S. Joseph Welborn, Bar No. 25928

By _____

650 Poydras Street
Suite 2600
New Orleans, LA 70130
Telephone: (504) 523-7333
Facsimile: (504) 528-1080
**ATTORNEYS FOR PLAINTIFF ALVIN C.
COPELAND**

**PLEASE SERVE:**

1.  Treasure Chest Casino, L.L.C., through its registered agent for service of process:
    Paul S. West
    One American Place
    Ninth Floor
    Baton Rouge, Louisiana 70825

    -and-

2.  Robert J. Guidry
    3817 Spencer Street
    Harvey, Louisiana   70058

CIVIL

☑ 01-DAMAGES
☐ 02-CONTRACT
☐ 03-PRISONER SUIT
☐ 04-EXECUTORY PROCESS
☐ 05-SUIT ON NOTES
☐ 06-EVICTION
☐ 07-WORKMENS COMPENSATION
☐ 08-JUDICIAL REVIEW
☐ 09-PROPERTY RIGHTS
☐ 10-INJUNCTION MANDAMUS

☐ 11-COMM. PROP. PARTITIONS
☐ 12-PUBLIC SERV. COMM.
☐ 13-OTHER PARTITIONS
☐ 14-OTHER
☐ 15-D.E.Q.
☐ 16-
☐ 17-
☐ 18-
☐ 19-
☐ 20-



CERTIFIED
TRUE COPY

SEP 2 2 1999

BY _____
DEPUTY CLERK

Form  C 003

Outside Parish Paid For
Service $20.00 108932
JEFFERSON Parish SHERIFF'S OFFICE


ALVIN C. COPELAND

vs                    **Plaintiff**

TREASURE CHEST CASINO, ET AL

                    **Defendant**

No  C 464607 Sec: 21
19th JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

TO:  Plaintiff,
Robert A Kutcher
Chopin, Wagar, Cole, Richard, Reboul & Kutcher, LLP
Two Lakeway Center, Suite 900, 3850 North Causeway Blvd.
Metairie La.

    The **DEFENDANT** in this case filed a **Treasure Chest Casino, L.L.C.'S Peremptory Exceptions to Plaintiffs Petition for Damages** which has been set for hearing. Certified copies of this document and the Court's order are attached

    You MUST come to Court at 09:30 o'clock **AM** on the 10th day of Februar 2003, at Room 804 in the Governmental Building, 222 St. Louis St., and show cause why:

**SEE ATTACHED ORDER**

    This Rule was issued by the Clerk of Court of East Baton Rouge Parish the 27th day of January, 2003.

By _____
      Deputy Clerk of Court for
      Doug Welborn, Clerk of Court

                    SERVICE INFORMATION

Received on the _____ day of _____, 20____ and on the _____ da of _____, 20____ served the above named party as follows:

PERSONAL SERVICE  on the party herein named
at _____

DOMICILIARY SERVICE: on the within named _____, by leavi same at his domicile in this parish in the hands of _____ of suitable age and discretion residing in said domicile at _____

SECRETARY OF STATE:  by tendering same to the within named, by handin to _____

DUE AND DILIGENT:  After diligent se ch and inquiry, was unable to within named _____ or his domicile, or legally authorized to represent him.

RETURNED  Parish of _____, this _____ of _____, 20____

SERVICE  $ _____
MILEAGE. $ _____              _____
TOTAL   $ _____              Deputy Sheriff  na
                              Parish of East Baton Rouge, L

**DATE RECEIVED** 2/3/03  **DATE RETURNED** 2/3/03
DATE SERVED 2/3/03
**SERVICE AFFECTED OR REASON UNSERVED:**
✓ PERSONAL  DOMICILIARY _____
____ NOT AT THIS ADDRESS PER _____
____ UNABLE TO SERVE AFTER MAKING ____ ATTEMPTS
OTHER: _____

E. TZAVELLAS                 19577
Deputy Sheriff of Jefferson Parish

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10  Page 265 of 323

# CHOPIN, WAGAR, COLE,
# RICHARD, REBOUL & KUTCHER, LLP
### ATTORNEYS AT LAW

RICHARD A. CHOPIN †‡
NELSON W. WAGAR, III †‡
KEVIN L. COLE ‡
THOMAS M. RICHARD
BRIAN L. REBOUL
ROBERT A. KUTCHER *
ELIZABETH SMYTH SIRGO
NICOLE S. TYGIER

MICHAEL L. COHEN
DIANA L. TONAGEL
PATRICIA D. TUNMER
JUDITH A. MILLER £
MATTHEW D. MONSON
CYNTHIA J. THOMAS △○
JASON P. FOOTE
JAMES A. PRATHER
ANGELA M. HEATH
ALLEN K. TRIAL ‡

NORTHSHORE OFFICE

THREE SANCTUARY BOULEVARD
SUITE 301
MANDEVILLE, LOUISIANA 70471
TELEPHONE 985-674-6680
FACSIMILE 985-674-6681

TWO LAKEWAY CENTER
SUITE 900
3850 NORTH CAUSEWAY BOULEVARD
METAIRIE, LOUISIANA 70002
TELEPHONE 504-830-3838
FACSIMILE 504-836-9540
www.chopin.com

*Writer's Direct Number*
504-830-3824
*Writer's Direct Facsimile*
504-836-9573
ntygier@chopin.com

† Professional Corporation
△ Also Admitted in D.C.
* Also Admitted in New York
○ Also Admitted in Puerto Rico
‡ Also Admitted in Texas
£ Registered Nurse, BSN

*Please Reply to
Metairie Office*

## POSTED
APR - 8 2003

April 3, 2003

The Honorable J Douglas Welborn
Clerk of Court
19th Judicial District Court
Parish of East Baton Rouge
P. O. Box 1991
Baton Rouge, LA 70821-1991

> **Re:** *Alvin C. Copeland v. Treasure Chest Casino, LLC and Robert J. Guidry*
> *19th JDC No. 464-607(D)*
> *Our File No. 245.2433*

Dear Mr. Welborn:

In connection with the above captioned matter, please issue a Subpoena Duces Tecum, pursuant to La. C.C.P. art. 1463, to the following entities stating the below information:

(1) Louisiana Riverboat Gaming Enforcement Division of the Gaming
Enforcement Section of the Office of the Louisiana State Police,
***through its attorney of record***:
Michael A. Patterson
The Long Lawfirm, LLP
8550 United Plaza Blvd.
Suite 800
Baton Rouge, LA 70809

(2) Louisiana Riverboat Gaming Commission,
***through its attorney of record***:
Michael A. Patterson
The Long Lawfirm, LLP
8550 United Plaza Blvd.
Suite 800                                    **REC'D C.P.**
Baton Rouge, LA 70809
                                              APR 0 8 2003

Louisiana Riverboat Gaming Commission
***through its attorney of record***:
Michael A. Patterson
The Long Lawfirm, LLP
8550 United Plaza Blvd.
Suite 800
Baton Rouge, LA 70809

**ROBERT A. KUTCHER** (LSBA #7895)
**NICOLE S. TYGIER** (LSBA #19814)
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9573

*Attorneys for Plaintiff Alvin C. Copeland*

**REC'D C.P.**

APR 0 8 2003

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of

record in this proceeding:

| | | | | |
|---|---|---|---|---|
| ( ) | Hand Delivery | ( XX ) | Prepaid U.S. Mail |
| ( ) | Facsimile | ( ) | Overnight Delivery |

**Metairie, Louisiana**, this 3rd day of April, 2003.

CERTIFIED TRUE COPY

303020

DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH, LA

2003 APR -7 PM 5:01

2

# EXHIBIT "A"

## DEFINITIONS

A.  In answering the items in this request for production, complete documentation must be divulged, regardless of whether it is in the possession of the named defendant or the defendant's attorneys, employees, agents, investigators, or other representatives.

B.  If you object to any of the items in this request for production on the grounds that the document requested is protected or otherwise privileged, please state the following with respect to each such document: the privilege claimed; a brief description of the nature, subject, and contents of the document claimed to be privileged; the name, occupation, and capacity of the individual who authored such protected or privileged documentation; the date that the document bears; and the person or persons, if any, to whom the document was directed.

C.  The term "Plaintiff" means Alvin C. Copeland and/or American Gaming Association ("AIGA").

D.  The terms "you" and "your" include the named defendant to whom this request for production is directed and defendant's attorneys, employees, agents, investigators, and other representatives.

E.  As used herein, the words "and" and "or" shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the discovery request any document that otherwise might be deemed outside its cope by another construction.

F.  The term "document(s)" includes every wiring and record of every type and description in the possession, custody, control, or within the knowledge of any named defendant and the attorneys, employees, agents, investigators or other representatives, including but not limited to letters, correspondence, computer database or computer-generated information, telegrams, memoranda, notes, reports, calculations, ledgers, recordings (mechanical, electronic, typed or written), transcripts, drawings, blueprints, charts, maps, graphs, photographs, still moving picture films, studies, books, pamphlets, schedules, desk calendars, diaries, invoices, work sheets and all drafts of any kind. Additionally, the term "document" means a copy where the original is not in your possession, custody or control.

G.  The term "person(s)" refers to every individual, partnership, firm, corporation, enterprise, entity, association, employer, employee, agent, investigator, attorney, party, accountant, engineer, expert witness, lay witness, photographer, police

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 268 of 323

officer, other representative or person in any way connected with the events as alleged in the pleadings.

H.    The term "License" means a license to conduct riverboat gaming operations in Louisiana in accordance with LSA – R.S. 4:501, *et seq.*

I.    The term "Certificate" means a certificate of preliminary approval, as set forth in Louisiana Riverboat Gaming Commission Rules 301, *et seq.*

J.    The term "Division" means the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of the Louisiana State Police.

K.    The term "Commission" means the Louisiana Riverboat Gaming Commission.

L.    The term "Board" means the Louisiana Gaming Control Board.

M.    The term "Treasure Chest" means Treasure Chest Casino, L.L.C. and/or Treasure Chest Casino, Inc.

## DOCUMENTS REQUESTED

1)    All documents reflecting or relating to any transfer(s) of any interest in Treasure Chest's License.

2)    All documents reflecting or relating to any transfer(s) of any interest in a License other than the License awarded to Treasure Chest.

2 of 2

SUBPOENA DUCES TECUM

S 0 4 0 9 0 I 2 0 0 0

Form C 192

IRELAND, ALVIN C.,
vs                          Plaintiff

TREASURE CHEST CASINO, ET AL.
                            Defendant

No. C 464607 Div: 21
19th JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

1.  Louisiana Riverboat Gaming Commission,
    through Michael A Patterson
    8550 United Plaza Blvd., Suite 800
    Baton Rouge, La.   70809

You have been ordered by the Court to Produce in the office of:
        Chopin, Wagar, Cole, Richard, Reboul & Kutcher, LL
        Two Lakeway Center, Suite 900
        3850 North Causeway Boulevard,
        Metairie, La. 70002

10:00 o'clock AM, on the **14th** day of **May**_____, **2003**, produce the
following.
. . . . . . . . . **SEE ATTACHED NOTICE OF DOCUMENT**
        **INSPECTION**. . . . . . . . . . . .

this case is continued, you must bring these items back with you.

If you do not come and do not bring these items, you will be violating the
law and may be subject to penalties.

This SUBPOENA was ordered by Attorney **KUTCHER, ROBERT A.** and was issued by
the Clerk of Court on the  8th day of April, 2003.

                        _____
                        Deputy Clerk of Court for
                        Doug Welborn, Clerk of Court

                    SERVICE INFORMATION

Received on the _____ day of _____, 20____ and on the _____ day
_____, 20____, served the above named party as follows:

PERSONAL SERVICE: on the party herein named

_____

DOMICILIARY SERVICE: on the within named _____ by leaving the
same at his domicile in this parish in the hands of _____, a person
    suitable age and discretion residing in said domicile

SECRETARY OF STATE: by tendering same to the within named, by handing same

DUE AND DILIGENT: After diligent search and inquiry, was unable to find the
within named _____ or his domicile, or anyone
legally authorized to represent him.

RETURNED  Parish of _____, this _____ day
                        _____ 20____

SERVICE:  $ _____
MILEAGE:  $ _____          _____
TOTAL:    $ _____          Deputy Sheriff
                                     Parish of East Baton Rouge, Louisiana

3 0 4 0 9 0 0 9 6 0 0

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                    DIVISION "D"

**ALVIN C. COPELAND**

-versus-

**TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY**

Filed:_____          _____
                                                         Deputy Clerk

**NOTICE OF DOCUMENT INSPECTION**
**UNDER LOUISIANA CODE OF CIVIL PROCEDURE ART. 1463**

TO:    Louisiana Gaming Control Board
        *through its attorney of record*:
        Michael A. Patterson
        The Long Lawfirm, LLP
        8550 United Plaza Blvd.
        Suite 800
        Baton Rouge, LA 70809

Please take notice that plaintiff, Alvin C. Copeland, will inspect and copy the documents in the possession of the *Louisiana Gaming Control Board* that are listed on Exhibit "A" attached hereto on *Wednesday, May 14, 2003, at 10:00 a.m.*, at the law offices of CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP, Two Lakeway Center, Suite 900, 3850 North Causeway Boulevard, Metairie, LA 70002. You are invited to appear, inspect and copy these documents as you may deem appropriate.

                                        Respectfully submitted,

                                        **CHOPIN, WAGAR, COLE, RICHARD,**
                                        **REBOUL & KUTCHER, LLP**

*Please serve along with the*
*Subpoena Duces Tecum on:*        By: _____
Louisiana Gaming Control Board          **ROBERT A. KUTCHER** (LSBA #7895)
*through its attorney of record*:        **NICOLE S. TYGIER** (LSBA #19814)
Michael A. Patterson                    Two Lakeway Center, Suite 900
The Long Lawfirm, LLP                   3850 North Causeway Boulevard
8550 United Plaza Blvd.                 Metairie, Louisiana 70002
Suite 800                               Telephone: (504) 830-3838
Baton Rouge, LA 70809                   Facsimile: (504) 836-9573

                                        *Attorneys for Plaintiff Alvin C. Copeland*

30409009601

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

( )    Hand Delivery      ( XX )    Prepaid U.S. Mail
( )    Facsimile          ( )    Overnight Delivery

**Metairie, Louisiana,** this 3rd day of April, 2003.

CERTIFIED TRUE COPY

303025

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH, LA

2003 APR -7 PM 3:02

2

# EXHIBIT "A"

# DEFINITIONS

A.    In answering the items in this request for production, complete documentation must be divulged, regardless of whether it is in the possession of the named defendant or the defendant's attorneys, employees, agents, investigators, or other representatives.

B.    If you object to any of the items in this request for production on the grounds that the document requested is protected or otherwise privileged, please state the following with respect to each such document: the privilege claimed; a brief description of the nature, subject, and contents of the document claimed to be privileged; the name, occupation, and capacity of the individual who authored such protected or privileged documentation; the date that the document bears; and the person or persons, if any, to whom the document was directed.

C.    The term "Plaintiff" means Alvin C. Copeland and/or American Gaming Association ("AIGA").

D.    The terms "you" and "your" include the named defendant to whom this request for production is directed and defendant's attorneys, employees, agents, investigators, and other representatives.

E.    As used herein, the words "and" and "or" shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the discovery request any document that otherwise might be deemed outside its cope by another construction.

F.    The term "document(s)" includes every wiring and record of every type and description in the possession, custody, control, or within the knowledge of any named defendant and the attorneys, employees, agents, investigators or other representatives, including but not limited to letters, correspondence, computer database or computer-generated information, telegrams, memoranda, notes, reports, calculations, ledgers, recordings (mechanical, electronic, typed or written), transcripts, drawings, blueprints, charts, maps, graphs, photographs, still moving picture films, studies, books, pamphlets, schedules, desk calendars, diaries, invoices, work sheets and all drafts of any kind. Additionally, the term "document" means a copy where the original is not in your possession, custody or control.

G.    The term "person(s)" refers to every individual, partnership, firm, corporation, enterprise, entity, association, employer, employee, agent, investigator, attorney, party, accountant, engineer, expert witness, lay witness, photographer, police

1 of 2

MILEAGE  $ _____

TOTAL.   $ _____

Deputy Sheriff
Parish of East Baton Rouge, Louisiana

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                DIVISION "D"

**ALVIN C. COPELAND**

-versus-

**TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY**

Filed:_____          _____
                                                                                        Deputy Clerk

## NOTICE OF DOCUMENT INSPECTION
## UNDER LOUISIANA CODE OF CIVIL PROCEDURE ART. 1463

TO:     Louisiana Riverboat Gaming Enforcement
          A Division of the Gaming Enforcement Section
          of the Office of the Louisiana State Police
          *through its attorney of record*:
          Michael A. Patterson
          The Long Lawfirm, LLP
          8550 United Plaza Blvd.
          Suite 800
          Baton Rouge, LA 70809

**PLEASE TAKE NOTICE** that plaintiff, Alvin C. Copeland, will inspect and copy the documents in the possession of the *Louisiana Riverboat Gaming Enforcement A Division of the Gaming Enforcement Section of the Office of the Louisiana State Police* that are listed on Exhibit "A" attached hereto on *Wednesday, May 14, 2003, at 10:00 a.m.*, at the law offices of CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP, Two Lakeway Center, Suite 900, 3850 North Causeway Boulevard, Metairie, LA 70002.  You are invited to appear, inspect and copy these documents as you may deem appropriate.

                                                    Respectfully submitted,

                                                    *CHOPIN, WAGAR, COLE, RICHARD,*
                                                    *REBOUL & KUTCHER, LLP*

*Please serve along with the*
*Subpoena Duces Tecum on:*
Louisiana Riverboat Gaming Enforcement
A Division of the Gaming Enforcement Section of     By: _____
the Office of the Louisiana State Police                   **ROBERT A. KUTCHER** (LSBA #7895)
*through its attorney of record*:                           **NICOLE S. TYGIER** (LSBA #19814)
Michael A. Patterson                                        Two Lakeway Center, Suite 900
The Long Lawfirm, LLP                                     3850 North Causeway Boulevard
8550 United Plaza Blvd.                                    Metairie, Louisiana 70002
Suite 800                                                        Telephone: (504) 830-3838
Baton Rouge, LA 70809                                    Facsimile:  (504) 836-9573

                                                    *Attorneys for Plaintiff Alvin C. Copeland*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

| ( | ) | Hand Delivery | ( XX ) | Prepaid U.S. Mail |
| ( | ) | Facsimile | ( ) | Overnight Delivery |

**Metairie, Louisiana,** this 3rd day of April, 2003

CERTIFIED TRUE COPY

303023

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH, LA

2003 APR -7 PM 5:02

## EXHIBIT "A"

## DEFINITIONS

A.   In answering the items in this request for production, complete documentation must be divulged, regardless of whether it is in the possession of the named defendant or the defendant's attorneys, employees, agents, investigators, or other representatives.

B.   If you object to any of the items in this request for production on the grounds that the document requested is protected or otherwise privileged, please state the following with respect to each such document: the privilege claimed; a brief description of the nature, subject, and contents of the document claimed to be privileged; the name, occupation, and capacity of the individual who authored such protected or privileged documentation; the date that the document bears; and the person or persons, if any, to whom the document was directed.

C.   The term "Plaintiff" means Alvin C. Copeland and/or American Gaming Association ("AIGA").

D.   The terms "you" and "your" include the named defendant to whom this request for production is directed and defendant's attorneys, employees, agents, investigators, and other representatives.

E.   As used herein, the words "and" and "or" shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the discovery request any document that otherwise might be deemed outside its cope by another construction.

F.   The term "document(s)" includes every wiring and record of every type and description in the possession, custody, control, or within the knowledge of any named defendant and the attorneys, employees, agents, investigators or other representatives, including but not limited to letters, correspondence, computer database or computer-generated information, telegrams, memoranda, notes, reports, calculations, ledgers, recordings (mechanical, electronic, typed or written), transcripts, drawings, blueprints, charts, maps, graphs, photographs, still moving picture films, studies, books, pamphlets, schedules, desk calendars, diaries, invoices, work sheets and all drafts of any kind. Additionally, the term "document" means a copy where the original is not in your possession, custody or control.

G.   The term "person(s)" refers to every individual, partnership, firm, corporation, enterprise, entity, association, employer, employee, agent, investigator, attorney, party, accountant, engineer, expert witness, lay witness, photographer, police

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 276 of 323

SUBPOENA DUCES TECUM

Form C 132

COPELAND, ALVIN C.
      vs            Plaintiff

TREASURE CHEST CASINO, ET AL
                Defendant

No: C 464607 Div: 21
19th JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

TO:  Louisiana Gaming Control Board,
     through Michael A Patterson
     8550 United Plaza Blvd. , Suite 800
     Baton Rouge, La  70809

# FILED

APR 16 2003

*Ruth [signature]*

DEPUTY CLERK OF COURT

You have been ordered by the Court to Produce in the office of:
    Chopin, Wagar, Cole, Richard, Reboul & Kutcher, LL.
    Two Lakeway Center, Suite 900
    3850 North Causeway Boulevard,
    Metairie, La  70002

at 10:00 o'clock AM. on the **14th** day of **May**, **2003**, produce the following:

. . . . . . . . .**SEE ATTACHED NOTICE OF DOCUMENT
INSPECTION.** . . . . . . . . . . . . .

If this case is continued, you must bring these items back with you.

If you do not come and do not bring these items, you will be violating the law and may be subject to penalties.

This SUBPOENA was ordered by Attorney **KUTCHER, ROBERT A.** and was issued by the Clerk of Court on the  8th day of April, 2003.

*[signature]*

Deputy Clerk of Court for
Doug Welborn, Clerk of Court

## SERVICE INFORMATION

Received on the _10_ day of _April_ , 20_03_ and on the _10_ day
_April_ , 20_03_ , served the above named party as follows:

PERSONAL SERVICE: on the party herein named
: 4041 Essen Lane Ste 500 .

DOMICILIARY SERVICE: on the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in said domicile

SECRETARY OF STATE: by tendering same to the within named, by handing same
_____

DUE AND DILIGENT: After diligent search and inquiry, was unable to find the within named _____ or his domicile. or anyone legally authorized to represent him.

RETURNED. Parish of _____, this _____ day
_____ 20____

SERVICE: $_____
MILEAGE: $_____
TOTAL: $_____

*[signature]*

Deputy Sheriff
Parish of East Baton Rouge, Louisiana

Form C 132

COPELAND, ALVIN C.,
_____ Plaintiff
vs

TREASURE CHEST CASINO, ET AL_____
_____ Defendant

TO: Louisiana Riverboat Gaming Commission,
through Michael A Patterson
9550 United Plaza Blvd., Suite 800
Baton Rouge, La   70809

No: C 464607 Div: 21
19th JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

You have been ordered by the Court to Produce in the office of:
Chopin, Wagar, Cole, Richard, Reboul & Kutcher, LL
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard,
Metairie, La. 70002

# FILED

APR 1 6 2003

DEPUTY CLERK OF COURT

at 10:00 o'clock AM on the **14th** day of **May**_____, **2003**, produce the
following:
. . . . . . . . . . . **SEE ATTACHED NOTICE OF DOCUMENT**
**INSPECTION.** . . . . . . . . . . . . . .

If this case is continued, you must bring these items back with you.

If you do not come and do not bring these items, you will be violating the
law and may be subject to penalties.

This SUBPOENA was ordered by Attorney **KUTCHER, ROBERT A,** and was issued by
the Clerk of Court on the  8th day of April, 2003.

_____
Deputy Clerk of Court for
Doug Welborn, Clerk of Court

## SERVICE INFORMATION

Received on the  _10_  day of _April_____, 20 _03_ and on the  _10_  day
of _April_____, 20_03_, served the above named party as follows:

PERSONAL SERVICE  on the party herein named
t  _4071 Essen Lane_

DOMICILIARY SERVICE: on the within named _____, by leaving the
same at his domicile in this parish in the hands of _____, a person
of suitable age and discretion residing in said domicile
t _____

SECRETARY OF STATE:  by tendering same to the within named, by handing same
> _____

DUE AND DILIGENT.  After diligent search and inquiry, was unable to find the
within named _____ or his domicile, or anyone
legally authorized to represent him.

RETURNED  Parish of _____, this _____day
_____, 20___.

SERVICE: $_____
MILEAGE: $_____
TOTAL: $_____

_____
Deputy Sheriff
Parish of East Baton Rouge, Louisiana

Form C 132

COPELAND, ALVIN C.,
_____ Plaintiff
vs

TREASURE CHEST CASINO, ET AL
_____
Defendant

No: C 464607 Div: 21
19th JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

TO: Louisiana Riverboat Gaming Enforcement Division of
the Gaming Enforcement Section of the Office of the
Louisiana State Police, through Michael A Patterson
8550 United Plaza Blvd. - Suite 800
Baton Rouge, La.

# FILED

You have been ordered by the Court to Produce in the office of:
**Chopin, Wagar, Cole, Richard, Reboul & Kutcher, LL**
**Two Lakeway Center, Suite 900**
**3850 North Causeway Boulevard,**
**Metairie, La. 70002**

APR 1 6 2003

_Ruth Goodson_
DEPUTY CLERK OF COURT

at **10:00** o'clock **AM.** on the **14th** day of **May** 2003, produce the
following:

. . . . . . . **SEE ATTACHED NOTICE OF DOCUMENT**
**INSPECTION** . . . . . . . . . . . . .

If this case is continued, you must bring these items back with you.

If you do not come and do not bring these items, you will be violating the
law and may be subject to penalties.

This SUBPOENA was ordered by Attorney **KUTCHER, ROBERT A.** and was issued by
the Clerk of Court on the 8th day of April, **2003**.

_____
Deputy Clerk of Court for
Doug Welborn, Clerk of Court

### SERVICE INFORMATION

Received on the _10_ day of _April_, 20_03_ and on the _10_ day
of _April_, 20_03_, served the above named party as follows:

PERSONAL SERVICE on the party herein named
at _4041 Essen Lane Ste 500_

DOMICILIARY SERVICE: on the within named _____, by leaving the
same at his domicile in this parish in the hands of _____, a person
of suitable age and discretion residing in said domicile
: _____

SECRETARY OF STATE: by tendering same to the within named, by handing same
) _____

DUE AND DILIGENT: After diligent search and inquiry, was unable to find the
within named _____ or his domicile, or anyone
legally authorized to represent him.

RETURNED Parish of _____, this _____ day
: _____, 20____

SERVICE: $ _____
MILEAGE $ _____
TOTAL: $ _____

_____
Deputy Sheriff
Parish of East Baton Rouge, Louisiana

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 279 of 323

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607

DIVISION "D"

ALVIN C. COPELAND

VERSUS

COST OK Amt. _____

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

MAY 3 0 2003

FILED: _____

_____
DEPUTY CLERK  BY _____
BY CLERK OF COURT

## REPLY MEMORANDUM IN SUPPORT OF EXCEPTION
## OF RES JUDICATA AND ALTERNATIVE
## PARTIAL EXCEPTION OF NO RIGHT OF ACTION

**MAY IT PLEASE THE COURT:**

Robert J. Guidry replies herein to certain arguments raised by Alvin C. Copeland, Plaintiff,

in his opposition to Guidry's Exception of Res Judicata. As will be seen, none of Copeland's

arguments prevent the application of the doctrine of res judicata to this matter.

**I.     The Prior Positions Taken Concerning Transfer And Consolidation Do Not
        Determine The Outcome Of The Res Judicata Exception**

Plaintiff argues that the transactions or occurrences underlying the present action are not the

same as those underlying the Riverboat Gaming Action. (Opp. Memo at pp. 4-5.) Plaintiff claims

that Guidry is estopped from asserting that the transactions or occurrences underlying the two suits

are the same by Treasure Chest's opposition to a motion for consolidation.

Copeland's argument that the prior opposition to a Motion to Transfer and Consolidate

constitutes a judicial admission as to a Transaction or Occurrence fails because of his own

arguments. Just as Treasure Chest took the position that the matters should not be consolidated,

Copeland asserted that they were factually linked. Therefore, there is an equal counterargument that

Copeland is now estopped from arguing that the matters do not arise out of the same transactions

or occurrences.

Given the prior positions taken by both Treasure Chest and Copeland, Guidry suggests that

the Court make a fresh determination of whether the transactions or occurrences underlying this

matter and the Riverboat Gaming Commission suit are the same. The best starting point for this

analysis is the plaintiff's own pleadings. As explained by comparison in Guidry's original

memorandum, a review of the pleadings filed by Copeland in this matter reveals that the

transactions or occurrences underlying the two actions are the same.

Finally, Guidry notes that the standards for res judicata and consolidation of suits are

different such that any opposition to the Motion for Transfer and Consolidation does not dispose of

FAX COPY FILED _5-28-03_
ORIGINAL FILED _5-30-03_

this exception. The concept of two claims arising out of the same transactions or occurrences, as is the standard for res judicata is much broader and merely requires that there be a large commonality of fact and law, not a predomination of common issues. See La. R.S. 13:4231; Durkin v. Quest, Inc., 724 So.2d 868, 870-871 (La. App. 5th Cir. 1999). Therefore, Copeland's argument fails as to any purported judicial admission.

## II.   Copeland's Argument That This Is Not A Subsequent Action Rests On An Absurd Interpretation of the Res Judicata Statute

Plaintiff argues that the present suit is not a "subsequent action" such that it would be barred by res judicata because the petition in the present suit was filed prior to the rendition of a final judgment in the Riverboat Gaming Commission suit. (Opp. Memo at p. 5.) While the res judicata statute is to be strictly construed, nothing requires an absurd construction, which would be necessary for plaintiff's argument to prevail.

A simple hypothetical explains the problem with plaintiff's position. Assume two parties are in an auto accident, one party is convinced the other party is at fault, and the parties or their insurers are unable to reach any settlement. The hypothetical plaintiff, distrusting the courts to "get it right" then files three lawsuits. The first suit is then resolved by a summary judgment or other motion practice. If Mr. Copeland's theory is correct, the hypothetical plaintiff could then simply activate his second, or third, lawsuit and relitigate the same claim. The wastefulness and absurdity of Mr. Copeland's position is obvious.

On the other hand, if the Court construes subsequent action to mean any action pending after the rendition of a final judgment in the original action, the problem posed by Copeland's argument is entirely avoided.

## III.  There Are No Exceptional Circumstances Sufficient To Justify An Exception To Res Judicata In This Matter

Plaintiff argues that exceptional circumstances justify a refusal to apply res judicata to bar further litigation of this matter. (Opp. Mem. at pp. 5-6.)

The rare nature of the La. R.S. 13:4232 exception based upon exceptional circumstances was described by the Fourth Circuit as follows:

> This discretion must be exercised on a case by case basis and such relief should be granted only in truly exceptional cases, otherwise the purpose of *res judicata* would be defeated. It is not intended to apply in the case where the plaintiff has simply failed to assert a right or claim for damages through oversight or lack of proper preparation. It is designed to protect those drawn into error by an awkward factual or legal scenario, not those who can allude to no circumstance to justify their inaction below. (citations omitted) Spear v. Prudential Property and Cas. Ins. Co., 727 So.2d 640, 642-643 (La. App. 4th Cir. 1999).

Mr. Copeland should have protected his rights by amending the Riverboat Gaming Commission suit to include the allegations made in the present action. As already noted by Guidry

2

in his original memo, there was ample public knowledge of the relevant facts in October and November 1998, and even one lawsuit filed by another plaintiff out of these events on November 12, 1998, long before Copeland filed his Third Supplemental and Amended Petition in the Riverboat Gaming Commission suit with a motion for leave on January 21, 1999. Thus, there was no awkward factual or legal scenario that could constitute an exceptional circumstance. Treasure Chest was already a party to the Riverboat Gaming Commission suit. He was ultimately granted leave for his Third Supplemental and Amended Petition, and the knowledge needed to state his claims had long been public prior to that filing. Logically, there was no reason for Copeland to not simply amend his existing action to state his new claims. This fact is further supported by Copeland's later attempt to have them consolidated. Given this history, Copeland's decision to file a separate action is best viewed not as an exceptional circumstance, but as a litigation decision made by a sophisticated litigant with counsel. Therefore, the exception provided for in La. R.S. 13:4232 is inapplicable and does not prevent the operation of res judicata in this matter.

## IV.  Guidry Is A Privy To Treasure Chest For Res Judicata Purposes

Copeland argues that Guidry is not a privy of Treasure Chest such that Guidry receives res judicata protection from the final judgment in favor of Treasure Chest in the Riverboat Gaming Commission suit. (Opp. Mem. at pp. 6-7.)

There is no dispute as to the basic precepts of Louisiana law. Louisiana has adopted the federal doctrine of privies, which allows for a non-party to be treated as a privy in three circumstances, only one of which is at issue herein. Specifically, a nonparty to the prior litigation is given the benefit of the prior judgment when "the nonparty's interests were adequately represented by a party to the action who may be considered the "virtual representative" of the nonparty because the interests of the party and the nonparty are so closely aligned. Hudson v. City of Bossier, 766 So.2d 738, 743 (La. App. 2d Cir. 2000).

Plaintiff asserts that Guidry has cited no authority or facts in favor of Guidry's proposition that Guidry is a privy of Treasure Chest. This assertion simply overlooks the argument by Guidry that this matter fits squarely into the mold long recognized in the federal cases applying the privy doctrine adopted by Louisiana. Specifically, the pattern of an unsuccessful suit alleging wrongdoing by a business entity in which the plaintiff is unsuccessful followed by a second suit alleging fraud and/or RICO violations against both the corporate entity and individual officers or directors is both the pattern present in this matter and the fact pattern presented in the federal cases cited by Guidry in his original memorandum. (Mem. Supp. Exceptions at pp. 8-9.) Unsurprisingly, given the relatively recent changes in Louisiana's law of res judicata and the prevalence of fraud and RICO litigation in federal court, the available authority is from federal courts. This authority should be sufficient, however, given the absence of any countervailing

3

authority. None of the cases cited by Copeland involve a similar fact pattern.

Copeland raises two other arguments concerning the identity of the parties and privy status that must be mentioned.

First, Copeland notes that Guidry had sold his interest some five years before the judgment in the Riverboat Gaming Commission suit, and therefore is no longer an officer or director. This is true, but it is a true red herring. The proper inquiry is whether Guidry was an officer or director at the time of the conduct that was at issue in the Riverboat Gaming Commission suit and the present suit, which he was.

Second, Copeland argues that Treasure Chest and Guidry did not have interests that were aligned in the Riverboat Gaming Commission suit, attempting to draw a distinction between Guidry's obtaining the license and Treasure Chest buying the license from Guidry. This argument ignores the obvious, to with, both Guidry and Treasure Chest have always taken the position that the license was legally granted and that Guidry properly possessed the license up through the time at which it was sold to Treasure Chest. Thus, their positions are and have been aligned for res judicata purposes.

## IV. Conclusion

Copeland has tried to distract the Court from the pivotal fact. As shown by the pleadings, Plaintiff has already asserted claims arising out of the same transactions or occurrences and lost. The Court should not countenance Mr. Copeland taking another bite after that loss. Therefore, the Court should grant Guidry's Exception of Res Judicata and dismiss Copeland's claims.

Respectfully Submitted,

RALPH CAPITELLI (2858)
CAPITELLI & WICKER
1100 Poydras Street
2950 Energy Centre
New Orleans, Louisiana 70163-2950
Telephone: (504) 582-2425

AND

ARTHUR A. LEMANN, III (8296)
ARTHUR A. LEMANN, III & ASSOCIATES
938 Lafayette St., Ste. 100
New Orleans, LA 70113
Telephone: (504) 522-8104

AND

WINSTON G. DECUIR, SR. (4795)
DECUIR & CLARK, L.L.P.
1951 Government Street
Baton Rouge, Louisiana 70806
Telephone: (504) 522-8104
*COUNSEL FOR DEFENDANT, ROBERT J. GUIDRY*

4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been duly served upon all counsel of record __ by hand delivery, __ by facsimile transmission, or __ by depositing same in the U.S. MAIL, properly addressed, postage prepaid, this 28th day of May 2003.



5

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 284 of 323

## CAPITELLI & WICKER

2950 ENERGY CENTRE

1100 POYDRAS STREET

NEW ORLEANS, LOUISIANA 70163-2950

RALPH CAPITELLI
T. CAREY WICKER, III

TELEPHONE (504) 582-2425
FAX: (504) 582-2422

May 28, 2003

Clerk of Court                                    By Fax: 225-389-3392
19th Judicial District Court
Parish of East Baton Rouge
P.O. Box 147
Baton Rouge, LA

                                RE:    19th Judicial District Court
                                       No. 464-607 Division "D"
                                       Alvin Copeland vs. Treasure Chest
                                       Casino, LLC and Robert J. Guidry

Dear Sir/Madam:

        Enclosed please find the Reply Memorandum in Support of Exception of Res Judicata
and Alternative Partial Exception of No Right of Action.    Please fax file this pleading in the
above captioned matter.  The original and a check for the filing fees will be forwarded to your
office tomorrow.   By carbon copy of this letter both the Court and all counsel are being provided
with a copy of this pleading.

                            Sincerely,

                            RALPH CAPITELLI

RC/pb
enclosure

cc:     Honorable Janice Clark        By Fax: 225-389-5327
        Arthur A. Lemann, III         By Fax: 504-525-4231
        Arthur A. Lemann, IV          By Fax: 504-525-4231
        Winston DeCuir                By Fax: 225-336-1950
        Robert A. Kutcher             By Fax: 504-836-9540
        Paul S. West                  By Fax: 225-343-3076

TRANSMITTED/STORED : MAY. 28. 2003  4:14PM
FILE MODE        OPTION                ADDRESS                      RESULT        PAGE
--------------------------------------------------------------------------------------
617  MEMORY TX                        915045822422                 OK            1/1

**POSTED**
MAY 28 2003

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL          E-2) BUSY
E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION



## DOUG WELBORN
### CLERK OF COURT
19TH JUDICIAL DISTRICT
PARISH OF EAST BATON ROUGE

**POSTED**
MAY 28 2003

Suit Accounting Dept.
P. O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3992
Fax: (225) 389-3392
www.ebrclerkofcourt.org

### FAX RECEIPT

From:       Suit Accounting Department          Date:        5-28-03
Fax Number: (225) 389-3392                        Suit No.:    464607
To:         _Capitelli_                           Division:    D

_____ _Copeland_ ___ vs. ___ _Treasure Chest_ _____

Item(s) Received: _____ _reply memo_ _____

Amount Due (includes $5.00 Fax Fee and $.50 per page) $ _____ 22.50 _____

The Clerk of Court's office has received, by facsimile transmission, documents in the above
referenced case. It has been filed as of this date. In accordance with R.S. 13:850 (B), the original
and applicable fees should be forwarded to this office within five (5) days.

In accordance with 13:850 (B) (3), a transmission fee of $5.00 should be forwarded to the Clerk of
Court with the original document. The fax filing fee is necessary even if filing in forma pauperis.

**NO FURTHER ACTION WILL BE TAKEN WITH THIS DOCUMENT
UNTIL THE ORIGINAL AND NECESSARY FILING FEES ARE RECEIVED
IN THIS OFFICE.**

**SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX-
ISSUANCE BY ORIGINAL REQUESTS ONLY!**

**PLEASE ATTACH THIS RECEIPT TO YOUR ORIGINAL.
IF FILING IN PERSON, NOTIFY FILING CLERK OF PREVIOUS FAX.**

*Deputy Clerk of Court for*
*Doug Welborn, Clerk of Court*

Acct. Dept. Form #6
Rev. 1. 3000

memorandum, a review of the pleadings filed by Copeland in this matter reveals that the

transactions or occurrences underlying the two actions are the same.

Finally, Guidry notes that the standards for res judicata and consolidation of suits are

different such that any opposition to the Motion for Transfer and Consolidation does not dispose of

cc:    The Honorable Janice G. Clark *(w/enclosures via facsimile & Overnight Mail)*
       Arthur A. Lemann, III, Esq. *(w/enclosures via facsimile only)*
       Ralph Capitelli, Esq. *(w/enclosures via facsimile only)*
       Winston G. DeCuir, Esq. *(w/enclosures via facsimile only)*
       Paul S. West, Esq. *(w/enclosures via facsimile only)*
       Lanny R. Zatzkis, Esq. *(w/enclosures via facsimile only)*

that, unlike the Bank Disclosure Statute, La. R.S. 6:333, which provides extensive protection

against the production of nonparty bank records, La. R.S. 27:21 does not prohibit the production

of records pursuant to subpoena or court order.  In fact, La. R.S. 27:21(B)(1) provides:

FAX COPY FILED 7·3·03

> (B) Confidential information or data which is obtained by the board may not be revealed in whole or in part except in the course of the proper administration of this Title. However, the board or its authorized agents may reveal such information or data to an authorized agent of any agency of the United States Government or to any agent of this state, or of any political subdivision of this state, pursuant to rules and regulations adopted by the board, or **pursuant to a lawful order of a court of competent jurisdiction.**

(Emphasis added.)

Although Copeland is sensitive to the need to protect the confidentiality of third party information submitted to both the Board and the Division, this statute does not prohibit the production of these documents pursuant to court order, and Copeland is willing to enter into a protective order designed to protect against dissemination of information contained in these documents outside the scope of this litigation.

The extensive jurisprudence cited by the Board relating to protecting the confidentiality of third parties and their bank records is irrelevant to La. R.S. 27:21 and the facts of this case. However, to the extent that this Court might be inclined to read into the applicable statute a heightened standard of relevance to order the production of these documents, Copeland respectfully submits that the standard is clearly met with respect to the subpoena at issue despite the fact that the Board and the Division have not even challenged the relevance of the documents sought to the issues in this suit.

The central focus of this case is on the corruption of the licensing process by Treasure Chest Casino, operating through its prior principal, Robert J. Guidry, both of which have been served with Requests for Production seeking substantially the same documents in their possession. Neither Defendant has produced any documents, nor has either of them ever responded to these Requests for Production. The gravamen of Copeland's Petition is that, as a result of an "overarching corrupt conspiracy," i.e., a scheme to corrupt the entire process for issuing riverboat gaming licenses in which both Treasure Chest Casino, LLC and Robert Guidry participated and engaged in overt acts in furtherance of, a Riverboat Gaming license was not awarded to Copeland, but to Treasure Chest Casino, LLC. This was despite the fact that it was Treasure Chest Casino, **Inc.,** another corporation owned and controlled by Guidry which initially applied for a Certificate of Preliminary Approval from the Division. Subsequently, Guidry

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been duly served upon
all counsel of record __ by hand delivery, ✓ by facsimile transmission, or __ by depositing
same in the U.S. MAIL, properly addressed, postage prepaid, this 28th day of May 2003.

_Roger Capitelli_

5

19TH JUDICIAL DISTRICT COURT

COST OK TO Amt ✓

FOR THE PARISH OF EAST BATON ROUGE

JUN – 3 2003

BY ⌐
DY. CLERK OF COURT

STATE OF LOUISIANA

NO. 464-607                                                    DIVISION "D"

ALVIN C. COPELAND

versus

TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

Filed:_____                          _____
                                                    Deputy Clerk

## *JUDGMENT ON MOTIONS AND EXCEPTIONS*

This matter came before the Court on June 2, 2003, on a motion to stay

discovery, res judicata, alternatively no right of action, and prescription filed by

the defendant, Guidry and an exception of res judicata filed by the defendant,

Treasure Chest Casino, L.L.C.  Present in Court were: Robert Kutcher on behalf of

Alvin C. Copeland, Winston G. DeCuir, Ralph Capitelli, Arthur Lemann, III on

behalf of Robert Guidry and Paul West and Juliann L. Keenan on behalf of

Treasure Chest Casino, L.L.C.

After reviewing the pleadings, memorandums and considering the

arguments of counsel, for reasons orally assigned at the conclusion of the hearing:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the

defendant, Guidry's motion to stay discovery is granted and all discovery in this

matter is stayed for thirty (30) days from the date of this Judgment;

IT IS FURTHER ORDERED that the exceptions of Res judicata ,

alternatively, no right of action and non-joinder of parties, filed on behalf of the

-1-
REC'D C.P.
JUN 05 2003

defendant Guidry is denied;

IT IS FURTHER ORDERED that the exception of res judicata filed on

behalf of the defendant, Treasure Chest Casino, L.L.C., is denied.

The exception of prescription urged by defendant Guidry was not

considered by the Court as it was deemed moot or unnecessary based on the

Court's ruling that the only remaining claim is Plaintiff's action for unfair trade

practices.

Judgment rendered in Open Court on the 2nd day of June, 2003, in Baton

Rouge, Louisiana, and signed in Chambers on the __3__ day of _Juné_, 2003.

_Jamie Clark_

JUDGE

Winston Decuir, Sr. (#04795)
1961 Government Street
Baton Rouge, LA 70806
Phone: (225) 346-8716

Mr. Paul S. West, Esq.
McGlinchey Stafford
Ninth Floor, One American Place
Baton Rouge, LA 70825

Arthur A. Lemann III (#8296)
938 Lafayette Street, Suite 100
New Orleans, Louisiana 70113
Phone: (504) 522-8104

I hereby certify that on this day a notice of the
above judgement was mailed by me, with sufficent
postage affixed, to: _All COR_

Done and signed on _6-5-03_

_Jo Knight_

Deputy Clerk of Court

Ralph Capitelli (#3858)
Capitelli & Wicker
1100 Poydras St., Ste. 2950
New Orleans, Louisiana 70163
Phone: (504) 582-2425

Lanny ~~&~~ Zatzkis (#13781)
Zatzkis McCarthy & Assoc.
650 Poydras Street, Suite 2750
New Orleans, LA 70130-6101
Phone: 523-1266

Mr. Robert A. Kutcher, Esq.
Two Lakeway Center, Ste. 900
3850 North Causeway Boulevard
Metairie, LA 70002

2003 JUN -3 PM 1:36
DEPUTY CLERK & RECORDER
BATON ROUGE PARISH
FILED
DOUG WELBORN
CLERK OF COURT E.B.R. PAR.

-2-

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 291 of 323

ALVIN C. COPELAND                    SUIT NO. 464-607    DIVISION "D"

VERSUS                               19TH JUDICIAL DISTRICT COURT

TREASURE CHEST CASINO, L.L.C. AND    PARISH OF EAST BATON ROUGE
ROBERT J. GUIDRY                     STATE OF LOUISIANA

                                     BY: _____
                                         Deputy Clerk of Court

**STATE
FILED**

## MOTION TO QUASH SUBPOENA DUCES TECUM

On motion of the Louisiana State Police, Video Gaming Division (hereinafter "Division")

and the Louisiana Gaming Control Board (hereinafter "Board"), it is respectfully submitted that:

**1.**

A subpoena duces tecum has been issued to the Division in the above referenced matter,

ordered by Robert A. Kutcher, Attorney at Law representing Plaintiff, Alvin C. Copeland

requesting:

1. All documents reflecting or relating to any transfer(s) of any interest in
   Treasure Chest's License.

2. All documents reflecting or relating to any transfer(s) of any interest in a
   License other than the License awarded to Treasure Chest.

**2.**

The Division is not a party to this proceeding and the subpoena seeks documents related

to other entities not party to this proceeding.

**3.**

The documents sought by the subpoena duces tecum referred to in Paragraphs 1, 2 and 3

necessarily include financial records, categorized as confidential pursuant to the provisions of

La. R.S. 27:21 A.(2).

**4.**

The subpoena is not limited to certain time periods or licensees/applicants and is

therefore unduly burdensome.

**5.**

No provision creating an exception to the confidential document disclosure prohibition

for documents subpoenaed is contained in La. R.S. 27:21 which applies to this case.

REC'D C.P.

JUN 0 6 2003

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 292 of 323

## 6.

Mover offers to provide inspection of all documents, which are not confidential to any party to this proceeding.

**WHEREFORE**, mover prays for an Order of the Court, quashing the subpoena duces tecum ordered issued herein, and relieving the Louisiana State Police, Video Gaming Division and the Louisiana Gaming Control Board from complying therewith at Plaintiff, Alvin C. Copeland's cost.

Respectfully submitted,

**RICHARD P. IEYOUB
ATTORNEY GENERAL**

BY: _____

Thomas A. Warner, III #13248
Earl G. Pitre, Jr. #23258
Assistant Attorneys General
339 Florida Street, Suite 500
Baton Rouge, Louisiana 70801
225-342-2465



CERTIFIED TRUE COPY

197091

DEPUTY CLERK OF COURT

2003 JUN -4 AM 11: 25

DOUG WELBORN
CLERK OF COURT E B R PARISH

## CERTIFICATE

I HEREBY CERTIFY that a copy of the foregoing Motion and Order was served this date, via U.S. mail, to the issuer of the subpoena duces tecum and all counsel of record, postage prepaid and properly addressed.

Baton Rouge, Louisiana, this 4th day of _____June_____, 2003.

_____
Thomas A. Warner, III



ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C. AND
ROBERT J. GUIDRY

SUIT NO. 464-607     DIVISION "D"

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

BY: _____
    Deputy Clerk of Court

## RULE TO SHOW CAUSE

Considering the foregoing:

IT IS ORDERED that Alvin C. Copeland show cause on the _14_ day of

____July____, 2003 at _9:30 AM_ o'clock why the subpoena duces tecum ordering

the Louisiana State Police, Video Gaming Division to disclose confidential records not be

quashed.

Baton Rouge, Louisiana, this _4_ day of ___June___, 2003.

_____
Judge
19th Judicial District Court

CERTIFIED TRUE COPY
197093
DEPUTY CLERK OF COURT

EAST BATON ROUGE PARISH
FILED
2003 JUN -4 AM 11 25
DEPUTY CLERK OF COURT FOR
DOUG WELBORN
CLERK OF COURT E.B.R. PARISH

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 295 of 323

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                    DIVISION "D"

**ALVIN C. COPELAND**                        COST OK TO Amt _____

-versus-                                              JUN - 6 2003

**TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY** BY _____

                                                      DY. CLERK OF COURT

Filed:_____          _____

                                                      Deputy Clerk

### NOTICE OF INTENTION TO APPLY FOR
### SUPERVISORY WRITS AND ORDER FIXING TIME

                                                                            •

TO:     The Honorable Janice Clark
        Judge, Division "D"
        19th Judicial District Court
        Parish of East Baton Rouge
        816 Governmental Building
        222 St. Louis Street
        Baton Rouge, LA  70802

        Paul S. West, Esq.
        McGLINCHEY STAFFORD
        One American Place, 9th Floor
        Baton Rouge, LA  70825

        Winston Decuir, Sr. (#04795)
        1961 Government Street
        Baton Rouge, LA 70806

        Arthur A. Lemann III (#8296)
        938 Lafayette Street, Suite 100
        New Orleans, Louisiana 70113

        Ralph Capitelli (#3858)
        Capitelli & Wicker
        1100 Poydras St., Ste. 2950
        New Orleans, Louisiana 70163                    REC'D C.P.

                                                        JUN 1 0 2003
        Lanny R. Zatzkis (#13781)
        Zatzkis, McCarthy & Assoc.
        650 Poydras Street, Suite 2750
        New Orleans, LA 70130-6101

        **NOW INTO COURT,** through undersigned counsel, comes plaintiff, Alvin C. Copeland,

who, pursuant to La. C.C.P. art. 2201, and in accordance with the Rule 4-2 of the Uniform Rules

of Louisiana Courts of Appeal, hereby gives notice that he intends to apply to the First Circuit

Court of Appeal for supervisory writs from this court's judgment of the June $3\overset{rd}{2}$, 2003 hearing, and further requests, pursuant to Rule 4-3 of the Uniform Rules of the Court of Appeal, that this Court fix a reasonable time within which the aforesaid application for supervisory writs must be filed with the First Circuit Court of Appeal.

WHEREFORE, Alvin C. Copeland prays that this Court enter an Order fixing a date within which the aforesaid writ application must be filed with the First Circuit Court of Appeal.

Respectfully submitted,

*CHOPIN, WAGAR, COLE, RICHARD,*
*REBOUL & KUTCHER, LLP*

By: _____

ROBERT A. KUTCHER (LSBA #7895)
NICOLE S. TYGIER (LSBA #19814)
Two Lakeway Center, Suite 900
3850 North Causeway Boulevard
Metairie, Louisiana 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9573

*Attorney for Plaintiff, Alvin C. Copeland*

## ORDER

Considering the foregoing;

IT IS HEREBY ORDERED that the Application for Supervisory Writs of plaintiff, Alvin C. Copeland, must be filed with the First Circuit Court of Appeal by the /3 day of _____, 2003.

BATON ROUGE, LOUISIANA, this 6 day of _____, 2003.

_____
JUDGE

CERTIFIED TRUE COPY

2003 JUN -6 PM 12: 11
FILED
DEPUTY CLERK OF COURT FOR
DOUG WELBORN
CLERK OF COURT E.B.R. PARISH

2

06 1 1 2 2 3 9 0 2

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding:

( ) Hand Delivery      ( ) Prepaid U.S. Mail
(✓) Facsimile      ( ) Overnight Delivery

**Metairie, Louisiana**, this ____ day of _____, 2003.

_____

CERTIFIED TRUE COPY

018226

DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRICT PARISH, LA.
FILED

2003 JUN -6 PM 12: 11

DEPUTY CLERK / RECORDER FOR
DOUG WELBORN
CLERK OF COURT E.B.R. PARISH

3

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 298 of 323

## ZATZKIS, McCARTHY & ASSOCIATES, L.L.C.
### ATTORNEYS AT LAW
SUITE 2750
650 POYDRAS STREET
NEW ORLEANS, LOUISIANA 70130
TELEPHONE: (504) 523-2266   FACSIMILE: (504) 593-9921

LANNY R. ZATZKIS*▪
KAREN D. McCARTHY
\* IN TAXATION
▪ ALSO ADMITTED IN TEXAS & COLORADO

YVETTE A. D'AUNOY
ANDREW N. LEE

WRITERS' DIRECT DIAL: (504) 670-3106
E MAIL: Erin@Zatzkis.com

### BY FEDERAL EXPRESS
### June 18, 2003

Doug Welborn, Clerk of Court
Government Building
222 St. Louis Street
Baton Rouge, Louisiana  70821-1991

**D**

Re:    Alvin C. Copeland v.
       Treasure Chest Casino, L.L.C. and Robert J. Guidry
       No. 464,607, Division "D"

Dear Mr. Welborn:

Enclosed please find one original and four copies of a Motion to Substitute Counsel of Record, which I submit to you for filing into the record. Additionally, I have enclosed a check in the amount of $14.60, which should satisfy the filing fee.  Also, I have enclosed an envelope for your convenience, to return a clocked copy to me.

Thank you and please contact us if you have any questions or comments.

Very truly yours,

REC

Erin D. McMahon
*Paralegal*

EDM
Enclosures

REC'D C.D.
JUN 3 0 2003

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

COST OK Amt. 14.60

NO. 464607 DIV. "D"

DOCKET 1215
JUN 20 2003

ALVIN C. COPELAND

BY csl
DY CLERK OF COURT

VERSUS

TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY

D

FILED:____________________ ____________________
DEPUTY CLERK

## MOTION TO SUBSTITUTE COUNSEL OF RECORD

**NOW INTO COURT**, come Lanny R. Zatzkis, Karen D. McCarthy, Yvette A. D'Aunoy, Andrew N. Lee and the law offices of Zatzkis, McCarthy & Associates, L.L.C. ("Movers"), who respectfully move this Honorable Court, pursuant to District Court Rule 9.13(g), for an order removing them as co-counsel of record for Defendant, Robert Guidry and substituting current co-counsel as trial counsel and counsel of record. Movers aver that they may be substituted by the undersigned law firms of Arthur A. Lemann, III, Inc. and Capitelli and Wicker, APLC. Arthur A. Lemann, III, and Ralph J. Capitelli (hereinafter "remaining counsel") and their respective law firms have been counsel of record throughout this litigation and have represented Mr. Guidry at all times along with Movers, and remaining counsel shall continue as his counsel of record. Movers aver that no prejudice will occur to the client, Mr. Guidry, as he has been continuously represented by remaining counsel relative to all motions and hearings, or to the Court, and no delay will be required. Movers aver no trial date has been set or scheduling order issued. Movers have advised Mr. Guidry in writing of their intention to resign and withdraw as counsel ten (10) days prior to the filing of this motion.

**WHEREFORE**, Movers respectfully pray for an order removing Lanny R. Zatzkis, Karen D. McCarthy, Yvette A. D'Aunoy, Andrew N. Lee, and the law offices of Zatzkis McCarthy & Associates, L.L.C. as counsel of record for defendant, Robert Guidry, and substituting current co-counsel, Arthur A. Lemann, III of Arthur A. Lemann, III, Inc. and

REC'D C.P.
JUN 23 2003

REC'D C.P.
JUN 30 2003

Ralph J. Capitelli of Capitelli and Wicker, APLC.

**(WITHDRAWING COUNSEL)**                RESPECTFULLY SUBMITTED:

LANNY R. ZATZKIS, T.A. (Bar #13781)
KAREN D. McCARTHY (Bar #14193)
YVETTE A. D'AUNOY (Bar #22761)
ANDREW N. LEE (Bar #24154)
**ZATZKIS McCARTHY & ASSOCIATES**
650 Poydras Street Suite 2750
New Orleans, Louisiana 70130
Telephone: (504) 523-2266
Fax: (504) 593-9921

**(REMAINING ENROLLED
COUNSEL)**

ARTHUR A. LEMANN, III (Bar #8296)
**ARTHUR A. LEMANN, III & ASSOCIATES**
938 Lafayette Street, Suite 100
New Orleans, Louisiana 70113
Telephone (504) 522-8104
Fax: (504) 525-4231

RALPH CAPITELLI (Bar # 3858)
**CAPITELLI & WICKER**
1100 Poydras Street
Energy Center Suite 2950
New Orleans, Louisiana 70163
Telephone: (504) 582-2425
Fax: (504) 582-2422

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing document has been served upon all parties, through counsel of record, via facsimile, hand delivery or U.S. Mails postage prepaid and properly addressed, this 18th day of _____ June _____, 2003.

8 0 6 3 0 1 5 , 7 0 0

**19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

NO. 464607                          DIV. "D"                          DOCKET

**ALVIN C. COPELAND**

**VERSUS**

**TREASURE CHEST CASINO, L.L.C. and ROBERT GUIDRY**

FILED:_____          _____

                                              **DEPUTY CLERK**

**ORDER**

The foregoing Motion considered;

**IT IS ORDERED** that Lanny R. Zatzkis, Karen D. McCarthy, Yvette A. D'Aunoy,

Andrew N. Lee and the law offices of Zatzkis McCarthy & Associates, L.L.C. be and they

are hereby removed as counsel of record for plaintiffs, being substituted by current co-

counsel Arthur A. Lemann, III of Arthur A. Lemann, III, Inc. and Ralph J. Capitelli of Capitelli

and Wicker, APLC.

NEW ORLEANS, LOUISIANA  this _24_ day of ___June___,2003

                                    _____
                                              JUDGE

CERTIFIED ...
21360b
BY_____
DEPUTY C... RECORDER FOR
DOUG... JOHN
CLERK OF ... PARISH

19TH JUDICIAL ...
EAST BAT...
03 JUN 20 AM10: 56
DEPUTY CLERK OF COURT

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 302 of 323

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE LOUISIANA

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, LLC
AND ROBERT GUIDRY

POSTED

JUN 1 2 2003

SUIT NUMBER 464,607

DEPOSIT OK Amt. $5-02
CK# 47461
JUN 1 1 2003

BY _____
DY CLERK OF COURT

TREASURE CHEST CASINO, L.L.C.'S
NOTICE OF INTENT TO SEEK SUPERVISORY REVIEW AND
MOTION FOR FIXING TIME FOR FILING APPLICATION FOR WRITS

In accordance with Rule 4 of the Uniform Rules of the Courts of Appeal, defendant Treasure

Chest Casino, LLC ("TCC") hereby gives notice of its intent to apply to the Louisiana Court of

Appeal, First Circuit, for a Supervisory Writ of Certiorari from the judgment of the June 3, 2003

hearing, denying the defendant's exception of res judicata.

Further, upon suggestion that it is necessary for this Court to fix a reasonable time in which

TCC may file the application in the Court of Appeal, First Circuit, TCC moves that this Court issue

an order fixing a reasonable amount of time for TCC to file its Supervisory Writ in the Louisiana

Court of Appeal, First Circuit.

Respectfully submitted,

_____
Paul S. West, La. Bar Roll No. 13375
Juliann L. Keenan, La. Bar Roll No. 25740
MCGLINCHEY STAFFORD, PLLC
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825
Telephone (225) 383-9000
Facsimile (225) 343-3076

COUNSEL FOR TREASURE CHEST
CASINO, L.L.C.

REC'D C.P.
JUN 24 2003

REC'D C.P.
JUN 1 2 2003

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing has been mailed today, via United

States Mail, postage prepaid and properly addressed, to the following counsel of record:

Lanny R. Zatzkis, Esquire
ZATZKIS & ASSOCIATES
Suite 2750, Poydras Center
650 Poydras Street
New Orleans, LA 70130

Arthur A. Lemann, III, Esquire
ARTHUR A. LEMANN, III
  & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Robert A. Kutcher, Esquire
CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

Winston G. DeCuir, Esquire
DECUIR & CLARK, L.L.P.
1961 Government Street
Baton Rouge, LA 70806

Ralph Capitelli, Esquire
CAPITELLI & WICKER
Suite 2950, Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Baton Rouge, Louisiana on this ___10___ of June, 2003.

Paul S. West

CERTIFIED TO BE TRUE
201 11:38
DEPUTY CLERK OF COURT

2003 JUN 11 PH 4:26
DOUG WELBORN
DEPUTY CLERK OF COURT FOR EAST BATON ROUGE PARISH

# NINETEENTH JUDICIAL DISTRICT COURT

## PARISH OF EAST BATON ROUGE

### STATE OF LOUISIANA

| | |
|---|---|
| ALVIN C. COPELAND | NUMBER  464,607 |
| VERSUS | DIVISION D |
| TREASURE CHEST CASINO, LLC<br>and ROBERT GUIDRY | |

## ORDER

Considering the foregoing motion,

**IT IS HEREBY ORDERED,** that the Application for Supervisory Writs of Treasure

Chest Casino, LLC, must be filed with the First Circuit Court of Appeal by the ___3 0___ day of

_____, 2003.

Baton Rouge, Louisiana, this 2 0 day of _____ June _____, 2003.

_____

J U D G E

Respectfully Submitted:

_____

Paul S. West, Bar Roll No. 13375
Juliann E. Keenan, La. Bar Roll No. 25740
McGLINCHEY STAFFORD, PLLC
Ninth Floor,  One American Place
Baton Rouge, Louisiana  70825
Telephone:     (225) 383-9000
Facsimile:      (225) 343-3076

**PLEASE NOTIFY:**

Paul S. West, Esquire
Juliann L. Keenan, Esquire
McGLINCHEY STAFFORD, PLLC
Ninth Floor,  One American Place
Baton Rouge, Louisiana  70825

Winston G. DeCuir, Esquire
DECUIR & CLARK, L.L.P.
1961 Government Street
Baton Rouge, LA 70806

Ralph Capitelli, Esquire
CAPITELLI & WICKER
Suite 2950, Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Lanny R. Zatzkis, Esquire
ZATZKIS & ASSOCIATES
Suite 2750, Poydras Center
650 Poydras Street
New Orleans, LA 70130

Arthur A. Lemann, III, Esquire
ARTHUR A. LEMANN, III
  & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Robert A. Kutcher, Esquire
CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

**CHOPIN, WAGAR, COLE,**
**RICHARD, REBOUL & KUTCHER, LLP**
**ATTORNEYS AT LAW**

RICHARD A. CHOPIN †‡
NELSON W. WAGAR, III †‡
KEVIN L. COLE ‡
THOMAS M. RICHARD
BRIAN L. REBOUL
ROBERT A. KUTCHER *
ELIZABETH SMYTH SIRGO
NICOLE S. TYGIER

MICHAEL L. COHEN
DIANA L. TONAGEL
PATRICIA D. TUNMER
JUDITH A. MILLER £
MATTHEW D. MONSON
CYNTHIA J. THOMAS ∆○
JASON P. FOOTE
JAMES A. PRATHER
FRANK J. TOWERS
ANNE B. NYANDA
WILLIAM M. McGOEY

**NORTHSHORE OFFICE**

THREE SANCTUARY BOULEVARD
SUITE 301
MANDEVILLE, LOUISIANA 70471
TELEPHONE 985-674-6680
FACSIMILE 985-674-6681

TWO LAKEWAY CENTER
SUITE 900
3850 NORTH CAUSEWAY BOULEVARD
METAIRIE, LOUISIANA 70002
TELEPHONE 504-830-3838
FACSIMILE 504-836-9540
www.chopin.com

*Writer's Direct Number*
504-830-3824
*Writer's Direct Facsimile*
504-836-9573
ntygier@chopin.com

† *Professional Corporation*
∆ *Also Admitted in D.C.*
\* *Also Admitted in New York*
○ *Also Admitted in Puerto Rico*
‡ *Also Admitted in Texas*
£ *Registered Nurse, BSN*

*Please Reply to*
*Metairie Office*

July 16, 2003

<u>*Via Facsimile*</u>

The Honorable Janice Clark
Judge, Division "D"
19th Judicial District Court
Parish of East Baton Rouge
816 Governmental Building
222 St. Louis Street
Baton Rouge, LA 70802

   **Re:**  *Alvin C. Copeland v.*
     *Treasure Chest Casino, LLC and Robert J. Guidry*
     *19th JDC No. 464-607(D)*
     *Our File No. 245.2433*

Dear Judge Clark:

   As per your ruling at the hearing in the above captioned matter on July 14, 2003, enclosed please find an Order resetting the Motion to Quash for hearing on July 28, 2003, at 9:30 a.m.

   By copy of this letter to all counsel, I am notifying them of the rescheduled hearing date.

        Yours respectfully,

        Nicole S. Tygier

NST/jjw
*Enclosure*

REC'D C.P.
JUL 2 5 2003

The Honorable Janice Clark
July 16, 2003
Page 2


cc:    Arthur A. Lemann, III, Esq. *(w/enclosure)*
       Ralph Capitelli, Esq. *(w/enclosure)*
       Winston G. DeCuir, Esq. *(w/enclosure)*
       Paul S. West, Esq. *(w/enclosure)*

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                                   DIVISION "D"

### ALVIN C. COPELAND

### VERSUS

### TREASURE CHEST CASINO, L.L.C. and ROBERT J. GUIDRY

FILED:_____          _____
                                                        DEPUTY CLERK

## O R D E R

**ON MOTION** of the Louisiana State Police, Video Gaming Division, and the Louisiana Gaming Control Board to quash subpoena duces tecum directed to the entities;

It appearing that all parties with the exception of counsel for the movants were present in Court on July 14, 2003;

**IT IS HEREBY ORDERED** that the hearing on the Motion to Quash Subpoena Duces Tecum is hereby continued, to be set within fifteen (15) days of the original date, or on the 28th day of July, 2003, at 9:30 a.m., and that discovery is stayed pending that hearing.

**BATON ROUGE, LOUISIANA**, this _22_ day of ___July___, 2003.

_____
**JUDGE JANICE CLARK**

REC'D C.D.

JUL 2 5 2003

RICHARD A. CHOPIN †‡
NELSON W. WAGAR, III †‡
KEVIN L. COLE ‡
THOMAS M. RICHARD
BRIAN L. REBOUL
ROBERT A. KUTCHER *
ELIZABETH SMYTH SIRGO
NICOLE S. TYGIER
───────────────
MICHAEL L. COHEN
DIANA L. TONAGEL
PATRICIA D. TUNMER
JUDITH A. MILLER £
MATTHEW D. MONSON
CYNTHIA J. THOMAS ▵○
JASON P. FOOTE
JAMES A. PRATHER
FRANK J. TOWERS
ANNE B. NYANDA
WILLIAM M. McGOEY

# CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP
### ATTORNEYS AT LAW

TWO LAKEWAY CENTER
SUITE 900
3850 NORTH CAUSEWAY BOULEVARD
METAIRIE, LOUISIANA 70002
TELEPHONE 504-830-3838
FACSIMILE 504-836-9540
www.chopin.com

*Writer's Direct Number*
504-830-3820
*Writer's Direct Facsimile*
504-836-9573
rkutcher@chopin.com



**NORTHSHORE OFFICE**
THREE SANCTUARY BOULEVARD
SUITE 301
MANDEVILLE, LOUISIANA 70471
TELEPHONE 985-674-6680
FACSIMILE 985-674-6681

† *Professional Corporation*
▵ *Also Admitted in D.C.*
* *Also Admitted in New York*
○ *Also Admitted in Puerto Rico*
‡ *Also Admitted in Texas*
£ *Registered Nurse, BSN*

*Please Reply to
Metairie Office*

July 3, 2003

<u>***Via Facsimile and Overnight Mail***</u>

The Honorable J. Douglas Welborn
Clerk of Court
19th Judicial District Court
Parish of East Baton Rouge
222 St. Louis Street, Governmental Bldg.
Baton Rouge, LA 70802

>      Re:     *Alvin C. Copeland v. Treasure Chest Casino, LLC and Robert J. Guidry*
>              *Court of Appeal, 1st Circuit No. 2001-CA-1122*
>              *19th JDC No. 464-607(D)*
>              *Our File No. 245.2433*

Dear Mr. Welborn:

Enclosed please find the original and two copies of a Memorandum in Opposition to Motion to Quash Subpoena Duces Tecum. Please file the original into the record of the above captioned matter and return a stamped copy to me in the enclosed self-addressed, postage-prepaid envelope. Also, enclosed please find our check in the amount of $19 to cover the filing costs.

Should you have any questions, please do not hesitate to contact me.

Yours very truly,

Robert A. Kutcher

RAK/eb
***Enclosures***

transferred the entirety of his interests in Treasure Chest Casino, LLC, pocketing $113 million

paid to Guidry and family for their interests in Treasure Chest, L.L.C. in October of 1997, $85

million of which were allocated to Treasure Chest's "intangible license rights." As such,

Copeland is clearly entitled to documents reflecting or relating to transfers of interests in

Treasure Chest's license (Category No. 1), and, having failed to obtain them directly from Guidry

and Treasure Chest, should at least be able to obtain those documents in the hands of the

Division.

Moreover, Copeland is similarly entitled to production of documents reflecting or relating

to any transfers of any interests in licenses other than the license awarded to Treasure Chest

Casino (Category No. 2) to determine whether these other licensees were treated differently than

Treasure Chest. Evidence of different treatment is probative as to the corruption of the licensing

process, and any concerns about the confidentiality of the records of non-parties can easily be

allayed by a reasonable protective order prohibiting the dissemination of these records.

Considering the foregoing, Copeland respectfully prays that this Motion to Quash

Subpoena Duces Tecum be denied, and that this Court order the production of the documents in

question subject to whatever restrictions on dissemination outside the scope of this litigation this

Court may deem appropriate.

Respectfully submitted,

**CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP**

By: _____
    **ROBERT A. KUTCHER** (LSBA #7895)
    **NICOLE S. TYGIER** (LSBA #19814)
    Two Lakeway Center, Suite 900
    3850 North Causeway Boulevard
    Metairie, Louisiana 70002
    Telephone: (504) 830-3838
    Facsimile: (504) 836-9573

**Attorneys for Plaintiff, Alvin C. Copeland**

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 3rd day of July, 2003, served a copy of the foregoing pleading on all counsel for all parties, by facsimile and/or mailing same by United States Mail, properly addressed, and first class postage prepaid.



4

COMMUNICATION RESULT REPORT ( JUL 3 2003 12:57PM ) * * *

FAX HEADER: SUIT ACCT

TRANSMITTED/STORED : JUL. 3. 2003 12:46PM

| FILE MODE | OPTION | ADDRESS | RESULT | PAGE |
|-----------|--------|---------|--------|------|
| 928 MEMORY TX | | 915048369540 | OK | 1/1 |

**POSTED**

JUL 0 3 2003

--------------------------------------------------------
REASON FOR ERROR
E-1) HANG UP OR LINE FAIL          E-2) BUSY
E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION



# DOUG WELBORN
## CLERK OF COURT

### 19TH JUDICIAL DISTRICT
### PARISH OF EAST BATON ROUGE

Suit Accounting Dept.
P. O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

## FAX RECEIPT

From: Suit Accounting Department          Date: 7-3-03
Fax Number: (225) 389-3392                 Suit No.: 464607
To: _Kitchen_                               Division: B

_____ _Copeland_ ___ vs. ___ _Treasure Chest_ _____

Item(s) Received: _memo_

Amount Due (includes $5.00 Fax Fee and $.50 per page) $ _0 - due_

The Clerk of Court's office has received, by facsimile transmission, documents in the above referenced case. It has been filed as of this date. In accordance with R.S. 13:850 (B), the original and applicable fees should be forwarded to this office within five (5) days.

In accordance with 13:850 (B) (3), a transmission fee of $5.00 should be forwarded to the Clerk of Court with the original document. The fax filing fee is necessary even if filing in forma pauperis.

**NO FURTHER ACTION WILL BE TAKEN WITH THIS DOCUMENT
UNTIL THE ORIGINAL AND NECESSARY FILING FEES ARE RECEIVED
IN THIS OFFICE.**

**SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX-
ISSUANCE BY ORIGINAL REQUESTS ONLY!**

**PLEASE ATTACH THIS RECEIPT TO YOUR ORIGINAL.
IF FILING IN PERSON, NOTIFY FILING CLERK OF PREVIOUS FAX.**

_Deputy Clerk of Court for_
_Doug Welborn, Clerk of Court_

Acct. Dept. Form #6
Rev. 1/2000



# DOUG WELBORN
## CLERK OF COURT

### 19TH JUDICIAL DISTRICT
### PARISH OF EAST BATON ROUGE

Suit Accounting Dept.
P. O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392

www.ebrclerkofcourt.org

## FAX RECEIPT

From:      Suit Accounting Department      Date: _7-3-03_

Fax Number: (225) 389-3392      Suit No.: _464607_

To: _Katcher_      Division: _D_

_Copeland_    vs. _Treasure Chest_

Item(s) Received: _memo_

Amount Due (includes $5.00 Fax Fee and $.50 per page) $ _0 - due_

The Clerk of Court's office has received, by facsimile transmission, documents in the above referenced case. It has been filed as of this date. In accordance with R.S. 13:850 (B), the original and applicable fees should be forwarded to this office within five (5) days.

In accordance with 13:850 (B) (3), a transmission fee of $5.00 should be forwarded to the Clerk of Court with the original document. The fax filing fee is necessary even if filing in forma pauperis.

### NO FURTHER ACTION WILL BE TAKEN WITH THIS DOCUMENT
### UNTIL THE ORIGINAL AND NECESSARY FILING FEES ARE RECEIVED
### IN THIS OFFICE.

### SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX-
### ISSUANCE BY ORIGINAL REQUESTS ONLY!

### PLEASE ATTACH THIS RECEIPT TO YOUR ORIGINAL.
### IF FILING IN PERSON, NOTIFY FILING CLERK OF PREVIOUS FAX.

*Deputy Clerk of Court for*
*Doug Welborn, Clerk of Court*

Acct. Dept. Form #6
Rev. 1/2000

# CHOPIN, WAGAR, COLE, RICHARD, REBOUL & KUTCHER, LLP

## Attorneys at Law

# FAX COVER SHEET

> **THIS COMMUNICATION IS CONFIDENTIAL AND INTENDED ONLY FOR THE ADDRESSEE. ANY DISTRIBUTION OR DUPLICATION OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU RECEIVE THIS TELECOPY IN ERROR, PLEASE CALL SENDER IMMEDIATELY**

DATE:  July 3, 2003

A TOTAL OF __7__ PAGES (INCLUDING THIS COVER SHEET) IS BEING SENT

Sender's Direct Dial: **(504) 830-3820/3824**
Sender:        **Robert A. Kutcher/Nicole S. Tygier**
File No.:      **245.2433**

TO:            **Clerk's Office, 19th JDC**

FAX NO.:       **1 (225) 389-3392**

RE:            **Alvin C. Copeland v. Treasure Chest Casino, L.L.C. and Robert J. Guidry**

COMMENTS:

         cc:   The Honorable Janice G. Clark
               Division "D"           1-225-389-5327

Should you have any problems receiving this transmission, call Julie Wisecarver at (504) 830-3987.

# CHOPIN, WAGAR, COLE,
# RICHARD, REBOUL & KUTCHER, LLP
### ATTORNEYS AT LAW

RICHARD A. CHOPIN †‡
NELSON W. WAGAR, III †∆
KEVIN L. COLE ‡
THOMAS M. RICHARD
BRIAN L. REBOUL
ROBERT A. KUTCHER *
ELIZABETH SMYTH SIRGO
NICOLE S. TYGIER
──────────────
MICHAEL L. COHEN
DIANA L. TONAGEL
PATRICIA D. TUNMER
JUDITH A. MILLER £
MATTHEW D. MONSON
CYNTHIA J. THOMAS ∆o
JASON P. FOOTE
JAMES A. PRATHER
FRANK J. TOWERS
ANNE B. NYANDA
WILLIAM M. McGOEY

TWO LAKEWAY CENTER
SUITE 900
3850 NORTH CAUSEWAY BOULEVARD
METAIRIE, LOUISIANA 70002
TELEPHONE 504-830-3838
FACSIMILE 504-836-9540
www.chopin.com

*Writer's Direct Number*
504-830-3820
*Writer's Direct Facsimile*
504-836-9573
rkutcher@chopin.com

NORTHSHORE OFFICE

THREE SANCTUARY BOULEVARD
SUITE 301
MANDEVILLE, LOUISIANA 70471
TELEPHONE 985-674-6680
FACSIMILE 985-674-6681

† *Professional Corporation*
∆ *Also Admitted in D.C.*
\* *Also Admitted in New York*
o *Also Admitted in Puerto Rico*
‡ *Also Admitted in Texas*
£ *Registered Nurse, BSN*

*Please Reply to*
*Metairie Office*

July 3, 2003

<u>*Via Facsimile and Overnight Mail*</u>

The Honorable J. Douglas Welborn
Clerk of Court
19th Judicial District Court
Parish of East Baton Rouge
222 St. Louis Street, Governmental Bldg.
Baton Rouge, LA  70802

   Re:   *Alvin C. Copeland v. Treasure Chest Casino, LLC and Robert J. Guidry*
         *Court of Appeal, 1st Circuit No. 2001-CA-1122*
         *19th JDC No. 464-607(D)*
         *Our File No. 245.2433*

Dear Mr. Welborn:

   Enclosed please find the original and two copies of a Memorandum in Opposition to Motion to Quash Subpoena Duces Tecum.  Please file the original into the record of the above captioned matter and return a stamped copy to me in the enclosed self-addressed, postage-prepaid envelope.  Also, enclosed please find our check in the amount of $19 to cover the filing costs.

   Should you have any questions, please do not hesitate to contact me.

                  Yours very truly,

                  Robert A. Kutcher

RAK/eb
*Enclosures*

cc:     The Honorable Janice G. Clark *(w/enclosures via facsimile & Overnight Mail)*
        Arthur A. Lemann, III, Esq. *(w/enclosures via facsimile only)*
        Ralph Capitelli, Esq. *(w/enclosures via facsimile only)*
        Winston G. DeCuir, Esq. *(w/enclosures via facsimile only)*
        Paul S. West, Esq. *(w/enclosures via facsimile only)*
        Lanny R. Zatzkis, Esq. *(w/enclosures via facsimile only)*

RECEIVED TIME   JUL. 3.  12:41PM

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 464-607                                           DIVISION "D"

ALVIN C. COPELAND

VERSUS

TREASURE CHEST CASINO, L.L.C. and ROBERT W. GUIDRY

Filed:_____

JUL 0 3 2003

Deputy Clerk

BY CLERK OF COURT

**MEMORANDUM IN OPPOSITION TO
MOTION TO QUASH SUBPOENA DUCES TECUM**

**MAY IT PLEASE THE COURT:**

Plaintiff, Alvin C. Copeland ("Copeland"), respectfully submits this Memorandum in Opposition to the Motion to Quash Subpoena Duces Tecum filed in this matter on behalf of Louisiana State Police, Video Gaming Division ("Division") and Louisiana Gaming Control Board ("Board"), urging that this Court deny this motion and order the production of the documents sought in subpoenas directed to the Division and the Board.

In contrast to the more inclusive Requests for Production of Documents previously sent to Defendants, Robert Guidry ("Guidry") and Treasure Chest Casino, LLC ("Treasure Chest") on April 21, 2003, which included similar requests from the parties themselves, these Subpoenas sought the production of:

1) All documents reflecting or relating to any transfer(s) of any interest in Treasure Chest's License.

2) All documents reflecting or relating to any transfer(s) of any interest in a License other than the License awarded by Treasure Chest.

Although both the Division and the Board have filed this motion seeking to avoid the production of those documents they deem "confidential" pursuant to La. R.S. 27:21(A)(2), they fail to mention that Treasure Chest is a party to this proceeding, and further, fail to acknowledge that, unlike the Bank Disclosure Statute, La. R.S. 6:333, which provides extensive protection against the production of nonparty bank records, La. R.S. 27:21 does not prohibit the production of records pursuant to subpoena or court order. In fact, La. R.S. 27:21(B)(1) provides:

(B) Confidential information or data which is obtained by the board may not be revealed in whole or in part except in the course of the proper administration of this Title. However, the board or its authorized agents may reveal such information or data to an authorized agent of any agency of the United States Government or to any agent of this state, or of any political subdivision of this state, pursuant to rules and regulations adopted by the board, or **pursuant to a lawful order of a court of competent jurisdiction.**

(Emphasis added.)

Although Copeland is sensitive to the need to protect the confidentiality of third party information submitted to both the Board and the Division, this statute does not prohibit the production of these documents pursuant to court order, and Copeland is willing to enter into a protective order designed to protect against dissemination of information contained in these documents outside the scope of this litigation.

The extensive jurisprudence cited by the Board relating to protecting the confidentiality of third parties and their bank records is irrelevant to La. R.S. 27:21 and the facts of this case. However, to the extent that this Court might be inclined to read into the applicable statute a heightened standard of relevance to order the production of these documents, Copeland respectfully submits that the standard is clearly met with respect to the subpoena at issue despite the fact that the Board and the Division have not even challenged the relevance of the documents sought to the issues in this suit.

The central focus of this case is on the corruption of the licensing process by Treasure Chest Casino, operating through its prior principal, Robert J. Guidry, both of which have been served with Requests for Production seeking substantially the same documents in their possession. Neither Defendant has produced any documents, nor has either of them ever responded to these Requests for Production. The gravamen of Copeland's Petition is that, as a result of an "overarching corrupt conspiracy," i.e., a scheme to corrupt the entire process for issuing riverboat gaming licenses in which both Treasure Chest Casino, LLC and Robert Guidry participated and engaged in overt acts in furtherance of, a Riverboat Gaming license was not awarded to Copeland, but to Treasure Chest Casino, LLC. This was despite the fact that it was Treasure Chest Casino, **Inc.,** another corporation owned and controlled by Guidry which initially applied for a Certificate of Preliminary Approval from the Division. Subsequently, Guidry

2

transferred the entirety of his interests in Treasure Chest Casino, LLC, pocketing $113 million paid to Guidry and family for their interests in Treasure Chest, L.L.C. in October of 1997, $85 million of which were allocated to Treasure Chest's "intangible license rights." As such, Copeland is clearly entitled to documents reflecting or relating to transfers of interests in Treasure Chest's license (Category No. 1), and, having failed to obtain them directly from Guidry and Treasure Chest, should at least be able to obtain those documents in the hands of the Division.

Moreover, Copeland is similarly entitled to production of documents reflecting or relating to any transfers of any interests in licenses other than the license awarded to Treasure Chest Casino (Category No. 2) to determine whether these other licensees were treated differently than Treasure Chest. Evidence of different treatment is probative as to the corruption of the licensing process, and any concerns about the confidentiality of the records of non-parties can easily be allayed by a reasonable protective order prohibiting the dissemination of these records.

Considering the foregoing, Copeland respectfully prays that this Motion to Quash Subpoena Duces Tecum be denied, and that this Court order the production of the documents in question subject to whatever restrictions on dissemination outside the scope of this litigation this Court may deem appropriate.



Respectfully submitted,

*CHOPIN, WAGAR, COLE, RICHARD,*
*REBOUL & KUTCHER, LLP*

By: _____
    **ROBERT A. KUTCHER** (LSBA #7895)
    **NICOLE S. TYGIER** (LSBA #19814)
    Two Lakeway Center, Suite 900
    3850 North Causeway Boulevard
    Metairie, Louisiana 70002
    Telephone: (504) 830-3838
    Facsimile: (504) 836-9573

*Attorneys for Plaintiff, Alvin C. Copeland*

3

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 3rd day of July, 2003, served a copy of the foregoing

pleading on all counsel for all parties, by facsimile and/or mailing same by United States Mail,

properly addressed, and first class postage prepaid.



4

Case 3:10-cv-00603-BAJ-DLD   Document 6   10/07/10   Page 320 of 323
RECEIVED TIME   JUL.  3.  12:41PM

07980 110000

**NINETEENTH JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**



**STATE OF LOUISIANA**

ALVIN C. COPELAND                                    NUMBER 464,607

VERSUS                                                      DIVISION D

TREASURE CHEST CASINO, LLC
and ROBERT GUIDRY

COST OK TO Amt. _12_
_48300_
JUL - 7 2003
BY _____ _BP._
DY. CLERK OF COURT

___

**TREASURE CHEST CASINO, LLC'S MEMORANDUM IN SUPPORT OF THE
LOUISIANA STATE POLICE, CASINO GAMING DIVISION'S
MOTION TO QUASH**

A subpoena duces tecum was issued by Copeland in this matter, directed at Louisiana State Police, Casino Gaming Division ("Division") seeking certain documents relative to the "transfer of any interest" in Treasure Chest Casino, LLC and relative to the "transfer of any interest" in *any and all licenses* ever issued by the Division. (To the best of undersigned counsel's knowledge, this would include each and every license ever issued in that State of Louisiana as it appears that every license has had at least one, if not more, transfers of an interest.) The Division and the Louisiana Gaming Control Board have both appeared and filed motions to quash the subpoena. Treasure Chest Casino, LLC files this memorandum in support of the motion to quash, alternatively in support of a extension of the stay of discovery previously issued by this Court and alternatively, in support of a protective order.

1.      **Gaming Division's Motion to Quash should be granted.**

For the reasons set forth by the Division, Treasure Chest urges the Court to quash the subpoena as being overly broad and requesting confidential information. Treasure Chest adopts the arguments of the Division in this regard.

2.      **Alternatively, the Discovery Stay should be extended.**

On June 3, 2003, this Court issued a stay of all discovery for a period of thirty (30) day, which expired on July 4, 2003. Treasure Chest suggests to the Court that an indefinite extension of this stay is in order. As the Court is aware, there are presently three separate writ applications pending before the First Circuit Court of Appeal in this matter. Robert Guidry filed a writ application asking the First Circuit to review the ruling denying his exception of prescription (2003-CW-0706). If the writ is issued, then this matter will be dismissed in its entirety and any



discovery which was undertaken would have been a waste of time and resources. Additionally, Treasure Chest has filed a writ application concerning its exception of res judicata (2003-CW-1322). Again, if that writ is issued, Treasure Chest is dismissed from the suit and the discovery sought by Copeland would be meaningless. Lastly, Copeland has filed a writ application asking the First Circuit to decide the parameters of the causes of action presently pending in this matter (2003-CW-1184). Further, the First Circuit has asked for responses to that writ application indicating that the Court is making a careful examination of the application. Depending on what the First Circuit decides in that writ application, some or all of the requested discovery could become objectionable. Due to these uncertainties, Treasure Chest suggests that the Court extend the stay of discovery until these writ applications are decided by the First Circuit. Then, at that time, the scope of allowable discovery, if any, would be much clearer.

3.     **A Protective Order should be issued, if the Discovery Stay is not extended.**

The information sought by Copeland from the Division includes financial information of officers and directors of these licensees (including spouses), family information, investigative material, personal information and any manner of very confidential information. If the Court is considering ordering the production of any of this information, each licensee must be given an opportunity to reach a mutually agreeable protective order concerning the information including the right to review ALL documents prior to disclosure and the opportunity to designate material "Confidential: Subject to Protective Order." Keep in mind that Copeland asks for ALL information concerning the transfer of any license - this will include most, if not all, of the licenses ever issued in the State of Louisiana. Treasure Chest respectfully requests that, if any documentation will be released, ample time be given to reach an agreeable protective order.

**Conclusion**

The Division's motion to quash the subpoena duces tecum issued by Copeland should be granted, as the subpoena is overly broad and seeks to obtain information that is confidential. In the alternative, however, Treasure Chest asks that this Court extend its previous stay on discovery, due to the three writ applications pending at the First Circuit, which may likely alter the scope of discoverable information or obviate the need for discovery. If this Court is not inclined to extend the stay on discovery, a Protective Order should be issued to protect the sensitive and confidential

information of the gaming license holders, and time should be given to allow the licensees to come

to an agreeable Protective Order with Copeland.



Respectfully Submitted:

Paul S. West, La. Bar Roll No. 13375
Juliann L. Keenan, La. Bar Roll No. 25740
MCGLINCHEY STAFFORD, PLLC
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825
Telephone (225) 383-9000
Facsimile (225) 343-3076

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing has been mailed today, via United

States Mail, postage prepaid and properly addressed, to the following counsel of record:

Lanny R. Zatzkis, Esquire
ZATZKIS & ASSOCIATES
Suite 2750, Poydras Center
650 Poydras Street
New Orleans, LA 70130

Arthur A. Lemann, III, Esquire
ARTHUR A. LEMANN, III
 & ASSOCIATES
938 Lafayette Street, Suite 100
New Orleans, LA 70113

Robert A. Kutcher, Esquire
CHOPIN, WAGAR, COLE, RICHARD,
REBOUL & KUTCHER, LLP
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.
Metairie, Louisiana 70002

Winston G. DeCuir, Esquire
DECUIR & CLARK, L.L.P.
1961 Government Street
Baton Rouge, LA 70806

Ralph Capitelli, Esquire
CAPITELLI & WICKER
Suite 2950, Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Baton Rouge, Louisiana on this _7th_ of July, 2003.

Paul S. West